Vol. 12 -   1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
2                    EASTERN DIVISION

3    CARLA MARIE BARTLETT and              )
     JON WILLIAM BARTLETT,                  )
4                                           )
                    PLAINTIFFS,             )  CASE NO. 2:13-cv-170
5                                           )
          vs.                               )  SEPTEMBER 30, 2015
6                                           )
     E. I. du PONT de NEMOURS AND COMPANY, )  8:30 A.M.
7                                           )
                    DEFENDANT.              )
8    _____)

9

10                     VOLUME NO. 12
          TRANSCRIPT OF THE PROCEEDINGS OF THE JURY TRIAL
11            BEFORE THE HONORABLE EDMUND A. SARGUS, JR.
                UNITED STATES DISTRICT CHIEF JUDGE
12                      COLUMBUS, OHIO

13   FOR THE PLAINTIFF:

14      Levin Papantonio Thomas Mitchell Rafferty & Proctor, P.A.
        By:  James M. Papantonio, Esq.
15           Ned McWilliams, Jr., Esq.
             Christopher Paulos, Esq.
16           Timothy O'Brien, Esq.
        316 South Baylen Street, Suite 316
17      Pensacola, Florida  32502

18      Douglas & London, PC
        By:  Gary J. Douglas, Esq.
19           Michael A. London, Esq.
             Rebecca Newman, Esq.
20           Alicia P. Ellsayed, Esq.
        59 Maiden Lane, 6th Floor
21      New York, New York  10038

22      Taft Stettinius & Hollister
        By:  Robert A. Bilott, Esq.
23           David J. Butler, Esq.
        1800 Firstar Tower
24      425 Walnut Street
        Cincinnati, OH  45202

25

```
                                              Vol. 12  -     2
 1
              Schlichter, Bogard & Denton, LLP
 2            By:  Roger C. Denton, Esq.
                   Ashley Brittain Landers, Esq.
 3            100 South Fourth Street, Suite 900
              St. Louis, Missouri  63102
 4
              The Cochran Firm
 5            By:  David E. Haynes, Esq.
              1100 New York Avenue, N.W.
 6            Suite 340, West Tower
              Washington, D.C.  20005
 7
              Cory Watson Attorneys
 8            By:  Nina Towle, Esq.
              2131 Magnolia Avenue South
 9            Birmingham, Alabama  35205

10

11    FOR THE DEFENDANT:

12            Squire Patton Boggs LLP
              By:  Damond R. Mace, Esq.
13                 C. Craig Woods, Esq.
                   Stephanie E. Niehaus, Esq.
14                 Stephen Fazio, Esq.
                   Aaron T. Brogdon, Esq.
15            4900 Key Tower
              127 Public Square
16            Cleveland, Ohio  44114

17                           - - -

18

19            Proceedings recorded by mechanical stenography,
       transcript produced by computer.
20

21

22

23                    LAURA SAMUELS
               FEDERAL OFFICIAL COURT REPORTER
24             85 MARCONI BOULEVARD, ROOM 302
                  COLUMBUS, OHIO  43215
25             TELEPHONE NUMBER: 614-719-3245
```

Vol. 12 –   3

1                              WEDNESDAY MORNING SESSION

2                                  SEPTEMBER 30, 2015

3                                      –  –  –

4          Thereupon, the following proceeding was held in

5    chambers:

6              THE COURT:  So, we have three depositions to review?

7              MR. O'BRIEN:  Yes, Your Honor.

8              THE COURT:  Or four to be exact.

9              MR. O'BRIEN:  As I had indicated -- I'm sorry -- I had

10   an opportunity to review the Flarhety recast.  Hudson is still

11   ripe with opinion and hearsay.  There is still a lot of stuff

12   about the precision and accuracy of the testing and then what

13   did DuPont tell you they wanted, and that's hearsay.  So, we

14   still maintain our objection, Your Honor, as to the entirety of

15   the Flarhety deposition.

16             MS. NIEHAUS:  Your Honor, I mean, we did what we were

17   instructed to do.  We pared it back; it is now 12 minutes.  It

18   is limited to background for what he did and what he --

19             THE COURT:  Do you have something that I could follow

20   for what you are proposing?  I have read the whole deposition,

21   but I don't know the selected parts.

22             LAW CLERK:  I gave it to you yesterday.

23             THE COURT:  Oh, all right, then maybe I do have it.  I

24   don't have it handy if I do.

25             MS. NIEHAUS:  What I do have is --

1          THE COURT:  Just give me -- I am looking for a flavor,

2   to be honest with you.

3          MS. NIEHAUS:  Yes.  This is anything that's in gray is

4   what we have agreed to remove.

5          THE COURT:  All right.  So, what's left?

6          MR. MACE:  Non-gray is what we have narrowed it to.

7          THE COURT:  So, we have got the hearsay issue again.

8   I am looking at Page 128 and 129.  You start talking about the

9   type of work they have done in the past, quality assurance,

10  matrix effects.

11         MS. NIEHAUS:  Well, that's how he did the testing for

12  DuPont --

13         THE COURT:  Right.

14         MS. NIEHAUS:  -- and that's the method of testing that

15  was used.

16         THE COURT:  So, beyond the hearsay issue, what do you

17  see as the problem here?

18         MR. O'BRIEN:  Comments about precision and accuracy of

19  the testing, which are opinions.  It is not like -- is it four

20  inches by six inches, which would be a fact.  It is the subject

21  of analysis, was it precise and was it accurate.

22         THE COURT:  Okay.  So, we have got that issue.  Then,

23  the hearsay issue, how do you respond to that?

24         MS. NIEHAUS:  The hearsay issue or the precision and

25  accuracy issue?

Vol. 12 –    5

1          THE COURT:  I think I understand the precision and

2     accuracy.

3          MS. NIEHAUS:  Okay.  Well, I mean, what DuPont told

4     him and what he understood DuPont to have told him to do is

5     very relevant to -- I mean, the issue of whether DuPont was

6     intentionally falsifying its results.

7          THE COURT:  I mean, usually the hearsay is relevant,

8     that's a given, but I mean, what he did is not hearsay, but

9     what they told him, that's what I want to focus on.

10          MS. NIEHAUS:  Well, I mean -- so, you are looking at

11     128, I think, Your Honor?

12          THE COURT:  Yeah, that's probably where it starts.  I

13     have a received call from Mary Kaizer.  Yeah, that part is not

14     hearsay, but then it goes on to say "she said".  We can purge

15     the hearsay.

16          I mean, did she come on a visit?  That's not hearsay.

17     Did you have a conversation?  That's not hearsay.  What she

18     said is.  So, let's take the hearsay out, and let's go back to

19     the other issue right now.

20          MR. MACE:  And on that, Your Honor, it is not so much

21     an opinion that he is giving, he is talking about the QA, QC

22     process he used to try to insure a good result.  It is the

23     factual of what he did.  It is his personal observation.

24          THE COURT:  The issue is not whether he could

25     testify -- he could -- but it is the designation that we are

1    talking about.  So, he is talking about normal practice.

2         And, of course, the accuracy is the only reason for his

3    testimony, right?  So, if we exclude that, I mean, there is

4    really not a whole lot of relevance, is there?

5         MS. NIEHAUS:  Well, it is his belief as to the

6    accuracy of the testing and his belief as to what DuPont wanted

7    him to do.  I mean, it is the case that we cited in our

8    opposition, Your Honor, where the fact consultant was permitted

9    to testify about his own measurements of the trailer.  I don't

10   know if you recall the case that we cited in our opposition to

11   motion in limine Number 5 -- I don't remember the name of it

12   off the top of my head --

13        THE COURT:  You don't?

14        MS. NIEHAUS:  Gerling, maybe?  But don't hold me to

15   that.  But, you know, the consultant was permitted to testify

16   about his own measurements, whether they complied with

17   standards.

18        MR. O'BRIEN:  Yeah, but that's facts.

19        MS. NIEHAUS:  That's fact testimony.

20        THE COURT:  I can see this a couple of different ways.

21   I mean, it would have been so much easier, I think, to depose

22   him as an expert, and this whole thing would disappear.

23        MS. NIEHAUS:  We don't see him as a expert,

24   Your Honor.

25        THE COURT:  So, we need a decision.  So, go ahead.

1    You get the last word.

2        MR. BILOTT:  Our concern, Your Honor, if you look at

3    the language that was used by Mr. Flarhety, it is clear that

4    they were intending to track the language from the expert

5    report on the plaintiff's side about precision, accuracy,

6    representativeness, sensitivity -- those are all -- anything

7    dealing with those kinds of assessments is pure expert opinion,

8    and they have an expert, Dr. Snyder.

9        MR. MACE:  We removed all of that though, Your Honor.

10   And the part where he went through each of those terms and what

11   they meant -- even though I would say that that is still

12   factual testimony, we removed all of that.

13       THE COURT:  I think I have gotten this in terms of

14   what your positions are, but give me a second here.

15       (Judge is marking the deposition.)

16       THE COURT:  All right.  So, I am taking out the

17   hearsay and, you know, generally describing -- a test taken is

18   not by itself expert testimony, but he bleeds into that a

19   couple of places here when he is describing what's coming out.

20       Quantifiable, that's an opinion.

21       But in terms of what DuPont wanted from him, that will

22   stay in.  In terms of, you know, was he asked to throw the

23   results, basically, and he says emphatically no.  That has been

24   some issue in the case.  So, I kind of skimmed back as much

25   expert stuff as I can.

1          MR. O'BRIEN:  Your Honor, so that was their

2    designations.  We, of course, have counter designations, which

3    I would request some guidance on because, obviously, we are

4    going to recast our counter designations in light of the

5    Court's ruling, if it is not responsive or if it was responsive

6    to what has been excluded.

7          One of the major objections that defendant has presented

8    to our counter designations is a lack of a chain of custody.

9    And that's a fact.  So, I would just request guidance that the

10   failure to have a chain of custody of the samples can be

11   permitted to be displayed to the jury or shown to the jury.

12         THE COURT:  In other words, you are questioning about

13   documents that show what his samples were?

14         MR. O'BRIEN:  Right, the samples he received because

15   he is purporting to say these were samples from "X", and he has

16   no chain of custody to prove that's true.

17         THE COURT:  And you have objected to that?

18         MR. O'BRIEN:  No.  We presented the chain of custody

19   just to impeach his testimony that -- that this is what it

20   purports to be, samples from --

21         THE COURT:  Well, can I see it?  I just don't want to

22   decide it in the abstract.

23         MS. NIEHAUS:  Your Honor, so here is the testimony.

24         THE COURT:  Well, I mean, I need to digest this, too.

25         MS. NIEHAUS:  That's fine.

1          THE COURT:  Do you have a clean copy of what your

2     counter designations are and what your objections are?

3          MR. O'BRIEN:  Your Honor, we can get that to you, but

4     I have the combined one.  I have theirs combined with mine, but

5     I can give you our PC.

6          MS. NIEHAUS:  This will include some of what you just

7     struck, but this is what we had originally exchanged with

8     plaintiff, counter designations in blue here.

9          MR. MACE:  I think what Mr. O'Brien is suggesting is

10    he will truncate that to just what he is offering.

11         MS. NIEHAUS:  Okay.  And they would be our objections

12    to their counter designations.  And the chain of custody piece,

13    I mean what is left of Mr. Flarhety's designations, I don't

14    believe there is any indication of where the samples came from,

15    just that he was sampling.  So, the chain of custody issue, he

16    said it came from here, and it actually didn't -- there is no

17    direct testimony about that anyway.

18         THE COURT:  Again, you have seen it, and I haven't.  I

19    need to look at it so that I have an idea what the issue is,

20    okay?

21         Then, we have -- I want to get into both Graham and

22    Sykes.

23         And let me just start by saying -- I guess there is -- I

24    guess we could call it post stipulations.  I have been giving

25    these instructions on both the livestock and birth defects, but

1    that doesn't mean the issue is agreed upon.  I don't mean to

2    imply that, particularly when it comes to DuPont's conduct.

3    But the issue with both of these is whether they are opinions

4    or not, right?

5            MS. NIEHAUS:  Well, they are experts.

6            THE COURT:  They are experts.  But I thought one of

7    the complaints is that they weren't designated as experts in

8    this case?

9            MR. PAPONTONIO:  No, it was that the deposition

10   testimony was not designated in time in compliance with the

11   Court's CM 09.  That was the issue.

12           The second issue is they are available.  And so under FR

13   32, they haven't shown a lack of availability.  So, it is not

14   proper for a retained expert that they have control of to play

15   the discovery deposition of that expert.  And we relied upon

16   that, particularly, in light of the fact that there was no

17   deposition designation for these.

18           The other objection -- group objections is, what is the

19   relevance of this?  In other words, is it to prove the truth of

20   the limiting instruction that the Court has already given on

21   both of these issues, that is the birth defect and the cattle?

22   So, you know, for all of these reasons, Your Honor, we think

23   that if a witness is going to offer this opinion, it ought to

24   be live so that a foundation can be laid as to the relevance of

25   the testimony.

```
1              THE COURT:  Well, the jury has heard some testimony

2     about both of these topics, so the fact is -- and we don't have

3     quite a stipulation.  We are close to it.  That doesn't bar

4     you.  As long as the evidence is competitive and not

5     cumulative, I won't decide it on that basis that you can't

6     offer this.

7              MR. MACE:  If I can summarize on his three points --

8              THE COURT:  Let me finish.

9              MR. MACE:  Okay.

10             THE COURT:  But the issue about live, why can't they

11    be here?

12             MR. MACE:  Well, it is because -- Your Honor, we had

13    moved to try to keep these issues out completely.  Your Honor

14    has come up with a ruling that basically has given some

15    limiting instructions but left open for the plaintiffs to put

16    in evidence on DuPont's response, what was DuPont's response to

17    this in evaluating DuPont's conduct.  So, it is a very, very

18    narrow -- these experts were initially designed to cover the

19    whole waterfront.  What we have done is truncated what we are

20    designating to just on the issue of the response.

21             But, Your Honor, has discretion under Rule 32 -- I think

22    it is (b) -- 2(e) something -- to allow this under appropriate

23    circumstances.  We think these are appropriate circumstances

24    because of the somewhat unique situation that we are in.  The

25    main part of the expert's opinion has now been resolved by the
```

1   limiting instruction, but since we have allowed the plaintiffs

2   to get into DuPont's response -- so, each of these experts talk

3   about what DuPont's response was.  We tried to narrow the

4   designations down to I think --

5           THE COURT:  My recollection with regards to the

6   birthing issue, I think that's been made very clear to the

7   jury, nobody has claimed that.  We have had a lot more

8   discussion about the cattle.  The ruling you are referring me

9   to is --

10          MR. PAPONTONIO:  32(b).

11          MR. MACE:  32, you said?

12          MR. PAPONTONIO:  I seem to remember, Your Honor.  I

13  agree.  It is a discretionary issue.

14          THE COURT:  Okay.  The party may use for any purpose

15  the deposition of a witness.

16      Are you talking about availability of a witness or by an

17  expert?

18          MR. PAPONTONIO:  That's the problem here, Judge.

19  These are expert witnesses.

20          MR. MACE:  It is (e)(1) here (pointing).  I'm sorry,

21  Mike.

22          THE COURT:  Okay.  So, unavailable witness on motion

23  and notice of exceptional circumstances make it desirable in

24  the interests of justice and with due regard in the importance

25  of live testimony in open court to permit the deposition.

Vol. 12 -   13

1    That's what you are asking to do?

2            MR. MACE:  Yes, Your Honor.

3            THE COURT:  And to even consider that, I have to know

4    why they can't be here.

5            MR. MACE:  That's because they have these surgical

6    schedules and things, and they are many states away.

7            THE COURT:  But one is a veterinarian, right?

8            MR. MACE:  One is a veterinarian, yes, sir.

9            THE COURT:  And the other one is retired?

10           MS. NIEHAUS:  He is semi-retired.  He still has clinic

11   twice a week.

12           THE COURT:  In West Virginia?

13           MS. NIEHAUS:  No, no.  He is in California.

14           THE COURT:  And the veterinarian is in?

15           MR. MACE:  The East Coast -- I am not sure if it is

16   Delaware.

17           MS. NIEHAUS:  I don't know where he is.

18           MR. PAPONTONIO:  If I could respond?  It is the same

19   problems we run into, it is getting people here.  There is no

20   exceptional circumstances here.  There really is none at all.

21   As a matter of fact, the approach to this case has been to try

22   to -- and again, it is just lawyering, I am not taking

23   exception to it -- but to try the case without the experts

24   showing up, without cross-examining, is just not fair.

25           THE COURT:  But I mean, I am just reading this.  This

1   is a rule, five parts.  One is just beyond 100 miles within the

2   subpoena power of the Court.  But you are not relying on that?

3           MR. PAPONTONIO:  No, sir.  But, I mean, that's true.

4           MR. O'BRIEN:  But they have control of the witness.

5   That's for someone you don't have control of.  They have

6   control, they pay them tens of thousands of dollars.

7           MS. NIEHAUS:  It goes back to what we talked about

8   with Flarhety, though, the issue of unavailability outside 100

9   miles.  It is not whether we have made any effort to bring them

10  here, extraordinary effort to bring them here, it is whether we

11  have actively prevented them from being here.

12          THE COURT:  What makes this hard is these are two

13  issues that I think of as extremely collateral to the matter.

14  You know, we have these limiting instructions that tried to

15  keep them fenced out.  It didn't do it entirely.  I think their

16  testimony should be relatively short, in all honesty, but on

17  the other hand, there has to be due process here.  I want to

18  task you to find out if they can be here.  Let's answer that

19  question first.  I am assuming they are not coming on today, in

20  any event, even with the depositions.

21          MR. MACE:  No, sir.

22          THE COURT:  All right.  That's the best we can do with

23  that.  All right.  That's all that I have.  Anything else?

24          MR. BILOTT:  Your Honor, there was one issue.  I know

25  we raised it yesterday with the sidebars with Dr. Playtis

1    yesterday, and that's this line between fact witness testimony

2    and expert testimony.  And to try to avoid a lot of sidebars

3    today, we just want to make clear what our concerns are with

4    two of the witnesses, the first two witnesses today, Dr.

5    Dourson and Mr. Hartten.  And with Dr. Dourson --

6                 THE COURT:  These are not disclosed as experts?

7                 MR. BILOTT:  Correct.  And just so the Court is aware,

8    Dr. Dourson was the toxicologist from TERA, which we have heard

9    a lot about who worked on the CATT team report.  Dr. Dourson

10   was previously disclosed by DuPont in the original Leach case

11   as an expert who was going to come in and talk about the CATT

12   team report, how it was designed, how it was developed, the

13   reasonableness of the number, etc.  In this case, Dr. Dourson

14   has not been disclosed as an expert.

15        And our concern is, we have seen the CATT team report a

16   number of times.  DuPont had a toxicologist on that team, Dr.

17   Kennedy and could have brought Mr. Kennedy in as a toxicologist

18   to talk about how this was derived, whether it is reasonable,

19   whether the number was adequate, what was known at the time,

20   etc.  They have chosen not to bring Dr. Kennedy.  Instead, they

21   are bringing Dr. Dourson, but again, only as a fact witness.

22                 THE COURT:  And his medical background is?

23                 MR. BILOTT:  He is a toxicologist.

24                 THE COURT:  So, he is an undisclosed expert, but you

25   are going to bring him on as a fact witness?

1          MR. BILOTT:  Yeah, and our concern, Your Honor, we

2    want to make sure he is not discussing the adequacy of that

3    CATT team number, how it was derived, whether it was reasonable

4    or not, whether it represents what was known at the time.

5    Those are all expert opinions.

6          THE COURT:  Let's hear from them.

7          MR. MACE:  Yes, Your Honor.  I am planning a narrow

8    examination for Dr. Dourson.  And it is really to rebut these

9    allegations that were made by the plaintiffs' experts that

10   these CATT teams was a bunch of individuals who weren't

11   qualified, had conflicts of interest.

12         THE COURT:  He will come on and give a different view

13   of the process?

14         MR. MACE:  Right.  His observations from being

15   personally involved, how he got involved, the different people

16   involved.

17         THE COURT:  So, none of that is expert testimony at

18   that point?  So, you are not planning on opinions about the

19   numbers arrived and standards set and so on?

20         MR. MACE:  No, sir.

21         MR. BILOTT:  We didn't want the CATT team put up as an

22   expert report of Dr. Dourson and him walking through it and

23   telling the jury this is how we did it and this is why it was

24   reasonable.  So, that would be expert testimony, in our view,

25   Your Honor.

1      THE COURT:  Well, the process does not seem to be in

2   any way off limits.

3      MR. MACE:  And I have been trying to notify counsel

4   the night before, but last night turned into this morning.  So,

5   the only exhibits I am planning to use -- I am not sure who is

6   covering him on your side -- is his CV.  I was going to use the

7   CATT report and signature pages from the CATT report.

8      THE COURT:  On the CVs, we have an understanding that

9   you want them to all go back?  I have done it both ways.  It is

10   all or nothing.

11      MR. MACE:  I want them all to go back.

12      MR. PAPONTONIO:  No, no, Judge.  It is all hearsay.

13      THE COURT:  Some of these CVs in these cases go for

14   100 pages and rather than have someone read through it all,

15   they can stipulate.  But they all go back or to none go back.

16   It is not going to be selective.

17      MR. PAPONTONIO:  Judge, we prefer they not go back.

18      MR. MACE:  And we prefer they all go back.

19      THE COURT:  Well, you haven't put an expert on yet.

20   Your feeling is your direct was sufficient and you don't

21   want -- you know, the problem is you are going to end up having

22   Mr. Mace spending a lot of time on the CV.

23      MR. BILOTT:  Well, Your Honor, when plaintiff went

24   through the expert qualification, I think it was done in a

25   pretty efficient way.  It can be done fairly briefly.

1          THE COURT:  Well, I just want to say to you, if it not

2    going in, you decide how much you want to use on the

3    credentials.  Normally, I would say don't use a whole lot, but

4    if we are not sending the CV back, I will give it more leeway.

5          MR. BILOTT:  But, again, Dr. Dourson is not one of the

6    experts.

7          THE COURT:  Yeah, that's right.

8          MR. MACE:  But his CV was relevant in that the

9    allegation was made that these people were basically industry

10   shells and they didn't know they were doing.

11         THE COURT:  I understand.  But his CV would not go

12   back for sure in this case if he is not an expert, but

13   certainly, he can testify to it.

14         MR. MACE:  All right.  The only other thing that is

15   not one of the marked exhibits, and I am only using it as a

16   demonstrative is their funding list that is off of their

17   website.

18         MR. O'BRIEN:  One in 2001?

19         MR. MACE:  2002.

20         MR. O'BRIEN:  53 percent of the industry?

21         MR. MACE:  You picked out that number.

22         MR. O'BRIEN:  I am sure we will hear the other number,

23   too.

24         MR. PAPONTONIO:  Judge, I wanted to get something on

25   the record because we are guests in your court.  And it

Vol. 12 -    19

1  bothered me yesterday when I left the courtroom.  We, I think

2  on behalf of all of us, have tried to cooperate, do everything,

3  provide documents, give notice when a slide is going to go up.

4  Yesterday, I put that slide up totally by mistake.  It is

5  because we have a lot of cooks in the kitchen.  And I didn't

6  want the Court to think that there was any intent there.  We

7  are going to be working together a long time, and I don't

8  operate like that.

9       THE COURT:  No, I didn't take it that way.

10       MR. PAPONTONIO:  I also -- the thing with the three

11  cancers, what I was trying to say, I was trying to go back to

12  the doctor's testimony, that he talked about the different

13  types of kidney cancer.

14       And the third thing I can assure you I did not mean to

15  call Mr. Brogdon "Mr. Brodhead".

16       I didn't want to leave the courtroom -- these things

17  bothered me anyway because I think we have done a pretty good

18  job of everybody getting along.  And I think credibility is

19  critical.  I wanted to clear the air.

20       THE COURT:  I think that reviewing these before we go

21  in, too.  There are so many documents.  I can see making a

22  mistake on what is displayed.

23       MR. MACE:  And I didn't mean to get riled yesterday,

24  Judge, and I didn't mean there was any intent behind that, but

25  it is just this has been a hard-fought battle.

Vol. 12 -    20

1          THE COURT:  I noticed.

2          MR. MACE:  And we have things we have agreed to.

3          MR. BILOTT:  Your Honor, we have talked about Dr.

4    Dourson.  Just again, to try to avoid a bunch of sidebars today

5    with Mr. Hartten, it is a similar issue that we had with Dr.

6    Flarhety.  Hartten has done a lot of water sampling for DuPont,

7    has overseen a lot of the activity with DuPont, going out and

8    taking water samples.  And, again, as you have already

9    indicated, he can talk about what he did, what he collected.

10   But he was previously disclosed by DuPont in other cases as an

11   expert on these methods.  We just don't want him, again,

12   crossing that line.  So, that's our only concern with Mr.

13   Hartten.

14         MR. MACE:  Your Honor, to clean up issues that neither

15   one should take too much time.  One is with regard to one of

16   the witnesses today, Dr. Cohen.  So, he has given some

17   testimony in the State legislature in Nebraska and in Congress

18   about fetal tissue issues.  This would be a highly sensitive

19   issue to the jury and has no bearing on any issues in this

20   case.  But similar to the Court's exclusion of gun control for

21   one of the plaintiff's experts, we would ask that plaintiff be

22   prohibited from inquiring about his testimony on fetal tissue.

23         THE COURT:  It doesn't tie into this case at all, does

24   it?

25         MR. MACE:  No.

1          MR. PAPONTONIO:  Gary needs to know that.

2          MR. BILOTT:  Okay.

3          MR. MACE:  And the fourth thing, Your Honor, I know we

4   have been throwing an awful lot at the jury and you and

5   everybody else involved.  But let me give one to counsel.

6          When we were asking for instructions, and there was

7   quite a bit of process between the parties and the Court to

8   come up with what you were going to tell the jury about the

9   general causation stipulation.  We have gone back and looked at

10  the record the numerous times it has been described to the

11  jury, and I know it is under the heat of fire, but it has

12  gotten looser and looser as time has gone on in this trial, but

13  two of the things that were critical for us, that Your Honor

14  had agreed to, is that we would tell them the year, that these

15  findings were made in 2012 because timing is important, in

16  evaluating the conduct of DuPont, and number two, capable of

17  causing --

18         THE COURT:  Well, let them read it.  We will talk

19  about it again.  We will talk before I give the instruction

20  again.

21         MR. BILOTT:  Is DuPont proposing a different limiting

22  instruction than what was agreed to?

23         MR. MACE:  No, we just want the one read the way it

24  was agreed to.

25      (End of chambers discussion.)

```
                                                Vol. 12 -   22
 1                         - - -

 2        Thereupon, the following proceedings were held in open

 3   court with jurors present at 9:04 a.m.

 4            THE COURT:  Good morning, ladies and gentlemen.

 5   Welcome back.  I'm sorry to report that Mr. Quisumbing is sick

 6   this morning.  I want to thank Ms. Sherry Nichols for filling

 7   in for him.  She's normally with Magistrate Judge Deavers.

 8            With that, DuPont may call its next witness.

 9             MR. MACE:  Thank you, Your Honor.  The defense calls

10   Dr. Michael Dourson.

11      (Witness sworn.)

12            THE COURT:  Mr. Mace, whenever you're ready, you may

13   proceed.

14             MR. MACE:  Thank you, sir.

15                         - - -

16                     MICHAEL DOURSON, PH.D.

17     Called as a witness on behalf of the Defendants, being first

18   duly sworn, testified as follows:

19                      DIRECT EXAMINATION

20    BY MR. MACE:

21    Q.   Good morning, Doctor.

22    A.   Top of the day to you.

23    Q.   Could you state your name, please?

24    A.   Michael Leonard Dourson.

25    Q.   Where do you currently work?
```

Vol. 12 –   23

1    A.   University of Cincinnati College of Medicine.

2    Q.   What do you do there?

3    A.   I'm a research professor in environmental health.  And

4  we do risk assessment, risk research and then risk

5  communication to the public.

6    Q.   Could you please take us through your educational

7  degrees.

8    A.   I got my bachelor's of biology at University of

9  Wittenberg in Springfield, Ohio.  Then I went down to the

10  University of Cincinnati and got a doctorate in toxicology from

11  the College of Medicine, the place I now have returned to work.

12  I also along the way got certified in toxicology, American

13  Board of Toxicology certification.  And I've had some executive

14  training with the U.S. government.

15         MR. MACE:  May I approach the deputy clerk, Your

16  Honor?

17         THE COURT:  You may.

18  BY MR. MACE:

19    Q.   Doctor, we've handed you what's been marked as Exhibit

20  D2455.  Do you recognize that?

21    A.   Yes, I do.

22    Q.   What is it?

23    A.   That's my resumé.

24    Q.   If we could bring that up, please.  Will you bring up,

25  please, from the top down through the employment?

Vol. 12 -    24

1          Doctor, there's some letters after your name.  What's

2    the Ph.D.?

3     A.    That's doctor of philosophy in toxicology.

4     Q.    The DABT?

5     A.    Diplomate of the American Board of Toxicology.  That's

6    one of the certifying bodies.

7     Q.    ATS?

8     A.    The Academy of Toxicological Science, another certifying

9    body.

10    Q.    Could you take us through, let's start at the bottom on

11    your employment and take us through your employment history

12    briefly.

13    A.    Sure.  Briefly.

14          MR. DOUGLAS:  Your Honor, I hate to interrupt but I

15    want some clarification if we could have a quick side-bar.

16          THE COURT:  You may stand if you wish, ladies and

17    gentlemen.

18          I'll see you at side-bar.

19                          - - -

20     Thereupon, the following proceeding was held at side-bar:

21          THE COURT:  I think the matter you're going to bring

22    up we just discussed.

23          MR. DOUGLAS:  I apologize for not being there.  But I

24    just want to be sure but since it's not going to go to the jury

25    whether it's proper to display it on the screen at all.

Vol. 12 -    25

1          THE COURT:  I don't remember what we did with your

2    witnesses.  Did we do that?

3          MR. DOUGLAS:  I didn't use any resumés.

4          MR. MACE:  I would still argue it goes back but,

5    regardless, I should be able to use it as a demonstrative.

6          THE COURT:  It's not going to be an exhibit.  Without

7    an agreement it won't be an exhibit.  I prefer they all go

8    back.  We can still do that if you wish.  He's going to testify

9    to this anyway.

10                             - - -

11       Thereupon, the following proceedings were had in open

12    court:

13     BY MR. MACE:

14     Q.   If you could continue with your employment history.

15     A.   I got my Ph.D. from University of Cincinnati in 1980.

16    Then went across the street and worked for the Environmental

17    Protection Agency as a staff-level toxicologist; worked in EPA

18    for 15 years at various positions, as you can see.  Did some

19    time in Washington, D.C.

20     Q.   Let me just ask a few specifics.  So the acceptable

21    daily intake group, what did that entail?

22     A.   Well, back in 1984 we had the National Academy of

23    Science came up with a new way of managing risk assessment in

24    the federal government.  There was a lot of confusion.  USEPA

25    took that to heart and one of the things they did is they put

1    together an acceptable daily intake group within our unit to

2    summarize risk values of ADIs that we had already done and that

3    group interacted with other EPA groups that were doing similar

4    work.  That led to some interagency work groups with this

5    particular idea, ADI, acceptable intake of the chemical in

6    mind.

7      Q.   You have methods evaluation development.  What did that

8    entail?

9      A.   Part of the National Academy of Sciences' work had to do

10   with new ways to assess risk and so commonly what we've done is

11   we don't experiment on people, we experiment on animals and try

12   to judge the safe level of a chemical from the animal exposure.

13   And the animals, of course, are treated ethically.  The point

14   being is we do this for all chemicals because all chemicals are

15   toxic.  There's always new methods and new approaches to do

16   this better.  That's what our group is charged with doing.

17     Q.   You mentioned the National Academy of Sciences a couple

18   times.  What is that group?

19     A.   Well, it's a -- the National Academy of Sciences is a

20   nonprofit group that does a lot of work for the federal

21   government but it's high level -- they're scientists from all

22   walks of life but they're the A team, the top of the line,

23   usually, and they will do different tasks.  So one of them was

24   to develop this idea of risk assessment in the federal

25   government managing the process.  That was one of their tasks

Vol. 12 -   27

1   to do that.

2      Q.   Then you went to methods evaluation and development.

3   What was that?

4      A.   We talked about the developing methods a little bit

5   already.  But after that was, I went to Washington, D.C. and

6   spent a year there in the pesticides and toxics team.

7      Q.   What did that involve?

8      A.   What that involved was I was part of research and

9   development.  EPA is a large organization, and research and

10   development has a lot of aspects to it.  One of the

11   coordinating functions that I served as a chief of this team is

12   to talk to our counterparts in EPA's office at Pesticides and

13   Toxic Substances and take the research that folks were doing in

14   that part of EPA and translate it over to the needs of the

15   folks that were evaluating pesticides and chemicals, toxic

16   chemicals like in your window spray.  What's a safe level of

17   that?  And so we would -- I was doing the translation between

18   the two EPA groups.

19      Q.   Let's go up to this one, the systemic toxicants

20   assessment branch.  What did that group?

21      A.   After I did my gig in Washington, D.C. I returned to my

22   home office in Cincinnati, Ohio and that particular group was

23   charged with doing assessments for safe levels of chemical in

24   water.  We also did Superfund site risk assessment work there

25   and we had a variety of tasks that worked for primarily EPA's

Vol. 12 –    28

1   program offices, the Office of Water and the Office of Solid

2   Waste and Superfund.

3   Q.    Then you've got toxicology excellence for risk

4   assessment.  What's that group?  How did it get started?

5   A.    Okay.  So, mid-level managers are being bought out by

6   EPA.  Bill Clinton was offering these buyouts.  I had been 15

7   years in the federal government, learned a lot but was looking

8   for something perhaps different so I took the buyout, which was

9   pretty meager in retrospect, and ended up starting a nonprofit

10  organization.  To get an Ohio nonprofit is quite easy.  It's

11  $25 at the time.  But then we had to get a 501(c)3 tax

12  exclusion.  We ended up getting that.  For the last 20 years

13  we've been doing work with various parties.

14      About two-thirds of our work is government and other

15  nonprofits, and about one-third is industry or industry

16  nonprofits.  And what we do is we build collaborations between

17  parties.  We've got a lot of examples of that.

18  Q.    What's the mission of that group?

19  A.    It's to provide information to protect the public

20  health.

21  Q.    And now you said you're over at the University of

22  Cincinnati?

23  A.    Yeah.  I've been there for two months as a research

24  professor.  I'm still learning what that means.

25  Q.    All right.  If we could go lower on the page.

1     In terms of teaching, have you lectured in graduate

2  level?

3    A.   Yeah.  I've actually done -- since we're close to the

4  University of Cincinnati and the College of Medicine, and since

5  I'm an alumni, they've invited me to give lectures every year,

6  nearly, since I've been out.  Well, probably not the first

7  couple years.  But after I started with TERA I would go over

8  and lecture on a routine basis.  I've given some lectures to

9  high school students.  That's a challenge.  I admire teachers.

10   Q.   Sir, your CV is 30 pages.  I'm not going to go through

11  all of it.

12   A.   Thank you.

13   Q.   We're trying to make some progress here.  But if we

14  could look over at page 13.  You have a section on research

15  risk assessment publications.  Have you done quite a few papers

16  and peer-review literature on that?

17   A.   Yeah.  It's probably near 150.  I lost count of them

18  after 100.  So I just put in what I think is important.

19   Q.   You have a section over on page 28 about awards.  Have

20  you received a number of awards regarding risk assessment?

21   A.   Right.  And a number those awards are team efforts.  So

22  I think the very first one it was a team effort.  We had four

23  different groups that we worked with that do that particular

24  website for kids chemical safety.  The groups are the

25  Cincinnati Poison Control Center, our group, Harvard Center for

 1   Risk Analysis and NSF International which is a nonprofit in Ann

 2   Arbor that certifies chemicals that touch water.  If you open

 3   your refrigerator door you'll see NSF certification for the ice

 4   maker.  So that's what they do.  And we've got together and put

 5   this website together.

 6   Q.   I wanted to ask about a particular one over on the next

 7   page, page 29.  In 2002.  Could we bring that one up?

 8        Environmental Stewardship Award.  What was that?

 9   A.   That was the work that we did with other group -- other

10   folks on the team to look at the C-8, the CATT team, the

11   assessment team.  After we did the report, afterwards, myself

12   and Andy Maier got this award.  It was quite gratifying.  It

13   was also unexpected.

14   Q.   Do you have a copy of the certificate with you?

15   A.   Yeah.  Actually I brought that.

16   Q.   And that was from whom?

17   A.   That was from the State of West Virginia.

18   Q.   Now, with regard to your work at EPA did you have any --

19   first of all, are you familiar with the term IRIS?

20   A.   IRIS, yeah.  Very much so.

21   Q.   What does it stand for and what is it?

22   A.   The Integrated Risk Information System.  It's a system

23   designed by EPA staff.  I had the lead of the group that

24   developed it but there was teams of people that review the ADIs

25   at the time and now they're called reference doses, but made

1   sure that everybody in EPA agreed to it.  Once we all agreed,

2   unanimous consensus, then we put it on the Integrated Risk

3   Information System.

4       Q.    How were you involved with it?

5       A.    Two ways.  My team was -- I was staff lead of the method

6   evaluation and development staff, we were the group that put

7   out the actual IRIS.  And the first time we did it was on

8   e-mail and it was very archaic.  You can only scroll down.  You

9   couldn't go backwards.  It was designed only for EPA staff

10  because we found out that our ADIs was not the same between

11  groups.  It was actually pretty embarrassing.  We had 40

12  chemicals where we actually did the same evaluation and 39 of

13  the 40 were different.  That was pretty embarrassing.  We got

14  it together and tried to harmonize it.  That was the principle

15  behind the IRIS thing.

16       Part of my effort was to lead the team, to build it,

17  build the database.  The second part of the effort was I

18  chaired a group that actually did the certification of the ADIs

19  and then we culled and referenced those.  We had a hard time

20  harmonizing so we changed the name and very slowly everybody

21  came into harmony.

22       Q.    In all that work that you just described with respect to

23  IRIS, Integrated Risk Information System, that was all done

24  while you were at EPA?

25       A.    Yeah.  All that work was done, right.

Vol. 12 -   32

1    Q.    Sir, were you traveling last week?

2    A.    Yeah.  Actually I was.

3    Q.    Where were you?

4    A.    I was in Geneva.

5    Q.    For what purpose?

6    A.    Switzerland.  I was offered to -- selected, I suppose,

7    to attend a joint meeting of the Food Agricultural

8    Organization.  So it's a part of the World Health Organization.

9    And another unit of the World Health Organization to do

10   pesticide reviews.  So this group gets together once a year for

11   two weeks.  I didn't realize it was a two-week assignment at

12   the time I accepted it last year, but nevertheless.  And what

13   they do is they review the toxicology or exposure information

14   for about 20 pesticides.  And when they do that, at the end of

15   the Thursday you walk out of that meeting and they've got the

16   report done.  It's pretty impressive actually the way they do

17   it.  And then that report gets edited and things and then it

18   gets released.  Sometime later, different member countries, the

19   World Health Organization will use that information to set safe

20   levels of pesticides for their crops.  So people can use the

21   pesticide.  As long as it doesn't go above a certain level then

22   that's safe use.

23   Q.    All right.  Let me focus this, sir.  You mention the

24   CATT team and the jury's heard a little bit about that.  We've

25   been at this for two weeks, going on three.

1    A.    Okay.

2    Q.    Let's bring up Defense Exhibit D613.

3         MR. MACE:  May I approach, Your Honor?

4         THE COURT:  You may.

5    BY MR. MACE:

6    Q.    Sir, do you recognize this as the final report that came

7    out of the CATT?

8    A.    Yes, it is.

9    Q.    And do you understand, sir, that you're here to give

10   fact testimony regarding your involvement in the CATT team?

11   A.    Yes.

12   Q.    How did you get involved in the CATT team?

13   A.    One or more of my staff, either myself or one of our

14   staff, were approached by a contractor with the State of West

15   Virginia to see if we could develop a small group to study this

16   issue.

17   Q.    If you could turn over, please, to page 6.  The second

18   paragraph.  Could you blow that up?

19        It talks about the CATT team being tasked with

20   investigating the toxicity of C-8; developing provisional risk

21   factors; and, establishing human health protective screening

22   levels for air, water and soil.  Does that sound like an

23   accurate description of part of what you were doing?

24   A.    Yes.

25   Q.    Go over to page 8, please.  Blow up the third paragraph.

Vol. 12 –    34

1      The CATT toxicologists met on May 6 and 7, 2002 at EPA

2  offices in Cincinnati, Ohio.  Does that comport with your

3  memory?

4    A.   Yes.

5    Q.   And with respect to TERA, which you've talked about and

6  the jury's heard a little bit about, at page 9, it says TERA is

7  a nonprofit corporation dedicated to the best use of toxicity

8  data to the development of risk values.  All the nonTERA

9  toxicologists on the CATT, whether from government agencies or

10  industry, were in unanimous support of including TERA in this

11  project.

12      Is that accurate to your memory?

13    A.   Well, the first line is accurate.  I'm not so sure I

14  knew about the second part.

15    Q.   Let's turn over to the next page, page 10.  Why don't we

16  bring up from the top of the page down to Mr. Briggs.

17      So this meeting was held over two days, May 6 and 7,

18  between these toxicologists?

19    A.   Yes.

20    Q.   Were you familiar -- are you familiar today or were you

21  familiar back at the time with these -- let's start with Mr --

22  how does he say that?

23    A.   Cicmanec.  John Cicmanec.

24    Q.   Dr. Cicmanec from USEPA.  Are you familiar with him?

25    A.   I'm very familiar with Dr. Cicmanec.  I worked on the

1    ADI work group with him and when we traveled on occasion, we

2    had to room together to save money.

3        Q.    What about Dr. Rotenberg?

4        A.    I know Dr. Rotenberg a little bit less well.  He's in

5    Region 3 Philadelphia office.  If he walked in here, I'd

6    recognize him.  But I didn't work with him on a day-to-day

7    basis.

8        Q.    Jennifer Seed, Dr. Seed?

9        A.    Dr. Seed is a well-respected toxicologist in USEPA.  I

10   worked with her a number of times.  She's a developmental

11   toxicologist.  Very astute.

12       Q.    Dr. John Wheeler from the Agency for Toxic Substances

13   and Disease Registry?

14       A.    I knew him a little bit less well.  Probably not -- I

15   wouldn't have recognized him prior to that meeting.

16       Q.    And he's got that same certification, DABT?

17       A.    It's a Diplomate of the American Board of Toxicology.

18       Q.    Is that board certification?

19       A.    Board certification in toxicology, yes.

20       Q.    Tell us about this organization.  I think the jury heard

21   that term.  I don't think we ever talked about that agency is,

22   what it does.

23       A.    It's a U.S. federal agency located in Atlanta, Georgia.

24   They didn't exist -- I guess they came into existence about 20

25   years ago when the Superfund site work became more prominent in

1    the U.S. government.  EPA, I believe at the time, was doing the

2    work and it was so extensive they created another agency.  I'm

3    sure there's some political things about that but I'm unaware

4    of any of that.  And they do have some really good scientists

5    down there.  John Wheeler I got to know as a good scientist.

6    They also had some luminaries, Christa Rosa was another person

7    that came from EPA, went down there, did a lot of good work.

8      Q.   These individuals from USEPA and the Agency for Toxic

9    Substances Disease Registry, were these knowledgeable and

10   competent people?

11     A.   Oh, absolutely.

12     Q.   Factually, sir, can you describe for us generally the

13   steps of the process that was followed by the CATT team to come

14   up with the drinking water screening level?

15     A.   Well, yeah.  In general what had happened was USEPA ––

16   TERA staff summarize a large body of information into tables

17   with summaries and then that information was passed out to the

18   CATT team probably three, four weeks ahead of the meeting.  The

19   CATT team then looked at the information.  If they had

20   questions, they could come to TERA and say, hey, I want more

21   information on this study or whatever.  And then we had the

22   meeting and at the meeting we carefully went through each study

23   trying to cull out about this study, where is the place where

24   the study doesn't show any effect.

25          Because what toxicologists do, they'll test experimental

1    animals in an ethical way and they want to test a high enough

2    dose to cause a toxicity.  All chemicals are toxic, even water

3    if you drink too much will kill you.  So you test high enough

4    to see where the toxicity is and you test low enough to see

5    where there's no effect.

6         Between that gap, you study that and in the CATT team

7    study, each study that way and try to determine the no-effect

8    level and then the effect level.  Once you determine that, they

9    culled it out as a no observe adverse effect level and they

10   went through each study.  Once they did that, they started

11   looking at different studies and applying this thing called a

12   safety factor or uncertainty factor to take that animal

13   no-effect level and project it to people.  That becomes a safe

14   dose for people.

15        So the CATT team did that with each study and then at

16   the end, they went through and had a discussion about the

17   appropriate safety factors for each study because they're not

18   always the same.

19   Q.   And was it an open discussion -- based on your personal

20   observations was it an open discussion among the various

21   people?

22   A.   Open discussion and free flowing.  One reason it's free

23   flowing is what we do in our particular situation and what was

24   followed here is that we don't say who said what in the notes

25   so there isn't a person assigned to a particular statement.

1   Even though during the meeting, of course, a person makes a

2   particular statement.

3        What that allows is anybody to make whatever comment

4   they want based on the science and that focusing on the science

5   is what we had in our meeting.  It was a free-flowing

6   discussion.

7   Q.   You mention the minutes.  Could we bring page 10 back

8   up, please?

9        So this page of the report is titled the CATT

10  toxicologist meeting minutes.  It starts at page 10.  Could you

11  check your copy there, does that continue through page 35 of

12  the report?

13  A.   That's correct.

14  Q.   And is that detailed minutes of the various studies that

15  you looked at, some of the key points that were brought out

16  about the studies and the votes to conclusion?

17  A.   That's correct.

18  Q.   And with regard to that, reaching a conclusion, how did

19  that work?  Was it one person/one vote or some other method?

20  A.   The attempt is to do consensus.  Unanimous consensus

21  would be ideal, of course.  The studies are pretty complex and

22  for many of the studies we did have unanimous decisions on

23  where the no-effect level was and the effect level.  The

24  uncertainty factors discussions were a little bit more less

25  unanimous.  So in those cases what we did was we just voted.

Vol. 12 - 39

1    Everybody was heard and then the chair, Dr. Staats would --

2         If someone said, hey, the safety factor should be 10,

3    which is sort of our default maximum and other people said,

4    well, I don't think that's a worry at all.  I think it should

5    be 1, which is basically saying I don't think we should even

6    use it and other people would say, well, it should be halfway

7    between.  Well, halfway between when you use safety factors,

8    you multiply them.  Halfway between is not 5 which is what you

9    think normally.  It's 3.  Three times three is about ten.  It's

10   probably a scientific technical point.  But three is kind of

11   the midway point.

12        So people would say 1, 3 or 10 often.  If there was a

13   spread, the chair would say can we all live with, let's say,

14   this number.  Let's say 3.  If you can live with it, that's

15   what they went with.  But sometimes we voted and there was

16   different votes.  That's all laid out in the document.

17   Q.   Let's get to the results over at page 33.  If you could

18   bring up the screening levels.

19        The report says the screening levels are calculated

20   following the premise that if lifetime exposure is equal to or

21   less than the pRfD or pRfC then no risk of deleterious effect

22   is expected.  Is that right?

23   A.   That's correct.  According to the definition of RfD or

24   RfC.

25   Q.   What are those describing?

Vol. 12 -   40

1  A.   The reference dose is the dose with uncertainty spanning

2  perhaps an order of magnitude kind of a tenfold.  So it's kind

3  of imprecise.  The daily, in the case of a reference, those

4  daily oral exposure or the case of an RfC inhalation,

5  continuous inhalation exposure, it's likely to be without

6  deleterious effects for a lifetime in sensitive subgroups.  In

7  the general population including sensitive subgroups.  So this

8  protects everybody.  That's the intent.

9  Q.   We can go to page 35.  Blow up for water.

10      The determination was for water that that number was, is

11 that 150 parts per billion?

12 A.   150 micrograms per liter is parts per billion.

13      THE COURT:  Is there an objection?

14      MR. DOUGLAS:  Your Honor, I would request at this time

15 the limiting instruction with respect to this number.

16      THE COURT:  I'll see you at side-bar.

17      You may stand if you wish, ladies and gentlemen.

18                    - - -

19    Thereupon, the following proceeding was held at side-bar:

20      THE COURT:  The defendants had a different proposed.

21 You want me to use the 2014 as the date of the science -- 2012,

22 excuse me.

23      MR. MACE:  Yes.

24      THE COURT:  Do you have an objection to that?

25      MR. DOUGLAS:  I'm sorry, I'm not following that.

1          MR. MACE:  Mentioning the date that the science panel

2     came out with the finding.

3          THE COURT:  As 2012.

4          MR. BILOTT:  We would ask that the Court read the

5     original instruction that was agreed to.

6          MR. DOUGLAS:  I don't think it's a good idea to change

7     anything.

8          THE COURT:  It's a long one.  I've given it at least,

9     I'm going to guess, seven or eight times.

10          MR. DOUGLAS:  But I think this is an important time to

11     give it and I would note that any time the word trial has been

12     mentioned, Mr. Mace pops out of his seat and requests that

13     charge.

14          THE COURT:  I'm going to use, for now, the one that

15     was the previous one but I did ask, I think, Mr. O'Brien to

16     take a look at this and tell me what his view is.  We'll

17     address that the next time.

18          MR. DOUGLAS:  Thank you, Your Honor.

19                              - - -

20      Thereupon, the following proceedings were had in open

21     court:

22          THE COURT:  Counsel, let me see you again at side-bar.

23      Ladies and gentlemen, you may stand by your seats, if

24     you wish.

25

Vol. 12 -    42

1                          - - -

2      Thereupon, the following proceeding was held at side-bar:

3          THE COURT:  This is not in the list that we put

4   together.  Are you talking about the instructions I gave at the

5   beginning of the case?

6          MR. MACE:  I think that is.

7          MR. DOUGLAS:  And several times during the course.

8          THE COURT:  Very good.  I'll just stay with the script

9   that we used at the beginning of the case.  Thank you.

10                         - - -

11     Thereupon, the following proceedings were had in open

12  court:

13         THE COURT:  So, ladies and gentlemen, I know you've

14  heard this before but this is an important part of this case.

15          As you recall, the parties agreed before this case

16  started that, based on the science panel, there was a level

17  that if Mrs. Bartlett proves she's entitled to, that being that

18  she drank the water for more than a year and that the water she

19  drank contained a C-8 level of greater than .05 parts per

20  billion then the issue of general causation would not be one

21  for you to decide.

22          We're looking at a different standard here, earlier in

23  time.  And that's offered for you to consider when you look at

24  DuPont's conduct but not with regard to the issue I just

25  mentioned that the parties have agreed to.

1          So with that, you may continue.

2               MR. MACE:  Thank you, Your Honor.

3     BY MR. MACE:

4     Q.   Dr. Dourson, I think you mentioned that you could help

5     us understand part per billion maybe?

6     A.   Right.  So the way you look at part per billion is you

7     take a sugar packet, you open up and you dump it out and you

8     have all those little sugar granules.  Of course they all weigh

9     different amounts.  Generally they're 10 micrograms to

10    100 micrograms.  So if you lick your finger and pick one up,

11    you get 10 micrograms.  If you put that into a liter of water,

12    or three cans of Coke or something like that, that's 10 parts

13    per million.  10 micrograms per liter.

14         So 150 is more than that.  It's two or three of them,

15    depending on how much they weigh.

16    Q.   So before we leave the CATT report, let me just point

17    out a couple things.  At page 46 there's a discussion on water

18    and there's the DEP -- DEP is the Department of Environmental

19    Protection?

20    A.   I believe so, yeah.

21    Q.   Notes the water screening level is higher than DuPont's

22    internal community exposure guidelines for drinking water of 1

23    or 3 parts per billion.  However, these guidelines were

24    developed in the early '90s and based solely on two-week

25    inhalation study from '86.  Since then, significant additional

Vol. 12 –   44

1  toxicology data have been collected and the CATT water SL is

2  based on a comprehensive examination of all available

3  information.

4       Did you feel that the number that you came up with with

5  this CATT team was based on a comprehensive examination of all

6  available information?

7       MR. DOUGLAS:  Objection.  Calling for an expert

8  opinion.

9       THE COURT:  We're getting right up to that.

10       This witness is here to talk about the methodology and

11  just the process by which this was done, not to give an expert

12  opinion on anything in conclusions like that.

13       With that distinction in mind, he may answer the

14  question.

15  BY MR. MACE:

16  Q.   You may answer, Doctor.  Did you feel that your process

17  involved a comprehensive examination?

18  A.   Absolutely.  The fact is, the usual process is one group

19  does -- looks at all the data by themselves and after they

20  write the report they get it peer reviewed by an outside group.

21  This was different in that we had an outside group come

22  together and collectively develop the risk value.  It was

23  actually surprising that we got it done in two days.  We've

24  never done that before.  We've done it since because we've

25  taken this as a model to apply to other situations.  So it was

Vol. 12 -   45

1   a very good rendition of the data and a good discussion with

2   different viewpoints during the course of the two days.

3       Q.   One other point.  If we could go over to page 27.  This

4   paragraph here on the cancer hazard.  Talks about cancer hazard

5   identification.

6           The panel discussed the evidence for C-8 carcinogenicity

7   in humans and agreed that the human carcinogenicity evidence is

8   inconclusive.  Although four prostate tumors were reported in

9   retired workers, three of these four cases now are known to

10  have minimal or no C-8 exposure.

11          As part of the studies that the CATT team discussed, did

12  you discuss the '93 Gilliland thesis about the 3M plant and the

13  prostate cancer?

14      A.   I believe I did.  I'd have to check to make sure.

15      Q.   Could you check the report and look at it?

16      A.   That was a human study section?  That was Gilliland and

17  Mandel 1996?  Gilliland and Mandel 1993.  I see it.

18      Q.   Did your team review both the '93 Gilliland and Mandel

19  and the '96 update?

20      A.   Yes, we did.

21      Q.   Doctor, did the toxicologists who participated in coming

22  up with the determination that the lifetime exposure to the 150

23  parts per billion or less of C-8 would have no risk of

24  deleterious effects, did those toxicologists sign a

25  certification of the final report?

Vol. 12 -    46

1      A.    Yes, they did.

2            MR. MACE:  May I approach the deputy clerk, Your

3    Honor?

4            THE COURT:  You may.

5    BY MR. MACE:

6      Q.    Doctor, we've handed you what's been marked as D1812.

7    Do you recognize that?

8      A.    Yes, I do.

9      Q.    Are those copies of the signed certifications?

10     A.    Yes, they are.

11     Q.    Could you please bring up 1812?  Let's start with page

12   dot 3.  Mr. Hoeppner, if you could bring up the language at the

13   top.

14          I apologize for the quality of this.  Can you see the

15   words, I agree that the notes, as presented, accurately reflect

16   the panel's discussion and conclusions during the May 6 to

17   7, '02 C-8 assessment of toxicity toxicologists panel meeting.

18   You see that language?

19     A.    Yes, sir.

20     Q.    Down below, did Dr. Wheeler from ATSDR signed that?

21     A.    Yes, he did.

22     Q.    Go back to the cover page.  Did Dr. Rotenberg from EPA

23   sign that?

24     A.    Yes, he did.

25     Q.    Go to page dot 4.  Did Dr. Seed from EPA sign that?

Vol. 12 -    47

1    A.    Yes, she did.

2    Q.    And over at dot 5 did Dr. Cicmanec sign it as well?

3    A.    Yes, he did.

4    Q.    Did you sign it as well?

5    A.    Yes, I did.

6    Q.    Did all ten of the toxicologists sign it, sir?

7    A.    We all signed it.

8    Q.    And back at that time, sir, after the final report had

9    been issued, what was your feeling about the process that had

10   been used to come up with that number?

11   A.    Again, I --

12         MR. DOUGLAS:  Objection.

13         THE COURT:  I think it's the framing of the question.

14   Rephrase that, please.  Feeling is the word that set

15   Mr. Douglas on his feet.

16   BY MR. MACE:

17   Q.    Sir, that process, did you feel that that was a fair and

18   reliable process that had been used to come up with that

19   number?

20         MR. DOUGLAS:  Same objection.  It's word.  It's an

21   expert opinion.

22         THE COURT:  Overruled.  It's a question about process.

23   The objection is overruled.  You may answer.

24         THE WITNESS:  I thought the process was great.  And,

25   again, we've used it subsequently to do complex evaluation.

Vol. 12 -   48

1    BY MR. MACE:

2    Q.    Sir, let me switch topics a second.  Are you familiar

3    with the term conflict of interest?

4    A.    Yes, I am.

5    Q.    What does that refer to?

6    A.    Well, there's a couple ways you could look at it.  We

7    have a well-established -- we have a conflict of interest

8    statement on our website for all peer reviews and work that we

9    do.  Conflict of interest can look to be a financial conflict

10   of interest.  So it's not like it's wrong but if I own stock in

11   DuPont, for example, and I would go into this meeting, I would

12   have a financial conflict of interest.  That's a financial

13   conflict of interest.

14         There are times when a conflict of interest might be --

15   well, let's go to the bias.  Then they have biases.  And the

16   way scientists look at biases is we're all biased.  I'm a

17   toxicologist so I look at epidemiology data from a toxicology

18   perspective.  I have a toxicology bias.

19         So you balance biases on peer review panels but you

20   avoid conflicts of interest.  On occasion, someone has such

21   intense biases, that's a conflict.  And that's a judgment call.

22   We go through that with each of our panels.

23   Q.    Sir, did you have a conflict of interest in working on

24   the CATT team?

25   A.    No.  Not at all.  I didn't have a financial conflict of

1   interest for the reasons that we described on our website.

2   Q.   Did anybody at TERA?  You had some other members of your

3   team that were on that group.  Did anybody at TERA have a

4   conflict of interest working on the CATT team?

5   A.   No.  They didn't have a financial conflict of interest.

6   Q.   A separate issue, Dr. Dourson.  If anybody suggested to

7   the jury that TERA was biased toward industry, is that

8   accurate?

9   A.   Well, I wouldn't use the word biased toward industry.

10  Our mission is to protect public health and we do this by

11  looking at the science as best possible.  Our motto is

12  dedicated to the best use of tox data for risk values.  That's

13  what we're all about.  We build collaborative information so we

14  work with industry and government and NGOs, nongovernment

15  organizations, to build teams to do this.  When you're building

16  a team you can't be overtly or even partially biased with one

17  part of the team or other.  You have to just be neutral.  We're

18  really -- we strive to be neutral in all cases.

19       If someone said that, I would encourage them to look at

20  our website.  You can look at the funding, you can look at the

21  types of work we've done.  You can look at, I don't want to say

22  accolades.  That's probably too strong.  There have been people

23  that have talked about us.  For instance, the EPA Inspector

24  General wrote a report on peer reviews --

25            MR. DOUGLAS:  Your Honor, I'm going to ask that that

1    be stricken.

2         THE COURT:  The objection is sustained.

3    BY MR. MACE:

4    Q.   Back in 2002, so let's focus on the year in question.

5    A.   Sure.

6    Q.   Back in 2002.  Was TERA biased toward industry back in

7    2002?

8    A.   No.

9    Q.   You mentioned funding.

10        MR. MACE:  May I approach, Your Honor?

11        THE COURT:  You may.

12   BY MR. MACE:

13   Q.   Have you been handed a demonstrative aid which is a

14   printout from your website of funding from over the years?

15   A.   Yes.

16   Q.   Bring that up, please.  And if we could bring up the

17   table at the bottom.

18        What is this graphic showing in terms of just overall

19   before we focus on 2002?

20   A.   Just overall it's just the amount work we do for

21   government other than nonprofit versus industry and industry

22   related.

23   Q.   So in 2002, which was the year of this CATT team report,

24   how did the breakout work?

25   A.   Well, yeah.  72 percent was government or other

1    nonprofit work and 28 percent was industry or industry related.

2      Q.    And that number has varied at different times in

3    different years?

4      A.    Oh, yeah.  Roughly it's about two-thirds government,

5    one-third industry, roughly.

6      Q.    Sir, were you personally present during these CATT team

7    meetings, both days, on May 6 and May 7 of 2002?

8      A.    Yes.

9      Q.    Did you personally observe what went on in the meetings?

10     A.    Yes.

11     Q.    The jury has seen Mr. Kennedy from Mr. DuPont was part

12   of the meeting?

13     A.    Yes, he was.

14     Q.    Based on your personal observations, was Mr. Kennedy

15   dominating the discussion?

16     A.    No.

17     Q.    Did you hear Mr. Kennedy try to strong-arm anyone into

18   voting a certain way?

19     A.    No.

20     Q.    We saw up on the list that Dr. Butenhoff from 3M was

21   also there as an invited guest?

22     A.    Yes.

23     Q.    Since 3M had conducted a number of the animal studies

24   and was the manufacture and supplier of C-8 was it helpful to

25   have him there to answer questions anyone would have?

Vol. 12 -   52

1    A.    Yes.   Study directors are always useful at meetings like

2    this.

3    Q.    During your personal observations during those two days

4    of the meetings, did any of the industry representatives

5    dominate the discussions or the voting?

6    A.    No.

7    Q.    Were the industry folks lobbying for higher numbers for

8    the screening level?

9    A.    No.

10   Q.    Bottom line, Dr. Dourson, did it appear to you that the

11   CATT team process was an unbiased process with an open

12   discussion of the science based on the knowledge at the time?

13   A.    Absolutely.

14   Q.    Sir, did anyone coerce you or improperly influence you

15   in any way to arrive at 150 part per billion number?

16   A.    No.

17   Q.    Before I sit down, sir, have you ever testified for me

18   before?

19   A.    No.

20   Q.    Have you ever testified for anyone from my law firm,

21   Squire Sanders or Squire Patton Boggs before?

22   A.    No.

23   Q.    Have you ever been employed by DuPont?

24   A.    No.

25   Q.    Do you own any stock in DuPont?

Vol. 12 -    53

1    A.    No.

2    Q.    Did you receive a subpoena to be here to testify today?

3    A.    Yes, I did.

4    Q.    Was that served on your at your office at the University

5    of Cincinnati?

6    A.    Yes, it was.

7    Q.    Other than reimbursement of your mileage expenses for

8    traveling here to testify and your daily subpoena attendance

9    fee of $40 are you receiving any money from DuPont?

10   A.    From DuPont, no.

11   Q.    Did I talk to you by phone to check on some facts a

12   couple of times over the past few months?

13   A.    Yes, you did.

14   Q.    Did you ever meet me before you walked into the

15   courtroom today?

16   A.    No, I haven't.

17        MR. MACE:   Thank you, sir.  I have nothing further at

18   this time.

19        THE COURT:   Thank you, Mr. Mace.

20        Mr. Douglas, you may cross-examine.

21                        - - -

22                   CROSS-EXAMINATION

23   BY MR. DOUGLAS:

24   Q.    Good morning.

25   A.    Top of the day to you.

1    Q.    Not accustomed to hearing somebody say top of the day.

2  I haven't been in England for quite a while.  I guess it's an

3  acceptable way of saying good morning.

4    A.    It certainly is.

5    Q.    And a good morning to you, sir.

6          Did I hear you say you received a subpoena to be here

7  today?

8    A.    Yes, I did.

9    Q.    You don't mean to imply to our jurors that but for the

10  subpoena you wouldn't be here?

11    A.    I'm not sure how to answer the question.

12    Q.    Let me see if I can help you out.  When did you receive

13  the subpoena?

14    A.    Yesterday.

15    Q.    Where were you when you received it?

16    A.    At the University of Cincinnati.

17    Q.    What time of day did you receive it?

18    A.    I think it was the afternoon.

19    Q.    How long have you been in Columbus?

20    A.    You mean this morning?

21    Q.    When did you get to Columbus, Ohio?

22    A.    I came in about -- left Cincinnati at 5:30.  7:30

23  roughly.

24    Q.    You did not arrive yesterday?

25    A.    No, sir.

Vol. 12 -    55

1    Q.    And so but before you received the subpoena you knew

2    that you were going to be here today and testify, correct?

3    A.    Yes, I had been --

4    Q.    When did you first know, sir, that you were going to

5    travel from Cincinnati to Columbus, Ohio to give testimony for

6    the defendant DuPont in this case?

7    A.    Probably last week.

8    Q.    That's the first time you ever heard that your testimony

9    would be wanted in this case, in this trial?

10   A.    No.  Pardon me.  I thought I answered your question

11   directly.  Maybe I misunderstood it.  What was the question?

12   Q.    When were you first asked to give testimony in this

13   case?

14   A.    I was -- probably several months ago when -- well, I'm

15   not so sure.  Several months ago Mr. Mace had questions.

16   Q.    And you had spoken to Mr. Mace before today.  This isn't

17   the first time you've spoken with him?

18   A.    Oh, no.  I've spoken with Mr. Mace.  He had questions

19   about part of the files that we kept.

20   Q.    Was that by telephone?

21   A.    Yes.

22   Q.    Have you ever met Mr. Mace before?

23   A.    No.

24   Q.    Have you met anybody from his firm before?

25   A.    I don't believe so.

1    Q.    What do you mean you don't believe so?

2    A.    I don't know everybody in his firm.

3    Q.    You didn't mean to suggest to our jurors that you just

4    found out yesterday, you got a subpoena and you got in your car

5    and came here all bright-eyed and bushy-tailed, ready to go to

6    give testimony that you had no idea of -- no way of knowing

7    that you were going to --

8    A.    I don't mean to imply that.

9    Q.    By the way, you know that -- my name, by the way, is

10   Mr. Douglas.  Gary Douglas.

11   A.    Nice to meet you.

12   Q.    Good to make your acquaintance.  You know that folks,

13   paralegals and attorneys from my team, have tried to call you

14   and ask you questions about your files.

15   A.    Okay.

16   Q.    And you know a Ms. Carol Moore?  She's a paralegal.

17   A.    Good morning.

18   Q.    Why don't you tell the jurors, do you check your

19   messages, sir?

20   A.    Check my messages?

21   Q.    Yeah.  When people leave a message and they call?

22   A.    Absolutely.

23   Q.    Then you know that Ms. Moore has been calling you

24   several times and you have yet once to return her call.  Do you

25   know that?

Vol. 12 -   57

1    A.    I'm not aware of that, sir.

2    Q.    You're not aware of that.  I thought you checked your

3    messages?

4    A.    As I said, I'm not aware of any message from Ms. Moore.

5    Q.    So would you be willing to talk to us privately, as you

6    spoke to Mr. Mace?

7    A.    Absolutely.

8    Q.    Then why didn't you return her calls?

9    A.    Sir, I don't know -- I'm not aware of any calls from

10   Mrs. Moore.

11   Q.    So when you leave today would you mind talking with me?

12   A.    No.  No problem at all.

13   Q.    Sir, what is your salary?

14   A.    At the University?

15   Q.    Let's start with TERA.

16         THE COURT:  I'll see you at side-bar, counsel.

17         You may stand by your seats, ladies and gentlemen.

18                           - - -

19      Thereupon, the following proceeding was held at side-bar:

20         THE COURT:  What's this?  I mean, he's connected to

21   TERA.

22         MR. DOUGLAS:  He's representing that he works for this

23   nonprofit company, that's looking out for the public health

24   which is -- I'm trying to expose that as being just a facade.

25         THE COURT:  Did you watch the woman from Planned

Vol. 12 -    58

1  Parenthood testify before Congress that she made 500,000 a

2  year?  You can tell.  If this is somebody who was an expert,

3  the fees are always in play.  But he's not being paid by

4  DuPont.  So what difference does the salary make?

5          MR. DOUGLAS:  Because Mr. Mace didn't get into

6  betraying the MSS person who is so concerned about the public

7  health I wouldn't get into it.

8          THE COURT:  I'm assuming the head of the Sierra Club

9  makes a lot of money too.  What inference would the jury draw

10 from his salary?

11         MR. DOUGLAS:  That he's not as altruistic as he's

12 painted to be.

13         THE COURT:  I just don't see it.  There are people who

14 had nonprofits who are not connected to anything to do with

15 industry that make a lot of money.  It's not probative.

16         MR. DOUGLAS:  Okay.  I'll move on.

17                              -  -  -

18    Thereupon, the following proceedings were had in open

19 court:

20         THE COURT:  Mr. Douglas, you may continue.

21         MR. DOUGLAS:  Thank you, Your Honor.

22  BY MR. DOUGLAS:

23  Q.   Writing down some notes?

24  A.   Yes.

25  Q.   Does it have to do with your testimony?

Vol. 12 -    59

1    A.    Yes.  I wrote down your name so I'd remember it,

2   Mr. Douglas.

3    Q.    Sir, I just want to get this straight.  You were hired,

4   you say, by the West Virginia Department of Environmental

5   Protection, correct?

6    A.    I think --

7    Q.    Your company was?

8    A.    I think it was a contractor to West Virginia that

9   approached us.

10    Q.    Who was that?

11    A.    I don't recall off the top of my head.

12    Q.    What kind of contractor?

13    A.    A contractor that works for the State of West Virginia.

14    Q.    What do they do?

15    A.    I don't know.

16    Q.    So you get contacted by this contractor and you put

17   together, if I understand correctly, a summary of the studies

18   that you had been provided with from DuPont, right?

19    A.    Well, there was two tasks.  The first task was for the

20   TERA staff to put together a summary of information on this

21   particular chemical which included available information on

22   literature search.

23    Q.    So the summary -- and then the summaries were put

24   together by TERA, your company, right?

25    A.    Right.  What we did then is we summarized --

1    Q.    Just yes or no is fine.

2    A.    Yes.

3    Q.    Then you took the summaries and you gave them to the

4  members of the CATT team?

5    A.    The summaries and associated references were given to

6  the CATT team, yes.

7    Q.    And then a few weeks passed by and you have this

8  meeting, right?

9    A.    Yes.

10    Q.    And this meeting lasted a grand total of two days,

11  correct?

12    A.    That's correct.

13    Q.    And by the end of those two days the CATT team comes up

14  with this number of 150 parts per billion which is 150 times

15  higher than the level which had been set at that time by

16  DuPont, right?

17    A.    I'm not aware of what DuPont had set at that time so I'm

18  not sure how to answer your question, sir.

19    Q.    I'll rephrase it for you.

20    A.    Okay.  Thank you.

21    Q.    So in this two-day meeting where you're discussing all

22  of this -- all the summaries and all the scientific literature,

23  whatever it was you were doing, grand total of two days you

24  came up with this 150 parts per billion number, right?

25    A.    Well, that forgets the prior three or four weeks the

1    team was studying it.

2    Q.   So in a matter of three or four weeks and two days --

3         MR. MACE:  Your Honor, I object to the interrupting of

4    the witness.

5         THE COURT:  Read back the second to last question from

6    Mr. Douglas and we'll let the witness answer.

7         (Thereupon, the last question was read by the court

8    reporter.)

9         THE COURT:  And your answer?

10        THE WITNESS:  No.

11   BY MR. DOUGLAS:

12   Q.   It was a grand total of three or four weeks plus these

13   two days?

14   A.   Yes.

15   Q.   From the time you were contacted by this contractor,

16   whose name you can't recall, and the time that the CATT team

17   came up with this 150 parts per billion?

18   A.   Yes.

19   Q.   Now, did I hear you say you didn't know at the time that

20   you did this allegedly comprehensive review that DuPont had

21   already set a level of 1 part per billion?  Did I hear that

22   correctly?

23   A.   I wasn't sure that I knew that.

24   Q.   Are you sure today?

25   A.   No.

1    Q.   Did Mr. Mace when he spoke to you remind you of that

2    fact?

3    A.   He mentioned that fact.  I don't think he --

4    Q.   So he mentioned the fact but you forgot about it today?

5    A.   At the time --

6    Q.   Which --

7    A.   At the time of the meeting I don't remember being aware

8    of that fact.

9    Q.   So you wouldn't be aware of, if you were not aware of

10   that fact, that DuPont had already set a level of 1 part per

11   billion for water, you certainly weren't aware of how they

12   derived that number, correct?

13   A.   That's correct.

14   Q.   And would it be fair to say that at that point in time

15   the folks at DuPont, the time you assembled your CATT team and

16   in this three or four weeks came up with this 150 part per

17   billion number, would it be fair to say that when you were

18   first contacted by this contractor, whose name you can't

19   recall, that DuPont would have known a lot more about C-8 than

20   you, right?

21   A.   Before we were contacted, I would presume so, yes.

22   Q.   You knew nothing about C-8 at that point in time,

23   correct?

24   A.   I wouldn't say that.

25   Q.   Since you guys brought it up on the direct examination

Vol. 12 –   63

1    about whether your company, TERA, is biased, you know the old

2    Shakespeare saying, he doth protest too much?  You familiar

3    with that saying?

4     A.    Unfortunately, no.

5     Q.    Didn't read much Shakespeare?

6     A.    Wasn't my strong suit.

7     Q.    I didn't do too well in that class either.

8           So since you guys brought it up, I have a few questions

9    about it.

10     A.    Absolutely.  Please do.

11     Q.    Let's start with how your company was approached.  You

12    don't -- you didn't know that you were handpicked by DuPont to

13    do this work?

14           MR. MACE:  Objection, Your Honor.  Assumes facts.

15           THE COURT:  Unless there's a foundation for that

16    question, the objection is sustained.

17     BY MR. DOUGLAS:

18     Q.    Did you know, sir, that you were handpicked by DuPont to

19    do this work?

20     A.    No.

21     Q.    And speaking of bias, you have been accused, on many,

22    many occasion, of being industry biased.  Biased in favor of

23    industry.  Many media reports, investigative reports by

24    investigative journalists and in consumer interest groups,

25    correct?

Vol. 12 –    64

1          MR. MACE:  Objection, Your Honor.

2          THE COURT:  It has to come from the witness, not the

3     attorneys.  Keep in mind questions are not evidence.  It's the

4     answers from witnesses that are the only evidence you can

5     consider.

6          You may seek your answer.

7          You may answer.

8          THE WITNESS:  Okay.  Thank you.

9          I guess I'm going to have to say no to that because of

10    the way you phrased it.

11    BY MR. DOUGLAS:

12    Q.   So you have been the subject of news reports,

13    investigative news reports where you've been accused of having

14    an industry bias.  Yes or no?

15    A.   Yes.

16    Q.   And you've been quoted in a number of these

17    investigative news reports denying wholeheartedly that you are

18    biased in favor of industry, correct?

19    A.   I'm hung up on your word numerous.

20    Q.   More than one?

21    A.   More than one, yes.

22    Q.   How many times?

23    A.   I'm aware of maybe three.  Independently –– well, three

24    reports.

25    Q.   One of them dubbed you the industry favorite, right?

Vol. 12 -    65

1    A.    I don't --

2    Q.    You were quoted extensively -- weren't you quoted

3    extensively in an article in which you were referred to as a

4    favorite of industry.  A Pulitzer-Prize-winning news

5    journalist.  Does that refresh your recollection?

6    A.    No, it does not.

7    Q.    Why don't we --

8    A.    That would be helpful if you pull it up.

9         MR. MACE:  Could we approach, Your Honor?

10        THE COURT:  I'll see you at side-bar.

11        You may stand if you wish, ladies and gentlemen.

12                             - - -

13      Thereupon, the following proceeding was held at side-bar:

14        THE COURT:  Do we have the article?  And you'd like

15   to -- you would cross him with his own statements?

16        MR. DOUGLAS:  Well, and the matters that he responded

17   to.

18        MR. MACE:  But it's pretty extraneous, Your Honor, in

19   using the hearsay statements from some media source.  It's one

20   thing to ask him about his statements without displaying the

21   document.  I don't think he should be allowed to display the

22   document that has hearsay statements by media with nobody I can

23   cross.  He wants to bring the reporter in --

24        THE COURT:  I'm with you.  His statements in here are

25   certainly fair game.  And if he can -- I'm sure he's seen the

```
 1    article but that doesn't necessarily make it admissible.

 2              MR. DOUGLAS:  May I lay the foundation?

 3              THE COURT:  You can try.

 4              MR. MACE:  You're not going to allow him to display

 5    it.

 6              THE COURT:  Don't display it.

 7              MR. DOUGLAS:  It will not be displayed.

 8                              - - -

 9       Thereupon, the following proceedings were had in open

10    court:

11              MR. DOUGLAS:  May I approach, Your Honor?

12              THE COURT:  You may.

13      BY MR. DOUGLAS:

14      Q.    Do you recognize the article?

15      A.    Yes, I do.

16      Q.    It's entitled One-stop science shop has become a

17    favorite of industry-and Texas.  Is that the article?

18      A.    Yes, it is.

19      Q.    And you're quoted extensively in this article, correct?

20      A.    I'm quoted in the article, correct.

21      Q.    And this was in the Pulitzer-Prize-winning news

22    organization Inside Climate News, right?

23      A.    I don't --

24      Q.    You don't recall?

25      A.    I don't know that.
```

Vol. 12 -    67

1   Q.   In this article you deny -- you are quoted extensively

2   denying accusations that you are an industry favorite, the

3   go-to guy, the guy who sets these limits really, really high so

4   that industry can just slide right through, right?

5   A.   Would you like to point to a particular piece, sir?

6   Q.   Absolutely.

7   A.   Thank you so much.

8   Q.   Do you deny the accusation, second page, one, two,

9   three.  You're quoted.  You see where you're quoted in the

10  third paragraph?

11        THE COURT:  You've seen this article, you're familiar

12  with it?

13        THE WITNESS:  Yes, sir.

14        THE COURT:  Go ahead.

15  BY MR. DOUGLAS:

16  Q.   You're quoted on that page, right?

17  A.   Line three?

18  Q.   Line three.

19  A.   Of page two?

20  Q.   On page two.

21  A.   Right.  Absolutely.

22  Q.   Below that, and you're responding to an accusation in an

23  investigation by the Center for Public Integrity and Inside

24  Climate News shows your firm has close ties to chemical

25  manufacturers, tobacco companies and other industries.  You

Vol. 12 -    68

1    were quoted responding to that accusation and that

2    investigation by the Center for Public Integrity, right?

3        A.    That's not correct.  I wasn't --

4        Q.    Do you see the words --

5            THE COURT:  Wait.  You interrupted.

6            Go ahead.  Finish your answer.

7            THE WITNESS:  I wasn't responding to accusations.  I

8    was just being interviewed by a reporter and answering the

9    questions posed by the reporter.

10        BY MR. DOUGLAS:

11        Q.    And the questions had to do -- you were asked about an

12    investigation by the Center for Public Integrity which found

13    that your company had close ties to chemical industry, tobacco

14    industry and other industries, right?

15        A.    Well, again, sir, you're asking a question about facts

16    not in evidence.  I wasn't --

17        Q.    Are you a lawyer, sir?

18            THE COURT:  Let's not get into that.  That's beyond

19    what this witness can say.

20            Ask the next question.

21        BY MR. DOUGLAS:

22        Q.    The subject matter of your interview was this

23    investigation of your company by the Center for Public

24    Integrity.  It's right there.  Take a look.

25        A.    That's not correct.

Vol. 12 –    69

1    Q.   You see on the paper where it says, an investigation by

2    the Center for Public Integrity.  You see where I'm reading

3    from, sir?

4    A.   I see that.  That's what the --

5    Q.   You see where it says, shows the firm has ties to

6    chemical --

7              MR. MACE:  Object to the cutting off of the witness.

8              THE COURT:  He didn't finish the answer.

9              THE WITNESS:  Sir, this is written by a reporter.  I

10   interviewed with the reporter prior to this.  I interviewed

11   with a reporter who asked me questions about TERA.  It wasn't

12   in response to anything in particular.  And I got this

13   afterwards.  And the words that you say are correct but I

14   wasn't responding to anything along these lines.  I was just

15   answering questions of the reporter.

16   BY MR. DOUGLAS:

17   Q.   But you know that there was an investigation of your

18   company by the Center for Public Integrity in regard to your

19   close ties to the chemical industry, tobacco industry and other

20   industries.  You're aware of that?

21   A.   There was a report prior to this thing.

22   Q.   And there's a report after this thing.

23   A.   Is there?  Okay.  Thank you.

24   Q.   Not surprised to hear that?

25   A.   Surprised to hear what?

1    Q.    That there would be other reports of your close ties to

2    the chemical industry?

3    A.    You're surprised to hear that?

4    Q.    Are you surprised, sir?

5    A.    Yes, actually I am.

6    Q.    If you go to the next page, I want to ask you about --

7    A.    Sure.

8    Q.    -- something else in this article about your company

9    and you.

10   A.    Okay.  Page 3.

11   Q.    3 of 9.

12   A.    I've got 3 of 12.

13   Q.    Are you familiar with the term, quote, whitewashing the

14   work of industry, end quote?  Are you familiar with that

15   phrase?

16   A.    No.

17   Q.    Your firm has been accused of whitewashing the work of

18   industry, hasn't it?

19   A.    If you say so.  Are you saying --

20   Q.    That's what you did in your work coming up in this

21   three-week magical period of coming up with this 150 parts per

22   billion.  You whitewashed DuPont's C-8 problem, yes or no?  And

23   if you can't answer it yes or no, I'll come up with another

24   question.

25   A.    No.  Affirmatively no.

1    Q.    In fact, you defended, in this interview, your decision

2    to work with the tobacco industry, right?  Which is fine.  It's

3    your prerogative.  Do you recall defending that?

4    A.    I made a comment about a hypothetical.

5    Q.    And you said in response to -- in defending your

6    decision to work with the tobacco industry you said, quote,

7    Jesus hung out with prostitutes and tax collectors.  He had

8    dinner with them, end quote, to justify your work with the

9    tobacco industry.  Were those your words, sir?

10   A.    The premise of your question is incorrect.  Those are my

11   words.  I like to get Jesus quotes in as often as I can.

12   Q.    In terms of hanging out with prostitutes, are you

13   analogizing DuPont with the tobacco industry, the companies you

14   work with to prostitutes and tax collectors?

15        THE COURT:  I don't think DuPont is in this article,

16   so strike that part of the question.

17        THE WITNESS:  It was a hypothetical response given to

18   a reporter's question.  The reporter put ties together with

19   tobacco industry that they surmised.

20   BY MR. DOUGLAS:

21   Q.    And in response you said, in defending your decision to

22   work with tobacco industry, you worked with tobacco industry,

23   correct?

24   A.    We have taken $85 from Reynolds Tobacco to Xerox some

25   paper for them when they had an issue with chromium when we

Vol. 12 -    72

1    were doing work for USEPA.  We charged them for it.  I had a

2    colleague in Philip Morris back in the whatever, back in the

3    late '90s that had a problem with this benchmark dose.  It's a

4    model that we can do real well and other people are just

5    learning now and we did that benchmark dose for him and we

6    charged him $550.  That's our tobacco money intake.

7        Q.   We'll talk about some more of your tobacco money and

8    other industry money.

9        A.   Okay.  That would be great.

10       Q.   But for you, your 550 bucks that you alleged is all you

11   got, that's like Jesus hanging out with prostitutes and tax

12   collectors.  That's the quote.

13       A.   The reporter put two different disparate ideas together

14   in that quote.

15       Q.   So you say it's taken out of context?

16       A.   I don't know what to say.

17       Q.   I didn't think so.

18       A.   Yeah.

19       Q.   And you said in that article entitled favorite of

20   industry, we get criticized by everyone.  That's true, right?

21       A.   There have been times where we've been criticized by

22   everyone.  That's true.

23       Q.   Sir, I want to show you P3232 in regard to my questions

24   before about how you became the one that was selected to do

25   this work that took two or three weeks or three or four weeks.

Vol. 12 -    73

1    I want to show you a document from DuPont, an e-mail P1.3232.

2            MR. DOUGLAS:  May I approach, Your Honor?

3            THE COURT:  You may.

4      BY MR. DOUGLAS:

5      Q.   Do you know Timothy Bingman?

6      A.   I don't think so.

7      Q.   You see here we have an e-mail from Timothy Bingman

8    August 21st, 2000 to Robert Rickard.  Do you know Robert

9    Rickard?  Bobby Rickard as he's referred to?

10     A.   I think I do know him.

11     Q.   He's sitting right here, right?

12     A.   Yes, I do.

13     Q.   How do you know him?  How do you know him?

14     A.   Society of Toxicology meetings.  Probably in the last

15   four or five years I've gotten to know him from that.

16     Q.   You don't know him -- you didn't know him prior to four

17   or five years ago, sir?

18     A.   I don't think so.  I apologize.

19     Q.   I'm sorry?

20     A.   I apologize to Mr. Rickard.

21     Q.   You see where it says prospective contractors for PFOA

22   criteria review.  See that?

23     A.   Sure.

24     Q.   And you see where it says Bobby/Jerry.  When you see

25   Dr. Rickard, do you call him Bobby?  Are you on first-name

1    basis?

2    A.   I wouldn't do that, Mr. Douglas.

3    Q.   So you haven't.  So when you see him at the toxicology

4    meetings, or whatever organization you've seen him, you call

5    him Dr. Rickard?

6    A.   Well, usually it's Society of Toxicology meetings it is

7    a first-name basis.  If I don't know the person well, and I

8    don't know if it's a doctor or not, I'll go with either first

9    name or mister or miss.

10   Q.   So you see it says as a follow-up to the go-do I had

11   from this morning's meeting I've talked to a number of

12   colleagues that use external toxicity peer review services to

13   see who they like as contractors.  You see that?

14   A.   Yes, I do.

15   Q.   You do toxicity peer review, right?

16   A.   Yes, we do.

17   Q.   That's what we're talking about here in terms of the

18   work you did with the CATT team, right?

19   A.   That was actually more risk assessment development but

20   we also do reviews.

21   Q.   And it says, one person from another chemical company

22   that used to work on the EPA's criteria office in Cincinnati

23   said that -- let's go back.  Sorry.

24        While everyone had a few names to offer, talking about a

25   potential outside contractor, right?

Vol. 12 —    75

1    A.    Yes.

2    Q.    The common theme that emerged was that TERA, i.e. Mike

3    Dourson.  Is it Dourson or Dourson?

4    A.    Dourson is okay.

5    Q.    The common theme that emerged -- let's underline common

6    theme -- that emerged was that TERA, Mike Dourson, was the

7    leading choice.  You see that?

8    A.    Yes.

9    Q.    And so it goes on to say, one person from another

10   chemical company -- you see where I'm reading from?

11   A.    Yes.

12   Q.    So this is folks from chemical companies talking about

13   who's the go-to guy, who's good to use, what company should we

14   hire, right?  Is that apparent from what I just read?

15   A.    I haven't read it all yet.

16   Q.    One person from another chemical company that used to

17   work in the EPA's criteria office in Cincinnati said that Mike

18   enjoys a very good reputation among the folks that are still in

19   the business of blessing criteria.

20         Can we underline blessing criteria?

21         That's sort of like that whitewashing term, right?

22   A.    I wouldn't say that, but okay.  You do.  Go ahead.

23   Q.    You've heard the term blessing criteria, right?

24   A.    Actually I haven't.

25   Q.    It goes on to say, other added benefits besides the

Vol. 12 -    76

1    blessing criteria -- you know what the word blessing means,

2    right?

3     A.    Yeah.  I think so.

4     Q.    Okay.  You know, Jesus blessed people, right?

5     A.    Right.

6     Q.    And it goes on to say, other added benefits that were

7    identified for TERA were their ability to put together an

8    independent peer review panel to oversee their findings; and,

9    two, their ability to assemble, a, quote, package, and then

10   sell this to EPA or whomever we desired.

11         See where I'm reading from?

12    A.    Yeah.

13    Q.    You sell things to the EPA, is that what you do?

14    A.    No.

15    Q.    So they got it wrong here when they were under the

16   impression that one of the reasons you should be hired is

17   because you're able to sell packages to the EPA.  They got it

18   wrong, you don't sell stuff?

19    A.    Toxicology Excellence for Risk Assessment doesn't

20   advocate for any position.  We just do the science.  So they

21   got it wrong.  You're correct.

22    Q.    In the same way, sir --

23         MR. DOUGLAS:  May I, Your Honor?

24         THE COURT:  Yes.

25

1    BY MR. DOUGLAS:

2    Q.    You heard the Judge instruct the jury about this finding

3    of the science panel of .05 parts per billion being capable of

4    causing cancer, sir.  So they got this wrong in the same way

5    that you got it wrong.  Your great company, full of all this

6    integrity not only got it wrong, you got it wrong by 3,000

7    times higher than this .05 parts per billion.  Not even close.

8    A.    What's this scientific -- what's this science based on?

9    Q.    I ask the questions, sir.  Do you have an answer for me?

10   If you can't answer the question, I'll ask you another one.

11   A.    What's the question, please?

12   Q.    You got it wrong, sir.  This number you came up with in

13   three or four weeks following this discussion with Dr. Rickard

14   about blessing criteria, your number of 150 parts per billion,

15   would you agree, mathematically speaking, is 3,000 times higher

16   than this number here, .05 parts per billion?

17            MR. MACE:  Objection.  Compound.  Assumes facts.

18            THE COURT:  Let me see you at side-bar.

19        You may stand by your seats, ladies and gentlemen.

20                            - - -

21      Thereupon, the following proceeding was held at side-bar:

22            MR. MACE:  The objection is that his question is

23   compound.  It assumes facts.  I also strongly object to the

24   crudity that he's showing to the witness.  And particularly

25   with respect to the compound that he had assumed the fact that

Vol. 12 -   78

1   he had a discussion with Rickard.  He never saw the e-mail

2   before.  It's an e-mail, not a discussion.  It's misphrased.

3           MR. DOUGLAS:  I can rephrase it.

4           THE COURT:  That e-mail is coming in, I'm sure.  But

5   this witness never did say he ever saw it before.  We're past

6   that.

7           MR. DOUGLAS:  I have no further questions on the

8   e-mail.

9           THE COURT:  I want to be clear.  I don't like to harp

10  about this but there's sometimes I will weigh in but I'm not

11  going to cover everything that's objectionable.  That's what

12  the lawyers have to do on both sides.  Sometimes it's

13  frustrating where I sit.  But I'm supposed to be neutral.

14          MR. DOUGLAS:  Sometimes we can get the sense from the

15  Court that maybe counsel should stand up and object.

16          THE COURT:  That issue is number one.  But here's the

17  bigger concern I have.  Bias is always fair game.  No argument

18  there.  But the more we get into the findings and the science,

19  the more he's being crossed as if he's an expert.

20          MR. DOUGLAS:  Well, he's been called here to testify

21  that this was the best science available, this 150 --

22          THE COURT:  I get that.  And the process up to this

23  point has gotten into how he was picked, how it was conducted,

24  that sort of thing.  That's exactly what you're allowed to do.

25  But the more we get into him versus the science panel we're

Vol. 12 -    79

1    going to be talking about his expertise and then we're going to

2    get into opinions is my fear.  So I would caution you on that.

3           MR. MACE:  And to correct his statement that the

4    direct was on best science available at the time when he did

5    the work in 2002.  He was here for a very limited purpose.

6    He's way beyond the scope of direct.

7           MR. DOUGLAS:  I'll address that.  The whole point is

8    this was not the best science.  This was junk science.  I

9    should be free -- and it wasn't reasonable.  Therefore, for a

10   company to believe the industry should --

11          THE COURT:  That's what the jury is going to have to

12   decide.  But at this point there's nothing pending right now.

13   We're going to take a 15 minute break and you can start again.

14                          - - -

15       Thereupon, the following proceedings were had in open

16   court:

17          THE COURT:  We are right up to our 15-minute morning

18   recess.  We'll see you back in 15 minutes, ladies and

19   gentlemen.

20       (A recess was taken at 10:30 a.m. until 10:47 a.m.)

21          THE COURT:  Mr. Douglas, you may continue.

22          MR. DOUGLAS:  Thank you, Your Honor.

23     BY MR. DOUGLAS:

24     Q.   You discussed that your firm TERA has a website, right?

25     A.   We have several, yes.

1    Q.    And it's had a website or several websites for years?

2    A.    Yes.

3    Q.    Take a look, since this came up during your questioning

4    on direct examination by Mr. Mace, I want to take a look at

5    some of that.

6          Can we have the 2012?

7          MR. DOUGLAS:  May I approach?

8          THE COURT:  You may.

9    BY MR. DOUGLAS:

10   Q.    Before we get to it, you recall you were asked some

11   questions on direct examination about the source of funding for

12   your company by Mr. Mace.  He produced a table that's from your

13   website, right?

14   A.    That's correct, yes.

15   Q.    This is also -- what I've handed you is from your

16   website?

17   A.    Yes.

18   Q.    I want to put it up on the Elmo.  You see it's a 2012

19   project time by sponsor.  You see where it says that?

20   A.    Yes.

21   Q.    So, first of all, it says, 2012 and it's 40 percent for

22   profit.  You see that?

23   A.    Yes.

24   Q.    So we had, first of all, we had Dr. Siegel from the

25   Boston University School of Public Health here testified.  If

1  somebody had suggested to him that your source of funding from

2  industry was only 1 percent, that would be completely and

3  utterly inaccurate, right?

4  A.   I'm sorry, the question again?

5  Q.   If somebody were to infer to our jurors that TERA

6  receives only 1 percent of its funding source from industry,

7  that would be misleading?

8  A.   That's misleading.

9  Q.   So some of your clients are Drinker, Biddle & Wreath.

10  You see that?

11  A.   Yes.

12  Q.   They're a law firm, right?

13  A.   Could be.

14  Q.   They are a law firm.  Will you take my representation --

15  A.   Sure.

16  Q.   -- of that fact?

17       And they're a law firm, sir, that defends chemical

18  companies and pharmaceutical companies in lawsuits just like

19  this.  Did you know that?  It's on your website.

20  A.   Do I recall that?  I don't recall that off the top of my

21  head.

22  Q.   You know what Amgen is, right?

23  A.   I think it's a company that does pharmaceuticals.

24  Q.   That's one of the sources of your funding is Amgen, a

25  pharmaceutical company?

Vol. 12 -   82

1    A.    That's correct.

2    Q.    That's what you're saying here on your website.  You

3    look like you've never seen this before.  Have you seen it

4    before?

5    A.    I've seen this before.  I helped put it together.

6    Q.    You helped put it together but you can't remember who

7    Drinker, Biddle is, the very first list of the top of the

8    companies that provide 40 percent of your source funding; is

9    that right?  Do I have that correct?

10   A.    You've confused me, sir.  I'm sorry.  It's a company

11   that we --

12   Q.    You're confused now, sir?

13   A.    It's a company we did work for in 2012.  You asked me a

14   specific question about them and I don't recall those details.

15   Q.    ACI.

16   A.    Right.

17   Q.    Is that an industry outfit?

18   A.    It's industry related.

19   Q.    Eli Lilly.  We've all heard of Eli Lilly.  Another

20   pharmaceutical company.

21         NIPERA.  What's NIPERA?

22   A.    Nickel producers -- Nickel Institute for -- something

23   associated with the nickel institute.

24   Q.    That's another industry outfit?

25   A.    Yes.

Vol. 12 -   83

1    Q.   PPG?

2    A.   I think they just refer to them as PPG Industries.

3    Q.   They're another industry outfit?

4    A.   Absolutely.  They're all industry.

5    Q.   And American Petroleum -- I want to take you through

6    some of the companies that your company has done work for and

7    one of them is the American Petroleum Institute, right?

8    A.   That's correct.

9    Q.   That's an industry organization, petroleum industry,

10   right?

11   A.   That's correct.

12   Q.   Let's do the 2013.

13        MR. DOUGLAS:  May I approach, Your Honor?

14        THE COURT:  You may.

15   BY MR. DOUGLAS:

16   Q.   Sir, you recognize what you've just been handed as

17   another page from your website?

18   A.   That's correct.

19   Q.   That you helped put together, right?

20   A.   Yes, I did.

21   Q.   You'll see it's from 2013 for profit.  37 percent,

22   right?

23   A.   That's correct.

24   Q.   And again we see American Cleaning Institute, Amgen

25   again, American Chemistry Council, Eli Lilly again and

Vol. 12 –    84

1   Genentech.  You see that?

2    A.   Yes, I do.

3    Q.   Genentech is a chemical company.  You saw Amgen.  What

4   is Genentech?

5    A.   I think it's a pharmaceutical company.

6    Q.   Sir, you've written in the peer review I think you said

7   you lost count after 100, right, contributed to the peer review

8   literature?

9    A.   Yes.

10    Q.   And do you recall an article entitled *Peer consultation*

11   *on relationship between PAC profile and toxicity of petroleum*

12   *substances*?

13    A.   Yes, I do.

14        MR. DOUGLAS:  May I approach, Your Honor?

15        THE COURT:  You may.

16   BY MR. DOUGLAS:

17    Q.   We talked before about conflicts of interest.  Do you

18   recall that when you were asked by Mr. Mace, what is a conflict

19   of interest?

20    A.   Yes.

21    Q.   And sort of the same idea of disclosure is in

22   acknowledgments that would be in a peer review journal, if

23   there are any, you would list them, right?

24    A.   Right.

25    Q.   Could we put the title page, please?

1        This is the article that I just asked you about, right?

2    A.    Yes.

3    Q.    And that's you, you authored this article?

4    A.    Yes, sir.

5    Q.    And if you just go to the second to last page, I think

6    it's the second to last, you'll see a section, conflict of

7    interest and below that, acknowledgments?

8    A.    Yes.

9    Q.    You see that?  And it says, the American Petroleum

10   Institute, on behalf of the Petroleum High Production Volume

11   Testing Group, provided TERA with financial support for the

12   peer consultation meeting and preparation of the manuscript.

13        You see that?

14   A.    Yes.

15   Q.    You've written an article called *The importance of*

16   *problem formulations in risk assessment:  A case study*

17   *involving dioxin-contaminated soil*.  You recall that?

18   A.    Yes, I do.

19        MR. DOUGLAS:  May I approach?

20        THE COURT:  You may.

21   BY MR. DOUGLAS:

22   Q.    You have the article in your hand right now?

23   A.    Yes, I do.  Thank you.

24   Q.    I have it displayed on the Elmo.  And that's you, you're

25   the lead author on this?

Vol. 12 -   86

1    A.   Yes, I am.

2    Q.   And if you go to, again, the second to last page.

3    Acknowledgment.  The authors wish -- you're one of the authors,

4    right?

5    A.   Yes.

6    Q.   The authors wish to thank Robert Budinsky of the Dow

7    Chemical Company for his thoughtful comments on the early

8    drafts.  You see that?

9    A.   Yes, I do.

10   Q.   By the way, you've received financial remuneration from

11   the Dow Chemical Company over the years, right?  Your company

12   has?

13   A.   On this particular paper?

14   Q.   Not asking about this particular paper.  Over the years

15   your company, TERA, has received financial remuneration from

16   Dow Chemical Company?

17   A.   For several projects, yes.

18   Q.   And you authored a piece called *Crystallographic*

19   *Analysis and Mimicking offers Estradiol Binding:*

20   *Interpretation and Speculation*.  Do you recall that article?

21   A.   I'd have to see that to make sure.  That sounds like

22   letters to the editor.

23   Q.   Well, I misspoke.  It's a letter to the editor.

24   A.   Right.  And that was by Tom, the lead author, Thomas

25   Osimitz.

1    Q.   Why don't I just give you a copy of it.

2    A.   That works, yeah.  Thanks.

3         MR. DOUGLAS:  May I approach?

4         THE COURT:  You may.

5    BY MR. DOUGLAS:

6    Q.   Is that the article you had in mind?

7    A.   Yeah.  That's the letter to the editor.

8    Q.   The letter.  Excuse me.  Let's put that up on the Elmo.

9         This is the title of the article, right, the letter?

10   A.   Right.

11   Q.   And that's you?

12   A.   Right.

13   Q.   Signing off as one of the people signing off on the

14   letter, right?

15   A.   Yes.

16   Q.   And it says, the work was supported by the North

17   American Flame Retardant Panel of the American Chemistry

18   Council which previously provided funding for travel expenses

19   and honoraria to the authors as members of NAFRA.

20        You see that?

21   A.   Yes.

22   Q.   So it would be another industry organization who has

23   supported or funded your work, right?

24   A.   The TERA work, right.

25   Q.   Just a moment.

Vol. 12 –   88

```
 1     A.    No worries.

 2     Q.    You authored an article with a Dr. Samuel M. Cohen who

 3   we're going to hear from in a little while called *Linear*

 4   *low-dose extrapolation for noncancer health effects is the*

 5   *exception, not the rule.*  Do you recall that?

 6     A.    Yes, I do.

 7           MR. DOUGLAS:  May I approach?

 8           THE COURT:  You may.

 9   BY MR. DOUGLAS:

10     Q.    You have it in your hand, sir?

11     A.    Yes, I do.

12     Q.    First I want to ask about this fellow, Samuel M. Cohen.

13   You know him?  You co-authored an article with him.

14     A.    I know him.

15     Q.    How long have you known Dr. Cohen?

16     A.    I've known of him for probably a dozen years.  Working

17   with him is infrequent.

18     Q.    Did you know that he is a retained expert for DuPont in

19   this case?

20     A.    No.

21     Q.    Is that the first you're hearing of it?

22     A.    Yes.

23     Q.    He's going to take that very witness chair when you are

24   done?  You didn't know that?

25     A.    I didn't know that.
```

1    Q.    And if you go to, I believe, again, the second to last

2    page, it might be the third to last page, under acknowledgments

3    and declaration of interest.  You'll see it states, this paper

4    that you wrote or co-authored with Dr. Cohen, this paper was

5    prepared with financial support provided by the American

6    Chemistry Council to Gradco LLC doing business as Gradient.

7         You see that?

8    A.    Yes.

9    Q.    That's another industry company that's funded your

10   company TERA, correct?

11   A.    Yeah.  The American Chemistry Council through Gradient.

12   Q.    Right.

13   A.    Right.  Gradient is a consulting group, it's not

14   industry.  That's correct.

15   Q.    We could go all day.  I'll just do one more.

16   A.    Sure.

17        MR. DOUGLAS:  May I approach, Your Honor?

18        THE COURT:  You may.

19   BY MR. DOUGLAS:

20   Q.    You recognize what you are holding in your hand, sir?

21   A.    Yes, I do.

22   Q.    What is that?

23   A.    A paper that was just recently published in the Journal

24   of Toxicology by my co-authors Rhian Cope who is now with the

25   Australian Authority for Medical Veterinary Sciences, Sam Kacew

1  up at the University of Ottawa and myself.

2  Q.   If you go to the acknowledgments in this article.  It

3  states, this research is performed by scientists with the MPI

4  Research located on North Main Street in Mattawan, Minnesota

5  (sic).  This research is sponsored by Brominated Flame

6  Retardant Industry Panel of the American Chemistry Council

7  located at 700 Second Street in Washington, D.C.  You see that?

8  A.   Yes, I do.

9  Q.   That's another company, another industry organization

10 that you have worked with, sir; is that correct?

11 A.   That's correct.

12 Q.   We could go through many, many more of your articles and

13 there are dozens of different chemical industry, pharmaceutical

14 industry and other industries that you have worked with over

15 the years, right?

16 A.   That's correct.

17        THE COURT:  Counsel, let me see you at side-bar for

18 just a moment.

19        You may stand by your seats, ladies and gentlemen.

20                          - - -

21    Thereupon, the following proceeding was held at side-bar:

22        THE COURT:  We've got a juror pretty much completely

23 out.  I'm thinking of -- I'm think about maybe excusing him.

24 We had said we've got eight, seven or six.

25        MR. PAPANTONIO:  Which one is it?

1          THE COURT:  If you're looking at the front row, two in

2     from the left.

3          MR. DOUGLAS:  Blue shirt.

4          THE COURT:  Yes.

5          MR. DOUGLAS:  Judge, if I can be heard on this.  What

6     I noticed is he's almost, I call it the hound dog effect.  It's

7     almost as if he's sleeping and all of a sudden he'll pop up and

8     he'll start taking notes.

9          THE COURT:  I noticed that, too.  I can't tell if he's

10    completely out or not.  But I am concerned.  None of us want

11    anybody to decide the case who hasn't heard the whole case.

12          MR. PAPANTONIO:  We are very concerned about that.

13          THE COURT:  That's why I keep doing this.  It's not

14    working.  Usually with most people it shakes them up a bit.  I

15    noticed it seems to have no effect.

16          MR. MACE:  What I have seen with jurors that they're

17    still listening even though their eyes are closed.

18          THE COURT:  That's what we never know for sure.

19          MR. PAPANTONIO:  Judge, here's what I've noticed also.

20    There are two jurors that keep looking down at him when he's

21    asleep almost as if they want to wake him up.

22          THE COURT:  Right.  I noticed that, too.

23          MR. PAPANTONIO:  That's a very big concern of ours.

24          THE COURT:  We can address that maybe at 5:00 today

25    but I'm thinking the other option would be for me to take him

Vol. 12 -    92

1    in and just ask him is there anything we can do to help you,

2    can you bring some coffee in with you.  My guess is he's

3    medicated, he's not doing this deliberately.

4            MR. MACE:  We have no objection to your talking to

5    him, Your Honor.  Obviously in a discreet manner.

6            THE COURT:  I'd do it privately unless there's an

7    objection I'd just bring him in.  Why don't we do that?

8            MR. PAPANTONIO:  Judge, can we talk about it a little

9    bit more before we do that?

10           THE COURT:  All right.

11           MR. PAPANTONIO:  But we have the same concerns.  But

12   so what we've been trying to put everything together and what

13   we are observing is he keeps -- the other jurors keep looking

14   at him like wake up.

15           THE COURT:  Yes.  That's my observation as well.

16           MR. MACE:  I haven't observed that, for the record.  I

17   have not observed that.

18           THE COURT:  Thank you.

19                            - - -

20      Thereupon, the following proceedings were had in open

21   court:

22           THE COURT:  Mr. Douglas, you may continue.

23    BY MR. DOUGLAS:

24    Q.   Just a few more questions.

25    A.   Sure.

Vol. 12 –   93

1    Q.    Sir, you would agree that risk assessment is an inexact

2    science?

3    A.    Risk assessment is like a logic problem.  It falls into

4    different disciplines of toxicology, epidemiology and other

5    disciplines, medical science.  So it's imprecise.

6    Q.    So you would agree that it's an inexact science?

7    A.    Well, I think my views have changed a little bit over

8    the years but inexact is another way to say it, perhaps.

9    Q.    You've written an article entitled *The inexact science*

10    *of risk assessment and implications for risk management*, right?

11    A.    Yes.  That was back in the late '90s, I believe.  Which

12    is why I made the statement my views have changed somewhat.

13    Q.    I'm going to ask you about some of the views you've

14    expressed in that article.

15    A.    Thank you.

16        MR. MACE:  Your Honor, may we approach?

17        THE COURT:  I'll see you again at side-bar.

18        You may stand if you wish, ladies and gentlemen.

19                        – – –

20    Thereupon, the following proceeding was held at side-bar:

21        THE COURT:  Mr. Mace.

22        MR. MACE:  Counsel has been dancing over the line but

23    now he's clearly crossing it asking opinion testimony that he's

24    excluded me from getting into with him.  If he wants to open

25    the door to this.

1          THE COURT:  Is this the article?  How do you respond?

2          MR. DOUGLAS:  The same way I responded before the

3    break, Your Honor.  This witness was portrayed, was brought

4    here to testify about reliable -- he asked the witness to vouch

5    for the reliability.  Whether that question was objectionable

6    and therefore it goes to the reasonableness of the company

7    relying on it.

8          THE COURT:  I get that.  But the trouble is this is a

9    different study.  This is a general attack, not attack but it's

10   a limiting as far as so it doesn't go to this particular study.

11         MR. DOUGLAS:  I'll move on.

12                          - - -

13     Thereupon, the following proceedings were had in open

14   court:

15         THE COURT:  Mr. Douglas, you may continue.

16    BY MR. DOUGLAS:

17    Q.   You received that award there you brought with you to

18   court today from the West Virginia Department of -- from the

19   West Virginia DEP?

20    A.   Yes.

21    Q.   May I see it, please?

22    A.   Sure.

23         MR. DOUGLAS:  May I approach?

24         THE COURT:  The deputy clerk would give it to you.

25         If you would.

1    BY MR. DOUGLAS:

2    Q.   Did it come framed or did you have it framed?

3    A.   I framed it.

4    Q.   Did somebody ask you to bring it with you today?

5    A.   Yes.

6    Q.   Was that before or after you were subpoenaed to be here?

7    A.   That was before.

8    Q.   By the way, this subpoena is really just a charade for

9    the jurors, right?

10   A.   I'm not sure what you mean.

11   Q.   We talked before that you intended to come here even

12   before you were served with a subpoena.  You recall that

13   testimony earlier?

14   A.   I think the question was, I talked to Mr. Mace.  I'll

15   try to get this correct.  Talked to Mr. Mace several months ago

16   about questions of what we had in our file and then subsequent

17   to that, Mr. Mace indicated that there might be a trial and the

18   trial would be somewhere in the range of the end of September

19   so would you please consider holding that week available.

20   Q.   And you did hold the week available?

21   A.   The first three days available.  And then last week I

22   found out it was going to be today.

23   Q.   When did you find out it would be today?

24   A.   Last week.

25   Q.   Last week.  So you've been planning to be here for quite

1    a while, right?

2      A.    No.

3      Q.    Well, you were planning to be here before you were even

4    served with the subpoena?

5      A.    Yes.

6      Q.    Weeks before, right?

7      A.    I'm not sure what you mean by planning.  I have it on my

8    schedule.

9      Q.    Well, I think it's pretty simple but maybe I'm not being

10   articulate enough.  You did tell us that you set aside this

11   week?

12     A.    Right.

13     Q.    Right?  You planned on being -- you understand the word

14   planned?

15     A.    It has -- planning is putting it on the schedule and

16   preparing for it.

17     Q.    So you cooperated with Mr. Mace in setting aside time

18   three days out of this week to potentially testify at this

19   trial?

20     A.    Yes.

21     Q.    And you grabbed your little certificate here you got

22   from the DEP of West Virginia, right?

23     A.    Yes.

24     Q.    So you could show the jurors, hey, I got a certificate,

25   right?

Vol. 12 -   97

1      MR. MACE:  Your Honor, I object to the demeaning

2    nature of these questions, the whole attitude.

3      THE COURT:  Listen, about side-bar, the objection is

4    sustained.

5    BY MR. DOUGLAS:

6    Q.   Sir, were you told to bring your certificate?

7    A.   I was not told to bring it.  I was -- it was asked if I

8    would bring it and I said yes.

9    Q.   Sir, this has to do -- you were given this certificate

10   for the work you did when you came up with this 150 parts per

11   billion, right?

12   A.   We got the certificate for the work we did to

13   scientifically evaluate the information and came up with a

14   scientifically-based number.

15   Q.   Which was 150 parts per billion?

16   A.   For oral exposure, that's correct.

17   Q.   Which was 150 times higher than what DuPont had already

18   set at the time you did your work, right?

19   A.   That may or may not be true.

20   Q.   You know that other states and other offices of

21   Environmental Protection have done risk assessments over time

22   both before and after your work?

23   A.   Yes.

24   Q.   And being naturally and intellectually curious, I'm sure

25   you're aware of these other results, right?

Vol. 12 -    98

1    A.    I'm aware in general terms of these other results, yes.

2    Q.    I want to share a few of them with you for a moment.

3  Okay?

4    A.    Certainly.

5    Q.    I'm going to -- do we have that slide?

6          Bobby Rickard, Dr. Rickard had a report in this case and

7  he summarized all of the other risk assessment values that have

8  been done over the years.  I'll just ask you to assume that.

9    A.    Okay.

10   Q.    My question was, were you aware of that, that

11  Dr. Rickard prepared a report in this case?

12   A.    I'm not aware of that report.

13         MR. DOUGLAS:  With counsel's permission.

14         THE COURT:  Any objection, Mr. Mace?

15         MR. MACE:  As long as it's clear this is not -- this

16  slide is not out of Dr. Rickard's report.  It's something

17  counsel created.

18  BY MR. DOUGLAS:

19   Q.    What this is, is the values were taken from

20  Dr. Rickard's report, which we'll establish when he testifies,

21  and summarized on this table that we did create, but taken from

22  his report.

23         So this is C-8 risk assessments over time for drinking

24  water per Dr. Rickard's report dated January 27, 2015.

25         THE COURT:  Take that down while they're talking.

Vol. 12 –   99

1      MR. MACE:  Let me just note for the record, I noticed

2  an error.  But he can use it.  We'll just point out the error

3  later.

4      THE COURT:  Put it back up.

5  BY MR. DOUGLAS:

6  Q.   You see in 1988, DuPont had set a level of 1 part per

7  billion.  We talked about that, right?

8  A.   Yes.  We talked about it.

9  Q.   So your number, and by simple math of 150 parts per

10  billion, would be 150 times higher than that, right?

11  A.   Well, you're making a comparison on the basis of one's

12  science generated and one is not.  I don't think the comparison

13  is appropriate.

14  Q.   Sir, let's just do the math and let the jury decide

15  what's science based.  Your number of 150 parts per billion is

16  150 times higher than 1 part per billion, correct?

17  A.   Again, sir, you're comparing different things.

18  Q.   Sir, is 150 parts per billion 150 times higher than 1

19  part per billion?

20  A.   That's easy to answer.  It is.

21  Q.   Thank you.  And in 2002, Environ, a DuPont contractor,

22  had set a risk assessment of 14 parts per billion.  I'm going

23  to ask you to assume that.  Were you aware of that?

24  A.   I don't believe so.

25  Q.   And that would be, if my math is correct, 14 parts per

Vol. 12 -  100

1    billion or -- let's do it the other way around.  150 parts per

2    billion is more than ten times higher than 14, right?  So the

3    number you got was over ten times higher than Environ, right?

4    A.   That's correct.

5    Q.   Not even close, right?

6    A.   Is that a question?

7    Q.   Yeah.  Those two numbers are not close.  Something

8    that's ten times higher than another value is not close.  If

9    you're having trouble, I'll move on to another question.

10   A.   You're, again -- I don't know the basis of the Environ

11   2002 assessment.

12   Q.   They're all based on the same available information that

13   was out there that you based your -- that TERA found 150 parts

14   per billion, right?

15        MR. MACE:  Objection.  Compound.  Assumes facts.

16        THE COURT:  Rephrase the question.

17   BY MR. DOUGLAS:

18   Q.   Let's just move on to Minnesota Department of Health.

19   Were you aware that they had formed a risk assessment and came

20   up with a value of 7 parts per billion in water?

21   A.   I wasn't aware of that in 2002.

22   Q.   But 150 parts per billion would be 20 times higher than

23   7 parts per billion, right?

24   A.   If we're comparing just strictly numbers.

25   Q.   Just numbers, sir?

1    A.    And assuming nothing else, then, sure, you could do the

2    math.  It's easy.

3    Q.    So the North Carolina Division of Water Quality found a

4    value limit of 2 parts per billion in water.  Were you aware of

5    that?

6    A.    No.

7    Q.    And 150 parts per billion would be 75 times higher, sir,

8    than 2 parts per billion, right?  Simple math?

9    A.    Simple math.

10   Q.    We can go down the list.  You'll see Minnesota set a

11   limit of 1.5.  Again, in 2013, North Carolina Division of Water

12   revisited the subject and lowered theirs to 1 part per billion.

13   And then were you aware of the Maine Center of Disease Control

14   set a value of .1?  Were you aware of that, sir?

15   A.    I'm not aware of that.

16   Q.    Sir, did you know that the New Jersey Department of

17   Environmental Protection set a limit of .04 parts per billion?

18   .04, that's even lower than this .05 in 2006.  Did you know

19   that.

20   A.    I wasn't aware of that.

21   Q.    Your value of 150 was a number, 150 parts per billion is

22   3,500 times higher than the value of .04.

23        THE COURT:  Counsel, let me see you at side-bar.

24        You may stand if you wish, ladies and gentlemen.

25

Vol. 12 - 102

1                          – – –

2      Thereupon, the following proceeding was held at side-bar:

3           THE COURT:  So this was a process witness as I

4  understood, not an expert, and the process arguably would

5  include what did you do before you came up with these numbers.

6  But this is a 2002 report.  How do the numbers that come after

7  that play into this witness?

8           MR. DOUGLAS:  I think it still goes to the reliability

9  of the methodology.  The result is so far off from every other

10  organization that has ever looked at it.

11          THE COURT:  You mean all the ones.  A number of these

12  were in existence before they completed their study.  I have no

13  issue with that.  But there are things that come after.

14          MR. DOUGLAS:  I think it still goes to the issue of

15  getting it right and how unreliable this was.  It was not

16  reasonable.

17          THE COURT:  Then what he's testifying to is the

18  standard.  I thought we agreed he was testifying as to the

19  process?

20          MR. DOUGLAS:  It is about the process.  What I'm

21  demonstrating is by virtue of the fact that his calculation was

22  so off the reservation is that it wasn't reliable and it wasn't

23  reasonable for the company to rely on it.  It's so outlandish.

24          MR. MACE:  I think he's opened the door pretty broad

25  in this, Your Honor, and showing that slide I'm entitled to

1    refer back to that slide now.

2         THE COURT:  Obviously.  I wouldn't argue that point.

3    It's been used.  I'm inclined to tell the jury that this

4    doesn't go to -- it doesn't go to -- it goes to the

5    reasonableness of the work done.  That's the only basis they

6    can consider.

7         MR. DOUGLAS:  That's what I'm offering it for.

8         THE COURT:  I'd also not go along if you tell me to.

9    But it would be the defendant that's asking for it.

10         MR. MACE:  I'm not asking for it.

11         THE COURT:  Very good.

12         MR. PAPANTONIO:  One other thing.  The juror next to

13    number two one time had to nudge.  I started watching.

14         THE COURT:  The nudging is probably a good thing.

15         MR. PAPANTONIO:  It is.  It is.  But I've been

16    thinking about the last conference, the last time we talked

17    about this.  I think we're really prejudiced, both sides, to

18    have the Court say, you got to stay awake, because he doesn't

19    know where that comes from.  And if we can continue to monitor

20    this, I literally saw --

21         MR. MACE:  I think the courtroom deputy or somebody

22    could do it.  I have no problem if one of the court staff does

23    it.

24         THE COURT:  I'd be more concerned about that.  First

25    of all, my bailiff isn't here.  I know this fill-in bailiff

Vol. 12 - 104

1  really well but that's not part of what they're used to doing.

2  I also thought maybe let them bring coffee in.

3       MR. MACE:  We have no objection to that.  Probably a

4  good idea.  I'd like to bring some myself, Your Honor.

5       THE COURT:  It doesn't apply to anybody else.

6       MR. PAPANTONIO:  What I'm concerned about is how much

7  has been missed.  I really am very much concerned.

8       MR. MACE:  I think Your Honor has been monitoring that

9  pretty well.

10      THE COURT:  I'm trying to.  Sometimes it works.

11  Sometimes it doesn't.  We'll continue.  Right now we're not

12  going to do anything.

13                          - - -

14    Thereupon, the following proceedings were had in open

15  court:

16      THE COURT:  Mr. Douglas, you may continue.

17   BY MR. DOUGLAS:

18   Q.   So what I'm getting at is the reliability of your work

19  that you did back then and, sir, this is not the first time

20  that your risk assessment was very different than other

21  agencies or governmental agencies for other chemicals; is that

22  right?

23   A.   That's correct.  We did something for the State of West

24  Virginia just last year and we lowered the number by eight

25   fold.

Vol. 12 -  105

1    Q.    Well, I'm talking about Alachlor.  Remember your company

2    did work on Alachlor?

3    A.    Alachlor, I'm sorry.  Acetochlor?

4    Q.    Just a moment.

5    A.    That's okay.  Take your time.

6    Q.    Thank you.

7    A.    It's not always easy.

8    Q.    You remember that your company, TERA, reviewed studies

9    that suggested serious health risks with respect to drinking

10   water in Wisconsin as a result of chemicals manufactured by the

11   company Monsanto.  You recall that?

12   A.    I believe that was the acetochlor which is an herbicide

13   and its degradation products in water, in ground water.  I

14   think that's what you're referring to.

15           MR. DOUGLAS:  May I approach, Your Honor?

16           THE COURT:  You may.

17           MR. MACE:  May we approach, Your Honor?

18           THE COURT:  Yes.  You may stand if you wish, ladies

19   and gentlemen.

20                         - - -

21     Thereupon, the following proceeding was held at side-bar:

22           MR. MACE:  So our objection, Your Honor, would be --

23           MR. DOUGLAS:  I'm not going to offer it.

24           MR. MACE:  I don't want you displaying it.  This is

25   another one of these media slander campaigns.

1          THE COURT:  Let's do this.  I'm going to be strict

2    about foundation.  Ask him if he's seen this before, ask him if

3    he's familiar with it before we get into and no representation

4    of who did it.

5          MR. MACE:  Or what they said.

6          THE COURT:  Until there's some authentication.  He's

7    not in the category, for example, of two or three DuPont

8    witnesses that I said could be crossed on things that they

9    maybe should have been aware of.  He's not in that category.

10         MR. MACE:  But, Your Honor, we'd object to how he used

11   the prior document like this repeating hearsay statements and

12   displaying them, even orally, to the Court.

13         THE COURT:  Not necessarily saying I disagree.  But

14   we're done with that.  And we can bring it back on redirect.

15   But again, I encourage the adversarial process.  You have to

16   tell me if there's something that you believe is inadmissible.

17         MR. MACE:  I'm telling you now.

18         MR. DOUGLAS:  Judge, just I think counsel jumped the

19   gun.  I'm not going to offer this in evidence.

20         THE COURT:  But even if you don't offer it, if you

21   describe it to the jury, essentially testifying.  If he doesn't

22   have any knowledge.

23         MR. DOUGLAS:  May I explain?

24         THE COURT:  All right.

25         MR. DOUGLAS:  There's a table in here that talks about

1   the values.  I'm just going to use it to refresh his

2   recollection as to what his findings were and what the other

3   agencies were.

4        THE COURT:  If he can identify it, has some idea,

5   that's what we'll see.

6        MR. DOUGLAS:  That's all.

7                        - - -

8     Thereupon, the following proceedings were had in open

9   court:

10   BY MR. DOUGLAS:

11   Q.   Sir, I'm just going to ask you to turn to page 8.

12   That's a table on page 8.

13   A.   Is this the latest copy of this?  We talking about this

14   document or not?

15   Q.   Sir, this document is not going to come into evidence.

16   There's a table I'd like to direct your attention to.  If you

17   would just go to page 8.

18   A.   Yes, sir.  I have it.

19   Q.   There's a chemical that is mentioned on that page in the

20   table.  You see that?

21   A.   I see six chemicals.  Which one?

22   Q.   The first one on the left.

23   A.   Alachlor.

24   Q.   And the one to the right is Alachlor ESA?

25   A.   That's right.

1    Q.    Do you recall that you were asked to do a risk

2    assessment to come up with a determination of level of parts

3    per billion were for Alachlor ESA?  By you, I mean your

4    company?

5    A.    We were not charged to do that, no.

6    Q.    Do you see where it says Wisconsin?  And in that matter,

7    Wisconsin determined a level of 20 parts per billion with

8    respect to this Alachlor ESA in the drinking water.  Does that

9    sound about right to you?

10   A.    That's what the table says, yes.

11   Q.    Do you recall Minnesota came up with a value of 70 parts

12   per billion in its risk assessment advice?

13   A.    That's what the table says, yes.

14   Q.    And North Carolina came up with .4 parts per billion?

15   A.    That's what the table says.

16   Q.    And your company came up with 5,600 parts per billion?

17   A.    That's not our number.

18   Q.    That's not your number?

19   A.    No, sir.

20   Q.    That's wrong?

21   A.    That's not correct.  We were not charged to come up with

22   safe water levels.  We were charged to come up with acceptable

23   daily intakes.

24   Q.    And the value was 5,600 parts per billion?

25   A.    That was determined by somebody else.

Vol. 12 - 109

1    Q.   It's not your company?

2    A.   This isn't the latest version of the document.  It's not

3    in evidence.  We have an annotated version of this correcting

4    it along with a press release and it's on our website if you

5    wish to see it.

6    Q.   Sir, your work was criticized.  You talk about the

7    certificate but in fact the Little Hocking Water Association is

8    extremely critical of the work that you did, that TERA did in

9    this case; is that correct?

10        MR. MACE:  Objection, Your Honor.

11        THE COURT:  Objection is sustained.

12        THE WITNESS:  Are we still on this?

13   BY MR. DOUGLAS:

14   Q.   No.  You can put that down.

15   A.   Thanks.

16        MR. DOUGLAS:  Those are all the questions I have for

17   you now, sir.

18        THE COURT:  Mr. Mace, you may redirect.

19                       - - -

20                REDIRECT EXAMINATION

21   BY MR. MACE:

22   Q.   How are you doing, Doctor?

23   A.   Good.

24   Q.   Some of us have had too much caffeine today.

25   A.   It's good to be here.

1    Q.    Let me see if I can clear up a few things.  Won't take

2    too long.

3          If we could bring up D613.  So this is the CATT team

4    report.  Could you go over to dot 3, page 3.

5          In terms of the contractor that you couldn't recall the

6    name of, does this refresh your recollection?

7    A.    Yeah.  Thank you.

8    Q.    What was it?

9    A.    The National -- that sounds right.

10   Q.    National Institute for Chemical Studies?

11   A.    Yes.  Thank you.

12   Q.    So your testimony was West Virginia hired this

13   contractor.  The contractor hired you?

14   A.    That's my understanding from my recollection.

15   Q.    Let's go down to the bottom of the page and I wanted to

16   get -- in regard to these three doctors from EPA.  Counsel

17   threw some rocks at you, your team.  Are you aware of any

18   criticism that was ever made of any of those EPA scientists

19   that were on that CATT team?

20   A.    Criticism from whom?  I'm not aware of any criticism of

21   their participation on the CATT team.

22   Q.    Or their work on the CATT team?

23   A.    No.  Not aware of any of that.

24   Q.    What about from the Agency for Toxic Disease Registry,

25   Dr. Wheeler.  Are you aware of anybody criticizing his work on

1    the CATT team?

2    A.   I don't have any -- I'm not aware of anything along

3    those lines.

4    Q.   Do you recall this Ohio EPA observer who was at the

5    meeting?

6    A.   Right.  I hadn't met him before.  If he walked into the

7    room now, I wouldn't recognize him.  There was an Ohio person

8    there.

9    Q.   Counsel asked you about a couple organizations, the

10   Center for Public Integrity and Inside Climate.  Are those

11   state or federal governmental agencies?

12   A.   I don't believe so.

13   Q.   And in the same article that he showed to you he read

14   you the first half of your sentence.  We get criticized by

15   everyone.  He didn't read the second half.  But that doesn't

16   change the fact that TERA is neutral.  Is that what you

17   actually said?

18   A.   Yeah.  Absolutely.

19   Q.   He showed you Defendant's Exhibit -- P1.3232 and there

20   was an implication at one point that you had a phone

21   conversation with Dr. Rickard before the CATT team was formed.

22   Did you have any conversation with Dr. Rickard before the CATT

23   team was formed?

24   A.   Not that I recall.

25   Q.   So you referred to this e-mail from 2000 and words I

Vol. 12 -  112

1    don't think he emphasized, their ability to put together an

2    independent peer review panel.  Is that what you did, put

3    together an independent peer review panel?

4      A.   In the case of the CATT team, I think folks were already

5    chosen.  I'm not so sure we actually put that panel together.

6    I'd have to go back and sort that.

7      Q.   Was that part of Dr. Staats from West Virginia?

8      A.   I believe that was already prearranged.

9      Q.   You talked about your mission statement on the website.

10        MR. MACE:  May I approach, Your Honor?

11        THE COURT:  You may.

12    BY MR. MACE:

13     Q.   I've handed you or the clerk has handed you a

14    demonstrative aid that we haven't marked as an exhibit.  Do you

15    recognize that?

16     A.   Yeah.

17     Q.   What is that?

18     A.   That's a page out of our TERA website.

19     Q.   Could we bring that up, please?  Let's bring up the

20    first couple paragraphs.

21        TERA was founded on the belief that an independent

22    nonprofit organization can provide a unique function to protect

23    human health by conducting scientific research and development

24    on risk issues in a transparent and collaborative fashion and

25    communicating the results widely.

1          Was that the attitude you brought toward your work on

2    the CATT team?

3      A.    That's the attitude we bring with all our work,

4    including the CATT team.

5      Q.    You refer to your mission being protection of public

6    health by developing, reviewing and communicating risk

7    assessment values and analyses.  Is that what you brought to

8    bear with the CATT team?

9      A.    Right.  We didn't do much in the way of communication

10   but we certainly did do in the way of development.

11     Q.    Were you aware that the State of West Virginia had

12   enlisted Dr. Becker from Marshall University and a couple other

13   people on the communication aspect?

14     A.    I don't recall those details.

15     Q.    You didn't get involved in that aspect of it?

16     A.    Not at all.  No.

17     Q.    In terms of TERA's core principles and values, if we

18   could go down to that.  Honesty and integrity, independence,

19   transparency, collaboration.  Those are the core principles

20   you've tried to live by?

21     A.    Absolutely.  On a daily basis.  And we try to always

22   improve it.

23     Q.    Over at the third page there's a reference in the last

24   paragraph here.  An award from the Independent Charities Seal

25   of Excellence.  What's that about?

1    A.   We were -- because we're a 501(c)3, a nonprofit

2   corporation, we're allowed to apply for the Combined Federal

3   Campaign.  So what that is, it's federal workers can give their

4   money away.  They can give it to charities.  So the 501(c)3 tax

5   code allows us to be considered a charity even though we're a

6   science work, we're a charity by that definition and so we were

7   accepted into the campaign and of course there's a lot of them

8   operating and we were awarded the seal of excellence, which was

9   quite surprising, but we were humbled to get it.

10   Q.   You refer to high standards of public accountability,

11   program effectiveness and cost effectiveness.  That was part of

12   the consideration?

13   A.   Oh, absolutely.  Right.

14   Q.   You referred to an Office of the Inspector General USEPA

15   evaluation.  You're familiar with that report?

16   A.   Yeah.  Very familiar.

17        MR. MACE:  May I approach the deputy, Your Honor?

18        THE COURT:  You may.

19   BY MR. MACE:

20   Q.   Again, we're using this as a demonstrative aid so it

21   doesn't have an exhibit number on it.  You're familiar with

22   that report?

23   A.   Yes, I am.

24   Q.   Would you bring that first page up?

25        What --

1          MR. DOUGLAS:  Your Honor, may we side-bar?

2          THE COURT:  You may stand by your seats, ladies and

3   gentlemen, if you wish.

4                         - - -

5      Thereupon, the following proceeding was held at side-bar:

6          MR. DOUGLAS:  I don't understand how this is a

7   demonstrative issue not being shown to the jury.  I don't know

8   what this is.

9          THE COURT:  What's it connect to this?

10          MR. MACE:  Counsel has impunged (sic).

11          MR. DOUGLAS:  Impugned.

12          MR. MACE:  Whatever he's done.  Criticized the witness

13   and his organization.  Plaintiffs' counsel has severely

14   criticized the witness and his organization and implied that

15   they are industry beholden and --

16          THE COURT:  Here's TERA.

17          MR. MACE:  So they're one of the people asked to

18   consult on this for the EPA and reviewed --

19          THE COURT:  So they're in here.  I get that.  You just

20   don't want it displayed.  You don't care if there's questions

21   about it.

22          MR. DOUGLAS:  It shouldn't be displayed.

23          MR. MACE:  What if I just do page four?

24          MR. DOUGLAS:  Just ask him.

25          MR. PAPANTONIO:  Just ask the question.

1          MR. DOUGLAS:  The witness is here to testify, not to

2     read documents.

3          THE COURT:  I mean I'd say you're about even on that

4     score.  And I have to tell you, both sides, that's been an

5     unusual method for me.  I'm not used to that.  But having said

6     that, you don't want any part of this in?

7          MR. DOUGLAS:  No.  It's collateral.

8          THE COURT:  It's collateral.  You can ask him.  We'll

9     leave the document out at this time point.

10                          - - -

11      Thereupon, the following proceedings were had in open

12     court:

13      BY MR. MACE:

14      Q.   Doctor, can you describe the document for us?  What's

15     that about?

16          MR. DOUGLAS:  Objection, Your Honor.  I think that's

17     the whole --

18          THE COURT:  Overruled.  You may answer.

19          THE WITNESS:  The Inspector General of USEPA was

20     looking at the Integrated Risk Information System process.

21     That's an agency unit and specifically the peer review within

22     it.  Remember, when I was back at EPA our group helped develop

23     IRIS.  It was mostly internal.  Then I left EPA and it started

24     to get more influential, which is good, and it has these

25     external peer review panels, and there's lots of angst about

1    them from a variety of groups, not just industry.  NGOs and

2    everybody, I suppose.  So the Inspector General said, we're

3    going to look at the process.  And unbeknownst to us, they

4    looked at the process and they pulled out examples of other

5    processes that were done well and they pulled out TERA as an

6    example comparability.  And there's a table that shows

7    comparability with not only IRIS but also TERA and then four

8    other government organizations.

9    BY MR. MACE:

10   Q.    So is this one of the records you referred to when

11   counsel was questioning you with regard to some of the rocks

12   that had been thrown at TERA by some outside organizations and

13   you were saying, well, the Inspector General had --

14   A.    Yeah.  That's it.  Right.

15   Q.    In terms of the review that was done by the Office of

16   Inspector General at USEPA, did they find that you had adequate

17   controls for conflict of interest and independent research to

18   identify potential panelist bias or conflict?

19   A.    Yeah.  We came across, in comparison, very good on that

20   issue and others as well.  And they summarize in a table in the

21   appendix that's easy to see.

22   Q.    Let's switch to a new topic.  Counsel showed you a

23   couple documents.  The 2012 project time by sponsor.  And he

24   focused on the 40 percent for profit and some of the companies

25   there.  But he ignored completely the 60 percent government

 1    nonprofit.  So could you tell us a little bit about what you

 2    did for the National Library of Medicine over the years?

 3      A.   Yeah.  In that particular -- that was 2012.  I think

 4    what we were doing is we put together a database of risk values

 5    called international toxicity estimates for risk.  It's freely

 6    available, has lots of different people's risk values on it,

 7    including those have been through independent vetted peer

 8    review by our group but also the Dutch and the Health Canada

 9    and EPA's IRIS.

10      Q.   Refers to NIOSH, National Institute of Occupational

11    Safety and Health.  What have you done for them over the years?

12      A.   In that particular case, NIOSH is a group that protects

13    American workers.  What we did that particular year, we've been

14    working with them every year, we were doing immediately

15    dangerous to life and health estimates.  So in other words, you

16    got a worker goes into a place, there's a certain level in air.

17    If it's immediately dangerous to life and health, they're out

18    of there.  We're determining those levels for NIOSH.  We

19    actually got an award for that that's listed somewhere.

20      Q.   That's enough.

21      A.   Sure.

22      Q.   I'm sorry to cut you off.

23      A.   That's fine.  I talk too much sometimes.

24      Q.   Consumer Products Safety Commission.  What have you done

25    for them over the years?

1   A.   Right now we're doing a series of work on Phthalate

2  ester exposure information and there was a review team, a team

3  that was put together for the Phthalate esters and it was a

4  National Academy of Science structure team and we did an

5  independent peer review for that team.  That team, National

6  Academy of Science team, wanted independent peer review and

7  Consumer Products tagged us to do that for them.

8   Q.   I guess the bottom line on this graphic is in terms of

9  the amount of your funding that came from government nonprofit,

10  was it more than half, 60 percent?

11   A.   Oh, yeah.  Those are, yeah.

12   Q.   So focusing on the 40 percent, the for profit, would

13  that be taking things out of context with regard to the overall

14  work?

15   A.   Well, we try to be neutral and work for all parties.  So

16  that's an important part of our work.  Just focusing on one

17  part of it of course misses the rest.

18   Q.   Then on the 2013 graphic, again, he focused on the

19  37 percent.  But that year did you, as well, do 63 percent

20  government nonprofit?

21   A.   Right.  Yeah.

22   Q.   You talked about some of these.  What about Health

23  Canada, what have you done for them over the years?

24   A.   We do a lot of work for Health Canada.  We do a lot of

25  their independent peer reviews.  They had something called

Vol. 12 - 120

1    Domestic Substances List. 23,000 chemicals. They whittle it

2    down, they write reports and we help review those reports.

3    That's one aspect. That's probably a large aspect. We've also

4    done other smaller tasks for them, independent peer reviews.

5    Q.   And maybe you should clarify for us. What is Health

6    Canada?

7    A.   Oh, it's -- Health Canada is the federal health agency

8    for Canada and that includes environmental protection for not

9    only humans but also ecological systems, birds, butterflies and

10   fish. And that's a large agency. And then they have separate

11   agencies like we do in the U.S. for occupational safety and

12   health and pesticide evaluations.

13   Q.   So Health Canada would have, in Canada, the same

14   responsibility and even more than USEPA does in the United

15   States?

16        MR. DOUGLAS:  Objection. It's leading. He's

17   testifying.

18        THE COURT:  Rephrase.

19   BY MR. MACE:

20   Q.   Does Health Canada, in Canada, do equivalent functions

21   to what USEPA does in the United States?

22   A.   I would say that's correct.

23   Q.   While we're on the context point. We went over this

24   graphic in your direct examination, you'll recall, in terms of

25   your work different years. You recall that?

Vol. 12 —  121

1    A.   Yes.

2    Q.   And counsel chose to focus on two years that aren't even

3    on this page in 2012 and 2013.  But back in the year that's at

4    issue for what you were brought here to testify about, the CATT

5    team, what was the percentage breakdown back then?

6    A.   Yeah, it was 72/28.  I think we also had a large USEPA

7    task, the World Trade Center disaster peer review.  We did

8    that.  That was in that year as well.

9    Q.   Who was that done for?

10   A.   We were approached by, this is a sad story of course.

11   The trade centers go down for the terrorist attack.  A year

12   later, nine different government organizations had put together

13   a risk document and they invited us to –– asked us to do the

14   independent peer review.  Exactly which agency asked us, I

15   think it was USEPA but I'm not sure.

16   Q.   But any event, it was governmental agencies, not private

17   industry?

18   A.   Right.

19   Q.   All right.  Then in terms of the overall, are the actual

20   numbers consistent with your testimony that, on average, about

21   two-thirds of your work is government and nonprofit work as

22   opposed to industry work?

23   A.   That's correct.

24   Q.   Counsel showed you a graphic, again I apologize for my

25   marks.  That's all I have.  You made a comment something about

Vol. 12 - 122

1    comparing apples to apples.  What was your comment about that?

2    Counsel said, aren't these numbers different than this number?

3    A.    Yeah.  You can do the quantification, of course, but

4    that's not how scientists compare things.  You have to

5    understand what goes into that number.  What we did, per se,

6    was the ADI.  Different states have different assumptions of

7    how much water is drunk, do they partition it to food or soil

8    or something.  So there's other steps that go from the ADI,

9    which is what we did, and then of course use a set assumptions

10   to get to the level using West Virginia's assumptions.

11         I'm not sure what the other groups have done so it's

12   hard to compare.  And I also know that there's other

13   organizations out there, the Committee on Toxicology of the

14   United Kingdom has a value as well.

15         So it's just a matter of you need to understand the

16   basis of the number before you start to compare one to another.

17   Q.    Is that, again, an example of how you have to keep

18   things in context?

19   A.    Well, you do.  There's some differences in the

20   acceptable daily intake amongst these groups.  They also are a

21   different time.  It's 2014 versus 2002.  So there had been --

22   science marches on and you should always incorporate the latest

23   science.

24   Q.    In fairness -- so we have been using this calendar or

25   timeline.  Your work, sir, on this CATT team was done in 2002?

Vol. 12 -  123

1    A.    Right.

2    Q.    And counsel referred to this science panel report.  That

3    came out in 2012, ten years later?

4    A.    The science --

5    Q.    Science panel he referred to.  It's a poster over here?

6    A.    Okay.  Oh, that.  Okay.

7    Q.    2012.

8    A.    I had trouble with that as a fact, but whatever.

9    Q.    Counsel showed you this graphic that's got numbers after

10   that time that have other values, right?  After 2012?

11   A.    Yeah.  There's '13 and '14.  Is that what you're --

12   Q.    Yes.

13        THE COURT:  I'll remind the jury, the numbers are

14   different don't have anything to do with the issues we've

15   talked about as far as general causation.  They do have to do

16   with the state of knowledge that DuPont had at the time.

17   BY MR. MACE:

18   Q.    Sir, I guess in closing, Mr. Douglas asked you about the

19   reliability of your work on the CATT team.  Was your work in

20   2002 on the CATT team reliable based on the state of the

21   knowledge at that time?

22   A.    Absolutely.

23        MR. MACE:  Thank you.  Nothing further.

24        THE COURT:  Thank you.  Recross, Mr. Douglas?

25        MR. DOUGLAS:  Just a few.

Vol. 12 - 124

1                              - - -

2                     RECROSS-EXAMINATION

3      BY MR. DOUGLAS:

4      Q.   Just a few and we'll let you get back to Cincinnati.

5           Despite all the accolades we've been hearing about and

6      all this stuff you put on your website, you're in control of

7      what goes on the website, right?

8      A.   That's right.  Myself and my team.

9      Q.   So to put that in context, it's your website.  You

10     helped create what it says, right?

11     A.   Well, we're a nonprofit.  I don't own anything in the

12     nonprofit.

13     Q.   I didn't ask anything about nonprofits.  I'm asking you,

14     again, you participated in creating the website.  All those

15     facts and figures, 40 percent industry, 60 percent nonprofit

16     and government, right?

17     A.   It's our website.

18     Q.   That's your website.  You approved that, right?

19     A.   Yes.  It's our website, right.

20     Q.   Despite all these accolades that we've been hearing

21     about, your certificate that you were asked to bring to court

22     and you obliged, somehow the folks at DuPont and other folks

23     who throw in -- other organizations, apparently, who are

24     throwing rocks at your company, have the impression that you're

25     in the business of blessing criteria, right?

Vol. 12 - 125

1    A.    You're asking me what?

2    Q.    Some folks at DuPont, the folks at DuPont have the

3    impression, despite everything that we've heard from Mr. Mace,

4    that you're in the business of blessing criteria?

5              MR. MACE:  Objection.  Foundation.

6              THE COURT:  You're asking him to speculate about what

7    people at DuPont knew.

8              MR. DOUGLAS:  I'll rephrase.

9    BY MR. DOUGLAS:

10   Q.    You see where it says blessing criteria?

11   A.    Yes, I do.

12   Q.    Let's read the sentence again together.  One person from

13   another chemical company that used to work in the EPA's

14   criteria office in Cincinnati said that Mike enjoys a very good

15   reputation among the folks that are still in the business of

16   blessing criteria.  You see where I read from?

17   A.    Yes, I do.

18             MR. MACE:  Objection.  Foundation.  Triple hearsay.

19             THE COURT:  I understand this will be coming in

20   anyway.  Starting with that.  But there has to be some

21   foundation for this witness to be able to answer a question

22   about this document.

23   BY MR. DOUGLAS:

24   Q.    My question, sir, is you are unaware of what the term

25   blessing criteria means?

Vol. 12 - 126

1    A.    I've never heard that phrase before.

2    Q.    If I told you it means whitewashing science, does that

3    help you understand the phrase?

4         MR. MACE:  Objection.  Move to strike.

5         THE COURT:  Objection is sustained.  Don't answer it.

6    BY MR. DOUGLAS:

7    Q.    You were asked just now on redirect about all these

8    folks that praised your work with the CATT team.  You recall

9    those questions?

10   A.    Some of them.

11   Q.    But you do know, sir, that at the time you issued your

12   report, right after, the Little Hocking Water Association was

13   highly critical of your work, aren't they, the folks that were

14   drinking they water?

15        MR. MACE:  Objection, Your Honor.

16        THE COURT:  One moment.  Do you know anything about

17   the report?

18        THE WITNESS:  I don't think so.

19        THE COURT:  There has to be a foundation.  At this

20   point the objection is sustained.

21   BY MR. DOUGLAS:

22   Q.    You don't recall, sir, that the screening level of 150

23   parts per billion established by your CATT team generated much

24   criticism and controversy when the results were released?  You

25   don't remember that?

Vol. 12 - 127

1    A.    I don't think I'm aware of that.

2    Q.    You did the work, sir.  You took three, four weeks you

3  came up with this 150 number that is far different than any

4  number anybody else has come up with.  Do you remember the

5  Little Hocking Water Association?

6              MR. MACE:  Objection, Your Honor.

7              THE COURT:  Do you have any knowledge of the water

8  association?

9              THE WITNESS:  I don't have any recollection of knowing

10  that.

11   BY MR. DOUGLAS:

12   Q.    Did you ever hear of Little Hocking?

13   A.    Little Hocking?

14   Q.    Yeah.

15   A.    I think we have Hocking Hills in Ohio but I'm not sure

16  about Little Hocking.

17   Q.    Have you ever heard of Tuppers Plains?

18   A.    I'm sorry?

19   Q.    Ever heard of Tuppers Plains?

20   A.    I don't believe so.

21   Q.    Sir, at the end of the day, the value that you and your

22  CATT team came up with, 150 parts per billion, is numerically

23  higher than this figure here, .05 parts per billion.  We've

24  agreed it's numerically higher, right?

25   A.    I don't agree with what's on that chart.

1      THE COURT:  And that's something that, again, is not

2  at issue.  The question is whether you agree with the number or

3  not.

4  BY MR. DOUGLAS:

5   Q.   Do you agree your number of 150 parts per billion is

6  3,000 times higher than this .05 parts per billion, right,

7  numerically speaking?  Let's keep it simple.

8   A.   I'm in the business of comparing like to like.

9   Q.   Just answer my question, sir.

10      MR. MACE:  Objection to the question, Your Honor.

11      THE COURT:  There's not a response to the question.

12  It's a straightforward question.  If you can answer.

13      THE WITNESS:  There is a difference between the number

14  150 and the number 0.5, yes, there's a difference.

15  BY MR. DOUGLAS:

16   Q.   It's 3,000 times higher, correct?

17   A.   There's a difference between the numbers.  The basis of

18  those numbers are not, at least that one, is not intelligible

19  to me.  So I have nothing more to say.

20   Q.   This is completely unintelligible to you.  That's what

21  you're saying?

22   A.   The basis of that number I don't understand.

23   Q.   You're here to testify about how great your work was

24  that you did in reaching 150 parts per billion.  That's what

25  you said your work was reliable, right?  Just think about the

Vol. 12 -  129

1   question and answer only the question.

2     A.    And we have a report that establishes a basis of that

3   number.

4     Q.    Right.

5     A.    All you have there is four lines.

6           THE COURT:  Well, there's a lot more than four lines

7   there.  And, Doctor, if you're not familiar with it, just leave

8   it at that.  That's not a number picked out of the air.

9           THE WITNESS:  I apologize.

10    BY MR. DOUGLAS:

11    Q.    Would you agree if there were no emissions, if DuPont

12   didn't put this chemical C-8 into the drinking water of tens of

13   thousands of men, women and children that --

14          MR. MACE:  Objection, Your Honor.

15    BY MR. DOUGLAS:

16    Q.    There would be no need to be any of the work that you

17   did --

18          MR. MACE:  Objection.  Argumentative.

19          MR. DOUGLAS:  -- if there were no C-8 in the water in

20   the first place.

21          THE COURT:  Objection sustained.

22          MR. DOUGLAS:  Those are all the questions I have.

23          THE COURT:  Thank you, Doctor.  You may step down.

24          Ladies and gentlemen, we'll be in recess for one hour.

25      (A recess was taken at 12:00 p.m.)

Vol. 12 - 130

1          WEDNESDAY AFTERNOON SESSION

2          SEPTEMBER 30, 2015

3                    - - -

4          MR. MACE:  Mr. Mace, call your next witness.

5          MR. DOUGLAS:  Your Honor, may we go to side-bar?

6          THE COURT:  I'll see you at side-bar.  You may stand,

7    if you wish, ladies and gentlemen.

8                    - - -

9       Thereupon, the following proceeding was held at side-bar

10   out of hearing of the jury:

11         THE COURT:  What's the issue?

12         MR. DOUGLAS:  I had a brief conversation with Mr. Mace

13   before we started just now, and I asked him if he had spoken to

14   the witness and let him know about the Court's ruling about

15   excluding the specific causation opinion.

16         THE COURT:  You're way ahead of me.  The next witness

17   is --

18         MR. MACE:  Dr. Cohen.

19         MR. DOUGLAS:  So it's excluded by the Court.  And I

20   just want to make sure there's not going to be any fumbles.

21   When I asked Mr. Mace if he had spoken with the witness to make

22   sure there would be no -- I don't want any fumbles, and I

23   didn't get exactly a one hundred percent assurance.

24         THE COURT:  I assume you've made it a point --

25         MR. MACE:   Absolutely.  We carefully read your

Vol. 12 - 131

1  orders, all four of them.

2        MR. DOUGLAS:  That's different than what you said to

3  me, but I appreciate you saying that.  I was getting a little

4  nervous.

5        THE COURT:  Understood.

6        MR. BILOTT:  One of the prior limiting instructions we

7  had asked about was the obesity limiting instruction.  I

8  believe the Court deferred on that because the issue with Dr.

9  Cohen was still pending and hadn't been resolved yet.  So

10  plaintiffs would still like a limiting instruction on obesity.

11  This is the prior one that was proposed.

12        THE COURT:  I'll look at it.

13     (Back in open court.)

14        THE COURT:  Mr. Mace, now you may proceed.

15        MR. MACE:  The defense calls Dr. Cohen to the stand.

16     (Witness sworn.)

17        THE COURT:  Mr. Mace, you may proceed.

18        MR. MACE:  Thank you, Judge.

19                      - - -

20             SAMUEL COHEN, M.D., Ph.D.,

21   Called as a witness on behalf of the Defendant, being first

22  duly sworn, testified as follows:

23                  DIRECT EXAMINATION

24   BY MR. MACE:

25   Q    Good afternoon, sir.

Vol. 12 -  132

1    A    Good afternoon.

2    Q    Could you state your name for the record?

3    A    Samuel Cohen.

4    Q    And where do you live, sir?

5    A    In Omaha, Nebraska.

6    Q    What do you do for a living?

7    A    I'm a physician and scientist.

8    Q    Do you have a specialty?

9    A    My medical specialty is pathology and my scientific

10   specialty is chemical carcinogenesis and toxicology.

11        THE COURT:  I missed the first part.  Your specialty

12   is --

13        THE WITNESS:  The medical specialty is pathology and

14   specifically surgical pathology, and my scientific specialty is

15   chemical carcinogenesis and toxicology.

16   BY MR. MACE:

17   Q    Dr. Cohen, if you can keep the microphone closer to your

18   mouth without banging into it, it would make it easier for us

19   all.

20        Doctor, have we asked you to review Dr. Bahnson's expert

21   report and his two depositions and his trial testimony

22   regarding the specific causation issues in this case?

23   A    Yes.

24   Q    Are you knowledgeable regarding risk factors for kidney

25   cancer and the relationship between obesity and kidney cancer?

Vol. 12 –  133

1    A    Yes.

2    Q    Have you analyzed those issues?

3    A    Yes.

4    Q    And have you reached opinions on those issues to a

5    reasonable degree of scientific certainty?

6    A    Yes.

7    Q    Before we get into the details of your analysis and your

8    opinions, let's spend a little bit of time on your personal

9    qualifications in order to talk to the jury on the specific

10   issues in this case.

11        Where do you currently work?

12   A    At the University of Nebraska Medical Center in Omaha,

13   Nebraska.

14   Q    What do you do there?

15   A    I'm a professor of pathology and microbiology and also

16   of the cancer center.  I do surgical pathology, research and

17   teaching.

18   Q    Do you have an endowed professorship?

19   A    Yes.

20   Q    And what does that mean?

21   A    An endowed professorship is both an honor and provides

22   financial support that I can use for my research laboratory.

23   It's specifically an oncology or cancer research.

24   Q    Who provides the funding for that?

25   A    Private donors.

Vol. 12 - 134

1    Q    How long have you been a professor at the University of

2   Nebraska?

3    A    Since 1981.

4         MR. MACE:  May I approach?

5         THE COURT:  Yes.

6   BY MR. MACE:

7    Q    Professor, Doctor, you've been handed Exhibit D1461.  Do

8   you recognize that?

9    A    Yes.

10   Q    What is that?

11   A    It's my curriculum vitae.

12   Q    Is that a true and accurate copy?

13   A    Yes.  I don't know what date this is, but reasonably

14  recent.

15   Q    Let's --

16        MR. MACE:  Can you bring up 1461?

17   BY MR. MACE:

18   Q    Doctor, why don't you first take us through your

19  education and training.

20   A    Okay.  I went to the University of Wisconsin in Madison

21  for all of my degrees, beginning with my bachelor's degree in

22  medical sciences, graduated in 1967.  Then I did an M.D. and

23  Ph.D. degree combined, with an M.D. in general medicine and the

24  Ph.D. in experimental cancer research, or oncology.

25        I then went to Saint Vincent Hospital in Worcester,

1    Massachusetts, for my residency in pathology which went from

2    1972 to 1975, became board certified in 1976.

3        Q     You talked about experimental oncology.  What is that?

4        A     Cancer research.

5        Q     And for your graduate work, what type of research did

6    you do?

7        A     My graduate research was on chemical carcinogenesis and

8    predominantly on a class of compounds called Nitrofurans, which

9    were used as antibacterial food additives or preservatives and

10   other anti-organism-type of drugs.

11       Q     What about your career?  What is your career specialized

12   in?

13       A     My career is specialized in a combination of surgical

14   pathology with an emphasis predominantly on the lower urinary

15   tract, also including the kidney; did kidney pathology for a

16   number of years.

17             And then in research, it's been focused on chemical

18   causation of cancer as well as other toxic endpoints, again,

19   initially, with an emphasis on the bladder but ultimately in a

20   number of other tissues including the kidney and liver.

21       Q     Are you board certified?

22       A     I'm board certified in anatomic and clinical pathology.

23       Q     What does that mean to be board certified?

24       A     That's a national organization that basically certifies

25   that I have been properly trained and passed an examination

1    that qualifies me to practice pathology.

2    Q    Have you served on any national or international

3    committees and panels for government agencies?

4    A    Numerous ones.

5    Q    Would you list some of them for us.

6    A    A number of them for National Institutes of Health.

7    Also the National Toxicology Program and the National Institute

8    of Environmental Health Sciences which are institutes within

9    the NIH.

10        I've also served on a number of panels for the

11    Environmental Protection Agency, or EPA, and also for the Food

12    and Drug Administration.

13        Internationally, I've been involved with a couple of

14    organizations within the World Health Organization, including

15    the International Agency for Research on Cancer, and also the

16    International Program on Chemical Safety.  And then there's

17    been a bunch of others here and there over the years both

18    internationally and for other national organizations.

19    Q    You mentioned the International Agency for Research on

20    Cancer.  Is that known as IARC?

21    A    Yes.

22    Q    You're familiar with something called the International

23    Life Sciences Institute?

24    A    Yes.

25    Q    What is that?

1    A     That's a private, not-for-profit organization that

2   brings together scientists from government academia and

3   industry to work on specific issues related to predominately

4   through risk assessment and safety of chemicals.

5    Q     What's been your involvement with that organization?

6    A     I've been involved with it both on research programs,

7   pathology programs, as well as serving on the board of

8   trustees.

9    Q     Are you familiar with an organization, the NTP

10  Scientific Board of Counselors.

11   A     Yes.  That's the National Toxicology Program which is

12  under the aegis of the National Institute of Environmental

13  Health Sciences.  And I've served in a number of roles there,

14  but on the board of scientific counselors for a period of two

15  years more than a decade ago.

16   Q     Have you been involved with the Food and Drug

17  Administration and the FEMA expert panel?

18   A     Yes.

19   Q     What does that panel do?

20   A     We evaluate the safety of flavor ingredients, and we're

21  essentially the organization that evaluates any applicant that

22  wants to sell an ingredient as a flavor, we have to approve it

23  first before it's allowed to be sold in the United States.

24   Q     What is your role on that?

25   A     I've been on the panel since 2002 and I'm currently the

1    chair of the panel.

2       Q    Has the Food and Drug Administration, the FDA, consulted

3    with you outside of the FEMA expert panel?

4       A    Yes.

5       Q    Can you give us an example or two on that?

6       A    I've actually taught courses with them. I've served on

7    promotion and tenure committees for them. And then probably

8    most noteworthy was about seven or eight or nine years ago I

9    was called by the commissioner of the Food and Drug

10   Administration regarding the safety of a chemical called

11   melamine which had been an adulterant from China in a number of

12   pet foods that harmed cats and dogs.

13       It turned out that it had also been put into food that

14   had been given to pigs, chickens and fish which meant that it

15   was now in the human food supply. And the commissioner was

16   asking five of us independently -- he wouldn't tell any of us

17   who the other ones were, that we independently review the

18   safety of melamine and its amount in the food supply and for

19   humans. And if any one of us came to a determination that

20   there was a safety concern, that they would have to pull over a

21   billion dollars of food off the market.

22       Q    Doctor, have you received any awards for your research?

23       A    Yes.

24       Q    Could you list a few of those?

25       A    Most notably is the Arnold Lehman award from the Society

1    of Toxicology which is for achievements in risk assessment.

2    I've been awarded an award from the Japanese Cancer Association

3    for my work overall in chemical carcinogenesis.  And I'm about,

4    in a couple of weeks, to receive the Lifetime Achievement Award

5    from the Society of Toxicologic Pathology.

6       Q    Did you also receive a Lifetime Achievement Award from

7    the Association for Environmental Health and Sciences?

8       A    Yes, that was a couple of years ago.

9       Q    Have you written any chapters in any books?

10      A    I've written approximately 50.

11      Q    Do you have any articles that have been published in

12   peer-reviewed scientific journals?

13      A    I've had over 350 articles published in peer-reviewed

14   journals.

15      Q    What does that mean, peer-reviewed scientific journal?

16      A    These are scientific journals where when you submit a

17   manuscript to them, they send it out to at least two other

18   scientists to review it, which are basically peer reviewed,

19   sometimes more.  And depending on the comments of the

20   reviewers, you make revisions or it's accepted or rejected.

21   But eventually, if it's to be published, it has to pass the

22   concerns of those reviewers.

23      Q    Are you on any editorial boards?

24      A    I currently am on four or five, plus I'm an associate

25   editor for another journal.  I served on a number of other

Vol. 12 - 140

1    editorial boards and associate editorships over the years, and

2    I've peer reviewed for probably ninety to a hundred different

3    journals over the years.

4       Q    What does it mean to be on an editorial board?

5       A    An editorial board is both an honor.  It's recognizing

6    outstanding individuals in those respected fields that the

7    journal is related to.  And then it also basically commits you

8    to providing reviewer -- reviews of manuscripts that come into

9    the journal.

10          The associate editorship, in contrast, is where you

11   actually are the one that receives the article and then assigns

12   that to specific peer reviewers.

13      Q    Your résumé, or CV, as I look at it here, Doctor, it's

14   about 119 pages long?

15      A    It sounds about right.

16      Q    And you list a number of your articles, presentations,

17   awards you've received beyond what you just described to us?

18      A    Yes.

19      Q    Do you think it will be helpful to the jury to have that

20   to terms of evaluating your qualifications?

21      A    I hope so.

22      Q    Doctor, now that we know some of your qualifications,

23   let's talk about kidney cancer for a few minutes.  First of

24   all, what type of kidney cancer did Mrs. Bartlett have?

25      A    Mrs. Bartlett had what's called clear cell renal cell

1    carcinoma.

2    Q    Does that type of cancer commonly occur throughout the

3    general United States population?

4    A    Yes.

5    Q    Approximately how much?

6    A    Kidney cancer in totally is about 2 to 3 percent of all

7    the cancer deaths in the United States.  And out of that 2 to 3

8    percent, probably 80 to 85 percent are the so-called clear cell

9    carcinoma-type.

10    Q    Was there anything atypical in Mrs. Bartlett's

11    presentation?

12    A    No.

13    Q    Now, what grade and stage was Mrs. Bartlett's tumor at

14    the time it was removed?

15    A    It was a Grade 1, Stage 1 tumor.

16    Q    Can you explain to us what that means?

17    A    Grade is essentially the extent of differentiation of

18    the tumor.  The lower the grade, the more similar it is to the

19    tissue it arose from.  For Grade 1, it will look a lot like the

20    normal kidney.

21         Stage, in contrast, is the extent of the disease.  If

22    it's Stage 1, that means it's confined to the kidney.  It

23    hasn't spread beyond the kidney, and it also means it's smaller

24    than 7 centimeters in diameter, or about three inches.

25    Q    What's the significance of it being a Grade 1, Stage 1

1    at the time it was removed?

2      A     The grade and stage are what's used to help formulate

3    both the evaluation for prognosis, as well as for what

4    additional therapy, if any, needs to be done and how the

5    patient is going to be followed going forward.

6      Q     Let's talk about each of those.  First of all, in the

7    follow-up treatment, what does Grade 1, Stage 1 mean in terms

8    of follow-up treatment?

9      A     Generally, Grade 1, Stage 1 is treated only with

10   surgery.  It doesn't require chemotherapy and/or radiation

11   therapy.  And it usually doesn't require additional surgery,

12   just the initial removal of the tumor itself.

13     Q     And then you said - what? - prognosis?  What does it

14   have to do with prognosis?

15     A     Prognosis is essentially an estimate of what the

16   likelihood is for the recurrence of the disease or progression

17   of the disease.  Grade 1, Stage 1 usually means that the tumor

18   is going to be cured with surgery and that it will not recur.

19     Q     And that determination -- so the Grade 1, Stage 1,

20   you're aware that Mrs. Bartlett had her tumor removed.  It was

21   sent to a pathologist who made that determination within a day,

22   if not the same day that her surgery occurred?

23     A     Correct.  I believe in the pathology report that I saw,

24   that she had a frozen section done at the time of surgery which

25   both gave the diagnosis, but, more importantly, is an

1    evaluation of what's called the margins, to make sure that the

2    surgeon had taken all of the tumor and there's no tumor

3    extending to the margin.

4        Q    What's the significance of that?

5        A    Basically, it tells the surgeon that he's gotten all of

6    the tumor and that he doesn't have to take more kidney tissue.

7    For the procedure that Mrs. Bartlett had, which was a partial

8    nephrectomy, that means he can preserve as much of the kidney

9    as possible.

10       Q    So the day of the surgery, it's found out that it's

11   clear margins and Grade 1, Stage 1.  What was known then at

12   that time, the day of surgery, about her prognosis?

13       A    Probably at the time of frozen section, they wouldn't

14   have given a grade.  They would have said there's no extension

15   to the margin.  On examination the next day when they have

16   permanent sections paraffin-embedded and formalin-fixed, that

17   they would find out that it's Grade 1, because you would sample

18   more of the tumor.

19       Q    Let's go to day two.  I was on day one.  Let's go to day

20   two.  Day two, once you have the permanent specimen and you

21   know it's Grade 1, Stage 1, and you know the report from the

22   day, clear margins, you got it all, what does that tell you

23   right then about prognosis?

24       A    Basically, it tells you that it's a patient who has been

25   treated completely and has an excellent prognosis and is

Vol. 12 -  144

1   unlikely to have a recurrence or progression of the disease.

2   Q    Now, in terms of the size of the tumor when it was

3   removed, do you recall that?

4   A    Yes.

5   Q    What was it?

6   A    I believe the largest diameter was 3.2 centimeters.

7   Q    Now, do you these types of Grade 1, Stage 1 renal cell

8   kidney cancer tumors tend to be slow growing or rapidly

9   growing?

10   A    They tend to be very slow growing.

11   Q    Sir, one of the materials that Dr. Bahnson referenced

12   that he refers to was the American Urological Association

13   *Guideline for Management of the Clinical Stage 1 Renal Mass.*

14        MR. MACE:  May I approach, Your Honor?

15        THE COURT:  You may.

16   BY MR. MACE:

17   Q    Dr. Cohen, we've handed you what's called here the

18   *Guideline for Management of the Clinical Stage 1 Renal Mass,*

19   American Urological Association.  Are you familiar with this

20   publication?

21   A    Yes.

22   Q    Do you consider it authoritative?

23   A    Yes.

24        MR. MACE:  For reference purposes, we're going to tag

25   this as Defendant's Exhibit 2456.  Could I have the ELMO,

1   please?

2    BY MR. MACE:

3    Q    So that's the document you've got in front of you there,

4   Doctor?

5    A    Yes.

6    Q    I don't want to spend too much time on this, but let's

7   look at a couple parts of it.  If you could turn over, after

8   the index, to page one.  In the introduction, it's estimating

9   approximately 54,000 new cases of kidney cancer will be

10   diagnosed in the United States -- this was back in '08 -- and

11   that renal cell carcinoma, RCC, account for approximately

12   85 percent of the kidney cancers diagnosed in the U.S.

13        That's similar to the statistic you used?

14    A    Yes.

15    Q    All right.  Over to the next page, it's got a section on

16   etiology.  Can you explain to us what that term means?

17    A    Etiology is another word for causation or cause.

18    Q    There's some other phrases we'll talk about later.

19   Another phrase that's been used at trial is diagnosis.  What is

20   diagnosis?

21    A    Diagnosis is just a statement of what the disease is

22   that you're dealing with.

23    Q    Is that different than etiology?

24    A    Yes.  Diagnosis is the disease.  Etiology is the cause

25   of the disease.

1    Q    Under etiology, the American Urological Association

2  says, Tobacco use and obesity are the most consistently

3  identified risk factors for renal cell carcinoma, accounting

4  for about 20 percent and 30 percent of cases respectively.

5         Are you familiar with that statistic?

6    A    Yes.

7    Q    Do you agree with that statistic?

8    A    It's in the same ballpark.  Other publications have had

9  estimates for a little bit higher, some a little bit lower.

10   Q    The next sentence has a statement about hypertension.

11        Hypertension has also been demonstrated to increase the

12  risk of renal cell carcinoma development.

13        Do you recognize hypertension as a risk factor for

14  kidney cancer?

15   A    Yes.

16   Q    We were talking about the rate of growth.  If you could

17  turn over to page 28.  Do you see, sir, at the bottom of that

18  page, it's got a section on summary of the treatment options

19  for the clinical Stage 1 renal mass, right?

20   A    Yes.

21   Q    And the sentence that carries over, it says a meta --

22        MR. DOUGLAS:  Your Honor, may we approach?

23        THE COURT:  I'll see you at side-bar.

24

25

1                          - - -

2      Thereupon, the following proceeding was held at side-bar

3  out of hearing of the jury:

4           MR. DOUGLAS:  Judge, this is a completely unequivocal

5  opinion.  This document, first of all, wasn't exchanged with me

6  prior to -- I received some documents at 12:38 a.m.  So I was

7  lead to believe -- it was one new document.

8           THE COURT:  What's the opinion you're claiming is new?

9           MR. DOUGLAS:  There was reference here to the rate of

10  growth of tumors.  There is nothing whatsoever in the doctor's

11  report about rate of growth.  And I would also say that this is

12  a back door --

13           MR. MACE:  Let me get his report.

14           THE COURT:  Any rough idea where you are

15  schedule-wise?

16           MS. NIEHAUS:  I don't --

17           THE COURT:  Not so much with this witness but just

18  overall when you think you might finish the defense case.

19           MS. NIEHAUS:  We're hoping by the end of this week or

20  early next week.

21           THE COURT:  So we're on schedule.

22           MS. NIEHAUS:  The cross-exam.

23           THE COURT:  Blame it on that if it's going to go over.

24           MS. NIEHAUS:  Of course.

25           MR. DOUGLAS:  I was in mid-sentence.  And I'm

1  concerned --

2         MR. MACE:  I was trying to get my materials.

3         MR. DOUGLAS:  That's all right.  So first of all, this

4  is reference to rate of growth of --

5         THE COURT:  You've got to educate me.  First of all,

6  what does it have to do with rate of growth?

7         MR. MACE:  In terms of when her tumor began.  It's a

8  rebuttal to Dr. Bahnson who said if, you will recall, I think

9  it was at least six months before but less than three years

10  before, which that raises an entirely new opinion.  Nowhere in

11  his deposition, nowhere in his report --

12         THE COURT:  I'm still not understanding.  What do you

13  expect him to say?

14         MR. MACE:  I'm permitted to --

15         THE COURT:  What do you expect him to say?

16         MR. MACE:  More than ten years.

17         MR. DOUGLAS:  This is a back door way of giving a

18  specific causation opinion.  One plus one equals no causation.

19  If you do the math, it will take him back ten years, at least.

20  This is -- you don't say the words but the conclusion is --

21         THE COURT:  Her use of the water goes back to '81 or

22  '83, right?

23         MR. DOUGLAS:  I appreciate that, but I don't think

24  it's a no-harm-no-foul-type of argument.  It's the cumulative

25  years of exposure.  It's been excluded on specific causation.

Vol. 12 - 149

1          THE COURT:  Hang on.  Do you have anything here in his

2    report that gets --

3          MR. MACE:  I know he says that.

4          MS. NIEHAUS:  I know we've cited it in some briefs, I

5    believe, and discussed it at his deposition as well.

6          MR. MACE:  It's a long report.  I should be able to

7    find it.

8          MR. DOUGLAS:  It is certainly not cited in that

9    report.

10          THE COURT:  Let me see that.

11          MR. DOUGLAS:  It continues here, and .28.

12          THE COURT:  It's the growth rate.  That's what you're

13    focused on?

14          MR. DOUGLAS:  Yes.  If you do the math -- and he will

15    give a specific causation opinion.

16          THE COURT:  No.  He's not going to give a specific

17    causation opinion.

18          MR. DOUGLAS:  I'm afraid that putting the two facts

19    out there --

20          THE COURT:  This would go to duration of exposure for

21    the cancer.  I see that issue.  But I don't see how it leads us

22    into a differential diagnosis.

23          MR. DOUGLAS:  I think specific causation does depend

24    on cumulative years of exposure.  I think that's important.

25          THE COURT:  Your doctor testified to something

1    different.  Why wouldn't this be rebuttal?

2           MR. DOUGLAS:  Because this is -- this goes to specific

3    causation, first of all.  And second of all, he can disagree.

4    He's free to disagree, but this is --

5           MR. BILOTT:  This particular witness is one that

6    cannot rebut any specific causation argument.

7           THE COURT:  Wait.  Right now all I'm hearing is the

8    rate of growth.

9           MR. MACE:  He's rebutting what their doctor said on

10   the stand, which he talked about rate of growth.

11          THE COURT:  Let's do this.  You question him by:

12   There's been testimony previously that says X.  Is that your

13   belief?

14          And the jury will get the idea that there's a

15   difference.  And we're only talking about rate of growth,

16   that's it; not talking about anything beyond that.  I do think

17   you're entitled to a limiting instruction.  Let me read it to

18   you, and I'll ask your opinion.

19          There's no easy way to say this.  But this is how I'm

20   thinking, a little bit of what you offered, the first sentence.

21   You may hear evidence in this case relating to an alleged

22   relationship between obesity and kidney cancer.  But you should

23   understand that no expert or other witness in this case is

24   actually offering any medical opinion that obesity, and not

25   C-8, was the specific cause of Mrs. Bartlett's kidney cancer in

Vol. 12 - 151

1    this case.

2         Mrs. Bartlett has offered medical opinion testimony that

3    her kidney cancer was caused by C-8 in the drinking water.  Any

4    evidence relating to obesity as potential cause of her kidney

5    cancer may be considered only as an attempt to discredit the

6    evidence supporting her claim that C-8 caused her kidney

7    cancer.

8         Any problem with that?

9         MR. MACE:  We preserve all of our prior objections.

10        THE COURT:  Sure.  I mean, where we are right now,

11   does that satisfy you?

12        MR. BILOTT:  (Nods head.)

13        THE COURT:  At this point you're not in obesity.  Are

14   we coming back to that?

15        MR. MACE:  Yes, sir.

16        THE COURT:  When we come back to that, I'll come back

17   to you.

18        MR. MACE:  It tends to be slow going.

19        THE COURT:  Again, to make sure it's rebutted,

20   indicate there has been a conflict in the testimony by the

21   other doctor.

22        MR. DOUGLAS:  Is he permitted to cite to this

23   statistic that's been disclosed?

24        THE COURT:  Yes.  Well, what about the disclosure

25   issue?

1    MR. MACE: Because Dr. Bahnson acknowledged this

2  statistic as being an accurate statistic in his testimony and

3  he's in rebuttal to Dr. Bahnson's testimony.

4    THE COURT: Not if Dr. Bahnson says the same thing.

5  That wouldn't be rebuttal.

6    MR. MACE: Dr. Bahnson knows of this data and didn't

7  do the calculation.

8    MR. DOUGLAS: If anything, it tells us the doctor was

9  aware of the issue and had every opportunity to cite whatever

10  statistic he wanted to cite.

11    THE COURT: The rate of growth -- limited to the rate

12  of growth. Thank you. And the article.

13    MR. MACE: All right.

14   (Back in open court.)

15    THE COURT: Thank you for your patience.

16  BY MR. MACE:

17  Q    Doctor, a little foundation before we get back to the

18  document. You've read -- we have asked you to read not only

19  Dr. Bahnson's expert report. You've read that?

20  A    Yes.

21  Q    You've read both his depositions, his 2014 deposition

22  last summer and his 2015 deposition earlier this year?

23  A    Yes.

24  Q    And you've also reviewed his transcript from the trial

25  about a week ago when he testified in front of the jury?

Vol. 12 -  153

1    A    Yes.

2    Q    Do you recall that as part of that testimony in front of

3    the jury, he talked about rate of growth?

4    A    Yes.

5    Q    And he made some comments - correct me if I'm wrong,

6    that in his view, the tumor had to start at least six months

7    before it was removed, but he thought probably less than three

8    years before it was removed.  Do you remember that testimony?

9    A    I don't remember the exact numbers, but that sounds

10   about right.

11   Q    And do you agree or disagree with his estimate of how

12   far back the tumor started?

13   A    I would disagree.

14   Q    Now, as part of that testimony in court, do you recall

15   that Dr. Bahnson was referred to this publication, the

16   *Guideline for Management of Clinical Stage 1 Renal Mass,*

17   American Urological Association?

18   A    Yes.

19   Q    He said that was one of the things he references, that

20   body of work from time to time?

21   A    Yes.

22   Q    And you've already testified you consider that to be an

23   authoritative source?

24   A    Yes.

25        MR. MACE:  So we have it on the screen.  So, if you

Vol. 12 -  154

1    could bring up -- we're between two pages.  If you could bring

2    up the bottom of page 28 and top of page 29, next to each

3    other.

4      BY MR. MACE:

5      Q    Where we were is the carryover sentence that says, A

6    meta-analysis of this literature demonstrated an average growth

7    rate of only 0.28 centimeters per year?

8      A    Yes.

9      Q    First of all, can you tell us what a meta-analysis is?

10     A    It's basically a statistical analysis of several studies

11   where you put the total populations together and do an overall

12   evaluation.

13     Q    And with a tumor that measured 3.2 centimeters and a

14   growth rate at this number that Dr. Bahnson agreed with, when

15   would that indicate that Mrs. Bartlett's tumor started?

16     A    At a growth rate of .28 centimeters per year, this would

17   translate out to a tumor that's 3.2 centimeters in diameter

18   over ten years, so about 11, 11 and a half.

19     Q    Doctor, we asked you to analyze Dr. Bahnson's specific

20   causation opinions, true?

21     A    Yes.

22     Q    Let's get one thing very clear.  Just because a

23   substance is capable of causing kidney cancer, does that

24   necessarily mean that it actually caused it in a specific

25   individual?

Vol. 12 -  155

1    A    No.

2    Q    Is there an example you can use to help us understand

3    that?

4    A    I think probably the easiest example to keep in mind is

5    a substance called aflatoxin, which is a well-known and potent

6    liver carcinogen that's present as a contaminate of peanut

7    products.  We're able to analyze it down to very small amounts

8    so it turns out that it's present in all peanut products.  So

9    it's peanuts, peanut butter, anything that contains peanuts

10   will contain some aflatoxin.  We can set a level that we

11   consider and the FDA now considers to be a safe level even

12   though we know this is a substance that can produce liver

13   cancer in humans.

14   Q    Let's focus on one of the other opinions that

15   Dr. Bahnson gave.  Did you read his opinion about whether

16   obesity should be considered a risk factor for kidney cancer?

17   A    I did read that, yes.

18   Q    Did you see his testimony that, in his view, obesity is

19   not a risk factor for kidney cancer?  Did you see that opinion?

20   A    I did see that, yes.

21   Q    Do you agree or disagree with that opinion?

22   A    I disagree.

23   Q    Do you have knowledge in that area?

24   A    I have extensive knowledge in that area.

25   Q    Doctor, in addition to your training and your general

1    knowledge, are you familiar with the specific scientific

2    literature on the relationship between obesity and kidney

3    cancer?

4      A    Yes.

5      Q    Doctor, because of your education and training and over

6    your decades of experience with cancer research and your

7    teaching and your clinical work, are those the types of studies

8    that you regularly review and analyze and use in your work?

9      A    I've been involved with kidney both from diagnostic

10   point of view, clinical point of view, as well as basic

11   research, and I'm quite familiar with a lot of the literature

12   on causation of tumors including diabesity.

13     Q    In terms of toxicological information, epidemiological

14   information and other scientific studies?

15     A    Yes.

16     Q    Do you have experience in the design and interpretation

17   of epidemiology and other scientific studies?

18     A    Yes.

19     Q    Have you been a member of panels that have evaluated

20   epidemiologic methodology?

21     A    Yes.

22          MR. MACE:  May I approach, Your Honor?

23          THE COURT:  You may.

24   BY MR. MACE:

25     Q    Dr. Cohen, you've been handed Exhibit D2029.  Do you

Vol. 12 – 157

1    recognize that?

2    A    Yes.

3    Q    Is that one of the articles you reviewed in connection

4    with your work in this case?

5    A    Yes.

6         MR. MACE:  Can we bring up the first page of 2029,

7    please?

8    BY MR. MACE:

9    Q    First of all, let's talk about the date of this.  If we

10   could go down to the bottom.  So this is from 2004, Doctor?

11   A    Yes.

12   Q    And let's go back up to the title.  Overweight obesity

13   and cancer, epidemiological evidence and proposed mechanisms.

14   That's one of the articles you reviewed?

15   A    Yes.

16   Q    In terms of the authors, if we could go to the lower

17   left corner.  Where would the authors -- who are they

18   affiliated with?

19   A    The first author is from the American Cancer Society,

20   one of their buildings in Atlanta.  The second author is from

21   the International Agency for Research on Cancer that I

22   mentioned earlier that I served on some of their panels.  It's

23   two major organizations that are involved with both cancer

24   research as well as the clinical aspects.

25   Q    Let's get back to the body of it and the paragraph on

1    the bottom here.

2          It states, It has been estimated that 15 to 20 percent

3    of all cancer deaths in the United States can be attributed to

4    overweight and obesity.

5          Is that a statistic you're familiar with?

6    A    Yes.

7    Q    Do you agree with that statistic?

8    A    For 2004, that was a reasonable estimate.  Some people

9    would put it quite a bit higher than that now for 2015.

10   Q    Let's good over to the summary at the top of the next

11   page.  We're going to get to some of the later articles.  I was

12   going to try to do them in chronologic chronology.  So the

13   summary is, IARC, International Agency for Research on Cancer,

14   has determined that based on results from epidemiological

15   studies, people who are overweight or obese are at increased

16   risk of developing several cancer types including -- and it

17   lists a number -- but renal cell cancer, right?

18   A    Yes.

19   Q    Do you agree with that statistic?

20   A    Yes.

21   Q    Then on the bottom right, the bottom right paragraph, it

22   talked about the IARC working group, and their report concluded

23   avoidance of weight gain reduces the risk of developing

24   cancers.  And it lists a number, but, again, kidney renal cell.

25   Do you see that?

1   A    Yes.

2   Q    Do you agree with that statistic?

3   A    Yes.

4        MR. MACE:  Let's get over to page -- with a summary

5   table.  It's page dot four.

6        If you could bring up the table.  Go ahead and get the

7   footnote.

8   BY MR. MACE:

9   Q    So this is table one, obesity-related cancers, and it

10  lists a number of them but it includes kidney renal cell, true?

11  A    Yes.

12  Q    What are these columns?  Relative risk with a BMI.

13  There's two different columns.  Can you explain those to us?

14  A    The first one is a relative risk for an individual

15  that's overweight which is considered a BMI of 25 to 30.  And

16  obesity is greater than 30.  That's the second column.  You'll

17  notice it goes up.  This is one of the pieces of evidence of

18  essentially a dose response for obesity.

19       And then the next two columns are essentially an

20  estimate of the attributable risk, or the percentage of the

21  population that of all the kidney tumors, renal cell tumors in

22  the United States, one could attribute approximately 42 percent

23  to obesity.

24       And the last column is in Europe, the EU, European

25  Union, that approximately 30 percent could be attributed to

1    obesity.

2    Q    So that's referring to this down here the percentage of

3    cases attributable to overweight and obesity?

4    A    Correct.

5    Q    And these numbers over here, we haven't talked about,

6    the 1.5 and the 2.5.  What are those?

7    A    Basically, it says that for an individual that's

8    overweight, BMI of 25 to 30, that they have a one-and-a-half

9    times risk of developing kidney cancer compared to somebody who

10   is of normal weight, BMI below 25.  For someone with a BMI over

11   30, that is then everyone over 30, so 30 onto whatever the

12   highest number is, it's two-and-a-half times risk compared to

13   the non-overweight.

14   Q    All right.  And underneath the table in the right-hand

15   column, the first full paragraph, it says, Studies of

16   populations worldwide have revealed that the risk of kidney

17   cancer, specifically renal cell cancer, is 1.5 to 3 times

18   higher in overweight and obese individuals than in men and

19   women of normal weight.

20        Is that a statistic you're familiar with?

21   A    Yes.

22   Q    Do you agree with that?

23   A    Yes.  Again, I think it's important to keep in mind that

24   the 3 refers to obesity, which would be anyone over a BMI of 3.

25   There are other studies that show that the higher the obesity,

Vol. 12 - 161

1    the higher the overall risk is.

2    Q    It says, Most studies reported a dose-response

3    relationship with increasing weight or BMI.

4         First, do you agree with that?

5    A    Yes.

6    Q    What is the significance of that?

7    A    That's what I was just saying.  Basically, the higher

8    the BMI over 30, the greater the risk of developing kidney

9    cancer.  So it gives you a very nice dose response that says

10   the higher your BMI, the higher your risk of developing kidney

11   cancer.

12   Q    Then it says in several studies, The increase in risk

13   with increasing BMI was greater in woman than in men.

14        What's that talking about?

15   A    Basically, some studies have found that the overall risk

16   as you increase BMI is greater in women than in men.

17             MR. MACE:  May I approach, Your Honor?

18             THE COURT:  You may.

19   BY MR. MACE:

20   Q    Doctor, we've handed you Exhibit D2032.  Do you

21   recognize that?

22   A    Yes.

23   Q    Is that one of the studies you analyzed in connection

24   with your work in this case?

25   A    Yes.

Vol. 12 - 162

1    Q    Do you consider that an authoritative article?

2    A    Yes.  This was a very large study that was done in

3    Europe involving nearly 350,000 people.

4    Q    I think I neglected to ask you.  Doctor, the article we

5    were just looking at, do you consider that one an authoritative

6    article?

7    A    Yes.  It's a review article.  This is a primary article.

8    Q    Let's bring the first page of that up.  And again, let's

9    focus on the date of it.  So this is in 2006?

10   A    Yes.

11   Q    And then the title, again, relates to body size and the

12   risk of renal cell carcinoma?

13   A    Yes.

14   Q    Let's get down to the summary in the bottom left.  It

15   says, Among women, an increased risk of renal cell carcinoma

16   was conferred by body weight, relative risk and highest versus

17   lowest quintile, 2.13, 95 percent confidence interval.

18        Can you translate that for us?

19   A    What that says is the highest group of BMI compared to

20   the lowest BMI had essentially a twofold risk of developing

21   renal cell cancer.  Confidence interval is just basically the

22   statistical analysis where 95 percent of the cases would have

23   fallen in the range stated there, 1.16 to 3.9.  So

24   statistically they can't sort out whether that was 1.16 or 3.9

25   times the risk.  The average was 2.13.

1    Q    There is a statement in the next column I wanted to ask

2   you about, over here.

3        Recent data suggests that the increasing prevalence of

4   obesity may at least partially be responsible for rising rates

5   of renal cell kidney cancer.

6        Now, in your review of Dr. Bahnson's trial testimony,

7   did you see his comments on the incidence, the rate of increase

8   or leveling off or decrease of kidney cancer and obesity?  Did

9   you see his comments on that?

10   A    Yes.

11   Q    Did you agree with his comments on that?

12   A    No.  I think he, one, factually was incorrect, but his

13   interpretation of the data was quite a ways off the mark.

14   Q    Let's take those one at a time.  In terms of factually,

15   what do you believe the facts to be?

16   A    In the United States, the incidence of renal cell

17   carcinoma has been increasing until about the last five or six

18   years, and then it's stabilized at that point.

19        He indicated that it had actually decreased over the

20   last few years.  In reality, what's decreased is the death rate

21   of renal cell carcinoma, and that's primarily due to the fact

22   that we just have better treatments now so people are living

23   longer.

24   Q    Catching it earlier and treating people?

25   A    And even those caught later were having more success in

1    prolonging life.

2    Q    So you had a factual dispute.  And then you said the

3    interpretation you disagreed with.  Tell us about that.

4    A    He was saying this would be evidence against obesity

5    being related to renal cell carcinoma because the obesity has

6    continued to increase so that the incidence of renal cell

7    carcinoma should continue to increase.

8          There's two factors that counter that.  One is that much

9    of the increase that happened during the '90s and early 2000s

10   were due to incidental cancers that were picked up like

11   Mrs. Bartlett's where she went in for some other complaint and

12   they did imaging studies of the abdomen and found a kidney

13   tumor.  In her instance, she was in there for gallbladder

14   disease and they found a kidney tumor.  So there's what is

15   called a blip there.

16         The other important part here – and he ignored

17   completely – was the other major cause of kidney cancer is

18   cigarette smoking.  And cigarette smoking incidence has been on

19   the decline over the last 30, 40 years or so, certainly amongst

20   men and now even amongst women.  So that would have led to a

21   decrease in kidney cancer.  So the blending of all of these

22   factors I think is why we're seeing a stabilization now of the

23   kidney cancer rate.

24   Q    Because one of the other contributing factors has gone

25   down?

Vol. 12 -  165

1   A    Basically -- obesity has gone up, cigarette smoking has

2   been going down.

3   Q    All right.  Let's look over at page dot four, so page

4   731 of the article.  But in the upper right-hand corner you'll

5   see 2032.4.  I wanted to focus you on the results down here.

6        Now, in terms of these studies and how much weight you

7   give the studies, does the size of the study have any impact on

8   that?

9   A    Yes.

10  Q    And how does that come into play?

11  A    Well, the larger number of population that's being

12  followed, the better the statistical analysis will be.  It

13  gives you a larger pool and there's less chance that the

14  results will happen by chance.

15  Q    And in terms of the participants here, there were how

16  many?

17  A    348,550.

18  Q    Is that big or small?  What is that?

19  A    That's a huge study.

20  Q    Let's go in the next column briefly.  It says, Among

21  women, body weight and BMI were positively related to risk of

22  renal cell carcinoma, and woman in the highest versus the

23  lowest quintile of body weight had a twofold increase risk

24  after multivariable adjustment.

25       Can you interpret that for us?

Vol. 12 - 166

1   A    Essentially, when you take into account all of the risk

2   factors -- so they took into account cigarette smoking,

3   hypertension, a few other things.  When they filter all of that

4   out, there is attributed to obesity itself about a twofold

5   increase in overall risk.

6   Q    Let's go back, Doctor, to page 3032.7, underneath the

7   table is a paragraph.

8        It says, In these analyses, obese women had a 1.68-fold

9   increased risk of RCC, renal cell carcinoma, compared to

10  non-overweight women.

11       Is that a statistic you're familiar with?

12  A    Yes.

13  Q    Do you agree with that statistic?

14  A    Yes.

15  Q    Doctor, we're not going to go through them all, but

16  approximately how many papers did you look at that have

17  analyzed the relationship between obesity and renal cell kidney

18  cancer?

19  A    There were at least 20, some of which were reviews and

20  some of which were primary studies.

21  Q    And again, we're not going to go through all of them.  I

22  just want to do a couple.  I want to go to a plaintiff's

23  exhibit.

24       MR. MACE:  Can I approach, Your Honor?

25       THE COURT:  You may.

Vol. 12 - 167

1    BY MR. MACE:

2    Q    Sir, do you have the exhibit that's been marked P1-6672?

3    A    Yes.

4    Q    Are you familiar with that article?

5    A    Yes.

6    Q    Do you consider it authoritative?

7    A    Yes.

8         MR. MACE:  Can we bring up P1-6672?  Let's start with

9    the date again.  I guess down at the bottom.

10   BY MR. MACE:

11   Q    So we're now into 2008, sir?

12   A    Yes.

13   Q    And it's the *Lancet*.  What is the *Lancet*?

14   A    The *Lancet* is a medical journal published out of

15   England.  It's comparable to our *Journal of American Medical*

16   *Association* here in the United States.

17   Q    Is it fair to say that's one of the leading medical

18   journals?

19   A    It's one of the more popular medical journals.

20   Q    Let's go back up to the title, please.  This one is,

21   *Body mass index and incidence of cancer, systemic review and*

22   *meta-analysis of prospective observational studies*.

23        Do these people get paid by how many letters they use in

24   their words?

25   A    This would actually be considered a short title.

Vol. 12 -  168

1    Q    In any event, body mass index.  I think most of us are

2    familiar, but just so we're clear, what does that refer to?

3    A    The index which is a reflection of your weight.  It's a

4    ratio of your weight to height.

5    Q    And then meta-analysis, again, what is that?

6    A    That's a statistical review of several studies that

7    you've pooled all the population together to try to give a

8    larger sample size.

9    Q    Let's bring up the findings box.  In terms of study

10   size, we analyzed 221 datasets, 141 articles, including 282,137

11   incident cases.

12        That's the number of different people they looked at?

13   A    That's the number of actually cases of tumors they were

14   able to identify.

15   Q    Again, is that a small number or a big number?

16   A    Enormous.

17   Q    Below that it talks about, in women we recorded strong

18   associations between a five kilogram per meter squared increase

19   in BMI.  It goes on with a number of cancers but renal is

20   included there, right?

21   A    Yes.

22   Q    What is that saying to us?

23   A    Basically, what they're saying here is that every

24   increase of five BMI points, that the incidence rises by 1.34

25   times.

1    Q    Let's go to the bottom of the page.  And if we could

2    bring up the text, the bottom third of the page.  It says, In

3    2007, the World Cancer Research Fund used a more standardized

4    approach to review the evidence.  This report concluded that

5    the evidence that body fatness is associated with increased

6    risk of -- and it goes on with cancers, but it includes the

7    kidney is convincing.

8         Do you agree with that statement?

9    A    Yes.

10   Q    Let's go over, sir, there's some tables and some text

11   next to it.  I want to turn you over to, please, dot four.

12        MR. MACE:  If we could enlarge, please, the paragraph

13   at the bottom.

14   BY MR. MACE:

15   Q    In women, a five kilogram per meter squared increase in

16   BMI was strongly associated with renal cancer.  Again, do you

17   agree with that statement?

18   A    Yes.

19        MR. MACE:  May I approach, Your Honor?

20        THE COURT:  You may.

21   BY MR. MACE:

22   Q    Doctor, I'm handing you -- it's being handed to you --

23   an article I guess we'll marked for identification as D2457.

24   Are you familiar with that article?

25   A    Yes.

Vol. 12 – 170

1    Q    Is that something you've analyzed for purposes of your

2   work in this case?

3    A    Yes.

4    Q    And do you consider that an authoritative article?

5    A    Yes.

6         MR. MACE:  Let's bring up the first page of that.

7         MR. DOUGLAS:  This is D2457?

8         MR. MACE:  Yes.  We've labeled it 2457.

9         Could we have the ELMO, please?

10   BY MR. MACE:

11   Q    Doctor, now we're up to 2010?

12   A    Yes.

13   Q    And the title is, *Body mass index and cancer risk,*

14  *evidence for causal association,* right?

15   A    Yes.

16   Q    There's some reference here that they're testing the

17  data against the Bradford-Hill criteria of causal association.

18  Do you have an understanding of what Bradford-Hill is referring

19  to?

20   A    Yes.

21   Q    What is that referring to?

22   A    Bradford-Hill was a scientist that came up with some

23  criteria to evaluate causality now more than 50 years ago, and

24  it's still used today for evaluation of scientific evidence

25  supporting causation.

1    Q    They say that they tested the data against the

2  Bradford-Hill criteria of causal association and argue that the

3  available data support strength of association, consistency,

4  specificity, temporality, biological gradient, plausibility,

5  coherence and probably analogy.

6         What is that referring to?

7    A    Those are the criteria that were set forth by

8  Bradford-Hill, again, more than 50 years ago.

9    Q    This is 2010.  We conclude there is considerable

10  evidence to support a causal association between BMI and risk

11  for many cancer types.  Then they go on.

12         Do you agree with that statement?

13    A    Yes.

14    Q    And in the introduction part, if we could -- they say

15  that increased body mass index as an approximation for body --

16  is that adiposity?

17    A    Yes.

18    Q    Is an established risk factor for developing adult

19  malignancies.  First of all, do you agree with that?

20    A    Yes.

21    Q    What is adiposity?

22    A    Adiposity is fat tissue.

23    Q    Let's look at one more, Doctor.

24         MR. MACE:  May I approach, Your Honor?

25         THE COURT:  You may.

1    BY MR. MACE:

2    Q     Doctor, do you have Exhibit D1492?

3    A     Yes.

4    Q     Is that one of the articles you've reviewed and analyzed

5    in coming to your opinions in this case?

6    A     Yes.

7    Q     Do you consider it authoritative?

8    A     Yes.

9    Q     Let's bring that up and start at the bottom --

10         MR. MACE:  I guess we need to switch over.  If we

11   could bring up the date at the bottom.

12   BY MR. MACE:

13   Q     So we're May of 2010 now.  Is that when this was put

14   out?

15   A     Yes.

16   Q     And let's bring up the entire summary box at the top.

17         So this is called epidemiology and risk factors for

18   kidney cancer.  And lead author is Chow?

19   A     Yes.

20   Q     It makes a reference here to the changing prevalence of

21   known risk factors for renal cell cancer including cigarette

22   smoking, obesity, and hypertension is likely to affect

23   incidence treads.  Does that relate to what you were telling us

24   earlier?

25   A     Yes.

Vol. 12 - 173

1    Q   In terms of these factors -- let's look over at the key

2 points box on the next page. If you could pull up the key

3 points.

4        Article states, Cigarette smoking, obesity, and

5 hypertension are well-established risk factors for renal cell

6 kidney cancer.

7        Do you agree with that statement?

8    A   Yes.

9    Q   Did you read Dr. Bahnson's testimony that he did not

10 think any of those were risk factors?

11    A   I read that, yes. He actually used this reference also,

12 which surprised me.

13    Q   He used this reference as one of his references, but his

14 conclusion is they're wrong, they're not risk factors?

15    A   That's what he stated.

16    Q   Let's look over at the table on risk factors, table

17 three in this article he cited. So it would be over at -- let

18 me look. My page doesn't have the number.

19        MR. MACE: I guess it's dot six, please. If you could

20 blow up that table, including the footnote.

21   BY MR. MACE:

22    Q   So it's table three, risk factors for renal cell

23 carcinoma. Do you see that?

24    A   Yes.

25    Q   It breaks them up into established and suspected, right?

Vol. 12 - 174

1    A    Yes.

2    Q    And established risk factors include the cigarette

3    smoking, excess body weight and hypertension, right?

4    A    Yes.

5    Q    Also, I guess, family cancer syndromes, right?

6    A    Yes.

7    Q    And in terms of the established, it's got this little

8    asterisk.  If you go down and look at what that means, Observed

9    in nearly all scientific study, exposure precedes renal cell

10   cancer, dose-response relationships, risk reductions with

11   removal of exposure.  Are those factors you consider in terms

12   of whether or not it's causal or not?

13   A    Yes.

14   Q    Let's look at the renal cell carcinoma box lower in the

15   page to the right.  So it talks about cigarette smoking being

16   an established risk factor for both tumor types, and then

17   predisposing conditions including obesity and hypertension are

18   known to increase the risk of renal cell cancer development,

19   right?

20   A    Yes.

21   Q    Over on obesity, let's look at that page.  Over one page

22   at the top right, it's got a specific statement on obesity.

23        Excess body weight was estimated to have a role in the

24   development of more than 40 percent of renal cell cancer cases

25   in the U.S.

1      Do you agree with that statistic?

2   A   Yes.

3   Q   And then it talks about, Prospective studies worldwide

4   found individuals who were overweight or obese at baseline had

5   an increased risk of subsequent renal cell cancer in a

6   dose-response manner.  What's that talking about?

7   A   I think there are several aspects of the sentence that

8   are important.  One is they're prospective studies, not

9   retrospective, so it eliminates the issue of recall bias.  It's

10  looking forward and following patients for development of

11  cancer.

12      Secondly, it's including individuals that are overweight

13  and obese.  So it's a BMI of 25 and greater, and putting them

14  all together in a category.  And even with that for renal cell

15  carcinoma, that 34 percent of the cases in women -- I'm sorry,

16  that there is a dose-response increase for each five BMI units,

17  kilogram per meter squared, that for each of those for women it

18  increases by 34 percent.

19  Q   All right.  And for somebody like Mrs. Bartlett, what

20  was her BMI?

21  A   Her BMI was, at the time of diagnosis, just over 40.  So

22  it would be three of these five kilogram per meter squared

23  units.

24  Q   So in terms of a percent risk increase?

25  A   It would be up by 102 percent more.  So more than double

Vol. 12 - 176

1    compared to the baseline.

2    Q    There is a statement below that in the next paragraph.

3    If we could go down a little further.

4         The global rise in obesity is likely to have contributed

5    to the increase in renal cell carcinoma incidence.

6         Does that relate to what you were talking about earlier?

7    A    Yes.

8    Q    Did you also, sir, review some of the materials that we

9    reviewed with Dr. Bahnson during his testimony at court?

10   A    Yes.

11   Q    And, for example, the American Cancer Society, do you

12   view their publications on cancer generally to be

13   authoritative?

14   A    They're good reference, especially on incidence and

15   causation.

16        MR. MACE:  May I approach, Your Honor?

17        THE COURT:  You may.

18   BY MR. MACE:

19   Q    I'm going to label this as D2458.  Doctor, are you

20   familiar with this review?

21   A    Yes.

22   Q    Do you consider it to be authoritative?

23   A    Yes.

24        MR. MACE:  Can we bring up the first page of that,

25   please?

```
1    BY MR. MACE:

2    Q    Again, I don't want to dwell too much on this.  Let's go

3    to page one, basic cancer facts, and can cancer be prevented.

4         It talks about the World Cancer Research Fund estimating

5    that up to one-third of the cancer cases that occur in

6    economically developed countries like the U.S. are related to

7    overweight or obesity, physical inactivity, and/or poor

8    nutrition, and thus could be prevented.

9         Are you familiar with that research?

10   A    Yes.

11   Q    Do you agree with it?

12   A    Yes.

13   Q    Let's look over specifically at kidney cancer, which is

14   page 13 of the document.  It's going to have a different --

15   page 13 on the bottom right corner.  Let's bring up that kidney

16   cancer.

17        So, again, it's talking about now we're up to 2015 and

18   it's talking about an estimated more than 61,000 new cases of

19   kidney renal cancer expected to be diagnosed in 2015.  Do you

20   see that?

21   A    Yes.

22   Q    That's what you were referring to that statistics are

23   going up?

24   A    Yes.

25   Q    Risk factors.  Tobacco smoking is a strong risk factor
```

Vol. 12 - 178

1    for kidney cancer.  Additional risk factors include obesity

2    which causes an estimated 30 percent of cases, and it lists

3    some other things.

4            Are you familiar with these statistics?

5    A    Yes.

6    Q    Is that in the same ballpark that you believe is

7    accurate?

8    A    Yes.

9    Q    Finally, on this topic, you saw that Dr. Bahnson

10   referred to some textbooks?

11   A    Yes.

12   Q    Campbell-Walsh Urology.  Are you familiar with that

13   text?

14   A    Yes.  That's the standard textbook for urologists.

15   Q    Four volumes of this, right?

16   A    It's a very heavy set of documents.  I think it costs

17   over a thousand dollars.

18   Q    Do you consider that authoritative?

19   A    Yes.

20           MR. MACE:  Do we have page 1421 of that?

21   BY MR. MACE:

22   Q    Again, in terms of the established -- so this is renal

23   tumors, established, and etiology.  You said that's causation.

24   A    Yes.

25   Q    Tobacco exposure, obesity, hypertension and putative,

1    and it has some other things listed, right?

2      A    Correct.

3      Q    Trichlorethylene, occupational exposure, radiation

4    therapy, dietary and other things, right?

5      A    Yes.

6      Q    It's got etiology below that.  And again, you said

7    that's causation, right?

8      A    Correct.

9      Q    The most generally accepted environmental risk factor

10   for renal cell cancer is tobacco exposure, and talks about the

11   relative associated risks being modest.

12          And let's go to the next page.  Bring up the obesity

13   section.

14          Obesity is now accepted as another major risk factor for

15   renal cell cancer of an increased relative risk of 1.07 for

16   each unit of rising body mass index, right?

17     A    Correct.

18     Q    And it cites some of the articles we've already talked

19   about, right?

20     A    Yes.

21     Q    Increased prevalence of obesity likely contributes to

22   increase incidence of renal cell cancer in Western countries.

23   It's been estimated that more than 40 percent of cases of renal

24   cell cancer in the United States may be causally linked to

25   obesity.  Do you agree with that statistic?

Vol. 12 —  180

1     A    Yes.

2     Q    And finally the other text that Dr. Bahnson mentioned,

3   Adult and Pediatric Urology.  Are you familiar with that text?

4     A    Yes.

5     Q    Do you consider that authoritative?

6     A    Yes.

7          MR. MACE:  If we could go to page 614, please.  Let's

8   bring up the table in that paragraph.

9   BY MR. MACE:

10    Q    Table 6.2, risk factors associated with renal cell

11  carcinoma, it includes cigarette smoking, hypertension,

12  elevated body weight, medications and some other things, right?

13    A    Yes.

14    Q    Including genetic predisposition, right?

15    A    Correct.

16    Q    Etiology, causation.  Based on information from case

17  controlled genetic and cohort studies, several risk factors

18  have been associated with the development of renal cell cancer.

19  Most studies with sufficient sample size demonstrate a positive

20  correlation between renal cell cancer and smoking cigarettes

21  associated with up to 35 percent increase in risk.

22         Obesity also has shown positive association with renal

23  cell cancer.  Greater risks exist with women with elevated

24  weight than for male counterparts, right?

25    A    Yes.

Vol. 12 -  181

1    Q    Do you agree with those statistics?

2    A    Yes.

3    Q    Doctor, do you have an opinion to a reasonable degree of

4    medical certainty as to whether obesity is a causative risk

5    factor for the development of kidney cancer in general?

6    A    I do.

7    Q    What is your opinion?

8    A    I strongly believe that it is a major cause of renal

9    cell carcinoma in the United States.

10   Q    Do you believe that obesity, as a causative factor for

11   the development of kidney cancer, is well established in the

12   literature?

13   A    Yes.

14   Q    And do you believe that it satisfies the Bradford-Hill

15   criteria?

16   A    It does.

17   Q    With regard to Dr. Bahnson's testimony that obesity is

18   not even a risk factor, do you agree or disagree with that?

19   A    I strongly disagree with that statement.

20   Q    With regard to his statement that hypertension and

21   smoking are not risk factors for kidney cancer, do you agree or

22   disagree?

23   A    I also disagree with that.

24   Q    Did you see Dr. Bahnson's testimony that prior to coming

25   to his opinions in this case he did not specifically pull out

Vol. 12 - 182

1   and analyze the literature on the relationship between obesity

2   and kidney cancer?

3   A    I did see that statement, which surprised me considering

4   that he was countering all the published literature.

5   Q    Do you think that's a reliable way to come to opinions

6   on the relationship between obesity and kidney cancer?

7            MR. DOUGLAS:  I object.  It misstates the testimony.

8            THE COURT:  You can cover that on cross.  We have the

9   instruction as well.  I'm waiting for you to ask me when to

10  give it, then we'll continue.

11           MR. DOUGLAS:  This would be a good time for the

12  instruction.

13           THE COURT:  When you're finished with this topic, let

14  me know and then I'll give it.

15  BY MR. MACE:

16  Q    Doctor, do you think that's a reliable way to come to

17  opinions on relationship between obesity and kidney cancer, to

18  not pull out the literature on it and study it?

19  A    No.

20           MR. DOUGLAS:  Objection.

21           THE COURT:  Overruled.

22  BY MR. MACE:

23  Q    Your answer, Doctor?

24  A    No, especially if you're going counter to the prevailing

25  conclusions that are in the literature.  You need to have a

Vol. 12 - 183

1  thorough review and come to a clear understanding of why you're

2  disagreeing with everyone else.

3          MR. MACE:  I'm shifting a little bit on topic, Your

4  Honor.

5          THE COURT:  Ladies and gentlemen, I'm going to give

6  you another instruction here.

7          You've just heard some evidence relating to an alleged

8  relationship between obesity and kidney cancer, but you need to

9  understand that no expert or other witness in this case is

10  actually offering any medical opinion that obesity, and not

11  C-8, was the specific cause of Mrs. Bartlett's kidney cancer.

12  Mrs. Bartlett has offered medical opinion testimony that her

13  kidney cancer was caused by C-8 in her drinking water.  Any

14  evidence relating to obesity as the potential cause of her

15  kidney cancer may be considered only as an attempt to discredit

16  the evidence supporting her claim that C-8 caused her kidney

17  cancer.

18          With that, you may continue.

19  BY MR. MACE:

20  Q    Dr. Cohen, are you aware that Dr. Bahnson listed a

21  number of competing causes for kidney cancer and then evaluated

22  the competing causes?

23  A    Yes.

24  Q    And are there important factors that need to be

25  considered when you're doing that type of weighing between

1  competing risk factors?

2    A    Yes.

3    Q    Let's use an example, Dr. Cohen.  Let's say,

4  hypothetically, that instead of kidney cancer, this case was

5  about what caused somebody's lung cancer.  Are you with me on

6  the hypothetical?

7    A    Yes.

8    Q    Let's say that person, this hypothetical person, had

9  been exposed to both chest radiation on one hand, and tobacco

10  smoke on the other hand.  What type of factors would be

11  important to consider when you're trying to evaluate the most

12  likely cause of the lung cancer?

13    A    For both the causes, you would have to know something

14  about the amount that they were exposed to and for how long.

15  With regard to radiation, you'd have to be specific as to the

16  type of radiation that was involved.

17    Q    Now, in terms of the amount of exposure with regard to

18  the smoking, are you familiar with the concept of pack years?

19    A    Yes.

20    Q    And, in your opinion, sir, before we get there, are both

21  smoking on the one hand, and radiation on the other hand,

22  capable of causing, capable of causing lung cancer?

23    A    Yes.

24    Q    So despite the fact that radiation and smoking are both

25  capable of causing the lung cancer, can you come to a reliable

1    opinion as to whether one was, in fact, a likely cause of the

2    specific person's lung cancer without an evaluation of the

3    relative dose?

4    A    No.  You have to know the dose and duration.

5    Q    Dr. Cohen, have you also reviewed Dr. Bahnson's

6    background and training?

7    A    Yes.

8    Q    And are there differences between his background and

9    training and your background and training, as it relates to the

10   specific issues in this case?

11   A    Yes.

12   Q    What are some of those differences?

13   A    Dr. Bahnson is a urologist, and he's been trained in the

14   surgical aspects of urology, particularly the treatment of

15   cancer in the various urological organs, which would be kidney,

16   bladder, testes, adrenal.  His research has been focused on

17   various clinical aspects of these diseases, also looking for

18   biomarkers.  He has not had any training nor has he published

19   on causation or evaluation of that.

20        My background is involved with diagnosis and prognosis

21   as a pathologist.  I actually served on the bladder panel with

22   Dr. Bahnson with the NCCN, which is the National Comprehensive

23   Cancer Network system for the bladder, where we came up with

24   guidelines for the diagnosis and management of patients with

25   bladder cancer.

Vol. 12 -   186

1          But I've also been trained, with my Ph.D. and then with

2     all my research, on specific aspects of causation with regard

3     to what kinds of chemicals and other agents can cause cancer

4     and mechanisms by which they act.

5     Q    Doctor, do you have specific experience with

6     investigations concerning animal carcinogenesis?

7     A    Yes.

8     Q    Do you have specific experience with investigations

9     concerning human cancer epidemiology?

10    A    Yes.

11    Q    Do you believe that the differences between some of your

12    training and experience versus Dr. Bahnson's are significant in

13    terms of the specific issues involved in this case?

14    A    Yes.

15    Q    How so?

16    A    I think that, as I said, he has not had any training in

17    causality, and that's reflected in both his report as well as

18    his testimony and cursory aspect of his overall evaluation,

19    whereas, I've been involved with the causation and especially

20    the issue of extrapolation of animal findings to humans.  I've

21    been on the WHO panel that's involved with this beginning in --

22    I think we started in 1996 developing a framework on how you

23    analyze the animal data and how you then extrapolate those

24    findings to the human.

25    Q    Doctor, did you review Dr. Bahnson's report in his

Vol. 12 –   187

1   testimony regarding C-8?

2     A     Yes.

3     Q     And did that include a transcript from Dr. Bahnson's

4   trial testimony?

5     A     Yes.

6     Q     Did you see Dr. Bahnson's statement that it is important

7   to consider dose when evaluating specific causation in an

8   individual?

9     A     Yes.

10    Q     Do you agree with that statement, that it's important to

11  consider dose when evaluating specific causation in an

12  individual?

13    A     Yes, that's the fundamental principle of toxicology.

14    Q     We talked about this hypothetical and the tobacco and

15  the number of pack years.  Do you have an opinion, sir, as to

16  whether Dr. Bahnson appropriately considered relative dose,

17  this pack-years-type concept, when weighing the potential that

18  Mrs. Bartlett's kidney cancer was caused by obesity or weighing

19  the possibility that it was due to C-8?

20    A     It didn't seem --

21          MR. DOUGLAS:  Objection, Your Honor.

22          THE COURT:  I'll see you at side-bar.  You say stand

23  if you wish, ladies and gentlemen.

24

25

Vol. 12 -  188

1                        - - -

2        Thereupon, the following proceeding was held at side-bar

3  out of hearing of the jury:

4        THE COURT:  What we all know has been ruled out is

5  this doctor's use of a differential diagnosis.  What I

6  understood the question to be asking is whether Dr. Bahnson's

7  use of differential diagnosis was medically sound.  Is that

8  what you see is the question?

9        MR. MACE:  In a nutshell.  This is right in accord

10  with your ruling on evidentiary motions.

11        THE COURT:  You're assuming one thing, though, that

12  I'm going to be consistent.

13        MR. MACE:  You were pretty close through three orders.

14        THE COURT:  For the record, I'd say I was a hundred

15  percent close.  There's no margin of error.

16        MR. MACE:  Yes, sir.  Stipulated.

17     DuPont can present a witness to create a triable issue

18  by attempting to disprove the reliability of testimony on

19  specific causation.

20        THE COURT:  I'm with you on that.  I agree with that.

21  Now the question is, is there any reason why this goes beyond

22  that?

23        MR. DOUGLAS:  I just want to read -- let me preference

24  it by saying I'm concerned about the part of the Court's order

25  that said DuPont is cautioned that Dr. Cohen may not utilize

1  his impeachment opinion as a back door to state his opinions

2  related to general or specific causation.

3         MR. BILOTT:  That's precisely what this is.  They were

4  attempting to present to the jury the fact that -- this is

5  exactly what we talked about before.  They're going to say

6  Dr. Bahnson -- they're going to get this witness to say

7  Dr. Bahnson didn't properly consider dose, which is something

8  the science panel did not do.  To suggest through this

9  hypothetical --

10        THE COURT:  Let me get an instruction on this.

11    This reminds me of the tobacco case.  You can't use dose

12 in the tobacco case to say you didn't have high enough dose to

13 get lung cancer.  That can't be said here as long as she

14 doesn't meet the .05 parts per billion.  It can be used when

15 you're weighing competing etiology.

16        MR. BILOTT:  Our concern in this particular case, the

17 science panel didn't calculate what the specific doses were.

18        THE COURT:  I'll give you an instruction on that.  I

19 do think, like in smoking cases, whether you smoke 30 years or

20 five years, it's something the jurors can consider in deciding

21 which is the more probable cause.

22        MR. MACE:  That's the limited use I'm trying to make.

23        THE COURT:  With that instruction, would you be

24 satisfied with that?  Not satisfied, but be happier than you

25 would be without the instruction.

 1          MR. BILOTT:  We understand, Your Honor.

 2      (Back in open court.)

 3          THE COURT:  If you want to reask the question, you

 4   may.  And after the answer, I'll give the instruction we talked

 5   about.

 6      BY MR. MACE:

 7      Q    To set the stage, we talked about a hypothetical, not

 8   this case but a different case, and we talked about if this

 9   case was about lung cancer and pack years.  And I was trying to

10   bring it back to Dr. Bahnson's testimony.  My question to you

11   was:  Do you have an opinion as to whether Dr. Bahnson

12   appropriately considered relative dose, that pack-years-type

13   concept, when weighing the potential that Mrs. Bartlett's

14   kidney cancer was caused by obesity, or in weighing the

15   possibility it was due to C-8?

16          This first question was do you have an opinion?

17      A    Yes.

18      Q    And let's start with the obesity, first.

19          Do you have an opinion to a reasonable degree of medical

20   certainty as to whether Dr. Bahnson appropriately considered

21   the level of obesity, the pack years to put it into a different

22   context, the pack years of obesity, or level of obesity in

23   weighing the potential that Mrs. Bartlett's kidney cancer was

24   caused by obesity?

25      A    He completely dismissed obesity as a risk factor, so he

1    couldn't put it into perspective of quantitatively since he

2    dismissed it qualitatively.

3        Q    In terms of the literature, some of which we reviewed,

4    but you said approximately 20 articles out there, several of

5    these cited by Dr. Bahnson, what does the scientific literature

6    in your opinion tell us about the relative risk for getting

7    kidney cancer from obesity if you're morbidly obese, if you

8    have the level of obesity we're talking about here?

9        A    I think as you saw in the articles we reviewed, all of

10   them talk about a dose response.  And nearly all the studies

11   that have looked at obesity and renal cell carcinoma, they've

12   shown a dose response which means the heavier you are, the

13   higher your BMI, the rate of your risk of developing kidney

14   cancer.

15           For the morbidly obese, some of them come up with

16   estimates that are fivefold higher than somebody who is normal

17   weight, or even higher.  That would be the high end of the

18   risks.  So going back to your cigarette analogy, that would be

19   your three pack a year for 40 years kind of exposure.

20       Q    Okay.  As opposed to a pack a day or a pack --

21       A    Compared to a cigarette a day.

22       Q    Okay.  So similarly, when applying this pack-year

23   concept to Mrs. Bartlett's exposure to C-8, did you feel that

24   Dr. Bahnson adequately evaluated that?

25       A    I felt that he did not evaluate quantitatively.  He just

1    basically put together all of that, even though he stated that

2    dose was an important consideration.

3    Q    Now, the jury has heard a little bit, Doctor, about

4    water levels, the level of C-8 in water, drinking water, and

5    level of C-8 in the blood.  In your expert opinion, is one a

6    better measurement of a particular individual's dose than the

7    other?

8    A    Blood levels are generally considered a better

9    assessment of the exposure compared to water levels, because

10   blood levels would reflect what that individual's body has done

11   with the substance once it's gotten their exposure into it.  So

12   generally, blood levels are considered a much better exposure.

13   So, for example, in pharmaceutical industry, the FDA only

14   accepts blood levels.  They don't say what's the daily dose or

15   something, how much is in a pill.  It's what's the blood level.

16   Q    So there is individual variation among people?

17   A    Quite a large variation.

18   Q    And you and I, for example, could be exposed to the

19   exact same amount in the air, but we could end up with

20   different amounts in our blood?

21   A    Exactly.

22   Q    Do you recall from reading Dr. Bahnson's second

23   transcript of his deposition -- so after he had rendered his

24   opinions, and then he was deposed as an expert -- that he did

25   not know at that time even what Mrs. Bartlett's blood level

Vol. 12 -  193

1  was?

2  A    I do not believe he knew at that time, or at least he

3  didn't state that he was aware.

4  Q    Did you read the part of his trial testimony where he

5  acknowledged that she had about a 19.5 part per billion of C-8

6  in her blood when it was tested in 2005?

7  A    Yes.

8  Q    Did you see his acknowledgment that the mean level for

9  all of the community members that were tested in 2005 was

10  approximately 82 parts per billion?

11  A    Yes; for women, yes.

12  Q    And then for the people drinking the Tuppers Plains

13  water, that the mean was approximately 39 parts per billion?

14  A    Correct.

15  Q    But did you see any of this weighing of the pack years

16  in Dr. Bahnson's, either in his report or his opinion and

17  testimony at deposition or at trial?

18  A    No.

19  Q    I'm going to keep moving.

20       MR. DOUGLAS:  Your Honor, I ask for the instruction.

21       THE COURT:  Ladies and gentlemen, I'm going to try and

22  thread the needle again here with you.  Let's use a comparison

23  to a cigarette smoking case where someone has developed lung

24  cancer and the issue would be was it caused by smoking or was

25  it caused by something else?  And the jury would have to decide

Vol. 12 - 194

1   which of the causes was the one that essentially caused the

2   lung cancer.  The law has concluded that lung cancer can be

3   caused by smoking.  It doesn't mean it always is the cause.

4   But that's not something any scientist would deny at this

5   point.

6          The place that dosage comes in, in other words, how many

7   cigarettes did you smoke comes in, is not to show that someone

8   didn't smoke and the lung cancer wasn't connected to the

9   smoking, but it goes to the issue of is it more likely that

10  smoking caused the lung cancer compared to something else.

11  That's what we're getting into here.

12         You've seen the standard that we've talked about, the

13  .05 parts per billion.  I know you all know it by heart.  The

14  doctor's testimony is not challenging that.  But the dosage,

15  the quantity in the water and the length of time may have

16  something to tell you about how you decide what caused the

17  kidney cancer.

18         It doesn't undercut the .05 parts per billion.  I'm sure

19  you understand that.  So with that, you may continue.

20  BY MR. MACE:

21  Q    Dr. Cohen, as part of your work in this case, did we ask

22  you to look at the various risk factors that Dr. Bahnson had

23  listed in reaching opinions in terms of the thoroughness of his

24  investigation of those various factors?

25  A    Yes.

1    Q    I'm going to talk to you about a couple, but let's bring

2    up his list of risk factors for kidney cancer.

3         I guess, let's just start with the first one there,

4    Doctor.  Family history.  Is it your opinion, Doctor, did

5    Dr. Bahnson do a thorough investigation of that factor?

6    A    He did an investigation but it was quite limited and

7    certainly wouldn't be considered a thorough investigation.

8    Q    And why do you say that?

9    A    A couple of things.  One is that he didn't -- other than

10   I believe parents and siblings, he didn't go beyond that, as

11   far as looking for possible causes.  But also he didn't follow

12   it in greater breadth with other family members and other

13   generations, particularly in an individual like Mrs. Bartlett

14   who developed a cancer at a relatively young age.  I believe

15   she was 40 or 41 at the time of diagnosis.  Generally, that's a

16   figure you should explore in greater depth in family history.

17   Q    So, if this is Mrs. Bartlett and her mom and dad and

18   their moms and dads, you saw that he had some information on

19   her dad?

20   A    Correct.

21   Q    Did you see any investigation of the rest of the family

22   tree?

23   A    No, I did not.  And also with regard to the dad, it was

24   strictly for him, the evaluation of the kidney cancer that he

25   had, although his was a different type than the one that

Vol. 12 - 196

1    Mrs. Bartlett had.

2      Q     Let's be clear on that.  You're not claiming that her

3    father, Mr. Clem -- you're not claiming that he had renal cell

4    kidney cancer?

5      A     No.  But I think it's important to note he had four

6    different types of cancer, and that should also bring up a

7    greater concern for a family connection for just cancer risk

8    overall.

9           MR. DOUGLAS:  Your Honor, may we approach?

10          THE COURT:  You may stand if you wish, ladies and

11    gentlemen.  I'll see you at side-bar, Counsel.

12                         -  -  -

13       Thereupon, the following proceeding was held at side-bar

14    out of hearing of the jury:

15          MR. DOUGLAS:   I hate to be a nag, Judge, but this

16    opinion is -- he's clearly said that he is -- he is suggesting

17    that family history may have played a role.  He just said that

18    all these different cancers that the father had should be of

19    concern, and that it's clearly -- this is just coming that

20    close to just stating an opinion.

21          Secondly, he testified that -- he wrote in his report

22    and testified at his deposition that family history played no

23    role.  So to suggest right now is completely disingenuous.

24          THE COURT:  Isn't that cross-examination?  Why

25    wouldn't that be sufficient?

1          MR. DOUGLAS:  He's been precluded on specific

2    causation.  I'm not going to open that door.

3          THE COURT:  Do you mind if I kid you, that's kind of a

4    New York thing?

5          MR. DOUGLAS:  We use our hands.

6          MR. BILOTT:  There was a motion in limine on the

7    family history issue.

8          MR. MACE:  You'll recall the resolution of the -- the

9    erroneous of the other doctor's investigation.  That's all he's

10   talking about, the erroneous --

11         THE COURT:  I'm sure if he said it's so, it's so.  But

12   that's cross-examination.

13         MR. DOUGLAS:  I don't think this is something I can

14   cross-examine on because that would open the door to his

15   specific causation.

16         THE COURT:  No.  I mean --

17         MR. DOUGLAS:  Am I permitted to say you ruled out

18   family history?  If the Court is saying I am permitted to do

19   that, cross-examine, and I'm not opening the door --

20         MR. MACE:  I don't believe he'll say that -- during my

21   discussions with him, he thinks family history was -- he's

22   talking about the thoroughness.

23         MR. DOUGLAS:  The suggestion is right now that it was

24   of concern and, therefore, he is suggesting that -- the doctor

25   is suggesting to the jury potentially, as they go back and

Vol. 12 –  198

1    deliberate and think about that answer, they'll think that

2    family history is part of what happened.

3            THE COURT:  You can still use his testimony even

4    without the opinion.  He's not going to give the differential

5    diagnosis.  You can still cross him with his prior testimony.

6            MR. DOUGLAS:  So I'm clear, I can ask him, don't you

7    agree that family history played no role in this case, and that

8    will not open the door for Mr. Mace to get into the rest or

9    anything else on cause specific.

10           MR. MACE:  My redirect can get him –– he doesn't know

11   one way or the other and Bahnson doesn't know one way or the

12   other.

13      (Back in open court.)

14           THE COURT:  You may continue, Mr. Mace.

15    BY MR. MACE:

16    Q    We were about to go to the second factor, genetics.  I

17   guess I'll ask you the same question, Dr. Cohen.  Did Dr.

18   Bahnson do a thorough investigation, in your view, of that

19   factor?

20    A    No.  He mentioned some of the genes that are related and

21   some of the mechanisms by which they act, but he didn't give a

22   thorough evaluation of either aspect.

23    Q    Let's get some clarification here because you may recall

24   from reading his testimony, he and I had a brief discussion

25   about the VHL gene?

1    A    Yes.

2    Q    Can you explain to us -- first of all, do you have

3    familiarity with that based on your decades of experience in

4    cancer research?

5    A    Yes.  I'm very familiar with the VHL gene.

6    Q    In terms of kidney cancer and the VHL gene, could you

7    describe to us why that can be significant?

8    A    It was discovered that people with the so-called Von

9    Hippel-Lindau, or VHL disease, that they have a very high

10   chance of developing renal cell carcinomas.  That led to an

11   examination of that gene in people who don't have that specific

12   genetic abnormality, and it was found that probably around 75

13   to 80 percent of renal cell carcinomas, in general, have

14   abnormalities in that particular gene.  And that's led to a

15   whole avenue of investigation in investigating other genes that

16   are related to VHL that can also lead to the development of

17   kidney cancer.  But more importantly, it's given us insight

18   into the mechanism by which this gene can cause cancer.

19   Q    What do you mean by that?

20   A    Essentially, the VHL gene and a number of these other

21   genes that have shown to be causative for kidney cancer, all

22   lead to activation of a gene called hypoxia inducible factor

23   alpha 2.  It's a fancy name for HIF 2 alpha.  This gene is in

24   response to hypoxia.  That seems to be the common thread.

25   Actually, as Dr. Bahnson pointed out, it's a common thread for

1    the VHL gene and all these other genes.  There's probably five

2    or six other genes that are involved with these.

3         The common thread is this activation of this HIF 2

4    alpha.  That gene is important because what it does is, when

5    it's activated, it makes the kidney cells proliferate.  And

6    it's that proliferation of the kidney cells that eventually

7    leads to the development of the cancer.

8         So it's begun to tie together a lot of different aspect

9    of kidney cancer which has been very important because now we

10   actually have a target for the treatment of kidney cancer,

11   which is being utilized in a number of clinical trials.

12   Q    Sir, this VHL gene, is that on chromosome three?

13   A    Yes.

14   Q    And are you familiar with something -- have you heard

15   the phrase spontaneous DNA replication errors?

16   A    Yes.

17   Q    What does that mean?

18   A    Basically, every time DNA divide, replicates itself and

19   the cell divides, that mistakes happen; not very many given the

20   enormity of number of letters in the gene alphabet.  But it --

21   some of these can occur.  And if all of the mistakes that are

22   needed for development of cancer occur in a single cell, then

23   you eventually will develop cancer.

24   Q    And can those spontaneous DNA replication errors occur

25   without any external factor, any chemical exposure, anything

1  else?

2    A    Just DNA replication itself will lead to a small number

3  of errors.  It's just when you put that into perspective of the

4  literally billions of cells in our body that are replicating

5  every day, the chances of abnormalities happening increases

6  significantly.

7    Q    In terms of the thoroughness of Dr. Bahnson's

8  investigation, did you see any indication that he did any

9  genetics testing on Mrs. Bartlett?

10    A    I don't believe he did, nor have any of the other

11  physicians that I'm aware of.

12    Q    Do you recall his comment -- I can't recall if it was

13  D.C.  He said you would have to go somewhere for that, like

14  there's only one place in the country to get genetics testing?

15  Is that accurate?

16    A    I think he referred it was all at the National Cancer

17  Institute.  In reality, this is done in many institutions

18  including here at Ohio State, the Cleveland Clinic, any major

19  medical center would do these kinds of analyses.

20    Q    I don't want to dwell too much on any one of these.

21  Workplace chemical exposure.  Did you think Dr. Bahnson

22  thoroughly evaluated whether workplace chemical exposure was a

23  proximate cause of her kidney cancer?

24    A    He didn't mention any workplace exposures or possible

25  exposures for Mrs. Bartlett.

Vol. 12 -  202

1    Q    Did you see anything on the records that indicate at

2    least something that should be looked into?

3    A    I thought there was one aspect that needed to at least

4    be explored, and that was the fact that she stated in her

5    testimony that she goes for, I believe, lunch at a dry cleaner

6    and cleaning facility.  One of the chemicals used in dry

7    cleaner facilities is this trichlorethylene, which has been

8    classified as a known human carcinogen.

9    Q    I don't want to spend too much time on these lists.

10   Doctor, you've talked about a number of factors that can lead

11   to kidney cancer.  But do some people get kidney cancer for no

12   identifiable reason?

13   A    Yes.

14   Q    And in fact, unfortunately, is that common?

15   A    Unfortunately, yes.

16   Q    And sir, as much as people would like to find something

17   to blame, are we always able to find out the cause of a

18   specific individual's cancer?

19   A    No.  I think it's been estimated that approximately half

20   of the cancers that develop in the United States that lead to

21   death do we actually have a known cause for, or even possible

22   cause.

23   Q    Doctor, I want to shift for just a couple minutes, a few

24   minutes, and talk about the time.  I want to take you back in

25   time to the '80s and the '90s.

Vol. 12 -  203

1    A    Okay.

2    Q    A lot of our discussions have been down here in green.

3  I want to take you back to the '80s and '90s.

4    A    Okay.

5    Q    Sir, you say you have some familiarity with animal

6  studies for cancer and how those results should be applied to

7  humans or should not be applied to humans?

8    A    Yes.

9    Q    And I want to take you back to the state of the science

10  back in the '80s and '90s.

11    A    Okay.

12    Q    Are you able to do that?

13    A    Yes.

14    Q    All right.

15    A    Remember my history goes back to the '60s.

16    Q    You're not that much older than me.

17        The jury has heard about a rat study that showed benign

18  Leydig cell tumors at high doses of C-8 that was conducted by

19  3M Corporation in the late '80s.  Are you familiar with that

20  study?

21    A    Yes.

22    Q    First of all, let's back up a few steps.  Are the

23  results of animal studies always applicable to humans?

24    A    No.

25    Q    For example, do some of the common medicines that human

1    beings take cause cancer in laboratory animals?

2    A    Many of them do.  Actually, it's been estimated that

3    approximately 50 to 60 percent of the drugs that are in the

4    Physician's Desk Reference, which is a compilation of all the

5    drugs on the market, about 50 to 60 percent have tested

6    positive in a rat, mouse, or both.

7    Q    In fact, did you look at Mrs. Bartlett's list of

8    medicines?

9    A    Yes.  At least one of those is a known animal

10   carcinogen.  Omeprazole, which she's taking for

11   gastroesophageal reflux disease, otherwise known as Prilosec,

12   is a well-known carcinogen in rats and mice.  It produces a

13   type of stomach cancer.

14   Q    Just so the jury is perfectly clear, you're not claiming

15   that -- I can't even pronounce it.

16   A    Omeprazole.

17   Q    That one.  You're not claiming that caused her kidney

18   cancer?

19   A    No.  Everything we know about that drug is that it

20   causes stomach cancer in rats and mice by a mechanism that's

21   not relevant to humans.

22   Q    Your only point is that some substances can cause a

23   disease in one animal but not another?

24   A    Correct.

25   Q    So back in the '80 and '90s, when this study came out in

1    the late '80s that shows Leydig cell tumors in rats, should

2    that have put DuPont on notice back at that time, knowing what

3    was known at the time, that C-8 was a human carcinogen?

4            MR. DOUGLAS:  Objection on the grounds that is going

5    to general causation.

6            THE COURT:  All right.  Overruled.  This goes to

7    knowledge of DuPont in the '80s, not to the standard we've been

8    talking about.

9            MR. MACE:  I tried to make that very clear.

10   BY MR. MACE:

11   Q    Sir, you can answer the question.

12   A    I believe the study was reported and completed in 1987

13   or thereabout.  By that point in time, number one, we know that

14   Leydig cell tumors in certain strains of rats were very common.

15   This particular strain of rat, it certainly is very common.

16   And that number two is that they're almost -- not almost, they

17   are always benign.  They never evolve into malignant tumors.

18   Number three is there is already a considerable amount of

19   evidence that they did not have any relevance to humans.  So I

20   don't think it would have been appropriate to interpret at that

21   time that this posed a cancer risk to humans.

22   Q    All right.  Let's go back -- I'm going to take you back

23   to today.  We talked about diagnosis of the cancer and

24   Dr. Bahnson's opinions.  Then I took you back in time to talk

25   about DuPont's reaction and conduct.  Now I'm coming back to

Vol. 12 - 206

1   today as we sit here in 2015.

2       I wanted to talk about Mrs. Bartlett and her medical

3   records you reviewed.  Have you reviewed the medical records

4   and the testimony that following Mrs. Bartlett's successful

5   surgery in 1997 with what you said was a Grade 1, Stage 1

6   tumor, that she has remained cancer free for almost 20 years

7   now?

8   A    Yes.

9   Q    Sir, do you have an opinion to a reasonable degree of

10  scientific certainty as to whether it is likely or unlikely

11  that her kidney cancer will return at this point?

12  A    This kidney cancer is very unlikely to return.  She

13  continues to have now two risk factors for development of

14  possibility of a new kidney cancer, and that is she's both

15  obese and hypertensive at this point.  At the time --

16  Q    Let me slow you down a few steps.  I want to make sure

17  we get this clear.

18      With regard to her prior tumor that was removed in '97,

19  are you saying it is likely or unlikely to a reasonable degree

20  of medical certainty as to whether that tumor will come back?

21  A    It's very unlikely.

22  Q    Then you said she remains at risk for two factors of

23  getting a new kidney cancer.  What were you saying about that?

24      MR. DOUGLAS:  Objecting to the previous question.

25      THE COURT:  Overruled.

```
 1      BY MR. MACE:

 2      Q    Continue.

 3      A    She not only continues to be obese, but she also has

 4      developed hypertension.  She was not hypertensive at the time

 5      of her original surgery, but now she is.  She has two major

 6      risk factors of her development of a new kidney cancer.

 7      Q    Doctor, with regard to that last topic, are you aware of

 8      the evidence that C-8 has been filtered out of Mrs. Bartlett's

 9      Tuppers Plains water since the spring of  '06?

10      A    Yes.

11      Q    Do you have an opinion to a reasonable degree of

12      scientific certainty as to whether, sitting here today,

13      compared to the average person in the general United States

14      population, whether Mrs. Bartlett is at any increased risk of

15      kidney cancer from her past exposure to C-8?

16      A    Well, given the gradual elimination --

17           MR. DOUGLAS:  Objection, Your Honor.

18           THE COURT:  I'll see you at side-bar.  You may stand,

19      if you wish, ladies and gentlemen.

20                              - - -

21        Thereupon, the following proceeding was held at side-bar

22      out of hearing of the jury:

23           THE COURT:  So this goes to risk of future development

24      of kidney cancer.  Why is this improper?

25           MR. DOUGLAS:  He said he hasn't considered C-8 as a
```

1    risk factor.  We know she had exposure because she's not --

2    it's undisputed she is --

3            THE COURT:  The problem is he didn't believe .05 was

4    ever a risk factor.

5            MR. DOUGLAS:  That is inherent in what he was going to

6    say.  This is what was excluded.

7            MR. BILOTT:  This goes directly to what was the

8    problem with the specific causation.

9            THE COURT:  I'm with you on this.  I think you're

10   right, because otherwise to cross him on this effectively, you

11   would have to get back in the opinion that was excluded.  So

12   this needs to be excised as well.

13           MR. PAPANTONIO:  One other thing.  We intend to file a

14   motion to excuse the sleeping juror at the break.  I'd like the

15   Court to review it, if you would.

16           THE COURT:  Why don't we address this at five o'clock.

17   How does that sound?

18           MR. PAPANTONIO:  That's fine.

19           THE COURT:  We're not going to do anything with him

20   now.

21           MR. MACE:  He's been fairly attentive, I thought, this

22   afternoon.

23           MR. DOUGLAS:  He missed three quarters of what's

24   happened so far.

25           MR. MACE:  That's not accurate.

Vol. 12 - 209

1    THE COURT: It sounds like you're opposed to this.

2    MR. MACE: Yes. I thought there was much more interim

3 relief that can be done.

4    THE COURT: Let's do this. At five o'clock, we'll

5 address this.

6   (Back in open court.)

7    THE COURT: Mr. Mace, you may continue.

8  BY MR. MACE:

9  Q Dr. Cohen, before I wrap up, were all the opinions that

10 you gave to me today made to a reasonable degree of scientific

11 certainty?

12  A Yes.

13  Q And do you charge for your time?

14  A Yes.

15  Q What is your hourly rate?

16  A Six hundred dollars per hour.

17    MR. MACE: I have nothing further for you at this

18 time.

19    THE COURT: This would be a good time for our

20 mid-afternoon break. We'll be in recess for 15 minutes.

21   (Recess taken from 2:52 to 3:05.)

22    THE COURT: All right. The defendants may call their

23 next witness.

24    MR. PAPANTONIO: Your Honor, may we approach?

25    THE COURT: If you'd like.

Vol. 12 -   210

1      Take a stand by your seats, and I'll see you in just a

2 moment, ladies and gentlemen.

3    (Discussion at side-bar as follows:)

4      MR. PAPANTONIO:  We would like to move to strike all

5 of the testimony that was just put on by this particular

6 witness to preserve our record.  He went -- A, this was a

7 witness who did not make it past summary judgment.  B, it was a

8 witness that did not make it through a Daubert evaluation.

9      He's come into court, and he is now -- he's now created

10 another idea of spontaneous -- I suppose it's the idea that

11 there is some spontaneity to the process of cancer.

12      There are experts that we could have brought had we

13 known that this was going to occur.  We now are under a cloud.

14 There is no way to correct this problem.  He has been allowed

15 to say things that are completely on the edge that would never

16 withstand a Daubert test.  And so we are -- we are in a

17 situation, Judge, the only thing we can do is move to strike

18 the testimony to preserve the record.

19      THE COURT:  Well, this is what I think my earlier

20 opinions parsed through.

21      In the abstract, if this were -- if the defense had the

22 burden of proof that obesity was the cause, you'd lose -- I

23 think -- from my ruling.  Maybe you don't concede that that

24 would be the issue.  Their burden, though, isn't to prove

25 causation.  It's the plaintiff's to prove.

Vol. 12 - 211

1      The defendant -- I called this person a bocce ball, if

2  you'll remember.  That's what he's for.  And the jurors were

3  told that there is no opinion that obesity was a causal factor.

4  All they know is that this can be used to try to discredit your

5  claim that C-8 is the causative factor.  So, I get the

6  objection.  I note it.  It's preserved, but we'll go forward.

7          MR. MACE:  While we're here, we want to make sure we

8  proffer and I don't forget that, if allowed --

9          THE COURT:  What he would have said if not struck.

10          MR. MACE:  Thank you, sir.

11          THE COURT:  Yes.

12          MR. MACE:  If allowed, he would have testified to all

13  of the opinions reflected on his report and all of the things

14  that have been in our briefs.

15          THE COURT:  And do that when you need to, but I want

16  to put on the record here, so both sides can use this, anything

17  I've excluded up to this point in motions in limine are

18  preserved.  But if you want to make more record with it, go

19  right ahead.

20          MS. NIEHAUS:  Your Honor, does that count, as well,

21  for -- I mean, we were going to proffer Rettos, for example.

22          THE COURT:  Anything that I've stricken -- and that

23  would be Rettos, and I haven't -- I've stricken most of

24  Flaherty -- that's all preserved.  Okay?

25          MR. MACE:  Thank you.

Vol. 12 -  212

1          MR. PAPANTONIO:  The only other thing that I just want

2     to make clear, we're going to the issue, also, of spontaneous

3     replication.  That becomes very important, because there are

4     experts who think that is completely voodoo.  And now we have

5     no -- we have no ability to get a witness in here for that.

6          MR. MACE:  Well, let me just note for the record that

7     Dr. Bahnson acknowledged that that occurs.

8          THE COURT:  All right.  Thank you.

9        (Back in open court.)

10          THE COURT:  I misspoke.  We're not calling a new

11     witness.  We're going to have a cross-examination of Dr. Cohen.

12          So, with that, Mr. Douglas, you may proceed.

13          MR. DOUGLAS:  Thank you, Your Honor.

14                         -  -  -

15                     CROSS-EXAMINATION

16     BY MR. DOUGLAS:

17     Q.   Good afternoon, Dr. Cohen.  How are you today?

18     A.   Good.  Thank you.

19     Q.   Very good.

20          I just have a few questions for you.

21          You were very critical of Dr. Bahnson both with respect

22     to his qualifications and the way he went about reaching his

23     conclusion regarding the cause of Ms. Bartlett's renal cell

24     carcinoma just a few moments ago during direct examination.

25     Right?

Vol. 12 - 213

1    A.    About his qualifications regarding causation, not his

2    qualifications regarding his abilities as a surgeon.

3    Q.    Okay.  So, you took issue with his qualifications to

4    render an opinion on causation and then the way in which he

5    did, in fact, go about reaching his conclusion.  Do I have it

6    right?

7    A.    Yes.

8    Q.    Okay.  So, you say you are in a better position to

9    render an opinion than Dr. Bahnson on those subjects -- on that

10   subject, right?

11   A.    Yes.

12   Q.    You're in a better position than Dr. Bahnson, the doctor

13   who treated Mrs. Bartlett for nearly a decade; is that what

14   you're telling us?

15   A.    Again, with regard to causation, yes; not with regard to

16   her clinical management.

17   Q.    You're in a better position than the doctor who treated

18   her for ten years, who's written textbooks, who's written 50

19   chapters and textbooks, or edited chapters and textbooks, over

20   150 articles on cancer -- including articles on cancer, who's

21   treated thousands of patients and had to make life-and-death

22   decisions, not sitting in a laboratory looking at specimens

23   under a microphone -- under a microscope, but making life-and-

24   death decisions on the front lines of the James Cancer

25   Hospital, where his decision as to what may have caused

Vol. 12 - 214

1  somebody's cancer might make the difference between life and

2  death, that's the Dr. Bahnson we're talking about that you're

3  in a better position than?

4  A.   His decisions at the time of surgery and treating the

5  patient are not based on causation.  His abilities as a surgeon

6  I'm not questioning.

7       I've known Dr. Bahnson for more than 20 years.  I've

8  served on panels with him, but his abilities in causation --

9  and his publications are not on causation -- I'm in a better

10 position than he, because --

11 Q.   Doctor, you haven't treated a patient --

12      THE COURT:  Wait.  One moment.

13      MR. MACE:  Your Honor, --

14      THE COURT:  The answer wasn't finished.

15      Go ahead and finish your answer.

16      MR. DOUGLAS:  Sorry.

17      THE WITNESS:  Okay.

18      With regard to causation, I am better trained and in a

19 better position than he is.  He has treated patients.  He has

20 not dealt with causation issues.  He hasn't been trained in

21 that.

22 BY MR. DOUGLAS:

23 Q.   Than Dr. Bahnson, who makes life-and-death decisions and

24 gives a treatment plan to patients that sometimes and often

25 involves decisions that are based on what caused a patient's

Vol. 12 -   215

1    cancer in the first place?

2      A.   In this instance, that clearly was not the case, as his

3    deposition -- his first deposition was --

4      Q.   Just yes or no, sir.

5      A.   I can't answer it yes or no without putting it in

6    context.

7      Q.   So, you haven't treated a patient, face to face, with

8    renal cell carcinoma since your residency in 1975; isn't that

9    true?

10     A.   Yes, that's true.

11     Q.   We're going to put you on this list, this chronology.

12          That would be way back here (indicating), in 1975, the

13   last time you treated a patient, face to face, like Carla

14   Bartlett, with renal cell carcinoma, right?

15     A.   Correct.

16     Q.   Gerald Ford was the president.  The Brady Brunch, I

17   think, was on television, as was pointed out by defense

18   counsel.  That's how long ago it was since you've actually

19   treated a patient --

20     A.   Correct.

21     Q.   -- for renal cell carcinoma.  And you still don't see

22   patients directly.  You see their specimens, correct?

23     A.   Most of the time, that's correct.

24     Q.   And when we're talking about specimens, we're talking

25   about a surgical slide, right?

1     A.    No.  I get the gross specimen and the slides.

2     Q.    Okay.  You're talking about you're in the laboratory, or

3   in your office?  Where do you look at the surgical slides and

4   the specimens?

5     A.    The specimens, themselves, are received in a grossing

6   room, which is part of the operating suite.  And the slides

7   come either to my office or to the resident's office or to a

8   reading room.

9     Q.    So, you can't ask a specimen -- you can't take a history

10   from a specimen.  You've been critical of the way Dr. Bahnson

11   took a history from Ms. Bartlett, an actual patient, but you

12   can't take a history from a specimen, right?  You don't do

13   that?

14     A.    Most of the time -- most aspects, you can't take the

15   history.  There are some aspects that, yes, a slide will give

16   you a history.

17     Q.    You can't ask a specimen on a microscopic slide did your

18   brother, did your uncles, did your aunts have kidney cancer.

19   You can't do that.  You don't do that.

20     A.    Not usually, but if a genetic analysis is involved, I am

21   involved with that.

22     Q.    But you're critical of the way in which Dr. Bahnson took

23   a history, right?

24     A.    Yes, I am.

25     Q.    But you don't do that?

Vol. 12 —  217

1    A.    I do not.

2    Q.    You ever hear the expression "a back-seat driver"?

3    A.    I'm not a back-seat driver.

4    Q.    I didn't ask you if you were.  I just asked you if you

5    ever heard the expression.

6    A.    I have heard the expression.

7    Q.    You don't see patients with Von Hippel-Lindau Syndrome

8    in an office, face to face, right?

9    A.    Correct.

10   Q.    So, Dr. Bahnson testified that, in his years of

11   experience, his 30-plus years of experience of treating cancer

12   patients and other patients, he understands the clinical signs

13   and symptoms of patients with Von Hippel-Lindau, and they

14   present with unusual physical characteristics.  Did you read

15   that part of his testimony?

16   A.    Yes.

17   Q.    So, when you're looking at a slide under a microscope in

18   your laboratory, Doctor, back in Nebraska, you don't see the

19   physical presentation.  You don't see the -- you can't -- the

20   slide doesn't display for you the physical features or the

21   facial features of the patient, right?

22   A.    The slide itself doesn't.  We frequently are given the

23   history of it from the patient, though, as part of the

24   evaluation.

25   Q.    Okay.  But you do not take a history.  You just told us

Vol. 12 -   218

1    that.

2      A.   I do not take the history, except sometimes the genetic

3    aspects.

4      Q.   You do not see the patient, and so you don't have an

5    opportunity to observe the patient and see whether or not they

6    have the physical signs, the clinical signs, the facial

7    features and other unique symptoms of something like Von

8    Hippel-Lindau syndrome, right?

9      A.   Only if a photograph is provided to us, which frequently

10   is.

11     Q.   You frequently get a photograph with the specimen; is

12   that what you just said?

13     A.   Yes.

14     Q.   And you make no treatment decisions with respect to

15   these patients; you're just making a diagnosis?

16     A.   We're part of a treatment plan, frequently, as a

17   presentation at a tumor board, which is where the urologist,

18   the clinical oncologist, radiotherapist and the pathologist get

19   together and discuss cases.

20     Q.   You're not the captain of the ship.  The treating

21   physician is the captain of the ship and makes the ultimate

22   decision and listens to persons like yourself, the pathologist

23   or radiologist, other subspecialties.  And the treating

24   physician is the one who takes all of the different

25   subspecialties and makes a decision for what is going to happen

Vol. 12 - 219

1    with respect to treatment.  Right?

2     A.    That's correct.

3     Q.    And you rarely find yourself in the position of being

4    the captain of the ship, the person who is ultimately

5    responsible for the treatment of a patient.  Correct?

6     A.    That's correct.

7     Q.    So, you're not an oncologist, correct?

8     A.    That's correct.

9     Q.    You are not a uro-oncologist like Dr. Bahnson, correct?

10     A.    That's correct.

11     Q.    You're not a surgeon?

12     A.    That's correct.

13     Q.    You've never performed a nephrectomy, right?

14     A.    I assisted in nephrectomies in medical school and

15    residency.  I've never done one myself.

16     Q.    Okay.  So that would, again, be back in the 1970s?

17     A.    A long time ago.

18     Q.    And you're not an epidemiologist?

19     A.    I have experience with epidemiology, but I'm not an

20    epidemiologist.

21     Q.    And these -- I believe you cited six, if my count is

22    right -- one, two -- five or six -- I might be off by one --

23    studies that talked about an association or risk or causation,

24    whatever you want to call it, between obesity and renal cell

25    carcinoma, right?

Vol. 12 - 220

1   A.   Yes.  That was some of the articles that I reviewed.

2   Q.   Okay.  Out of -- out of a total of 20?

3   A.   Probably 20 and a few more reviews.

4   Q.   Okay.  And those are epidemiology studies, right --

5   A.   They are.

6   Q.   -- for the most part?

7   A.   Yes.

8   Q.   And there's a meta-analysis?

9   A.   Including meta-analyses, yes.

10  Q.   And the meta-analysis, just so we're clear, is just a

11  review.  It has no original data.  It's just a review of other

12  studies, right?

13  A.   It's a statistical evaluation of multiple studies.  It

14  actually is new data.  It's just a composite of previously

15  published or analyzed data.

16  Q.   Right.  So, you know -- being that you're not an

17  epidemiologist, sir, you know, and our jury heard, that DuPont

18  has a whole epidemiology department.  You know that, right?

19  A.   I do not know if they have a department.  I know they

20  have epidemiologists involved.  I don't know if it's a whole

21  department.

22  Q.   Okay.  But you know they have epidemiologists?

23  A.   Yes.

24  Q.   And you are not one of them?

25  A.   Correct.

Vol. 12 -   221

1    Q.   And you know, sir, because you read his report, that

2    DuPont hired, like you -- your only connection to this case, by

3    the way, is that you're hired by a law firm, right?

4    A.   That's correct.

5    Q.   There are many doctors who, over the course of years,

6    have treated Ms. Bartlett, right?

7    A.   Yes.

8    Q.   And you read their medical records, right?

9    A.   Yes.

10   Q.   And, by the way, not a one said a word about obesity

11   having one iota or anything to do with her renal cell carcinoma

12   in all of the records you reviewed, correct?

13   A.   Her medical records didn't give any evaluation of her

14   causation.

15   Q.   And, Doctor, you know, because you read his report, that

16   the defendant hired, like yourself, --

17           MR. MACE:  Objection, Your Honor.

18       May we approach?

19           THE COURT:  Well, I haven't heard the whole question

20   yet, but we will.

21       You may stand by your seats, if you wish, ladies and

22   gentlemen.

23     (Discussion at side-bar as follows:)

24           THE COURT:  Let me get the whole question first.

25           MR. DOUGLAS:  That the defendant hired an expert in

Vol. 12 -  222

1    epidemiology, Dr. Weed, whose report he read and whose

2    testimony he opined on at his deposition.

3             THE COURT:  So, it's the absence of him testifying is

4    what you want to get into?

5             MR. DOUGLAS:  Yes.

6             THE COURT:  What's your position?

7             MR. MACE:  My position is, one, I have to object at

8    that point because I can't unring a bell.  So that's why I

9    interrupted counsel.

10            I apologize for interrupting you, --

11            MR. DOUGLAS:  That's all right.

12            MR. MACE:  -- I need to preserve.  And, two, we

13    clarified this before.  Their Dr. Bahnson got on the stand,

14    because I was going to cross him with Dr. Siegel's testimony,

15    and Siegel didn't testify --

16            MS. NIEHAUS:  Margulis.

17            MR. MACE:  Margulis.  I'm sorry.  But we covered it in

18    one of the 8:30 conferences that it would be improper to cross

19    or use the testimony of an expert who wasn't going to be

20    presented.  So I was prohibited from doing that in their case,

21    and I expect the same rule to apply in my case.

22            THE COURT:  I don't remember that being the rule at

23    all.  What would you have preferred to ask Dr. Siegel about?

24            MR. MACE:  I would have preferred to ask Dr. Bahnson

25    about Margulis' opinions which were inconsistent with

Vol. 12 - 223

1    Bahnson's.

2         THE COURT:  But Bahnson didn't rely on them.  If he is

3    relying on somebody else's opinion, then he can be crossed on

4    it.  That's the difference.

5         MR. MACE:  But he's not relying on it for the opinions

6    you've left in the case.  You've taken out 80 percent of his

7    opinions, Your Honor.

8         THE COURT:  Well, you need to cover that, too, --

9         MR. MACE:  Those went to the other article because it

10   was the general causation opinion that he was relying on

11   before, and that's gone.

12        MR. DOUGLAS:  Just to be clear, the opinion is the

13   opinion that Dr. Weed expressed about obesity and renal cell

14   carcinoma, which was that he doesn't believe there is anything

15   in the literature that establishes --

16        THE COURT:  If it stays with that --

17        MR. DOUGLAS:  That's where I'm going.

18        MR. MACE:  Your Honor, if I could clarify, Dr. Weed

19   was not in the scope of his -- At deposition, it was not within

20   the scope of his work in this case or his opinions to analyze

21   the causation issue between obesity and renal cell carcinoma.

22   It was not within the scope of what he was doing.

23        Counsel asked him questions on something he wasn't even

24   within the scope of his thing -- of his assignment, his report

25   and his opinions.  And we objected at the time, but we can't do

Vol. 12 -  224

1    anything when Your Honor is not there to rule on it.  But to

2    allow him to open a known door to create a scope that wasn't

3    even --

4              THE COURT:  We got far, far into obesity here on

5    direct.  The ruling is you can -- you stay on the obesity

6    issue.

7              MR. DOUGLAS:  That's where I'm staying.

8              THE COURT:  Not anything that would call into question

9    the issue of the rejected opinion by this doctor.

10             MR. DOUGLAS:  Staying on obesity.

11             THE COURT:  Okay.

12        (Back in open court.)

13             THE COURT:  You may continue.

14             MR. DOUGLAS:  Thank you, Judge.

15     BY MR. DOUGLAS:

16     Q.   So, you know, because you read his report and we

17    discussed him at your deposition when I questioned you, that

18    the defendant hired an outside expert like yourself, a person

19    who is an epidemiologist, and a well regarded one at that,

20    Dr. Weed.  Right?

21     A.   Yes.

22     Q.   In fact, you would agree with me that Dr. Weed, who has

23    authored many textbooks/articles on this subject of cause and

24    effect between an exposure and a disease like obesity and

25    cancer or smoking and cancer, that you referred to him as the

Vol. 12 -  225

1   guru of cause and effect?

2     A.    He is one of the gurus.  There are certainly many other

3   people that published on this.  And the ultimate guru was Dr.

4   Hill in 1964 or '5.

5     Q.    But this is -- but this guru is the one that this

6   defendant hired for this case, Dr. Weed, right?

7     A.    Yes.

8     Q.    And, sir, I played you a portion of his testimony that I

9   had taken.  Do you recall that happening at the deposition,

10   your deposition, when I questioned you?

11     A.    I -- I recall you reading some of it.  I don't remember

12   if it was played or not.

13     Q.    We actually played it.  And we're happy to play it again

14   if you'd like.

15     A.    That's fine.

16     Q.    And do you recall that it was Dr. Weed's opinion and

17   testimony that he had done an exhaustive search, like you, an

18   exhaustive search on the subject of obesity and renal cell

19   carcinoma and found nothing in the literature to establish that

20   it is generally accepted, not just five or six articles or 20

21   articles or 21 articles.  He found nothing in the scientific

22   literature from his exhaustive search on the subject to

23   establish that it is generally accepted that obesity is a --

24   not a risk factor -- a cause of renal cell carcinoma.  Do you

25   remember that?

Vol. 12 - 226

1    A.    I don't remember his exact words, but his overall

2  evaluation was that it's a major risk factor.

3         An attributable risk could be a -- was a major cause --

4  a cause.

5          MR. DOUGLAS:  Could we play that testimony, please?

6      (Thereupon, the following video clip was played:)

7      Question:  So you don't know whether it's generally

8  accepted or not as to whether obesity is a causal association

9  for renal cell carcinoma?  You don't know?

10     Answer:  I didn't say that.

11     Question:  Do you know?

12     Answer:  What I said was that what the literature that

13 I've reviewed says is that obesity is a risk factor for renal

14 cell carcinoma.  And I also said that I have not seen a

15 statement laying claim to causality.

16     Question:  Okay.  And do you think you did a pretty

17 thorough review of the literature on the subject?

18     Answer:  Reasonably thorough, yes.

19     Question:  So would it be fair to say that, based on

20 your research, it is not generally accepted that renal -- that

21 obesity is considered a causal risk factor for renal cell

22 carcinoma?

23     Answer:  It's like I said before, I haven't seen that

24 statement.  I would say that it is generally accepted it's a

25 risk factor.

1          Question:  But not a causal risk factor?

2          Answer:  I haven't seen that in the -- in the

3    literature.

4      BY MR. DOUGLAS:  (Continuing)

5      Q.    Sir, do you recall when I played that portion of the

6    deposition for you at your deposition?

7      A.    Vaguely, yes.

8      Q.    And you disagreed with Dr. Weed's testimony at that

9    time.  I'm happy to play your answer to that question from the

10   deposition.

11     A.    No.  I was just disagreeing with that statement to an

12   extent, the part that he hasn't seen it written.  But as we saw

13   in my earlier testimony today, there is several publications,

14   including the textbooks in Urology and the American Cancer

15   Society, that list it as a cause.

16     Q.    As a risk factor.

17     A.    No.  They link it as a cause.

18     Q.    We will go back.  And, by the way, there is -- you do

19   recognize there is a difference between risk factor and

20   causative risk factor, right?

21     A.    That's correct.  And they list it under cause.

22     Q.    Thank you for answering the question.  I have another

23   one for you.

24          A risk factor is something that's associated with

25   increased risk of a disorder, correct?

Vol. 12 -  228

1    A.   Correct.

2    Q.   And did you hear Dr. Bahnson's bow-tie analogy

3 describing what an association is?  Did you read that part of

4 his testimony?

5    A.   I did, yes.

6    Q.   Okay.  And just because two things are associated with

7 one another doesn't mean that one causes the other, right?

8    A.   That's correct.

9    Q.   And a causal risk factor is a factor that, with further

10 evaluation, can be identified as actually being causative,

11 correct?

12    A.   Correct.

13    Q.   Okay.  So, you -- you brought, and I have them here,

14 five or six articles to the attention of our jurors out of a

15 total of 20 or so articles on the subject, some of which have

16 actually used the word "cause," right?

17    A.   That's correct.

18    Q.   Okay.  Now, there were thousands and thousands of

19 articles in the scientific literature, the universe of

20 scientific literature, tens of thousands; aren't there?

21    A.   Overall, probably millions.

22    Q.   Millions.  Great!

23         And there are dozens of reputable journals out there,

24 right?

25    A.   Yes.

Vol. 12 - 229

1    Q.   And each one of those journals publishes articles every

2    month or every few months or every year, and the amount of

3    literature continues to grow and grow and grow, right?

4    A.   Yes.

5    Q.   And, for example, there are thousands of articles on

6    smoking being a cause of lung cancer, for example, right?

7    A.   I don't know how many, but lots, yes.

8    Q.   It's probably in the thousands by now, right?

9    A.   Could be, yes.

10   Q.   Okay.  And there are hundreds, if not thousands, of

11   articles on asbestos causing lung cancer or asbestosis, right?

12   A.   Certainly several hundred.  I don't know about

13   thousands.

14   Q.   Okay.  And I'll get back to your 20 articles, only six

15   of which you have shared with the jurors, but -- and that's a

16   good thing when people contribute to the scientific and medical

17   literature, right?

18   A.   Yes.

19   Q.   Okay.  It's a place for dialogue and debate of ideas,

20   and it's for the purpose of advancing science and medicine.

21   Agree?

22   A.   Yes.

23   Q.   And if you -- out of that -- you could find -- in the

24   scientific literature, if you look at this millions of

25   articles out there in the universe, you can find basically

Vol. 12 - 230

1  anything linking almost anything to cancer in the peer-reviewed

2  literature, right, if you look?

3  A.   No.  I think it's somewhat limited, but there are

4  certainly a large number of items that are listed.

5  Q.   Well, I was curious, so I took a look.  And, you know --

6       MR. DOUGLAS:  Let's have the oxygen-causes-lung-cancer

7  article published?

8       And I'll get to your six or seven.

9       May I approach?

10      THE COURT:  You may.

11 BY MR. DOUGLAS:

12 Q.   Do you see the title of this article?  Do you see the

13 title is Lung Cancer Incidence Decreases With Elevation,

14 evidence for oxygen as an inhaled carcinogen?  Do you see where

15 I'm reading from?

16 A.   Yes.

17 Q.   And a carcinogen is something that causes cancer, right?

18 A.   Correct.

19 Q.   And this is saying evidence of oxygen, what we're

20 breathing right now, as an inhaled carcinogen.  Did I read that

21 right?

22 A.   Yes.

23 Q.   One second.

24      How about citrus?  Have you read the articles about how

25 citrus causes melanoma?  Have you read those articles --

Vol. 12 - 231

1    A.   No, I haven't.

2    Q.   -- in the peer-reviewed journals?

3    A.   No.

4         MR. DOUGLAS:  Can we get that one, please?

5         May I approach, Your Honor?

6         THE COURT:  You may.

7    BY MR. DOUGLAS:

8    Q.   The Journal of Clinical Oncology, that's a peer-reviewed

9    journal, right?

10   A.   Yes.

11   Q.   It has to pass peer-reviewed muster, right?

12   A.   Yes.

13   Q.   It's got to show some scientific validity, right?

14   A.   Yes.

15   Q.   You see where it says:  Conclusion.  Citrus consumption

16   was associated with an increased risk of malignant melanoma in

17   two cohorts of women and men?  Do you see that?

18   A.   Yes.

19   Q.   Have you seen this before?

20   A.   I have not seen this article, no.

21   Q.   How about the American Journal of Epidemiology?  A

22   prestigious journal, right?

23   A.   It's a good journal on epidemiology, yes.

24   Q.   Okay.

25        MR. DOUGLAS:  Can we have the Vitamin D and pancreatic

1    cancer?

2         May I approach?

3         THE COURT:  You may.

4    BY MR. DOUGLAS:

5    Q.   Here, we have the American Journal of Epidemiology,

6    2010.  Anticancer Vitamins du Jour, the ABCEDs so far.

7         If you go -- flip the page, you'll see it says:  The

8    only association observed in this set of six analyses was a

9    troubling one.  The risk of pancreatic cancer was doubled for

10   those in the highest quintile of circulating Vitamin D levels.

11        Do you see where I'm reading from?  And have you ever

12   heard about Vitamin D causing pancreatic cancer or being

13   associated with it?

14   A.   I've seen several articles that have been published

15   relating low Vitamin D levels associated with various cancers,

16   including pancreas, but higher Vitamin D levels tend to be

17   protective.  It's in contrast to this.  This is in contrast to

18   those.

19   Q.   Okay.  Right.  Somebody in a peer-reviewed journal has

20   published an article in the Journal of Epidemiology that there

21   is an association between increased levels of Vitamin D and

22   pancreatic cancer.  That got into peer-reviewed literature,

23   right?

24   A.   This was an editorial.  So it would not have been peer

25   reviewed.

1    Q.    Okay.  It's an editorial, correct?

2    A.    Correct.

3    Q.    Someone expressing an opinion.

4    A.    Correct.

5    Q.    Debate and dialogue is what scientific literature is all

6    about.

7    A.    Correct.

8    Q.    You put your theory out there, you do your research, and

9    you see -- sometimes your theories get debunked, sometimes

10   they're accepted, and sometimes nobody cares.  Right?

11   A.    Correct.  Because reproducibility is part of cancer,

12   that's why I think the strength of obesity is a very strong

13   one.

14   Q.    Have you heard, sir, in your five or six articles out of

15   the 20 -- I appreciate that we didn't have to go through all

16   20 -- I thank you for that -- but we've also heard about there

17   are studies out there showing cell phones cause brain tumors.

18   Right?

19   A.    There is one study that reported that.  And subsequent

20   studies have found no association.

21   Q.    Sometimes studies show there isn't an association.

22   Sometimes there are studies that show no associations.

23   A.    That's correct.

24   Q.    In fact, that meta-analysis you talked about, if

25   you -- you know that some of the studies that it cited, of

Vol. 12 -    234

1    these 141 studies that it claims to have reviewed, or

2    articles -- you're looking at me like I'm wrong.

3        A.    That was for all obesity-related cancers.  For renal

4    cancer, there's only been about 20 or 25 studies.

5        Q.    Great!  So, sir -- that's not a lot of studies, 20 to

6    25.

7        A.    Given the size of some of those studies, that's a lot of

8    investigation --

9        Q.    Okay.  Well, sir, --

10       A.    -- with very consistent findings.

11       Q.    Sir, what you didn't tell the jury about that

12   meta-analysis is that many of those studies found no

13   association.

14       A.    No, that's not true.

15       Q.    That's not true?

16       A.    Of all the studies investigating obesity and renal cell

17   cancer, I believe there's only been one that did not find a

18   statistically significant elevated --

19       Q.    There's actually more than that with respect to renal

20   cell carcinoma, because I went out and found them.

21       A.    I have not seen them.

22       Q.    Sir, you talked about this 2008 Renehan study.  That's

23   the meta-analysis.

24       A.    Yes.

25       Q.    All right.  That's the one that used the buzz words

1    "Bradford Hill criteria" and "causation," right?

2    A.    Correct.

3    Q.    Sir, that -- by the way, they were looking at 20

4    different cancers, not just renal cell carcinoma.

5    A.    A large number of cancers.  I don't think it was 20, but

6    it was a large number.

7    Q.    It was -- it was 19 others, 20 including renal cell

8    carcinoma.

9    A.    Okay.  They did a broader analysis of the relationship

10   of obesity with cancer.

11   Q.    So, when you told our jurors that it looked at 141

12   articles, only a small portion of that, as you just

13   acknowledged, had to do with renal cell carcinoma.  You didn't

14   mean to suggest to our jurors, in other words, that there are

15   141 studies out there looking at renal cell carcinoma and its

16   association with obesity?  Let's just clear that up.

17   A.    That's correct.

18   Q.    Okay.  But it wasn't -- I brought this out on

19   cross-examination that, of the 141 that study looked at, you're

20   saying there's only 20 that dealt with renal cell carcinoma?

21   A.    I never mentioned the 141 studies of epidemiology of

22   renal cell carcinoma and obesity.  I mentioned 20 to 25.

23   Q.    Sir, did you bother to go -- in that article, in the

24   Renehan article, it cites these -- it's a review of other

25   studies, right?

Vol. 12 -  236

1    A.    Correct.

2    Q.    Okay.  And they don't -- you cannot determine the name

3    or the study authors from the article itself, the one that

4    Mr. Mace flashed up on the screen, right?

5    A.    They only list some of the studies, not all of them.

6    Q.    You have to go to a web appendice to find the actual

7    study names, right?

8    A.    Correct.  That's typical of literature today as that --

9    a lot of journals don't want you to publish it and take up

10   space, but they have what's called supplemental information,

11   which is available on the web, which, if you're interested, you

12   can find that information then.

13   Q.    And you looked at all hundred and forty -- you went on

14   the web and looked at the web --

15   A.    No.  I looked at the cases that I could find that were

16   related to renal cell.  I didn't look at all the others.  I had

17   done, in the past, the relationship with endometrial cancer and

18   breast cancer and colon cancer.

19   Q.    Sir, what I'm asking you is whether or not you went on

20   the website of the journal that published the Renehan article,

21   the meta-analysis, --

22   A.    I did not.

23   Q.    -- and looked up all of the studies that it cited, that

24   it was based on.

25   A.    I did not.

Vol. 12 -   237

1    Q.   And so you did not see, because I did -- you did not

2    see --

3              MR. DOUGLAS:  Hiatt?

4         May I approach?

5              THE COURT:  You may.

6    BY MR. DOUGLAS:

7    Q.   I mean, you're familiar with the phrase "garbage in,

8    garbage out"?

9    A.   Yes.

10   Q.   Okay.  And we've already established that -- so what

11   this Renehan summary was doing was looking at other articles

12   and studies, right?

13   A.   Correct.

14   Q.   And you didn't bother to go on the web to go pull those

15   actual studies -- you just told us that, right? -- and look at

16   them?

17   A.   I only concentrated on the ones that were related to

18   renal cell carcinoma.

19   Q.   You did not go on the web to pull those articles,

20   correct?

21   A.   That's correct.

22   Q.   Okay.  So you did not see, then, for example, the Hiatt

23   study, renal cell carcinoma and Thiazide use, a case-control

24   study --

25   A.   Correct.

1    Q.    -- where it stated -- and this is one of the articles

2  here that that study you came to talk about is based on.

3    A.    Uh-huh.

4    Q.    So, it says:  We found a statistically -- sorry.  This

5  is like getting sea sick.

6          We found a statistically nonsignificant relation between

7  BMI and renal cell carcinoma.

8          Do you see that?

9    A.    Yes.

10   Q.    So, you did not read that for yourself until I pointed

11  that out to you just now, correct?

12   A.    I did not look this up from the website.  I had seen

13  this previously from a review of the literature that had been

14  cited by the IARC and a number of other organizations.

15   Q.    It's not one of the 20 you say you relied on?

16   A.    I believe this is actually the one that is negative.

17   Q.    It is not -- this is not one of the 20 you cited in your

18  report?

19   A.    I didn't cite all 20 of them in the report.  I only

20  cited a significant number of them.

21   Q.    The positives?

22   A.    This is the one that was negative.  I didn't cite this

23  one.

24   Q.    Did not cite it and did not mention it to our jurors

25  today.  If I'm not mistaken, you did not mention this on your

Vol. 12 -  239

1   direct testimony.

2   A.   I didn't on direct, and I don't remember if I included

3   it in the report or not.  I'd have to see my report.

4   Q.   You mentioned the American Cancer Society.  And I

5   believe one of the articles you showed our jurors was written

6   by a member of the American Cancer Society.  Do you recall

7   that?

8   A.   Yes.

9   Q.   Okay.  And you know they have a website where they

10  inform the public -- where they keep the public informed about

11  statistics and data, prognosis, definitions, and information

12  related to cancer, correct?

13  A.   They have a website for a lot of information, you're

14  correct.

15       MR. DOUGLAS:  Can we have that printout of the

16  website?

17       May I approach, Your Honor?

18       THE COURT:  You may.

19  BY MR. DOUGLAS:

20  Q.   I'm going to put this up on the ELMO.  This is printed

21  out from the American Cancer Society, I'll represent to you,

22  printed out yesterday from their website.

23       "Kidney Cancer (Adult) Renal Cell Carcinoma Overview,"

24  do you see that?

25  A.   Yes.

Vol. 12 -  240

1    Q.    If you go to the page that I folded over on the corner,

2    you'll see there is a paragraph entitled "What are the Risk

3    Factors for Kidney Cancer."

4    A.    Yes.

5    Q.    And do you see where it says, We do not -- we do not yet

6    know exactly what causes kidney cancer, but we do know that

7    certain risk factors are linked to the disease?  Do you see

8    that?

9    A.    Yes.  That's in contradiction to their other

10   publication.  But, yes, I see that.

11   Q.    There is debate and dialogue on the subject, right?

12   A.    Well, it's from the same source in two different places.

13   Q.    Sir, this is the source that is currently -- this is the

14   source that is currently on the American Cancer Society's

15   website, right?

16   A.    Correct.  And this is the document --

17   Q.    Yes or no?

18   A.    -- that they send to physicians.

19   Q.    Yes or no will do.  You'll have plenty of opportunity --

20   A.    That's fine.

21   Q.    -- to address anything you would like to address.

22   A.    You're correct.  You're correct.

23   Q.    The World Health Organization, you're familiar with the

24   World Health Organization?

25   A.    Yes.

1    Q.   And they are an organization that looks out for the

2   interests of the health of the population of the world,

3   correct?

4    A.   That's their purpose, yes.

5    Q.   And they also issue information, disseminate

6   information, publish information that has to do with disease,

7   right?

8    A.   Correct.

9    Q.   Including cancer?

10    A.   Correct.

11    Q.   Including kidney cancer, right?

12    A.   Correct.

13    Q.   Okay.  And including special -- and including the

14   obesity, so-called, epidemic, right?

15    A.   That's correct.

16         MR. DOUGLAS:  May I approach, Your Honor?

17         THE COURT:  You may.

18   BY MR. DOUGLAS:

19    Q.   If you'll go to page -- you'll see, here, I'm going to

20   put up on the screen, in a second -- you'll see the "Who,

21   Obesity and Overweight."  Do you see that?  "Media centre."

22   This is updated January 2015.  Do you see that?

23    A.   Yes.

24    Q.   And it talks about key facts.  Worldwide obesity has

25   more than doubled since 1980, do you see that?

Vol. 12 -   242

1    A.    Yes.

2    Q.    Okay.  And if you go to the next page, you'll see what

3  are common health consequences of overweight and obesity.

4    A.    Yes.

5    Q.    Raised BMI is a major risk factor for noncommunicable

6  diseases such as -- and it goes to say some cancers:

7  Endometrial, breast and colon.  Do you see that?

8    A.    Yes.

9    Q.    It doesn't say kidney cancer in there, does it?

10    A.    Here, it does not.  Here, it does not.

11    Q.    Now, sir, getting back to Dr. Bahnson, we've talked

12  about risk factor, and we've talked about causative risk

13  factor.  And you understand that all Dr. Bahnson is saying in

14  his opinion is that obesity -- first of all, did I hear you

15  correctly say that Dr. Bahnson doesn't -- did not acknowledge

16  that obesity is a known risk factor for renal cell carcinoma?

17    A.    He stated that he did not think it was.

18    Q.    Okay.  Are you sure you read his testimony?

19    A.    I believe so.

20       MR. DOUGLAS:  Okay.  Could you put up Dr. Bahnson's

21  list of risk factors for renal cell carcinoma, the slide he

22  used on his direct testimony?

23  BY MR. DOUGLAS:

24    Q.    And, sir, do you see, right here -- excuse me -- it

25  says:  "Risk factors for kidney cancer."

Vol. 12 -  243

1          This is a slide that we used --

2     A.   I see that.

3     Q.   -- for Dr. Bahnson's direct testimony when he was

4     sitting right in that chair.  And you see all these risk

5     factors that he listed --

6     A.   Yes, but in his discussion --

7     Q.   Yes or no?  Do you see all these risk factors?

8     A.   I see the list.

9     Q.   We're talking about his testimony at trial, right?

10    A.   In his testimony, he dismissed obesity as a --

11         MR. MACE:  He won't let the witness --

12         THE COURT:  Wait.  Wait.  There's two problems here.

13    There is two problems here.  First of all, you're interrupting

14    the witness.  But some of these questions are pretty simple.

15    There will be an opportunity for Mr. Mace to ask you some

16    additional follow-up questions.  So please stay with the

17    limited questions being asked.

18         Re-ask the question.

19         MR. DOUGLAS:  Yes, sir.

20    BY MR. DOUGLAS:

21    Q.   Do you see the number of risk factors that Dr. Bahnson

22    described for our jurors and displayed on this chart?  Do you

23    see them?

24    A.   He listed these on the chart.  This isn't what he

25    described.

Vol. 12 -  244

1    Q.    As known risk factors, right?

2    A.    This is what he listed as -- the risk factors that have

3    been reported is not what he described.

4    Q.    Sir, do you see where it says obesity is one of the risk

5    factors, on Dr. Bahnson's slide, in a slide of risk factors for

6    renal cell carcinoma?

7    A.    I --

8    Q.    Do you see it?  Yes?

9    A.    Yes.  It's on his list of risk factors.

10    Q.    Thank you.

11          And so you understand that all that Dr. Bahnson is

12    saying with respect to obesity is -- and I think I'm going to

13    get at what you're saying -- he doesn't consider this a major

14    risk factor, a serious risk factor, for renal cell carcinoma

15    based on his 30 years of practice, based on all the articles

16    that he's kept abreast over the many decades in the scientific

17    literature?  You understand that's all he said?  That's his

18    opinion?

19    A.    His opinion was that he didn't think -- was -- he did

20    not refer to any articles

21    Q.    Sir, I didn't ask you about articles.

22          Are you sure you read his testimony?

23    A.    I read his testimony.

24    Q.    Did you read the part where he testified that he has

25    read and kept abreast of all the literature, including the

Vol. 12 -  245

1    literature on renal cell carcinoma on obesity?  Both at this

2    trial he testified to that and at his deposition, which you

3    also read.

4              MR. MACE:  Objection.

5              MR. DOUGLAS:  Did you miss that part?

6              THE COURT:  Overruled.

7              THE WITNESS:  I'm sorry?

8     BY MR. DOUGLAS:

9     Q.    Did you miss that part of his testimony?

10    A.    Would you ask it again?

11    Q.    Did you miss the part of the testimony where he told our

12    jurors that he has kept abreast of the scientific literature,

13    that it's extremely important, or words to that effect, and

14    that he has kept abreast of the literature with respect to the

15    causes of renal cell carcinoma, because that's what he does for

16    a living?  He saves people's lives.  And did you read that part

17    of the testimony where he said he kept abreast of the

18    scientific literature?

19    A.    I did see that that's what he said.

20    Q.    And that he's read the scientific literature with

21    respect to obesity and renal cell carcinoma and testified he is

22    not very impressed by it because, he said, it is flawed by many

23    well-known limitations in epidemiology?  Did you read that part

24    of his testimony?

25    A.    I did see that in his testimony.

Vol. 12 - 246

1    Q.    Thank you.

2          So, all he's saying is, based on his review of the

3    literature and his years of experiences, he doesn't put a lot

4    of merit into those folks who say obesity, like yourself, is a

5    cause of renal cell carcinoma.  He disagrees with that.  That's

6    all he's saying, right?

7    A.    That's what he's saying.

8    Q.    And you disagree with it.

9    A.    And I disagree vehemently.

10   Q.    Strongly disagree with it, right?

11   A.    I strongly disagree with it.

12   Q.    Okay.  And doctors and scientists disagree all the time,

13   right?

14   A.    We do disagree.  And usually that means that it's based

15   on sound science.

16   Q.    Just answer my question yes or no.

17   A.    I did.  It has to be explained further.

18   Q.    You can answer my question yes or no.  And the question

19   is, scientists and medical doctors disagree all the time?  If

20   you can't answer that with a yes or no, let us know that you

21   can't.

22   A.    The disagreement has to be based on sound science.

23   Q.    Okay.  And you have an opinion that your position about

24   obesity is based on sound science and that Dr. Bahnson's

25   opinion is not based on sound science.  Is that it in a

1   nutshell?

2     A.   That's a nutshell.

3     Q.   Okay.  So, we talked about the fact that you're not an

4   oncologist or epidemiologist.  Let's talk about some of the

5   things that you do do and that you are.

6          If I can switch gears, you testify in court.  You get

7   involved in litigation cases, right?

8     A.   I have in some, yes.

9     Q.   That's something you do.  And you've made hundreds of

10  thousands of dollars doing it, right?

11    A.   Over a span of about ten years, yes.

12    Q.   Okay.  And, in fact, you've testified several times for

13  the company that makes the drug Actos, right?

14    A.   That's correct.

15    Q.   So you've testified for pharmaceutical companies, right?

16    A.   Yes.

17    Q.   Okay.  And they were the companies, in those cases when

18  you testified, that were getting sued, right?

19    A.   Correct.

20    Q.   And they were getting sued by folks who had cancer.  And

21  the claim was that the drug caused their cancer, right?

22    A.   That's correct.

23    Q.   And you came to court and/or deposition or wrote a

24  report saying the drug didn't cause their cancer, right?

25    A.   In most of the instances, yes.  Not always.

1    Q.    Every time you've testified in an Actos case -- how many

2    times?

3    A.    In an Actos, yes.

4    Q.    Have you ever testified in court and said that the

5    defendant's drug or chemical was a cause of the claimed injury?

6    A.    Not in court.  When I've said that, it hasn't gone to

7    court.

8    Q.    My question is court, sir.

9    A.    Not in court.

10    Q.    Okay.  And, sir, you've also testified for DuPont in

11    that kidney cancer case, right?

12    A.    Correct.

13    Q.    That was a case pending in Tampa, Florida.  And you

14    testified, in 2010, just about five years ago.  You testified

15    for DuPont, right?

16    A.    That sounds like about the right time frame.

17    Q.    So this isn't the first time you've done work for

18    DuPont, right?

19    A.    That's correct.

20    Q.    Okay.  And that was the Ramirez vs. DuPont case, right?

21    A.    That sounds familiar, yes.

22    Q.    Okay.  And you went -- you came to court, just like you

23    came to court, and said essentially the same, identical thing.

24    You claim that obesity was a cause of cancer and that the

25    chemical manufactured by DuPont, which was not C-8 -- that the

1  chemical had nothing to do with this person's kidney cancer.

2  It was a farmer that was using pesticides.  Does that sound

3  about right?

4  A.   I testified that I was -- that his chemical exposure was

5  not -- I did not get into obesity in that case.

6  Q.   Oh, really.  Okay.  Well, I understand it's five years

7  ago, but didn't you testify --

8          MR. DOUGLAS:  Where is the transcript?

9  BY MR. DOUGLAS:

10  Q.   It's the Ramirez case, vs. E.I. du Pont, Case No.

11  8:09-cv-321, 10th of September, 2010, Tampa, Florida.  You

12  testified on that date at 9:24 a.m.  Do you remember that?

13  A.   Yes.

14  Q.   And do you remember testifying, sir, that the chemical

15  manufactured by DuPont had nothing to do with what caused

16  Mr. Ramirez's kidney cancer, of which he ultimately died?  Do

17  you remember testifying to that?

18  A.   I don't remember that he died, but I do remember that I

19  testified that the chemicals that he was exposed to didn't

20  cause the two tumors that he had.

21  Q.   And, sir, you argued that his obesity was the cause, or

22  contributed -- let me phrase it the way you phrased it.

23       You argued in that case, specifically, that obesity can

24  cause cancer and that -- and you argued that it contributed to

25  the plaintiff's cancer in that case, as opposed to the DuPont

Vol. 12 - 250

1  chemical in that case, right?

2    A.   Correct.

3    Q.   Doctor, you look at a couple thousand pathology slides a

4  year, right?

5    A.   Cases, yes.  Probably tens of thousands of slides.

6    Q.   Okay, cases.  So you looked -- and you told me, at your

7  deposition, and I believe it was in March -- that you looked

8  at -- you had 2,300 pathology reports last year, in other

9  words, 2014?

10   A.   Yes.

11   Q.   Twenty-three hundred reports?

12   A.   Approximately, yes.

13   Q.   Okay.  And at least 50 to a hundred times, in your

14 report, you opined as to the cause of a patient's -- of a

15 person's cancer, right?

16   A.   Correct.

17   Q.   And, sir, you do do that?  You do opine with respect to

18 cause on occasion, at least 50 to a hundred times last year

19 alone, right?

20   A.   Correct.

21   Q.   And you have never written and reported in any pathology

22 report that obesity was the cause of anybody's cancer; is that

23 right?

24   A.   I have not put that in any pathology reports.

25   Q.   Sir, the only time you've ever opined that obesity is a

Vol. 12 -   251

1    cause of cancer, or cause of someone's cancer, was in

2    litigation as an expert like right here or like right in the

3    Ramirez case, right?

4     A.    Also --

5     Q.    Not also.  That's just yes or no.

6     A.    No, it's not the only time.  I've also -- I've also done

7    it in some panels on kidney cancer that I've been a part of.

8            MR. DOUGLAS:  Can we play page 114, lines 1 through 7,

9    please?

10    BY MR. DOUGLAS:

11    Q.    Now, my question is, do you recall being asked this

12    question and giving this answer that Mr. Wolfe is going to play

13    for us now.

14     (Thereupon, the following video clip was played:)

15            Question:  If I understand correctly, the only time

16    you've ever opined that obesity had something to do with

17    someone's cancer is when you were hired as an expert to testify

18    in litigation; is that true?

19            Answer:  Yes.

20    BY MR. DOUGLAS:  (Continuing)

21    Q.    Do you recall giving that answer to that question?

22    A.    I do.  It was --

23    Q.    Yes or no, that's all I'm asking.

24    A.    I recall that answer.

25    Q.    Yes or no, sir?

Vol. 12 — 252

1     A.    It was incorrect at that time.

2           MR. MACE:  Your Honor, can he be allowed to explain

3     his answer?

4           THE COURT:  Well, he'll have to give a yes or no

5     first.

6           Let's go back.  Re-ask the question.

7           Yes or no, and then take your time to explain your

8     answer.

9     BY MR. DOUGLAS:

10    Q.    Sir, did you give that answer to that question at your

11    deposition that we just heard just now?

12    A.    Yes.

13    Q.    Thank you.

14    A.    Can I explain now?

15    Q.    Yes.

16    A.    I was wrong at that time because I had forgotten the

17    times I'd been on kidney cancer panels where I'd also discussed

18    the issue of obesity.

19    Q.    Did there come a time that you received your transcript

20    to review?

21    A.    Yes.

22    Q.    Did you make a correction to that, to that wrong answer?

23    A.    I was told only to make corrections of spelling and

24    grammar, not on content.  So, I didn't change the content.

25    Q.    Who told you that?

Vol. 12 -   253

 1    A.    That's what I've been told whenever I've corrected

 2   transcripts.

 3    Q.    How many times have you testified at a deposition?

 4    A.    Probably a half a dozen or so.

 5    Q.    And trial?

 6    A.    Counting this one, it would be seven or eight.

 7    Q.    How many litigation cases have you reviewed, over the

 8   course of your years, where an individual has sued a company,

 9   or whatever, and you were asked -- how many cases have you

10   looked at, individual cases?

11    A.    Probably 15 to 20, of which I've been on the defense

12   most of the time, but on the plaintiff once.

13    Q.    Once.  I'm not surprised.

14          Sir --

15          MR. MACE:  Your Honor, objection.

16          THE COURT:  Wait.  Wait.  That's a -- that last

17   comment, that was not a question.

18   BY MR. DOUGLAS:

19    Q.    Sir, and every time you've testified in court, it's been

20   for a defendant like DuPont or the company Takeda, that makes

21   Actos, right?

22    A.    In court, it's been for the defense, correct.

23    Q.    How much -- you said you're charging 600 an hour?

24    A.    That's my current rate, yes.

25    Q.    And what other work have you done for DuPont besides

1  coming to court and testifying that obesity causes cancer and

2  it wasn't -- and it wasn't the chemicals -- that obesity causes

3  cancer and it wasn't the chemicals made by DuPont?  How

4  many -- how many -- how much work have you done for them?

5      A.   As I can remember, I've been involved with two research

6  projects that were sponsored by DuPont.

7      Q.   I'm sorry.  I didn't hear the answer.

8      A.   That I can remember, I've been involved with two

9  research projects that were sponsored by DuPont.

10     Q.   Okay.  And they paid you for that, right?

11     A.   They paid the university for that.  I did not --

12     Q.   But you did the work?

13     A.   My laboratory and I did the work, yes.

14     Q.   And raising revenue -- when you say -- hear me out.

15  When you say they paid the university, that's an important part

16  of university life, of academia.  When you're a professor, it's

17  important that you raise money to justify your existence, for

18  lack of a better way to say it, for the university, right?

19     A.   Most of what I have to justify is for -- from clinical

20  duties, where I raise most of the monies.  Research is

21  essentially an add-on that, fortunately, I've been able to

22  raise a fair amount with research, but it's not required.

23     Q.   Sir, I don't believe you mentioned -- now, we heard that

24  Dr. Bahnson was the chair of the urology department over at

25  James Cancer Hospital for a number of years.  You were a

Vol. 12 -  255

1   department chair at one point at your university, right?

2    A.   Correct.

3    Q.   And then you were asked to step down?

4    A.   The dean and I concluded that it was time for me to step

5   down because we disagreed on the direction things were going.

6    Q.   Yeah.  You were not appreciated by the dean of the

7   school, and it was -- you were either going to be discharged or

8   you voluntarily step down.  And that's what you've said in open

9   court in these Actos trials, right?

10    A.   No.  What I've said is that the dean and I, after

11   discussion, decided that it was best for someone else to become

12   chair.  Basically, I was --

13    Q.   Let's put it this way:  The dean and yourself didn't see

14   eye to eye for over a year, and it became obvious that it was

15   time for you to resign, right?

16    A.   That's correct.

17    Q.   And you resigned so that the university would avoid the

18   embarrassment of taking away your chairmanship, right?  I mean,

19   that's how it worked?

20    A.   That's not correct.

21    Q.   Now, before you came here to court, did you spend some

22   time meeting with the lawyers for DuPont?

23    A.   Yes.

24    Q.   And before you came to testify at your deposition in

25   March, you spent some time meeting with the lawyers for DuPont,

Vol. 12 – 256

1  right?

2  A.   Yes.

3  Q.   And how much time have you spent, since your deposition,

4  speaking with and/or meeting with DuPont lawyers?

5  A.   I've spoken, by phone, with them probably 15 to 30

6  minutes over several phone calls because they were very brief

7  requests for information.  And then, last night, we spent about

8  an hour and a half together.

9  Q.   Where was that?

10  A.   At the -- one of their offices, I believe.

11  Q.   And where are you staying?  You are staying in town, I

12  assume.

13  A.   I'm staying at the Courtyard Hotel.

14  Q.   And are they paying for your hotel?

15  A.   Yes.

16  Q.   Do you get to eat meals on their expense account?

17  A.   Not very good meals, but some meals, yes.

18  Q.   There are some great places here in Columbus to eat.

19  A.   I haven't had the opportunity.

20  Q.   Before your deposition, you spent some time with the

21  lawyers, right?  You went over -- with the lawyers for DuPont,

22  that is, right?

23  A.   Yes.

24  Q.   And you talked to them about your report, right?

25  A.   Yes.

Vol. 12 - 257

1    Q.    You talked about what should be in the report and not in

2    the report, right?

3    A.    They gave me a broad outline of what they thought I

4    needed to address in the report, yes.

5    Q.    Okay.  And so you spent time speaking with them before

6    your report and before your deposition, right?

7    A.    Yes.

8    Q.    How many hours did you spend in preparation for your

9    deposition testimony?

10    A.    With the attorneys?

11    Q.    With the lawyers for DuPont.

12    A.    With the lawyers for DuPont, a few hours.  I don't

13    remember exactly.

14    Q.    On how many occasions?

15    A.    I believe we met either the day before or the morning of

16    the deposition.  I don't remember exactly, but for a few hours.

17    Other times, it was by phone, because I needed to get some

18    additional information.

19    Q.    Okay.  So you've had an ongoing dialogue with the

20    lawyers from DuPont, right, about the case?

21    A.    Generally, sure.

22    Q.    And how many lawyers did you meet with last night?

23    A.    Mr. Mace and Mr. Fazio.

24        MR. DOUGLAS:  Okay.  May I have a moment to confer

25    with my colleagues?

Vol. 12 - 258

1          THE COURT:  You may.

2          MR. DOUGLAS:  Thank you.

3      (Whereupon, there was a brief interruption.)

4          MR. DOUGLAS:  Now, sir, those are all the questions I

5  have for you for now.  I'm going to --

6          THE COURT:  Thank you, Mr. Douglas.

7          MR. DOUGLAS:  I'm going to clear out some space for

8  you, Mr. Mace, and turn him back to you.

9          MR. MACE:  May I proceed, Your Honor?

10          THE COURT:  You may proceed.

11          MR. MACE:  Thank you, sir.

12                          - - -

13                    REDIRECT EXAMINATION

14    BY MR. MACE:

15    Q.   Doctor, there's only one profession with worse

16  handwriting than doctors', and that's attorneys.

17          Can you see or, more importantly, read what I've written

18  on the board, sir?

19    A.   Yes.

20    Q.   Is there a difference between those terms?

21    A.   Yes.

22    Q.   What is it?

23    A.   Etiology is cause.  Diagnosis is the name of the disease

24  or what -- the disease the person has.  And the treatment is

25  how the patient is going to be taken care of.

Vol. 12 - 259

1    Q.   In terms of your expertise, what is it that's different

2    about your expertise than Dr. Bahnson's expertise on those

3    terms?

4    A.   I specialize scientifically on etiology, clinically on

5    diagnosis.  He specializes clinically in diagnosis and

6    treatment.  And that's also his area of research, is primarily

7    in treatment and biomarkers, which is another issue.

8    Q.   And are you criticizing Dr. Bahnson, at all, in terms of

9    his diagnosis of what disease Mrs. Bartlett had or his

10   treatment of that disease?

11   A.   No.

12   Q.   Okay.  Is your -- is your point more in terms of the

13   specific expertise on etiology and cause?

14   A.   Correct.

15   Q.   Okay.  Counsel asked you some questions about Von

16   Hippel-Lindau disease.  Do you need to have Von Hippel-Lindau

17   disease to have faulty genes that can cause kidney cancer?

18   A.   No.

19   Q.   You talked to us about the VHL gene?

20   A.   Correct.

21   Q.   And you can have defects in that gene without having Von

22   Hippel-Lindau disease?

23   A.   Correct.  Basically, as you're DNA is replicating, it's

24   going to make mistakes.  And occasionally those mistakes will

25   be in the VHL gene.  And if both aspects occur in a kidney

1   cell, then you'll get kidney cancer.

2   Q.   Did you understand that DuPont had retained a number of

3   different experts to do a number of different things in the

4   case?

5   A.   Yes.

6   Q.   Did you understand your scope to be looking at specific

7   causation for kidney cancer?

8   A.   Correct.

9   Q.   And did you understand that different experts were doing

10  different things?

11  A.   Yes.

12  Q.   Did you read the part of Dr. Weed's testimony where he

13  said it wasn't within the scope of his assignment to analyze

14  the relationship between obesity and kidney cancer?

15  A.   Yes.

16        MR. MACE:  Your Honor, may we have a side-bar,

17  briefly?

18        THE COURT:  Yes.

19      You may stand if you wish, ladies and gentlemen.

20    (Discussion at side-bar as follows:)

21        MR. MACE:  Your Honor, I think counsel has opened the

22  door to a number of things, among them -- I would intend to ask

23  the following two questions and followups if the Court allows

24  it:  Sir, did you understand counsel to be saying that if the

25  peer-reviewed literature only refers to an association, that

Vol. 12 - 261

1  factor can be disregarded as a cause, to which I anticipate he

2  will say yes.  Are you aware of any peer-reviewed literature

3  that refers to C-8 as a cause of kidney cancer, to which I

4  think he'll say no.

5        MR. DOUGLAS:  That's clearly off the radar.

6        THE COURT:  The second question, I'm not going to

7  permit.

8        The first one, is that a prelude to the second one?

9        MR. MACE:  It is, Your Honor, to show -- if I could

10  just make my record -- to show that -- counsel, as they did

11  with their expert, is trying to use two completely different

12  methodologies, one to analyze obesity and a completely

13  different one to analyze C-8.

14        THE COURT:  Well, because this is not -- in other

15  words, we've let in other issues about standards besides the

16  .05 parts per billion, but that was only with regard to

17  DuPont's conduct.

18        This witness has next to -- he said a little bit about

19  DuPont's conduct, but not in regard to these two questions.  So

20  I find the door has not been opened.

21        MR. MACE:  Okay.

22     (Back in open court.)

23  BY MR. MACE:

24  Q.  Sir, counsel cut off some of your answers.  I wanted to

25  find out what your answer was going to be on a few of them.

1       Have you ever given an opinion to a defendant, somebody

2    who is a defendant in a lawsuit, that you thought their

3    chemical caused the disease?

4    A.   Yes, I have.

5    Q.   Okay.  Now, the Ramirez case, was the chemical at issue

6    C-8?

7    A.   No.

8    Q.   Okay.  You say you've been involved in tumor board

9    panels.  What are those?

10   A.   Tumor boards are where various clinicians who are

11   involved with a particular case or type of case get together

12   and discuss the clinical management of the individual patient.

13   So, for a urologic pathology, the urologist, the pathologist,

14   the radiologist, radiation therapist and medical oncologist

15   will all be there, along with residents and fellows, to discuss

16   how to manage cases.

17   Q.   And in the practice of your medicine and your research

18   outside of courtrooms, outside of the litigation field, do you

19   regularly participate in those types of boards and have you

20   over the years?

21   A.   Yes.

22   Q.   And on those boards outside of litigation context, have

23   you had discussion and given the opinion that obesity was the

24   cause of kidney cancer?

25   A.   Yes.

Vol. 12 - 263

1    Q.   Okay.  And did you, in fact, talk about the tumor boards

2  at your deposition, page 110?

3    A.   I don't remember, but I may have.

4    Q.   All right.  Counsel asked you about Bahnson's testimony.

5         MR. MACE:  Could we bring up page 152 of the morning

6  two transcript, September 22nd?

7  BY MR. MACE:

8    Q.   Among the testimony you reviewed from Dr. Bahnson, did

9  you review this testimony:  Your personal opinion is that

10  smoking is not a risk factor for kidney cancer?  True.  Your

11  personal opinion is that hypertension is not a risk factor for

12  the development of kidney cancer?  True.  Your personal opinion

13  is that obesity is not a risk factor for kidney cancer?  True.

14         Was that the testimony you're referring to?

15    A.   That's what I was trying to say, yes, is that, even

16  though he listed them, he basically dismissed them.

17    Q.   Okay.  Counsel showed you an article.  Before I go

18  there, in your discussion with me on direct examination, did

19  you mention the fact that there were 20 to 25 studies, and all

20  but one of them showed a statistically significant relationship

21  between kidney cancer and obesity?

22    A.   Yes, a very consistent finding in the literature.

23         MR. MACE:  Could I get the ELMO, please?

24  BY MR. MACE:

25    Q.   All right.  Counsel showed you this study, and you said

Vol. 12 - 264

1    that's the exception?

2      A.   Correct.

3      Q.   This is a '93 study?

4      A.   Yes.

5      Q.   Whereas the ones we were going through on direct are

6    2006, 2009, 2010 and later?

7      A.   Correct.

8      Q.   And this has to do with thiazide?

9      A.   Yes.  This is a diuretic that's used in the treatment of

10   hypertension.  And, since this study, it's been questioned

11   whether it's the thiazide or the hypertension that was really

12   the risk factor that was involved here.  And most people now

13   conclude it's the hypertension, and not the thiazide.

14     Q.   In any event, you've seen Mrs. Bartlett's medicines

15   list?

16     A.   Yes.

17     Q.   And did you see thiazide on there anywhere?

18     A.   It -- not recent -- I don't remember it being there, no.

19     Q.   All right.  In terms of the size of these studies, you

20   were showing us things with many thousands.

21          Ninety women involved in this?

22     A.   Correct.

23     Q.   Okay.  Is that a small, or a large, study?

24     A.   It's small.  And, also, it's a case-control study.  So

25   this is a retrospective analysis, not prospective.  And

1    prospective are much more -- provide much stronger evidence

2    than the retrospective study.

3      Q.   All right.  We're not going to take the time to explain

4    that right now.

5          Counsel showed you the American Cancer Society renal

6    cell carcinoma overview.

7      A.   Yes.

8      Q.   And he referred you to the page, but he didn't show you

9    the language.

10         What are the risk factors for kidney cancer?  Lifestyle,

11   body weight.  A very overweight person has a higher risk of

12   getting kidney cancer.  Right?

13     A.   Correct.

14     Q.   American Cancer Society.  Do we know what causes kidney

15   cancer?  Risk factors for kidney cancer, and the same

16   statement:  People who are very overweight have a higher risk

17   of developing renal cell cancer, true, --

18     A.   True.

19     Q.   -- in your opinion?

20     A.   It's listed under their section on cause.

21     Q.   And counsel made a timing.  Was that published within

22   the last week or so?

23     A.   Yes.

24     Q.   I'm losing track of the days, but -- National Cancer

25   Institute, do you recognize them as an authoritative source?

Vol. 12 -  266

1    A.   Yes.

2              MR. DOUGLAS:  Objection.  Outside the scope.

3              THE COURT:  You'll have an opportunity.  The objection

4    is overruled.  You get the last shot here.

5    BY MR. MACE:

6    Q.   National Cancer Institute, September of '15.  What is

7    known about the relationship between obesity and kidney cancer?

8    Obesity has consistently -- has been consistently associated

9    with renal cell cancer, which is the most common form of kidney

10   cancer.

11             Now, consistency, was that one of the things that you

12   said is important in terms of the Bradford Hill criteria and

13   making a causal statement?

14   A.   Yes.  Consistency is one of his criteria.

15   Q.   Okay.

16             The Hakimi study, you've looked at that?

17   A.   Yes.

18   Q.   Do you consider that authoritative?

19   A.   It's a very good study, yeah.

20   Q.   2013, right?  Fairly recent?

21   A.   Yes.

22   Q.   Obesity increases risk for clear-cell renal cell

23   carcinoma, right?

24   A.   Yes.

25   Q.   More than 40 percent of renal cell cancers attributable

Vol. 12 -  267

1    to obesity as measured by body mass index.  These processes can

2    both induce and promote carciogenesis.  It talks about the

3    mechanism of action, right?

4     A.    Correct.

5     Q.    Attributable.  What does attributable, in the context of

6    these studies, mean?

7     A.    Attributable refers to how many cases would be caused by

8    that factor.  So, in this case, it's obesity.

9     Q.    Macleod, are you familiar with this article?

10    A.    Yes.

11    Q.    Consider it authoritative?

12    A.    Yes.

13    Q.    Now, it says:  Confirmed several previously identified

14    risk factors for renal cell cancer, including obesity, right?

15    A.    Yes.

16    Q.    More importantly, obesity and smoking are commonly

17    linked to several cancers, including renal cell cancer.  In

18    this study, morbidly obese individuals, BMI 35 or greater, were

19    at 71 increased risk for renal cell cancer compared to normal

20    weight individuals.

21         Now, first of all, do you agree with that?

22    A.    Yes.

23    Q.    And was Mrs. Bartlett above, or below, the 35?

24    A.    She was between 40 and 41 at the time of diagnosis.

25    Q.    So, the -- according to these statistics, it would be

Vol. 12 -  268

1    even greater than the 71 percent?

2      A.   Correct.

3      Q.   Counsel was challenging you about the word "cause."  We

4    already looked at this in your direct, right?

5      A.   Correct.

6      Q.   American Cancer Society.  Additional risk factors

7    include obesity, which causes an estimated 30 percent of cases.

8           American Cancer Society using the word "cause"?

9      A.   Correct.

10     Q.   We don't need to keep going through these, sir.

11          Despite counsel's questioning, does it remain your

12   opinion, to a reasonable degree of medical certainty and

13   scientific certainty, that obesity is a cause of renal cell

14   cancer?

15     A.   Yes.

16     Q.   And do you stand by your opinions where you were

17   critical not of Dr. Bahnson's diagnosis and treatment but about

18   his etiology opinions?

19     A.   Yes.

20          MR. MACE:  Nothing further at this time.  Thank you.

21          THE COURT:  Thank you.

22          Recross examination.

23          MR. DOUGLAS:  Just a few.

24

25

Vol. 12 -  269

1                          - - -

2                    RECROSS-EXAMINATION

3    BY MR. DOUGLAS:

4    Q.   You did make a distinction between the two terms,

5    earlier today, in my questioning, between risk factor and

6    causative risk factor.  Do you remember our discussion on that?

7    A.   Yes.

8    Q.   Okay.  And just to get back to the American Cancer

9    Society, September 29, 2015 -- I think that was yesterday -- it

10   might have been this morning -- we've been here awhile -- it

11   says -- it does say:  We do not yet know exactly what causes

12   kidney cancer.  But we do know that certain risk factors are

13   linked to the disease.  Do you see that?

14   A.   Yes.

15        MR. DOUGLAS:  May I approach the board?

16        THE COURT:  You may.

17   BY MR. DOUGLAS:

18   Q.   So, your expertise is etiology, right, --

19   A.   Yes.

20   Q.   -- if you do say so yourself?  You're an expert in

21   etiology, with all modesty?

22   A.   I have written many times on it.

23   Q.   And you're saying that, Dr. Bahnson, he is not an expert

24   in etiology, right?

25   A.   Correct.

Vol. 12 –   270

1    Q.   You did not, speaking of etiology –– and etiology is

2    what is the cause, right?

3    A.   Correct.

4    Q.   You did not render an opinion on your direct examination

5    ––

6            MR. MACE:  Objection, Your Honor.

7            THE COURT:  One- or two-word basis?

8            MR. MACE:  Can we approach?

9            THE COURT:  I'll see you at side-bar.

10       You may stand by your seats, ladies and gentlemen.

11      (Discussion at side-bar as follows:)

12           MR. MACE:  Your Honor, he's about to ask him, I take

13   it, you didn't render an opinion on direct examination that

14   Mrs. Bartlett's kidney cancer was caused by her obesity.  That

15   clearly is his opinion.

16           MR. DOUGLAS:  That's not quite what I was going to

17   say.

18           THE COURT:  What were you going to ask?

19           MR. DOUGLAS:  I was going to ask, you're an expert on

20   etiology, but you didn't render an opinion on a cause of this

21   person's cancer.

22       And let me point out that is exactly what's in the

23   Court's instruction.  So how could that –– how could that

24   possibly be prejudicial or improper?

25           MR. MACE:  Because it implies that he doesn't have an

Vol. 12 -   271

1    opinion.  He clearly has a very strong opinion, which we

2    believe he should be allowed to give.  And we think you're

3    opening the door to that if you ask that question.

4         MR. DOUGLAS:  But the fact that his opinion is not

5    admissible is not my doing.  It's his doing.

6         THE COURT:  It's not that he doesn't have one.

7    Wait.

8         He didn't give one.  He has one.  He wasn't allowed to

9    give it.  So, I mean, at a minimum, I would require you to say

10   that.

11        MR. DOUGLAS:  That's how I'll phrase it:  that he did

12   not opine as to the cause on direct examination.

13        THE COURT:  That actually is covered in my

14   instruction, more or less, that they've already heard.

15        MR. DOUGLAS:  I think I'm entitled to make that point

16   through the witness who is on the witness stand who has gone on

17   about how he's an expert.

18        MR. MACE:  It's not an issue in dispute in the case,

19   Your Honor, much like some of your rulings on causation that

20   you haven't let us get into because it's not a fact in dispute

21   in the case, because you have ruled it out.

22        MR. DOUGLAS:  It's a fact as to what occurred on

23   direct examination.

24        THE COURT:  Well, he -- you know, the thing is, he

25   gave a lot of testimony about obesity; but he hasn't given

Vol. 12 - 272

1  testimony on an opinion because I excluded it.  So you can ask

2  he hasn't given.  Don't imply that he doesn't have one, though.

3      MS. NIEHAUS:  Doesn't the question imply that he

4  doesn't have one, though?

5      MR. MACE:  It sure does.

6      THE COURT:  No.  No.  That's what we're going to do.

7    (Back in open court.)

8  BY MR. DOUGLAS:

9  Q.  Getting back to etiology, you're the expert in etiology,

10  if you do say so yourself, right?

11  A.  I am an expert, yes.

12  Q.  Okay.  You did not render an opinion -- you did not give

13  an opinion on direct examination as to what the etiology was

14  of --

15      THE COURT:  Give, not render.  Rephrase the question.

16  BY MR. DOUGLAS:

17  Q.  You did not give an opinion on direct examination as to

18  what was the etiology, in your area of expertise, of

19  Mrs. Bartlett's cancer, did you?  Yes or no?

20  A.  No.

21  Q.  You did not give an opinion on redirect examination with

22  respect to the etiology of Mrs. Bartlett's cancer, right?

23  A.  That's correct.

24      MR. DOUGLAS:  Those are all the questions I have.

25      THE COURT:  Thank you, Doctor.  You may step down.

Vol. 12 -  273

1          Who is your next witness?

2          MR. MACE:  The defendant calls Dr. Bruce Karrh by

3     video deposition.

4          MR. PAPANTONIO:  Judge, may we have a side-bar?

5          THE COURT:  Very briefly.

6          Again, you may stand if you wish, ladies and gentlemen.

7        (Discussion at side-bar as follows:)

8          THE COURT:  When all of you ask for a side-bar, I

9     noticed the jurors are rolling their heads, seriously.  So, I

10    mean, you know, if we could do these at breaks, I'd prefer it,

11    but let's go ahead.

12         MR. PAPANTONIO:  The only reason I think I have to do

13    it now, Judge, I just want to put on the record the issue that

14    we raised already.  I'm moving to strike this testimony.  This

15    issue was already out on summary judgment.  It was ruled out on

16    summary judgment.

17         The doctor's testimony didn't rise to Daubert quality of

18    admissibility at pretrial.  The plaintiffs were fatally

19    prejudiced by not being permitted to address this testimony by

20    our own experts.

21         THE COURT:  You're going to have to back me up here.

22    It's a long day in the trial here.

23         MR. MACE:  He's just repeating what he said --

24         THE COURT:  Yeah, but I want to know, the witness

25    we're talking about is going to say what?

1          MS. NIEHAUS:  He's talking about Dr. Cohen.

2          MR. MACE:  He is talking about this witness.  He's

3    just repeating what he said.

4          THE COURT:  I'll incorporate all of your remarks then

5    to now --

6          MR. PAPANTONIO:  Okay.  That's fine.

7          THE COURT:  -- and make the same ruling as I did then.

8          MR. PAPANTONIO:  Okay.  That's fine.  I simply didn't

9    know what the Court's preference was.

10          THE COURT:  Thank you.

11        (Back in open court.)

12          THE COURT:  You may proceed.

13        I mentioned to you the very first day, if we knick 20

14    minutes here, 20 minutes there, you'd be here a few extra days.

15    So, I know you don't prefer that.  So we'll go right up to

16    five, if you don't mind.  So, with that, you may continue to

17    see part of this deposition.

18          MR. MACE:  Yes.  I think it's only 37 minutes, or

19    thereabouts, Dr. Bruce Karrh.

20          THE COURT:  Yeah.  I don't think we're going to finish

21    it.  We're going to go right up to five o'clock.

22         Okay.  You may proceed.

23        (Thereupon, the video deposition of Bruce Karrh was

24    played as follows:)

25                                  - - -

1              BRUCE KARRH,

2         Having been first duly sworn as prescribed by law, was

3    examined and testified as follows via deposition:

4                        - - -

5                   CROSS-EXAMINATION

6    BY MR. BILOTT:

7    Q.    Would you state your name, please?

8    A.    Bruce Karrh.

9    Q.    Is that Dr. Bruce Karrh?

10   A.    Yes.  I have an M.D. degree.

11   Q.    During what period of time were you employed by DuPont?

12   A.    I was employed two different times.  I first went to

13   work --

14        MR. MACE:  Could you turn the volume up?

15        THE COURT:  If you'd like, you can start it again.

16   Q.    Would you state your name, please?

17   A.    Bruce Karrh.

18   Q.    Is that Dr. Bruce Karrh?

19   A.    Yes.  I have an M.D. Degree.

20   Q.    During what period of time were you employed by DuPont?

21   A.    I was employed two different times.  I first went to

22   work for DuPont in 1958, probably the end of May of 1958, until

23   the 1st of September of 1958, as a laboratory technician at the

24   Birmingham, Alabama, plant.  Then I was reemployed by DuPont

25   August the 1st of 1970, and was a full-time employee of DuPont

Vol. 12 - 276

1  until March 31st of 1996.

2     Q.   You say a full-time employee until March 1st of '96.

3  Did you maintain any sort of employment relationship with

4  DuPont after March 1st of 1996?

5     A.   Not as an employee.

6     Q.   In what way did you maintain any sort of relationship

7  with DuPont?

8     A.   I have served as a consultant a few times for DuPont.

9     Q.   What position did you hold with DuPont at the time that

10  you retired?

11     A.   I was vice president, integrated health care.

12     Q.   You were a corporate medical director for DuPont,

13  correct?

14     A.   At one point in time.

15     Q.   During what period of time?

16     A.   From 1977 -- April, I think it was, of 1977, until April

17  of 1983.

18     Q.   How did you first learn about your deposition today?

19     A.   I was informed by counsel that I was to be deposed.

20     Q.   Who was that?

21     A.   It was an in-house counsel with DuPont, a gentleman

22  named John Bowman.

23     Q.   Was this through a telephone conversation, or written

24  communication of some sort?

25     A.   Telephone conversation.

Vol. 12 -  277

1    Q.   When was that; do you recall?

2    A.   No, I don't.

3    Q.   Was it within the last year?

4    A.   Yes.

5    Q.   Do you know whether anybody else other than Mr. Bowman

6    was on the telephone with you during that particular

7    conversation?

8    A.   To my knowledge, during that conversation no one else

9    was on the phone except Mr. Bowman.

10   Q.   At that particular point in time, were you employed by

11   DuPont?

12   A.   No.

13   Q.   Had you asked Mr. Bowman to serve as your counsel during

14   that -- when he called you on that particular date?

15   A.   Not at that point in time.

16   Q.   What did Mr. Bowman tell you during that telephone

17   conversation?

18   A.   He just told me that I was to be deposed in the case

19   that you referenced earlier and that they were looking for a

20   date and wanted to know what my availability was, what my dates

21   of availability were that might coincide with when the

22   deposition would be taken.

23   Q.   And did he mention what the case was you were requested

24   for a deposition in?

25   A.   Not by a title.  He mentioned what it involved.

1    Q.    And what did he say it involved?

2    A.    It involved a particular chemical substance, and it

3    involved a situation in West Virginia and Ohio.

4    Q.    And what particular chemical substance were you told it

5    involved?

6    A.    A material that's called C-8, ammonium

7    perfluorooctanoate.

8    Q.    How many such conversations had you had with Mr. Bowman

9    prior to this particular telephone when he called to tell you

10   you had been requested for a deposition?

11   A.    I don't recall.

12   Q.    More than one?

13   A.    Yes, more than one.

14   Q.    More than a dozen?

15   A.    Mr. Bowman was DuPont in-house counsel that I had worked

16   with while I was working.  We had a lot of other situations

17   where he and I had worked together.  We had many conversations

18   over the years involving a lot of different things.

19        I don't recall specifically when he first mentioned to

20   me a C-8 lawsuit, but I know it was more than one.  I don't

21   know if it was a dozen.  It could have been two.  It could have

22   been more than a dozen.  I don't know.

23   Q.    You mentioned you had had depositions before, right?

24   A.    Yes.

25   Q.    The most recent one being sometime earlier this year; is

Vol. 12 —  279

1   that correct?

2    A.   In January of '04.

3    Q.   How many depositions have you participated in?

4    A.   There have been several.  I don't know an exact number.

5    Q.   More than a dozen?

6    A.   Yes.

7    Q.   More than two dozen?

8    A.   Yes.

9    Q.   More than three dozen?

10   A.   Yes.

11   Q.   What's your best estimate?

12   A.    In the deposition in January, I was asked the same

13   question.  And I guessed around 50 at that time.  This would

14   make 51.

15   Q.   Were you ever compensated for your time during any of

16   the depositions that you gave?

17   A.   Yes.

18   Q.   How many times were you compensated?

19   A.   I'm compensated every time that I am deposed.

20   Q.   At what rate are you compensated?

21   A.   First, I get a pension from DuPont as an earned pension

22   that all employees, if they reach a certain amount of service

23   and age, are entitled to.  And so I get that pension.  I also

24   get an hourly rate of compensation, and it's $350 an hour, and

25   expenses.

Vol. 12 -  280

1    Q.    And are you getting paid that rate for a deposition here

2    today?

3    A.    Yes, I am.

4    Q.    And who is paying that rate?

5    A.    The DuPont Company.

6    Q.    Do you currently own any DuPont stock?

7    A.    Yes, I do.

8    Q.    How much stock?

9    A.    I have about 3,000 shares now.

10   Q.    Has the amount of your DuPont stock fluctuated in any

11   significant degree over the last -- since you left your

12   employment at DuPont?

13   A.    The number of shares --

14   Q.    Yes.

15   A.    -- has decreased steadily, because I use that as ways to

16   fund my grandchildren's educations.

17   Q.    I'd like to go back to the depositions.  You mentioned

18   you've participated in some -- I guess is it fair to say more

19   than 50 depositions?

20   A.    I would say approximately 50.

21   Q.    Okay.  Did any of those prior depositions involve

22   anything to do with any perfluorinated chemicals or materials

23   of any kind?

24   A.    I don't recall any of them dealing with perfluorinated

25   chemicals.

Vol. 12 -  281

1    Q.    I may be able to try to speed through this a little.

2  Let me see if I understand this correctly.

3         You were a military physician for about three years?

4    A.    Yes.

5    Q.    And was that between about 1962 and 1965?

6    A.    That's correct.

7    Q.    And then where did you perform your services for the

8  military during that period of time?

9    A.    Well, I was first at Brook General Hospital in San

10  Antonio, Texas, for a year.  Then I went to the U.S. Army

11  Medical Field Service School, also in San Antonio, for two

12  months.  Then I went to the U.S. Air Force School of Aerospace

13  Medicine, also in San Antonio, for three months.

14        Then I went to the U.S. Army School of Aviation Medicine

15  in Fort Rucker, Alabama, for a month.  And then I went to the

16  U.S. Army Primary Helicopter School in Mineral Wells, Texas,

17  from November of '63 until July of '65.

18    Q.    Any other licenses or certifications of any kind?

19    A.    I'm board certified.

20    Q.    In what?

21    A.    In occupational medicine, by the American Board of

22  Preventive Medicine.

23    Q.    And when did you first obtain that certification?

24    A.    1977.

25    Q.    Have you maintained that certification since that time

Vol. 12 - 282

1   continuously?

2   A.   Yes.

3   Q.   In 1973, you were transferred to DuPont's Haskell

4   Laboratory for Toxicology and Industrial Medicine as Research

5   Manager in Environmental Sciences, correct?

6   A.   Yes.

7   Q.   With responsibility for industrial hygiene and

8   physiological evaluations, correct?

9   A.   Yes.

10  Q.   And following your work at Haskell, you were named

11  Assistant Corporate Medical Director in 1974?

12  A.   Correct.

13  Q.   And held that position for three years before becoming

14  medical director for DuPont, correct?

15  A.   That's correct.

16  Q.   During the time that you were medical director for

17  DuPont between 1977 and 1983, were you the top person at

18  DuPont, so to speak, for making medical decisions?

19  A.   I was considered the top corporate medical person within

20  the company as far as decisions or policies or what else was

21  concerned.

22  Q.   And when you became vice president safety, health and

23  environmental affairs in 1984, were you still the top person at

24  DuPont for medical decisions?

25  A.   Yes.

1    Q.    What about when you became vice president integrated

2  health care?  Were you still the top person at DuPont for

3  making medical decisions?

4    A.    Yes.

5    Q.    And you maintained that position from March of 1993

6  until when?

7    A.    Until I retired in March, 31st, of 1996.

8    Q.    Dr. Karrh, in your employment experience with DuPont,

9  did you become personally familiar with a chemical used by

10  DuPont known as C-8?

11    A.    I have to ask you to define what you mean by personally.

12  I became familiar with that chemical.

13    Q.    When did you first hear of that chemical, if you recall?

14    A.    It was in the late seventies, '79, plus or minus, when I

15  first became aware of C-8.

16    Q.    And is it fair to say that, during your employment

17  experience with DuPont, you were personally involved in the

18  medical decisions made by DuPont with respect to health hazards

19  --

20    A.    Yes.

21    Q.    -- from C-8?

22    A.    Yes.

23    Q.    How do you recall C-8 first coming to your attention?

24    A.    The first recollection I have of it is when the supplier

25  of the chemical, the 3M Company, provided DuPont with some

1  information that indicated that the particular chemical had --

2  on a test they had run on rats, looked like it may have caused

3  some eye abnormality in the rats that had been subjected to

4  exposure to the chemical.

5  Q.  Dr. Karrh, I'm going to hand you what's been marked as

6  Exhibit 10 and ask you to take a moment to look at that, and

7  tell me if you can identify what that is.

8  A.  This is a letter written from me to F. E. French, dated

9  June 16th, entitled "Fluorochemicals in Blood."

10  Q.  And, in fact, this particular memo that you -- you

11  recognize that as your signature on the last page?

12  A.  Yes.

13  Q.  And a document you prepared while employed at DuPont?

14  A.  Yes, it is.

15  Q.  And you are providing a recommendation of some testing

16  to be done on DuPont workers based on information about

17  fluorochemicals in the blood, FC-143 in particular, correct?

18  A.  That's correct, plus other unidentified fluorochemicals

19  in the blood.

20  Q.  And, in fact, you say:  "The medical division recommends

21  the following course of action for DuPont employees whose jobs

22  have potential for exposure to Telomer A and its non-polymeric

23  derivatives," right?

24  A.  That's correct.

25  Q.  Now, why were you making a recommendation to test

1    employees with potential exposure to the fluorochemicals?

2      A.   I think the letter stands for itself.  If you'd like,

3    I'll read the whole letter.

4      Q.   I'm just asking for your recollection of why you made a

5    recommendation to test employees for exposure to

6    fluorochemicals.

7      A.   The first sentence starts off:  3M has reported finding

8    FC-143 plus other unidentified fluorochemicals in the blood of

9    potentially exposed workers.  And then it goes on:  Similar

10   tests have not been done on the general population, and medical

11   division recommends the following with jobs with potential

12   exposure to Telomer A.  And that's Number 5.  And the main

13   reason was to see if our employees were showing the same thing

14   that 3M employees had shown.

15     Q.   Based on the information you had that there was C-8

16   being detected in 3M worker blood, you made a recommendation to

17   test DuPont workers, right?

18     A.   That's correct.  It's in the previous -- .

19     Q.   Knowing that this material was also in general

20   population blood, why was there no recommendation made to

21   follow up and do further testing of general population blood?

22     A.   At that point in time, we were trying to determine if it

23   was in the blood of our workers who would have the highest

24   potential exposure to the material in the workplace.

25     Q.   What disclosures did DuPont make to anyone with respect

1   to the data showing C-8 in general population blood?

2    A.   I don't recall DuPont making any disclosure as far as

3   that because the general population data was already in the

4   published paper that you showed me earlier, the Taves paper,

5   and 3M -- reference here to 3M was based upon that, according

6   to your summarization of it.  So, I don't see any -- I don't

7   think DuPont had any reason to do anything right then until we

8   got some more data.

9    Q.   And, again, what data did DuPont have at that time in

10   1979 to inform DuPont as to what, if any, safe level existed

11   for having C-8 in human blood?

12    A.   I don't think we had any data that told us what was safe

13   or what was not safe.  We just had some data that was showing

14   us that C-8 was in the blood, and we were undertaking then a

15   pretty extensive program to try to determine exactly what that

16   did mean and what was the significance of it.

17    Q.   Did you have any knowledge indicating that any copy of

18   the 1976 article from Taves had ever been given to U.S. EPA by

19   anybody?

20    A.   I didn't have any knowledge that it did.  I didn't have

21   any knowledge that it didn't.  It was a published paper out in

22   the published literature.

23    Q.   Why not err on the side of making sure EPA had that

24   information?

25    A.   What would be the reason for that?  It was a published

1    paper out in the public domain that EPA had signed, reviewed

2    the literature.  They know everything that's coming out and

3    published.  There would not have been any reason whatsoever to

4    go back and send that paper to the EPA, because it didn't

5    really say anything that EPA could use if they hadn't already

6    picked it up by their own scientists.

7       Q.   You had no information indicating that EPA was aware of

8    that document?

9       A.   No, but I don't know that they weren't, either.

10      Q.   Yet, with getting that information, DuPont went ahead

11   and recommended sampling of its employees, correct?

12      A.   Yes.

13      Q.   And, in fact, you made recommendations to actually look

14   into the health records for those employees, correct?

15      A.   Yes.

16      Q.   Because there wasn't much information available to

17   DuPont at that time confirming what the safe levels of exposure

18   were for C-8, was there?

19      A.   We had no reason to think that these employees' health

20   had been harmed at all by any exposure to C-8; but, as we

21   discussed this morning, based upon our intent to try to do an

22   appropriate -- provide an appropriate safe and healthful

23   workplace, we wanted to make sure we knew exactly what were the

24   circumstances, what were the fluorochemical levels in our

25   employees' blood and if, in fact, they had any health effects

1    that could be related to these.  We had no reason to think that

2    they did, but we wanted to err on the side of prudence and look

3    and see if they did.

4    Q.    And, in fact, you say that you had no evidence

5    indicating there was a health problem.  You also had no

6    evidence, though, indicating there wasn't, correct?

7    A.    That is correct, but you have to -- every DuPont

8    employee got a physical examination on a regular basis.  If

9    they were 40 years of age or under, they got one every two

10   years, which included liver function tests, a complete exam by

11   a physician, chest x-ray, urinalysis, and any other test that

12   might have been indicated.

13        If they were over 40 years of age, they got one every

14   year, exactly the same thing, plus they got an

15   electrocardiogram every year.

16        We were able to monitor employee health by doing this on

17   a regular basis, physicians at the plant sites.  And then we

18   could look and see if there were any abnormalities that were

19   showing up.

20        We also had an epidemiologic database in which we picked

21   up any type of illness that an employee may have for which they

22   lost eight days or more or anything that an employee or a

23   pensioner might die from.  This was entered into our

24   epidemiologic database.  And periodically, about every two

25   years, we would run that database and see if we had a plant

1   site that was showing any abnormality and causes of death or

2   adverse health effects that might be showing up. Plus, we had

3   the physical exams that the physicians were looking at.

4       And so we had a pretty good way to make sure that our

5   employees did not have a clustering of cases of some type of

6   adverse health effects.

7       But once we got these data that you reference here from

8   3M, then we felt that we needed to increase that surveillance a

9   little bit to make sure we weren't missing something, but we

10  were already doing a pretty extensive surveillance program.

11      THE COURT:  Stop there.  We are right up to five

12  o'clock.

13      Ladies and gentlemen, I thank you for your attention.

14  I'm not going to repeat all of the do's and don'ts, but please

15  keep them in mind.  You've heard those several times now.

16      Have a nice evening.  We'll see you back here to start

17  at nine o'clock tomorrow morning.

18      (Thereupon, the Jury exited the courtroom.)

19      THE COURT:  I have a couple of things I want to go

20  over with you.  Let me first ask, Mr. Mace, just in terms of

21  schedule, what do you anticipate where we are at this point?

22      MR. MACE:  That's why I raised my hand, Your Honor.

23      We're going to give it a look-over tonight.  But,

24  frankly, I see the jurors not only rolling their eyes at

25  side-bar, I think they rolled their eyes when they come in the

1   courtroom.  So, we are really thinking about cutting it back.

2   I want to look at some of these videos that are still being

3   discussed.  But my current anticipation would be,

4   provisionally, that we're going to finish this video, call Dr.

5   Rickard, and we'll be done.

6           THE COURT:  And I assume Dr. Rickard will take an

7   entire day.  Would you anticipate --

8           MR. MACE:  Probably a day between both sides.

9           THE COURT:  All right.  So you're confident we can

10  finish by Friday, is what it sounds like.

11          MR. MACE:  I'm trying for that.

12          THE COURT:  And in terms of rebuttal, how do you see

13  it?

14          MR. PAPANTONIO:  Judge, I doubt we'll have rebuttal.

15  But I'm not so confident -- we'll finish on Friday, but that

16  would just be with testimony.

17          THE COURT:  Right now -- I know things can change,

18  but, right now, you're not anticipating rebuttal?

19          MR. PAPANTONIO:  No, sir.

20          THE COURT:  All right.  So we could finish with the

21  testimony this week and get this case to the jury early next

22  week?

23          MR. PAPANTONIO:  Yes, sir.

24          THE COURT:  Very good.

25          MR. MACE:  We need to have a charge conference at some

Vol. 12 -  291

1    point.

2         THE COURT:  You're not just going to trust me to give

3    the instructions and -- I will tell you, before this trial is

4    over, how Judge Kinneary would do it.  I don't think any side

5    would agree to that, but I'm not going to follow that habit.

6    He would just give them, and God help a person who objected.

7    That's -- we'll try to have a complete copy to you before the

8    weekend so you can take a look at it and we can move quickly

9    through those.

10        I would like to do close and the charge all in the same

11   day.  How long are you thinking about for close?  I know we're

12   jumping ahead here.  What sort of timeline are you thinking of?

13        MR. PAPANTONIO:  Yes, sir.  We're looking at a way to

14   keep to the same two hours that we used for openings.

15        THE COURT:  All right.  Two hours each?

16        MR. MACE:  That should be plenty, Your Honor.

17        THE COURT:  All right.  So, if we do two hours each

18   and the charge will take anywhere from 30 to 45 minutes, then

19   we could do all this in a day.  The jury probably won't have a

20   lot of time to deliberate that first day, but at least they'll

21   have the case submitted and come back and have a full day the

22   next day.

23        All right.  The other matter that had been mentioned at

24   side-bar we'd take up at this time has to do with an issue of a

25   juror possibly sleeping.

1      I have mentioned on the record several times at side-bar

2   that I've had some concerns.  That's one reason why we've had

3   so many side-bars.  I've also been paying closer attention to

4   him today.  I think the unknown is that he does appear to close

5   his eyes, but when he opens, he's writing something.  So I'm

6   not exactly confident and I'm not finding that he's sleeping,

7   but I can certainly say, from my observation, his eyes have

8   been closed from time to time.

9      So, with that, Mr. Papantonio, you were the one that

10   would like to raise that issue.

11      MR. PAPANTONIO:  May I approach, Your Honor?

12      THE COURT:  You may.

13      MR. PAPANTONIO:  Judge, we have been somewhat in a box

14   with what to do with this juror.

15      As the Court pointed out, the last time we had a

16   side-bar the Court made the statement, and I totally agree, the

17   jury is at the point when they're rolling their eyes when we

18   ask for a side-bar.  And it puts us -- and we've talked about

19   that among ourselves.  It puts us at a pretty big disadvantage.

20      There are times besides the eight -- besides the eight

21   side-bars that the Court has recognized in this case where

22   we've had to stop the process and come forward, we have

23   recognized about the same number of times where it wasn't

24   appropriate, we didn't think, because we thought it was a

25   prejudice to our side to ask for a side-bar.

1    Here is the problem.  This is our burden of proof.

2  Ms. Bartlett has the burden of proof here, Judge.  And I've

3  provided you some case law.  There is no reason for me to go

4  over that case law.

5    THE COURT:  Well, the case law basically says that

6  it's somewhat discretionary.  I think it's fundamental to a

7  fair trial --

8    MR. PAPANTONIO:  Yes, sir.

9    THE COURT:  -- that no one vote on a case if they

10  haven't heard all the evidence.  I don't think anybody would

11  argue that point.

12    MR. PAPANTONIO:  Well, the argument is that -- and to

13  add to that -- this is a complex case.  This is not a typical

14  type of case; but, if you look at the case law -- and I have it

15  there -- I don't want to plow through the case law, but this

16  type of thing is akin to a form of juror misconduct.  It can't

17  be expected that a juror is able to perform their duties if

18  they're asleep.  And when a juror makes it impossible to

19  perform their duties, they should be removed from that -- from

20  that jury.  It's an important -- it's an important part of the

21  proceeding.  It goes to the very heart of due process.  This is

22  the only time that Ms. Bartlett is going to have her case

23  heard.

24    And so to follow some of the reasoning here, it's

25  not -- if you look at the cases, jurors are removed simply for

Vol. 12 - 294

1  nodding off once or twice.  We now have -- in the material I've

2  given you, Judge, the analysis is very good.  The analysis goes

3  about telling us that if there's no -- the person who is

4  prejudiced in a situation like that is the party that has the

5  burden of proof.  Now --

6          THE COURT:  In theory, that's true because, if the

7  case isn't proven, you lose.

8          MR. PAPANTONIO:  Yes, sir.

9          THE COURT:  That's the theory.  I'm not necessarily

10  sure that's the reality.

11          MR. PAPANTONIO:  I understand that.  But the

12  point -- the jury has to be able to discharge their duty.  And

13  if they're not -- if they're not wholly awake in a case like

14  this that's very complex, Judge, this has -- this case has been

15  dependent on video tapes, --

16          THE COURT:  I'm paying attention.  I'm just trying to

17  find the rule, but keep talking.

18          MR. PAPANTONIO:  It's been dependent on video tapes,

19  Judge.  It's been dependent on what I call compilation type of

20  presentations in very complex matters.

21          THE COURT:  It is a complex case.

22          MR. PAPANTONIO:  Yes, sir.

23          THE COURT:  I think that's another factor that I would

24  certainly be focused on.  The more complex case, the more

25  important it is for the jurors to follow it.

1       MR. PAPANTONIO:  The numbers of documents alone,

2  Judge, I've lost track of them, frankly.  And I didn't look at

3  it before I came here.  But it's been so necessary to even use

4  composite material, and what we've done is, we've been very

5  precise in that motion that we've given you.

6       In the motion we've given you, we've gone back and

7  actually looked at what was happening during the eight times

8  that the Court had to stop and say, look, let's come up here

9  and have a side-bar and give the jury a chance to wake up.

10       This isn't rampant.  And sometimes you'll see a jury

11  that everybody is asleep.  That is not the case here.  We've

12  actually observed, Judge, and I think everybody who's been

13  paying attention to this has observed where other jurors have

14  almost nudged this guy.

15       Juror #4 keeps looking at Juror #2 at whether he's awake

16  during critical times of the testimony.  And the genie is out

17  of the bottle at this point.  We can't go back and say --

18       THE COURT:  Just assume that I share the concerns.

19  All right?  And I think the argument that you have a right to a

20  jury that's heard the evidence is unassailable.  Having said

21  that, the doubt that I have in my mind is not so much the legal

22  standard.  It's knowing or not knowing just how much of this

23  trial the juror has absorbed, because I can't, truthfully,

24  tell, when his eyes are closed, whether he is sleeping or

25  whether he is simply -- some people can still listen and pay

Vol. 12 -  296

1   attention and not fall asleep.  I know I'm not one who could do

2   that.

3        What would you think of the option of me telling him

4   that I'm the only one who wanted to talk to him, no one else

5   has asked for this, and I sit down and talk to him in camera,

6   but on the record, and ask him has he been able to keep track

7   of the evidence, has he been following asleep for periods of

8   time that would block him from knowing main parts of the case,

9   and see what his response is?

10        MR. PAPANTONIO:  Judge, even though the Court might do

11   that, the chances of us being prejudiced -- we have a fifty

12   percent chance of being prejudiced by that.  We've interrupted

13   this case to go forward and make an issue out of this.  We've

14   done side-bars.

15        THE COURT:  But I mean -- I just tell you, when I try

16   cases -- and I'm sure you've had the same experience -- this

17   happens from time to time, particularly after lunch.  And

18   oftentimes a side-bar is all it takes.  Someone gets on their

19   feet.  Their eyes are open and we go forward.  This has been a

20   recurring problem, as I've mentioned this at side-bar.  So I

21   don't disagree as to what the record shows at this point.

22        MR. PAPANTONIO:  And in a setting like this, we've

23   actually had jurors removed for that very reason, especially

24   when it reached the complexity of this.  This is not a

25   fender-bender.  If this juror misses one major element of this

1    case -- if he was -- for example, we have a cite in there

2    where, during Dr. Bahnson, that was a time when we had to wake

3    him up.  Dr. Bahnson was talking about causation in this case

4    that the defendant has made a major part of their case.

5              THE COURT:  Right.

6              MR. PAPANTONIO:  And for Mrs. Bartlett to have to

7    guess was he -- how often did that happen is just not

8    appropriate, Judge.

9         And if we had a problem where we didn't have enough

10   jurors, but we can go forward with seven jurors, and there's no

11   prejudice; there is no question of prejudice whatsoever.

12        The other thing -- I want to put this -- I want to be

13   clear about this.  From day one -- and you're certainly welcome

14   to take testimony from Mrs. Bartlett about this.  From day one,

15   Ms. Bartlett has said to me, The man is sleeping.  How is he

16   paying attention?

17             THE COURT:  Well, again, my position is this is on the

18   record.  I've mentioned this at side-bar.  No one's -- you

19   know, I think we've all seen the same thing.

20        I think the only issue in my mind is do we take a

21   remedial step first.  That's one question.  The other question

22   is --

23             MR. PAPANTONIO:  I genuinely believe we're more

24   prejudiced with that.

25             THE COURT:  All right.

1          MR. PAPANTONIO:  I genuinely believe that, Judge.  I'm

2     not -- I'm not just imagining that.

3          THE COURT:  Well --

4          MR. PAPANTONIO:  We don't know what's been said among

5     these jurors.  The side-bar issue does become -- the side-bar

6     is the best approach to a trial like this.  It works.  But

7     there has been times where I've felt like we couldn't do a

8     side-bar.  And I've had to tell co-counsel we can't go up -- we

9     can't keep jumping up there.  We can't keep asking for

10    side-bars.  It's destructive to do that.

11         THE COURT:  All right.

12         MR. PAPANTONIO:  And it's actually had an impact on

13    our strategy.

14         THE COURT:  Thank you.  I understand your position.

15    You get the last word.

16        Mr. Mace?

17         MR. MACE:  Ms. Niehaus will be addressing it.

18         THE COURT:  Ms. Niehaus.

19         MS. NIEHAUS:  Thank you, Your Honor.  Just a couple

20    points in response.

21        One, you mentioned that you think this is a somewhat

22    discretionary standard.  In fact, the cases indicate that you

23    have great discretion in this area.

24         THE COURT:  Right.  It's a good cause standard, and

25    it's the use of discretion on appeal.

Vol. 12 -  299

```
 1            MS. NIEHAUS:  Right.

 2            THE COURT:  I want to get this right.

 3            MS. NIEHAUS:  Okay.

 4            THE COURT:  I understand -- you know, I don't think

 5     this is one-sided, by the way.  I could imagine a person who's,

 6     just hypothetically -- I'm not talking about Juror #2 -- the

 7     other jurors would probably say, What do you know?  You slept

 8     through half this trial.  They would discard his opinion, would

 9     be -- I think that's the most likely outcome, but I'm

10     speculating, I will be the first to admit.

11            I also think that if I were in your position I would

12     fear that, you're at opening statement, slept through the

13     trial, and just relied on that in making a decision, which we

14     all know is completely improper.

15            It just seems to me that this is sort of a ricocheting

16     bullet here, and any one of you can be hit with it.  I don't

17     think it's necessarily the plaintiff's -- it's not the

18     plaintiff who is the only party at risk.

19            MS. NIEHAUS:  Sure.  But especially given where we're

20     at in the trial, Your Honor.  We have maybve a day or two left

21     of testimony.  There is only a down side to letting him

22     continue.

23            The cases speak to curative measures.  You've done some

24     of that.  You've called side-bars.

25            THE COURT:  The trouble is this is -- I'm not going to
```

1   use the example that came to my mind.  It would -- but what I

2   tried was curative, but it's sort of like giving a patient the

3   same medicine for 360 days and the temperature is still very

4   high.  It hasn't worked.

5          MS. NIEHAUS:  Sure.  Well, I mean, you've suggested

6   having them bring in coffee.

7          THE COURT:  Right.

8          MS. NIEHAUS:  We think that's the next step, at least,

9   in the curative measures.

10         THE COURT:  But we've been through, now, 13 -- 12 days

11  of trial, and this would be the last two days.

12         MS. NIEHAUS:  Sure.

13         THE COURT:  I would be fearful that we just didn't

14  absorb enough of the testimony with that juror during the other

15  days.

16         MS. NIEHAUS:  Sure.  But in any event, Your Honor, the

17  cases speak to curative measures.  They also suggest that,

18  before a juror is actually dismissed, you need to take the

19  steps that you've sort of outlined here, and that is to ask him

20  has he actually listened to the testimony, has he appreciated

21  the testimony --

22         THE COURT:  Yeah.

23         MS. NIEHAUS -- perhaps review the notes that he's

24  taken.

25         As you pointed out, he's taken notes, so -- you know,

Vol. 12 - 301

1    what is he writing down?  Is he writing down -- is he writing

2    down the evidence?  That's some evidence that he's paying

3    attention to the evidence.

4           THE COURT:  What's the -- what prejudice would there

5    be?  I know we've talked before about the number of jurors, and

6    your side advocated nine.  We went with eight.

7           MS. NIEHAUS:  Right.

8           THE COURT:  But the rule only requires six.  It can be

9    as many as 12, but it's discretionary with me.  And seven

10   jurors who heard all of the testimony versus an eight jury

11   group with one juror that we have great fear didn't hear all of

12   the testimony, how would that in any way harm the case?

13          MS. NIEHAUS:  Your Honor, we don't know if he's heard

14   all of the testimony.  We haven't had an opportunity, or you

15   haven't had that opportunity, to ask him in camera.

16          THE COURT:  Yeah.  My fear, truthfully -- I don't

17   think would argue this -- we've had side-bars.  I've told the

18   jurors that they may stand.  And he continues with closed eyes

19   and doesn't stand.  You've seen that, I'm sure, right?

20          MS. NIEHAUS:  Sure.  He engages with the deputy clerk

21   when the deputy clerk goes over.

22          THE COURT:  Right.

23          MS. NIEHAUS:  And he does wake up.  And as you've

24   pointed out, the times that he appears to be nodding off, he

25   does perk back up and takes notes.

Vol. 12 - 302

1              THE COURT:  He does do that.  That's his one saving

2   grace at this point.

3              MS. NIEHAUS:  Your Honor, we did request nine jurors.

4              THE COURT:  Right.

5              MS. NIEHAUS:  We think we were prejudiced in not

6   having nine jurors.  So, to go from nine to seven, then,

7   without even any additional information on whether this juror

8   has been paying attention or has been paying attention

9   sufficiently enough to consider the evidence I think compounds

10  the prejudice.

11             THE COURT:  I knew this was an important matter.  I've

12  only had one other case where I've excused a juror.  It wasn't

13  for sleeping.  It was for another matter altogether.

14              I want to think about it over the night.  If I do talk

15  to him, it will be in the morning.  And I would say, if I do

16  talk to him, it's because I'm probably leaning towards excusing

17  him.  But I might just hang on a thin reed and see what he says

18  before we do that, because he has put a lot of time in here,

19  and I wouldn't want to have him do that for naught.

20              But at this point -- this is in writing.  I think the

21  case law is exactly as you've described.  It's discretionary.

22  It's a just cause standard.

23              Do you need a chance to respond to this?

24              MS. NIEHAUS:  In writing?

25              THE COURT:  Yeah.  You don't need to.

1      First of all, the factual basis is everything we've

2  talked about.  We've all been at side-bar together.  You know

3  what I've put on the record.  I don't think you don't need to

4  address that.  But if you have some great concern -- I won't

5  make a final decision before 8:30 tomorrow, but it's going to

6  be pretty close to 8:30.

7      What I'd want to do is meet with him, if I'm going to do

8  that, probably about 8:50.

9      MS. NIEHAUS:  Your Honor, I would say I did skim it,

10  as much as I could in the five minutes and also pay attention

11  to Mr. Papantonio.  I noticed that one of the concerns is that

12  Dr. Rickard is coming up and that he's a critical witness in

13  the case.  And we don't dispute that, of course.

14      I'd ask that if you do speak with him and ask him to

15  stay awake, that he at least be permitted to continue through

16  the duration of the trial and, you know, listen to that

17  critical witness.

18      THE COURT:  One other thing to put on the record --

19  this is in the *voir dire*, and it's always in his jury

20  questionnaire -- he is on Worker's Compensation.  Nobody asked

21  him if he's taking medication, but I wouldn't be surprised.  It

22  was a physical injury to the knee, if you remember.

23      MS. NIEHAUS:  Yes.

24      THE COURT:  So he could very well be taking pain

25  medication that is making him sleepy.  So I don't want to make

Vol. 12 -  304

1    the record look like I'm criticizing him.  He may just be in

2    that spot.

3         MS. NIEHAUS:  Sure.

4         THE COURT:  But I don't -- I just want to see if he's

5    been able to absorb most of the case.  That's going to be the

6    focus.  And if he says he's had a rough time with it, I'm going

7    to be inclined to dismiss him.

8         MR. MACE:  That's obviously fine, Your Honor.  I want

9    to note for the record, I've had some other observations with

10   at the side-bar.  Some of those have been recorded, and I've

11   certainly noticed him, appear to be, his eyes closed, but then

12   he's writing something down.

13        THE COURT:  There has been some of that.  But there

14   have been lots of times when I've noticed -- and I've already

15   put this on the record -- as we were going through each day.

16   So this is -- I think we all understand this was not a one-time

17   occurrence.  I had that happen a lot, and people are shaken up

18   once and then they tend to get the message, but that hasn't

19   happened here.  So --

20        Okay.  I'll give it some more thought.  Try to get it

21   right.

22        You can have the last word, Mr. Papantonio.

23         MR. PAPANTONIO:  May I make one request, Judge?

24        I realize this is your court, but we would request

25   if -- rather than asking him any questions, if the Court

Vol. 12 - 305

1   decided that there was even a possibility that he was going to

2   stay, that he not be interviewed, because I really -- I

3   sincerely believe we're prejudiced by that.  I sincerely

4   believe that.

5          THE COURT:  All right.  Well, you know, I will tell

6   you this much:  If I decide to interview him, it will be

7   because I'm inclined to excuse him.

8          MR. PAPANTONIO:  Yes, sir.

9          THE COURT:  I wouldn't do this just as a neutral

10  proposition, but I think I owe him at least a talk before I

11  send him off after almost three weeks here.

12         All right.  With that, we'll be in recess.  I'll see you

13  at 8:30 in the morning.

14         (Proceedings adjourned at 5:20 p.m.)

15                        - - -

16

17

18

19

20

21

22

23

24

25

Vol. 12 – 306

1                          I N D E X

2                            – – –

3

4    WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS

5    Michael Dourson
          By Mr. Mace            22             109
6         By Mr. Douglas                 53                  124

7

     Samuel Cohen
8         By Mr. Mace           132             258
          By Mr. Douglas               212                  269
9

10   Bruce Karrh
          By Mr. Bilott               275
11

12                            – – –

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    United States of America

4    Southern District of Ohio

5

6          We, Shawna Evans, Lahana Dufour, Georgina Wells and

7    Denise Errett, Official Court Reporters of the United States

8    District Court for the Southern District of Ohio, do hereby

9    certify that the foregoing constitutes a true and complete

10   transcription of our stenographic notes taken of the

11   proceedings held in the afore-captioned matter on the 30th day

12   of September, 2015.

13         In testimony whereof, we hereunto set our hands on the

14   1st day of October, 2015.

15

16                         /S/Shawna Evans, RMR
                           Shawna Evans, RPR
17                         Official Court Reporter
                           Southern District of Ohio
18
                           /S/Lahana Dufour, RMR
19                         Lahana Dufour, RPR
                           Official Court Reporter
20                         Southern District of Ohio

21                         /S/Denise Errett, FCRR
                           Denise Errett, FCRR
22                         Official Court Reporter
                           Southern District of Ohio
23
                           Georgina Wells, RPR
24                         Georgina Wells, RPR
                           Official Court Reporter
25                         Southern District of Ohio