Vol. 15 -    1

1         UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF OHIO
2               EASTERN DIVISION

3    CARLA MARIE BARTLETT and          )
     JON WILLIAM BARTLETT,             )
4                                      )
                    PLAINTIFFS,        )  CASE NO. 2:13-cv-170
5                                      )
            vs.                        )  OCTOBER 5, 2015
6                                      )
     E. I. du PONT de NEMOURS AND COMPANY, )  10:40 A.M.
7                                      )
                    DEFENDANT.         )
8    _____)

9
                    VOLUME NO. 15
10   TRANSCRIPT OF THE PROCEEDINGS OF THE JURY TRIAL
        BEFORE THE HONORABLE EDMUND A. SARGUS, JR.
11        UNITED STATES DISTRICT CHIEF JUDGE
                  COLUMBUS, OHIO
12

13   FOR THE PLAINTIFF:

14      Levin Papantonio Thomas Mitchell Rafferty & Proctor, P.A.
        By:   James M. Papantonio, Esq.
15            Ned McWilliams, Jr., Esq.
              Christopher Paulos, Esq.
16            Timothy O'Brien, Esq.
        316 South Baylen Street, Suite 316
17      Pensacola, Florida  32502

18      Douglas & London, PC
        By:  Gary J. Douglas, Esq.
19           Michael A. London, Esq.
             Rebecca Newman, Esq.
20           Alicia P. Ellsayed, Esq.
        59 Maiden Lane, 6th Floor
21      New York, New York  10038

22      Taft Stettinius & Hollister
        By:  Robert A. Bilott, Esq.
23           David J. Butler, Esq.
        1800 Firstar Tower
24      425 Walnut Street
        Cincinnati, OH  45202

25

```
                                                Vol. 15 -    2
 1
                Schlichter, Bogard & Denton, LLP
 2              By:  Roger C. Denton, Esq.
                     Ashley Brittain Landers, Esq.
 3              100 South Fourth Street, Suite 900
                St. Louis, Missouri  63102
 4
                The Cochran Firm
 5              By:  David E. Haynes, Esq.
                1100 New York Avenue, N.W.
 6              Suite 340, West Tower
                Washington, D.C.  20005
 7
                Cory Watson Attorneys
 8              By:  Nina Towle, Esq.
                2131 Magnolia Avenue South
 9              Birmingham, Alabama  35205

10

11    FOR THE DEFENDANT:

12              Squire Patton Boggs LLP
                By:  Damond R. Mace, Esq.
13                   C. Craig Woods, Esq.
                     Stephanie E. Niehaus, Esq.
14                   Stephen Fazio, Esq.
                     Aaron T. Brogdon, Esq.
15              4900 Key Tower
                127 Public Square
16              Cleveland, Ohio  44114

17                            -  -  -

18

19         Proceedings recorded by mechanical stenography,
      transcript produced by computer.
20

21

22

23                       LAURA SAMUELS
                 FEDERAL OFFICIAL COURT REPORTER
24                85 MARCONI BOULEVARD, ROOM 302
                      COLUMBUS, OHIO  43215
25               TELEPHONE NUMBER: 614-719-3245
```

```
                                        Vol. 15 -   3
                                   MONDAY MORNING SESSION
```

1

```
                                   OCTOBER 5, 2015
```

2

3                          – – –

4      (Thereupon, the following proceedings were held in open

5    court; jurors not present.)

6           THE COURT:  Counsel, good morning to you.  I hope you

7    had a restful weekend and you're ready to go.

8           I thought we would start with the proposed jury

9    instructions.  Let me first give you a couple of, what I view

10   as, nonsupplement changes that I have made.  If you would first

11   turn to instruction number 14 to get the sequence here.  This

12   is the initial reference to the burden of proof.  It's a single

13   sentence.  It has a paren that does a very brief definition of

14   preponderance of the evidence.

15          What I'm going to do is take that out and then the very

16   next page is the full definition of preponderance of the

17   evidence.  Instead of that paren it will now say, which I will

18   define for you.  And then the next page is the definition.  So

19   hopefully that doesn't cause anybody heartburn.

20          MR. DENTON:  No, Your Honor.

21          MR. MACE:  No, Your Honor.

22          THE COURT:  The next one is even easier.  Page 33 had

23   a typo in the heading.  Spelling of the word compensatory.

24          And then flipping to page 36, interrogatory to be given.

25   This is really a stylistic change.  The second sentence starts

1   with, if you indicate that you did.  I think it would be

2   simpler to say, if you find for Mrs. Bartlett, which is really

3   the same thing, just a little bit clearer.  And then going to

4   the next to the last line it says that Mrs. Bartlett has

5   presented proof.  I think it should say and whether

6   Mrs. Bartlett has presented proof.  I view that as stylistic as

7   well, not substantive.

8          Finally, on page 41, I'm adding a sentence to the first

9   paragraph.  This is nothing in dispute.  I'm just going to add,

10  and I mention again, your verdict must be unanimous.

11         So with those changes I would like, then, to review with

12  you the charge in its entirety.

13         MR. MACE:  Your Honor, on the housekeeping front I did

14  notice just one typo in all these pages.  At page 40,

15  instruction 39.  In the middle of the second paragraph there's

16  a line that begins questions or messages, you must written them

17  down.  You must write them down.

18         THE COURT:  Instruction number 39, page 40.

19         MR. MACE:  Yes, sir.  Middle paragraph, about halfway

20  down there's a line that starts, questions or messages --

21         THE COURT:  You must write them down.

22         MR. MACE:  Yes, sir.

23         THE COURT:  We will fix that.  Thank you.

24         What I typically like to do is put these instructions in

25  three segments.  I'm hoping some of these are matters we can go

1    through relatively quickly.  Looks to me if we take

2    instructions 1 through 16, these are what I would call noncase

3    specific.  Are there any objections to any of those

4    instructions?

5              MR. DENTON:  No, Your Honor, from the plaintiff's

6    side.

7              MR. FAZIO:  No, Your Honor.

8              THE COURT:  Let's go backward --

9              MR. MACE:  Your Honor, can we get one thing on the

10   record to make this shorter?  That both parties are preserving

11   all of their prior objections and that any accommodations or

12   compromises that are being proposed or in light of the Court's

13   ruling today, all points for appeal are being fully preserved

14   and we don't need to restate all that.

15             THE COURT:  Very good.  I'll note that for the record.

16        And then, again, I'm looking at nonsubstantive matters.

17   I think if we look beginning with instruction number 39, that's

18   page 40, to the end of 46.  Are there any objections to those?

19             MR. DENTON:  Not from the plaintiff, Your Honor.

20             MR. FAZIO:  No objections, Your Honor.

21             THE COURT:  So now what we'll do, we'll go to the

22   substantive instructions and we'll go through page by page.  I

23   think that means we should be starting instruction number 17

24   which starts on page 18.  This incorporates what I had done.  I

25   did this sua sponte with regard to the issue of the science

Vol. 15 -    6

1   panel.  I'll give either of you a quick opportunity if there's

2   anything else you thought of since I did catch both sides cold.

3          MR. DENTON:  Your Honor, on the plaintiff's side, we

4   accept what the Court has structured as instruction number 17.

5   We believe that's an accurate statement of what the case is at

6   this point.

7          THE COURT:  Mr. Mace, anything additional you'd like

8   to add?

9          MR. FAZIO:  Yes, Your Honor.

10         THE COURT:  Mr. Fazio.

11         MR. FAZIO:  We object to instruction 17.  With respect

12  to the first paragraph of instruction 17, we don't believe that

13  that's a complete description of the defendant's defenses in

14  the case.  We had tendered a description with our proposed

15  instruction.  It's under DuPont's proposed instruction number

16  17.

17         THE COURT:  What do you contend is missing in there?

18  Just a general sense first and then we'll talk about, maybe,

19  language.

20         MR. FAZIO:  Your Honor, it doesn't make my reference

21  to any form of alternative causation for Mrs. Bartlett's kidney

22  cancer and it does not indicate that DuPont also denies it

23  breached any legal duty owed to Ms. Bartlett.

24         THE COURT:  How about it is a bit bare boned?  I think

25  all of this is pretty obvious from trial.  How about, DuPont

Vol. 15 -   7

1    denies these allegations, denies that it breached a duty to

2    Mrs. Bartlett.  I'm writing this as we go.

3            MR. FAZIO:  Your Honor --

4            THE COURT:  Wait one second.  I'm not done.  Then you

5    can comment.

6            And denies that C-8 caused her kidney cancer.  Does that

7    cover what you're worried about?

8            MR. FAZIO:  That would be adequate, Your Honor.

9            THE COURT:  Those are all within the trial.  It's no

10   news to the jury.  But let's go ahead and add that.

11           MR. DENTON:  Your Honor, could I be heard on that?

12           THE COURT:  Yes.

13           MR. DENTON:  Thank you.

14           The previous sentence essentially says that, that she

15   claims that C-8 caused her kidney cancer from the drinking

16   water.  DuPont denies all these allegations.  So we're

17   essentially repeating some things here.  And of course all this

18   is further developed in the case-specific instructions as we go

19   forward.  So we do object to adding that duplicative language

20   at that point because it's essentially this is just a broad

21   general statement of the issues.  I believe the Court has it

22   correctly when you read what the Court wrote in those two

23   sentences.  Thank you.

24           THE COURT:  I don't entirely disagree with you but I

25   think it's better just to lay this out.  So I'm going to put

Vol. 15 –    8

1    that in.

2          Anything else, Mr. Fazio?

3          MR. FAZIO:  With respect to the second two paragraphs,

4    Your Honor, we think that there are really two issues.  One is

5    that, as we've indicated numerous times throughout the trial,

6    the second paragraph doesn't reference any of the dates during

7    the time.

8          THE COURT:  You want 2012 added?

9          MR. FAZIO:  2004 and 2012.  And actually we had

10   prepared --

11         THE COURT:  2004 for the agreement; 2012 for the

12   science panel's conclusions?

13         MR. FAZIO:  Correct.

14         THE COURT:  All right.  Let's just stay with that for

15   a moment.

16         How's the plaintiff see those two dates?

17         MR. DENTON:  Your Honor, we do object, particularly to

18   the 2004 date.  There's no evidence of that in the record.

19   Clearly the 2012 date is in the record.  We have a problem with

20   that.  And it doesn't -- it's going to potentially add to

21   speculation and it's not a triable issue as to when the science

22   panel started.

23         THE COURT:  So you're objecting to '04 but not 2012?

24         MR. DENTON:  Yes, Your Honor.

25         THE COURT:  I'm inclined to add the 2012 date.  The

1    2004, not so much.  The second sentence I would propose that we

2    say, the science panel conducted a study and in 2012 concluded.

3              MR. FAZIO:  Your Honor, that would be fine.

4         Actually, I'm sorry.  Where are you proposing to put the

5    2012, in the second?

6              THE COURT:  It would be the third line starts with

7    panel conducted a study.  You with me?

8              MR. FAZIO:  Yes.  And concluded in 2012?

9              THE COURT:  Yes.  We can put it either place.

10   Concluded in 2012.  That's where we'll put it.

11        Anything else on that page?

12             MR. FAZIO:  No, Your Honor.

13             THE COURT:  We'll preserve your objection, of course.

14             MR. MACE:  The last sentence, Your Honor.  I'm not

15   sure you even need it but if you're going to leave in the very

16   last sentence on the page which truncates what the jury still

17   needs to decide.  The way it's written --

18             THE COURT:  That I put in because of the sentence that

19   precedes it.  Read those together.  You don't want me leaving

20   it -- I'm afraid the sentence before that made it sound like

21   the case is over.

22             MR. MACE:  Your Honor, there's a preliminary issue

23   here on liability that's left out entirely.  And this is stated

24   as the general statement of the issues.  I'm proposing that in

25   the very last line after the you, Mrs. Bartlett has proven to

 1    you liability, and whether in her case the kidney cancer was

 2    caused by C-8.  Because it sounds like they can just skip

 3    liability the way it's written.

 4              THE COURT:  I don't want to use that word but I see

 5    your concept.

 6              MR. MACE:  That DuPont breached a legal duty then?

 7              THE COURT:  How about we say has proven all the

 8    elements of her claim?

 9              MR. DENTON:  Yes.

10              MR. MACE:  That's fine, Your Honor.

11              THE COURT:  So we'll say has proven all of the

12    elements of the claims, actually plural.  All the elements of

13    each -- all the elements of her -- it's singular as well.

14    Claim or claims.

15              MR. DENTON:  Yes.  That comes up in some other

16    instructions, Your Honor, because we are instructing on

17    alternative claims.  We have to make sure that no instruction

18    applies.  Ms. Bartlett has to prove all the claims.

19              THE COURT:  There's no question of that.  I agree.

20         So here's how I would propose it.  Read the whole

21    sentence.  Some of this is not in dispute.

22         It will read, while this fact is now established, you

23    will still decide whether Ms. Bartlett has proven all of the

24    element of her claim or claims and that in her case the kidney

25    cancer was caused by C-8.

1        MR. MACE:  I think that addresses it, Your Honor.

2        THE COURT:  I'm sorry, your name again is?

3        MR. DENTON:  I'm sorry.  I'm Roger Denton, Your Honor.

4        THE COURT:  Denton?

5        MR. DENTON:  Denton, D-E-N-T-O-N.

6     Your Honor, this is getting pretty dicey, in our view,

7  because we've already added language in the first paragraph

8  that DuPont denies all these allegations, including causation.

9        THE COURT:  Just so you understand my thinking, and

10  you can dispute this.  I put -- the sentence before that, we

11  would call a general causation sentence.  I just want to add

12  the second sentence -- the last sentence on the page to make

13  sure they understand that specific causation is what the trial

14  is about.

15        MR. DENTON:  I do.  And I think combining, then,

16  liability and elements in that sentence is very misleading and

17  detracts from what the Court is trying to tell them.  And as

18  the Court wrote it, I think it's very precise and the

19  appropriate way.

20     We're talking in those last two paragraphs simply about

21  general causation and specific causation.  We've already

22  told -- instructed the jury at the beginning of the instruction

23  about breach of duty, et cetera.  And so if we're only talking

24  about causation, I don't think we should then blend back into

25  elements of the claim because I think that is confusing.

1          MR. BILOTT:  Your Honor, Rob Bilott for the plaintiffs

2     as well.

3          I think what's getting confusing here is we're just in

4     the prior paragraph talked about the general causation being

5     established and then this language that's just added makes it

6     sound as if all of the elements still need to be proven.  It

7     should, at a minimum, refer to all the other elements.  Because

8     if I'm the jury, I'm reading this thinking everything still

9     needs to be proven at this point.

10          THE COURT:  Nowhere in the elements do we mention the

11     .05 parts per billion.  That's not in it.  So I'm satisfied

12     with that.  It's a little burdensome from my standpoint but I

13     think it's accurate.  I'm going to leave it as I just read it.

14          By the way, as we get to the next page, these references

15     at the bottom are going to be put into this iteration of the

16     instructions but will not be with the jury instructions that

17     the jury actually gets.  There's no reason they need the

18     citations.  Just so you understand.

19          Let's go to page 19, statement of claims.  Any

20     objections?

21          MR. DENTON:  Yes, Your Honor.

22          I understand what the Court is trying to do here to

23     explain to the jury that these claims are alternatively

24     submitted and/or need to be done separately.  I think the

25     instructions would be concise and consistent with what the

1   parties both tendered to the Court without objection initially

2   would be to end the instruction with the sentence, you will

3   decide each of these claims separately.  All this additional

4   language, unfortunately, seems to confuse it.

5        THE COURT:  I'll ask.  If we did that, is that

6   acceptable?  If you both agree, I'm prepared to do it.  I think

7   it is repetitive.

8        MR. MACE:  We're okay with that, Your Honor.

9        THE COURT:  All right.  So this will be much shorter.

10  It will end with, you will decide each of these claims

11  separately.  And then there are three sentences that follow,

12  and those will be deleted.  We will do that.

13       MR. FAZIO:  Your Honor, one other issue on instruction

14  18.  Just a housekeeping matter.  In the first sentence,

15  subpart (3), we refer to negligent infliction of emotional harm

16  and elsewhere in the instructions we refer to that as negligent

17  infliction of emotional distress.  Just to avoid any confusion

18  we should bring it, the reference to it, as parallel to

19  instruction 28.

20       THE COURT:  Yes.  They should be the same throughout.

21  I agree with that.  Any objection?

22       MR. DENTON:  No, Your Honor.

23       THE COURT:  So negligent infliction of serious

24  emotional distress.

25       All right.  That would take us to number 20.

Vol. 15 -   14

1        We were giving you a test here.  The word ordinary in

2   the caption is misspelled and bringing it to my attention.

3   That's my way of saying it's not my fault.  So we're going to

4   change the word ordinary there.  That's on page 20.

5        Anything else on that page?

6        MR. DENTON:  Not from the plaintiff, Your Honor.

7   We're fine.

8            MR. FAZIO:  No, Your Honor.

9            THE COURT:  All right.  That takes care of 20.

10       21, any objections?

11           MR. DENTON:  Not from the plaintiff, Your Honor.

12           MR. FAZIO:  Instruction or page?

13           THE COURT:  Instruction number 20 on page 21.

14           MR. FAZIO:  No objection, Your Honor.

15           MR. MACE:  Your Honor, do you mind if we sit down?

16           THE COURT:  That's fine.  For now.  There's too many

17   pages to be standing with this.

18       Instruction number 21, which is on page 22, any

19   objection?

20           MR. DENTON:  Not from the plaintiff, Your Honor.

21           MR. FAZIO:  No objection, Your Honor.

22           THE COURT:  And then 15 is the burden of proof.

23   Instruction number 14 on page 15.  Any objection?  This is one

24   sentence.  This should hopefully be fairly easy.

25           MR. DENTON:  No objection, Your Honor.

1          MR. FAZIO:  No objection, Your Honor.

2          THE COURT:  Number 23, proximate cause.  That's page

3    23, instruction number 22.  Any objection?

4          MR. DENTON:  Your Honor, Plaintiff tendered a

5    proximate cause instruction using the substantial factor

6    language.  I fully and readily understand that what the Court

7    has used is consistent with patterned Ohio instruction but

8    there are many, many cases in Ohio.  In fact, the Court even

9    cited some of those in some of its dispositive motions, the

10   substantial factor language should be there.  We do have a

11   brief on it if the Court is interested.

12         I would tell the Court that there is at least one Ohio

13   case that did not allow this substantial factor language but

14   there seems to be overwhelming support for it.  We'd ask the

15   Court to consider it.  We would object to this instruction for

16   that reason.

17         THE COURT:  All right.  Defendant's side?

18         MR. FAZIO:  Your Honor, we would object to including

19   the substantial factor language.  We don't believe that it

20   applies in the context of this case.  To the extent

21   Ms. Bartlett has or there are alternative potential causes for

22   her kidney cancer, they are not causes that either combine in

23   any way, shape or form --

24         THE COURT:  That's the problem -- I had the same

25   problem.  I think you both make the point.  There's no

1   testimony about combination, right?  It's one or the other.

2        MR. MACE:  Right.  And in fact, Your Honor, you'll

3   recall, you excluded the synergy concept which is our problem

4   with the whole second paragraph.

5        THE COURT:  The real problem with me is there's no OJI

6   instruction on substantially contributing cause.  There's a

7   statute in Ohio that picks that up in exposure cases but it

8   doesn't apply in our case.  So it is true.

9        I've given the instruction in many cases before where

10  we're talking about there could be more than one proximate

11  cause but Mrs. Bartlett must prove that it was a substantially

12  contributing factor.  You object to language like that?

13       MR. MACE:  We do, Your Honor.  We don't think that

14  applies in this case.  We think this whole second paragraph

15  also is improper because nobody is claiming superseding or

16  intervening cause, which is what that would go to.  And it

17  would also maybe be proper if you were allowing synergy, which

18  you're not.

19       So we disagree with the request for the substantial

20  factor and we disagree with the second paragraph.

21       THE COURT:  That is the trouble.  There's no doctor

22  that's talked about a combination.  Your side presented doctors

23  that say it's C-8 and the other side says it's obesity and

24  never the two shall meet as far as the testimony goes, right?

25       MR. DENTON:  I'm not sure what Dr. Cohen said.

1        THE COURT:  We'll leave that for a moment.

2        MR. DENTON:  I don't mean that sarcastically.  But

3    there was all this discussion about obesity extensively with

4    Dr. Cohen.  A lot of comparisons to tobacco cases and smoking

5    and, frankly, anyone sitting in this courtroom but for the

6    Court's instruction, limiting instruction, would have thought

7    during his testimony that he was giving a specific causation

8    opinion.  And this jury, I think based on that evidence, both

9    Dr. Bahnson and Dr. Cohen could say, well perhaps obesity is a

10   partial cause but if C-8 is a substantial cause she still --

11       THE COURT:  I can understand jurors thinking that way

12   but that would be proper because there's no medical expert to

13   go with that, right, with the two combined?

14       MR. DENTON:  The problem we have, Judge, is that they

15   heard extensive evidence of obesity and both were a risk

16   factor.  That's what Dr. Cohen said.

17       THE COURT:  That's what I heard as well.

18       MR. DENTON:  And in a differential diagnosis the

19   doctors check off, we had a lot of testimony of them checking

20   off the various risk factors.  There's no question that

21   Dr. Bahnson checked off obesity not being part of

22   Mrs. Bartlett's injury, kidney cancer.  But Dr. Cohen was

23   certainly suggesting and implying, in fact cited article after

24   article, that obesity is a risk factor.  Quite frankly, I think

25   he said was causative of kidney cancer.  He went that far.

1          Certainly he was not allowed to give a special causation

2     ultimate opinion here.  But there is evidence that obesity and

3     C-8 may be contributing points of factors here and without

4     either the substantial contributing language --

5          THE COURT:  Here's what I think it's missing.  It's

6     probably missing because there's no science behind it.  This

7     instruction would make sense if someone said, if you have more

8     than one risk factor then the two together increase your

9     overall risk factor.  But no doctor said that.

10          MR. DENTON:  I agree with that, Your Honor.  They did

11     not say that.  But if we don't have substantial contributing

12     cause and then eliminate the second paragraph, I think this

13     instruction is misleading and inconsistent with the evidence

14     this jury heard.  We would accept the instruction as proposed

15     by the Court.

16          THE COURT:  That's the one we're going to take under

17     advisement.  I think you both have -- I think the way it's

18     written, it doesn't comport with the evidence but I think the

19     law in Ohio has always been clear that you don't have to prove

20     the only cause.  You have to prove the cause that's the

21     substantial contributing factor.  I will look at that and I

22     will tell you between now and about two o'clock today.  If you

23     want to look at this again, I'll be happy to hear some

24     additional comment you might have.

25          One thing I will tell you, from my research there's a

1    statute that picks up that phrase.  I don't think that's

2    helpful.  The cases that follow that statute don't guide us

3    because the statute doesn't apply here.  So we had to be

4    looking more at common law cases than we would at the statutory

5    interpretation cases.

6             MS. NIEHAUS:  Your Honor, the statute you're referring

7    to, I believe, is an asbestos-specific statute.  In an asbestos

8    case you're talking about multiple exposures to the same

9    substance and you've got a science issue there.  In asbestos

10   cases, I've tried several of them, there's usually

11   scientific -- competing scientific evidence that multiple

12   exposures to the same substance, each one could be a

13   substantial contributing factor.

14            THE COURT:  I see a lot of similarity.  The lung cases

15   tend to have -- you might have smoking, you might have asbestos

16   exposure, you could have other issues.  That's what this is

17   about.  It's a differential diagnosis case.  It's about

18   figuring out causation.

19            MS. NIEHAUS:  But Your Honor has already made the

20   point, there is no scientific evidence anywhere and certainly

21   none presented in this case that obesity and C-8 could combine.

22   In fact, you've excluded that, that specifically.

23            THE COURT:  Have you seen an asbestos case where

24   people claim -- where scientists claim asbestos exposure and

25   smoking combined?  It's one or the other, isn't it?

Vol. 15 -   20

1          MS. NIEHAUS:  I believe there actually is a synergism

2     theory for asbestos and smoking.

3          THE COURT:  That's not in a typical case, though.

4          MR. MACE:  Right.  Plus, Your Honor, I think the point

5     Ms. Niehaus was trying to emphasize is in asbestos, typically

6     you have these workers who have working careers over 30, 40

7     years where they were exposed to one of the defendant's

8     products for a certain length of time, another defendant's

9     products.  So it's about a substantial contributing factor with

10    the exposure.  It's also the same substance.  It's whether this

11    defendant --

12         THE COURT:  This phrase has a statutory history now

13    but that's why I don't think -- I guess we're agreeing with

14    each other.  I don't think that statute is particularly

15    helpful.  You agree with that, right?

16         MS. NIEHAUS:  Correct.

17         THE COURT:  I think there's a long history in

18    automobile case, other types of torts where the substantially

19    contributing factor language plays a big role in the causation

20    theory in Ohio.  That's why I suggest if you have a few

21    moments, take a look at that after we break.  And this one I

22    will take under advisement.

23         MR. DENTON:  Just one final point on that, Judge.

24         Dr. Bahnson specifically gave the opinion that C-8 was a

25    substantial contributing cause to her cancer.  I'm sure you

Vol. 15 -   21

1    probably heard that.

2           THE COURT:  Yes.  And I think the evidence -- I don't

3    think the issue, in my mind, is whether the evidence supports

4    that theory but the case law does.

5           MR. DENTON:  Yes, Your Honor.

6           THE COURT:  We'll hold on that one.  This is an

7    important one.  Obviously we want to get it right.

8           All right.  That takes us to instruction number 23 on

9    page 24.  Are there any objections?

10          MR. FAZIO:  No objection, Your Honor.

11          MR. DENTON:  We have no objection, Your Honor.

12          THE COURT:  And how about instruction number 24 which

13   is on page 25?

14          MR. DENTON:  Your Honor, Plaintiff does have an

15   objection.  At the end of the third bullet point, we believe it

16   should read, DuPont's negligence proximately caused

17   Mrs. Bartlett's injuries.

18          THE COURT:  Take out the parenthetical?

19          MR. DENTON:  Yes, Your Honor.  Because they are

20   instructed --

21          THE COURT:  It's already in the instructions that they

22   can't decide.

23          MR. DENTON:  Right.

24          THE COURT:  All right.  I'm inclined to take that out.

25          MR. MACE:  We would object to that, Your Honor,

1    because that general instruction is varied elsewhere.  This is

2    the law.  We also had some additional similar language we had

3    asked for under Gedra, but we're not going to insist on that as

4    long as you keep the parenthetical in there.

5           THE COURT:  I think if we go back, I think that's

6    already on page 16.

7           MR. DENTON:  It is, Your Honor.

8           THE COURT:  If you are unable to determine which side

9    of as issue has the preponderance, then the party having the

10   burden of proof loses, basically.

11          MR. DENTON:  Correct.

12          THE COURT:  So I'll note your objection.  We'll take

13   that out.

14       And then we turn over to the battery claims, instruction

15   number 25.

16          MR. FAZIO:  I'm sorry, Your Honor.  Just before we

17   move on.  One housekeeping issue there.

18       I think in the fourth line of the instruction

19   Mrs. Bartlett's name is misspelled.

20          MR. DENTON:  Yes.

21          THE COURT:  You're right.  We'll fix that.  Thank you.

22       Number 25, battery-generally.

23          MR. DENTON:  Your Honor, these instructions are

24   difficult.  The pattern instruction which is basically, I

25   think, what the Court has suggested.  Battery is a common term

1    that lay people seem to understand and equate with a punch in

2    the face or barroom brawl or something like that, a physical

3    striking.  The pattern instruction, you know, sets forth that

4    type of tort.

5         Here, the harmful conduct or offensive conduct that is

6    alleged is C-8 in drinking water.

7         THE COURT:  Right.

8         MR. DENTON:  And we had, you know, previously tendered

9    an alternative instruction trying to be more case specific on

10   this so that the jury understands that the offensive conduct

11   that's alleged is the C-8 in her drinking water.

12        THE COURT:  Actually if you don't mind, put this

13   together with the next page and see if you think that that's a

14   problem.  We're saying exactly what you're talking about.  In

15   other words, with the first page 26 where it's somewhat

16   ambiguous, page 27 where we have instruction number 26, it's

17   making it clear it's all about C-8, not about a punch in the

18   nose.

19        MR. DENTON:  Well, that's true.  The other problem we

20   have or would object to, respectfully, to the Court's

21   instruction number 26, is that you have two definitions of

22   intent in the disjunctive (a) and (b).  Our evidence is (b)

23   only.  We think (a) should be removed.  Because it's a

24   disjunctive definition I think we can ask for only that be

25   given and we would respectfully have the Court --

1    THE COURT:  Take out the (a) and (b) and just go right

2  to, means that DuPont knew with substantial certainty?

3    MR. DENTON:  Yes.

4    MR. MACE:  We object to that, Your Honor.  Clearly,

5  battery is an intentional tort.  The intent can be inferred

6  with substantial certainty but the jury is entitled to hear

7  that that's an intentional tort.

8    THE COURT:  But there's no evidence that DuPont

9  intended to hurt somebody.

10    MR. MACE:  I didn't hear any.

11    THE COURT:  Normally you're not entitled to an

12  instruction if there's no evidence to go with it.

13    MR. MACE:  But in terms of defining what the legal

14  claim is.  The legal claim is an intentional tort but the

15  intent can be inferred.

16    THE COURT:  If they would find (a) they wouldn't be

17  asking this specifically.  Hypothetically, at least, the

18  evidence doesn't support it, they can't return a valid verdict.

19  So I'm inclined to take out (a) and (b) and just leave it right

20  to -- when I say (b) I'm not taking out what follows (b) but

21  just the heading (b) on page 27.

22    MR. MACE:  So, Your Honor, you're going to leave in on

23  page 27 the first sentence up through (a), take out (a) and go

24  to (b)?

25    THE COURT:  Yes.  So say, in this context, intent

Vol. 15 –     25

1     means that DuPont knew with substantial certainty.

2          Anything else on pages 25 and 26?

3          MR. DENTON:  Instruction number 26, Your Honor.  I

4     think the last word should be contact instead of conduct.  I'm

5     not sure.

6               MR. MACE:  I think that's right, Your Honor.

7               THE COURT:  Contact you agree upon?

8               MR. MACE:  Yes, sir.

9               THE COURT:  All right.  Then we will fix that.

10          Anything else on those two pages?

11          MR. FAZIO:  Yes, Your Honor.

12          On instruction number 25, subpart (2) it describes an

13     offensive contact with Ms. Bartlett directly or indirectly

14     resulted.  And the directly or indirectly we couldn't locate

15     the origin of that particular phraseology and the OJI pattern

16     it refers to proximate cause.  So we think that directly or

17     indirectly should be replaced with proximately resulted.

18               THE COURT:  Any objection?

19               MR. DENTON:  No.  Not to that language, Your Honor.

20     But we still have the overall objection to the instruction we'd

21     like to preserve.

22               THE COURT:  We can do that.

23          All right.  So anything else on 25 or 26?

24               MR. FAZIO:  Not from the defendant, Your Honor.

25               MR. BROGDON:  Your Honor, we just note that there is

Vol. 15 —   26

```
 1    the same spelling with Ms. Bartlett as well.  Maybe just check
 2    that globally.
 3              THE COURT:  I see it.  We'll check that.
 4          I think that takes us then to 28.  Any objections?
 5              MR. DENTON:  Your Honor, yes, on instruction number
 6    28.
 7              THE COURT:  I'm sorry, excuse me.  I'm on page 28.
 8              MR. DENTON:  I'm sorry, Your Honor.
 9              THE COURT:  It's instruction number 27.  It's a
10    summary.
11              MR. DENTON:  No objection to that one, Your Honor.
12              MR. FAZIO:  No objection, Your Honor.
13              THE COURT:  Now we're to 28.
14              MR. DENTON:  I'm sorry.  My page numbers are
15    inconsistent with what the Court has.
16              THE COURT:  Mr. Denton, on 28, instruction number 28,
17    page 29.
18              MR. DENTON:  Instruction number 28 is really the same
19    issue.  And I understand, I believe, this is the pattern
20    instruction, but it's the same issue in paragraph number 3,
21    motion for distress was a direct result of the negligence.  I
22    think that should be proximate result.
23              THE COURT:  Any objection for inserting the word
24    proximate?
25              MR. FAZIO:  No objection, Your Honor.
```

Vol. 15 -   27

1          THE COURT:  That change will be made.  Thank you.

2      Then we'll go to instruction number 29 on page 30.  Any

3  objection?

4          MR. DENTON:  None from the plaintiff, Your Honor.

5          MR. FAZIO:  Yes, Your Honor.

6      DuPont objects to instruction number 29 in its entirety.

7  As you know, Ms. Bartlett is bringing her negligent infliction

8  of serious emotional distress claim premised on a so-called

9  cancer phobia claim; that is, that she was exposed and as a

10  result of her exposure she's at -- she's fearful of an

11  increased risk in the future of developing kidney cancer yet

12  again.  Our read on the law on this front is that for a

13  negligent infliction of serious emotional distress claim, as we

14  argued in the past, under those circumstances there does need

15  to be severe debilitating emotional distress which, as the

16  Court had previously ruled, she's not suffered and there's no

17  evidence of it in the case here.

18          MR. MACE:  We would also argue, Your Honor, on the

19  facts that the only evidence they tried to put in on this was

20  Dr. Bahnson.  Dr. Bahnson did not say that she had an increased

21  statistical likelihood.  So she cannot have a reasonable

22  apprehension.  So both on the law and the fact, Your Honor.

23          THE COURT:  We've been through the first issue that

24  was just raised by Mr. Fazio and I'm just going to be

25  consistent on that.  I also at this point think that's the

Vol. 15 -    28

1    correct legal position to take.

2        The issue is it's not that she has to prove by a

3    preponderance that she has a greater chance but that she has an

4    increased statistical likelihood and greater chance.  I

5    remember Dr. Bahnson talking about, independent of C-8 even,

6    about asking her to be regularly tested, much more often than a

7    person who didn't have future risk.  Then later he testified

8    about what he saw as the effect of continuation of C-8 in her

9    system.

10       So if you are asking me was there enough evidence to

11   show by a preponderance that she's at greater risk, probably

12   not.  But a greater statistical likelihood I think there's

13   enough here for it to go.

14       So if there's any language issues, we'll preserve your

15   objection and go to those.  But if there's not, we'll just keep

16   this as objected to and go forward.

17           MR. FAZIO:  Your Honor, our issues are not language

18   issues.  They're substantive issues.

19           THE COURT:  So with the objection noted, we'll go to

20   instruction number 30.  And with all these, that objection

21   will, of course, continue.

22       Any objection to instruction number 30 on page 31?

23           MR. DENTON:  No objection from Plaintiff, Your Honor.

24           MR. FAZIO:  No objection, Your Honor.

25           THE COURT:  Then we go to 32, the conclusion.  Any

Vol. 15 -   29

1    objection?

2         MR. DENTON:  Instruction number 31, Your Honor?

3         THE COURT:  Yes.  On page 32.

4         MR. DENTON:  There is a typo in the title.

5    Conclusion, I think.  Or am I wrong?  No, I guess that's right.

6    Sorry about that.

7         Other than that, Your Honor, we have no objection.

8         MR. FAZIO:  No objection, Your Honor.

9         THE COURT:  Then we'll turn to damages on instruction

10   number 32.  Any objection?

11        MR. DENTON:  Not from the plaintiff, Your Honor.

12        MR. FAZIO:  Your Honor, in the proposed joint

13   submission, I believe it was, there was a sentence that

14   included or stated, you must be cautious in your consideration

15   not to overlap or duplicate the amounts of your awards which

16   would result in double damages, that the Court removed.

17        THE COURT:  And my thinking was, and I'm jumping ahead

18   on you, there are three verdict forms, one for each claim.  And

19   I found in the past with claims like these we get three

20   numbers, potentially, or two numbers.  You're hoping for no

21   numbers but just thinking negatively for a moment.  I would

22   look at three verdict forms and not know, are these

23   collectively the same?  And oftentimes they're the same three

24   numbers.  Do they mean times three or do they mean one amount

25   of damages but they found in each claim?  So we put a fourth

Vol. 15 -    30

1   verdict form in that asks them for the total damages.

2            MR. MACE:  When we get there, we have a suggestion for

3   you on the verdict forms.

4            THE COURT:  And I'm not passing on this at this point

5   but it asks them what is the total sum.  And that was designed

6   to avoid the double or triple accounting.

7            MR. MACE:  Our problem with that, Your Honor, we'll

8   talk about when we get to the forms, we think it's exacerbated

9   the risk.

10           THE COURT:  I'm sorry?

11           MR. MACE:  We think it has exacerbated the risk.

12           THE COURT:  We'll talk about that.

13       Any objection about duplicating damages, the sentence

14   that you had submitted?

15           MR. DENTON:  Your Honor, we think that if you're going

16   to give the verdict form you're suggesting, we need to talk

17   about this together.  But so in other words --

18           THE COURT:  We left open proximate cause and we will

19   come back to this when we get to the verdict forms.  We'll just

20   call this double damages, for lack of a better phrase.

21       Anything else with regard to that page?

22           MR. DENTON:  No, Your Honor.

23           MR. FAZIO:  No, Your Honor.

24           THE COURT:  And then instruction number 33 on page 34.

25           MR. DENTON:  Your Honor, other than the typo, I think,

1    in the caption, compensatory, you've got one, two, three

2    elements.  It seems to us that pain and suffering should drop

3    down to be a third and then because you do have a semicolon

4    there.  It's different than the effect upon physical health.

5         THE COURT:  I see.  That should be (3).

6         MR. DENTON:  Correct.

7         THE COURT:  And then (3) becomes (4) is what you're

8    proposing.

9         MR. DENTON:  Yes, Your Honor.  Otherwise, we have no

10   other comments on this.

11        THE COURT:  Any objection if we do that?

12        MR. FAZIO:  No, Your Honor.

13        THE COURT:  We'll do that.  That takes care of

14   instruction 33 on page 34.

15        Then we get to future damages, instruction number 34 on

16   page 35.  Any objection?

17        MR. DENTON:  No objection from Plaintiff.

18        MR. FAZIO:  No objection, Your Honor.

19        THE COURT:  I think you agreed on the next one,

20   instruction number 35 about taxes.

21        MR. DENTON:  Correct.  No objection.

22        MR. FAZIO:  No objection, Your Honor.

23        THE COURT:  And we're getting into the punitive

24   damages here.  I note the defendant's continuing objection.

25   But with that, let's look at the language.  Any objection to

1    the language on page 37 as far as instruction number 36?

2              MR. MACE:  Your Honor, on behalf of the defense, the

3    second sentence.  Instead of, if you indicate that you did, the

4    second sentence, if you find for Mrs. Bartlett.  You already

5    changed that, right?  You changed that already, right?

6              THE COURT:  Yes.  That's the new language.  There is a

7    language problem here still though.  You'll be asked whether

8    Mrs. Bartlett proved by clear and convincing evidence, I think

9    that should be whether.  It should read whether DuPont acted

10   with actual malice and whether Mr. Mrs. Bartlett has presented

11   proof of actual damages.  Change the word that to whether.

12             MR. MACE:  Yes, sir.

13             THE COURT:  Anything else on that page?

14             MR. MACE:  You just said you're going to change the

15   other that in front of DuPont to a whether.  Clear and

16   convincing evidence whether DuPont acted --

17             THE COURT:  Yes.  There will be two whethers.

18             MR. MACE:  Okay.

19             THE COURT:  That takes care of instruction 36 on page

20   37.

21        Then we get to instruction 37, the definition of clear

22   and convincing evidence.  Any objection?

23             MR. FAZIO:  No objection, Your Honor.

24             MR. DENTON:  No objection.

25             THE COURT:  And the definition of malice on

Vol. 15 –   33

1    instruction number 38, page 39.  Any objection?

2            MR. DENTON:  None from the plaintiff, Your Honor.

3            MR. MACE:  Your Honor, we believe that the case law

4    supports instead of the words great probability, substantial

5    certainty.  Near certainty is actually what the Supreme Court

6    used.

7            THE COURT:  This comes from OJI.

8            MR. MACE:  There's been a subsequent case.

9            MR. FAZIO:  Your Honor, the language from OJI is what

10   appears in the instruction currently.  We had proposed an

11   additional sentence to explain the level of certainty that's

12   required in subpart (2) in the malice instruction.  Our

13   proposal was to include, quote, a great probability of causing

14   substantial harm, closed quote, means a near certainty that

15   substantial harm will occur.  That's taken from *Motorists*

16   *Mutual v. Said* and a number of other cases.  It's not

17   necessarily included in the pattern instruction but it is well

18   established in the case law.

19           THE COURT:  Hang on just a moment.  Actually I'm

20   looking at OJI.  Here's what I'm thinking.

21       You have OJI handy, counsel?

22           MR. FAZIO:  I do.

23           THE COURT:  Let's go to the definition of malice.

24   This is what I would propose.  Under malice there's an (A) and

25   a (B).  We'll just put both in.

Vol. 15 –  34

1          MR. DENTON:  May I be heard?

2          THE COURT:  You may.

3          MR. DENTON:  Judge --

4          THE COURT:  By the way, that has the great probability

5    language in it, (B).

6          MR. MACE:  We agree that both those should be in but

7    we still have our issue of the further definition of great

8    probability.  One of the issues becomes, with this particular

9    set of instructions, Your Honor, we're throwing three different

10   standards at them.  The preponderance of the evidence, clear

11   and convincing evidence, neither of which are particularly

12   elucidating by themselves, and now we're saying great

13   probability.  We think it's well-defined in Ohio Supreme Court

14   case law what that means by the great probability is a near

15   certainty.

16         MR. DENTON:  If I may, Your Honor.

17         We've briefed this argument in the dispositive motions.

18   But, Your Honor, here's the problem.  The Supreme Court of Ohio

19   *Mutual Insurance Company v. Said*, 590 N.E.2d 1228, has clearly

20   said that great probability is synonymous with near certainty.

21         The problem with adding both of those in there is I

22   think they are confusing.  If they are synonymous, we should

23   use the definition in the pattern instruction because it

24   appears that, to wrap on Mr. Mace's argument, you've now

25   potentially added another standard in the very same

Vol. 15 - 35

```
 1    instruction.  It's very confusing.

 2        If they mean the same thing, according to the Ohio

 3    Supreme Court, I think we should stick with the pattern

 4    instruction.  It's going to be very confusing.  I just don't

 5    see why that should be added because it throws out another

 6    standard.

 7            MR. MACE:  We have no problem with substituting, Your

 8    Honor.  In fact, that was what we had initially proposed.

 9            MR. DENTON:  We're not agreeing.

10            MR. MACE:  Instead of great probability, you would use

11    the words near certainty.

12            THE COURT:  Let me ask you this.  Under malice, I did

13    not use part (A) of OJI.  Is anybody urging me to do that?

14            MR. MACE:  We had asked for that, Your Honor.

15            THE COURT:  What's the plaintiff's view?  This is the

16    part that says --

17            MR. DENTON:  No, Your Honor.  It's the disjunctive

18    definition and it's the one that doesn't apply to the evidence

19    in the case.  There's no evidence that --

20        The Court's already spoken on that.  There's no

21    evidence.

22            THE COURT:  That's not in right now.  We'll keep that

23    as is.  So the question is whether or not we --

24            MR. BILOTT:  Your Honor --

25            THE COURT:  One moment.
```

1          The real issue is, do we add near certainty to go with

2     great probability?  That's the divide, right?

3          MR. BILOTT:  Yes, Your Honor.  And I believe this was

4     the exact argument that DuPont already raised when it was

5     moving for briefing on the directed verdict for punitive

6     damages and the Court already addressed this.  So this is the

7     same argument we're hearing again.

8          THE COURT:  I'm going to take another look at this.

9     You'll have this all answered this afternoon.  But this is the

10    third issue that I'm holding.  Proximate cause, double damages

11    and the definition of malice.  I'll take another look at that.

12         MR. MACE:  There were two issues, Your Honor.  And I

13    know we preserved everything but I really just wanted to

14    emphasize two that we asked for that aren't in here currently.

15         So we had asked in our proposed instruction 20, you were

16    instructed that, under the circumstances here, DuPont did not

17    have a duty to disclose information to Mrs. Bartlett and you

18    may not find DuPont liable for any claim of nondisclosure or

19    failure to disclose.

20         THE COURT:  We just have a difference of opinion on

21    that.  I understand.  I held there's no fiduciary relationship

22    here.  No question.  But in a situation where somebody is

23    putting something into play, it's not like a real estate broker

24    or trustee of a trust.  It's not a duty to disclose.  It's a

25    duty not to harm.  I think that's what's all through the

Vol. 15 –   37

1    instructions.

2         There's nothing in here that I could read that says

3    we're telling the jury that if they found there was a duty to

4    disclose that was violated, that somehow that makes DuPont

5    liable.  It's a duty to do no harm under the circumstances.

6         MR. MACE:  Yes, sir.

7         THE COURT:  I'll preserve that.

8         MR. MACE:  The second one, sir, was our proposed

9    instruction 27.  The mere fact that an injury has occurred,

10   standing alone, does not permit you, the jury, to draw any

11   inference that such an injury has been caused by anyone's

12   negligence or fault.

13        That instruction has been given in a number of cases.

14   We've cited you authority.  *Metzger v. Pennsylvania and Ohio*.

15   But in this type of case that's an often-given instruction we'd

16   ask for here.

17        THE COURT:  You object to that?

18        MR. DENTON:  Yes, Your Honor.

19        THE COURT:  It's not incorrect but I think it's said

20   very clearly in that there has to be a causal link made and I

21   think that covers it.  So I'll note the objection to both of

22   those.

23        So I think that takes us to the rest of the instructions

24   that weren't objected to.

25        Mr. Butler?

1          MR. BUTLER:  One other note on number 38.

2          THE COURT:  I've had you in court a lot but this is

3     the first time I've had you speak in this case, I think.

4     Welcome.

5          MR. BUTLER:  I just wanted to highlight.  You said you

6     might go back and look on number 38.  In DMO11 --

7          THE COURT:  Which one is 38?

8          MR. BUTLER:  That's the malice that we were just

9     talking about.

10         In DMO11, the Court just ruled in the denial of directed

11    verdict on punitive in DMO11, page 5.  The Court noted that

12    there's no improper avoidance of the applicable standard in

13    Mrs. Bartlett's memorandum by referring only to the phrase

14    great probability instead of near certainty and cited that

15    *Motorists Mutual v. Said* case.

16         THE COURT:  I'll take a look at it.  Thank you.

17         So I believe this takes us over to the verdict forms.

18         MR. MACE:  And we had a proposed that Mr. Fazio could

19    hand up to the clerk, Your Honor.

20         THE COURT:  All right.

21         MR. MACE:  The logical construct, Your Honor, is to

22    have the jury rule yes or no on each of the three claims being

23    raised, has she proved the elements by a preponderance.  And

24    then they're directed by their answers to that.  If they find

25    yes for any one or more of those, what's the amount of damages?

Vol. 15 -   39

1    That is the logical construct.

2         THE COURT:  There's several issues here.  Let's start

3    with that one.

4         So the damages, there's three I would call -- we put

5    these on separate pages, but three verdict forms, one for each

6    count.  And then no damage is assessed per count and then you

7    fill out those three verdict forms, the fourth verdict form

8    would aggregate, basically, and say, what sum of money do you

9    believe compensates Mrs. Bartlett?

10        How does the plaintiff feel about that structure?

11        MR. DENTON:  Your Honor, I think we have a problem

12   when we talk about the -- for sure the severe emotional

13   distress claim, the fear of cancer.  Because, as the Court has

14   pointed out, there doesn't have to be a preponderance -- there

15   doesn't have to be more than a 50 percent chance she will have

16   cancer.  It's just is there evidence to support that she is a

17   statistical increased chance of cancer.  I think that bundle of

18   damages, if the jury accepts that, is different than the

19   negligence.

20        THE COURT:  Right.  But they could, in theory at

21   least, aggregate that if they got to a fourth verdict form that

22   tells them to give us one number for all three.

23        MR. DENTON:  I believe that's what the Court has

24   proposed in your instructions, what is the total sum.

25        THE COURT:  There are two -- they could find -- you're

Vol. 15 -    40

1    right.  The third claim, in theory, has different damages than

2    claims one and two.

3          MR. DENTON:  Correct.

4          THE COURT:  But they could put that all together in a

5    single number or they could do it separately.  What I

6    definitely am not in favor of would be three verdict forms and

7    no question of any kind to them about, do we add these together

8    or are they to be treated as the highest number being the sum

9    of all of them?

10          MR. DENTON:  I think, clearly, we have to make sure

11   that, as the Court's talked about, that there's not double

12   damages.  From our perspective, we want to make sure that we

13   don't miss damages that the jury intends to award.  And if the

14   Court does it separately and then asks them to give a total

15   number, as you have proposed --

16          THE COURT:  What would typically happen is, let's say

17   they come back with $50,000 on one, 50,000 on one, 100,000 on

18   the other, the question becomes is it 200,000, is it 150 or is

19   it 100?  Normally the jurors know exactly what they mean by

20   that.  But they have to tell us.

21          MR. DENTON:  Right.

22          THE COURT:  That's the key.

23          MR. MACE:  And that's where we've tried to eliminate

24   the confusion and say do you find for her on any these claims

25   and, if any, what's the amount of the award?  It's much

Vol. 15 -    41

1    clearer.

2            THE COURT:  In my mind it's a matter of which one is

3    preferable.  I don't think any of them are incorrect.

4            MR. DENTON:  We would, Judge, have -- we do think the

5    Court's question --

6            THE COURT:  We'll come to the question.

7            MR. DENTON:  I have a problem with the question.

8            THE COURT:  I think we ought to finalize how we do the

9    damages, by claim or in the aggregate?  One last word from each

10   of you then we need a decision.

11           MR. MACE:  I feel, Your Honor, very strongly that it's

12   inviting error to divide it up as you have.  In 30 some years

13   of practice I've never seen it done that way in this type of a

14   case.  So we strongly --

15           THE COURT:  I'm older than you are.  I have 37 years

16   of practice.  When someone throws that number out --

17           MR. DENTON:  I only have 32.

18           MR. MACE:  I'm going to add Mr. Fazio's 25 year.

19           THE COURT:  I find many times where we send the jury

20   back in the beginning of the time here.  I don't do that

21   anymore.  We always get a very clear answer.  They knew exactly

22   what they meant.  There was no more discussion.  It was just

23   cleaning up a clerical error.  I don't think there's magic

24   here, I just think there's just a need for clarity.  That's all

25   we're looking for.

1        If they were all overlapping claims, I'd be very happy

2   to give the instruction Mr. Mace proposes.  If there were

3   claims one and two, for example, but not three.  I think

4   there's just the possibility, at least, of a different analysis

5   with each one of these claims.  So I'm inclined to stay with

6   that, the way we have it, with the aggregation question at the

7   end.

8        The issue that has been raised by Mr. Denton has to do

9   with the framing of each verdict question.  So you may address

10  that, if you like.

11       MR. DENTON:  Your Honor, I apologize.  I was listening

12  to Mr. Bilott.  Is the Court inclined to give the verdict forms

13  separately like the Court proposed with the aggregate at the

14  end?

15       THE COURT:  Yes.

16       MR. DENTON:  We're fine with that.  Frankly, Your

17  Honor, we believe the way you've simply asked the jury to say

18  yes or no is appropriate.  I don't think we need to get in and

19  repeat.

20       THE COURT:  I want to be clear.  And I'll hear from

21  Mr. Mace.

22       The last instruction on each claim tells them that they

23  will only find for Mrs. Bartlett if she proves each and every

24  element by a preponderance of the evidence.  We told them that

25  at least four times in the instructions.  Does it really need

Vol. 15 -   43

1   to be in the verdict form?

2          MR. MACE:  We ask for it, Your Honor.  That's how it's

3   typically done.

4          THE COURT:  I'm inclined to stay with the way it's

5   proposed and what I had sent.

6          Anything else with regard to those actually four verdict

7   forms?

8          MR. DENTON:  Yes, Your Honor.

9          At least the way we printed it out there appears to be

10  typos after the signature lines of each juror.  Maybe it's not

11  on the Court's version but ours prints out with a typo.  If you

12  answer question one as --

13         THE COURT:  Which one are you on?

14         MR. DENTON:  I'm on your form, Your Honor, your jury

15  verdict form.

16         MR. MACE:  I think what's intended is quote marks

17  prints out as an A and an asterisk or ampersand.

18         THE COURT:  You're losing me here.

19         MR. MACE:  If I could approach the deputy clerk.  I'll

20  need it back though.

21         But I think what's intended is to have the words in

22  quotes but it comes out as a character.

23         THE COURT: Yes.  That's not on mine.  Okay.  We'll

24  get you clean copies.

25         Anything else on those forms?

Vol. 15 –    44

 1          Then there's the interrogatory.

 2          MR. MACE:  I think the additional --

 3          THE COURT:  Then we have the jury interrogatory with

 4   regard to the punitive damage issue.

 5          MR. MACE:  I think it comports to what you said you

 6   were going to give, Your Honor.

 7          THE COURT:  So there's no objection to that other than

 8   what we've already talked about?

 9          MR. MACE:  Other than what's been preserved, Your

10   Honor.

11          MR. DENTON:  No objection.

12          THE COURT:  So I think, just so we're clear, that

13   leaves three issues.  I think the double damage issue has

14   disappeared.

15          MR. MACE:  Actually we think it's heightened, Your

16   Honor.  In fact, we would ask that you put it in that -- your

17   verdict form total damages.  So you say now, Your Honor, if you

18   found that Mrs. Bartlett was entitled to damages on any of her

19   claims, what is the total sum of the amount of damages you

20   found Mrs. Bartlett is entitled to, without duplicating

21   damages.

22          THE COURT:  Any objection?

23          MR. DENTON:  No.  Not to that issue.

24          THE COURT:  All right.  So if you found Mrs. Bartlett

25   is entitled to, without --

Vol. 15 -    45

1          MR. MACE:  Duplicating any damages.

2          THE COURT:  Duplicating any damages.

3          MR. MACE:  And if we have it here you probably don't

4    need to put it in the instruction.

5          THE COURT:  All right.  I'll add that.  And that takes

6    care of the double damage.

7          So we're left with two issues.  I do want to spend some

8    time on these.  The definition of malice and definition of

9    proximate cause.

10          So what I would propose, how long do you think it would

11    take to go through the exhibits?  Looks like we have --

12          MR. MACE:  I'd be surprised if it took a half hour,

13    Your Honor.

14          MR. DENTON:  We've made a lot of progress over the

15    weekend.

16          MR. MACE:  Again, the parties want to preserve their

17    past but --

18          THE COURT:  Right.  What I'd recommend then, why don't

19    we take not a super long lunch break but a little bit longer

20    one.  Come back here about 1:30 and be prepared to discuss

21    these remaining two issues on the jury instructions and then

22    we'll move right into the exhibits and we should be able to

23    wrap all these up pretty quickly.

24          MR. MACE:  Yes.

25          THE COURT:  Very good.  With that, we'll be in recess.

Vol. 15 -    46

1          (A recess was taken at 11:41 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 15 -   47

1        Monday Afternoon Session,

2        October 5, 2015.

3        2:11 p.m.

4              – – –

5        THE COURT:  I apologize for the delay.  I've been

6   hitting the books the last couple of hours.

7        The two issues, one I think is easier than the other.

8   Let me address the issue of actual malice.

9        This is not determinative but I just note this *Motorists*

10  *Mutual v. Said* case from the Ohio Supreme Court actually was

11  some time before the most recent iteration of the OJI

12  instruction on malice.  So they were aware of this case.

13       I don't think there's any dispute that these two

14  phrases, near certainty and great probability, are describing

15  the same thing.  I think it would be confusing to put them both

16  in the instruction.

17       So I will hear from either of you whether you want near

18  certainty or great probability.  OJI says great probability but

19  I think it's six of one, half dozen of the other, but not both.

20       MR. MACE:  We've argued for near certainty.  We think

21  that's a clearer term, more in accord with lay language that's

22  used.  We argue strongly for that.  Particularly it seems like

23  all three of us are in agreement, the defense, the plaintiff

24  and the Court, that they mean the equivalent.

25       MR. DENTON:  Your Honor, I did also hit the books over

1    the noon hour and interestingly, looking at the history of this

2    case law, the *Preston v. Murty* case was the original Ohio

3    Supreme Court case that talks about substantial certainty.

4         We get to the *Motorists Mutual* case where they -- and in

5    *Preston*, great certainty or near certainty language is not in

6    that opinion, interestingly, because in the *Motorists Mutual*

7    case where the near certainty language first appears it refers

8    back to *Preston* and that language is not in *Preston*.

9         The Court may have well been aware of that.

10        THE COURT:  I have great regard for appellate courts

11   but they oftentimes take a phrase and then just sort of

12   reiterate it and now you've got two ways of saying the same

13   thing.  I think with juries we want to stick with one.  So I

14   could kid you and say we can take great probability versus near

15   certainty and make it near probability or great certainty but I

16   don't think that's going to work.

17        MR. DENTON:  Your Honor, we want great -- we would

18   request great probability.

19        THE COURT:  I'm going to stay with the OJI instruction

20   on that and say great probability.

21        I think the much harder issue, and I know it's important

22   to both sides, I have spent a lot of time looking at this, is

23   the issue of proximate cause.  Let me tell you what I found.  I

24   want to hear your comments before I decide because I'm still at

25   the stage where I could at least be somewhat persuaded.  I'm

Vol. 15 -   49

1   going to be just a bit wordy.  You can tell me if you agree or

2   disagree with what I'm about to say.

3        So we start with the fact, I don't think there is,

4   relatively confident, a Supreme Court case in Ohio that has

5   addressed this.  That would be a nonasbestos case.  There were

6   some references prior to the statute that now incorporates an

7   asbestos case as the phrase substantial certainty.  I know that

8   doesn't apply in our case.  Actually to quote exactly,

9   O.R.C. 2307.96 talks about the plaintiff's exposure to the

10   defendant's asbestos was a substantial factor in causing

11   Plaintiff's injury or loss.  They used the phrase substantial

12   factor in several places.

13        And I know that there's been an argument from DuPont

14   that that's limited to asbestos cases.  It may very well be.

15   But it's a phrase that's in a lot of the case law in Ohio, not

16   in the Supreme Court.  At least since the statute was passed.

17        I just want to go through a number of things.  Oddly,

18   the place I start is this U.S. Supreme Court case that doesn't

19   control our case but it frames the issue.  Quick quiz.  It's

20   Burrage, B-U-R-R-A-G-E, versus United States.  Anybody come

21   across that over the last couple years?

22        Mr. Mace, you're from the Cleveland area.  Remember the

23   Amish beard-cutting case?

24          MR. MACE:  No, but I'm willing to research it, Your

25   Honor.

1      THE COURT:  It was a big trial in Cleveland.  You had

2   to follow that case somewhere along the way, Judge Polster.

3      MR. MACE:  The beard cutting, yes, sir.

4      THE COURT:  Right.  So a quick story.  Judge Polster,

5   this is a statute that says, I'll read it, basically the

6   statute says that when someone sells a drug, the exact phrase

7   is, and death results, there's a mandatory 20-year sentence.

8      This case, Judge Polster tried a beard-cutting case that

9   had a caused by, a crime of violence had to be caused by

10  someone -- a list of things and one of them is religion.  He

11  used the substantially contributing language in that case as

12  the causal link and this was before *Burrage*.

13     So by the time it got to the Court of Appeals*, Burrage*

14  had been decided.  I ended up sitting on the panel that

15  considered this case.  I will tell you before we go any

16  further, I was the odd man out, I dissented.

17     But this case actually does a tour de force of causation

18  and it goes through civil cases as well.  And I'll just read,

19  this is a good starting point:  The government appeals to a

20  second less demanding line of authority under which an act or

21  omission is considered a causing fact if it was a substantial

22  or contributing factor in producing a given result.  Several

23  state courts have adopted such a rule.

24     In fairness, I know they cite four states and Ohio is

25  not one of them.  But they do cite Restatement of Torts,

1    Second, they cite Prosser.  So there is a fair amount of

2    jurisprudence just in the abstract before we get to the Ohio

3    cases.

4         In the Supreme Court case, though, they were looking at

5    really three different things.  The substantially contributing

6    language was rejected.  In a criminal case it required caused

7    by to be proven by the government.  Then you get to two other

8    standards and I think this is what impacts our case.  One is an

9    a but for test and another is the but for test.  So I think

10   you're all familiar with that.  This is a nine to nothing

11   decision by the Supreme Court.  That alone caught my attention.

12   But it does sort of flesh out the different options we have

13   here.

14        So we turn to the Ohio case law.  I don't think there's

15   a Supreme Court case in Ohio and I think you can each cite to

16   me some things that sort of touch on this but they're not

17   definitive.  So we're left with a fair number of Court of

18   Appeals cases which unfortunately they're not -- in fact,

19   they're not consistent.  There is definitely one that goes the

20   defendant's way and I've quoted it's *Williams v. O'Brien* and it

21   is 1992 WL 348218 out of the Second District, Montgomery

22   County, and it rejects that language about a substantially

23   contributing issue.

24        There are a number of cases, though, for the plaintiff's

25   side that go that way.  And there's a cite of at least three or

1    four cases, Kelemen, K-E-L-E-M-E-N versus Williams, and that is

2    from the Tenth District Court of Appeals, Franklin County, and

3    it has a cite of four other cases that are in accord.  These

4    are all Court of Appeals cases.

5         As I know all of you know, a diversity case I'm to look

6    to the Ohio Supreme Court.  If the Court hasn't ruled then I

7    will look at the Courts of Appeals and do the best possible

8    estimate of what I believe the Supreme Court would do.  When

9    there's a split like this, that doesn't always help.

10        Then the final case that you may want to touch base with

11   me when we address is one from Judge Polster and that is the

12   name of the case is In Re: Gadolinium, G-A-D-O-L-I-N-I-U-M, and

13   this is a decision dated February 15, 2013 cited as

14   2013 WL 593993.  And he adopted the substantial factor test as

15   the causation.  He cites Restatement of Torts, Second and also

16   *Horton v. Harwick Chemical Corporation* that you cited to me.

17        That turns out to be an asbestos case so it's a bit

18   difficult to jive.  I do note that case was before the statute

19   so I suppose arguably it's certainly been changed according to

20   the statute as far as asbestos cases but I'm not sure it's been

21   overturned with regard to nonasbestos cases.

22        Then we go back.  OJI, to a certain extent, I think has

23   sort of passed on this.  They didn't adopt either.  The

24   language that I had included in the draft I gave you, I don't

25   think factually applies.  The language combined with the

Vol. 15 -   53

1    negligence of the defendant, this would be where you have

2    competing sources of negligence and you have to have some

3    testimony on that.  I don't think we do.

4        I can think of a number of permeations here that I'd be

5    happy to address with you first.  If there's anything you would

6    like to add to my legal analysis, I'd be willing to listen to

7    legal argument from either of you if you care to or we can move

8    right into language.

9        MR. MACE:  If I can make an initial comment then I

10   know Ms. Niehaus would like to supplement.  I've looked at this

11   quite hard, Your Honor.

12       THE COURT:  It's an important area.

13       MR. MACE:  I've worked in this area for quite a while.

14   This is probably one of the areas that Your Honor has seen that

15   the law is confused.  It hasn't -- there's not a lot of

16   clarity.  But in fairness, if you go back and trace where this

17   whole substantial factor came from, it comes in these

18   situations where it's acknowledged, essentially, that a certain

19   substance or factor caused the disease, but it's who supplied

20   that.

21       So whether it was somebody working in a certain person's

22   plant or whether it was a substance manufactured by a certain

23   Defendant, it's always of that collective -- there's been proof

24   that collectively that substance caused the --

25       THE COURT:  Let me pick up on that.  I don't

Vol. 15 -   54

1  necessarily disagree with that.  I'm going back to what the

2  Supreme Court used in *Burrage*.  As -- I view this substantially

3  contributing factor to be different than a but for test.  You

4  agree?

5       MR. MACE:  Absolutely I agree.

6       THE COURT:  But if you look closely, I know you have,

7  at the OJI instruction, it ties the two together.  It's

8  connected by an and.  Go back to my instruction that was just a

9  draft.  I haven't decided on this yet.  It goes to the fact

10 that some other cause combined with the negligence of the

11 defendant does not relieve the defendant from liability.  And

12 then it goes on to say, unless such other cause would have

13 produced the injury.

14      That's a but for test.  You agree?  That's in the OJI

15 instruction.

16      MS. NIEHAUS:  Your Honor, I'm sorry to interject.

17 That part of the OJI is actually under the several causes

18 optional section.  So it only comes into play if you have

19 several combined -- potentially combined forces.

20      THE COURT:  That's right.  And that's why I don't

21 think it factually applies here.  But this is a case with

22 competing causes asserted by each side.

23      MS. NIEHAUS:  Right.  They're competing causes.  It's

24 not combined force case.

25      THE COURT:  No.  Let me analogize to the beard-cutting

1  case.  Some of the defendants who were accused of cutting the

2  beards, they were accused of cutting the beards of their

3  relatives with whom they had had domestic disputes.  So the

4  issue there was, was it religion-based or it was

5  domestic-relations-based?  And they were separate issues as

6  well.  And the Court of Appeals sent the case back saying, the

7  jury should have considered both causes in deciding which

8  one -- it's a criminal case so the substantially contributing

9  factor was not permitted.  It's a causation.

10       You have to have at least two, of course, but you have

11  two here.

12            MS. NIEHAUS:  Well, but they're competing.

13            THE COURT:  They are.

14            MS. NIEHAUS:  There's only one possible proximate

15  cause here.  It's either C-8 or it's something else.  And those

16  are competing causes, they're not combined causes.

17       The *Kelemen* decision that you cited and the plaintiffs,

18  I think, are relying on for the substantial contributing factor

19  or substantial contributing cause analysis, it's a driveway

20  case.  It's an implied warranty of merchantability case.  The

21  issue there was, was it -- there was a supplier and a

22  contractor and the issue was, was it the supplier failing to

23  meet specifications, essentially, or was it the contractor

24  failing to add enough water or adding too much water, or was it

25  a combination of the two.

1          THE COURT:  Right.  We don't have much testimony on

2     combination.  Dr. Bahnson touched on that a little bit, didn't

3     he?

4          MS. NIEHAUS:  Actually, Your Honor, when we moved,

5     when we filed our Daubert motions, they had Dr. Margulis who

6     was going to come in and say that there was a potential

7     synergistic effect here.

8          THE COURT:  We didn't hear any of that, of course.

9          MS. NIEHAUS:  You excluded it because it was

10    completely hypothetical and speculative.  There's no

11    scientifically reliable testimony, there's no admissible

12    evidence in this case of a combination between obesity and C-8.

13    And we believe that allowing the jury to speculate, allowing

14    the jury to consider an instruction that incorporates

15    substantial-contributing-factor-type of analysis or language

16    would be inviting error.  It would be inviting the jury to

17    speculate there could be synergistic --

18         THE COURT:  It seems to me, on your side, the

19    important language is without which, where we put this phrase,

20    without which it would not have occurred.  That's but for

21    language.  That's not --

22         MR. MACE:  But both apply, Your Honor.  I don't think

23    anybody is disputing that in order to prove causation you have

24    to prove but for causation.  That's part of proximate cause but

25    it's not all of it.

1          THE COURT:  Well actually in *Burrage* the Supreme Court

2    disagrees with that.  They say that the but for is a higher

3    test, a more stringent test for a plaintiff, or the government

4    in that case, compared to a substantially contributing factor

5    issue.  This was a case with four or five drugs being used by a

6    person and the person dies.  They were trying to sort out, was

7    heroin the cause of death or not?  They didn't have testimony

8    that it separated it all out and there's no doctor who could

9    say without the heroin the person wouldn't have died.

10         So that language always struck me as but for language

11   which is tougher than substantially contributing factor

12   language.  And OJI does include that language in their

13   permeation.

14         MS. NIEHAUS:  But again, it includes the language if

15   you have potentially --

16         THE COURT:  Combined.  I don't want to get thrown off

17   by the -- can you read with me if I -- one way to fix this, and

18   this is not what I'm doing at this point but this is what I'm

19   thinking about.  If you go to the second paragraph that started

20   with, there may be more than one proximate cause.  Or better

21   yet, we just say proximate cause is an act or failure to act

22   that was a substantial factor in bringing about an injury and

23   without which it would not have occurred.

24         Without which it would not have occurred seems to me to

25   put you back where you want to be.

1       MS. NIEHAUS:  I think, though, we're confusing two

2  different scenarios with that type of instruction.  Any

3  instruction that leads the jury to believe that they could find

4  that C-8 combined with some other force to cause her kidney

5  cancer --

6       THE COURT:  No.  That's where I think OJI gets us off

7  into right field.  I agree with you, there's no evidence.  What

8  I just read didn't have that other combined -- the word

9  combined wasn't in it.

10      MR. MACE:  That's where I think our suggestion, Your

11 Honor, was -- your current page 23, instruction 22, the first

12 paragraph, the way you have it written, we think is completely

13 accurate and the second paragraph totally doesn't apply and

14 should be --

15      THE COURT:  I'm not trying to bargain with you but I

16 want to see if we can get this as close to the law as we can.

17 Another option is to just have the first paragraph with the

18 modification.  You may want to follow closely with me on this.

19      The first sentence would stay as is.  The second

20 sentence, before I say this, is going to have two parts.  It's

21 going to use the word substantial but it's also going to

22 include without which they would not have occurred.

23      One option would be proximate cause is an act or a

24 failure to act that in the natural and continuous sequence --

25 I'm sorry.  Back up.

1            Proximate cause is an act or failure to act that was a

2    substantial factor in bringing about an injury and without

3    which it would not have occurred.  I'd just end it there.  I

4    can read it again, if you like.

5            MR. DENTON:  Please.

6            THE COURT:  I don't want to move away from the but for

7    but I think the word substantial is through a lot of the case

8    law in Ohio.

9            MR. BILOTT:  Your Honor, would it be possible to read

10   that again for us, please?

11           THE COURT:  Absolutely.

12           Again, we would eliminate the second paragraph

13   altogether.  The first sentence of the first paragraph would

14   stay and this would be the second sentence and the remainder of

15   the instruction:  Proximate cause is an act or failure to act

16   that was a substantial factor in bringing about an injury and

17   without which it would not have occurred.

18           MR. MACE:  For the reasons already stated, which we

19   don't need to go back through, we think what you already have

20   here is correct.  So we note our objection to that.  But as

21   long as you're leaving in the --

22           THE COURT:  Without which it would not have occurred.

23           MR. MACE:  I'm not going to be jumping up and down.  I

24   do think -- what you have here we think is an accurate

25   statement of law in the first paragraph without the second

Vol. 15 -    60

1    paragraph which sounds largely like what you're doing.

2              THE COURT:  Plaintiff's side?

3              MR. DENTON:  Yes, Your Honor.  Thank you.

4         Proximate cause is always -- even lawyers don't seem to

5    completely understand it.  I think there's a lot of cases that

6    say that.  But the substantial factor language is in the

7    restatement.  It doesn't really matter what kind of particular

8    personal injury it is.  And the point here is not combining

9    this with obesity.  It's the quantum of proof.  And first of

10   all, Dr. Bahnson said properly in his opinion that C-8 was a

11   substantial contributing factor to her injury.  And I think

12   these cases support that.

13        The *Gadolinium* case from Judge Polster, I'm familiar

14   with that.  I was actually involved in that.  Gadolinium is a

15   dye that they inject into the veins for certain type of

16   radiology procedures and unfortunately it caused a very serious

17   rare kidney disease depending on how much exposure you had of

18   it.  There was a big fight in those cases as to one injection,

19   the size of the injection and perhaps some other things.

20        He, very much as you know, he cited the case law and I

21   think it's in the brief that we sent to you, found that that

22   was the most appropriate way.  We would go to the cases the

23   Court cited, frankly.  I think the Court has summarized what we

24   briefed and provided to you over the noon hour.  Essentially

25   that.

1          But it's important that in this case in Ohio we don't

2   have to prove -- it's our position of the law that we don't

3   have to prove that C-8 is the only cause.  It can be a

4   substantial contributing factor to her kidney cancer.

5          THE COURT:  And the way this is written, this is the

6   big fight in the *Burrage* case, whether it has to be the but for

7   or a but for.

8          MR. DENTON:  And our view is it's a but for.

9          THE COURT:  The a but for is here, without which it

10  wouldn't have happened.

11         So who likes baseball here?  There's a great Scalia

12  analogy in the case.  First batter up in a baseball game hits a

13  home run and the game ends one to nothing.  But for the home

14  run would that team have won?  The answer is no.  It passes the

15  but for test, right?

16         MR. DENTON:  Right.

17         THE COURT:  But for the same team's pitcher pitching a

18  shutout, they wouldn't have won either.  That's what he means

19  by -- both of them are a but for.  Neither one is the but for.

20  And that's what this is supposed to be picking up.

21         Mr. Mace, last word.

22         By the way, I'm getting this from Judge Polster.  He

23  went to Harvard law school so you know he's smart.

24         MR. MACE:  Even the best of us make mistakes from time

25  to time, Your Honor.

1          THE COURT:  I'm inclined to go with that.  Any last

2     comments?

3          MR. MACE:  We'll note our objection.

4          THE COURT:  I'm getting one more comment.

5      I think this is a correct stylistic change.  That

6     doesn't change the substance.  We used the word it at the end

7     of that phrase.  Without which it would not have occurred.  I

8     think it makes a lot more clarity to say without which the

9     injury would not have occurred.  I assume that doesn't bother

10    anybody but it makes it a lot clearer.

11         MR. MACE:  That's fine, Your Honor.

12         THE COURT:  I think we've covered this.  I appreciate

13    your patience.

14      So to be clear, the first sentence on instruction 22

15    will remain.  And to be clear, we'll just eliminate everything

16    else after that plus the sentence that I've been reading into

17    the record.

18         MR. MACE:  Understood, Your Honor.  Thank you.

19         THE COURT:  And I think that covers all of the jury

20    instructions, if I'm not mistaken.  And that takes us to our

21    last order of business which are the exhibits.

22         MR. MACE:  Frankly, Your Honor, I believe it's been

23    narrowed substantially, the remaining issues.  Both parties

24    preserving all their prior positions.  The Court's already made

25    some rulings on and the parties have used those prior rulings

1   to form the remaining disputes.  Both parties preserve their

2   former positions.

3          MR. DENTON:  That is correct, Your Honor.

4          THE COURT:  So do I take it that everything is coming

5   in with the reservation of objections?

6          MR. MACE:  I think there's a very few five or six.

7          THE COURT:  Direct me to those.  We'll start with the

8   plaintiff's.

9          MR. BILOTT:  Your Honor, would you like the objections

10  to the plaintiff's or just objections --

11         THE COURT:  Let's go with Mr. Mace with which ones --

12  I have a sheet that has probably, rough guess, 30 or 40

13  objections.

14       Ms. Niehaus?

15         MS. NIEHAUS:  Yes, Your Honor.

16       You're looking, then, at the Plaintiff's list with our

17  objections noted?

18         THE COURT:  Yes.

19         MS. NIEHAUS:  Yes.  It looks a little more

20  overwhelming than it is, I think, because we have an agreement

21  with Plaintiffs on both sides that scientific studies will not

22  go back to the jury.  So I would say the vast majority of

23  what's highlighted on that sheet are scientific studies that

24  we've agreed to omit -- that both sides have agreed to omit

25  from their exhibits.

1          THE COURT:  So we go down this list.  Exhibit D2136,

2    that's out as an exhibit.  The testimony is in.

3          MS. NIEHAUS:  Yes.  D2136 is out.

4          THE COURT:  2146 is out?

5          MS. NIEHAUS:  2146 is out.

6          THE COURT:  And I'm going to guess Plaintiff's 1042 is

7    out?

8          MS. NIEHAUS:  Yes.

9          THE COURT:  And then it looks like we're moving into

10   something else here.  P1057.

11         MS. NIEHAUS:  Yes, Your Honor.

12     1057 we have an objection to on the basis of hearsay.

13   And we can provide copies.

14         MR. MACE:  On the studies, Your Honor, while she's

15   finding that, I think both parties are in agreement that

16   certain things that we're living with Your Honor's rulings on

17   what was shown.  That should probably be a court's exhibit.

18   It's not going to go back to the jury room but it needs to be

19   part of the record for the appeal.  So we're going to make a

20   joint list of court exhibits of some of these things that were

21   part of the trial but we're both in agreement that it's not

22   going back to the jury room.

23         THE COURT:  What would those be again, I'm sorry?

24         MR. MACE:  Usually they're just called court's

25   exhibits.

Vol. 15 -   65

1          THE COURT:  Give me an example of one.

2          MR. MACE:  These studies.

3          THE COURT:  I see.  Because there was testimony to

4   them.

5          MR. MACE:  Right.  So these aren't treatises.

6   Typically that's the way it's handled.  The reason being, the

7   jurors aren't scientists --

8          THE COURT:  I get it.  I don't want to call them court

9   exhibits.  We'll make sure they're accessible for the Court of

10  Appeals and your record as well.

11         MS. NIEHAUS:  May I approach?

12         THE COURT:  Sure.

13      So this is a newspaper article.  This is the one that

14  quotes, is it Dr. Dourson at some length, right?

15         MS. NIEHAUS:  He's quoted although he indicated that

16  perhaps he hadn't been accurately quoted which is one of the

17  fundamental problems with this type of newspaper publication.

18  In fact, Your Honor, we'll get to 5050 and I think it's 5065,

19  perhaps 5064.  We have similar objections on those.  Those were

20  the newspaper articles that were used with Mr. Webb in his

21  deposition.

22         THE COURT:  This one is a little different.  Let's

23  just stay with this one for now.

24      I remember the testimony on this.  Dr. Dourson -- let's

25  just break this in two.  There's the part where he's quoted and

1    he was questioned about and then there's the rest of the

2    article.  How does the rest of the article come in?

3             MR. PAULOS:  Your Honor, as I think you're pointing

4    to, Rule 106(b) allows us to show inconsistent statements with

5    statements that were made by Dr. Dourson.

6             THE COURT:  My understanding of that would be, that's

7    impeachment.  You can impeach him with it, and you did, but

8    this doesn't become an exhibit.

9             MR. PAULOS:  But I think the other layer of hearsay

10   that you're honing in on, I believe that falls under 803.21

11   which is the reputation of Dr. Dourson and his company TERA in

12   the community and how they conduct themselves and the work that

13   they do.  And this article would be a statement pertaining to

14   TERA's reputation.

15            THE COURT:  I don't read the rule the same way.

16   Wouldn't that be testimony about the person's reputation rather

17   than a document that he claims that he doesn't agree with his

18   own quotes?

19            MR. PAULOS:  The hearsay exception 803.21 is regarding

20   the reputation regarding character.  That is the reputation

21   among a person's associates or in the community concerning the

22   person's character.  This is an article written by a trade

23   magazine, a trade publication.  It's well-regarded.  It's a

24   Pulitzer Prize winning journalist and --

25            THE COURT:  No offense.  There was no testimony about

1    a Pulitzer Prize here.  There were questions about it but no

2    testimony about it.

3           MR. PAULOS:  That's correct, Your Honor.

4           We believe that the article itself is about the

5    reputation and character of TERA and that therefore it fits

6    that exception.  The statements within the article are

7    Dr. Dourson's own statements that he was questioned about and

8    was given the opportunity to clarify, deny or admit that he did

9    make those statements.  And I believe you recall his testimony.

10   He did, in fact, testify that he did make those statements and

11   was provided ample opportunity to explain them.

12          THE COURT:  You get the last word.

13          MS. NIEHAUS:  Your Honor, this is hearsay.  You had

14   made a similar ruling about Mr. Webb that Plaintiff's -- and we

15   have it in the transcript -- that Plaintiff's be permitted to

16   question Mr. Webb about his specific quotes in the newspaper

17   articles but that the newspaper articles themselves would not

18   go back to the jury.  It's no different here.

19          THE COURT:  This is one, though, that the person who

20   quoted him here was a big part of the article.  He had a chance

21   to contradict it.  So I am going to let that in.  Mr. Webb

22   didn't have that same sort of fact surrounding to it at all.

23   This is coming in but with Mr. Webb I think you'll have more

24   luck.

25          That's in.  That's 1057 of the plaintiff's.

Vol. 15 -   68

1          Then we have 1061 through 1069.  Are these connected?

2          MS. NIEHAUS:  1061 through 1069 are all scientific

3    papers that we have agreed will not go back to the jury.

4          THE COURT:  Does that pick up 1060 as well?

5          MS. NIEHAUS:  Yes, it does.

6          THE COURT:  So those are all out.

7          MS. NIEHAUS:  We have 1060, 1061, 1062, 1063, 1064,

8    1065, 1066, 1067, 1068, 1069.

9          THE COURT:  Right.

10         MR. PAULOS:  That's our agreement with the defendant

11   that those fall under 803.18.

12         THE COURT:  Then we get to Plaintiff's 13001.  It's a

13   summary.  Refresh my memory.

14         MS. NIEHAUS:  13001 is the demonstrative.

15         MR. MACE:  It's the demonstrative aid with the peaks

16   about the summary.  It's our understanding that was being used

17   as a demonstrative aid, not to go back to the jury.

18         MR. PAULOS:  Your Honor --

19         THE COURT:  I'm sorry, you are Mr --

20         MR. PAULOS:  I'm sorry.  Chris Paulos for the

21   plaintiffs.

22         Exhibit 13001 was disclosed in June to the defendants as

23   a Federal Rule of Evidence 1006 evidentiary summary.

24         THE COURT:  It has points on the graph.  Did someone

25   on your side testify to the point on the graph and link it to

1    the chart?

2         MR. PAULOS:  Yes.  We believe that our experts did

3    testify to the points on the graph regarding the emissions

4    data.  The emissions data was derived from information that was

5    disclosed to the plaintiffs in the discovery process and it was

6    related to the purchasing records and the emissions data that

7    was regularly kept in the course of business at the Washington

8    Works plant.

9         THE COURT:  There was a lot of testimony on this.  I

10   guess my question is, is there any reason to think it's not

11   accurate.  We didn't have any testimony to that effect, did we?

12        MS. NIEHAUS:  I don't believe.  We're questioning the

13   accuracy of it but it was demonstrative and general rule is

14   demonstratives don't go back.

15        THE COURT:  It dovetails with the testimony so I'm

16   going to let it go back.

17        Then we get over to Plaintiff's 185.

18        The last one is in.

19        MS. NIEHAUS:  185 was a document that the Court had

20   redacted before we started this process and the issue with 185

21   is the redactions on the version the plaintiff is having put in

22   their box.  The exhibit doesn't conform to the Court's

23   redactions.

24        MR. PAULOS:  In fact, we dispute that.  As you recall,

25   Your Honor provided the parties with some handwritten notes and

1    redactions that you had done on the documents that we could not

2    agree upon.  We redacted this document according to the input

3    that we received from the Court and provided it to the

4    defendants on September 10th for an opportunity to review and

5    dispute whether or not we'd appropriately toed the line in

6    regards to your input.  We heard nothing from them until they

7    told us that there was this issue.

8         I have Your Honor's handwritten notes that you provided

9    to the parties that show --

10         THE COURT:  I'm going to hold myself out as the expert

11    on those notes since it's mine.

12         If you have a copy handy and I can hopefully resolve

13    this.

14         MS. NIEHAUS:  There is a version showing what

15    Plaintiff's have proposed as their redaction and this is the

16    version with the Court's notes.  And I believe it's just one

17    line at issue.

18         MR. PAULOS:  And there's this version that we conform

19    with the redactions also.

20         MR. MACE:  The line is, I restrain from saying I told

21    you so, which we believe on Your Honor's eminently readable

22    handwriting is circled and says out.

23         THE COURT:  The first issue is the company plane.  I

24    knocked all that out, right?

25         MS. NIEHAUS:  And in fairness, they've redacted

1    everything we think that Your Honor had indicated should be

2    redacted with the exception of the one line which is, I

3    restrain from saying I told you so.

4            THE COURT:  I thought Mr. Mace was telling he told me

5    so.  This is in the document.

6            MS. NIEHAUS:  He was restraining from telling you he

7    told you so.

8            MR. PAULOS:  And, Your Honor, the version that we

9    relied upon is the one that has your handwriting that has the

10   plaintiff marking by Your Honor at the very top right-hand

11   corner and you circled things that were out and you did not

12   circle the line that they are maintaining should be, that is

13   the defendant's are maintaining should be removed.  And this is

14   the version of the redactions that the plaintiff is following

15   when we redacted the document.

16           THE COURT:  So all this because the client would not

17   settle when I told them -- what's the next word?  I can't read

18   it.

19           MR. PAULOS:  I only have the redacted version, Your

20   Honor.  Let me see.  Actually it says, all this because the

21   client would not settle when I told them almost a year ago.

22   And then in the version I'm looking at that you scratched out

23   there is a parenthesis, I refrain from saying I told you so,

24   period.

25           They're right now in dispute over that one sentence, I

Vol. 15 –    72

1    refrain from saying I told you so.

2         THE COURT:  I think that stays in.  I'm looking at my

3    handwriting and I actually -- that's out.  I had that marked

4    out.  That's out.

5         MR. PAULOS:  Your Honor, the second version of

6    information that you provided for us with the plaintiff's

7    marking at the top, that is not scratched out and that's the

8    version --

9         THE COURT:  Where I wrote out, that's what I scanned.

10         MR. PAULOS:  May I approach, Your Honor?

11         THE COURT:  Yes.

12         MR. PAULOS:  We were provided with two versions by the

13    Court.  The defendant submitted their versions, we submitted

14    our versions and you marked up both.

15         MR. BILOTT:  I believe that's the issue, Your Honor,

16    there's two inconsistent markings on that.

17         THE COURT:  Are you accusing me of being inconsistent,

18    Mr. Bilott, is that what you're saying?  After 10,000 documents

19    I marked two of them differently?

20         MS. NIEHAUS:  I'm not sure what the second version

21    there is.  I don't recall receiving two versions.

22         THE COURT:  Here, take a look at it.  We're talking

23    about a phrase that I don't think has great import to the case

24    but I want to get it right.  That is my handwriting on both of

25    these.  I will attest to that.

Vol. 15 –   73

1      MR. PAULOS:  We do believe that that statement is

2  probative.

3      MS. NIEHAUS:  That might be the case but we had agreed

4  to redactions.

5      MR. PAULOS:  We sent you --

6      THE COURT:  I take all the blame for this.  There's

7  two different versus of what I did.

8      MS. NIEHAUS:  I don't recall receiving the second

9  version but we were relying on this.

10      MR. PAULOS:  Mr. Fazio was there when we split them up

11  and we both received them.

12      THE COURT:  I don't want to create a problem for you.

13  This is my fault.  Nobody did this to the other side.

14      We'll take -- the part, I restrain from saying I told

15  you so, will stay in but the rest of it goes out.  So the

16  language about all this because is out but the, I restrain from

17  saying I told you so, stays in.

18      MR. PAULOS:  Thank you, Your Honor.

19      THE COURT:  Let's jump over to Plaintiff's 143.

20      Mr. Quisumbing wanted me to ask you about Plaintiff's

21  300.  There's a very tiny --

22      MS. NIEHAUS:  The ones with the tiny Xs, it's my

23  understanding that the plaintiff's carried those over from some

24  other list.  Only the ones with check marks next to it.

25      THE COURT:  So we're just looking at the yellow marked

Vol. 15 -    74

1    ones?

2              MS. NIEHAUS:  Correct.

3              THE COURT:  I think that takes us over to Plaintiff's

4    143.

5              MR. BUTLER:  1.43.

6              MS. NIEHAUS:  I don't have 143.  That's the Dahlgren

7    paper.  So we agree --

8              THE COURT:  The next one a scientific paper too, 433?

9              MS. NIEHAUS:  433 is also, yes, a scientific paper.

10             MR. PAULOS:  Yes, Your Honor.

11             THE COURT:  Those are out.  Then we get to 4513.

12             MR. PAULOS:  That is also a scientific article, Your

13   Honor.

14             THE COURT:  That is out.

15          46 for the plaintiff's.

16         MS. NIEHAUS:  46 is another redaction issue.  We again

17   have -- may I approach?

18             THE COURT:  You may.

19         MS. NIEHAUS:  We have the version that Plaintiffs are

20   proposing as their redactions and then we have the Court's

21   handwritten notes.  There is one line again that Plaintiffs

22   have not redacted that we believe should be redacted, and they

23   all live in Wood County.

24             THE COURT:  So what's the significance of that line?

25             MR. PAULOS:  Your Honor, we have no problem redacting

1    that out.  We do know that this version of the document was --

2    the witnesses were examined with it, there was testimony given

3    about this document and was displayed to the jury.  If the

4    Court would require us to redact that line -- we don't see

5    there's any prejudice with including it but if the Court would

6    require us, we certainly would.

7              THE COURT:  Let's just take it out then.

8              MR. PAULOS:  Okay.

9              THE COURT:  All right.  Then we get to Plaintiff's

10   5050.

11             MS. NIEHAUS:  Your Honor, both 5050 and 5064 are

12   newspaper articles that were displayed to Mr. Webb during his

13   deposition testimony that was played for the jury here.  And

14   you had ruled on September 22nd, 2015, and this is at page 62,

15   lines 12 through 14 of the September 22nd morning 1 transcript.

16   You said, with regard to the articles, I am excluding those

17   from evidence, but I am going to permit his testimony about his

18   own statements in those articles.

19        Which the statement -- the testimony was displayed but

20   it's our understanding from what Your Honor ruled that the

21   articles themselves would be excluded from evidence.

22             THE COURT:  Mr. Paulos.

23             MR. PAULOS:  If that is your ruling, Your Honor, we

24   would not want to dispute that.

25             THE COURT:  Thank you.

Vol. 15 - 76

1    So 5050 and 5064 will be out.  Testified to but the

2    exhibits won't go back.

3         Then 5058.

4         MS. NIEHAUS:  That's the Dahlgren article again.

5         THE COURT:  So that's out.

6         Then 5060.

7         MS. NIEHAUS:  Again, scientific article.

8         THE COURT:  So that's out.

9         Then we get over to the next page and we get to

10   6047.177.

11        MS. NIEHAUS:  Plaintiff's have withdrawn.

12        MR. PAULOS:  They've withdrawn.

13        THE COURT:  These are all withdrawn on this page?  No.

14        That's withdrawn.

15        The archive of Little Hocking Water Association website.

16        MS. NIEHAUS:  Yes, Your Honor.  That's 612.

17        That came up a few times during the course of trial and

18   Your Honor had ruled that that document was not admissible on

19   September 18th and that's in the trial p.m.2 transcript at 248,

20   lines 16 through 19.  You said, this is a letter to the EPA by

21   a third party quoting another third party.  I think it's just

22   too distant.  That's the ruling.

23        It's a letter --

24        THE COURT:  I remember it.

25        MS. NIEHAUS:  Okay.  It came up again and it was used

1    for some impeachment of Mr. Bossert on September 28 at which

2    time Your Honor said, the document's not admitted yet, you can

3    go ahead and show it to him.

4         If you recall, Mr. Woods had asked Mr. Bossert about

5    some website links that the company had provided.  Just the

6    links were provided and you said he can question him about what

7    people may have seen when they got there.  But it was our

8    understanding based on that that it would be the same kind of

9    situation where the document could be used but wouldn't go

10   back.

11        THE COURT:  Plaintiff's view?

12        MR. PAULOS:  Your Honor, I believe this is the

13   appropriate time to determine whether or not it is admissible.

14   I know that you did previously say that it could not come in

15   with a particular witness and then at another moment in the

16   trial, that is with Mr. Bossert, the door was opened to explore

17   the contents on the Little Hocking website where this was

18   posted because of the fact that DuPont had included the Little

19   Hocking website in some public communications that they

20   allegedly distributed.

21        I'm sure Your Honor will recall the extensive testimony

22   that Mr. Bossert gave providing the Little Hocking website and

23   the information contained in that posting on the website.  We

24   believe that it goes hand in hand with that testimony and would

25   be helpful for the jury to have in deliberations when

Vol. 15 -   78

1   deliberating about the testimony of Mr. Bossert and we believe

2   it should be admitted into evidence.

3          THE COURT:  I'd be willing to redact a lot of it and

4   leave the website links, that sort of things.  I think there

5   was a lot of third-party statements in there that I would not

6   be inclined to admit.

7          MR. PAULOS:  If Your Honor would like us to explore

8   redacting this document, I certainly would be willing to do

9   that.

10          THE COURT:  Why don't do you that.  I'll just put on

11   here maybe if it's redacted.

12          All right.  That takes us to 6565.

13          MR. PAULOS:  That is another scientific article, Your

14   Honor.

15          THE COURT:  I'm sorry, another?

16          MS. NIEHAUS:  It's another scientific paper.

17          THE COURT:  So that's out.

18          MR. PAULOS:  I think if it speeds things up, the only

19   remaining document, I don't want to speak for the defendants,

20   that is presently in dispute is 6570.

21          THE COURT:  The rest of them are --

22          MR. PAULOS:  Actually, no, you pulled your objection

23   on that.  I think, based on my notes, we're through the

24   plaintiff's documents.

25          THE COURT:  So the next five we haven't talked about,

Vol. 15 –    79

1    6570, 6579, 6592, 6643, 6672 and 6684, are those admitted or

2    kept out?

3              MR. PAULOS:  I don't have an objection for 6579 but

4    the numbers you read, 6565, 6643, 6592, 6672, 6684 are all

5    scientific articles.

6              THE COURT:  So those will all stay out.

7         I think we only have one more objection on the next

8    page, that's a scientific study, right?  So that's out?

9              MR. PAULOS:  That's correct, Your Honor.

10             THE COURT:  I think that covers all the plaintiff's

11   exhibits.

12             MR. BILOTT:  Your Honor, I think we've got an even

13   shorter list with the objections by Plaintiffs to the defense

14   exhibits.  I think we have an even shorter list of documents

15   now.

16             MS. NIEHAUS:  Yes.

17             MR. BILOTT:  The first one, Your Honor –-

18             THE COURT:  Just so I have the list, has this changed

19   or is this what we started with?

20             MR. BILOTT:  I think there may have been one or two

21   that we'll highlight when we go through.

22             THE COURT:  Mr. Quisumbing already gave me a note

23   here.  So we'll just go right through.

24        We start with number 10, Defendant's 10?

25             MR. BILOTT:  Yes.  Plaintiffs are objecting to defense

1   D0010.  In was an article you may recall, Your Honor --

2            THE COURT:  I'm sorry, this one is escaping me.

3            MR. BILOTT:  May I approach?

4            THE COURT:  Sure.

5        I remember this.  This is still being offered?

6            MR. MACE:  Sorry, Your Honor?

7            THE COURT:  This is being offered?

8            MR. MACE:  Yes, sir.

9            MR. BILOTT:  Your Honor, the concern we have is when

10   this was first brought up, it was brought up on cross and

11   counsel was told, we'll let you use it on cross as long as you

12   actually lay the proper foundation and authenticate it with one

13   of your witnesses later on.

14           THE COURT:  So the first witness was on cross.  Who

15   was that?

16           MR. BILOTT:  Dr. Siegel.  Then when defense actually

17   tried to lay the foundation and get it in through, I believe it

18   was Dr. Rickard, this is the one that Dr. Rickard said, I don't

19   know what this is.  We don't believe there is proper

20   authentication or foundation.

21           THE COURT:  I remember something, I don't want to

22   quote it, like I probably would have seen this, but nothing

23   more definite than that?

24           MR. MACE:  Two things, Your Honor.  You'll recall that

25   this was being offered as part of what the state of the

1   knowledge was at the time, at the relevant time, and impeaching

2   the plaintiff's experts.

3       This is Dr. Siegel's testimony we've handed you from

4   September 18 in the afternoon.  Said he was familiar with

5   NIOSH, they're a credible organization, he generally relies on

6   what they say.  He saw this report and at the levels

7   encountered -- levels of C-8 encountered at 3M facilities had

8   not been associated with adverse health effects.  That was part

9   of materials he had reviewed.  This is Exhibit 10 here.

10      So we used it with Dr. Siegel.  Then you recall this is

11  one of the exhibits we used with Dr. Rickard and then he said,

12  I know I saw it.  I can't give you the exact date I saw it.  I

13  think it was approximately the time it came out but I can't pin

14  you down on a date.  Your Honor asked him a follow-up question

15  as well.

16      We think even on Dr. Siegel's testimony it's --

17          THE COURT:  You're relying on Dr. Siegel pretty much,

18  not on Dr. Rickard?

19          MR. MACE:  Frankly, Your Honor, I think I didn't press

20  it because we had a short period of time to get redirect on

21  with Dr. Rickard but I think what Dr. Rickard said, if you go

22  back and look at the testimony --

23          THE COURT:  He didn't say he hadn't seen it.  He

24  didn't say he did see it.  He said it was around.  That's what

25  I remember.

Vol. 15 –   82

1           MR. MACE:  No.  He actually said, I did see it.  I

2    can't give you the exact date I saw it.

3           THE COURT:  He might have seen it during a deposition

4    is what I mean.  If he's seen it in the course of litigation

5    we're not talking about that, of course.

6           MR. MACE:  And he said it was likely that he saw it

7    back at the time but he couldn't give me a date.

8           THE COURT:  So let's go back to Dr. Siegel.  We're on

9    the second page of what you sent me, Volume 4-172.  You saw

10   NIOSH's report from 2001.  It's your understanding that's this

11   report?

12          MR. MACE:  Yes, sir.  That's Exhibit 10.  He goes on

13   and identifies it in a couple sentences, line 20.

14          THE COURT:  Exhibit 10 is what we're talking about.

15   Letter from NIOSH.  It was something you had in your materials.

16          MR. MACE:  It's part of what the plaintiff's expert

17   considered in coming to his opinions but yet he ignored it in

18   coming up with his opinions or didn't give it the weight we

19   think it deserved, more appropriately.

20          MR. BILOTT:  Your Honor, his testimony is his

21   testimony but the fact is, they never did establish any sort of

22   foundation or authentication from their witness to bring this

23   document in.

24          MR. MACE:  Nobody is disputing that it's a true and

25   accurate copy of the report.  So in terms of authentication

Vol. 15 –   83

1    it's that it is what it purports to be.

2          THE COURT:  I'm not worried about the authentication.

3    It's whether somebody with knowledge has actually talked about

4    it.  In other words, it's not authentication, it's -- you don't

5    just get it in because it's authentic.  Something has to go

6    with it.

7          MR. BILOTT:  That's our concern, Your Honor.  Counsel

8    and the Court gave Dr. Rickard several opportunities to try to

9    do that and he would not do that and was not able to say that

10   that was something he actually recalled seeing and couldn't

11   identify the time period where he saw it.

12         MR. MACE:  But it's a finding --

13         THE COURT:  Questioning of him about this was fine,

14   but isn't it really impeachment?  We're not letting everything

15   he reviewed go back to the jury just because he reviewed it but

16   we are -- certainly you're free -- you were free, and you did

17   cross him on what else he should have seen but didn't.  Isn't

18   that really what category it fits into?

19         MR. MACE:  It definitely was used with Siegel for

20   cross-examination purposes, yes.

21         THE COURT:  I'm going to treat this as impeachment.

22   It certainly can be argued in closed but it's not going to be

23   admissible.

24         MR. BILOTT:  Your Honor, the next document at issue

25   was Defense Exhibit D.0295.  This is a document, Your Honor,

Vol. 15 -    84

1    you may recall that there was some discussion about whether --

2    the second paragraph on the first page.  The parties have

3    agreed that that will be redacted.  So there's no longer an

4    issue there, Your Honor.

5              THE COURT:  Okay.

6              MS. NIEHAUS:  Just preserving our objection, of

7    course, that we have agreed that we will redact the second

8    paragraph.

9              THE COURT:  All right.  And then I think there's one

10   on here, Defendant's 311.

11             MR. BILOTT:  Correct, Your Honor.  I'll bring up a

12   copy here.

13        The basic concern we have, Your Honor, is this is a

14   document that starts off with a cover e-mail but then the

15   documents attached are not sequential bates numbering.  We're

16   not sure how these got attached.  I can approach -- may I

17   approach, Your Honor?

18             THE COURT:  Sure.

19             MR. BILOTT:  I believe the first two pages have the

20   proper sequential bates numbering but then it jumps to

21   completely different bates numbers.

22             THE COURT:  So you offered the press release; is that

23   correct?

24             MR. BILOTT:  This was a document that the defense

25   offered, Your Honor.  And they offered, I think I believe the

1    questioning was actually just on the first page and possibly

2    second page.  What we're objecting to are the attachments

3    there, Your Honor, which have completely different bates

4    numbers.

5            THE COURT:  All right.

6            MS. NIEHAUS:  Your Honor, in explanation of the bates

7    numbers, when these arguments were produced, they were produced

8    ten years ago, seven years ago.  I'm not entirely sure when

9    this particular document was produced.  They may not have been

10   produced with sequential bates numbers because they were

11   produced as individual documents.  But in the load files in our

12   system they are linked together as being one document.  So it's

13   a parent/child situation.  We admit -- we acknowledge that the

14   bates numbers are not sequential but our records indicate that

15   this is a single document, this document marked as 311.

16           THE COURT:  That's okay.  But the real question is,

17   was there testimony and is it now admissible?

18           MS. NIEHAUS:  Yes, Your Honor.

19           This was authenticated and the foundation was laid for

20   it through Dr. Rickard on October 1st.  I'm reading from my

21   computer here.  It's October 1st.  We only have the draft of

22   that transcript so far but at the draft there was discussion of

23   it at pages 153 and 154 at least.  It may have come up a little

24   earlier as well.

25           But Dr. Rickard said that he received this.  Attached

1    are near final versions of the communications documents for the

2    Washington Works health study that will be announced Tuesday,

3    January 11.  The drafts have been approved by Bobby Rickard and

4    others.  They include input from the DuPont Health Advisory

5    Board.

6         Now, was that part of your practice, Dr. Rickard, to

7    consult with the Health Advisory Board, these external doctors

8    and nurses that you talked about, to get their input on the

9    public statement?  He says, yes.  With this, we would try to

10   get them on the phone.  We wouldn't actually bring them in for

11   a meeting but, yeah, that was our practice.

12        MR. BILOTT:  Your Honor, we're not disputing that

13   Dr. Rickard testified about it.  Our concern is that we're not

14   sure that the documents that were attached to the cover memo,

15   which I believe was the only thing shown on the screen at the

16   time, were in fact attached.  We don't have the documentation

17   that Ms. Niehaus is referring to as far as whether they were

18   linked somehow.  Our concern is just whether those were, in

19   fact, the correct attachments.

20        MS. NIEHAUS:  Actually if you go back, I'm sorry, to

21   page 152 when he first -- when Mr. Mace first handed

22   Dr. Rickard 311 he says, do you see that?  Do you recognize it?

23   Yes, I do.  Let's start with dot 3, page dot 3.  So he does go

24   to the first attachment, questions him about the first

25   attachment.

Vol. 15 –   87

1        There's also -- there's no indication that these

2   documents aren't the attachments.  They match the -- they match

3   contemporaneously with the date on the e-mail.  They match the

4   title of the attachments and order.  The first one being a news

5   release, the second one being key messages chart.

6        THE COURT:  The fact that the news release -- are you

7   objecting to or not?

8        MR. BILOTT:  I'm --

9        THE COURT:  These come in sections.  There's the cover

10  page, first two pages are just the e-mail chain and then the

11  next two pages are the confidential draft and the press

12  release.

13       MR. BILOTT:  I believe what we're saying, Your Honor,

14  is we're simply objecting to the fact that we're not sure these

15  three documents were actually all attached to each other.

16  That's our objection.  And they're being presented as one

17  document.

18       THE COURT:  I'm not exactly sure how to resolve that.

19  I don't have a witness here to ask.

20       MS. NIEHAUS:  He was asked at least about the very

21  first attachment, dot 3, in the transcript.

22       THE COURT:  I remember the press release was testified

23  to, right?

24       MS. NIEHAUS:  Yes.  Dr. Rickard, I'm handing you or

25  the clerk is handing you Exhibit D311.  Do you see that?  Yes.

Vol. 15 —  88

1    Do you recognize it?  Yes, I do.  Let's start with dot 3, page

2    dot 3, which is the press release.

3             THE COURT:  So that's covered.  Keep going.

4             MR. MACE:  We're willing to limit the exhibit to the

5    press release if that will resolve it, Your Honor.

6             THE COURT:  That seems to fix it, doesn't it?

7             MR. BILOTT:  I believe so, Your Honor.

8             THE COURT:  That's what we'll do then.  Thank you.

9             MR. BILOTT:  The next two documents I believe that are

10   at issue, Your Honor, are similar.  Before I get into the

11   discussion here, may I approach and provide copies?

12            THE COURT:  Sure.

13            MR. BILOTT:  Your Honor, what we're referring to here

14   is Defense Exhibit D.0818 and D.0811.  Your Honor, these are

15   printouts from a website of the Hill Peterson law firm.  None

16   of these documents were referred to at any time during this

17   trial.  They've never used them with any witness.  And the Hill

18   Peterson law firm is not counsel for Ms. Bartlett in this case.

19   They are not involved in her claims that are pending before

20   this Court and there's no basis of any kind to have these

21   documents brought in here.

22            THE COURT:  You'll get the last word.

23        Mr. Mace?

24            MR. MACE:  May I approach?

25            THE COURT:  Sure.

1        MR. MACE:  Your Honor, this is going to get us into a

2   brief discussion of the procedure that Your Honor intends to

3   have us follow with regard to the punitive phase, if we get to

4   that.  These are documents that we would intend to introduce in

5   that phase of the trial because we think it goes to the

6   reprehensibility of the conduct in terms of determining an

7   appropriate nonpunitive damages, if we get to that phase of the

8   trial.

9        THE COURT:  Let me just jump in.  If this were in the

10  second phase -- at this point we're a little premature, aren't

11  we?  You're not offering this now?

12       MR. MACE:  Well, only in case -- I admit to being a

13  little less than clear on what Your Honor had envisioned in

14  terms of what was going to be allowed in the second phase.  So

15  if you're not going to allow me to do it in the second phase

16  then I want to do it now in this phase.  But I definitely want

17  it in if the jury gets to punitives.

18       THE COURT:  If we have that understanding that it's

19  not admissible in this phase but it could be usable if there's

20  a second phase.

21       MR. BILOTT:  As long as we can reserve our argument to

22  object to it at that phase, Your Honor.

23       THE COURT:  It wouldn't be a timeliness issue, it's a

24  relevance issue.

25       MR. MACE:  I just don't want to have a gotcha --

 1          THE COURT:  Let's just leave it at that.  So right now

 2   it will be out but it can be reoffered.

 3          MR. MACE:  Thank you, Your Honor.

 4          THE COURT:  If we have time, and I think we will, I

 5   would like to spend a little bit of time talking about if we

 6   were to need a second phase just so we don't --

 7          MR. MACE:  I'm sorry, Your Honor, I missed that.

 8          THE COURT:  If we have some time today I would like to

 9   talk to you a little bit about that.

10          MR. MACE:  Yes, sir.

11          MR. BILOTT:  Your Honor, I believe the next document

12   at issue is Defense Exhibit D1837.  This is a document you may

13   recall, and I'll provide a copy here, Your Honor, this is a

14   document that we discussed numerous times in the case where

15   there's a cover letter purporting to forward information to the

16   USEPA and then there's just an excerpt attached.  Our concern,

17   Your Honor, is the cover letter, again, has bates numbering and

18   the excerpt is completely different bates numbering.

19          May I approach, Your Honor?

20          THE COURT:  Sure.

21          MR. BILOTT:  Your Honor, this is one you may recall.

22   The attached document is actually an excerpt from a rather

23   voluminous document.

24          THE COURT:  This is the one where you wanted the

25   jurors to know that there were a lot other pages?

Vol. 15 -   91

1          MR. BILOTT:  Correct, Your Honor.

2          I believe that the arrangement was made that defense is

3    entitled to show or pick out portions they wanted to show

4    during the trial but as far as the document that would actually

5    go to the jury, to avoid any misperception that this is exactly

6    what went to EPA, because it isn't, that they would have to

7    actually provide the full document that was attached to that

8    letter.

9          THE COURT:  Mr. Brogdon, what do you think?

10          MR. BROGDON:  There are a couple issues, Your Honor.

11   If I may approach?

12          THE COURT:  You may.

13          MR. BROGDON:  I have a copy of Exhibit 747.  There are

14   several versions of this document floating around in the

15   database.  747 shows sequential bates numbering which show that

16   actually 1837 is a more complete version, that it replaces a

17   missing first page of the attachment.  If you compare the

18   attachments to the letter, 747, which is again was taken from

19   the files of DuPont that sequentially bates number, has a

20   missing page.

21          These letters, there are a few letters like this from

22   the '80s which were attached later to a 2000 document.  So

23   there's a body of documents sent together as attachments.  But

24   this letter, 1837, with these two pages attached, is a complete

25   version of this letter and its attachments.  It's not the

1   entire body of other documents that were sent with it later.

2   But it is, we believe, the most complete version we have of the

3   attachments.

4           MR. BILOTT:  Your Honor, all you have to do is look at

5   the bates numbering that begins on the third page that that is

6   not the attached document.

7           THE COURT:  Do you have a copy of what you claim is

8   the entirety of the document or not?

9           MR. BILOTT:  I believe there are many copies of that

10  document in the database but the defense has not marked that,

11  as far as I'm aware, as a trial exhibit.

12          THE COURT:  All we're arguing about here is whether we

13  attached the whole document or just redacted parts.  There's

14  nothing else in the other parts of the document that you

15  contend would be improper, are there?

16          MR. BROGDON:  No, Your Honor.  I believe 1837 is a

17  complete version -- as complete a version that we have of this

18  letter and its attachments.  Again, they are a part of a larger

19  body that was put together later.  But we have no concern about

20  including as much as possible.

21          MR. BILOTT:  But our concern, Your Honor, is this

22  totally misrepresents to the jury what actually went to EPA.

23          THE COURT:  Isn't this really what we're getting at?

24  In other words, forget what happened after.  What went with

25  this document to go with the document and you're free to argue

1    in close, go to this paragraph, go to that paragraph.  How many

2    pages are we talking about, roughly?

3            MR. BILOTT:  I believe, Your Honor, this is a rather

4    lengthy record facility.  Let me look at the back here.  I

5    believe this is about a 100-page document.  It's a lengthy

6    document.  That was our concern because it makes it look as if

7    this is the information that was highlighted to EPA when in

8    fact it's part of a very lengthy document.

9            We're not objecting to the letter and the document

10   itself but we're just objecting to it being presented this way

11   to the jury as something very different than what went to EPA.

12           MR. BROGDON:  If Mr. Bilott can help us identify the

13   full body of the document that he's contending it's all a part

14   of, we're happy to put that in.  It's not a simple process but

15   we can work with him.

16           MR. MACE:  What we ask for, Your Honor, if we find the

17   longer version we can make it an attached A exhibit because the

18   jury will have kept notes on the version that was put in.  So

19   if they want to find it they'll have both the excerpt and the

20   longer document.

21           THE COURT:  Put them both together?

22           MR. MACE:  Yes, sir.

23           THE COURT:  That's the way the testimony came in.  I

24   don't want them confused.

25           MR. BILOTT:  If we could reserve the right to see what

Vol. 15 -    94

1    they're actually proposing to do, Your Honor.

2              THE COURT:  So get the document together, if you

3    could, and then let me know before the exhibits go back.  The

4    part you want to use is in.  We're talking about putting the

5    whole document with it.  If there's a problem, let's resolve it

6    before anything goes back to the jury as far as exhibits.

7              MR. BROGDON:  Yes, Your Honor.  Thank you.

8              THE COURT:  1837, right?

9              MR. BILOTT:  Correct.

10             THE COURT:  That's in with additions.

11             MR. BILOTT:  We have a similar issue, Your Honor, with

12   D.1943.  May I approach?

13             THE COURT:  You may.

14             MR. BILOTT:  You may recall, Your Honor, this is a

15   document that we addressed in a very similar manner where,

16   again, it's another letter that went to the, I believe the EPA

17   and it attaches just an excerpt and you can see at the top it's

18   from page 18.

19             THE COURT:  It's the same.  So we have the same issue

20   here.  In other words, is this also 100 pages or more, do you

21   think?

22             MR. BILOTT:  It's a lengthy document, Your Honor.

23             THE COURT:  How about doing the same arrangement?

24             MR. BROGDON:  We ask that this be admitted and we'll

25   work with Mr. Bilott.  If he can supply copies and we'll agree

1      that the larger be put in.

2          MR. BILOTT:  We do object to them admitting the

3      current versions of 1837 and 1943 for the very reason we raised

4      the objection the first time.  That that is very misleading to

5      the jury that what the only thing should be admitted is the

6      letter with the actual document.  Like you say, if they want to

7      point out specific pages, they're free to do that.  But the

8      jury should not get a copy in the current form of 1837 and 1943

9      because that totally misrepresents what was actually sent to

10     the agency.

11         THE COURT:  But what if we had this as is but we put

12     on second page, see page such and such which would be part of

13     the larger document?

14         MR. MACE:  No objection to that.

15         MR. BROGDON:  That's fine, Your Honor.

16         THE COURT:  This is how they saw it in the trial.

17         MR. BROGDON:  Right.

18         MR. BILOTT:  Again, we would like to see how they

19     actually set that up, Your Honor.  But we would just preserve

20     our objection to that, Your Honor.

21         THE COURT:  That's what we'll do unless there's a

22     problem.  You'll let me know if there's a problem before the

23     items go back to the jury?

24         MR. BROGDON:  Thank you, Your Honor.

25         THE COURT:  And then the --

Vol. 15 -   96

1          MR. BILOTT:  Your Honor, we have sort of another

2     category that captures several of the documents.  Several of

3     the defense exhibits.  That's CVs.

4          It was our understanding that the way the plaintiffs, at

5     least, presented this, we went through the backgrounds and

6     qualifications and we did not offer CVs.  I know we had a

7     discussion about it during one of the pretrial conferences in

8     the morning and it was our understanding that DuPont would be

9     free to use the CVs, as they did during trial, putting them up

10    on the screen and walking through with the expert but DuPont is

11    now wanting to actually send those CVs back when we object to

12    that.

13         THE COURT:  I thought we resolved this before the case

14    started?

15         MR. BILOTT:  That was our understanding as well, Your

16    Honor.

17         MS. NIEHAUS:  Your Honor, there was an 8:30, I wasn't

18    part of any conversation before the case started but I know

19    there was an 8:30 conference discussion and we understood the

20    Court hadn't resolved the issue yet.  We actually have a small

21    bench brief prepared on the issue.

22         THE COURT:  I have a simple view of this.  They either

23    all go in or none go in.  It's do it one way or the other.

24         MS. NIEHAUS:  Your Honor, we obviously don't object to

25    the plaintiff's experts CVs going in.

1            THE COURT:  We stack them all up.  Your experts, their

2     experts, CVs.

3            MR. BILOTT:  Your Honor, we do strongly object to

4     that.  There were matters, for example, in one of Plaintiff's

5     experts CV that we had a motion in limine about.  So we do

6     disagree with the idea of sending the CVs in.

7            THE COURT:  It was a gun issue, wasn't it?

8            MR. BILOTT:  Yes.

9            THE COURT:  You can take that out, if you wish.

10            MR. BILOTT:  Again, Your Honor, we don't think that it

11     would be appropriate to send the CVs back.  There's no need to

12     do that.  And we thought that had been resolved and that's why

13     we presented our case the way we did.  We thought that had

14     already been ruled that those were not going back.

15            THE COURT:  I don't disagree with that.  I don't have

16     the memorandum.  The qualifications of an expert are a key part

17     of the testimony, but you can do it one of two ways.  You can

18     do it with paper CV or you can do it with examination or you

19     can do both.

20            MS. NIEHAUS:  Just one, the plaintiffs have very much

21     put the experts' qualifications at issue in this case.  In

22     addition to Dr. Dourson's qualifications --

23            THE COURT:  Again, I note for the record that we have

24     completely conflicting opinions here.  The jurors have to weigh

25     them.  One of the ways they weigh that is from the

Vol. 15 -   98

1    qualification.  There's no argument about that.

2         Other than the gun issue, I've already ruled on that,

3    but at least it was made moot.  I don't recall that.  The gun

4    issue didn't come up.  You can redact that.  All of the

5    witnesses have excellent CVs on the both sides.  What would be

6    the problem if they all went back?

7         MR. BILOTT:  Your Honor, that's not the way we

8    presented the case.  That's not the way we presented our

9    witnesses and I think that would be prejudicial to us at this

10   point.

11        THE COURT:  If I had the slightest inkling that's

12   true, I'm not questioning the veracity, I'm just thinking we

13   may have a different view on this.  I don't want to prejudice

14   either side but I do think weighing qualifications is part of

15   the jurors' job.  Again, I mean, I don't think there's any

16   error in not sending any of them back but I also think it gives

17   them more to consider when they're looking at the experts'

18   reports.

19        MR. BILOTT:  Again, Your Honor, it just would be

20   Plaintiff's preference that the CVs do not go back.  We would

21   just note our objection to that, Your Honor.

22        MS. NIEHAUS:  We have a strong preference that they do

23   go back.  If anything, what I'm hearing from Plaintiff is that

24   they built up their experts' credentials because they didn't

25   think the CVs were going back.  If anything, they're favored by

1  having put in additional testimony about credentials and that

2  having the CV go back.  I don't see any prejudice in having the

3  CVs go back.  In this case, the jurors sat through three weeks

4  of testimony.  They've seen multiple documents.  They shouldn't

5  be required to rely on their memories for the experts'

6  credentials in this case.

7        MR. BILOTT:  Your Honor, one of the concerns we have

8  is even the titles of some of the articles that these experts

9  have worked on, we believe, could be very misleading.

10  Particularly the way we've -- the line we've tried to walk here

11  with the causation issues.  A number of the -- what is

12  referenced on a number of these CVs, we do believe, would be

13  misleading.

14        THE COURT:  I want to do two things at this point.

15  One is to set a policy for future trials so you all know

16  exactly what to expect.  I'm happy -- Ms. Niehaus, I hope you

17  wouldn't object to this, but you can, within reason, if you

18  want to just say publish 25 articles in peer-reviewed journals

19  instead of listing them.  I can see a lot of flexibility here.

20  If there's anything on the CV you think that you want to take

21  out, you don't have a problem with that, do you?

22        MS. NIEHAUS:  No.  If they want to propose some

23  redactions for titles of articles this they think are

24  particularly objectionable, we can consider that.  But

25  certainly the volume of publication is a relevant

1   consideration.

2        MR. BILOTT:  And that's precisely why, when we had our

3   experts on the stand, that's the kind of questions we asked

4   them.  How many articles have you published?  We did not get

5   into the details of exactly what the titles were and the

6   subject matters.  We asked them general questions.  Have you

7   published 100, 150 articles?

8        THE COURT:  I sat through this and I don't really see

9   a whole lot of difference in the way either of you questioned

10  your experts.  You didn't go through everything.  These experts

11  have very long CVs.  And you were smart enough to do that.  The

12  jurors wouldn't have been able to take much more than that, I

13  don't think.  But the point, again, if there's any prejudice

14  here, I'm all ears but it just seems to me to be a fairly

15  simple issue.

16       MS. NIEHAUS:  We agree.

17       MR. MACE:  We believe that we're unfairly prejudiced,

18  Your Honor, if you don't let them go back.  We feel it's a

19  strategic position that the plaintiffs are taking that their

20  experts, frankly, don't have as beefy or relevant CVs as ours

21  do.

22       THE COURT:  I listened to all this testimony and I

23  know they all had excellent CVs, as far as I'm concerned.  I

24  don't think anybody is advantaged or disadvantaged.

25       MR. BILOTT:  Just a practical issue, Your Honor.  I

1    just checked here as we were talking.  I don't believe we even

2    marked our experts' CVs as trial exhibits in this case.

3          THE COURT:  I don't see that as a major impediment.  I

4    also propose you stick them in a stack and we won't call them

5    CVs, but resumés of testifying experts.  Jurors can look at

6    them or not look at them.  I'm not convinced they're --

7          MR. MACE:  We have no objection to that.

8          THE COURT:  -- going to spend a lot of time on this.

9        Any final thought?

10         MR. BILOTT:  We just preserve our opinion -- our

11   objection, Your Honor.

12         THE COURT:  We'll make a total number of experts, I

13   don't have them counted but there are a fair number, we'll put

14   them in order of testifying and then we'll just -- I suggest

15   maybe do a cover sheet that just lists one through whatever

16   number of each CV and back they'll go.

17         MR. BILOTT:  Your Honor, I would assume that we would

18   have the ability to request redactions if we go through these

19   CVs and there are items that we believe are inappropriate.

20         THE COURT:  Yes.  But I think for the purpose of the

21   next trial, assume that's going to happen, assume I'll permit

22   any redaction you wish.  This is the voluntary CV made by the

23   author and by the side calling.  As long as it's accurate, of

24   course, I know that it would be if you're doing it, but you can

25   summarize it any way you like.

1          MR. BILOTT:  Understood.

2          MR. MACE:  Just for clarity, we've included

3    Dr. Dourson's CV because there were allegations made about his

4    background and whether the CATT team was qualified.  Even

5    though we didn't present him as an expert, his qualifications

6    and what his background was go to the probative nature of the

7    CATT team testimony.

8          MR. BILOTT:  Absolutely not, Your Honor.

9          MS. NIEHAUS:  Not to tag team here.  Given that you've

10   admitted 1057, which is the article, the slanted and biased

11   article about his credentials, we think it would be incredibly

12   prejudicial not to allow his CV to come in to counterbalance

13   that.

14         MR. BILOTT:  Your Honor, what we're referring to is

15   Defense Exhibit D2455.  The plaintiff strongly objects to that.

16   We addressed this in one of the pretrial conferences that we

17   objected to any attempt by DuPont to present him as an expert

18   or to deal with him as an expert because he was brought in as a

19   fact witness and we would strongly object to any effort to

20   present his CV as if he's one of the experts in this case.  We

21   strongly objected to that in one of the pretrial conferences

22   and we understood that DuPont had agreed he would be here as a

23   fact witness only and would be presented as a fact witness

24   only.  And so there is --

25         THE COURT:  I'm of the same view.  He didn't testify

1    as an expert.  And he was also questioned extensively about his

2    background.  I think that's already been covered.  He's not an

3    expert.  His CV doesn't go back.

4              MS. NIEHAUS:  Your Honor --

5              MR. BILOTT:  Just for clarity, that was D2455?

6              THE COURT:  Right.

7          I think that covers all the exhibits, doesn't it?

8              MS. NIEHAUS:  I believe so, yes.

9              MR. MACE:  Your Honor, the nomenclature, you didn't

10   refer to them as court exhibits, record exhibits.

11             THE COURT:  Yes.  Make them part of the record.  And

12   just to the clear, this would be all of the articles that are

13   not -- scientific articles that were testified to but are not

14   going back to the jury but were used in the trial and made part

15   of the record in this case.

16             MR. MACE:  There may be a couple other loose ends that

17   go on that list.  That's the primary ones.

18             THE COURT:  That's fine.

19             MR. MACE:  I had a couple closing argument issues.

20             THE COURT:  Sure.

21             MR. MACE:  So you'll recall that several witnesses

22   we've used the 2010 article that was published in the

23   peer-reviewed literature by the science panel.  And Your

24   Honor's initial ruling was that we had to refer to it as an

25   article by 3M and epidemiologist but I was not to date

1  permitted to refer to it as written by the science panel.  We

2  would reraise that with Your Honor that in the closing argument

3  I be allowed to refer that to as an article written by the

4  science panel.

5       We think it's highly probative what the state of the

6  knowledge was regarding --

7       THE COURT:  It's come in that way already, right?

8       MR. MACE:  Frankly, Mr. O'Brien highlighted Steenland.

9  I don't know if the jury is putting two and two together to

10  make four.

11      THE COURT:  I'm going to stay with my earlier view

12  which is it is part of the state of the knowledge.  So that

13  part, three -- what was the word we used, eminent?

14      MR. MACE:  Highly preeminent.

15      THE COURT:  Scientists did a study that was published

16  in the science panel in 2010.  That's fair game.  Any reference

17  then to the science panel is what I excluded.

18      MR. MACE:  You're staying with that ruling?

19      THE COURT:  Yes.

20      MR. MACE:  The second one was a housekeeping order.  I

21  imagine both sides are going to be using a few demonstratives

22  in closing like we did in opening.  I think we need to schedule

23  a time to exchange those.

24      MR. DENTON:  Your Honor, if I could speak for

25  Mr. Papantonio.

1           We are not using anything that's not admitted into

2     evidence.  We think it would be inappropriate and unfair,

3     frankly, to have to trade with the defendants our mental

4     anticipation.

5           THE COURT:  Can we have an understanding on this?  If

6     something has already been offered and admitted it doesn't need

7     preclearance?  Is that fair enough?

8           MR. MACE:  I think that's true even if people are

9     doing call-outs on those because of exhibits.

10          THE COURT:  Right.  But what you have to exchange

11    would be something that the other side has just simply never

12    seen, even summary charts.

13          MR. MACE:  Right.  Which I don't anticipate having any

14    problem with any of them with the other side.  Much as we

15    didn't in opening.  There's things I didn't like but we kind of

16    said whatever you want to do.  Just so we see it so we're not

17    shocked by something.

18          THE COURT:  And there's nothing new coming is what I'm

19    hearing.

20          MR. DENTON:  Nothing that's not in evidence, Your

21    Honor.

22          MR. MACE:  We have some simple things.

23          THE COURT:  So you will exchange those?

24          MR. MACE:  We'll exchange those.

25          THE COURT:  And we'll note any objections.

1          Let's talk about the schedule tomorrow.  What I think,

2     we'll start right at 9:00 with the jurors and giving each side

3     two hours.  So let's just plan ahead as to how we want to do a

4     break.

5          MR. BUTLER:  Your Honor, I hate to interrupt.  On the

6     two hour issue, Mr. Douglas and Mr. Papantonio are busily

7     whittling things down as we speak.  However, we have been asked

8     to suggest that we may need a little extra time, 20, 30

9     minutes.

10          THE COURT:  Here's the problem.  It's not that I'm so

11     stingy with time.  It's that what we want to do in one day are

12     all the close and the charge.  The only thing, if I were to say

13     two and a half to each side, then I don't want to do the charge

14     at 4:45.  I'd want to do that the next morning.

15          MR. MACE:  Your Honor, I'll see if I can help.  I

16     don't need more than two.  So if Your Honor is inclined to give

17     them, frankly, I think they can make their own strategic

18     decisions.  I don't need more than two.  So I don't need two

19     and a half.

20          THE COURT:  But even so, I'm assuming you really want

21     to break somewhere if going over two hours, right?

22          MR. MACE:  They need to reserve.  They're not going to

23     do theirs all at once anyway.

24          MR. BUTLER:  We'll need to reserve.

25          THE COURT:  You need to reserve.  But if I gave you

1  two and a half hours, you still have –– say you reserve 15

2  minutes, that's two hours 15 minutes straight without a break.

3  That's going to be pretty tough on the jurors.

4       MR. DENTON:  Your Honor, if I may.

5       The anticipation would be if we start at 9:00 that we

6  would go until about 10:15, 10:30, typical break time, take a

7  15 minute break and then we would finish before noon and then

8  we could do lunch break at that point.  Mr. Mace can get his

9  argument together.  He could do his first part of the afternoon

10 if he needs two hours or less.  That would be about the

11 afternoon break and we would finish in rebuttal.  Probably take

12 you 30, 40 minutes to read the instructions to the jury.

13      THE COURT:  At least.

14      MR. DENTON:  I believe this would work.

15      THE COURT:  We can get the case to them right at five

16 o'clock is what we end up doing.

17      MR. DENTON:  Right.  We would respectfully ask for

18 that, Your Honor.

19      MR. MACE:  I was not consenting to two and a half.  I

20 think that's even a little long.  But 15 minutes what he was

21 talking about.  I don't really have a problem with 15 minutes.

22      THE COURT:  I would go with 2:15.  I think I'm doing

23 you a favor by not giving you more.  That's the longest close

24 I've ever agreed to.  So two hours 15 will do it, you think?

25      MR. BUTLER:  Your Honor, we'll follow your

Vol. 15 - 108

```
 1    instruction.  Absolutely.
 2            THE COURT:  I don't like to be autocratic on stuff
 3    like that.  That would get us -- whatever time we finish in the
 4    morning, that's when we'll break for lunch and then plan on an
 5    hour break and, Mr. Mace, you'll start 1:00 or before.  And I'm
 6    assuming you want to break in the middle of yours?
 7            MR. MACE:  Your Honor, I don't think so.  At this
 8    point I'll let you know tomorrow but I'm trying to keep mine,
 9    frankly, Your Honor, down to an hour and a half.
10            THE COURT:  An hour and a half we can do without a
11    break.  But if it's going closer to two, think about it and let
12    me know in the morning.  We can take a break if you like.
13    Sometimes it helps with the attention span.
14            MR. MACE:  Yes, sir.
15            THE COURT:  And then what I assume will happen, I'll
16    tell the jurors they can deliberate as long as they want to
17    tomorrow but my assumption is they'll come back Wednesday and
18    probably have a chance to look at all the exhibits and do some
19    serious deliberating.
20            The only thing -- I mention this, again, as a reminder
21    that rebuttal has to be purely rebuttal.  Nothing new that
22    hasn't been addressed by the defendant first.  So you'll have
23    opportunity for rebuttal but that's the one big note.
24            What I also want you to do is to be very careful with
25    Mr. Quisumbing that we have the exhibits ready to go back
```

1    completely consistent with what we just decided as far as

2    what's been offered and what's been admitted so we don't have

3    any issue later about things that were omitted or things that

4    shouldn't have been included.

5         MR. MACE:  Two other housekeeping items, Your Honor.

6    One is we formally move the admission of all of our exhibits

7    that are on the list that have been presented to the Court and

8    discussed with counsel.  We're not going to read off all the

9    numbers.  I think the record will be clear.  Your Honor has

10   made rulings that.  We'll comply with the ruling.

11        THE COURT:  Right.  And the exhibits that were offered

12   and not objected to of course I'm admitting.

13        MR. BUTLER:  Your Honor, we would move the plaintiff's

14   exhibits on the list that was provided to Mr. Quisumbing

15   consistent with the Court's rulings that were just provided as

16   well.

17        THE COURT:  Likewise, anything that's not objected to

18   will be admitted.

19        MR. MACE:  And then we have an extremely lengthy

20   motion for judgment as a matter of law that Mr. Fazio would

21   like to make.  So we are formally resting then subject to the

22   admission of our exhibits and my reservation on Exhibit 810,

23   811 for potential use in the punitives phase.

24        THE COURT:  All right.  Mr. Fazio.

25        MR. FAZIO:  Your Honor, we would again move for

 1    judgment as a matter of law on all of the plaintiff's counts.

 2    We move on the basis set forth in our prior motion, set forth

 3    in both the opening brief and reply memoranda and incorporate

 4    the additional evidence that the Court has seen in our case in

 5    chief.

 6            THE COURT:  I know you have to do that to reserve and

 7    I appreciate that.  The ruling will be the same.  Thank you.

 8            MR. FAZIO:  Thank you, Your Honor.

 9            THE COURT:  The other thing that -- I'm going to guess

10    you have some things to do before tomorrow but it might not be

11    a bad thing to take a break and come back and talk about just

12    what happens if you go to the second phase so there are no

13    surprises and we can do this efficiently.  Are you ready to

14    move into that area?  I'm thinking more just in terms of a

15    discussion about what we can expect, length of time, what

16    you're thinking of using as general testimony.  We can maybe

17    sort some things out.

18            MR. MACE:  We actually have a meeting later today to

19    discuss that, Your Honor, among my team.  Obviously that 810,

20    811.  We're looking at some other things.  It was our

21    understanding that the plaintiffs were calling Dr. Johnson.

22            THE COURT:  The plaintiffs have an expert.  So we can

23    at least start with that.  Do you expect him to be your only

24    witness?

25            MR. DENTON:  Yes, Your Honor.  And I don't think it

1    will take that long.

2            THE COURT:  There are some subissues, and I suppose we

3    could do this on Wednesday, too, but I believe we want to talk

4    about what to do with the spinoff, what to do -- there's an

5    issue I think raised about salary of people at DuPont, whether

6    that's permissible or not.  I want to address that with you so

7    you know which way that would be going.  But basically what I'm

8    getting from Plaintiffs is you would have an expert you would

9    go through assets and liabilities, income expenses, what size

10   the defendant is, right?

11           MR. DENTON:  That is correct, Your Honor.  Dr. Johnson

12   has submitted reports.  I think they know the nature of what we

13   expect.

14           THE COURT:  I would expect that would be a few hours.

15           MR. DENTON:  I wouldn't think any longer than that,

16   Your Honor.  And then we would have -- we would also

17   potentially -- not potentially.  We'd have some additional jury

18   instructions we'd have to deal with.

19           THE COURT:  We have an opinion coming within the hour

20   probably on just some of the related issues.  There have been

21   some motions pending.  But in terms of length of time on the

22   defendant's side, what are you thinking?

23           MR. MACE:  Your Honor, one of the issues we're going

24   to have to discuss, I think Wednesday morning is probably a

25   good suggestion, that I think a number of the issues we kind of

1    danced around during the cases in chief become more relevant as

2    we've argued in our motion papers for the reprehensibility.  So

3    some of the things the jury has heard bits and pieces about in

4    terms of the Leach settlement and things that DuPont has done

5    already, we think it's appropriate for the jury to hear about

6    that as part of the punitive damages case.

7            THE COURT:  I'm trying to do a couple of things,

8    manage my schedule and yours, but also to make sure there's no

9    surprise.  So the plaintiff's side is pretty simple.  You

10   expected this.  There's some issues that this opinion will

11   resolve as far as the matter's already raised.  But can you be

12   a little more -- you want to use the Leach settlement as

13   evidence in good faith sort of thing?

14           MR. MACE:  Some of DuPont's conduct in association

15   with that.  The fact that they took those steps, they can say

16   well sure but that was part of a legal proceeding.  I

17   understand they'll come back with that.  But the jury's heard,

18   and frankly they put it into evidence, I didn't, that DuPont

19   paid for the water filter.  We just got into the fact that the

20   water was being filtered.  They're the ones that pointed out

21   that DuPont paid for it.  The jury hasn't heard the tune of how

22   much they paid for that.

23           THE COURT:  So paying for the filter.

24           MR. MACE:  Paid for the filtering --

25           THE COURT:  The steps taken.

1          MR. MACE:  That we agreed to do the medical

2    monitoring, agreed to do a lot of things before the science

3    panel actually came back with findings which we think goes

4    toward the reprehensibility or lack of reprehensibility.  So it

5    won't take much time.  It's 15 minutes of -- Dr. Rickard could

6    put it on.

7          THE COURT:  It's more than 15 but it's not days.

8          MR. MACE:  It's not days, Your Honor.

9          MR. DENTON:  I guess that's for our planning and the

10   Court's planning.  Are you intending to call Dr. Rickard or

11   anyone else?

12         MR. MACE:  Well, I mean, if we could stipulate.

13   Frankly, I had offered to stipulate to net worth.  Usually

14   that's what's done in these cases rather than bringing in an

15   expert.  So it could be that the parties could agree on some

16   stipulations that would be read and then we'd have oral

17   argument.

18         THE COURT:  Truthfully, I've only had, I'm thinking,

19   two cases ever that get to the punitive damage phase.  They

20   were much simpler than this case.  So I don't have a lot of

21   track record with this.  But obviously size and then conduct

22   and then typically argument.  Is that how all of you see it?

23         MR. DENTON:  Yes, Your Honor.

24         I've done this once in the phase.  And we did have some

25   only financial information.  The defendant actually offered no

1  testimony.  This is more unique.  But I can't say we would

2  agree or not agree with the stipulation of facts but if

3  Mr. Mace wants to propose something to us, we certainly will

4  consider it.  I'm not saying we will agree to it but we

5  certainly will consider it.

6          THE COURT:  I had some preliminary ruling on this with

7  some Daubert matters but if you couldn't agree that an expert

8  makes sense because to a lot of jurors just the whole concept

9  of asset and liabilities and income and expenses has to be

10  explained.  No offense to any of you, but as lawyers you're

11  saying it's testimony.  You really can't do that through your

12  argument.  So I think a stipulation will be best, or better I

13  should say, and second best would be an expert who could be

14  examined and cross-examined on just what this all means.

15          MR. MACE:  I agree with the comment that we're not

16  talking a half a day.  Between evidence and argument we're

17  probably not talking a half a day.

18          THE COURT:  That gets to another matter.  I don't want

19  anybody to mention to the jurors if they mark the box one way

20  or the other, they go home and if they mark it the other way,

21  they stay.  So we'll avoid that, right?

22          MR. MACE:  Yes, Your Honor.

23          MR. DENTON:  Yes, Your Honor.

24          THE COURT:  That always is -- actually in the tobacco

25  case last summer that I tried, they marked the box and then

1    came back -- no, they didn't mark the box.  That's right.  My

2    memory is not as good as it used to be.  So we didn't have that

3    situation.  We were in a very tight schedule and I was

4    wondering what was going to happen with the schedule.  It

5    turned out not to be an issue.

6         It's anybody's guess how long they're going to

7    deliberate in this case.  I'm assuming you're all thinking that

8    the very next business day we'd start on the second phase as

9    well.

10        MR. MACE:  Yes, Your Honor.

11        Frankly, your schedule works out well if they come back

12   Wednesday and if for some surprise reason they did not come

13   back the right way, they'd have the day off before they'd have

14   to bring Mr. Johnson in on Friday.

15        THE COURT:  That's something I want to mention to you.

16   Normally if this were a more routine case I would have another

17   Judge take this over on Thursday and let them deliberate.  But

18   I don't want to do that.  I think there's way too much

19   complexity here.

20        MR. MACE:  We agree with that.

21        THE COURT:  They'll be home if they don't get a

22   verdict on Wednesday.  They'll just come back Friday and

23   deliberate.

24        Any other matters we need to take up?

25        MR. MACE:  Not at this time on the defense, Your

Vol. 15 -  116

1   Honor.

2          THE COURT:  All right.  Have a nice evening.  See you

3   back here.

4      Let's meet at 8:30 in the morning just to make sure we

5   don't have any unanswered questions.

6      (The proceedings were adjourned at 3:42 p.m.)

7                        – – –

Vol. 15 - 117

1                         C E R T I F I C A T E

2

3          I, Lahana DuFour, Official Court Reporter of the

4   United States District Court for the Southern District of Ohio,

5   do hereby certify that the foregoing constitutes a true and

6   complete transcription of our stenographic notes taken of the

7   proceedings held in the afore-captioned matter on the 5th day

8   of October, 2015.

9          In testimony whereof, I hereunto set my hand on the

10  7th day of October, 2015.

11

12

13                         s/Lahana DuFour, RMR, CRR
                           Lahana DuFour, RMR, CRR
14                         Official Court Reporter
                           Southern District of Ohio
15

16

17

18

19

20

21

22

23

24

25