Vol. 16 -     1

1              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF OHIO
2                  EASTERN DIVISION

3    CARLA MARIE BARTLETT and                )
     JON WILLIAM BARTLETT,                    )
4                                             )
                        PLAINTIFFS,           )  CASE NO. 2:13-cv-170
5                                             )
                vs.                           )  OCTOBER 6, 2015
6                                             )
     E. I. du PONT de NEMOURS AND COMPANY,    )  8:35 A.M.
7                                             )
                        DEFENDANT.            )
8    _____)

9
                       VOLUME NO. 16
10      TRANSCRIPT OF THE PROCEEDINGS OF THE JURY TRIAL
          BEFORE THE HONORABLE EDMUND A. SARGUS, JR.
11           UNITED STATES DISTRICT CHIEF JUDGE
                     COLUMBUS, OHIO
12

13   FOR THE PLAINTIFF:

14      Levin Papantonio Thomas Mitchell Rafferty & Proctor, P.A.
        By:  James M. Papantonio, Esq.
15           Ned McWilliams, Jr., Esq.
             Christopher Paulos, Esq.
16           Timothy O'Brien, Esq.
        316 South Baylen Street, Suite 316
17      Pensacola, Florida  32502

18      Douglas & London, PC
        By:  Gary J. Douglas, Esq.
19           Michael A. London, Esq.
             Rebecca Newman, Esq.
20           Alicia P. Ellsayed, Esq.
        59 Maiden Lane, 6th Floor
21      New York, New York  10038

22      Taft Stettinius & Hollister
        By:  Robert A. Bilott, Esq.
23           David J. Butler, Esq.
        1800 Firstar Tower
24      425 Walnut Street
        Cincinnati, OH  45202

25

```
                                                Vol. 16 -     2
1
             Schlichter, Bogard & Denton, LLP
2            By:  Roger C. Denton, Esq.
                  Ashley Brittain Landers, Esq.
3            100 South Fourth Street, Suite 900
             St. Louis, Missouri  63102
4
             The Cochran Firm
5            By:  David E. Haynes, Esq.
             1100 New York Avenue, N.W.
6            Suite 340, West Tower
             Washington, D.C.  20005
7
             Cory Watson Attorneys
8            By:  Nina Towle, Esq.
             2131 Magnolia Avenue South
9            Birmingham, Alabama  35205

10

11    FOR THE DEFENDANT:

12           Squire Patton Boggs LLP
             By:  Damond R. Mace, Esq.
13                C. Craig Woods, Esq.
                  Stephanie E. Niehaus, Esq.
14                Stephen Fazio, Esq.
                  Aaron T. Brogdon, Esq.
15           4900 Key Tower
             127 Public Square
16           Cleveland, Ohio  44114

17                            -  -  -

18

19           Proceedings recorded by mechanical stenography,
       transcript produced by computer.
20

21

22

23                         LAURA SAMUELS
                    FEDERAL OFFICIAL COURT REPORTER
24                   85 MARCONI BOULEVARD, ROOM 302
                        COLUMBUS, OHIO  43215
25                  TELEPHONE NUMBER: 614-719-3245
```

Vol. 16 –    3

TUESDAY MORNING SESSION

OCTOBER 6, 2015

– – –

Thereupon, the following proceeding was held in chambers:

THE COURT:  A couple little things.  Ms. Niehaus
pointed out some discrepancies on the jury instructions that
were corrected.  We fixed those.  You've seen that?

MR. DENTON:  Yes.

THE COURT:  It's consistent with what I said on the
bench, so we fixed that.

And then I've gotten another briefing regarding a guy
who could have been an expert but wasn't.  I'm still of the
same view that as far as Dr. Dourson's CV, that won't be going
in.

Have you worked out all the issues with the other CVs?
The ones are coming in but the plaintiff was able to do
whatever redactions or summaries you thought were appropriate?

MR. BILOTT:  I believe so, Your Honor.

THE COURT:  That's all I have.  Any other issues?

MR. DENTON:  Judge, we have made a decision to
withdraw the battery claim.

THE COURT:  All right.  So what we'll do quickly is
change the instructions.  It will change a number.  It will
take out all the battery instructions, of course.  Several
places where it referred to three claims, that will be two

Vol. 16 –    4

 1   claims.  The verdict forms will change.  And I think that

 2   that's about it.  So nothing about substance other than just

 3   the removal of the claim.

 4          MR. DENTON:  Yes, Your Honor.

 5          And if it's helpful for the Court, I had someone, early

 6   this morning, make those edits.  Not that we would do the

 7   Court's work but we thought we would --

 8          THE COURT:  We don't mind.

 9          MR. DENTON:  We thought it would be easy on the Court.

10   And the other point there, Your Honor, we had asked in limine

11   that no mention be made in closing of the removal of that

12   claim.

13          MR. MACE:  We have no objection to that.

14          THE COURT:  So what I'm going to do is, even though I

15   told them there were three claims, I'll just be silent on that.

16   It will be a two-claim submission.

17          MR. DENTON:  Very well.

18          MR. MACE:  And I would mention, Your Honor, we were

19   going to display, in accordance with Your Honor's guidance,

20   just a couple of the instructions.  But some of them may be

21   impacted by this now.  So we'll need to get an electronic copy.

22          THE COURT:  We'll have it fixed this morning.

23          MR. MACE:  We'll get a final?

24          THE COURT:  We'll do that, I'm sure.

25          MS. NIEHAUS:  We have some residual issues not related

1    to the CVs but some other documents.

2         Are we resolved on the other two --

3         MR. BROGDON:  1847 and 1943.

4         MR. BILOTT:  Yes.

5         MS. NIEHAUS:  So 1847 will go in as it was.

6         MR. BROGDON:  The one you listed.

7         MS. NIEHAUS:  And we'll relabel that 1937A?

8         MR. BILOTT:  That's fine.

9         MS. NIEHAUS:  I think the only other one, Your Honor,

10   was 612, it was the Little Hocking website.

11        THE COURT:  Where's Chris on the --

12        MR. BILOTT:  He gave her the instructions.

13        MS. NIEHAUS:  This was the website that was not

14   admitted but you asked for some redactions to be proposed.

15   Mr. Paulos sent over a version last night with some redactions.

16   I believe his are in blue.

17        MR. BILOTT:  Yes.

18        MS. NIEHAUS:  We're fine with those redactions but we

19   wanted some additional redactions.  Ours he has marked in red.

20   So that's on this version.

21        THE COURT:  So the red part is proposed to be redacted

22   by the defendant but not agreed to at this point?

23        MR. DENTON:  Correct.

24        MS. NIEHAUS:  Your Honor, I went back through the

25   transcript last night and identified the portions of the

1   document that had been read to the jury.  We believe everything

2   other than what was read to the jury should come out.  It's all

3   third party statements.  It's speculation.  It's innuendo,

4   unsupported allegations by the Little Hocking Water District.

5   And there was one portion at the end that was displayed to the

6   jury about Gerry Kennedy destroying documents but then on

7   side-bar you said should not have been disclosed.

8           MR. BILOTT:  Your Honor, that's -- obviously

9   Plaintiffs disagree.  The sections that have been -- pretty

10  much entire rest of the letter that DuPont proposes to take out

11  were referenced in summary form by the witnesses.  They didn't

12  maybe quote the exact language but those sections were

13  discussed by the witnesses, Your Honor.

14          MS. NIEHAUS:  Your Honor, you'll remember that the way

15  this came up was that we had put a document up that referenced

16  just the link to the website.  Before that, the document was

17  out entirely.  And the link -- what Your Honor had said was,

18  well, you can show the jury what would have been seen if

19  someone had followed that link.  But then there were portions

20  that were displayed.  But this document is full of references

21  to newspaper articles --

22          THE COURT:  We only have a couple minutes to do this.

23  I want to cut this short.  This is 15 pages of material.  I

24  could spend a couple hours on this if I had the opportunity to,

25  but I don't.

1        Let's go to the first issue.  There's some reference in

2  here to the CATT team and whether or not, with regard to the

3  CATT team, DuPont could rule out the development from humans.

4  Anybody testify to that from this document?

5        MS. NIEHAUS:  Where are you, on page --

6        THE COURT:  Page 39.  Page four at the bottom.

7        MS. NIEHAUS:  We've agreed that whatever is --

8        THE COURT:  The red part I thought is what's at issue.

9        MS. NIEHAUS:  What's in red is at issue.  I've got a

10  different version actually.  Because that was -- let's work off

11  my version.

12        THE COURT:  I thought we had this all resolved

13  yesterday.

14        MS. NIEHAUS:  So what I've boxed in red is the

15  additional things that we think should come out.  So starting

16  on page two there's a hearsay statement, I'm sorry, Your Honor,

17  the prior page.  There's a hearsay statement there about what

18  was told to Little Hocking by a third party water testing

19  company.

20        MR. PAPANTONIO:  Judge, this is what they would have

21  seen if they come to this website.  This was not going to come

22  in until they opened the door and they talked about the Little

23  Hocking website and how you can get all your information there.

24        MR. BILOTT:  Exactly.  This entire letter was posted.

25  There was nothing redacted for any of the -- this is what the

1    testimony was.  This thing was linked in full.

2         THE COURT:  But here's what I don't want to have is

3    the jurors picking up a document for which there hasn't been

4    any extensive testimony and reading comments.  That could hurt

5    either side.  I'm open for suggestion, but if there was a

6    witness who went through this --

7         MR. PAPANTONIO:  There wasn't.  There wasn't a witness

8    that went through it.

9         MS. NIEHAUS:  No, there wasn't.  Your Honor, what you

10   said is this document is not admitted yet.  You can use parts

11   of it.  Stay away from the things that -- you said, in other

12   words, things that would have gone right to DuPont are in here.

13   And that's what you said, stay with that for now.  So anything

14   else, the statements from third parties, statements from

15   newspapers, summaries of statements from newspapers, that all

16   should come out.

17        MR. PAPANTONIO:  The only troublesome thing is they

18   made this an issue by saying, the issue was we opened all of

19   this up to -- they put it up there as a website, go see this

20   website.  You're going to learn the story about DuPont.  Now

21   what we're hearing is, we don't want that story heard.  That is

22   part of the problem.

23        THE COURT:  Any particular problem with the proposed

24   redactions?  There would still be a lot of this in.

25        MR. BILOTT:  I think, if anything, one section we

Vol. 16 -   9

1    definitely disagree with is on the last page.  The last page of

2    redactions where it's Little Hocking stating their position.

3            THE COURT:  That's at the bottom --

4            MR. BILOTT:  That's P1612.7.

5            THE COURT:  And you could live with the other

6    redactions?

7            MR. BILOTT:  I think so, Your Honor.

8            THE COURT:  That's what we'll do.  We'll leave that in

9    and everything else will come out that's proposed to be

10   redacted.  Everything that's in now stays in except for the

11   parts that are in disagreement.  Everything that's disagreed

12   will come out except the last page.

13           MR. BILOTT:  Thank you.

14           MS. NIEHAUS:  All right.  I'll take care of those

15   redactions.

16           MR. MACE:  One issue I wanted to raise briefly, Your

17   Honor.  I've got several other hearings and oral arguments to

18   schedule.  There was a rumor around the back of the courtroom

19   that the Wolf trial may --

20           THE COURT:  No.  I want to talk to you about that.

21   What I'd like to find out is what you think the next trial will

22   take time-wise.  We'll have time for that.  I was thinking, in

23   fact I'm getting pressure from our jury commissioner that we're

24   going to move that by one day I think I told you.  I can't

25   start it that Monday but the Tuesday would be the date that I'm

 1   looking at this, December 1st.  It's going to be a four-week --

 2        By the way, I don't want to talk about this unless we

 3   have any other issues for today.  Do we?

 4        MR. PAPANTONIO:  We have one issue.

 5        THE COURT:  We'll come back if we have time.

 6        MR. PAPANTONIO:  Judge, I worked for MSNBC for quite

 7   some time and Ed Schultz is here today.  He has high

 8   recognition.  There may be some other people there from MSNBC,

 9   too.  Ed's doing a story on this.  He understands not to make a

10   big sign the autographs and that.

11        THE COURT:  Any problem if he's not in the first row

12   might make him less visible?

13        MR. PAPANTONIO:  I don't think so.  I think they're

14   going to recognize him anyway.  He's six foot four, six foot

15   three.

16        THE COURT:  He's free to be there.  I have no problem

17   with that.

18        MR. PAPANTONIO:  I just want to make the Court aware

19   of that.

20        THE COURT:  Okay.  Anybody else?

21        MR. PAPANTONIO:  I don't know right now.  I don't

22   know.

23        THE COURT:  I don't think that's going to happen.  You

24   see any issue?

25        MR. MACE:  I don't see any issue as long as no

Vol. 16 -   11

1    autographs and making a big deal of it.

2        THE COURT:  Let's go back to this.  It's my thought if

3    we have another four-week trial we're going to be missing a lot

4    of days and you'll have a hard time getting jurors who will go

5    through the entire month of December.  If it's shorter, and I

6    never impose time limits on a case ever, but if you've been

7    through one of these now you probably have a better idea of

8    what the next case is going to look like.  Any thoughts on how

9    long the trial would go?

10       MR. MACE:  It may go just a little bit longer for the

11   second one, Your Honor.  Longer than this one in that I think

12   both sides had some issues come up that they weren't as

13   prepared to deal with as they wanted to be.  So I think we have

14   to be prepared to deal with some additional issues.

15       THE COURT:  I don't want to throw the schedule off.

16   Even if we start on a Thursday, that one day wouldn't make any

17   difference.  Four weeks will put you to the end of December,

18   right up to New Year's Eve.  I've had a case where one of the

19   issues was they were deliberating Christmas Eve and that was an

20   assignment of error and the assignment lost.  I'm going to make

21   you stipulate you won't appeal on that issue if we try this.

22       So I am concerned with that part.  Think about it.  If

23   there's another way we could do it, I don't think we can start

24   it earlier.  That wouldn't make sense.  We can move it back a

25   week, it's right after Thanksgiving.  That's generally a tough

1    time of year to get a jury to sit for four weeks.

2            MR. MACE:  One thing I'd point out, Your Honor, is

3    that we started out with the six bellwethers and then Mr. Pugh

4    dropped out.  We only have five now.  So we have a slot.

5            THE COURT:  Move it forward?

6            MR. MACE:  Move it forward.

7            THE COURT:  I don't have a strong preference except

8    for the preference that I can imagine what the pool would look

9    like when we ask them, how many of you can serve all the way to

10   January 1st?  You're going to have a lot of people saying,

11   what?  It's going to be a tough month.

12            MR. PAPANTONIO:  Judge, as far as how they move, if

13   the Court decides that's what has to happen, we've already kind

14   of invested the effort for March for the case we have for

15   March.  And we wouldn't want to bump that to put this one into

16   there.

17            THE COURT:  We can look like the first of the year,

18   too.  Just move it a month.

19            MR. MACE:  Yeah.  And then you're going to run into

20   the issue with I think the Little Hocking case got rescheduled

21   for January 15th.  So we were avoiding --

22            THE COURT:  You're in that case?

23            MR. MACE:  Mr. Woods.

24            MR. WOODS:  Yes.

25            THE COURT:  You're in that case again.

1           MR. MACE:  And then we like the alternate courtroom

2    just because of the number of lawyers involved.

3           THE COURT:  We're going to be bumping.  Judge Marbley

4    is very generous and gracious with that but he has a couple of

5    murder cases coming up that are going to fill the courtroom,

6    too.  So we may have some issues there.  There is a screen

7    already in place in mine similar to the one you're using so the

8    technology is there.  Let's think about this.  When the jury is

9    out tomorrow we'd have plenty of time to discuss this.

10          Anything else before we begin?

11          MR. PAPANTONIO:  No, sir.

12          MR. MACE:  You know what, Your Honor, I will mention I

13   did review my argument last night and I think there is a very

14   logical break time after about an hour.  So I would ask for

15   just -- it doesn't have to be just a five-minute break even.

16          THE COURT:  All I want to be able to do is get the

17   charge to them before 4:30, something like that.  It sounds

18   like we're on schedule.  So you'll pretty much kill the

19   morning.  We'll probably take a little bit earlier lunch break

20   when you're done and then you'll have a break.

21          You'll still be within the two hours?

22          MR. MACE:  Yes, sir.  Well within.

23          THE COURT:  And then you'll have your -- I'm assuming

24   you want 15 minutes for rebuttal.  That's what you asked for.

25   And then we'll do the charge right after that.  Let's just get

Vol. 16 -    14

1    it all done today.

2        Very good.  Thank you.

3        (End of chambers discussion.)

4                    - - -

5        Thereupon, the following proceedings were held in open

6    court with jurors present at 9:04 a.m.

7            THE COURT:  Good morning, ladies and gentlemen.  And

8    welcome back.  We are about to begin the final portion of this

9    trial.

10        You have now heard all of the witnesses and testimony.

11   And when you begin your deliberations you'll also have with you

12   all of the exhibits that have been admitted as evidence in this

13   case.  I mention that because that is the basis for your

14   decision that will follow.  What you'll next hear will be

15   closing argument from the attorneys for each side.

16        This is a very important part of the case but I caution

17   you that it will be the opportunity for the attorneys to point

18   you to the different parts of the testimony and record that

19   you've heard.  As I've cautioned you, what the attorneys say or

20   do, of course, is not the evidence upon which you'll decide the

21   case.

22        The plaintiff has the burden of proof so Mrs. Bartlett

23   will have her attorneys go both first and then last with

24   rebuttal.  Each side has asked for approximately two hours for

25   closing argument.  And then after that, later today I will give

Vol. 16 -   15

1   you the final legal instructions that will apply in this case.

2        With that, I will call upon Mrs. Bartlett's counsel to

3   begin with closing argument.

4        MR. PAPANTONIO:  May it please the Court.

5        Ladies and gentlemen, thank you to your time these last

6   few weeks.  It's been a lot of information been thrown at you

7   and we realize that.

8        As I speak to you this morning I want you to rely on the

9   evidence.  I want you to rely on the documents that we've

10  introduced because, as the Judge says, that's what you'll have

11  back in the jury room.  So what I've done is I've prepared that

12  information the same way that I prepared the opening statement.

13       I started this case by telling you there's nothing I

14  will tell you that we will not have a document to substantiate.

15  And we have watched this entire trial as you have taken

16  incredible notes.  Please don't stop taking notes right now

17  because I'm going to try to give you the ideas of what we think

18  the evidence shows and I'll go right to the document we think

19  shows it and then I'll ask you to consider that back in the

20  jury room.

21       After working in courtrooms for 30 years I've

22  occasionally run into the cynic, very rare, but the cynic who

23  believes that the court system, the justice system doesn't

24  work; believes that the only place that you really see justice

25  being the only time you see things work out like they're

1     supposed to is in great theater, maybe in a movie or maybe in a

2     great novel.

3          Time and time across this court, across this country

4     I've tried cases from California to Connecticut.  That's been

5     proven wrong.  So I don't believe in the cynic.  I believe all

6     a jury wants to know is what are the facts, let me know the

7     truth and let the jury decide.  And I believe in the jury

8     system and I've seen the cynic day after day say it doesn't

9     work.  It does work.  It changes -- it changes the way we

10    interact as people.  It holds a democracy together.

11         One element is the constitutional notion of justice for

12    all, ladies and gentlemen, is not -- hasn't morphed into the

13    idea.  It's an old concept.  It is basic constitutional

14    concept.  It has not morphed into the idea that it's only

15    justice for the powerful.  A courtroom like this, Ms. Bartlett

16    is able to come to the courtroom with the biggest corporation

17    in the world and have a jury hear her facts.  And she's able to

18    tell her story.  And there is no place for justice only for the

19    people who have the most power.  And this concept of too big to

20    be held accountable was never something that the constitution

21    anticipated.

22         It doesn't fit with our constitutional values in this

23    country.  It doesn't fit into the plan of democracy that we've

24    made so important.  And for four weeks, my staff and I have

25    tried to remind DuPont of that.  And there's been times I know

1   with cross-examination you thought I was a little hard or you

2   might have thought my partner was a little hard on the witness.

3   But this is the only time Ms. Bartlett has to tell her story.

4   And the only way this system works is if I do my job.

5       So this morning, in this Ohio courtroom, I'm going to

6   try to do my job.  And I hope DuPont hears me.  I hope they

7   hear that there's no system in this country that says that a

8   corporation is too big to be held accountable.  And I want to

9   do it with the documents that you saw in this case.

10      You heard an awful lot about this concept that we have

11  no information at this point that would lead us to believe that

12  there's a significant human health impact.  We are the first

13  person who introduced that.  We are the first -- we introduced

14  that in our case.  Why?  We wanted you to see part of this case

15  is that as late as 2007 you have the biggest organization in

16  this country who was supposed to be understanding what's

17  happening with human health.  They don't understand it because

18  DuPont set out to make sure they don't understand it.  And in

19  your jury verdict you're going to hear from the Judge, you're

20  going to hear a term called conscious disregard.  That's

21  conscious disregard:  To intentionally set up a system to where

22  science cannot catch up with the truth, to where science has no

23  idea what's happening in people's lives in the Ohio Valley.

24      How about this one?  EPA is not aware of any studies

25  specifically relating to current levels of C-8 exposure to

1    human health effects.  We wanted you to see that.  We want you

2    to see that as late as 2014 they're saying, we don't have all

3    the information.  That is not a good thing for DuPont.  Any way

4    you dress that up, that is not a good thing for DuPont.

5         It's not a great idea to hide information from doctors.

6    It's not a good idea to set up on a plan where you hold up the

7    information so doctors like Dr. Bahnson have to take the stand

8    and say, I didn't know about this in 2015 and in 2014.  This is

9    part of the case.  Every time you see a document that says, we

10   didn't have enough information to conclude, we couldn't tell

11   you whether C-8 causes disease or not.  Every time you hear

12   that, ladies and gentlemen, understand that is part of the

13   conscious disregard that this company showed to everybody

14   living in the Ohio Valley.

15        It's conscious disregard and we asked the question about

16   conscious disregard.  You might remember we asked Dr. Michael

17   Siegel.  By the way, if you don't think a company that has

18   thousands of scientists could bring in a doctor like

19   Dr. Siegel, a public health specialist who devoted his life to

20   public health, if you don't think they could bring in a doctor

21   to dispute what this man said, really?  Here he says, I asked

22   him, do you believe that DuPont displayed a conscious disregard

23   to the rights and the safety of people like Ms. Bartlett, great

24   probability of causing substantial harm?  He says, I do.  He's

25   not equivocal about it.  He says, I do.  And he's undisputed in

1   this case, ladies and gentlemen.  Nobody has disputed him.  No

2   public health scientist has come to this Court.  You heard his

3   qualifications.

4        This is not one of those cast actors like we saw with

5   Mr. Dourson, who I'm going to talk about in a minute.  This is

6   not an actor.  This is a guy who's devoted his life to public

7   health.  And when I asked him the question, do you believe

8   conscious disregard is here, he said, yes.  He says, I think

9   it's important.  Actions are important.  He says, it doesn't

10  require some sort of malicious intent.  It's their actions that

11  are important.  Their actions where they failed to monitor the

12  water and they failed to tell the public about what was going

13  on is conscious disregard.

14       He says something else I'm going to show you in a

15  minute.  He says, conscious disregard is when a company like

16  DuPont makes the decision to keep quiet, to keep silent so

17  scientists, as late as 2015, don't even know what's going on.

18  So doctors like Dr. Bahnson who have to treat Mrs. Bartlett for

19  cancer, life and death situations, to where he doesn't know

20  what's going on.  That's conscious disregard.

21       And the man who explained it the best, I really think,

22  was Mr. Petty.  I asked him, do you have an opinion to a

23  reasonable degree of certainty whether DuPont existed --

24  exhibited conscious disregard of the rights and safety of

25  humans in the surrounding community?  He says, well, certainly.

1   First of all, do no harm.  Always make mistake on the part of

2   the public health.  That's common sense.  You don't need an

3   expert to tell you that.  But he told you something else.  And

4   this may be, this is a critical -- this was a critical document

5   in this case and I saw you all taking notes on it.  You

6   understood how critical it was.  Watch this.

7        I asked him -- he was on the stand and my partner,

8   Mr. O'Brien, asked him the question.  Would you talk about this

9   document called connecting the dots?  Would you talk about this

10  document?  And he said, yeah, I'll talk about it.  I reviewed

11  it.  He said -- the question was, what are the dots?  The dots

12  are all the bad things this company has done.  You'll have this

13  document in the room with you.  You'll be able to see it.  It's

14  unequivocal.

15       When they're talking about dots, they're talking about

16  all the bad things they have done in regard to C-8.  You watch.

17  When you have it back there, you'll see it.

18       Mr. Petty said, dots equal liability.  You remember

19  that?  He reviewed this.  He reviewed it with all the other

20  information.  Let me talk to you about this document.  This

21  tells a story.

22       This tells you the story why Dr. Bahnson had to take the

23  stand and didn't know anything about all this.  This tells you

24  why the EPA, as late as 2008, is still writing, we don't have

25  enough information.  Because this company set out to make sure

1    that nobody connects the dots, nobody connects all these issues

2    that are so important about what they knew and when they knew

3    it and how bad it was.  Under no circumstances can we let the

4    people connect the dots.

5         First question in this document was, who has an interest

6    in the dots?  Well, local environmental, environmental justice

7    activists, plaintiffs' bar, people like Mr. Bilott, who but for

8    his effort this story would never be told.  Local environmental

9    organizations, they have an interest in it.  Community

10   advocates.  The media.  How does the media report to let

11   anybody know something if every day they're covering it up?  If

12   every day they're trying to make certain that nobody connects

13   the dots?  Watch this.

14        You see this here on the bottom, is there a strategy we

15   could use to minimize the amount of information being

16   disseminated?  I didn't write that.  They wrote that up in

17   Delaware, up where Dr. Rickard does his business up in Delaware

18   with all this was taking place.  How is there a strategy?

19   Yeah, there's a strategy.  You know what, it worked really,

20   really well.  Is there a strategy we can use to minimize the

21   amount of information being disseminated?  That's right on this

22   document.

23        And then it says, how can information about dots be

24   obtained?  Well, discovery proceedings.  The same thing that

25   Mr. Bilott's been criticized for in their own documents.  He's

1   treated like some kind of second-class citizen because he's

2   trying to tell the story to people in this courtroom, because

3   he's trying to tell the story to people in the Ohio Valley.

4           Discovery proceedings.  You think we got all these

5   documents just from DuPont?  No.  That didn't all come from

6   DuPont.  It took hard work.  And Mr. Bilott is the one who

7   started all that.

8           Government agencies.  They're the ones who we got, how

9   can information about dots be obtained?  You can sure find it

10  out from government agencies.

11          The next document, the next part of this document.

12  Please, ladies and gentlemen, look at this document.  It will

13  cut through a lot of what you have to decide in this case,

14  connecting the dots.  What can trigger interest in the dots?

15  Public discontent.  That was going on in the Ohio Valley.  They

16  were worried about it.  People were wondering, my neighbor's

17  sick, their neighbor is sick, what is this all about?  What is

18  this stuff you're putting in our drinking water?  What is it?

19  I hear about C-8.  I hear it stays in your blood system for 20

20  years.  Is that good or is it bad?

21          That's one of the things they did not want connected up

22  in this case.  Health issues.  What can trigger interest in the

23  dots?  Health issues.  That can sure do it.  The media.  Once

24  the media actually has the information, they can report it and

25  people like Ms. Bartlett and her family can talk about it and

1    they can make a decision.  Do I want my family around this?  Do

2    I want my baby drinking this water?  They can make a decision.

3    It's about choice.

4         Here was the effort to keep the choice away.  As a

5    general -- here's what they say.  This is their words.  This is

6    not me talking.  It says, as a general statement, anything that

7    limits the interest in dots will tend to diminish our exposure.

8    As a general statement, anything that limits the interest in

9    the dots will tend to diminish our exposure.

10        In other words, people don't find out about

11   bio-persistence.  They don't find out that C-8 stays in

12   people's blood for 20 years.  They don't find out about

13   latency.  They don't find out what we've talked about in this

14   case that they didn't even know.  DuPont had no idea what was

15   going to happen 20 years later.  They were more concerned about

16   bio-persistence than they were cancer.  And I want to show that

17   to you in just a minute.

18        But here's the point.  This is conscious disregard.

19   This isn't just negligence.  You're not going to have any

20   trouble deciding negligence.  This goes far beyond negligence.

21   Most of what I talked to you about is going to be about

22   conscious disregard because that's the next step after

23   negligence.

24        It got to the point to where connecting the dots worked

25   so well that one -- in this town, right here in Columbus, you

1    have a premiere world-class oncologist who's written more,

2    studied more and researched more about cancer than 100 doctors.

3    He's right here in your backyard.  He's the one who was asked

4    to put together, help build the James Cancer Center and now,

5    what is the James Cancer Center?  It's one of the most

6    effective, most important cancer research centers in the world.

7    Right here in Ohio.  Right here in Columbus.  And he came to

8    town to tell you.  He was asked this question by my partner,

9    Mr. Douglas.

10        He says, did anybody come tell you about carcinogen in

11   the drinking water?  Not with me.  They never told me anything

12   about that.  Why would you not let doctors know the same thing

13   you told your employees back in 1988?  They told their

14   employees in 1988 that this stuff can cause cancer.  They were

15   silent with everything else dealing with the community.  They

16   didn't say a word.  And this is the effect of that.  Did

17   anybody say anything to any people around the James center?

18   No.  I don't know of anyone that they did.

19        That is part of the connecting the dots story.  Keep it

20   quiet.  Don't talk about it.  Maybe the media won't pick up on

21   it.  Maybe Mr. Bilott will get tired of what he's been doing

22   the last 15 years.  Maybe Ms. Bartlett will have no idea what

23   caused her cancer.  Maybe the people drinking the water out

24   there in the community will say, well, there's nothing here to

25   worry about.  Maybe, maybe, maybe.

1     You know what, they gambled and they lost.  And you are

2  the first people to hear this story and the whole world's

3  watching.  You're the first people to hear the story from

4  beginning to end.  This is the first time this story has been

5  told in a courtroom.

6     That's why I say, your burden is huge.  Because you have

7  to factor in some things that, in your daily life, you don't

8  run into.  You don't run into conduct like this.

9     I talked about Dr. Siegel.  Dr. Siegel talking about

10  conscious disregard.  Well, here's what I wanted to ask him.  I

11  said, Dr. Siegel, what does it mean when people hide things?

12  What happens when, for example, this company hid information

13  from the EPA which is the clearing house for everything that

14  happens as far as public health on an issue like this?  What

15  happens?

16     He said this.  I said, do you have any information on

17  how the process of withholding information, being transparent

18  slows the ultimate decision?  He says, it's important to point

19  out that the EPA doesn't go out and investigate all kinds of

20  chemicals.  Companies are trying to find out about hazards.

21  They really only respond when evidence is presented.

22     Evidence in this case was covered up.  And that was part

23  of -- that was part of the connecting-the-dots strategy.

24  That's what they were trying to do.  To where a person couldn't

25  get on the internet and find out what was really happening.

1    They had no way of doing it.

2         He says, had the information been released to them

3    earlier, they could have done something much earlier to protect

4    the public health.  They could have protected Mrs. Bartlett.

5    They could have protected the people in the Ohio Valley.  They

6    knew about it, ladies and gentlemen, as early as 1981.  And I

7    want to tell you why.  I'll tell you in just a minute.

8         It wasn't just Michael Siegel saying that.  This consent

9    order that we've talked about here, it says, time and time

10   again, it says, failure to receive TSCA substantial risk

11   information deprives the EPA of being fully apprised of

12   potential risks about chemicals and it impairs the EPA's

13   ability to take actions necessary to address the potential risk

14   to human health or the environment.

15        How do you make a decision that that's a good thing?

16   You make a decision because you are consciously disregarding

17   decency.  You are consciously disregarding fairness.  You are

18   consciously making decisions that the profits we're making off

19   of Teflon is far more important than the human life of a woman

20   like Ms. Bartlett.

21        And then we get to Dr. Rickard.  Dr. Rickard's on the

22   stand.  When we say to Dr. Rickard, my partner asked

23   Dr. Rickard, he says -- he starts talking about, we finally had

24   to admit -- we admitted in 2012 that C-8 causes cancer.  And

25   then he was asked, okay, at least in 2012 when you had to admit

1    it did you tell the community?  Did you send a press release to

2    the people living in the Ohio Valley?  Did you tell them, did

3    you hold town meetings, did you have news bulletins and

4    websites, all of which they did when they were telling

5    everybody don't worry about this stuff, it's not a problem?

6    How many of those did you see?  How many press releases where

7    they were telling people like Ms. Bartlett, don't worry about

8    it, everything is okay?  All this stuff about cancer doesn't

9    amount to anything.  Don't worry about it.  How many times did

10   you hear that?

11        And then the next question was, well, I'm talking

12   about -- Mr. O'Brien took it right up until last Thursday in

13   the courtroom.  He says, I'm talking about all the way to

14   today, did you send anything to the Ohio Valley residents

15   telling, oh, you know what, all that stuff you've been drinking

16   for 50 years, it can kill you.  It can cause cancer.  It can

17   have you in an operating room where they cut your body in half

18   to remove a tumor.  Did you tell anybody?  No.  No.  We didn't

19   tell anybody.

20        You know why that's important?  Because they've tried to

21   tell you that we didn't know, none of this was foreseeable and

22   had we known something, we would have done something about it.

23   We'd have done something about it.

24        Ladies and gentlemen, they had this information in 1988

25   and they didn't do anything about it.  In 1988 they told their

1   employees, you can get cancer from this but they kept it quiet

2   from the people in the Ohio Valley.  They kept it quiet from

3   people like Dr. Bahnson.  And you know what else about this,

4   think about this.  You saw documents -- you saw literature that

5   Mr. Mace put up on the screen and literature was as late as

6   2013, 2014 maybe where they're still saying, there's not enough

7   information to make a decision.  While that's up on the screen

8   and they're saying, we don't have enough information to make a

9   decision, in the file cabinets of Mr. Rickard's Delaware group

10  they're admitting, yeah, yeah, it causes cancer.

11       So what do you do?  What do you do?  What you do is you

12  do the same thing that the asbestos industry did, the same

13  thing the DET industry did, the same thing the tobacco industry

14  did.  What you do is you string out the American public as long

15  as you can, you create doubt as long as you can, you make every

16  penny, profit you can make off of Teflon as long as you can

17  because you know paying everybody off in the end is not

18  going -- it's not going to touch what you made in profits.

19       That's what you do.  You create this aura of being

20  silent.  You don't tell anybody.  And because you don't tell

21  anybody, you have to build a defense around we don't tell

22  anybody.  You know what the defense is?  We didn't know.

23  That's what we heard in this courtroom.  We didn't know.  We

24  had no way of knowing.  Nobody told us.  Nobody directed it to

25  us.  Nobody told us that C-8 can cause cancer.  Even though we

Vol. 16 -    29

 1    did know.  It's the only defense you got.

 2         Mr. Mace is a wonderful attorney and he's a wonderful

 3    person.  He really is.  He's here doing his job.  And anything

 4    I say here is not directed to Mr. Mace.  But you can bet it's

 5    directed to Mr. Rickard.  It's directed to DuPont.  It's

 6    directed to those people in Delaware who made these decisions

 7    I'm going to talk to you about.

 8         How about this decision?  Fayerweather.  This guy is a

 9    world-class epidemiologist, one of the best in the country.

10    DuPont has the ability to hire the best in the country.  And

11    they did.  And they hired Mr. Fayerweather to do something.

12    You know what he did?  All that stuff that Mr. Rickard said

13    they looked back at, Dr. Rickard said, oh, we looked back at

14    the workers and we looked through their cancer issues and there

15    weren't any and we looked through whether or not it's causing

16    kidney cancer.  We did what they call a worker study review.

17    Which is not epidemiology, by the way.  It is absolutely not

18    epidemiology.

19         They did a cancer review.  This guy did it.  Okay?  And

20    after he did it, in 1991, he went to leadership of DuPont and

21    said, you know what, for $45,000 I can do a real epidemiology

22    study and I can have enough information to know whether C-8 has

23    the ability to kill people that are drinking it every day.  I

24    can do a study that tells me, do we have enough information to

25    tell those people who are taking showers with it every day what

1    the effect is.  Give me $45,000, I'll go do it.  It's what I do

2    for a living.  Just give me the money.

3         They said, no.  Their words, wait.  Do the study -- do

4    the study after we are sued.  Ladies and gentlemen, they've

5    been sued and you're the first people to hear the story.

6    You're the first people to understand the significance of that

7    statement.  Wait until we're sued.  Don't do an epi study.

8    Don't worry about it.  1991.  My partner, Mr. Douglas, is going

9    to talk to you about what they did to avoid epidemiology

10   studies after that, year after year after year.

11        So what we're talking about now is we're talking about

12   the idea that, do the study after we're sued.  We're talking

13   about the idea of this thing called foreseeability.

14   Foreseeability is just common sense, ladies and gentlemen.

15   It's like standing in -- you're standing in the road and you

16   see a big old truck coming your way and you say, well, I wonder

17   when I ought to jump out of the way?  That's foreseeability.  I

18   see that truck coming.  When do I jump out of the way?  When do

19   I get out of here?  That's foreseeability.

20        Talk about foreseeability.  In 1984 -- they built their

21   entire case around it.  You understand that?  That's why I keep

22   talking about it.  The entire case is, we didn't know, they

23   couldn't know, they didn't know until 2014.  We didn't know

24   anything.  Foreseeability.  How about this for foreseeability?

25        When the lawyers up there in with DuPont headquarters in

1   Delaware say this, as we are already liable for the past 32

2   years.  Incremental liability from this point on if we do

3   nothing.  Well guess what, they did nothing.  They did nothing.

4   And then it goes on to say, as we are already liable for 32

5   years.

6          Ladies and gentlemen, I didn't write those words but I

7   felt like I had to put them up in front of you as often as I

8   could to remind you that this whole thing of foreseeability, we

9   didn't know, we didn't see the truck coming, we didn't know to

10  jump out of the way is ridiculous.  It's just so far off plan.

11         How about this one?  Right after that.  This is 1984.

12  1992, the legal department in Delaware is saying the same

13  thing.  They're saying, golly, you know what, legal -- the

14  legal department thinks toxicity issues with C-8 could turn

15  into the number one DuPont tort issue.

16         That's document 8276.  It's right there.  It's in black

17  and white.  They know they have looked at the material.  They

18  have done their due diligence and in 1992 they're saying, we

19  think it could be a tort issue.  Which is an injury issue.

20  That's what tort is.  It's an injury.  And we think it could be

21  our number one DuPont tort issue.  You think that just fell

22  into our lap, that document?  No, it didn't.

23         How about this?  How about John Bowman, year 2000.  The

24  reason this is so important, you all have seen this so many

25  times but the reason it's important, ladies and gentlemen, is

1    this document is document 176 and in that document 176, think

2    about what he is saying?  Bowman, who is the lead lawyer in all

3    this stuff says, I've looked at everything.  He's looked at

4    exactly what you have looked at.  He has reviewed what you have

5    looked at.  The first time he looked at it he said, we've got a

6    problem here.  And his problem was, our story is not a good

7    one.  That's what he says.  Our story is not a good one.

8          And you know what, here's what's interesting.  He says,

9    we're going to get hit for punitive damages.  Additional threat

10   of punitive damage.  Not because of cancer.  There's not a word

11   in here about cancer.  He has evaluated the case.  He says, the

12   bigger problem is bio-persistence.  The bigger problem is

13   people have this in their blood for 20 years and we don't know

14   what it means.  The bigger problem is just like asbestos, 20

15   years from now, people are going to have illnesses we don't

16   even know what they are.

17         He's the one that says this.  He's talking about

18   punitive damages and he's not talking about cancer, ladies and

19   gentlemen.  They thought bio-persistence was a bigger problem

20   than cancer.  And that's the truth.  And today, as we sit in

21   this courtroom, we don't even know how that ends.  We literally

22   do not even know how that ends.  He says, our story is not a

23   good one.

24         The test for foreseeability is not -- it's not whether

25   DuPont should have foreseen exactly how the injury was going to

1    take place.  Back when they were putting this stuff in

2    everybody's drinking water, when they were telling people

3    shower with it and telling them there's no harm here, don't

4    worry about any of this stuff.  Back when all that was going

5    on, the truth is, they didn't even have to know how -- what the

6    end injury would be.  Could have been liver, could have been

7    cancer, could have been a whole host of things.  They don't

8    have no know exactly how that ends.  They just have to know

9    that a reasonably prudent corporation could have anticipated

10   that their acts would cause injuries, period.

11         So what do they do?  After they get all this information

12   from people like their lead lawyer who says, I'm worried about

13   bio-persistence.  Cancer, we've already -- we toll our

14   employees about cancer but I'm worried about bio-persistence.

15   What he says is, they didn't come to court and they say, all

16   those animal studies we did, they don't mean anything.  That

17   literally is what they said.  They said, all those animal

18   studies, they don't mean anything.

19         So it's almost as if, heck, we just spent a bunch of

20   time killing a bunch of mice for nothing.  We just spent money

21   and we just spent time killing monkeys for nothing.  Everybody

22   in this courtroom understands that this is how we test for

23   human disease.  We don't go out and test with humans.  We test

24   with animals.  And time and time again in this case you've seen

25   that.

1        Matter of fact, here Michael Siegel is saying, we have

2   to rely on toxicology.  We rely on animal data because it takes

3   many, many years to do these studies on humans.  We can't wait.

4   We can't wait.  We think it's a potential hazard.  We have to

5   use a precautionary principle.  Don't wait.  Epidemiology

6   studies, studies to be done on humans.  We take action at the

7   point we believe this is a substantial risk.  They did not do

8   that.  They did -- DuPont did not do that.  And that is part of

9   the conscious disregard.

10       Ladies and gentlemen, do you really think that they

11  didn't read anything about low doses of C-8 killing a monkey in

12  less than three weeks or four?  Is that not important?  If it

13  was five weeks, I forgot exactly how long it was, but it was

14  low dose and it killed the monkey.  And all you've heard in

15  this case is the closest we have to test what it means for

16  humans is primates are closest to monkeys.

17       They told their employees that the monkeys died but they

18  sure didn't tell even their employees the truth.  And the truth

19  was they admitted that C-8 did it.  They admitted.  The

20  document shows, we believe C-8 caused this monkey's death.

21       So the next thing they do to defend themselves, they

22  say, we told everybody everything.  We told government

23  agencies, we told the EPA, we told everybody everything.  The

24  truth is, this is a company who had been hit 227, 221 times,

25  something like that, for violating EPA regulations, DEP

1    regulations.  Over 200 times.

2         And here you've got the EPA saying, wait just a second.

3    You've done some terrible things.  They list the things.

4    You'll have this document 558 back in the jury room with you.

5    So the next thing you do is you, along with saying, well, we

6    didn't know animal testing made any difference.  We just didn't

7    believe it.  Why would you even say that in this courtroom?

8    Why would Dr. Rickard get on the stand and say, well, we just

9    killed these monkeys for nothing.  That's what he's saying.

10   He's saying all that animal testing didn't mean anything.  It

11   meant everything.  It told them back in 1988 that the stuff

12   caused cancer.

13        In a minute you're going to see a document that's even

14   more important about that.

15        What do you do when you want to defend yourself?  You

16   get somebody like Ann Staats.  She's supposed to be a

17   regulator.  You see, she's a regulator.  What you do is you

18   look at this document, 4828, she's the one who put together the

19   CATT study.  She put together the CATT team study.  4828, look

20   at the number of times that she's sitting down with DuPont

21   talking about strategy.  Why does a regulator talk about

22   strategy with the people that she's supposed to be regulating?

23   Why do they do that?

24        That's why Michael Siegel said there's a conflict of

25   interest here.  You don't do this kind of thing.  Amount due.

1    It goes ahead and itemizes the time she sat down drafting

2    strategy with the company.

3         Are you comfortable with the idea that that's how

4    regulators work?  Of course not.  Nobody in this courtroom is

5    comfortable with that.  We believe regulators are out there to

6    take care of us until the power of influence gets involved,

7    until the power of -- the power of a corporation like this gets

8    involved.  And then you have -- every now and then you'll have

9    a Dee Ann Staats that will surface.

10        How about this guy?  Wow.  At some point, honestly,

11   looking at each other, it was almost like he was a cast

12   character for Saturday Night Live.  Top of the morning to you.

13   Top of the morning to you.  Goes from top of the morning into

14   saying, Gary asked him, Mr. Douglas asked him, didn't you quote

15   one time when you were working for the tobacco industry --

16   you'll see this guy did work trying to say tobacco doesn't hurt

17   you, it doesn't hurt children.  He worked for the tobacco

18   industry.  He described his role in what he did as a

19   professional as, Jesus hung out with prostitutes and tax

20   collectors.

21        That's how he tries to justify what he's doing is

22   thousands of Americans are dying every day from something like

23   tobacco.  This is what he did.  Jesus hung out with prostitutes

24   and tax collectors.  Those are his words.  We didn't make that

25   up.  He said that on the stand.

1          Then he says, well, the reason I said it is because I

2     like to use -- I like to get Jesus quotes in as often as I can.

3     That's the caliber of what we saw in this courtroom by DuPont.

4          No public health safety guy came in here.  No industrial

5     hygienist with any kind of degree came in here.  Mr. Playtis

6     came in.  He had some training, he said, in industrial but he

7     wasn't prepared to talk about these issues.  They've got

8     thousands of people up this in Delaware they could have brought

9     here to confront anything we put forward, and they haven't done

10    it.

11         I want to tell you something.  Again, I want to say to

12    you, these lawyers are professionals.  It's what we do.  Every

13    now and then you've got to say what the company wants you to

14    say if you're defending a company like DuPont.

15         So in opening statement, DuPont told us -- this is

16    opening statement.  As I was sitting there listening, I had to

17    go back and read it again to see if I really heard this.  But

18    it was that 3M manufactured it -- they're talking about C-8.

19    3M sold it to DuPont and 3M provided usage and handling

20    instructions about C-8.  You remember that?

21         He has an MSDS sheet because that's one that DuPont's

22    giving him.  He's doing his job.  What's the best spin I can

23    put on this?  Well, we did everything 3M told us to do.  That's

24    reasonable.  That's reasonable to do that when DuPont is asking

25    you to do it.  DuPont followed all of the usage and handling

1   instructions it received from 3M.  Very clear about that in

2   opening statement.  Very clear.  These are actual transcripts.

3       You're going to see the MSDS sheet.  That's the

4   information we have from people making it.  We checked whether

5   they were complying with all 3M's handing and usage guidelines.

6       Ladies and gentlemen, I want to save you a lot of time.

7   When you go back in the jury room -- would you write this

8   document down, please, 8195.  Please write that down and you'll

9   understand how important this is in just a minute.

10      When opening statement was taking place, Gary --

11  Mr. Douglas and I had in our hand the most -- what I feel is

12  the most important document in this case.  It cuts through all

13  of this stuff about we didn't know.  Cuts through all of the

14  stuff about foreseeability.  And we said to ourselves, well,

15  let's hold onto it.  Let's hold onto it and wait until

16  Dr. Rickard takes the stand and see if he owns up to the

17  charade, if he owns up to the ploy they have been using in this

18  trial for three weeks.  And not Mr. Mace.  It wasn't Mr. Mace.

19  Let's see if Mr. Rickard, Dr. Rickard owns up to the truth in

20  this case.  We had an argument among ourselves.  I kept saying,

21  you know, let's give them a chance.  Let's see if they'll own

22  up to it.

23      When Mr. O'Brien was questioning Dr. Rickard you saw me

24  jumping up and handing him notes and he came over to talk to me

25  and looked like, you know, conferences going on back and forth.

1    You know what the conferences were?  Conferences were this,

2    very clear, do we allow them to tell the truth?  Do we allow

3    them to finally come into this courtroom and say, you know

4    what?  We got it wrong.  All that stuff, we got it wrong.  And

5    we have not been even telling you the truth in court.  I wanted

6    Dr. Rickard to do that.  In my heart of hearts I was hoping

7    that would happen.  And the last witness, in the last document,

8    on the last day of this trial.

9         Let me show you something.  DuPont was sent this MSDS

10    from 3M.  They were sent this MSDS in 1997.  Here it is.  This

11    is C-8.  No question this is absolutely C-8 right here.  Now I

12    want you to look at this number right here.  You see this

13    number right here, would you write it down for me, please,

14    because I'll show you how important this is in just a minute.

15    3825-26-1.  3825-26-1.

16         Now, the next thing is -- you've seen this.  I'm not

17    talking about the fact that they told them to incinerate.

18    Literally every MSDS said incinerate.  You got that.  You got

19    the idea that none of this would have happened if they'd have

20    just done what 3M told them to do.  But what you didn't know

21    and what Dr. Rickard had on the stand that my partner handed to

22    him and we actually said, will he or won't he?  I saw his

23    reaction to it.  It was like he saw kryptonite.  Let me show

24    you the kryptonite.

25         Warning.  This is the MSDS that you're going to have

1    back in the jury room.  The document is 8195.  Warning:

2    Contains a chemical which can cause cancer.  See that number,

3    3825-26-1.  Can cause cancer.  Saying this in 1997, the same

4    year they cut Ms. Bartlett in half to remove a tumor.

5         Now, it gets worse than that.  Look here.  1983 and 1993

6    studies -- and this is something you have never heard in this

7    trial.  Those studies were conducted jointly by 3M and DuPont.

8    Did you ever hear that?  No, you didn't.  I didn't hear it.

9    And I held this document for three weeks.  And we used to joke

10   about the idea, well, this is the truth document.  When will we

11   hear the truth?  Because this document cuts right to the heart

12   of all this stuff we didn't know.  We could have had a way of

13   knowing.  Nobody told us.  They're talking about cancer in the

14   MSDS sheet.

15        Ms. Bartlett doesn't get -- the people in the Ohio

16   Valley don't get an MSDS sheet.  They don't know about the

17   studies that took place in 1983 and in 1993.  Warning:

18   Contains a chemical which contains -- which can cause cancer.

19   C-8 is what they're talking about.  It says studies conducted

20   jointly by 3M and DuPont.

21        Watch this.  You know the '83 thing they're talking

22   about, 1983, you know what it was?  It was what Michael Siegel

23   told us on the stand.  It's what I asked Dr. Siegel about the

24   first time I had him on the stand.  It was -- I said,

25   Dr. Siegel, would you explain to the jury how significant the

1    Leydig cell cancer is?  He says, it's important because it

2    shows us that it can cause cancer in humans.  And I asked him

3    that four times.  Would you please talk about the Leydig cell?

4    You all were probably tired of me saying Leydig cell.

5         But as I was talking to him about it, I had this

6    document in my back pocket.  And I was wondering how long is it

7    going to take for Mr. Rickard to get on that stand, tell us the

8    truth about it and I was going to cross-examine Dr. Rickard but

9    I had Mr. O'Brien do it because I didn't want to -- I just

10   wanted to give him a chance.  And they never took it.

11        Look here.  It says 1983 and what's this?  The other

12   study was -- other study was the animal triad, pancreas, testes

13   and liver, where animals are getting cancer of the pancreas,

14   testes and liver.  And you heard Michael Siegel talk about

15   that.  I said, what are the two -- what are the two most

16   important things?

17        You want to hear something really interesting, Michael

18   Siegel didn't even know that we're holding this document.

19   Michael Siegel had just reviewed the -- just reviewed DuPont's

20   documents.  And we're holding this document saying, give

21   Dr. Rickard a chance.  Give DuPont the chance to do what's

22   descent and honorable.  Give them the chance to show some

23   character and say, yeah, we got it wrong.  We never should have

24   come into this courtroom and tried to lead a jury into

25   believing that we didn't know anything.  Here it is right here.

1    If you want to cut through a lot of time, go right to

2    that document on the issue of foreseeability.  This is their

3    document, they had it, they knew about it, we showed it to

4    Dr. Rickard and he sat there silent.  And he knew why he was

5    sitting there silent.  Because it's important.

6    In the end, what ends up happening is they have this in

7    their file cabinets, 1997.  They have in their file cabinets

8    1988 when they're telling their employees about cancer.  And

9    they don't tell doctors, they don't let them know about it.

10   They don't tell the medical community.  They don't tell the

11   media.  They don't tell the community.

12   Did you hear them say at one point, I thought I did, I

13   wrote it down, we told the employees and we thought the

14   employees were going to tell everybody in the Ohio Valley.  We

15   thought the employees were going to tell everybody.  Really?

16   We told the employees and we thought it was the employees'

17   responsibility to clean up our disgusting catastrophe by

18   letting people know that this stuff will cause cancer.  That's

19   what I heard.  I might have misheard it, but I don't think I

20   did.

21   Ladies and gentlemen, sometimes chickens come home to

22   roost.  And that document right there, that's a chicken that

23   showed up to court and it came home to roost in this trial.  If

24   you believe for a second that they didn't know about all this

25   stuff, that they didn't know way before Ms. Bartlett was cut

1   almost in half that they didn't know about this stuff, go back

2   to this document, go back to connecting the dots and you're

3   going to see how all this fits together really with two

4   documents.

5       This line right here, you're going to have this back in

6   the jury room.  This is 13001.  That's the document.  It's a

7   composite that shows you how much of this C-8 went into the

8   Ohio River, when it went into the Ohio River, what was going on

9   when it went in the Ohio River, what they knew when it went

10  into the Ohio River, what they covered up when it went in the

11  Ohio River.  That's what I want to talk to you about.

12      First of all, let's start from the beginning.  I used

13  this line to show you when they knew something and how much

14  they continued to pollute the river.  When they knew something

15  and how often they made the Ohio River into their personal

16  toxic dumping ground so they could save money on manufacturing

17  Teflon.  It's the equivalent of somebody -- me going to this

18  man's house and saying, you know what, I got a bunch of sewage

19  but I don't want to pay for sewage service.  Let me just dump

20  it in your backyard.  Who in this courtroom would tolerate such

21  a thing?  Who among us?

22      And what you have to understand here, ladies and

23  gentlemen, is just because DuPont is a corporation doesn't mean

24  we treat them any different than a person.  That's the tough

25  thing about jurors understanding a corporation.  Mr. DuPont's

1    not in trial.  Matter of fact, we didn't have much of DuPont

2    coming into trial.  But Mr. DuPont has to be treated just like

3    a person.  And you have to ask yourself, if you had a neighbor

4    like that?

5         Here we are, 1975.  Here's what's important about this.

6    1975 they know this.  Toxicity is a problem and we're worried

7    about it -- all the way back in 1975, we're worried about

8    contamination of the underground water supplies by Teflon and

9    C-8.  They're talking specifically about C-8.  And this is

10   1975.  Toxicity and the idea it can get in underground water.

11   And they know what that means.  They're not dummies.  They

12   understand if it gets into the water, what ends up happening is

13   it gets in the drinking water.  They understand that.  They got

14   the best scientists in the world.  That's document number 4465.

15   That's the first shot.

16        Second one, second one here is this.  I put it up.  I'm

17   going to list this because I really -- I don't know how else to

18   do this.  If I don't show you the numbers, you're going to have

19   a stack of documents back there.  I'm trying to give you the

20   numbers that we think are important.  I'm sure they'll do the

21   same thing.  But this is kind of the way we see the case.

22        But in 1975 they know this.  Toxicity to drinking water.

23   So how about 1978?  Let's look.

24        1978 says, we are disturbed by the frequency of

25   borderline elevated liver functions.  That's 1978.  And we're

1    talking about unusual health problems with workers.  This is a

2    medical surveillance, ladies and gentlemen.  This is what

3    Dr. Fayerweather saw when he went to DuPont and said, you know

4    what, I need an epidemiology study.  I need $45,000 because I'm

5    seeing some bad stuff here.  This is one of the bad things he

6    saw in 1978.

7        So here we go, they know -- put all this together, they

8    know about toxicity, they know it can get into drinking water

9    because it's moving through the underground water.  They know

10   C-8 exposure causes elevated liver function.

11       Doesn't any decent person like -- doesn't any decent

12   person say, you need to know about this out there?  You need to

13   know about it, Mrs. Bartlett, you need to know about it because

14   it's in your drinking water.  Could be in your drinking water.

15   All the way back.  They didn't have to guess and wait about

16   drinking water.  This is their neighbor, though.  This is their

17   neighbor, Mr. DuPont.

18       Next thing that happens is 1979.  Oh, by the way, look

19   at something.  When they learned about the liver problems, when

20   they learned about toxicity in the water, look here.  It

21   starts -- they start actually increasing exposure.  They don't

22   say oh, my gosh, this is bad.  You got liver problems, got

23   toxicity in the water, in the drinking water.  They increased

24   production because they're making so much money on Teflon.

25   It's a business decision.  And they know if they make enough on

1    the front, doesn't make any difference what a jury does on the

2    back end because we made all the profit we need to make.  So

3    the next thing that happens is this.

4         It says, this is -- this is 1979 and it says, we should

5    attempt to determine in fluorine in blood levels increases with

6    increasing lengths.  This is all about bio-persistence.  You're

7    going to see '79 is when they know about organic fluorine blood

8    levels in the blood.  Washington Works.  So, okay, here we are.

9    This is 1979.  Add this up.  Look here.  It's toxicity by '75.

10   Toxicity they know about.  They know it's potentially in the

11   drinking water.  '78, they know exposure causing elevated liver

12   functions.  3M warns them that that stuff that causes liver

13   function abnormality can be in your blood for 20 years.

14        None of these people are told about it.  Nobody is told

15   about it.  It's a silent -- they're secret about it.

16        Next thing that happens is -- but by the way, they say,

17   we didn't see any of this coming.  We're out in the middle of

18   the road.  We didn't see that big truck getting ready to run us

19   over.  By the way, after that, predictably, they continue

20   increasing production.  They continue making the Ohio River

21   into a toxic waste dump at all of their expense.  They pay for

22   it.  Tax payers pay for it.  It's called externalizing costs.

23   They take the cheap way because they don't want to incinerate,

24   the way they had been told to incinerate by 3M.

25        None of this would have happened if they'd have just

1    said, I'm going to spend some extra money.  We're going to

2    incinerate.  We're going to do what they told us to do which

3    was burn this stuff up.  None of this would have ever happened.

4         So here you've got -- here you've got the next thing

5    that happens.  They're telling their -- they're telling their

6    people that, you know what, you need to be aware of this stuff.

7    This is where they start making their people aware.  They

8    say -- they ignore the community.  They're telling -- they've

9    got people dressed up in space outfits and the people in the

10   community are drinking the stuff that this person is trying to

11   protect themself in a straight -- in a space outfit.

12        And they say oh, well, we didn't, you know, people

13   didn't come around.  People didn't get that much exposure.

14   Yes, they did.  They drank it for 20 years.  They drank it for

15   30 years.  They showered with it.  They raised their vegetables

16   with it.  They had their babies playing in the pools with it.

17        There just wasn't enough there.  They tell their people

18   that at work.  And you know why?  Workers' Compensation.

19   They're worried about being sued by their employees.  They're

20   worried about Workers' Compensation claims.  They think, wait

21   until we get sued to worry about these folks.  Wait until we

22   get sued.

23        Next thing that happens is they tell their women

24   working -- by the way, after they do that with the employees,

25   they put the pedal to the metal again and increase production

```
                                              Vol. 16 -    48
```

1    even more, increase profits even more by dumping that waste

2    into their river.

3         So what happens next is they say, 1981, how many women

4    in the community up and down the Ohio River that are drinking

5    C-8, how many of them do you believe were childbearing age?

6    How many of them were carrying babies?  How many of them would

7    have liked to have known, gee whiz, I better not drink the

8    water because it might affect my pregnancy, it could cause a

9    birth defect?

10        Let me just tell you something.  In the end -- in the

11   end they say this never happened.  We'll see.  In the end, they

12   say it never happened.  There wasn't anything to worry about.

13   So they moved the women back.  But at least in 1981 they're

14   telling this stuff is so dangerous, if you're childbearing age

15   we want to move you away from it.  Get away from C-8.

16        It's not over on this.  This is document 4576.  And at

17   this point -- here's what they know.  '75 they know about

18   toxicity, drinking water, they know elevated liver function,

19   they know bio-persistence, they know workers need protection,

20   they know women potentially could be exposed to something that

21   can cause birth defects.

22        They tell nothing to the community.  Nothing.  Not a

23   word.  All they do with the community every time they get a

24   chance to is tell them, don't worry about any of this stuff.

25   We're DuPont.  We care about you.  We're a great corporation.

1  They're a corporation trying to make as much money on Teflon as

2  they can, as quickly as they can, passing on the garbage to

3  everybody in this community to make their profit.

4      Here's what they know.  And, again, they keep going up

5  with the production.  And then all of a sudden we find out

6  in '82 -- this is important.  Ladies and gentlemen, this is an

7  important document.  In 1982 -- this is document 363.  In 1982,

8  they're telling their employees, don't give blood donations.

9  It's almost like they're worried about spreading an awful

10  disease around the community.  Don't give blood donations.

11  That's what they tell their employees but they don't tell the

12  public.  They didn't tell nobody anything.

13      Don't you think people like Ms. Bartlett would like to

14  have known, I don't want to spread C-8 into people's blood.

15  This is what they tell.  It's an infected blood.  That's the

16  only way to put it.  It's an infected blood.  It's infected

17  with C-8 and if you give a blood transfusion, it's going to

18  move into somebody else's blood.  This is what they tell their

19  employees.  But they don't tell anybody in the community about

20  that.

21      Let's see what they do.  They go ahead and -- oh, yeah,

22  here it is right here.  After they tell their employees, don't

23  give blood donations, they put the pedal to the metal again and

24  the amount of money they're making, the amount of production,

25  the amount of garbage and toxic waste they're putting into the

Vol. 16 -    50

1   Ohio River continues to increase, continues to get more and

2   more.

3           And this one, you've already seen this.  I don't want to

4   spend much time.  This is 1984.  This is where they're saying,

5   we've been liable for 32 years.

6           What do they do after they find out after their lawyer,

7   after the people in charge say, we've been liable for 32 years

8   because of toxicity?  We've been liable for 32 years because of

9   bio-persistence.  We've been liable for 32 years because we

10  don't know where this story ends.  We don't know how bad C-8 is

11  in 20 years.  How does it end?  We don't know.  But we do know

12  this.  In 1984 they say they've been liable.

13          But what do they do when their lawyers are saying, hey,

14  pay attention.  We've been liable for 32 years.  We've got to

15  change something we're doing.  That's what this document says.

16  If we don't do anything, we're going to really have a problem.

17  And what do they do?  They listen to Delaware and the amount of

18  toxic garbage they are putting into people's drinking water in

19  every family that's using these water facilities continues to

20  go up.

21          And then here, this is just one of the 3M -- I'm not

22  going to go through all these.  You saw all the 3M's.  Every

23  one of them says incinerate.  Mr. Mace, when he was -- when

24  DuPont asked him to stand up and say that about we follow

25  directions, he's just doing what -- he's doing what DuPont

1    asked him to do.  He was doing what DuPont asked him to do.

2    Don't hold this against Mr. Mace, but do hold this against

3    DuPont.

4         It says incinerate.  This is an industrial -- put it in

5    a commercial facility.  This is document 265.  There are a

6    dozen of these.  They all say incinerate.  Some of them say

7    whatever you do, do not put this into the surface water of the

8    river.  They're very specific.  And they ignore it.  Why do

9    they ignore it?  That's what some of you all have -- that's

10   what some of you all may have problems coming to terms with

11   because you never want to believe that your neighbor here,

12   Mr. DuPont, would do such a thing.  You never want to say

13   somebody thinks like that.  But they do.  And they do it in the

14   name of profit.  And that's a hard thing for a jury to get to

15   understand sometimes because we want to forgive.  We want to

16   forget.  We want to believe that they wouldn't have done that

17   on purpose.  They did.

18        So I go and I ask Mr. Playtis.  I liked Mr. Playtis.  I

19   really did.  He wasn't the person to come to trial.  He's a

20   nice fellow.  He really genuinely -- I genuinely liked him and

21   it killed me to have to -- every time I had to get a little hot

22   with him, I didn't like that, because I liked the man.  But

23   Playtis tells us the obvious.

24        He says, you know, if it's incinerated, it doesn't go

25   into the atmosphere.  It doesn't go into the Ohio River.  It

1  doesn't go into the landfills if it's incinerated.  Mr. Playtis

2  says yes.  That's who they brought.  They brought Playtis to

3  trial to carry this on his shoulders.  They didn't bring an

4  industrial hygienist.  They've got dozens of them that know all

5  about it.  They put that man up there to say this.  He admits

6  it.  Yeah, none of this would have happened if they'd

7  incinerated.

8        Then he goes on to say dumping -- in one way you know

9  this C-8 got in the community is DuPont dumping into the Ohio

10  River.  You know that?  Right.  And you know C-8 was being

11  dumped into unlined landfills.  Illegal.  Ohio River

12  inappropriate.  Incinerate.  And you know that incineration was

13  one way that C-8 could be destroyed?  You knew that when you

14  took the stand, correct?  That's one method, yes.  That's what

15  Mr. Playtis said.  He knew all about incineration and he wasn't

16  sitting there equivocal about it.

17        Michael Siegel on incineration said, look -- he said the

18  material safety data sheet is making it clear.  He's talking

19  about the MSDS making it clear.  This is a public health

20  specialist.  This is what he does for his living.  He says he's

21  making it clear that this should not be put into an ordinary

22  landfill or put in the collection pond or put into soil or into

23  the -- it needs to be either incinerated or special water

24  treatment.  That is exactly what they said.  That is exactly

25  what they told you.

1        But still it continues.  Continues going up.  The next

2    one is in recent 3M studies indicate a slight but statistically

3    significant increase in tumors.  That's 252 they find out about

4    that.  Had an increase in tumors in rats.  After they find out,

5    Michael Siegel told us, you have to assume that animal

6    carcinogen is relevant to humans.  After they learned that,

7    after they learned that document, that's document 252, what do

8    they do?  Testicular cancer in tumors, they continue -- it

9    continues to go up after they tell their employees that this

10   can cause cancer.  Let's see what happens.

11       After they tell their employees it can cause cancer

12   there's a little, right here, a little drop right here.  Watch

13   this.  And then it goes into talking about employee

14   communication.  It causes cancer.  And when they did -- when

15   they did know about this, the question was, to Mr. Playtis,

16   because he knows more about this than anybody, when they did,

17   they never told the public that was drinking C-8 that it had

18   been characterized as a small C cancer, yes or no?  I don't

19   think it was communicated, no.  And you would certainly

20   consider it a health risk, wouldn't you?  He said, sure.

21       Up again.  More into the river.  It just continues.

22       Even after Fayerweather said, we need to spend $45,000

23   on an epi study, they say no.  What happens?  Jot down.  Now

24   watch this.  Legal thinks that this is our number one problem.

25   Wait to be sued.  This is our number one problem.  Watch what

1    happens.  Starts going up again.  Why?  Because they're making

2    profits.

3         Next thing that happens, they learn about liver tumors.

4    Number 38.  The tumor incidences liver, testes, pancreas.  This

5    is the document -- that MSDS sheet that shows you where they

6    admit in 1997 that it causes cancer and that they're using

7    studies to evaluate it, this is one of the studies.  This is

8    extremely important because if you take this study and compare

9    it to that MSDS sheet, this is number 38.  But that first MSDS

10   sheet that we held for so long, if you'll see it right there,

11   it will be right in the document.  They're talking about 1993

12   was one of the reasons that we knew it caused human cancer

13   because of these triad tumors.

14        Michael Siegel, again, says animal carcinogen substances

15   that we know as an animal carcinogen, scientific principles of

16   risk tells us we have to assume that the substance is also,

17   potentially, a human carcinogen.  And this is what they did in

18   Delaware when they said this causes cancer, in that MSDS sheet,

19   that's what they did.  They assumed it.  But in court, under

20   the leadership of Dr. Rickard here, they have tried to convince

21   you that all those animal studies don't mean anything.

22        Continues going up.  Here they're told, threefold

23   increase in prostate cancer.  That document is 6565.  This is a

24   study that DuPont did, they participated in.  It was their

25   study.  Next thing that happens is they're told about liver

1   enlargement.  And you remember the questions I asked

2   Mr. Playtis about, well, is liver enlargement a good thing?

3   You want to have a big liver?  He says, well, I'm not sure.

4   I'm not sure what I want.

5          Then we go into -- it continues going up.  We're

6   concerned about the potential long-term human health effects of

7   these materials considering they have biological half-lives and

8   we don't know if it causes toxicity.  We don't know how it goes

9   about causing cancer.  But even with that, Michael Siegel says,

10  C-8 chemical is bio-persistent, is especially concerning

11  because of the fact that it travels through the blood, touches

12  every organ and the potential to have multiple sites in the

13  body.

14         Next thing that happens, and that's document 2094, what

15  happens when they find out about bio-persistence, they know

16  about toxicity, they've told their employees it causes cancer,

17  they don't know what bio-persistent means in the long-term.  Do

18  they put the pedal to the metal again?  Yes.  They keep saying

19  profit matters, human life does not.

20         Our story is not a good story.  What do they do after

21  they get this from their lawyer?  They're about at the top of

22  the mountain top right here.  Right here.  This is where Bilott

23  sues them.  And do you think this all went down because they

24  were just trying to do the right thing?  Didn't have anything

25  to do with that.  It went down because they were caught.  It

 1    went down because they understood they had a problem.

 2         And it continues going -- even it goes down.  This is

 3    document number 710, this is our Achilles heel because of water

 4    contamination of C-8.  Even after that, starts coming down and

 5    they say, finally -- business has finally decided there is

 6    nowhere to hide.  What kind of statement is that, there's

 7    nowhere to hide?  They've been hiding for 50 years.  Nowhere to

 8    hide.

 9         And this is Reilly who is their environmental -- this

10    guy is their environmental lawyer.  They decided that there's

11    nowhere to hide.  Why?  Because Mr. Bilott has caught them.

12         Continues coming down.  He says, I can't blame people if

13    they don't want to drink our chemicals.  This is their lawyer.

14    This is the guy working and evaluating all this stuff.  This is

15    document 563.  I can't blame them if they don't want to drink

16    our chemicals.

17         Let me show you how much they knew.  This is really

18    important.  Let me show you how much even the lawyer knew about

19    all this.  Watch this.  He says, it goes into the system, goes

20    in through -- pulls into the intestines.  He describes exactly

21    how this happens and then it dumps into the liver, back into

22    the stomach and then the intestines put it back in the blood.

23    And then the liver dumps it back into the stomach because it

24    can't break it down.  Then the intestine puts it right back

25    into the blood and then the liver dumps it back into the

1   stomach because it can't do anything about it.  It goes on and

2   on and on and not a soul, not a person with enough decency told

3   anybody here along the Ohio Valley that they were drinking this

4   every day.

5        And I believe I heard at some point oh, this stuff

6   doesn't hurt you.  They don't know if it hurts you.  As we sit

7   here, they don't know if it hurts you.  That's why they're so

8   worried about bio-persistence.  They don't know.  They have no

9   idea if it hurts you.  But they do it anyway.  And that's

10  conscious disregard.

11       Sure like to be able to say that -- they're talking

12  about -- understand, this is a lawyer talking about the folks

13  in Delaware, up there where Dr. Rickard is.  This is a lawyer

14  talking about leadership up in Delaware.  He says this.  I sure

15  would like to be able to say that they were candid, but getting

16  them to be candid when news is bad is not easy.  Candid means

17  they can't tell the truth.  This fellow right here, Mr. DuPont,

18  cannot tell the truth.  And that's the simple truth.

19       You saw the Dahlgren study.  Prostate cancer, kidney

20  cancer, liver cancer, every kind of cancer imaginable where

21  they studied that up and down the Ohio River.  Dahlgren we

22  used -- they made it sound like it was a bad thing that

23  attorneys had to ask -- had to come up with half a million

24  dollars to do this study that they wouldn't do all the way back

25  in 1991.  Like that was a bad thing.  Like that was bad.

1          That's the kind of thing that got the EPA interested in

2     what was going on.  They saw what was going on.  It wasn't a

3     bad thing.  They can pay for studies but the people who are

4     trying to protect the citizens in that area, they can't pay for

5     a study?  This is the only way it got done.  You've seen this.

6     I won't talk -- this is 2005.  That's the story.  They're

7     talking.

8          Finally, when they know everything, here's what they

9     conclude.  They conclude, EPA has determined that C-8 is a

10    contaminant present in, and it says, it may present imminent

11    and substantial endangerment to human health.  And all this

12    stuff about 150 ppb, we had our CATT team come out and they

13    determined it was 150 ppb was a safe level.  Look at 4175 and

14    look what happens, finally.  Look what happens finally when the

15    truth is told.  It is an imminent and substantial endangerment

16    to human health and it is still in the soil.  It is still in

17    the water.  It is still in these people's bodies.  It's in an

18    environment for 2,000 years.  2,000 years.

19         Ladies and gentlemen, this is one world, one water.

20    We're all connected.  Don't ever dream that what happened to

21    those folks down there in the Ohio Valley doesn't have an

22    impact on everybody in this courtroom.  It's one world, one

23    water.  It's the only world we have and it's the only water we

24    have.  And they understand that as much as anybody.

25         Judge, I believe I'm going to pass.

1      THE COURT:  We're going to take a 15 minute recess at

2  this time, ladies and gentlemen.

3      (A recess was taken at 10:20 a.m. until 10:37 a.m.)

4      THE COURT:  Mr. Douglas, you may continue with

5  Mrs. Bartlett's closing argument.

6      MR. DOUGLAS:  Thank you, Your Honor.

7      Good morning, jurors.  Probably come as no surprise to

8  you, I guess you figured out that the division of labor over

9  here on our side of the courtroom that I'm probably going to

10  talk to you about Carla Bartlett.  And I am going to do that.

11  But I'd like to start with the concept of context and Carla

12  Bartlett, because you heard a lot about context from defense

13  counsel in his opening statement and throughout the case.

14      It's a very important concept.  I'm going to talk to you

15  about the context of how all of what we've heard affects real

16  people, a real person, a real American, someone who braved and

17  faced cancer and lived what was wrought upon her by the actions

18  of DuPont.  I'm going to talk to you about Carla and her

19  personal experience about what she went through.  So I want to

20  start out with this concept of context.

21      We have that on the slide.  Great.

22      They love that word context.  They love to accuse

23  others, DuPont does, of leaving out context and suggesting that

24  the part of -- that part of the story is left out and that they

25  are going to be the champions of everybody and bring you the

1   rest of the story.

2       You know, you remember throughout the course of the

3   trial you'd hear from defense counsel when they'd be

4   questioning witnesses.  Well, they showed you this but they

5   didn't show you that.  Well, they showed you this, but they

6   didn't show you that.  They showed you this, they didn't show

7   you that.  It's almost like a dance.  And it is a dance.  And

8   I'm going to talk to you about, folks, how DuPont has danced

9   around the truth, has danced around the truth for years and

10  years.

11      And there were many examples of it.  Because they are

12  the greatest offenders.  When they talk about Plaintiff's

13  attorneys leave out context, I'm going to show you that they

14  are the greatest offenders.  Not only the greatest offenders of

15  leaving out context but doing so in important ways and in

16  profound ways.  And there are many, many examples of it.  And

17  I'm going to start out and give you a couple of them.  And I

18  guess the best way to start out is in the beginning.  This is

19  the best example of their failure to fill in the context and

20  tell folks the rest of the story.

21      Let's start in the beginning.  The cattle team report.

22  You remember the whole cattle team issue where it all began,

23  the gentleman farmer, Mr. Tennant, and his cattle.  The Dry Run

24  landfill.  Remember, he sold off a portion of his property so

25  that DuPont could dump some of their waste, which turned out to

1    be C-8, into the Dry Run landfill which was near by the Dry Run

2    creek which became -- when started to bubble over with black

3    odorous foam.  Plants and wildlife dying.  Mr. Bilott gets

4    involved.

5         DuPont and others put together a cattle team.  Remember

6    this testimony, they got together.  These six, seven

7    veterinarians, esteemed veterinarians.  Let's find out why

8    these cattle by this Dry Run land creek are drying, why are

9    they getting sick, why animals are dying, why plant life is

10   dying.  They put together -- get this group of veterinarians

11   together to go, please, just go investigate what's happening

12   here.  And what's the one thing, we have it in evidence, it's

13   D927.  It's one of the last things you saw.  It's one of the

14   last things you saw on Friday during Dr. Rickard's

15   cross-examination.

16        This is the cattle team report.  The whole thing gets --

17   go back in history, this all began with the cattle dying.  The

18   gentleman farmer's cattle are dying.  Mr. Bilott gets involved.

19   They end up putting together this cattle team to investigate

20   this, this honest investigation, right, of chemical exposure.

21   What's the one thing, what's the one thing that DuPont does not

22   tell these veterinarians?  That there's C-8.  There's C-8 in

23   the creek, that there's C-8 in this unlined landfill.

24        And by the way, not only do they not tell them about it,

25   and you saw Exhibit P187, they sort of like boast about it.

1    Where they say, we never told the cattle team or the EPA about

2    the C-8 in the stream.  Talk about context.  How do you

3    honestly set out to have these scientists find out what

4    happened to poor Mr. Tennant's cattle without giving them the

5    benefit of what you know, what you know for years prior to 1999

6    that you've done studies on animals and you know that it's

7    harmful to animals, you know that monkeys died.  You know that

8    it caused -- it caused tumors in rats and liver enlargement.

9    You know about the triad of tumors.

10         You have all of this information.  Talk about context.

11   And you let these scientists go out there completely ignorant

12   of all of this -- of all of this information and then you

13   wonder why they conclude, well, we don't think it's anything to

14   do with any chemicals.  Because they don't even know what

15   chemicals are in the stream.  And they have the audacity -- and

16   you heard it in opening statements, remember to keep in mind

17   context.

18         How about that for context?  How about that they don't

19   tell people, they don't tell the EPA, they don't tell the

20   folks, these veterinarians?  But the most important thing that

21   got this all started and think about what would happen if they

22   did tell them and these veterinarians weren't blindfolded in

23   their mission to find out why the cattle were dying.  We

24   probably wouldn't even be here today.  It would have ended

25   right then and there.

1          Here's another example of context.  Remember when

2     Dr. Rickard -- I call it the Dr. Rickard flip-flop.  I had

3     asked him about the epidemiology review board.  You recall this

4     also happened on Friday.  The epidemiology review board where

5     these esteemed epidemiologists and Mr. Papantonio talked to you

6     about these scientists, they didn't want folks to know

7     everything.  By the way, the cattle team not knowing about C-8

8     is just another example of that.

9          They put together this epidemiology review board and --

10    to allegedly, because they want to have all the appearances,

11    oh, we're studying this diligently, we're studying.  They hire

12    these folks from these esteemed universities, they put together

13    this board and what does the board tell them?  They put in a

14    memo and they say, hey, you're not being candid with us.  They

15    say, given the many gaps and understanding of population

16    exposures to PFOA and the possible health consequences, we

17    strongly advise against any public statements asserting that

18    PFOA does not pose any risk to health.

19         Because we know that's exactly what they were out doing.

20    We saw all of their public announcements, all of their PR

21    announcements.  There's no evidence that it's harmful.  They're

22    telling the folks it's safe to drink the water.  Here are these

23    outside epidemiologists saying, you can't say that.  You

24    shouldn't go around saying that.

25         So I asked -- you heard the tape, you heard the

1    videotape of when I took Dr. Rickard's deposition.  I asked

2    him, did you receive this?  Because look, it's to Michael

3    Kaplan, copy to Bobby Rickard, epidemiology review board.  I

4    asked him, did you receive this?  And he says, yes.  But he

5    comes to court and he says oh, I must have been mistaken.

6    Because they can't acknowledge that even these outside experts

7    are telling them, you can't go around telling people it's safe

8    to drink the water.

9         He's got to dial that back so he flip-flops and in court

10   says that's a mistake.  What do they do?  They portray it as if

11   we did a trick lawyer question at the deposition.  What they

12   didn't tell you and the context that was left out is that

13   Mr. Mace was sitting right next to him at the deposition.  If

14   there was some kind of problem with the nature of this

15   document, they could have said so then.  But they had to think

16   about it.  They had to come to trial, how are we going to

17   explain this one?

18        By the way, listen to his answer.  In court today he

19   denies he received it.  Look at how quickly, look at how

20   genuinely and honestly and candidly and spontaneously he says,

21   yep, I got this document.

22        Play it, please.

23                          - - -

24        Thereupon, the recording was played in open court as

25   follows:

1    Q.    I've handed you Exhibit 23 which is an e-mail dated

2    February 24, 2006 to Michael Kaplan, copied to you and some

3    other folks.  Do you see where I'm referring to?

4    A.    Yes, I do.

5    Q.    And as you sit here today, do you recall receiving an

6    e-mail around that time in February of 2006 from the

7    epidemiology review board?

8    A.    Yes, I remember this.

9       (End of video clip.)

10        MR. DOUGLAS:  He remembers this, the document, that he

11   now says, he flip-flops, I didn't get, I made a mistake.  I got

12   a different document.  Okay.  That's fine.  But to suggest that

13   there's some lawyer trick going on here.  They want to know,

14   did he get it?  Why wouldn't we ask him that question?  The

15   context.  Mr. Mace, his lawyer, sitting right next to him the

16   whole time.

17       And then here's another good example of context.  Remember

18   that whole charade with Dr. Dourson, top of the morning,

19   gentlemen, that compared himself to Jesus.  And he said on

20   direct examination oh, yes, I'm here pursuant to subpoena.  And

21   this is important.  It might seem like a small example but it

22   tells you everything you need to know about what DuPont does.

23   This is just like breathing to them.  We've seen this for

24   decades.

25       This whole charade about a subpoena.  I get up on

1   cross-examination, I said oh, you're here pursuant to subpoena.

2   And he came with his little birth certificate or whatever that

3   little certificate was that they gave him from the Department

4   of Environmental Protection in West Virginia.  So proud of it,

5   he framed it himself.  I was wondering, how would he know to

6   bring his -- how would he know to bring that little

7   certificate?  He goes up to the witness stand and is holding

8   it, you know, ready to show it just in case, maybe he had a

9   hunch that Mr. Mace would ask.

10      So I'm thinking, this is planned out.  And they want our

11   jury, who sat here for weeks, to believe that he's some

12   independent person that only came because he was subpoenaed.

13   But it turned out, that was a complete charade.

14      Think about that.  You know, you've taken time out of your

15   lives.  It's hard enough to figure out a complex case like

16   this.  It's hard enough, folks.  But when the little charades

17   take place in the courtroom to mislead you down a path that

18   he's this objective, independent scientist -- which he's not.

19   I'll get to that in a second.  Then that makes your job even

20   harder.

21      It turned out he spoke to Mr. Mace weeks ago.  They're

22   talking about the case.  He set aside last week.  This guy that

23   would have you believe he's here -- they made me come.  I

24   wouldn't have been here.  I'm here because the law required me.

25   It turns out he's not so objective.

1        Speaking of charades, by the way, the whole thing, it

2    really goes to the heart of the case.  Not just one little

3    example.  Like I said, it's just like breathing for them.  They

4    just operate that way.  They want you to not see the real

5    story, the rest of the story.  When we heard about rest of the

6    story, the rest of the story was he really was coming anyway.

7    He didn't need to be subpoenaed.

8        Speaking of charades.  The whole thing –– this one is more

9    important and profound.  Dr. Rickard on that witness stand

10   being asked by Mr. Mace, and what was your reaction?  What was

11   your reaction when you found out in 2012 about the science

12   panel that C-8 can cause kidney cancer?  He had the look of

13   shock.  We were surprised.  We had no idea.  I think his word

14   was surprised.  With the look of shock.

15       Really?  Really?  You've been here.  You've seen all the

16   evidence.  For decades they've been looking at it.

17       Can I see the worker study?

18       1989.  Remember this, 1989 Washington Works cancer

19   incidences and overall mortality rates.

20       Go to the next slide, please.

21       It says, there was a statistically significant excess of

22   kidney and other urinary cancers.  Really?  Surprised, in 2012,

23   like this came out of nowhere.  That's part of the charade.

24   That's part of the leaving out the rest of the story.  That's

25   part of taking everything out of context with blinders on.

1        Let's go to the next workers study.  2003.  Now this is

2   nine years before the surprise of 2012.  The SIR, that's the

3   incident rate for kidney cancer is 2.30, that's 230 percent.

4   We learned that.  With a 95 percent confidence.  It's

5   statistically significant.  These numbers indicate an increased

6   risk for kidney cancer.

7        Surprised by the 2012 science panel?  And I'm not even

8   talking about the monkey dying and the rats and all the animal

9   and toxicity studies.  How could you be surprised?  It's part

10  of the charade, folks.  This is a court of law and a court of

11  evidence.  Let's just get the facts out and let you folks

12  decide.

13       Let me get back to Dr. Dourson.  We were accused of taking

14  something out of context.

15       Could you put up the pie chart?

16       This is the dance around the truth.  Remember I went up and

17  on cross-examination I showed -- I showed the witness this page

18  because Mr. Mace showed a different page from the website that

19  showed all their government work and a whole list of things

20  that they've done, apparently they do, at least that's what

21  they allege they do.  I just wanted you to see the rest of the

22  story.  But they have the audacity to accuse us of taking

23  something out of context.

24       The rest of the story, folks, is that they didn't tell you

25  about all of these chemical companies and law firms that they

1    do work for.  I wanted you to have the context.  But this was

2    just the tip of the iceberg because it turns out --

3         Can we show the article?

4         You remember.  Here he is.  Dr. Dourson, top of the

5    morning.  He admitted, there are lots of folks throwing rocks

6    at me accusing me of being biased in favor of industry, the guy

7    who comes here with the charade with the subpoena.  Make you

8    think that he's completely neutral.  Oh, I'm neutral.

9         It turns out it's an investigation by the Center for Public

10   Integrity, Inside Climate shows that the firm has close ties to

11   chemical manufacturers, tobacco companies and other industry

12   interests.

13        Let's go to the next slide.

14        TERA goes out of its way to describe itself as a nonprofit.

15   Didn't he do that for you?  This is what he does.  It's a dog

16   and pony show.  To emphasize it works for government.  That's

17   just what he did in this courtroom on direct.  Not just for

18   industry.  When, in fact, Dourson and his group engage in

19   industry-funded activities all the time, said Richard Denison

20   lead senior scientist at the Environmental Defense Fund.

21        Next file.  It's all from the same article.

22        Two-thirds of the resulting -- then you'll see that this is

23   also about he does a lot of work in Texas.  Dourson is a close

24   friend of Michael Honeycutt who heads the toxicology division

25   at the Texas Commission.  His department has evaluated toxicity

1    of 45 chemicals since 2007 through its risk assessment program.

2    Two-thirds of the resulting guidelines are less protective than

3    they used to be.

4        Bingo.  They had one part per billion, they bring in TERA

5    and suddenly it's 150 parts per billion.  Like magic.  Wonder

6    how that happened?

7        Any more slides on this?

8        The EPA -- this is important.  The EPA's integrated -- this

9    is why when Mr. Papantonio is talking to you about, you know,

10   they have to be transparent and they have to provide the

11   information to the EPA, DuPont does.  It's the company has the

12   obligation.  This is a free society, folks.

13       The EPA's Integrated Risk Information System, IRIS, has

14   evaluated less than one percent of the roughly 84,000 chemicals

15   registered with the agency.

16       You know, our EPA can't do it all.  They have to depend on

17   the honesty of Mr. DuPont to be forthcoming and let them know.

18   That's the rest of the story on Mr. Dourson.

19       Then I want to talk to you about the granddaddy of all of

20   the lack of context that you got from the defense side from

21   DuPont in this case, the lack of candor.

22       Can we get the MacIntosh chart up, please?

23       This is what I call the granddaddy of them all.  I'm going

24   to talk to you about Dr. Cohen, about this obesity issue and of

25   course about the reason we are here, Mrs. Bartlett.

1    You remember Dr. MacIntosh, the Harvard professor who

2  testified early in the trial, talked about all of these how

3  many -- how much was in the water.  This is all uncontested.

4  This is all uncontested.  How much was in the water.  He based

5  that on the science panel chart.

6    Dr. Cohen comes in here, who's apparently also a public

7  health official, according to Dr. Rickard, and it's like

8  there's an expression, the horse in the corner.  You ever hear

9  that expression, folks?  It's like this big giant horse that

10  sits all around in a corner making all this noise kicking and

11  bucking and all this kind of stuff.  That's what this is.  The

12  whole time he's testifying on that witness chair right there

13  he's completely ignoring the C-8 exposure.  Not a word, not a

14  peep about it.

15    Year after year after year after year of exposure.  Every

16  year multiple times more than .05.  Dr. Cohen, the eti --

17    Where is that?  I'll find it later.

18    The self-proclaimed etiology expert.  I'm an expert in

19  etiology.  Remember, Mr. Mace wrote it down?  Does not give an

20  opinion about that.  That's context, folks.  That's this.

21  That's what this case is about.  I don't know what case they

22  came to testify about.  That's the context that they laid out.

23  They have the audacity to say, they showed you this but they

24  didn't show you that.

25    Speaking of Dr. Cohen, I think we were all sort of

1  surprised to learn that he gave, as we learned only through my

2  questioning, no opinion, no opinion about the cause of

3  Mrs. Bartlett's cancer.  He talked a good game about obesity.

4  He talked a good game about how long her tumor would be there,

5  it could have been there.  Talked a good game about her blood

6  levels of C-8.  But at the end of the day he gave no opinion,

7  right?  I made that crystal clear on my recross-examination, no

8  opinion about what caused this person's cancer.  And we know,

9  folks, he's willing and able to do that because he's done it

10  before, to give an opinion as to what caused somebody's cancer.

11  Apparently he's got a resumé this thick that Mr. Mace is going

12  to want you to look through where he's looked at causation

13  issues, studies, published.  Not a single word about it, about

14  what caused her cancer in this case.

15      And as I said, he's willing to do it.  He's traveled around

16  the country.  He's earned hundreds of thousands of dollars in

17  litigation.  Always for Defendants, including DuPont, we

18  learned, in another case, eerily, where somebody was claiming

19  to have gotten kidney cancer from DuPont's chemicals and

20  pesticide.  Remember, that's the case I talked to him about in

21  Tampa, Florida.  He went to court and said, DuPont's chemicals

22  did not cause that cancer.  By the way, he did not say --

23      Could you put that back up?

24      He did not give an opinion as to whether this did or did

25  not cause Ms. Bartlett's cancer but he did give an opinion,

1    apparently, in the other DuPont case that DuPont's chemicals in

2    that case did not cause the cancer in that case.  He also

3    testified in that case that obesity -- he argued that obesity

4    contributed to that person, that poor guy's kidney cancer.

5         So we know he's ready and willing to do it, but he gave no

6    such opinion in this case.  What does that tell you?  What does

7    that tell you?

8         It tells you exactly as I told you in my opening.  That no

9    doctor, no person would walk through that courtroom door and

10   sit in that witness chair and tell you that C-8 -- tell you,

11   number one, that C-8 did not cause her cancer or, two, that

12   obesity caused her cancer.

13        But I got the feeling when he was doing his -- when he was

14   testifying that, you know, it seemed like he had that opinion,

15   right?  You know, he's talking about obesity, he's talking

16   about her BMI, he's talking about all these things and the

17   length, how long the tumor was there.  I said -- I leaned over

18   to Mr. Papantonio and said, you know, I think that they have

19   the idea that he has -- he's giving an opinion.  We know he's

20   not.  And so I made it crystal clear for everybody.  He gave no

21   such opinions in this case.  But they'd like you to think he

22   did, perhaps.

23        He talked to you about the age of the tumor.  Here's

24   another one of these perfect examples of leaving out context

25   and leaving out of the rest of the story.  He talked a good

1    game about the age of the tumor.  He pulled out one page from a

2    textbook.  Remember this?  He opened up a textbook and there

3    was growth rates of tumors.  We know that in -- we know there

4    was a 3-centimeter or so tumor that was removed in 1997.  So

5    the question was asked of Dr. Cohen, can you tell us how long

6    that tumor had been there?  And they opened up this textbook

7    and they find this statistic.  Renal cell carcinoma grows at a

8    rate, an average rate, of .28 centimeters a year.  Folks, you

9    do the math, you divide 3 point whatever the size of the tumor

10   was by .28 it's about 11, 11 and a half years.  So '97 -- first

11   of all, that would take you back to '86.  She still has all of

12   these years of exposure anyway.

13       Then they throw in oh, some of them can take as long as 20

14   years.  Let's speculate.  That's another word I know it's on

15   Mr. Mace's -- speculation.  We can't speculate.  This is a

16   court of evidence.

17       So but here's the point.  We know and we heard there are

18   some tumors that grow fast, some medium and some are slow.  And

19   they picked out a page out of a textbook which is an average.

20   You know, the average of one and twenty is 11 and a half.  Is

21   it 20 years, her tumor, was it one year?

22              THE COURT:  Ten and a half.

23              MR. DOUGLAS:  And Dr. Cohen ignored the rest of the

24   story.  The rest of the story, folks, is what Dr. Bahnson told

25   you about.  And you remember, we have Dr. Bahnson from the

1    James Cancer Hospital.  He didn't just pick a number out of a

2    textbook that may or may not be relative to this particular

3    case.  He considered all of the context.  He considered

4    everything.

5            Can we just have the testimony?

6            When I asked him, not just based on the size of the

7    tumor -- okay.  Context.  Dr. Cohen just wants you to look

8    tunnel vision, what's the size of the tumor.  Now let's get the

9    one page out of a textbook.

10           Not just based on the size of the tumor alone but

11   everything about the patient that you understood at the time,

12   can you give us a range as to how long the tumor had been

13   there, please.  And he goes on to talk about, yes, it would

14   be -- I would predict that it could have been there as long as

15   three years and more than a year.  It was some comment I recall

16   that suggested that he had said six months.  There's the answer

17   to the question.  Between a year and three.

18           What's that based on?  A page out of a textbook without

19   context?  No.  I reviewed images from six or seven months

20   before I ever saw her.  That's important.  That's the rest the

21   story.  That's part of it.  I considered the grade of the

22   tumor.  Those are factors that I would say -- I'd estimate it

23   has to have been there for more than a year.  And it could have

24   been there for up to three years.

25           Next slide.

1      That would also be based -- he goes on.  He's finishing

2  his answer -- on my clinical observation.  What is that?  Of

3  some people who we've chosen to watch with these small cancers

4  because they're not good candidates for surgery.  It's based on

5  experience watching tumors.  There are patients where they're

6  not going to do the surgery.  They have to watch, have the

7  patient come back and they watch the growth of the tumor.  He's

8  talking about -- we're talking about a real doctor from a real

9  cancer hospital who really knows tumors as opposed to

10  pathologists.

11      Remember Cohen -- Dr. Cohen is a pathologist.  He hasn't

12  seen a patient since 1975 with kidney cancer.  He can't -- he

13  works in a laboratory and looks at specimens under a microscope

14  to the exclusion of everything else.

15      Dr. Bahnson came in and testified about the rest of the

16  story.  Not a page out of a textbook.  And he told you that

17  this tumor, based on his real-life experience, treating

18  thousands of cancer patients, one to three years.  And the

19  reality is that some tumors grow fast, some are slow, and some

20  are in between.

21      And consider this.  C-8 -- and why is this important?

22  Because, look, if you go back to all of those year after year

23  after year after year after year of exposure it's important.

24  They want to push it as far back in time.  And some cancers are

25  aggressive.

1          Think about this.  The science panel found that it only

2     takes a year of drinking this amount.  One year of .05.  That's

3     a pretty aggressive cancer.  There are other cancers, we all

4     know, smoking, asbestos, take a lifetime of exposure before

5     something may happen.  This one, all you need is a year.

6          I know that's not growth rate.  Don't get me wrong.  But

7     that's a pretty fast-acting cancer.  And we got an opinion from

8     a real doctor who really treats kidney cancer patients who said

9     it was between one and three years.

10         Let me briefly talk to you about this obesity issue.

11    First of all, I'm not sure that it wasn't a complete waste of

12    time.  It was interesting.  We had an interesting dialogue,

13    Dr. Cohen and I, about what's in the scientific literature and

14    what's not in the scientific literature.  Because at the end of

15    the day, it's not relevant.  Nobody testified that obesity

16    played any role in causing her cancer.  So I'm not sure it

17    wasn't a complete and total waste of time.

18         Unless they want you to put -- they want to put doubt in

19    your minds about Dr. Bahnson.  Oh, he didn't -- he's improperly

20    thought this through because he dismisses obesity as a cause.

21    But there's not a scintilla of evidence, folks, that obesity

22    caused her evidence.

23         Can I have the scales of justice?  Thank you.

24         I want you to think about this.  We can put C-8 on one

25    of those scales.  If you're thinking about, what caused her

1    cancer?  Was it the years and years of C-8 exposure?

2           Can we put that slide up?

3           Was it all that?  And we saw the multiple, multiple

4    years at many times more than .05 on one scale.  That's

5    evidence in this case.

6           What evidence can we put on this scale to weigh these

7    two factors about obesity?  Nada.  Nothing.  Nobody testified.

8    Look through her medical records that will be in evidence.  Not

9    a single one of her doctors ever said obesity.  Lose weight

10   because your cancer may come back.  Risk factor.  You know, it

11   lists risk factors in medical records.  There's nothing in

12   there about obesity had anything to do with her cancer.  All of

13   these many doctors over all of these many years.

14          There's nothing you could put on that scale.  And so the

15   result is there's no other conclusion to reach unless you

16   speculate and maybe they just want you to speculate, but you

17   cannot put speculation on that scale.  You'll hear from the

18   Court.  You cannot speculate.  It's a court of evidence.

19          So we went through this little dialogue with Dr. Cohen

20   and picked out ten -- I think at the end with redirect they

21   went through 10, 11 or 12 articles out of the millions and the

22   scientific literature.  They picked out 10.  He said there were

23   20.  I think they talked about 10.  Maybe it's a little more.

24   I'm sure I'll be corrected if I'm wrong.  That most of which

25   say there's an association.  A risk, not causative risk.

1    Remember, there's an important distinction.  We know C-8 can

2    cause cancer.  A risk factor is not something that's yet been

3    established to be a cause.  It's just a bow-tie association.

4    The bow tie doesn't make you intelligent.  Remember

5    Dr. Bahnson's analogy?

6          The point is that there's a debate in the scientific

7    literature.  The American Cancer Society, for example.

8          Can we have that slide, please?

9          We do not yet know exactly what causes kidney cancer.

10   How about the World Health Organization?  Some can -- what are

11   the common health consequences of overweight and obesity?  Some

12   cancers.  I don't see kidney cancer listed there.  That's the

13   rest of the story.  And the rest story is there's a debate and

14   a dialogue about it.

15         And I was struck by the fact that Dr. Weed was not here.

16   He is not a pathologist.  He's an epidemiologist.  They brought

17   epidemiology studies in here to try to convince you that

18   obesity is a cause of kidney cancer.

19         You remember Dr. Weed.  He was the other expert that

20   they hired but did not bring and he is an epidemiologist.

21   Dr. Cohen referred to him as one of the gurus of cause and

22   effect.

23         Can we play that?

24         You remember what Dr. Weed said.  I took his deposition

25   and I asked him about this obesity stuff.  Just play that.

Vol. 16 -    80

1                        - - -

2            Thereupon, the videotape was played in open court as

3    follows:

4      Q.   So you don't know whether it's generally accepted or not

5    as to whether obesity is a causal association for renal cell

6    carcinoma?  You don't know?

7      A.   I didn't say that.  I said --

8      Q.   Do you know?

9      A.   What I said was that what the literature that I reviewed

10   says is that obesity is a risk factor for renal cell carcinoma.

11   I also said that I had not seen a statement laying claim to

12   causality.

13     Q.   Okay.  And do you think you did a pretty thorough review

14   of the literature on the subject?

15     A.   Reasonably thorough, yes.

16     Q.   So would it be fair to say that based on your research

17   it is not generally accepted that renal -- that obesity is

18   considered a causal risk factor for renal cell carcinoma?

19     A.   It's like I said before, I haven't seen that statement.

20   I would say that it is generally accepted.  It's a risk factor.

21     Q.   But not a causal risk factor?

22     A.   I haven't seen that in the literature.

23      (End of video clip.)

24          MR. DOUGLAS:  That's the epidemiologist.  Interesting

25   that they didn't bring him to testify but they chose the

1   pathologist, the guy who travels courtroom to courtroom to talk

2   about obesity causing cancer or not chemicals or the drug

3   manufacturer.  What does that tell you about context and the

4   rest of the story?

5        And they have the audacity to criticize -- and they

6   will.  You're going to hear, Dr. Bahnson did a terrible job.

7   You can just discount his opinion all together because he did a

8   terrible job of figuring out this mystery of what caused

9   Ms. Bartlett's cancer.  The defense would truly have you

10  believe that this man, the department chair at the James Cancer

11  Hospital is some type of extremist, some guy out on an island

12  of ignorance and that they, their experts, or their expert,

13  Dr. Cohen, are the true voices of reason on this planet.

14       The pathologist who sits in a laboratory and looks at

15  specimens and hasn't seen a patient in 30 years.  That person,

16  Dr. Cohen, had the audacity to criticize Dr. Bahnson for not

17  taking a proper family history.  You remember Mr. Mace's family

18  tree that he drew?  It's all well and good to do that here in

19  the cold confines of a courtroom after the fact when you're

20  representing someone that just got sued for causing somebody's

21  cancer.  But the pathologist who doesn't even take a history is

22  criticizing Dr. Bahnson?  Seriously?

23       Skip that next slide.

24       President Johnson once said -- and I'm going to clean

25  this up a bit, he spoke with some colorful terms.  President

1    Johnson once said, any mule can kick down a barn but it takes a

2    good carpenter to build one.  And I submit to you that in that

3    analogy, you know, Dr. Cohen is the mule just kicking down the

4    barn but it takes a competent cancer doctor like Dr. Bahnson to

5    build one.  Just came in to knock it down.

6         I just want to talk to you briefly about blood levels.

7         Let's put up the first slide.

8         The blood levels were taken in 2005 and found -- she's

9    found to have 19.5 parts per billion which placed her -- next

10   slide -- as you heard in the 99.6 percentile meaning less than

11   one half of one percent have more blood -- have more C-8 in her

12   blood.  In other words, she has more C-8 in her blood in 2005

13   than 99.6 percent of the United States population, according to

14   this study.  And I want to -- and so they need to explain this

15   away and they're going to tell you, oh, but that's nothing

16   compared to other people who had 80 parts, the workers or the

17   rats or the monkeys, as if that makes it okay because they want

18   to tell you, well, she doesn't have enough in her blood to

19   cause cancer.

20        But I want you to come back to what I told you was the

21   beacon in the night.  This is what you're going to be asked to

22   determine in terms of whether her cancer was caused by C-8.

23   This is the beacon in the night.  A lot of numbers you heard.

24   Parts per billion in the water, parts per billion in the blood.

25   This will guide you back to shore.  When you're thinking about

1    whether C-8 caused her cancer, this is the issue and we know

2    and we saw year after year after year of exposure.

3         By the way, here's something else that concerned me.

4         Can we have Dr. MacIntosh's table again?

5         The year her blood was sampled was 2005.  You see this

6    .12 parts per billion in the water at that point in time.

7    Dr. Rickard told us the concept of the less C-8 in the water

8    that you're drinking, the less will end up in your blood.

9    Common sense.  He made that point when he's talking about oh,

10   today, because the filters are on in 2006, Ms. Bartlett would

11   have virtually background levels of C-8 by this time.  But the

12   opposite is true, Dr. MacIntosh told us, that the more C-8 that

13   you have in the water, the more will be in your blood.

14        So look at this.  In 1995, two years before her cancer

15   surgery, it's not .12, it's .44.  That's three and a half times

16   more C-8 in the water.  So therefore, her C-8 would have been

17   much higher, three and a half times higher potentially.  So

18   think about that.

19        But at the end of the day, this is what matters.  At

20   least one year, and she had multiple, at least .05 and each one

21   of these years was several times higher than .05.

22        I want to talk to you now in my remaining few minutes

23   about what we call in the law, damages, capital D, about the

24   person, Carla Bartlett.  I talked to you in opening statement.

25   I told you she's salt of the earth.  She typifies everything

1    that's great about America and Americans.

2         In her own ordinary way doing extraordinary things like

3    facing death, facing cancer, facing the uncertainty and facing

4    the -- amazing how, as Americans, when it's time to get going,

5    we get going.  When she was called that day on the telephone

6    and she started shaking and she called her husband Jon, he's

7    here in the audience.  And so they prayed together and she

8    worried and wondered whether she'd see -- live to see her son

9    and her stepson grow up and what would happen?

10        These are things.  Is it unreasonable?  Are they going

11   to say our fear of cancer is not reasonable?  Walk a mile in

12   another man or a woman's shoes and say that.  It wasn't

13   reasonable for her to fear that the cancer would come back.

14   And you know, she does live in fear.  Especially you heard them

15   say now that I heard about bio-persistence.  And she's still

16   drinking --

17        Could you put the MacIntosh --

18        Bio-persistence.  Look at this.  All of these years

19   after her cancer, .85.  That's not just .05.  That's time --

20   many, many, many times more.  This is after the fact.  Coursing

21   through her blood.  Her God-given organs.  And we're hearing

22   about bio-persistence for 20 years.  Walk a mile in her shoes,

23   I say to anyone who says that her fear of cancer is not

24   reasonable.  And she described the pain of being cut in half to

25   remove the cancer from her kidney caused by years of exposure

Vol. 16 -    85

1    to the cancer-causing water.

2         Play the animation, please.

3         This is just an animation but Ms. Bartlett lived this.

4    She woke up from that surgery in agony.  And she talked to you

5    about it.  The rib being cut from her body, the worst pain she

6    ever had in her life.  Remember she talked about the painkiller

7    button, kept pressing that button to take away the pain.  She

8    woke up with the dry heaves.  Imagine that.  Dr. Bahnson called

9    it agony.  That was his word.  Anybody who's had that kind of a

10   rib removed, it's agony.

11        I'm sorry, it's just necessary to do this.

12        The ride home from the hospital.  How about the ride to

13   the hospital, wondering with her husband, that long ride to

14   Columbus to a cancer hospital, unimaginable that she'd ever be

15   in this situation?  That's all part of this case.  Her mental

16   anguish.

17        You're going to be asked to decide -- there's a question

18   on the jury verdict sheet that has to do with emotional

19   distress.  I'm going to show it to you in a second.  It's going

20   to ask you to find in her -- whether you find in her favor or

21   not for emotional distress.  And if you do, how much to award

22   her for that emotional distress, the mental anguish that she

23   went through.  It's part of this case.  Not just the physical

24   pain, folks.

25        Her ride home from the hospital.  Remember she talked to

1    you.  This is real stuff.  This is real life.  This is what

2    really happens when you drink cancer-causing water and have to

3    be cut in half and survive that.  You know, it's easy to say

4    here in the cold confines of a courtroom after the fact but I

5    want you to think about what she testified to.  Because the

6    case is about compensating somebody for pain and suffering and

7    her mental anguish.

8         The yearly CAT scans every time wondering about the

9    results climbing into that CAT scan machine, injecting the dye.

10   You think that's comfortable?  Drinking that terrible tasting

11   chalky water that she described.  Traveling every year, getting

12   in the car with her husband who faithfully drove her every year

13   for her yearly follow-up for nearly ten years.  Wondering each

14   time is it going to be good news/bad news.

15        So I've reached that part of my summation where I'm

16   going to talk to you about -- we've decided I'm going to talk

17   to you now about compensating the plaintiff for everything

18   she's been through.  And this is not to be presumptuous, folks.

19   We understand that you will first address the issue of

20   liability or in other words, whether the defendant DuPont is

21   negligent.

22        You're going to see a verdict form, not as big as this

23   one, and it's going to say, do you find in favor of

24   Mrs. Bartlett on her negligence claim, yes or no?  And you're

25   going to be asked to make a decision.  That's our case.  That's

1    the main case against DuPont that they were negligent.

2        They dumped it in the water.  They should have

3    incinerated it.  They should have listened to Dr. Karrh back in

4    1982 and '89 when he said, we have to prevent the general

5    public from being exposed.  That's negligence.  That's the

6    reckless disregard.  That's what Mr. Papantonio was talking to

7    you about.  Conscious disregard for people's health and safety.

8    That's what this is all about.

9        If you say yes, and we believe that there's really no

10   other way to view the evidence in this case, then you're asked

11   a second part which is, if you found in favor of Mrs. Bartlett,

12   what damages, if any, do you find Mrs. Bartlett is entitled to

13   on her negligence claim?  That has to do with her pain and

14   suffering.  This is what we're talking about.  That's the first

15   question.

16       There's another question.  Do you find in favor of

17   Mrs. Bartlett on her negligent infliction of emotional

18   distress?  That has to do specifically about her mental and

19   emotional distress as a result of what happened to her.

20       The Judge is going to tell -- define what these are.

21   What is negligent infliction of emotional distress?

22   Judge Sargus is going to define all that for you after

23   summations are over.  He's going to define to you what

24   negligence is.  If you answer yes to that, you'll be asked to

25   award a sum of money.

1        My time is running out so I'm going to start speaking

2   faster than I normally speak.

3        But this is important.  How do you equate somebody's

4   pain and suffering or mental anguish with a sum of money?  No

5   sum of money could ever take away what she went through.  We

6   know that.  But jurors are asked to do it because it's about

7   accountability.  It's about holding somebody accountable.  It's

8   about holding Mr. DuPont and the decisions that were made by

9   the folks that work at their company accountable for what

10  happened.  As I said in my opening statement, we all know

11  there's not enough accountability anymore in this world.  And

12  it applies to folks like Mr. DuPont just as it applies to me or

13  anybody else in this courtroom.

14       We're going to ask you to hold them accountable.  And

15  the only way we can do it in our civil system of justice is to

16  award a sum of money that accurately and fairly compensates

17  this person, this human being, this American citizen who was

18  harmed and experienced pain, anguish, suffering.  So how do you

19  do it?

20       We do it all the time just by going to a pharmacy to

21  spend five bucks on a bottle of aspirin.  We made a decision

22  five bucks is worth it to take away the pain.  We spend

23  millions and billions on cancer research, on wiping out

24  disease.  It's worth it.  We do value, we do place a value on

25  pain and suffering.

1     I know there are people out there -- by the way, let me

2  just dial this back just a second.  This is just our

3  suggestion.  This is entirely up to you.  You may hear what I'm

4  going to suggest and say, Mr. Douglas is crazy.  What did he

5  say?  That's way too high.  You may say, Mr. Douglas, you're

6  crazy, that's way too low.  It's your decision.  But we have a

7  right, we can exercise that right to suggest something.

8     There are people that are crazy enough out there that if

9  you said to them, you know, I'll give you a million bucks, I'll

10  give you multimillions, all you got to do is cut yourself in

11  half and remove part of your kidney and you have to live the

12  rest of your life wondering whether or not you can get kidney

13  cancer.  There are people crazy enough that would say, I'll

14  sign up for that.

15     And I submit to you that Mrs. Bartlett is not such a

16  person.  She'd never bargain for that.  But when she went under

17  that knife, and she described it for you, she's got that what

18  she called that big and ugly scar from here to here that is a

19  reminder every day when she gets dressed of what she went

20  through.  When they cut her open, when the good Dr. Bahnson cut

21  her open to remove the cancer that was caused by the

22  cancer-causing water, that was a million dollar moment in her

23  life.  Who would ever sign up for that?  I'm not going to give

24  you a specific amount.  And that's just for starters, folks.

25     Then the painful recovery, the mental anguish,

1    everything I've just talked about.  We submit to you that this

2    case is significant and they're going to try and portray her as

3    damaged goods.  What was that all about with Ms. Niehaus

4    talking to her about all these other surgeries?

5         Put up that slide, that last slide, please.

6         I've just got to make this point really clear because I

7    don't think this point was made clear.

8         The last slide, the doctor slide.

9         This is from Dr. Batten's records.  This is from the

10   year of her surgery, 1997.  It's Plaintiff's 2.34.5.  In case

11   you got the impression when counsel was questioning

12   Ms. Bartlett that she had all of these problems and she was

13   physically a wreck, look at this.  Heart attack -- no heart

14   disease, no blood pressure, heart failure.  You go down this

15   whole list.  She's got everything's a no.  Everything is a no.

16   She didn't have any of these problems.  The only problem that

17   they checked off yes was bladder or kidney problems and that's

18   what she was there for, her kidney cancer.

19        One could say that everything afterwards, after her

20   kidney cancer, everything went downhill for her.  She had the

21   back issues.  She had all these other issues that really have

22   nothing to do with this case.

23        So for Ms. Bartlett, who is a relatively healthy person

24   who underwent this kidney cancer surgery, I suggest to you that

25   this is a case of significant value.  They're going to diminish

```
 1    her as damaged goods.  She doesn't get -- deserve to be

 2    compensated.  Everything else that happened to her in her life,

 3    there were other surgeries in her life that were painful.  So

 4    what?  Walk a mile in somebody's shoes before you start

 5    diminishing what they went through.

 6         I'm going to leave you with one last, final thought.

 7    Please, if you find in our favor, we suggest that you should

 8    award an amount of money that is significant, that reflects the

 9    significant pain and suffering and experience and fears that

10    she went through.  You're going to hear about it was stage 1,

11    it was time to celebrate, it's good news, it's nothing, you

12    know, she's cured and all that stuff.  Likely story if you're

13    representing the company that got sued for all this.  Of course

14    they're going to say that.  But it's up to you.  It's up to you

15    folks in the jury right now.

16         I just want to tell you there's two other pages in the

17    verdict sheet.  This is for the total amount of damages.

18    There's a question about the total amount from the first two

19    questions.  And then there's a question, and this is what

20    Mr. Papantonio was talking to you about, where you're going to

21    be asked about, have we proven by clear and convincing evidence

22    that DuPont acted with actual malice and that Mrs. Bartlett has

23    presented proof of actual damages that resulted from those acts

24    of failures?

25         This is a textbook case, folks, of malice, of disregard
```

Vol. 16 -   92

1    for Mrs. Bartlett and everybody along the Ohio River and

2    Tuppers Plains and all the other water districts that were

3    unknowingly drinking cancer-causing water all of those years.

4         I want to thank you.  We will have an opportunity for a

5    brief rebuttal after you hear from Mr. Mace.  And

6    Mr. Papantonio is going to speak to you in rebuttal.  I want to

7    thank you for the incredible time and incredible effort and

8    clearly the degree of what you're paying attention and taking

9    notes.

10        Thank you, Mr. Bilott for trusting me with this case,

11   this important case.  And thank you, Mrs. Bartlett, for the

12   honor of representing you.  It was truly an honor.

13        THE COURT:  Thank you, Mr. Douglas.

14        We're going to take a one hour lunch break at this time,

15   ladies and gentlemen.  We'll recess for one hour.

16      (Thereupon, the jurors exit the courtroom.)

17        THE COURT:  Mr. Mace, you indicated you had a matter?

18        MR. MACE:  We do, Your Honor.

19        Judge, you had given us some guidance, which I respect,

20   many Judges do, not to be a jack in the box during closing

21   argument, but for purposes of appeal I do need to note for the

22   record our objections.

23        There were numerous, numerous violations of motion in

24   limine rulings the Court has made.  Motion in limine number 19,

25   probable testimony of a witness not called as a witness.

1    Motion in limine 6, comparisons, analogies to other industries.

2    Birth defects, they misstated what the holdings were, they

3    misstated your Court's limiting instruction.  They left open

4    the possibility both with regard to cattle, birth defects and

5    other things, that we still don't know what's going to happen.

6    Directly flying in the face of the science panel's rulings.

7    They talked about other acts, implying that these 200 some

8    violations related to C-8 when they didn't.

9         They also, Your Honor, and we had noted earlier in the

10   record but just to make sure the record is clear, we think it's

11   unfair prejudice to allow them to comment on Dr. Cohen not

12   giving an opinion on specific causation when the Court had made

13   a motion in limine ruling on that.  We're not supposed to get

14   into motion in limine rulings.  Very unfairly prejudicial to

15   imply to this jury the man had no opinion when he obviously had

16   a very clear opinion that Your Honor didn't let him give.

17        So those and some other respects.  Those are the main

18   ones.

19        THE COURT:  I understand making a record.  But I also

20   understand in the form of making an objection.  Now, what do

21   you propose is a remedy here?  Their closing argument is over

22   with regard to everything but rebuttal on the plaintiff's side.

23        MR. MACE:  The jury should be told to disregard each

24   of these issues.

25        THE COURT:  I'll hear from Mr. Papantonio or

Vol. 16 -   94

1    Mr. Douglas on each of these.

2         MR. PAPANTONIO:  Your Honor, I'm trying to evaluate

3    the issues.  First of all, the reason that we're put in the

4    position of commenting about experts to begin with was that

5    DuPont has intentionally tried to try this case without calling

6    experts but suggesting to the jury by innuendo and supposition,

7    for example, that Mrs. Bartlett suffers from cancer because

8    she's overweight.  They had the evidence to do it.  They had

9    the experts to do it.  They simply didn't call the witnesses

10   because those witnesses did not rise to the standard under the

11   Daubert test.

12        THE COURT:  Let's stay with Dr. Cohen for a moment.

13   As you know, I excluded his ultimate opinion testimony in this

14   case.  When we were wading through his testimony, my ruling was

15   that he could be asked has he given an opinion as opposed to

16   did he have an opinion.  Perhaps a subtle distinction but that

17   would be accurate to what he was doing in this case.  He had an

18   opinion, he just couldn't give it.  And he hadn't given one.

19        Mr. Douglas may have a better memory of this, and so may

20   Mr. Mace.  I didn't hear -- I heard he didn't have an opinion

21   in the close.

22        MR. DOUGLAS:  I have it in big bold letters in my

23   outline to make sure I used the words that conformed to the

24   Court's ruling.  Did not give an opinion.

25        THE COURT:  And then the issue of the birth defects in

Vol. 16 -   95

1   the cattle have been addressed with the jury multiple times

2   with the instructions that we had worked through.  So I am

3   going to overrule that as any sort of new issue that they

4   wouldn't be familiar with.  They've already been told that

5   those were not matters that turned out to be true but could be

6   used as the issue of notice to DuPont.

7        Then the last issue as to witnesses not called.  I'd

8   like you both to address that.  Starting with Mr. Papantonio.

9        MR. PAPANTONIO:  Your Honor, the reason we were put in

10  this situation about witnesses not called is, again, when you

11  look at the totality of the way that this case was tried by

12  DuPont, it's virtually impossible -- other than us to sit

13  silent and have the jury believe, have the jury believe that,

14  for example, Mr. Playtis is the guy that should be in here

15  talking about industrial hygiene or that the toxicologist,

16  Dr. Rickard, should be talking about public health issues.

17       I think for us not to bring that up is, first of all, to

18  make the leap that we really believe that what Dr. Rickard said

19  as a toxicologist has any bearing on medical issues, has any

20  bearing on public health issues.  I really don't believe we

21  overstated that issue at all.  I don't really think we did.

22  And if I did say it, I was very specific about when I said it

23  about the particular issue.

24       THE COURT:  Well, I'm inclined to at least think in

25  terms of the jury instructions, perhaps a certain paragraph.

1    Making sure the jury understands that either side can bring in

2    any witness that side chooses to.  I'm not sure the jury would

3    be aware of that.  What's your thought on something in the

4    general sense along those lines?

5           MR. PAPANTONIO:  That's fine with me, Your Honor.  I

6    think that tells the whole -- that tells the whole strategy.

7    It tells the whole story that this Court has had to endure

8    hearing after hearing where we've had to walk around the edges

9    of what DuPont has tried to do by trying the case with expert

10   absentia all the way down to Dr. Cohen.  The Court went out --

11   the Court went out of their way to say, yes, we're going to

12   allow these things of Dr. Cohen to give an opinion, and I think

13   that was an appropriate ruling.  That is what we should have

14   done.

15          But to allow them to simply try this case by saying they

16   paid huge money to experts and they haven't called them into

17   Court.  Because truthfully, Judge, I sincerely mean this, there

18   are experts that they had to come to court that could not

19   testify about key issues.  I didn't just say that in opening

20   statement.  There are people they had that could not testify to

21   key issues because they knew it completely would be

22   inappropriate and almost borderline fraud.

23          THE COURT:  Mr. Mace.

24          MR. MACE:  Your Honor, it would only exacerbate the

25   prejudice for you to give such an instruction on the experts.

1    It is highlighting the improper argument that was made by the

2    plaintiff.  We all know that Dr. Weed didn't have the

3    assignment to look at causation.  That was not his role.

4         More importantly, I really must note for the record the

5    whipsaw of being prejudiced by the different attitude on the

6    plaintiff's case versus the defense case.  We raised, during

7    the plaintiff's case, that they weren't calling Dr. Margulis

8    who we had videotape after videotape making gut-wrenching

9    admissions that gut their case.  And I got the Court's clarity

10   that you weren't going to let us use somebody they weren't

11   going to call as a witness to cross the person they did bring

12   as a witness.

13        So that was the understanding for the case.  And then to

14   allow them in our case in chief to talk about Weed, when that

15   wasn't even his role in the case, we think is highly improper,

16   unfairly prejudicial and to add to that by putting an

17   instruction in they can call whomever they want, we think is

18   highly unfair.

19        THE COURT:  If you're opposed to the instruction,

20   that's fine.  I'm not inclined, after close is over, to reopen

21   it with instructions.  The rules require a timely objection if

22   something's improper.  It didn't happen.  At this point we're

23   going to leave it.

24        MR. PAPANTONIO:  Just to be clear, we're fine with the

25   instructions.  If defense is really so worried about anything

Vol. 16 -    98

 1    that's been done out of -- that shouldn't --

 2            THE COURT:  I will note for the record, I probably

 3    would have sustained an objection.  We just got into this

 4    slightly but I will remind the jury, this is a case between one

 5    plaintiff and one defendant.  It may have ramifications beyond

 6    that, but that is not for the jury to consider to the evidence

 7    in this case.  When we get to rebuttal, that's something I

 8    would take a close view on if it comes up again.  So just a

 9    fair warning.

10            With that, we'll be in recess.

11         (A recess was taken at 11:41 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                           Vol. 16 -    99
 1                               TUESDAY AFTERNOON SESSION

 2                               OCTOBER 6, 2015

 3                                    -  -  -

 4           THE COURT:  So, ladies and gentlemen, we'll begin this

 5      afternoon with DuPont's closing argument.

 6           Mr. Mace, you may proceed.

 7           MR. MACE:  Thank you, Your Honor.

 8           Ladies and gentlemen, it's good to be able to talk with

 9      you again.  This case, as you've seen over the past three

10      weeks, is about facts versus sound bites taken out of context.

11      It's about proof versus speculation.

12           Three weeks ago I stood before you and I told you I'd

13      prove three things for you.  One, that no employee of DuPont

14      thought that their actions were likely to cause any harm to

15      Mrs. Bartlett or anybody in the community.  Two, that DuPont

16      has no liability here.  It did not breach any legal duty to

17      Mrs. Bartlett.  And three, that Mrs. Bartlett's kidney cancer

18      is readily explained by other things and was not caused by any

19      conduct of any DuPont employee.

20           I also told you that Mrs. Bartlett's lawyers were not

21      telling you the whole story, and that much of what they talked

22      about did not directly relate to the specific issues that you

23      need to decide in this case.

24           So let's see if I kept my word to you.

25           First, no employee of DuPont thought that their actions
```

1    were likely to cause harm to Mrs. Bartlett or anybody in the

2    community.  And you saw that the plaintiff's case is actually a

3    house of cards.

4         Let's start with the undisputed facts.  One of the last

5    things I said to you that we talked about in opening statement,

6    we talked about common sense, because you didn't leave your

7    common sense out on the street when you came into the

8    courthouse today.  And what you heard and what you saw, because

9    actions speak louder than words, you heard people like

10   Dr. Playtis who were involved in taking the community water

11   samples and analyzing the results, what they meant.  They were

12   drinking the very same water themselves along with their

13   spouses, their children, their friends, knowing that it had

14   small amounts of C-8 in it.  They were testing their own tap

15   water from their own houses.  They were analyzing the water

16   they use themselves every day to drink, to brush their teeth,

17   to take showers in, to cook with, water they put in their

18   family's pet's water bowl, to water their grass.

19        You heard the supervisors, top management, including the

20   plant manager, was drinking the water from the plant drinking

21   fountain knowing it had C-8 in it.  You heard that one of

22   DuPont's best and brightest, Dr. Rickard over here, when he

23   came to the plant, he would drink out of the plant drinking

24   fountain knowing that it had C-8 in it.

25        Did they really want you to believe that DuPont's

 1    employees thought that the trace amounts of C-8 that had gotten

 2    into the water were likely to cause harm but they just

 3    continued to drink it anyway, continued to let their family and

 4    friends drink it knowing it would cause harm?  Does that make

 5    any sense?

 6         And what about the contemporaneous documents, the

 7    documents written through the decades that we've talked about

 8    before there were any lawsuits?  The internal, confidential

 9    documents, the documents that show what people were really

10    thinking back at the time.  What did those show?  I'm not going

11    to go through the dozens we went through during the trial.

12    I'll remind you of a few of them.

13         You saw documents like Plaintiff's Exhibit 363, one of

14    these personal and confidential documents, internal company

15    files nobody would ever think it would see the light of day

16    back in '82.  All -- not some, not some, all.  All of our

17    presently available data indicate there is no chronic health

18    effect due to the low levels of exposure to the employees, to

19    the employees.

20         And we're going to talk about the relative levels of

21    exposure, what was known when, what was the information

22    available to DuPont through these decades that we talked about.

23         You saw documents like Defendant's Exhibit 676, up to

24    2000:  Dr. Playtis, internal company memo, not written for

25    purposes of any lawsuit.  He gets an inquiry from the plant

 1    over in Japan.  We've got some blood levels.  Anything to be

 2    concerned about?

 3         Dr. Playtis, recognized as having expertise in this

 4    area -- this is an industrial hygiene issue.  What does he say

 5    back not in the court of law, back at the time to his

 6    colleagues who needed to know the truth?

 7         Blood levels higher than 50,000 -- 5-0, comma, 0-0-0 --

 8    50,000 parts per billion have been recorded in humans with no,

 9    no observed health effects.  That's what the contemporaneous

10    documents show.  Even Dr. Siegel, the plaintiff's expert,

11    admitted this is what the documents show.

12         Siegel 1, please.  Cross-examination:

13              Sir, when you were reviewing the internal DuPont

14              documents, you noticed there were a number of internal

15              documents where DuPont stated it does not believe C-8 is

16              causing any disease.

17              Quite a few documents said that.

18         Their own expert acknowledged that.  That's what he saw

19    in DuPont's documents.  You saw it.  We threw the gauntlet down

20    to Mrs. Bartlett's lawyers.  Out of the 8 million pages of

21    records involved in this case, show me one document, just one,

22    show me one document where anybody at DuPont said they expected

23    that harm was likely to anyone in the community.

24         And despite the many, many years of litigation you've

25    heard about, more lawyers than I can count working against

1    DuPont every day, digging through every nook and cranny, every

2    file cabinet, every desk drawer, every computer of anybody who

3    had anything to do with C-8, and they've not shown you a single

4    document, not one, where anybody at DuPont said they expected

5    that harm was likely to anybody in the community.

6          Was that reasonable?  Was it reasonable for DuPont's

7    employees not to expect any harm?

8          You heard Dr. Rickard.  These are undisputed facts.

9    They never challenged them.  This is not the type of compound

10   you would expect to cause harm.  It's a surfactant, like a

11   soap, DuPont was buying from 3M.  C-8 was a fine, white powder,

12   kind of like Tide laundry detergent, a soap-type material.  It

13   was initially packaged by 3M as this powder.  Later they

14   dissolved it and diluted it into a liquid in the late '80s.

15   You heard it's stable, it's non-reactive, it has a structure

16   very similar to natural fatty acids we're all born with.  When

17   it gets into the blood, you heard it gets bound up with the

18   blood albumin, a protein in the blood, where nearly all of it,

19   99 percent of it, is bound up and not - the term used -

20   biologically available, not able to be reactive with other

21   things because it's bound up.  That's what DuPont knew at the

22   relevant time, undisputed facts.

23         You also saw that C-8 is not a regulated company.

24   Throughout that relevant time period we talked about, there was

25   never any restrictions, no laws restricting the purchase, use,

1    or disposal of C-8.  Plaintiff's own expert admitted that.  C-8

2    could be lawfully washed down the drain like the detergents,

3    dish-washing liquid, other soaps and things we all use at our

4    house every day like thousands of other chemicals.  You saw, as

5    you probably already knew, that both the state governments both

6    in Ohio and West Virginia, and the federal government, the

7    United States government, they have many, many agencies that

8    are charged with protecting the public health.  You heard that

9    these agencies take their job seriously.  They set exposure

10   limits to protect the public health.

11        And you saw that both the United States government and

12   Ohio set specific limits for what's called the MCL, Maximum

13   Contaminate Level.  The agency set limits for the chemicals and

14   substances that they determine are potentially dangerous enough

15   that they need to set a limit to protect the public drinking

16   water.

17        You saw, for example, Defendant's Exhibit 2351.  U.S.

18   EPA sets the national primary drinking water regulations.  And

19   you heard how the MCL lists many, many other things, other

20   chemicals, but not C-8.  And you also saw that C-8, the

21   chemical we're here to talk about, has never, never been on the

22   MCL list, and it still isn't today as we sit here.  There's no

23   draft, no proposal, to even put it on the MCL list.  Don't be

24   misled about that.

25        What else did DuPont know back at the relevant time?

1    DuPont knew that the people working at 3M, the people who are

2    making the C-8, had much higher exposures to C-8 than the

3    people working at DuPont.  3M was making the C-8.  3M was

4    selling it to a lot of other companies, not just to DuPont.

5    You heard that C-8 was made by eight other major manufacturers

6    in addition to 3M, and numerous other smaller manufacturers.

7    You heard that there were many, many, many other companies

8    around the world and in the United States using C-8.

9         You heard that C-8 is in the blood of many people around

10   the world and it came from many different sources, many other

11   companies.  Don't be misled into thinking it's in the blood of

12   people around the world because of DuPont.  DuPont was one of

13   many, many, many companies that was using this chemical you

14   heard from the 1940s through today.  DuPont hasn't used it

15   since 2013.  Many companies still use it today.

16        You heard how little of it DuPont was using.  It came in

17   50-pound drums, not these super sacks of thousands of pounds.

18   More importantly, you also saw that 3M, the manufacturer, the

19   person that was selling it to DuPont, repeatedly told DuPont in

20   the '70s, in the '80s, in the '90s, in the 2000s, that 3M was

21   not seeing any disease in the 3M workers, even the ones who had

22   the highest and longest exposures to C-8.

23        Remember what you heard.  3M had been making this and

24   using it itself since the 1940s, above our chart.  Back in the

25   1940s is when 3M started making it and using it.  By the time

1    we get to the late '70s, 3M had been making it and using it for

2    more than 30 years already by the late '70s.  3M was telling

3    DuPont that 3M's employees, the people with the highest

4    exposures, with 70,000 parts per billion in their blood, were

5    not having any diseases or any health problems caused by C-8.

6         Again, we won't look at all the documents.  Let's look

7    at a few.  Defendant's Exhibit 338.  1979, one of these

8    confidential, internal documents not written for any lawsuit.

9    The 3M medical director said no adverse liver effects.  And

10   remember, they want to talk about the studies on the animals

11   back in the '60s.  What was the target organ?  The liver.  Did

12   it make sense that was where they were looking primarily in the

13   workers?  Sure.

14        No adverse liver effects or other health effects,

15   because they didn't stop there.  They reviewed the employees'

16   medical records at 3M, at DuPont.  No health effects.  No liver

17   effects or other health effects found among employees in FC-143

18   C-8 operations.

19        On page two of that, please.  One of the issues that you

20   need to have in your mind is background levels of exposure.

21   There was some discussion about that here and there.  Let's

22   focus on that for a minute, because in terms of what DuPont

23   knew back at the time, 3M went and got samples in a Chinese

24   village totally away from industrialized society.  And what did

25   they find?  4 parts per billion to 17 parts per billion.  So

1    I'm converting that.  It says 004 to 017 parts per million.

2    You have to move three for parts per billion.  Most of what

3    we've been talking about is parts per billion.  I'm going to

4    keep apples-to-apples comparisons.

5         3M is telling DuPont, other side of the world away from

6    any industrialized society, people have 4 parts per billion to

7    17 parts per billion in their blood.  And what about in the

8    good old US of A?  3M found 2 parts per billion to 130 parts

9    per billion, background, in the general U.S. population.

10   You've heard the plaintiffs claiming 19.5 in 2005.  We'll get

11   back to that.

12        You saw documents like Exhibit 349.  1982, another

13   confidential, internal document.  Pearlson - that's one of the

14   doctors from 3M - reported on 600 employees at two different

15   plants.  You heard a little bit about Cottage Grove.  That was

16   the main plant where they made it.  They had two other plants

17   that made and used C-8.  An examination of liver enzyme levels

18   confirmed earlier studies, no adverse health effects related to

19   organofluorine in the blood.  Repeated message decade after

20   decade.

21        Exhibit 20.  We have the numbers up here.  If it's

22   something you want to look for in the pile of exhibits, they'll

23   have tab numbers.  You can find these.

24        Exhibit 20.  3M, the biologic limit value, 5 parts per

25   million, year 2000.  Let's get back apples to apples.  Five

1    thousand parts per billion in the blood.  What do they say

2    about that?  Is that a problem?  Is that something DuPont

3    should be concerned about?  If present, even on a chronic --

4    chronic means long term -- chronic basis would not be expected

5    to pose or correlate with a significant risk of adverse health

6    effects for a working lifetime, 40 years.  That's what 3M was

7    telling DuPont through the decades.

8         Now, some of you might ask, well, Mr. Mace, if DuPont

9    didn't believe that C-8 was likely to cause harm, why did it

10   take all of these precautions that we've heard about?  They

11   were monitoring the employees' blood levels.  They monitored

12   the air levels.  They reduced the exposures.  They put

13   scrubbers on the air emissions, they put filters on the water

14   emissions.  Why did they do all those things?

15        You saw that the precautions were taken to be proactive

16   because 3M had told DuPont that 3M noticed that C-8 was

17   persistent in the blood of the people working at 3M, even

18   though they were not seeing any disease resulting from the

19   exposure.  As you've seen, and I told you in opening statement,

20   the simple fact: persistence does not equal harm.  That was

21   unchallenged.  And in fact, Mrs. Bartlett's experts admitted

22   that.  Persistence does not equal harm.  There is a very big

23   difference, like we talked about in opening statement, between

24   something just being there and something causing disease.

25        In fact, you're going to recall that both of the

1    plaintiff's high-priced experts agree, just because something

2    is there it does not mean it's causing any harm.  In fact,

3    there's many things that remain in the body for various periods

4    of time without causing any harm, things like medical implants,

5    artificial joints, man-made things, not natural, not things

6    we're born with, put in the body for many years or decades and

7    they don't cause any harm.

8         Ladies and gentlemen, I'm sure you noticed it.  The very

9    documents that the plaintiff's lawyers wanted to show you the

10   most and showed you repeatedly and repeatedly and repeatedly

11   actually proved DuPont's point.  They rely very heavily on

12   these Bernie Reilly and John Bowman e-mails.  In fairness, do I

13   love all the language in those e-mails?  No.  Do I wish they

14   would have used a little bit different phraseology sometimes?

15   Sure.

16        Ladies and gentlemen, you can search each and every one

17   of those e-mails with a microscope and you will not find a

18   single statement in any of them that they expected any harm to

19   anyone.  In fact – I'm sure you noticed it – they said the

20   opposite.  In the very sentences they tried to point out to

21   you, and they didn't highlight or put their little lines under

22   or put their red circle around, the very rest of that sentence,

23   the sentence above, sentence below, said they didn't expect any

24   harm.

25        Let's look at a few of them, some they just showed you

 1    today.

 2          Plaintiff's Exhibit 181, Mr. Reilly's e-mail from 2000.

 3    We knew the material they sold us, a surfactant, also is very

 4    persistent and gets into the blood.  But what?  So far no signs

 5    that it's hurt anyone.

 6          You've seen the good, the bad, the ugly.  You have seen

 7    every piece of dirty laundry that DuPont has.  They think this

 8    is the dirtiest laundry.  What does it say?  No signs it has

 9    hurt anyone.

10          Mr. Reilly again, Plaintiff's Exhibit 563.  What does he

11    actually say in 2001?  I do not believe we are hurting anyone.

12    The good news is it's been used for three decades and doesn't

13    seem to have impacted anyone's health.

14          It does not say we think it's likely to cause harm.  It

15    says the opposite, the very documents they want you to focus

16    on.

17          Mr. Bowman, Plaintiff's Exhibit 176.  Year 2000, John

18    Bowman:  The public attitude is that anything biopersistent is

19    harmful, concern about biopersistence.  Not one word, not one

20    phrase, not one sentence:  Boy, we're in trouble.  This is

21    going to hurt somebody.

22          That is not what these say.  You are left with

23    implications.  Read the actual words.  Read the actual facts.

24          They showed you this one again today, Plaintiff's 366,

25    from 1984.  Again, personal and confidential.  And they love

1    this paragraph:  Consensus reached, issue will decide future

2    action, corporate image, corporate liability.

3          Once or twice they got around to mentioning two

4    paragraphs above it.  The consensus was C-8, based on all, all

5    the available information both from the company and 3M does

6    not, N-O-T, not pose a health hazard at low level chronic

7    exposure.

8          Are they using a sound bite out of context without

9    ignoring what the actual message was?  Yes.

10         This is the end of May of '84.  On cross we had to show

11   you Defendant's Exhibit 1970.2.  So 1970, this is within a few

12   weeks of that in '84.  On the back of the page, what were they

13   saying internally at DuPont at the same exact time?  No known

14   adverse health effects at current levels.  And that's current

15   levels in the workforce.  Orders of magnitude, ten, a hundred

16   times higher, a thousand times higher than anything getting out

17   to the community.  No adverse health effects.

18         Potential liability?  Sure.  There's always a potential.

19   From what?  From unjustified claims.  You can pay your hundred

20   bucks and file a lawsuit against anybody you want to and the

21   defendant has to come in and defend against it.  Yes, it costs

22   money and, yes, it's not a good thing.  But it doesn't mean

23   it's valid.  It doesn't mean that's valid.  Do corporations

24   have a fear of lawsuits?  Sure.  They have a fear of

25   unjustified lawsuits.  That's what they were concerned about,

1    low probabilty of liability losses, direct opposite of what

2    they wanted you to believe.

3         Thirty years of experience.  By then DuPont had been

4    using it for 30 years with no signs of adverse health effects.

5    What's their response?  Even though that's the thinking - it's

6    not hurting anybody, we've been using it for 30 years, there's

7    no issues here - did they say, okay, we're done?  No.  Continue

8    to monitor the blood, air and water.  Continue to reduce,

9    eliminate.  Is that the sign of a reasonable company trying to

10   be proactive doing good things?  You can evaluate that.

11        Let's move to the second thing I told you I would prove

12   to you.  DuPont has no liability here and did not breach any

13   legal duty owed to Mrs. Bartlett.

14        Later today, Judge Sargus is going to give you the jury

15   instructions on the law that you're to apply to the facts of

16   this case.  He tells you the law.  You determine the facts.

17   You put the two together and answer some questions.

18        Let's focus for just a few minutes on what the law is on

19   a few of the most critical points for which you need to decide

20   because you're going to see that the actual law on negligence,

21   this term negligence, and the other claims that are being made

22   by Mrs. Bartlett requires proof of facts that Mrs. Bartlett is

23   unable to prove and has not proved to you.

24        So let's start with negligence.  You're going to see

25   Instruction 20.  To prove negligence, she has to prove that

1    DuPont would have foreseen that injury was likely to result to

2    someone in Mrs. Bartlett's position from DuPont's conduct.

3    Injury was likely.  That the likely result of an act or failure

4    to act would cause injuries.  Focus on those words that are

5    underlined, please.  Likely, not just possible; would cause

6    injury, not just a risk.

7         This is a very different standard than what the

8    plaintiff's experts came in here to talk to you about.  There's

9    different standards in a court of law for a claim of personal

10   injuries than there is in the public health field.  Different

11   standards.

12        The judge is going to tell you the standard you're to

13   apply in this case.  And you may be a little surprised by that,

14   because the plaintiff's witnesses only wanted to talk about

15   risk, what might be, what could be, what's possible,

16   speculation.  But a court of law requires much more than that.

17   You're going to hear that.

18        What we're here to talk about, community level of

19   exposure.  It requires proof that a DuPont employee knew, or

20   should have known, that their conduct was likely to cause harm

21   to Mrs. Bartlett or someone like her in the community.

22   Community levels of exposure.

23        As you evaluate DuPont's knowledge, DuPont's conduct and

24   the reasonableness of it in the '70s, '80s, '90s, 2000s, it's

25   important to keep in mind, as you already know from your own

1    everyday life, that the level of exposure, or the dose, is

2    absolutely critical when you're deciding what actions to take.

3    Even Mrs. Bartlett's experts agreed with this, that if the

4    exposure is low enough, you don't expect any harm.  And

5    remember, the exposures that Mrs. Bartlett is claiming she had

6    was to less than one half of 1 part per billion.

7         Now, you heard how small a part per billion is.  I mean,

8    we held up a penny in opening statement.  You heard that a part

9    per billion, if I had a billion pennies, I'd have ten million

10   dollars.  One penny compared to ten million dollars, 1 part per

11   billion.  One second in 31 years.  That's how small a part per

12   billion is.

13        And you saw in plaintiff's opening slide 7, please, the

14   Bartlett exposure chart.  Now, they continued this chart up to

15   '81.  You'll recall Mrs. Bartlett said, well, I was around when

16   I was 25.  It might have been a few years later that I moved

17   out of the house.  But, in terms of the levels of exposure that

18   Mrs. Bartlett is claiming in the relevant years -- and we're

19   going to get in a minute to growth rate of tumors and when hers

20   likely started.  You heard Mr. Douglas refer to it, at least 11

21   years earlier, so 11 years before.

22        And you also -- we'll get to that in a minute.  But

23   think about in the relevant years.  In these relevant years

24   back here, she's claiming less than .3 parts per billion of C-8

25   in her water; actually, less than .2.  It's the equivalent, if

1  you want to think of it that way, as one penny out of

2  $30 million.  It's the equivalent of one second out of 105

3  years.  A hundred and five years ago was 1910.  The Model T had

4  just come out, Taft was the president.  It was before the

5  Titanic sank.

6       In terms of what DuPont knew and when, you saw that

7  DuPont looked for C-8 in the Tuppers Plains water and it didn't

8  find any in the 1980s.  Now, certainly, DuPont did not expect

9  any harm was likely when no C-8 was even found, when it went to

10  look for it.  You heard that the first time that C-8 was ever

11  detected in the Tuppers Plains water was not until 2002, an

12  undisputed fact.  They could have contested that if they had

13  anything to contest it with.  Uncontested.  DuPont did not know

14  there was any C-8 in the Tuppers Plains water until 2002, long

15  after Mrs. Bartlett's kidney cancer had already been

16  successfully removed in 1997.  Again, before June of 1997.

17  That's the time period we're looking at.

18       And think about the rest of the evidence you heard.

19  Let's go back and think hypothetically.  Hypothetically, even

20  if DuPont had known back in the 1980s that Mrs. Bartlett was

21  drinking water with less than 0.3 parts per billion of C-8 in

22  it, would DuPont have expected any harm to result?  Would they?

23       You saw a graphic we used in opening.  Dr. Rickard

24  talked about it.  There were all kinds of animal studies done.

25  As part of the animal studies, you try to determine what the

1    no-effect level is.  What is the level that the animal is being

2    subjected to that we don't see any effects?  This is measuring

3    the blood, and all these -- no-effect levels for the animal

4    studies.

5         And then we talked a little bit about the 3M employees

6    who had exposures going up to 70,000 parts per billion.  But

7    the average was about 5,000 parts per billion in the blood of

8    the 3M workers.  No effects.  DuPont, one-tenth of what the 3M

9    workers were seeing on average, so about 500 parts per billion.

10   That's what DuPont knew.  That's what the knowledge was back

11   then.  Why would DuPont expect harm at the extremely low

12   community levels of exposure when no harm was being seen at

13   much higher levels of exposure?

14        You also saw something very important.  You saw what

15   third parties were saying at the relevant time period.  You saw

16   that ACGIH, the American Conference of Government and

17   Industrial Hygienists -- third party, this isn't DuPont

18   talking -- they had the equivalent of 500 parts per billion is

19   okay for a working lifetime, 40 years.  You heard what 3M came

20   up with.  3M said the equivalent of 500 parts per billion is

21   okay for a working lifetime, 40 years.

22        And then you saw the CATT report, Defendant's

23   Exhibit 613, that as late as 2002 -- go to page 33, please.

24   For a lifetime exposure to drinking water with 150 parts per

25   billion, no risk, lifetime exposure equal to or less than --

1    and the 150 is on the next page -- no risk of deleterious

2    effects, bad effects, is expected.  No risk.  No risk.  Not

3    only we don't expect it to be likely, no risk.  So, even if you

4    want to get back into the fuzzy-wuzzies of risk that they

5    wanted to talk about, no risk.  Lifetime exposure, drinking

6    water, 150 parts per billion, 2002.  And this was more than a

7    year after Mr. Bilott wrote his letter in early 2001, sent it

8    to all the agencies trying to stir them up over C-8.

9         Go back to page 10, please.  You heard this team of

10   toxicologists from EPA, ATSDR, West Virginia and others.  They

11   looked at all the knowledge available at the time, all the data

12   DuPont had looked at, and they said a safe lifetime exposure

13   value of 150 parts per billion.  This confirmed what DuPont had

14   been saying, that DuPont had been ultraconservative in setting

15   its own internal guidance levels, values that were set very,

16   very low with all kinds of safety factors put into them trying

17   to ensure that people would be safe.

18        Then you saw what happened at trial.  Mrs. Bartlett's

19   lawyers know that the CATT report completely destroys their

20   case, so they tried to throw rocks at the CATT Team.  You heard

21   Dr. Dourson.  He was a leader in U.S. EPA for more than 15

22   years.  His job, when he was at EPA, he was charged with

23   evaluating the toxic effects of chemicals and setting

24   appropriate screening levels for the U.S. government; did that

25   for more than a decade.  You will recall when he came to the

1   courtroom, he had just gotten back from Geneva, the World

2   Health Organization.

3        He came to court.  He told you the facts.  There was no

4   conflict of interest.  We saw on page ten, highly, highly

5   qualified toxicologist, highly trained scientists, including

6   three from the U.S. EPA and one from ATSDR, Agency for Toxic

7   Substance and Disease Registry, federal government agency.

8        And you saw Defendant's Exhibit 1812.3.  All of them

9   signed a certification that they agreed with the 150 parts per

10  billion number and that the report accurately reflected their

11  deliberations.  If you're interested you can look at 1812.  You

12  will see signed certifications by each and every member,

13  including the U.S. EPA folks and including the ATSDR, all ten

14  of these scientists.

15       And you heard Dr. Dourson, no arm-twisting, no lobbying

16  for a higher number by DuPont.  You heard the CATT Team

17  thoroughly investigated the state of the knowledge at the time,

18  which is what you need to figure out, what you need to make

19  your decision based on.

20       What was the state of knowledge at that time over the

21  years?  They looked at that and they followed U.S. EPA guidance

22  in determining that lifetime exposure to 150 parts per billion

23  in the drinking water, lifetime, not expected to cause any

24  harm, no risk even.

25       And then what else did you see?  Mrs. Bartlett's lawyers

1    tried to ignore it hoping it would go away.  But then you saw

2    Defendant's Exhibit 614.  You saw this internal memo where Ohio

3    EPA rejected -- they actually sat back and evaluated.

4    Remember, this is written by Ohio EPA, interoffice

5    communication, 2002, to the director of the Ohio EPA, head

6    honcho.  They assigned a toxicologist to review the technical

7    report, this CATT report, CATT Team report, at page two.

8           They talk about these screening levels that had been

9    developed and 150 parts per billion.  Micrograms per liter is

10   the same as parts per billion.  They talk about the fact

11   that -- we talked about that the CATT Team determined what's a

12   safe level.  There was something called the GIS Team,

13   Groundwater Investigation Steering Team, that was looking

14   everywhere they could look to see where is C-8 and how much of

15   it is there.  They reviewed both of those things and said, when

16   we compare them, the samples, all the samples, not one or two,

17   all the samples of drinking water were below the screening

18   level.  As a result, no adverse health effects would be

19   expected to occur in populations using the contaminated water.

20          Ladies and gentlemen, see how this language is going to

21   track with how His Honor is going to tell you the law is.  Do

22   you expect harm will occur?  The opposite.  No.  No adverse

23   health effects would be expected.

24          Top of the next page, the conclusion on their review.

25   The screening levels developed by the CATT are reasonable,

1    scientifically defensible and health protective.  The process

2    followed U.S. EPA guidance.

3         You also heard about the fact that Mr. Bilott was

4    writing letters trying to get the CATT Team to change what it

5    was thinking about.  And the Ohio EPA addressed that:

6    Evaluations of specific concerns from the plaintiff's letter.

7    And time after time:  The issue's without merit, the issue's

8    without merit.  Go to the next page.  This issue is without

9    merit.  This issue is without merit.  This issue is without

10   merit time and again for the points Mr. Bilott was trying to

11   raise.

12        And the conclusion.  Can we blow that up?

13        Conclusion of Ohio, independent investigation, DuPont's

14   nowhere to be seen, nobody with a conflict of interest.  CATT

15   Team's analysis is fundamentally inconsistent with the facts

16   and guidance.  So they're evaluating the claim that was being

17   made by the attorney.  That's not valid.  The CATT properly

18   understood its work, performed the analysis in a scientifically

19   defensible manner according to the state of the art, state of

20   the art, risk assessment practiced by U.S. EPA.  Ohio put its

21   blessing on the CATT Team number.

22        Like an ostrich with its head in the sand, they tried to

23   ignore this document.  Why?  Because this was a completely

24   independent evaluation for the head of the Ohio EPA without any

25   involvement by DuPont at all.

1    Now, in terms of evaluating the conduct of DuPont.  You

2    saw that either before the CATT Team did its work, DuPont did

3    something that shows, dramatically shows, that it cared about

4    the community and did not expect any harm to the community.

5    You heard about the fact that in the 1980s when DuPont first

6    learned that traces of C-8 were getting into some of the

7    drinking water, DuPont didn't ignore it.  DuPont did

8    evaluations to arrive at an internal guidance level that they

9    called the CEG, Community Exposure Guideline.  And again, you

10   heard undisputed, DuPont was proactive on this.  It did it

11   before anybody else.

12       In fact, comparing DuPont to the other companies, you

13   saw that very few other companies ever set community exposure

14   guidelines.  Most companies just sit back and wait for the

15   government to get around to it.  That wasn't what DuPont did.

16   DuPont started with this very conservative AEL, Acceptable

17   Exposure Limit, that they had, which was the equivalent of 50,

18   5-0, parts per billion in the water.  Already a level with a

19   safety factor of at least one hundred times below where any

20   effect level had been seen in any of the animal studies, a

21   level so conservative that no harm was expected even if the 50

22   parts per billion was reached.

23       And you will remember that Dr. Siegel admitted that the

24   AEL was set following a reasonable standard of care to protect

25   the public health.  Siegel 6.

1                         - - -

2          Thereupon, video was played in open court as follows:

3     A    Yes, once again, I do agree that they're setting the AEL

4     at the level they set it was following a reasonable duty of

5     care to protect the public's health.

6                         - - -

7          MR. MACE:  DuPont started with that, the standard that

8     was already blessed at trial by Dr. Siegel, and then they added

9     on additional factors of safety.  Why?  To try to make sure

10    they were protecting even the most sensitive people and even if

11    they were exposed 24 hours a day, 7 days a week.  They set this

12    precaution level so, if exposures reached this ultra low level,

13    DuPont could then proactively consider whether any additional

14    actions were needed or not.

15         We talked about this kind of analogizes to the back-up

16    buzzer on your car.  You start backing up, the buzzer goes on.

17    You haven't hit anything yet, no damage caused, but it gives

18    you a chance to be proactive.  Should I be doing something

19    different?  Should I turn a different way?  Should I go slower?

20    Should I slow down?  DuPont set this back-up buzzer at a very

21    low level so it could consider -- not because it expected any

22    harm to occur at that point.  This is a back-up buzzer with

23    about a mile, a football field, before you hit the wall.  They

24    have it going off so we can think:  Do we have to do something

25    different?  Because we're proactive.  We're trying to be

1   reasonable.  And that precaution level was set at 3 parts per

2   billion, if all your exposure came from drinking water.

3        Again, you've seen Mrs. Bartlett only claims exposure

4   far, far below 3 parts per billion, far, far below any level

5   where DuPont thought any harm would occur.

6        So even if -- get back to our hypothetical question.

7   Even if DuPont would have known about the levels that she now

8   claims she was being exposed to prior to 1997, it was a level

9   far below any level where DuPont thought any harm could occur,

10  and for good reason based on the knowledge at the time and what

11  third parties were saying.

12       You saw the screening levels back at the time.  DuPont

13  set its AEL at the equivalent of 50 parts per billion.  3M

14  comes in about five years later and says, we think 500 is okay.

15  ACGIH, we think 500 is okay.  DuPont doesn't change it.  It

16  stays conservative.  DuPont sets its CEG even lower.  We want

17  to make sure we're absolutely protecting the community, 3 parts

18  per billion.  Many, many, safety factors.

19       3M comes out its with lifetime drinking water standard,

20  70 parts per billion.  The CATT Team, 150.

21       Looking back at what the state of the knowledge was at

22  the relevant time, you see a few things, that DuPont was always

23  the most conservative, the most protective of health.  And you

24  also see that Mrs. Bartlett does not claim any exposure even

25  reaching one-tenth of the back-up buzzer of 3 parts per

Vol. 16 - 124

1   billion.

2          In short, ladies and gentlemen, directly contrary to the

3   story you've been told by the plaintiff's lawyers, you saw that

4   DuPont was interested in making sure that no harm would come to

5   the community.  Instead of any employee of DuPont taking an

6   action that they knew was likely to cause harm, you've seen the

7   exact opposite.  You've seen that repeatedly through the

8   decades, DuPont has acted first to protect people while it

9   checked out the facts.  First to protect people while it

10  checked out the facts.

11         Let me touch on some of the time line events.  You heard

12  in 1978 3M told DuPont that 3M was seeing elevated organic

13  fluorine in the blood of people working at 3M -- we mentioned

14  this a few minutes ago -- even though 3M wasn't seeing any

15  disease or harm for it.  How did DuPont react?  Did they say,

16  okay, thanks?  No.  DuPont reacted how you would expect a

17  reasonable company to react.  They promptly told its employees,

18  the people working with C-8.  They started monitoring the

19  employee blood levels.  They reviewed all their medical

20  records.  They started reducing exposures, even though there

21  was no evidence of harm, just because C-8 was persistent.

22         You saw documents like 726, page 2.  June of '78.  No

23  known ill effects which could be attributed to these chemicals,

24  or C-8, have been defected among employees in more than 20

25  years of experience.  So you heard in the 1950s -- early 1950s

1    is when DuPont started using C-8.  By the late '70s they had

2    been using it for more than 20 years.  What had their

3    experience been?  No known ill effects in more than 20 years of

4    experience with the products.

5         Mrs. Bartlett's own expert admits this was good conduct

6    by DuPont.  And what did DuPont find when it went back and

7    looked at those employees' medical records?  They found a

8    couple of things: one, that the relatively few people who were

9    working directly with 100 percent C-8, the people who were

10   measuring it out to use it as a processing aid in some of the

11   processes, those were the people that had the highest levels of

12   C-8 in the blood, as you would expect.  They also found that

13   those people were not, not showing any disease or harmful

14   effects.

15        You've seen a lot of documents.  Let's look at a couple.

16   Exhibit 79.  Reviews of procedures, medical records,

17   toxicologic information, no health problems.

18        You saw documents like Exhibit 704.  Another one of

19   these personal and confidential internal company records buried

20   in the file cabinets at DuPont, what people were really

21   thinking, really saying, back at the time probably before some

22   of us were born.  Showed up 70 parts per million of organic

23   fluorine.  That's 70,000 parts per million in the 3M employees.

24   General background level less than 1 part per million, so less

25   than a thousand is general background.

1    What does it say?  No adverse health effects have been

2    detected in any of the exposed people.  That's what DuPont knew

3    back at the time.  And despite the fact that no harmful effects

4    were seen, DuPont still took reasonable precautions just

5    because C-8 remained in the body for a while.  DuPont took

6    steps to reduce exposures, continued to monitor its employees,

7    continued to monitor their work areas.

8        And you saw that DuPont did something else, something

9    different than any other company that was using C-8, including

10   3M.  Promptly after 3M informed DuPont that C-8 was persistent

11   in the blood, DuPont developed this AEL that we talked about,

12   the Acceptable Exposure Limit, to try to ensure that no harm

13   would be expected.  DuPont was the first.  Nobody else did

14   that.  Even 3M who was making it didn't do that.  DuPont wanted

15   to protect even the most highly exposed, the people directly

16   handling pure C-8, 40-year working lifetime.

17       And you heard Dr. Rickard talk about this.  Exhibit 1102

18   at dot 16.  Anything that we're around, any substance, can

19   cause harm if you're exposed to enough of it.  Water, normal

20   daily dose, lethal dose, about a ten times safety factor.

21   Sugar about 40 times, salt, caffeine, aspirin.  DuPont did not

22   just set its AEL in the 40s, the 10s, the 20s.  It had more

23   than a hundred, more than a thousand-fold safety factor before

24   any harm would be expected.  It was conservative.  In an effort

25   to make sure it was protecting people, DuPont set its guidance

1  level more than a hundred times below where any adverse health

2  effects had been seen in any of the animal studies.

3       And you heard about this rigorous evaluation, very

4  thorough evaluation that was made by DuPont, made initially and

5  then re-evaluated as each new piece of information came in.

6  Are we still being protective?  The team that evaluated this,

7  you heard, included highly trained Ph.D., toxicologist,

8  epidemiologist, industrial hygiene and other scientists who

9  evaluated all the information available.  People like

10 Dr. Rickard here.

11      Ladies and gentlemen, it has been an absolute honor for

12 me to get to know Dr. Rickard and the other folks at DuPont who

13 have been involved with these issues.  You saw DuPont's

14 witnesses on the stand last week.  The caliber, the quality of

15 these people, was amazing.  And to sit here for weeks and see

16 these fine people castigated, yelled at, second-guessed by

17 Monday morning quarterbacks with 20/20 hindsight has been

18 appalling.

19      Let me get back to the time line.

20      We get back to 1981.  That was when 3M tells DuPont that

21 a preliminary finding from a rat study was that C-8 may have

22 caused an eye lens defect in some rat pups.

23      So what did DuPont do?  Within ten days, DuPont

24 transferred all the woman of child-bearing years out of the

25 Teflon areas while it checked out the information.  Once again,

1    DuPont acted first to protect people while it checked out the

2    facts.

3          And what else did they do?  Did they sweep it under the

4    rug?  Absolutely not.  There wasn't a rug or even a broom to be

5    found.  It was just the opposite.  You saw the letters.

6          Exhibit 1414.  Within a few weeks of getting that

7    notice, DuPont's writing to EPA Region 3 West Virginia Water

8    Resources, here's this information we got from 3M.  They say

9    this might cause some problems with rat pups, just wanted you

10   to know.  We don't know if it's relevant to humans, just wanted

11   you to be aware of it.  By the way, this is present in our

12   outfall five.  We're putting this into the Ohio River, wanted

13   you to know.

14         Their air emissions, same date.  West Virginia Air

15   Pollution Control Commission, 1981:  Wanted you to know we got

16   this information from 3M.  We're not sweeping it under the

17   carpet.  Here it is.  This is what 3M is saying.  We don't know

18   if it's relevant or not.  We got to check that out.  But in the

19   meantime, we're venting this material, one-and-a-quarter pounds

20   per hour, out of the smoke stacks.

21         We told them.

22         We told them.

23         You heard how this was in the *Wall Street Journal*

24   heavily covered by the media.  And after acting first to

25   protect people, what did DuPont do to check out the facts?  You

1    heard that they coordinated with 3M who was selling the C-8 to

2    DuPont and who did the initial study on this.

3        You heard that 3M started two new animal studies.  And

4    DuPont, even though they're only the user, they started two new

5    animal studies to check out the facts.  All four come back

6    negative, negative.  They go back and look at the original

7    slides.  They bring in outside experts, National Institute of

8    Blindness, National Institutes of Health.  They find out that

9    they were using a dull scalpel, to put it in layman's terms.

10   They had dragged the scalpel across the eye lens and it ripped

11   the tissue instead of cutting it.  Outside experts agreeing

12   with that.  Outside experts agreeing that this was a false

13   alarm.

14       And you heard His Honor's instruction to you, that the

15   science panel has determined there is not a probable link

16   between exposure to C-8 and birth defects.  Why we got off on

17   this side issue remains to be seen, but it's undisputed that

18   C-8 does not cause birth defects.

19       But did DuPont say, well, we're not sure, let's wait,

20   let's wait until we all figure it out?  No.  Acted first to

21   protect people.  Let's move the women off the line, get them

22   protected while we check it out.  That was the conduct of the

23   company.

24       Moving on with the time line, 1984, the mid-'80s.  You

25   saw in the mid-'80s DuPont looked at community water, they

1    found such low levels of exposure, they did not expect any

2    harm.  Let's look at the jury instruction.  Remember that.

3    They have to expect that harm is likely to occur.  Is that what

4    they found?  No.  Water results in '84 -- personal and

5    confidential, buried in the vault, nobody is ever going to see

6    this memo, we can say whatever we want.  Update on C-8 in water

7    samples.  The concentrations are very low and in my judgment

8    are not cause for concern.  Not cause for concern.  Not likely

9    to cause harm.

10        And you heard Dr. Playtis.  He wouldn't have continued

11   using the water himself, letting his family and friends use it

12   if he thought it was causing harm.

13        You heard again today about 1999 and the Tennant cattle

14   claims.  What was DuPont's response?  DuPont cooperated with

15   the EPA, a panel of three EPA-selected veterinarians.  Three

16   veterinarians selected by DuPont made a thorough investigation.

17   They unanimously concluded that the issues with the Tennant

18   cattle were problems with how Mr. Tennant was taking care of

19   the cattle, not caused by substances from the landfill.

20        You saw Exhibit 927, the Cattle Team report.  Six

21   different veterinarians.  The EPA-DuPont Cattle Team.  You saw

22   the conclusions at page four.  This is Exhibit 927.  Conclusive

23   evidence, deficiencies in herd management, there was no

24   evidence of toxicity associated with chemical contamination of

25   the environment.

1    And again, while we took this frolic and detour, the

2    judge instructed you at least twice with regard to cattle

3    disease, a team of veterinarians, including three selected by

4    EPA, three selected by DuPont, investigated the farmer's claims

5    and determined the cattle's illness was not the result of any

6    environment contamination.  Neither party is claiming in this

7    case that C-8 actually caused or causes disease or death in

8    cattle.

9        You're required to follow the Court's instruction.

10       Now, let's get to 2006.  Some of you may not be able to

11   see it.  We're in the mid-2000s, so 2006 where we're at on the

12   time line of knowledge.  And you heard that in 2006, DuPont

13   paid for water filtration to remove the C-8 from the water in

14   Tuppers Plains and from other water districts.  You had heard

15   that DuPont had already been providing some bottled water since

16   2002.  But ladies and gentlemen, it's very important that you

17   focus on the time period -- 2006, water being filtered -- and

18   that you focus on what the knowledge was at the time.

19       What was the state of the knowledge at the time?

20       You saw Exhibit 1190.  Jennifer Seed, one of the people

21   that was there at the CATT Team, Ph.D. toxicologist, head of

22   the risk assessment division for a branch of the U.S.

23   government in EPA.  Studies have not shown any effects directly

24   associated with C-8 exposure, not shown any effects, C-8

25   exposure.  That was 2005.

1       2006, EPA –– and this is from the administrator, the

2  administrator, the head honcho, U.S. EPA, writes to the head of

3  DuPont.  Mr. Holliday, January of '06, refers to DuPont as a

4  proactive company working collaboratively with the EPA.  Not

5  exactly what you heard over here.

6       For the point we're on now, at page 2, EPA is not aware

7  of any studies specifically relating current levels of C-8

8  exposure to human health effects.  DuPont's paying for

9  filtration in 2006 even though EPA is saying, We don't see it

10  being linked to health effects.  This is Steven Johnson, the

11  head of U.S. EPA.

12       You saw the Emmett study, Exhibit 2136, 2006.

13  Dr. Emmett –– this is a study, 2006 community exposure to C-8,

14  relationship between serum levels and certain health

15  parameters.  Who funded this?  Is this some conflict of

16  interest, something that they want you to give the back of the

17  hand to, can't trust this one?  This is funded by the

18  Environmental Justice Program, the National Institute of

19  Environmental Health, not a penny from DuPont, not a penny from

20  3M, not a penny from the other eight manufacturers of C-8, not

21  a penny from the hundreds of companies using this chemical.

22  That's who funded it.

23       Who did they look at?  People that had a median, which

24  is kind of like the average, C-8 exposure of 354 parts per

25  billion, not 19.  354.  And this is in 2006.

1      What did they conclude?  No significant positive

2  relationships, no toxicity from PFOA was demonstrated.  None.

3  Zero.  Independent, third party, could do whenever he wanted to

4  do, not being influenced by DuPont, 2006.

5      You heard as late as 2009, in the late '00s, scientists

6  in Europe did a clinical trial involving C-8.  They thought it

7  would help fight cancer.  They intentionally gave large doses

8  of it to people.  These are third-party scientists.  Would

9  anybody do that if they really thought it was likely to cause

10  harm, the standard you're to use?  2009, state of the

11  knowledge.  Evaluate DuPont's conduct on the state of the

12  knowledge through the years.

13      You saw Defendant's Exhibit 2338.  2010, we're already

14  up to the '10s.  Three highly qualified, preeminent

15  epidemiologists from around the world get together and look at

16  this.  The health effects of C-8.  What do they conclude?  To

17  date, data are insufficient to draw firm conclusions regarding

18  the role of PFOA for any disease of concern.

19      2010.  DuPont has already been filtering the water since

20  2006.  All of these things happen later saying we're not seeing

21  it.  Once again, DuPont acts first to protect people by

22  filtering the C-8 out of the water while the facts are being

23  checked out.

24      You're going to see in the jury instructions number 17,

25  Instruction No. 17.  The judge is going to give you a pamphlet.

1    Parties agree to have a science panel study what?  Whether,

2    whether, there was a link between C-8 and kidney cancer.  That

3    panel concluded in 2012 there is a probable link.  That's when

4    they came up with their conclusion.  Did DuPont just sit back

5    and wait for that?  No.  Acted first to protect people, filter

6    the water, while they're looking into it.

7        Let's move on and talk about negligent infliction of

8    emotional distress.  You're going to see the law on this in

9    Instruction 25, the four different things that Mrs. Bartlett is

10   required to prove for that, including that DuPont was

11   negligent, she suffered a serious emotional distress, it was

12   the proximate result of negligence of DuPont, and it was

13   reasonably foreseeable by DuPont.

14       As you've seen from the evidence, she cannot prove any

15   of those elements.  For example, as we already discussed, she

16   cannot prove negligence.  But she also can't prove serious

17   emotional distress because you're going to have Instruction 26.

18   Instruction 26, serious emotional distress.  She has to prove

19   she in fact possesses an increased statistical likelihood of

20   developing cancer and from this springs a reasonable

21   apprehension that manifests as emotional distress.

22       Here you heard both Dr. Cohen, Dr. Rickard.  C-8 has

23   been filtered out of her water supply for nearly ten years now.

24   With a half-life of 2.3 years, which is undisputed, her blood

25   levels of C-8 are now well below the mean of the background

1    levels of everybody across our great country.

2         Do we have that graphic?

3         You heard her blood levels were measured in 2005 at 19.5

4    parts per billion.  Half-life, one of these fancy scientist

5    terms, but every 2.3 years it goes down by half.  You can do

6    the math yourself.  It does down to 9.7, 4.8, 2.4, by last year

7    down to 1.2 parts per billion.  You heard that the mean or

8    average background level for people who don't live anywhere

9    near this plant is about 4 parts per billion in the blood.  And

10   the range goes up to 77.  Don't be misled when they talk about

11   99th percentile.  They're talking about the 99th percentile for

12   everybody across the country that doesn't live by one of these

13   plants.  So she's within background -- by their own admission,

14   she's within the background of the range of people across the

15   United States.  But today -- that was back at the 19.5.  Today,

16   after these half lives are gone, she's got a very low, very

17   low, comparatively, part per billion in the blood.

18        The bottom line, it is undisputed based on the record

19   facts, which is what you need to base your decision on,

20   Mrs. Bartlett is not at any increased risk of kidney cancer

21   from her past C-8 exposure.  You heard she's at risk for some

22   other reasons because of her hypertension, her obesity, her

23   genetics, other things.  We'll talk about that in a few

24   minutes.

25        While we're on what you need to decide in the specific

1  instructions you're going to get, let's talk about actual

2  malice for a minute.  You're going to have Interrogatory 33.

3  If you find for Mrs. Bartlett, which we don't think you'll get

4  to this question, but if you did, you'll be asked whether

5  Mrs. Bartlett prove by – what? – clear and convincing evidence

6  whether DuPont acted with actual malice, and whether she proved

7  actual damages that resulted from those acts.

8          Your Honor will explain to you what clear and convincing

9  evidence is.  It's a higher burden of proof.  Clear and

10  convincing evidence, not just preponderance of the evidence.

11  And with – what? – actual malice like hatred or we wanted

12  revenge or something, get back at her.

13          You're going to get the following instruction.  Malice

14  means a conscious disregard for the rights and safety of other

15  persons that has a great probability of causing substantial

16  harm.  Substantial harm, serious injury, not just that an

17  enzyme level has been altered a little bit, it's still within

18  normal range.  Substantial harm.  A great probability.  Not

19  just a risk, not just possible, great probability, a near

20  certainty that substantial harm is going to occur.  And most

21  importantly, probably, conscious disregard, that you actually

22  know there is a near certainty of a very serious injury and you

23  make a conscious decision to do something anyway knowing that

24  serious injury is a near certainty.

25          Here, as we've discussed, all of the evidence is the

1  direct opposite of that.  DuPont did not expect any harm to the

2  community.  Counsel talked about, well, DuPont didn't know some

3  things.  You can't have a conscious disregard of something you

4  didn't know.  The two just don't fit.

5      There's no evidence, much less clear and convincing

6  evidence, of any of these three factors.  Even Dr. Siegel

7  admitted that there's no actual malice.  Siegel 3:

8          Sir, you're not contending any employee of DuPont had

9          actual malice?

10          No.

11      Your answer to that will be no, if you even get that

12  far.

13      The third thing I told you I would prove is that

14  Mrs. Bartlett's kidney cancer is readily explained by other

15  things and was not caused by any conduct by any DuPont

16  employee.  And here, ladies and gentlemen, it's very, very

17  important that you keep in mind the difference between general

18  causation and specific causation.

19      General causation is just whether a substance is capable

20  of causing a particular disease.  For example, we've used the

21  analogy through the trial about tobacco smoke.  Nobody disputes

22  that tobacco smoke is capable of causing lung cancer.  That's

23  general causation.  Specific causation, the much more important

24  issue, the one you need to decide in this case, is

25  Mrs. Bartlett still has the burden to prove whether the C-8 in

1    fact caused the kidney cancer in this specific individual,

2    Mrs. Bartlett.

3         And on this, you heard some very important and

4    undisputed facts.  You heard that, unfortunately, kidney cancer

5    occurs every day all across the United States.  And you heard

6    that kidney cancer results from many, many, many different

7    things besides exposure to C-8.  You heard that the risk

8    factors for kidney cancer includes a very long list, including

9    family history, genetics, smoking, hypertension, age, obesity,

10   spontaneous DNA replication errors, many, many things.

11        You saw some other things.  You saw that Mrs. Bartlett

12   had the most commonly occurring type of kidney cancer all

13   across the U.S., and she had one of the major risk factors for

14   kidney cancer: obesity.

15        Please, do not be misled by what the science panel found

16   in 2012.  As you heard, in 2012, the science panel found that

17   C-8 was capable of causing kidney cancer.  We talked about that

18   on the time line.  That was in 2012.  Not in 1980, not in the

19   1990s.  And importantly, there's two other very important

20   issues that are crucial for what you need to decide that the

21   science panel never commented on, never commented on, and

22   they're for you to decide.

23        The first issue: when, when was it known that relatively

24   low C-8 exposures like the ones that Mrs. Bartlett's claiming,

25   community levels of exposure, could cause disease in humans?

1    And you need to make that determination, everybody agrees,

2    without 20/20 hindsight, not as a Monday morning quarterback.

3        We've already mentioned the Emmett study from 2006,

4    community study in 2006 looking at people with much higher

5    exposures than Mrs. Bartlett.  No positive relationship, no

6    toxicity from C-8 was demonstrated, funded by independent third

7    parties, the Environmental Justice Program.

8        You heard what the three independent preeminent

9    epidemiologists said in peer-reviewed literature in 2010.

10   No -- to date, data are insufficient to draw conclusions

11   regarding the role of PFOA for any disease of concern.

12       The plaintiff's lawyers would have you believe that

13   DuPont should have concluded that low community levels of

14   exposures were likely to cause disease back in the 1980s,

15   despite the fact that third parties were saying there's no

16   evidence of that as late as 2006 and 2010.  Don't be misled

17   about that.

18       The second issue, whether there are other explanations

19   for Mrs. Bartlett's kidney cancer besides her exposure to C-8.

20   And again, you heard it's undisputed that just because C-8 is

21   capable of causing kidney cancer, that does not mean that it

22   did cause Mrs. Bartlett's kidney cancer.  Dr. Siegel admitted

23   that.  Siegel 8:

24           We can agree just because a substance is capable of

25           causing a disease, it doesn't mean it did?

Vol. 16 - 140

1          That's correct.

2          Difference between possible and likely, difference

3     between potential risk and likely, he acknowledged all those

4     points.

5          Dr. Bahnson admitted this too.  Bahnson 1.

6          My very first question in cross-examination to

7     Dr. Bahnson:

8              Doctor, you agree that just because something is

9              capable of causing a disease, it does not mean it did

10             cause the disease in a specific individual?

11             True.

12         When you get the jury instructions, ladies and

13    gentlemen, you're going to see this relates to what the law

14    calls proximate cause.  We like to come up with fancy words for

15    things that are really pretty simple.

16         We can see in Instruction 22:  Proximate cause, an act

17    or failure to act that was a substantial factor in bringing

18    about an injury and without which the injury would not have

19    occurred.

20         This is Mrs. Bartlett's burden of proof.  The judge will

21    tell you, DuPont does not have the burden to show anything.

22    She is the one that has the burden of proof.

23         What did the evidence show?

24         You heard Dr. Bahnson.  You heard Dr. Cohen.  They both

25    told you Mrs. Bartlett had renal cell kidney cancer, the most

1    common type of kidney cancer all across the United States.  The

2    type of kidney cancer that was occurring across the United

3    States before C-8 was ever being used by anybody.  They both

4    told you there was nothing atypical, nothing atypical, about

5    Mrs. Bartlett's kidney cancer.  You heard this type of kidney

6    tumor has a very slow growth rate, only about 0.28 centimeters

7    per year.

8         Counsel tried to dismiss it as, well, that's what a

9    textbook said.  You heard Dr. Bahnson admitted that.  It was a

10   meta-analysis, a study that looked at all the different studies

11   that had been done on this type of tumor's growth rate.  And

12   the average for all those studies was .28 centimeters per year.

13   You heard that with a tumor that was 3.2 centimeters in 1997,

14   it had to start more than 11 years before that.  And you heard

15   Mr. Douglas refer to the fact that there was even some mention,

16   could have been 20 years before that, before she was ever even

17   exposed to C-8 in her drinking water.

18        Now, you heard about this very long list of risk

19   factors, and you heard about what Dr. Bahnson did and, more

20   importantly, what he did not do to check them out.

21        Remember, he said the two he thought were most important

22   right at the top of his list: family history and genetics.  But

23   then we asked him about that, up the family tree, what he did

24   to look into that.

25        I apologize.  We didn't pay for fancy animation.

1         Mrs. Bartlett, like most of us, has a mom and a dad.

2     Each of them have a mom and dad.  Each of them have a mom and

3     dad.  We all have a family tree, family history.  What did

4     Dr. Bahnson look at?  He knew about one person, her dad.

5         What did he know about that person?  He had four

6     different types of cancer, her dad.  I'm not claiming he had

7     renal cell kidney cancer.  He had a different type of kidney

8     cancer.  You heard Dr. Cohen, that puts up the yellow flag.

9     You've got to pay more attention to family history when there's

10    something like that going on.  Bahnson did nothing to look into

11    that, nothing.

12        His second factor most important: genetics.  You heard

13    this.  Dr. Cohen, who has spent his life studying this,

14    70 percent of renal cell kidney cancer, the specific cancer

15    that we're here to talk about, is a result of a VHL gene

16    deficiency on chromosome 3.  You recall Dr. Bahnson danced

17    around with that a little bit.  You got the story, the actual

18    facts, from Dr. Cohen.  70 percent of people that have this

19    have a deficiency in their genes, the VHL gene, on chromosome

20    3.  What did you hear?  Dr. Bahnson did no genetic testing on

21    Mrs. Bartlett, even though Dr. Bahnson was forced to admit that

22    it's rare that heredity does not play a role in cancer.

23        Bahnson 2.

24                         – – –

25        Thereupon, video was played in open court as follows:

Vol. 16 –  143

1    Q    As you sit here today, do you have any opinion or

2    thought as to whether heredity played a role in Mrs. Bartlett's

3    cancer?

4    A    To the extent that I think it's a rare situation, that

5    it doesn't play a role in any cancer.

6                              – – –

7         MR. MACE:  Yet he doesn't even do genetic testing.

8         Employment.  You heard how Mrs. Bartlett for decades

9    went over to the dry cleaner for lunch every day.  And even

10   Mr. Petty acknowledged that dry cleaners admit chemicals that

11   are known to be capable of causing cancer.  You heard about

12   spontaneous DNA replication errors, fancy word for the fact

13   that as our cells divide in our body every day, it happens lots

14   of times and they can be spontaneous.  They just don't work

15   right every once in a while, kind of random error, that you

16   have spontaneous DNA replication errors.

17        You heard about other unidentified causes.  The fact

18   that many times, despite the desire to find something to blame,

19   which we all would have, despite the desire to find something

20   to blame, a lot of times we just don't know.  We just don't

21   know what caused a particular cancer.

22        And remember, Dr. Bahnson earlier testified that he

23   would not expect an external chemical to cause kidney cause.

24        Bahnson 3.

25                              – – –

1    Thereupon, video was played in open court as follows:

2    Q    In a case like hers, based upon your personal

3    consideration and/or investigation of potential cause of kidney

4    cancer, would you expect there to have been a connection

5    between her kidney cancer and any sort of chemical or external

6    substance?

7    A    Would not.

8                              - - -

9         MR. MACE:  And before he met with the plaintiff's

10   lawyers, before he agreed to get paid as an expert in this

11   case, he could not say that C-8 or any chemical caused

12   Mrs. Bartlett's kidney cancer.

13        Bahnson 4.

14                             - - -

15        Thereupon, video was played in open court as follows:

16   Q    And you certainly could not testify in this case that

17   her kidney cancer was caused by C-8 or any other chemical; is

18   that right?

19   A    Correct.

20                             - - -

21        MR. MACE:  You heard from Dr. Cohen.  Dr. Cohen has

22   studied chemical carcinogenesis, what causes cancer, the very

23   issues at issue in this case, for more than 40 years.  He's

24   lived his life studying these issues.  You're going to have his

25   CV.  It's at 1461, but I think all the CVs are going to be a

 1   separate package for you.  One hundred and twenty pages of all

 2   the work he's done that you'll be able to look through, his

 3   qualifications.

 4        Now, I hope you see that I've treated witnesses with

 5   respect, and I hope you see that Dr. Cohen treated Dr. Bahnson

 6   with respect.  We're not all experts in everything.  He

 7   acknowledged Dr. Bahnson is very good at diagnosis and

 8   treatment.  He is a very fine surgeon.  He did a great job with

 9   the surgery, no complications, quicker than normal recovery.

10   We'll talk about that in a minute.  But what he's not, he is

11   not an expert in etiology, he's not an expert in causation,

12   he's not an expert in what Dr. Cohen has spent 40 years of his

13   life studying.

14        And you heard from Dr. Cohen that Dr. Bahnson did not

15   have the specific expertise on the etiology or causation.  He

16   didn't do his homework on the causation here.  He didn't

17   adequately investigate these other explanations for

18   Mrs. Bartlett's kidney cancer.  And we talked about weighing of

19   the competing considerations.  And he talked about so if we

20   were in a tobacco case, you would be talking about the number

21   of pack years somebody had.  If they had both smoking exposure

22   and radiation exposure from x-rays, you would want to know, to

23   come to an opinion on specific causation, how many x-rays did

24   they have?  Is this somebody who had two x-rays over 40 years,

25   or is this somebody that had 50 x-rays every year for three

1    years?  Is it somebody who smoked a couple of cigarettes a day,

2    or somebody who had three packs a day for many years?

3         And in terms of weighing the competing risk factors, you

4    heard Dr. Cohen.  Because of Mrs. Bartlett's obesity, her

5    morbid obesity, she was off the charts in terms of number of

6    pack years when you look at what would that factor be; that it

7    was 90 percent increased risk of kidney cancer.  It's higher in

8    women than in men because of her level of obesity.

9         He analogized this to you're talking about somebody who

10   would be like having three packs a day for many years, smoker,

11   as opposed to the C-8, which you've seen from a number of

12   witnesses, she really was in the background even back at that

13   time.  Even when it was measured in '05, she was within the

14   background range of the general U.S. population.  She was low

15   on the end in terms of people living around the plant, the

16   people living in her water district.

17        You heard that Dr. Bahnson did not even bother to pull

18   out the scientific literature on the close link between obesity

19   and kidney cancer.  In questioning by Mr. Douglas, Bahnson 5:

20                             - - -

21        Thereupon, video was played in open court as follows:

22   Q    If I understand correctly, you did not go out and do

23   specific research and pull specific articles on obesity and

24   renal cell carcinoma for purposes or rendering your report; is

25   that correct?

1      A    Yes.

2                         -  -  -

3           MR. MACE:  Didn't even bother, didn't take the time.

4    You've been sitting here for three weeks.  He didn't take the

5    time to even go back and look at the literature before

6    rendering his report.  You heard he was retained at the end of

7    November.  Within two weeks he had a page-and-a-half-long

8    report, couldn't even bother to spend the time to pull out the

9    literature and actually learn about what he wanted to come in

10   here and talk to you about.

11          You heard, when we confronted him at trial with the

12   literature, including the things he says he relies on in his

13   everyday practice, he said you need to ignore it.  The American

14   Cancer Society and their statements about it being a causal

15   risk factor which causes an estimated 30 percent of cases,

16   obesity.  The American Urologic Association, similar

17   statements.  Campbell's *Urology* used in many of the medical

18   schools, ignore that.  *Adult and Pediatric Urology*.  Numerous

19   textbooks and articles.  We didn't take your time up to go

20   through all 20-plus of them.

21          He stuck his head in the sand claiming everybody else

22   was wrong: the American Cancer Society, The Urologic

23   Association, National Institutes of Health.  Everybody else is

24   wrong.  Of course, since his trial testimony conflicted with

25   his deposition testimony, he even disagreed with himself.

1    But keep in mind, ladies and gentlemen, as you're

2    sitting back in your room deliberating, the law tells you what

3    to do if you cannot make up your mind as to what caused

4    Mrs. Bartlett's kidney cancer.  You will have the law on

5    proximate cause.  Instruction 15, I think it is.  If the weight

6    of the evidence is equally balanced, or you're unable to

7    determine which side of an issue has the preponderance, the

8    party who has the burden of proof - Mrs. Bartlett - has not

9    established such issue by preponderance of the evidence.

10    I told you we don't have to prove to you anything.  It's

11    her burden to prove.  She's the plaintiff.  She's the one

12    making a claim against us.  She needs to prove it under the

13    law.  If she can't, your verdict has to be for us.  The ties go

14    to DuPont.  If you can't figure out what caused her kidney

15    cancer, Mrs. Bartlett has not met her burden of proof.

16    Now, you shouldn't reach the issue of damages, but let

17    me mention a few things.  You heard that Mrs. Bartlett was not

18    having any symptoms, no pain in her kidney, nothing like that.

19    Her kidney cancer was found during an examination for a

20    different gallbladder issue she was having.  The doctor,

21    Dr. Bahnson, was able to successfully treat it by removing a

22    small portion of one of her kidneys; no complications from the

23    surgery, no chemotherapy, no radiation, no further treatment

24    required because they caught it so early.  As Mr. Douglas

25    mentioned, Grade 1, Stage 1, the absolute lowest level of tumor

1   possible.  They successfully removed it before it caused any

2   other problems, clear margins.  They got it all.  Her recovery

3   was quicker than normal.  Thankfully, she's been cancer-free

4   for nearly 20 years now.  You heard that is not likely, not

5   likely, that her cancer will return.  Even her doctor admitted

6   that.

7          You also heard about a number of other issues

8   Mrs. Bartlett has had.  Mr. Douglas mentioned them.  And they

9   fully explain -- these are totally unrelated to her kidney

10  cancer, totally unrelated to any claims about C-8, and they

11  fully explain the various pain and suffering and similar things

12  she talked about.  You heard about her ear surgery, that

13  genetically she had some issue with the bones in her ear.  She

14  had to have a metal plate put in her head, the gallbladder

15  surgery, back surgery, uterine fibroid surgery, a C-section, a

16  hysterectomy, the doctor nicked her bladder, had more surgery.

17  She had a heart catheterization.  They had to scrape the nerves

18  off her bones, degenerative disc disorder.

19         In short, you saw she's had a host of other medical

20  issues totally unrelated to her kidney cancer that well explain

21  any of these emotional distress issues she's claiming.

22         As you're deliberating, please keep in mind the foam

23  board we showed you in opening statement.  This case is about

24  Carla Bartlett, nobody else.  It's about community exposure

25  levels.  It's about Tuppers Plains District Water.  She's not

Vol. 16 - 150

1  claiming any exposure from any landfill.

2      Before June of '97. We'll get back to speculation and

3  context. Before this 1997 issue, as we discussed in opening

4  statement, despite all the advances we made in science, we

5  still haven't figured out time travel. There is nothing that

6  happened after 1997 that would allow DuPont or anybody else to

7  go back in time and do things any differently than had already

8  happened. Nothing that DuPont or anybody else knew or did

9  after 1997 could have any effect on whether Mrs. Bartlett was

10 diagnosed with kidney cancer in 1997.

11     And they talked a lot about this science panel. But

12 when you're evaluating the reasonableness of DuPont's conduct,

13 you need to do it at the relevant time period. And that

14 finding, there's no dispute, did not come out until 2012. So,

15 please, keep the dates in mind.

16     Now, as I mentioned -- and you're going to hear from

17 Judge Sargus in a bit -- Mrs. Bartlett has the burden of proof

18 in this case. And he's mentioned already, you're going to hear

19 again about this preponderance of the evidence, the greater

20 weight of the credible evidence admitted in the case. But

21 instead of that, what you've heard throughout the trial from

22 the plaintiff's lawyers and their witnesses have been arguments

23 about what might be, what could be, possibilities.

24     That gets us back to the speculation point. Under the

25 law, maybe is not enough, speculation is not enough, possible

1    is not enough, and context is very important.  Mrs. Bartlett

2    has the burden of proof, and you cannot find in her favor if

3    she fails to prove every element of what she's required to

4    prove.  As you evaluate the evidence, you need to hold

5    Mrs. Bartlett to her burden of proof.  It's part of the oath

6    you took when you agreed to sit as jurors.  I know you'll do

7    it.

8            You're going to have some forms, four or so, that you're

9    going to have that you'll need to fill out.

10           Jury verdict form for negligence claim.  Do you find in

11   favor of Mrs. Bartlett on her negligence claim?  For the reason

12   we discussed, your answer is clear.  No, she hasn't proved

13   that.

14           On the negligent infliction of emotional distress, do

15   you find in her favor on that claim?  Your answer is clear.

16   No, she hasn't proved that.

17           I don't think you'll get to this one, in terms of amount

18   of damages.  Let's get to the next one.

19           I don't think you'll get to this one either.  If you

20   found in favor of Bartlett on any of her claims, do you find

21   that Bartlett has proven by clear and convincing evidence

22   DuPont acted with actual malice and she's presented proof of

23   actual damages resulted from those acts or failures to act?

24           The answer is clear.  No.  In fact, on the evidence

25   you've heard, if you even got that far, it would be, no, with

1   an exclamation mark.  It's the opposite of what you've heard.

2   You've heard of a company that acted first to protect people

3   while it checked out the facts.  That's what you've heard.

4        Your Honor, this a good time for the break.

5        THE COURT:  Yes.  We'll take a 15-minute recess at

6   this time, ladies and gentlemen.

7     (Recess taken from 2:13 to 2:43.)

8        THE COURT:  Mr. Mace, you may continue.

9       MR. MACE:  Thank you, Your Honor.

10       Welcome back.  Before I wrap up, I want to talk for a

11  few minutes about some of the things that have been raised by

12  Mrs. Bartlett's lawyers, because what you saw through the past

13  three weeks is speculation and things taken out of context.

14       For example, you saw quite often a chart, Plaintiff's

15  Exhibit 13001.  And there's several important points here.

16  First, whether you're talking about a smoke stack into the air

17  or an outfall to the Ohio River, emissions do not equal

18  exposure.  Emissions do not equal exposure to an individual.

19       We talked -- I used my little handwritten drawing of a

20  smoke stack, but we looked at the concept of a smoke stack that

21  goes up into the air.  Mrs. Bartlett doesn't claim that she was

22  at the top of any of the smoke stacks at the plant.  She

23  doesn't claim she was at the end of the outfall going into the

24  Ohio River.  The concept, whether you're talking about

25  emissions into the air or emissions into the water, as things

1   get released, they disperse and dilute down to non-harmful

2   concentrations before they ever get in the zone of anybody in

3   terms of exposure; difference between emissions and exposure.

4   That's somebody that's playing on the wrong things and trying

5   to distort the facts to try to get you focused on emissions

6   instead of exposure.

7           Second, you can always play with the scale on any graph.

8   You can make things look more dramatic than they are.  But was

9   that fair?  You need to keep things in context.

10          You heard that many other companies emit many hundreds

11  of thousands of pounds of substances into the air and water.

12  But, more importantly, you heard that the Ohio River has an

13  enormous, huge, volume going by the plant.  You saw Defendant's

14  Exhibit 169 at page 12.  C-8 in the river.  Average Ohio River

15  flow, 13.88 billion pounds.  Per year?  No.  Per month?  Per

16  week?  Per day?  13.88 billion pounds an hour.

17          And then look at what these attorneys did in the chart

18  they probably showed you more than any other exhibit in this

19  case.  They started off with their 13001.  They would have you

20  believe that they were showing you release to the Ohio River,

21  as if the muddy Ohio is in here somewhere.

22          We took their data, put it on a graph.  They say release

23  to the Ohio River but, in fact, this is totally out of context.

24  This is the pounds released as if the Ohio River wasn't even

25  there, just a dry stream bed.  And if we try to take into

1    account the flow of the Ohio River in one second, one second,

2    what happens to their bars?  They disappear.

3         Now, they're using annual emissions per year.  You

4    consider the flow of the river for one second, ladies and

5    gentlemen.  All we've done is change the scale to what the flow

6    would be for the Ohio River in one second.  Let's look at it

7    for a minute, for an hour, for a month.  Let's go to the year.

8    Apples to apples, the concentrations being released into the

9    river compared apples to apples to the flow of the river in a

10   year, you can't even see it.  It's not even there.

11        Remember our example about the temperature on the

12   courthouse steps in January.  If things warm up from one degree

13   to three degrees, they triple, but does it feel any warmer

14   outside?

15        When you look at the plant emissions in the context of

16   the massive flow of the Ohio River, you see that plaintiff's

17   lawyers are unfairly and inaccurately distorting the facts,

18   trying to play on your emotions instead of the facts.

19        New topic.  You heard this phrase repeatedly from their

20   experts and from these lawyers: industry standard of care.  But

21   then on cross-examination, you saw that the plaintiff's experts

22   did not know a single thing about the relevant industry

23   standard of care.  Their experts came in here with blindfolds

24   on.  They didn't even bother to look into what other companies

25   using C-8 were doing.

Vol. 16 - 155

1      Siegel 4:

2          What did you do, sir?  Tell the jury everything you

3      did -- this is Mr. Siegel -- to check out the other

4      companies besides DuPont and besides 3M, the other

5      countries across the country that were using C-8?  What

6      did you do to look into their practices?

7           I didn't look into that issue.  Didn't look into

8      that.

9      Petty 2.  Mr. Petty:

10         Well, you can't list all of them.  Can you list any

11     of the other companies besides 3M and DuPont that were

12     using C-8?

13         I haven't looked that up.  I know a lot of paper

14     companies were using C-8 as a coating for popcorn bags

15     and everything, would let grease move through.

16         You say you've looked at the industry standard of

17     care.  But the fact is, you did not do anything at all

18     to compare DuPont's conduct with the other companies in

19     the industry that were using C-8, true?

20         That is true.

21     For Mr. Petty, who wouldn't admit to me that the sky is

22     blue but he admitted that.

23         These experts stuck their head in the sand because they

24     want to completely ignore that the undisputed evidence showed

25     that DuPont was doing far more than any other company was doing

1    in terms of trying to use C-8 in a responsible way, in trying

2    to make sure that it would not cause harm to humans.

3         You will remember Mr. Petty, not a Ph.D. in any topic,

4    not an M.D., not board certified in toxicology, not board

5    certified in epidemiology, admitted he has never been

6    responsible for setting human exposure guidelines for any

7    chemical.

8         Petty 1:  Acknowledged he's been deposed perhaps 150,

9    200 times.

10        In all those times, prior to this case, can you cite us

11   a single example where you've ever offered opinions regarding a

12   private company's compliance with a standard of care regarding

13   warnings to a community?

14        That was his entire spiel here:  Should have warned the

15   community.

16        I don't recall one, don't recall one.

17        A mouthpiece brought in here to say something he's never

18   said before, not his area of expertise.  You heard about his

19   testimony on scaffolding cases, air conditioners, swimming pool

20   liners, roofing, a forklift, mold.  He's never had any

21   experience with C-8, none.  His claim to fame, he's testified

22   for plaintiffs' lawyers more than 93 percent of the time.  He's

23   been paid more than $3,000 a day to come here and talk to you.

24   But his expertise did not fit the issues in the case.  The

25   plaintiffs brought you a fork when you needed a spoon.  This

1  case has to do with toxicology and epidemiology, and he's not

2  an expert in either of those.

3       They talked about the surveillance reports, these

4  periodic reports that DuPont did, that DuPont was able to do

5  because it was proactive enough to have a registry where it

6  kept track from the 1950s at what was going on at its plants,

7  decades before the EPA, decades before any of these federal

8  agencies: OSHA, NIOSH.  DuPont was a leader in being able to

9  even do these types of analyses and look backs.

10       Now, you were told there was an excess of kidney cancer

11  at the plant.  I think you heard it again today.  But then you

12  saw that DuPont took this extremely seriously.  They

13  investigated the work histories, where were these people

14  working.  You heard this plant was a huge plant, 2,500 people,

15  more than a hundred different buildings.  Only about a quarter

16  of the plant was involved with C-8.  They looked at the work

17  history of those people and they found that the people showing

18  up having cancer were not the people working with C-8.

19       You saw Defendant's Exhibit 2452 where they looked at

20  those eight individuals on that report in 1989.  They looked.

21  What department were they in?  What division were they in?  And

22  seven of the eight never had any experience with C-8, never any

23  experience in Teflon.  One of the persons had about three

24  years.  Was that some type of a signal, a red flag, a yellow

25  flag, something that, oh, my goodness, there is a cluster in

1    the Teflon workers?  Absolutely not.  If anything, it pointed

2    in another direction.  These aren't the people working in

3    Teflon.

4         More importantly, you heard that in the same time

5    period, 1989, they analyzed, they did periodic reviews of what

6    are we seeing in the blood levels.  This was, let's look at all

7    the people at the plant being exposed to thousands of different

8    chemicals, lots of different processes.  Is anybody having any

9    disease?  We look at the people that have disease; very few,

10   one, a little bit of time in Teflon; generally, no, seven of

11   the eight, no, not working in Teflon.

12        Come at it the other way.  What about the people that

13   are working in Teflon?  We're monitoring their blood.  What do

14   we see?  Exhibit 14.  They look at the people with parts per

15   million levels in their blood.  You will see this, Defendant's

16   Exhibit 14.  About 40 different people that had the highest

17   blood levels.  You can see these are people that have been

18   monitored for decades, back in the late '70s, right when 3M

19   first said, Hey, DuPont, by the way, we're seeing elevated

20   organic fluorine in our workers' blood.  Just wanted to let you

21   know.  We're not seeing any disease.

22        DuPont jumps on it.  They're monitoring people.  They

23   have people.  We talked about 3M had some people up at 70 parts

24   per million, 70,000 parts per billion.  DuPont had people 2.5,

25   9, 8, 6.  These can be considered thousands in parts per

1    billion, 24,000 parts per billion, 33,000 parts per billion in

2    the DuPont workers.

3         You heard Dr. Playtis.  He was directly involved with

4    this, looking back with Dr. Power, the plant doctor who had

5    been there for decades, looking back at the medical records of

6    the people most highly exposed.  No medical problems, none.

7    Whichever way they looked at it, the people having disease, are

8    they working in Teflon?  No.  The people with the high blood

9    levels having disease?  No.  That was what DuPont knew.  That

10   was the state of the knowledge, not what was portrayed to you.

11        Contrary to their claim, you saw that DuPont did

12   communicate appropriately with third parties.  You saw this

13   plant employed approximately 2,500 people plus about 400

14   contractors.  Approximately 3,000 people employed at this

15   plant.  You heard that almost all of them lived in the areas

16   around the plant, and you heard that in many ways the DuPont

17   employees, with their spouses, their children, additional

18   family, neighbors and friends, they were the community.  You

19   heard that DuPont kept its employees very well informed.  You

20   heard there was never any blood oath:  All right, Susie, Jerry,

21   not a word of this to anybody outside the plant.  When you

22   leave, what stays in -- what happens in the Washington Works

23   plant, stays in the Washington Works plant.  Nothing like that.

24   No blood oath.  Don't tell anybody.  People talk.  People live

25   with other people.  People have family members.  All of these

1    things are discussed.

2         You will recall that the plaintiff's expert admitted

3    that they kept their employees well informed.  Dr. Siegel said

4    that; very well informed, and we showed you the testimony

5    earlier.

6         They also ignored the Community Responsible Care Team in

7    existence since 1990, a couple dozen community members from

8    different walks of life who were brought in monthly at first,

9    then quarterly, to chat about whatever concerns they had about

10   the plant.  They were given updates.  They were given updates

11   on these various landfills, on the permits, on C-8 was

12   discussed with them.  Plaintiff's experts want to ignore that.

13        You heard that DuPont gave many notices to the public

14   agencies that are charged with protecting the public health,

15   agencies like the United States EPA, annual budget of

16   billions -- with a B -- dollars, a team of more than 1,500 --

17   15,000 scientists; agencies like the West Virginia Department

18   of Environmental Protection, budget of more than a hundred

19   million dollars a year, a team of more than a thousand people;

20   agencies that had toxicologists, epidemiologists, industrial

21   hygiene experts and other scientists with the expertise to

22   evaluate information on chemicals and exposures and likelihood

23   of harm; agencies that had the resources and power to take

24   whatever steps are needed to protect people from harm.

25        Some examples, Defendant's Exhibit 1837.  1985 West

1    Virginia Division of Water Resources, U.S. EPA.  The C-8

2    surfactant has also been detected in the aquifer at parts per

3    billion levels, just above the analytical detection limit.

4          Exhibit 1943.  1990, West Virginia, U.S. EPA.  The

5    Lubeck Public Supply Wells have detectable levels parts per

6    billion of ammonium perfluorooctanoate, also called C-8.

7    Washington Works is in the process of purchasing these wells

8    from Lubeck.

9          Exhibit 750.  1992, meeting with West Virginia

10   Department of Natural Resources, including the chief.

11         Next page.  All important issues, including

12   biopersistence, the accumulation of C-8 in the blood were

13   mentioned.  All the names for C-8 were brought out.  Monitoring

14   results and nearest neighbors were reviewed.  There was no

15   concern voiced about spread offsite.  From West Virginia,

16   agencies charged with protecting the public health.  One part

17   per million, C-8 was not an issue.  The concentration in the

18   Ohio River is calculated to be at least a factor of one hundred

19   less than the CEG water, one hundred times less than the

20   back-up buzzer which had 30,000 safety factor built into it;

21   not discussed, but we were prepared.

22         And there were notices to the local water district,

23   Lubeck, Exhibit 295.  1989, Lubeck Public Service District.  We

24   performed analyses for C-8 and Lubeck water taps from '84 to

25   '88, concentrations of 1 to 2.2 parts per billion.  We have

1    noted accumulations in the blood of workers, no adverse effects

2    on employee health.  We reported all of this to U.S. EPA, West

3    Virginia, back in '85.  We saw the earlier letters back in '81

4    when they had the false positive with the rat study.  There

5    were notices given.

6         You saw in Plaintiff's Exhibit 518, from September of

7    '91, and then on page two about this water sampling that was

8    being conducted.  Sampling was conducted and completed

9    September 11, 12 and 13.  By whom?  By a bunch of people

10   including assistance from Bill Packard, Lubeck.

11        Lubeck was involved in some of the water sampling; no

12   sweeping under the carpet, no hiding things, not what you were

13   told.

14        Ladies and gentlemen, you can remember what Dr. Karrh

15   said when he was deposed.  I think it was about 15 years ago.

16   We have that video clip.

17                          – – –

18        Thereupon, video was played in open court as follows:

19   Q    What would be an important factor for determining

20   whether the local community should know that this particular

21   chemical was in their drinking water?

22   A    I think it would depend upon how much of the material

23   was in the drinking water and whether or not we felt that there

24   might be a significance risk of any kind, or even a potential

25   risk of any kind, and subsequently then try to make some

1    judgments based upon that.  We didn't have any reason at that

2    point in time to think that there was a health hazard from the

3    levels at which the community might be exposed.

4                              - - -

5          MR. MACE:  That makes sense, doesn't it, ladies and

6    gentlemen?  You heard the testimony.  That's reasonable.  In

7    fact, you heard Dr. Siegel who, again, didn't agree very much

8    with me -- the plaintiff's experts said the same thing.  Siegel

9    2.

10                             - - -

11         Thereupon, video was played in open court as follows:

12   Q    You would agree, sir, if you have no reason to believe

13   that the person is going to be harmed, there's no need to

14   disclose exposure information, right?

15   A    I would generally agree.  I don't think that it's

16   incumbent upon every company to inform the public of every

17   single pollutant that it is emitting.  I think you're correct,

18   that where there is suspicion of potential health effects is

19   where you need to disclose.

20                             - - -

21         MR. MACE:  You will recall that we talked about the

22   analogy to automobile exhaust.  That helps us understand a

23   couple of important points, because it's undisputed that

24   automobile exhaust contains a lot of dangerous, toxic and

25   cancer-causing chemicals, capable of causing cancer.  But in

1    terms of exposure or dose, there is a very big difference

2    between having your nose at the end of the tailpipe and

3    standing ten feet away, 50 feet away.  There is a very big

4    difference between emissions and exposure.  Dose is critical.

5        More importantly, for the topic we're on right now, in

6    terms of what a reasonable person would do in warning others,

7    we all drive by dozens, if not hundreds, of people every week,

8    if not every day.  We don't stop to tell them that we're

9    putting chemicals that are capable of causing cancer into the

10   air they're breathing while we drive by in our cars and trucks.

11   Our children are exposed every day to diesel exhaust fumes from

12   school buses, fumes that contain numerous chemicals that are

13   capable of causing cancer.  The bus driver doesn't warn them or

14   their parents that they're being exposed to chemicals that are

15   capable of causing cancer.  And why not?  Because the exposure,

16   or the dose, is so low that no harm is likely.  Remember the

17   big difference between a mere possibility and what is likely.

18       We talked about things like airplanes, and you can think

19   about elevators.  Every time you step onto an airplane, every

20   time you step onto an elevator, there's always a possibility, a

21   risk, that the plane is going to crash or the elevator is going

22   to fall down the chute.  But that's far different than it being

23   likely that the plane or elevator will crash.  Court of law

24   requires likely, not possibility.

25       DuPont's public statements in the 2000s.  You saw that

1    DuPont's statement were the same as what U.S. EPA, NIOSH,

2    ATSDR, these three eminent epidemiologists, Dr. Emmett in 2006,

3    what all the third parties were saying.  Importantly, as well,

4    you heard Mrs. Bartlett.  She did not even hear, much less rely

5    on, anything DuPont said about C-8.  Bartlett 1:

6              You've never had any direct contact with anyone from

7         DuPont?

8              No.

9              You don't recall seeing or hearing about any

10        communications from DuPont on any subject at any time?

11             Not to my knowledge.

12             You've never read or reviewed any statement that

13        DuPont has made about C-8?

14             Not that I remember.

15        Mrs. Bartlett's testimony under oath.

16        Incineration and these MSDS sheets.  You saw that the

17   MSDS sheets are for employers, and they apply to the pure

18   chemical, not the diluted form after it's been through the

19   process.

20        You saw Defendant's Exhibit 1046 from 1991 talking about

21   the supernate.  After it's been through the process, they call

22   it supernate.  It's a highly diluted form.  They're talking

23   about a change in the handling of the supernate to be sent for

24   offsite incineration as opposed to sending it to Chambers Works

25   for waste water treatment.  You're going to recall they tried

1    to pick out some sound bites.  Those 3M MSDS sheets talked

2    about waste water treatment.

3        And in terms of when this started, you saw the other

4    document, Plaintiff's Exhibit 1024, from 1986, the mid-'80s

5    talking about the supernate.

6        Next page:  Waste disposal to be sent to Chambers Works

7    or Ohio Liquid Disposal, a commercial disposal facility.

8        They want to talk about a small stream that did end up

9    in the Ohio River, the majority of it, commercial treatment

10   from the mid-'80s.  And you saw that 3M wasn't incinerating its

11   C-8 waste.  You heard they were disposing of it to the surface

12   water, the land and the air.  In fact, if you were listening

13   carefully, you heard that DuPont was always incinerating more

14   than any other company.

15       The Toxic Substance Control Act.  You heard about this

16   again today.  Defendant's Exhibit 237.  You're going to have

17   our Exhibit 237, our side of the story, the rest of the story,

18   because this was vigorously contested.  They painted as if you

19   should accept as true everything EPA was saying.  When did this

20   happen?  This was the mid-2000s, mid-2000s.

21       DuPont denies that it committed any of the violations

22   alleged.  We fully and promptly reported to EPA all the

23   information we were supposed to report.  The small amounts of

24   PFOA that we discovered in a blood sample and drinking water

25   did not suggest that there was any risk, any risk, to human

 1    health.  Consistent with what the third parties were saying,

 2    much less a substantial risk.

 3         You heard about the ambiguity in the reporting

 4    requirements over the years.  Later in the document:  As

 5    supported by the science, there's no none adverse health

 6    effects.  There was and is no substantial risk information to

 7    report.

 8         There is a whole different side to that story.  I didn't

 9    take your time up to have you go through this 40- or 50-page

10    document.  If you're interested in it, you can go there and

11    see.  There's a completely different side of the story.

12         Also, importantly, in the plaintiff's exhibit they kept

13    showing you, Plaintiff's Exhibit 558, December of '05, that's

14    the time period we're talking about.  Let's go to that other

15    page.  This is at page 11 of that.  They talked about

16    litigation risk, the litigation risk.  This is EPA inside their

17    offices that they thought nobody would ever see.  Litigation

18    risk.  There was significance risk EPA would not be able to

19    prove successfully that the violation directly disrupted EPA's

20    risk assessment activities.

21         They would have you believe that these two innocuous,

22    irrelevant pieces of information that DuPont didn't think it

23    was required to report somehow would have changed the world.

24    EPA recognized that wasn't so, and they weren't going to be

25    able to prove it.  In fact, they realized they're probably

1    going to be barred by the statute of limitations because

2    they're trying to raise things from an earlier time period when

3    the guidance was different, that happened long ago.

4         More importantly, you got another limiting instruction

5    by His Honor that you are required to follow in this case.

6         DuPont and EPA agree to settle the claims by entering

7    into a consent agreement that acknowledges that DuPont denied

8    liability and expressly stated that nothing in the agreement

9    should be taken as an admission of liability by DuPont.

10        This is His Honor's instructions to you.

11        Further, you may not infer liability nor draw any

12   conclusions about DuPont's potential liability in this case

13   based on the fact that it settled EPA's 2004 administrative

14   claim against it.

15        That's what you've been told.  That's what you have to

16   follow.  The facts are far different.

17        Connect the dots.  I can't believe we even heard that

18   this morning.  For some reason, Mr. Papantonio loves that

19   document, connect the dots, a sound bite out of context, never

20   referenced, not once, not once, by any of the people who are

21   dealing with C-8.  Not once.  They didn't link that up at all.

22        You heard, in short, that we had answers to every item

23   they raised.  They said DuPont's a corporation.  True.  But

24   Judge Sargus will tell you all persons stand equal in front of

25   a court of law.

1      You've all seen - I don't think we have one in the

2    courtroom - pictures of Lady Justice, a woman holding the

3    scales of justice.  What does she have on her head?  A

4    blindfold.  A blindfold.  Because as His Honor will tell you,

5    all persons stand equal in a court of law.  We're all to be

6    treated the same.  We're a corporation, but that's not supposed

7    to enter into your decision at all.  We're two equal people

8    here looking for the best of the best of the jury.  You guys

9    have listened to it.  You know what you heard.  We're two equal

10   people, and you're not supposed to treat us any differently.

11   You all promised us in jury selection that you would follow

12   that.

13      They want you to believe profits over safety.  But what

14   did you see at trial?  Not one document, not one document, that

15   said it, profits over people.  You saw the opposite.  DuPont's

16   attitude demonstrated time and time again actions speak louder

17   than words, protect people first while we check things out.

18      I didn't hear yet today -- maybe it's coming, but they

19   said the other day to several of the witnesses:  You got it

20   wrong.  You got it wrong.  2012 science panel came out.  You

21   were wrong.  You got it wrong.

22      That is not the issue here.  That is not the issue here.

23   The issue for you to decide is reasonable conduct at the

24   relevant time, before the science panel finding in 2012.

25      As I wrap up, ladies and gentlemen, was DuPont perfect?

1    No.  Is any of us?

2         Perfection may be what DuPont would like.  It's

3    certainly a good goal to have.  But it's not what the law

4    requires.  The law talks about reasonable conduct.  That's what

5    you're going to hear from the judge.  That's what you'll read

6    in the instructions: reasonable conduct, not perfection.  Here

7    the evidence showed DuPont was more than reasonable.

8         Before I sit down, I want to thank you, each and every

9    one of you.  It's a long trial, longer than most.  And we

10   really appreciate the fact that you paid such careful and close

11   attention.  I really do appreciate that.  Because one the

12   things that makes our country special is our jury system and

13   the collective wisdom of seven good citizens sitting as a jury.

14   And it works best when the jurors have been as patient as you

15   have been, to listen and to wait for the rest of the story.  I

16   trust you because you paid attention, and I feel you did wait

17   to hear the rest of the story.

18        A few final comments before I sit down.  You've seen

19   throughout this case that the plaintiff's lawyers always get to

20   go first.  And today you heard that they actually get another

21   advantage because one of them gets to come back up here and

22   talk to you again.  But this is my one and only chance to talk

23   to you.  And the fact that they get to come back up here brings

24   us to a couple of points.

25        First, if they raise new issues, I assure you I would

1    welcome the opportunity to address it.  I would have a response

2    to every point they make, but the rules don't allow me to get

3    back up again.

4         But secondly and more importantly, ladies and gentlemen,

5    we have all invested a lot of time and a lot of energy in this

6    case.  DuPont's had to deal with these issues for several long

7    years.  You've invested more than three weeks of your valuable

8    time to sit here and listen day after day, kind of trapped

9    because you couldn't leave.

10        Like the movie *A Few Good Men*, you're entitled to some

11   answers now.  When Mr. Papantonio or one of the other lawyers

12   gets back up here in a few minutes, you should look them in the

13   eye and you should ask them to answer the tough questions that

14   despite three weeks of trial they've never answered for you.

15        One, how does he expect you to find that back at the

16   relevant time period DuPont expected that harm was likely to

17   someone like Mrs. Bartlett, with these low community levels of

18   exposure, when her exposures were so far below any of the

19   exposure guidelines that existed at the time?

20        Two, how does he expect you to find that DuPont expected

21   that harm was likely to someone with low community levels of

22   exposure when throughout the relevant time period, DuPont

23   wasn't seeing any disease or harm in the people working at 3M

24   or the people working at DuPont who had much, much higher

25   levels of exposure?

1        Why does he want you to speculate that her kidney cancer

2    was caused by C-8 when there are so very many other

3    explanations for it, and when Dr. Bahnson did such a sloppy job

4    of looking into the other explanations?

5        Why did they bring you experts who didn't do their

6    homework, did nothing to look into the other companies that

7    were using C-8, and did not have the specific skills in the

8    areas that are relevant to what you need to decide in this

9    case?

10        Why did they waste your time on so many side issues,

11    distractions, repetition?

12        You're entitled to answers.

13        Ladies and gentlemen, I want to thank you very much for

14    your kind attention today and your kind attention throughout

15    the three weeks.  I stand before you now, as I told you I would

16    three weeks ago, and I ask you for the only findings that

17    justice require, findings of no liability, no specific

18    causation, no actual malice, and no damages.  Thank you.

19        THE COURT:  Thank you, Mr. Mace.

20        As I mentioned to you earlier, ladies and gentlemen,

21    because Mrs. Bartlett has the burden of proof, she has the last

22    word.

23        Mr. Papantonio has an additional 15 minutes, and then

24    we'll be done with closing argument.

25        MR. PAPANTONIO:  Ladies and gentlemen, there's nothing

1    new here.  I'm not going to bring up anything new.  What I'm

2    going to bring up is the first document I started with.

3    Mr. Mace said to me:  Show me a document.  Would you please

4    show me a document that shows we knew about cancer back in the

5    '90s.

6           That's what he said:  Show me a document.

7           Mr. Mace, Dr. Rickard, there's the document.

8           Could you put it up on the screen, please?  Maybe they

9    can read this right along with you.  He said show me a document

10   that says we knew about cancer in the 1990s.

11          Warning, contains a chemical which can cause cancer.

12          That is talking about C-8.

13          Show me a document?  There you go.  Read that.

14          And it's talking about the fact that not only does it

15   cause cancer, it's talking about Rickard's team up in Delaware,

16   the Rickard team.

17          Mr. Rickard, was it five times you've been down here

18   drinking the water, six times?

19          They're up in Delaware.  So maybe they didn't see this

20   document.  Not likely.  They didn't want to talk about the

21   document.  Show me a document.  How about this document?  All

22   that stuff you just heard about we didn't know, we couldn't

23   find out, this says it all, ladies and gentlemen.  Please

24   believe me.  It says it all.

25          It says cancer -- and you know what?  It talks -- give

1    me the next slide on that, please.  It talks about we're using

2    the very studies that they've tried to run away from, that

3    Mr. Rickard took the stand and tried to run away from.  The

4    very studies they have in their file cabinet is telling them in

5    1997 these are the studies we did jointly.  We did this with

6    3M.  DuPont did this with 3M.

7        Why did Mr. Mace spend all that time just now and not

8    mention this document?  Because that's the way the whole trial

9    has been.  They've had this in their file cabinets.  Mr. Mace

10   had possession of it.  Mr. Rickard had possession of it.  They

11   knew all about it, and they avoided it because this tells the

12   story.  This tells exactly the story.

13       And the truth is, the truth is, ladies and gentlemen, I

14   can sit here and review the documents again.  I'm not going to

15   do that because you have the information.  You have -- you've

16   taken notes about it.  You begin here and then you go to

17   connecting the dots that Mr. Mace said was ridiculous.  That

18   number is what?  Would you put that connecting the dots up?

19       He said this was ridiculous.  By the way, I gave you the

20   wrong number.  This number is 283.  Please write down 283 for

21   connecting the dots.  Put connecting the dots with the document

22   that they're still lying about, the document that they're still

23   covering up, the document -- he was up here an hour and a half

24   and didn't show you the most important document that we've been

25   talking about in this trial.

Vol. 16 - 175

1    I held it back.  I wanted to see how dishonest would

2  they be, how dishonest would Mr. Rickard be.  I got a picture

3  of it.

4         So show me a document?

5         When you go back into that jury room, you're going to

6  have that document.  You'll understand how important it was

7  that nobody wanted to talk about it.

8         I want to show you something.  I want to show you how

9  flippant they are about people's health in the Ohio Valley.  I

10  want to show you how they think this is a joke.  Put up Reilly.

11  I want to show you the deposition I took of this man.  Listen

12  to me.  I'm asking him about life and death here.  I'm asking

13  about people like Mrs. Bartlett who has counted on this company

14  being honest.

15         Roll it.

16                             - - -

17         Thereupon, video was played in open court as follow:

18  Q    In other words, the company actually had this in their

19  own computer system, correct?

20  A    That's my understanding.

21  Q    They kept everything.  They had a central clearing house

22  for everything, and this was one thing the company kept, these

23  e-mails you were writing?

24  A    Yes, something I obviously did not understand or

25  appreciate.  But that's life.

Vol. 16 - 176

1    Q     Isn't it a good thing, though, that the company kept

2    this because we can go back and look at history now?  It is a

3    good thing that they kept these documents, isn't it?

4    A     You're saying it's a good thing?  Mr. Papantonio, you

5    can frame that any way you want.

6                              - - -

7          MR. PAPANTONIO:  That's the attitude of this company.

8          Do you think this stuff just jumped out at us?

9          How long do you think it took for Mr. Bilott to assemble

10   part of this?

11         You were danced around for a hour and a half by Mr. Mace

12   ignoring the time lines.

13         Please put it up.

14         The time line tells us everything.  If you want weight

15   of the evidence, if you want preponderance of the evidence,

16   please do me this favor.  Please.  I'm begging you.  Go back in

17   the jury room, take this chart, put the documents right on the

18   chart with the time that they knew about it and the amount of

19   emissions and pollution that they put into the river.  Please

20   do that.  Put that -- I think it's 13001 is the chart.  One of

21   you have the chart, somebody hand them the document, say put

22   this on there about what they knew and what they could have

23   known.  All you have to do is start with Document No. 8193 and

24   it tells the story about how dishonest these people are.

25         And I don't have any compunction about pointing my

1   finger because I've sat and watched this thing unfold.  And I

2   had to listen to that for an hour and a half about how we

3   didn't know, about how we didn't bring any witnesses to court.

4   Really?

5           Do you realize they had a doctor on the stand that did

6   not testify that her cancer wasn't related to C-8?  Because he

7   couldn't.  Because he knows it is.

8               MR. MACE:  Objection, Your Honor.

9               THE COURT:  That's sustained.  That's speculation.

10  Ignore that last comment, if you would, ladies and gentlemen.

11              MR. PAPANTONIO:  He never testified about it.  But we

12  brought a witness in that did.  And the witness was right here

13  in town and said, Yes, she got cancer related to C-8.  They can

14  play games with Deposition No. 1 and Deposition No. 2 as much

15  as they want.

16          Ladies and gentlemen, it doesn't do any of us any good

17  to sit here and me go through this again.  It doesn't make any

18  sense.  You have the information.  You have your common sense.

19          But I want to tell you this much.  When they talked

20  about how we told the community everything, we told them

21  everything, this tells a story right here.  This is a

22  compilation of everything this company did where it comes to

23  saying they told the public.  Here it is right here.

24          1978, they informed -- 3M informs DuPont about

25  biopersistent.  They don't tell the community a thing about it;

1    silent about it.

2          In 1979 DuPont started testing workers' blood levels,

3    liver functions.  They don't tell the public a thing about it.

4          Now, you understand this document -- this right here,

5    1979, this is what Dr. Fayerweather said he relied on and

6    found -- and he found increased kidney cancer and liver cancer.

7    That's the stuff that -- they said they talked about all these

8    worker studies.  This is one of the worker studies.  And then

9    when he goes to leadership and he says, I need $45,000 to do an

10   Epi study, they say, No, wait until we get sued.  And they

11   remain silent about it with the community.

12         This isn't about workers.  This case isn't about

13   workers.  It's about the community.

14         Employee communications.  They talked about known --

15   toxicity known since 1965.  Where?  Equipment.  They say

16   nothing.  Female employees move, they say nothing.  This stuff

17   will cause cancer, they say nothing.  They don't say anything

18   until they're sued.  That's what I'm trying to say to you right

19   now.

20         I think I heard, I think I heard Mr. Mace honestly say

21   to you that we started doing filters in people's water in 1996

22   I think he said.

23         Play Playtis.  I want to show you how long the

24   technology has been around to do what they were ordered to do.

25   They didn't do this because they were being friendly.  They

1  didn't do this because they cared about this community.  They

2  did this because they were ordered by the EPA.  They were

3  punished by the EPA, and they did what they had to do.

4        Look at this, Mr. Playtis:

5            How many years has activated carbon filter been

6        around?

7            Well, that's fairly old technology.

8            When you say it's old, it goes all the way back to

9        the 1950s, doesn't it?

10           Probably.

11       They had the same technology they were ordered to use,

12  they were punished to do it, and they finally did it in 1996

13  not because they cared a whit about the people on the Ohio

14  River.  It's because they were ordered to do it.

15       There's nothing magnanimous about this company, ladies

16  and gentlemen.  When you get back there and really look at the

17  documents, you'll understand what I'm saying.  You'll

18  understand the fury I feel in my heart right now.

19       When we remain silent and we allow people to mistreat

20  people, and we say it's not our problem because we didn't live

21  down there with Mrs. Bartlett, and we're willing to say --

22  we're willing to bury evil, we're willing to bury conduct of

23  people mistreating people, the problem with that is you are

24  planting that kind of idea in the very foundation of our

25  democracy.

1    It's going to show its ugly head again, ladies and

2    gentlemen.  It may not be this generation.  It's the next

3    generation.  It gets worse and worse and worse.  When we accept

4    that we can walk out of this courtroom and it's okay, it's okay

5    because of something Mr. Mace said that maybe had some kinship

6    in our head.  When we can walk out of here and we can say it's

7    perfectly okay for a corporation, one of the biggest chemical

8    corporations in the world, to come to West Virginia and Ohio

9    and pollute the river with something they know is a toxin as

10   early as 1988, and you walk out of here and say that's okay, I

11   believe that cynic.  I believe that cynic was right.  And I've

12   never believed in a cynic.  But if you can do that in this case

13   and you can say what they did, what they did by polluting this

14   river with something they knew was going to cause cancer, and

15   you have a kinship with that because it's okay, something is

16   broken in our justice process.

17        Mr. Mace knows that.  And Mr. Mace is playing piecemeal

18   lawyering.  Piecemeal lawyering is where you say something and

19   you ignore all the obvious things that say just the opposite.

20        Ladies and gentlemen, this case isn't just about

21   negligence.  Negligence is the least of this company's problem.

22   This case is what Dr. Siegel told you about.  This case is what

23   Dr. Siegel has called a conscious disregard for the health and

24   safety of people.  Dr. Siegel told you that.  Mr. Petty told

25   you that.  It's a conscious disregard.

1    I'm not worried, frankly, about you deciding negligence.

2   I don't think there's any question they were negligent.  The

3   question you're going to have to wrestle with back there, that

4   you need to understand why we showed you all this stuff, why

5   did I just make a big issue about the fact in 1997 they knew

6   this stuff would cause cancer and held it quiet all the way

7   through this trial, why I thought it was important, Mr. Rickard

8   who said, yeah, I knew about cancer in 2012, chose to make the

9   decision as late as 2015 not to let anybody know with a press

10  release, with a media event, with a town hall meeting.  To this

11  day, this company up in Delaware does not care what's going on

12  unless they're ordered to care.

13      And ladies and gentlemen, you saw everything that

14  described nothing short of conscious disregard.  This is the

15  one I think you all need to focus on.  I think it needs to be a

16  clear yes.  It needs to be, yes, you don't conduct business

17  like that.  You don't put people out -- first of all, you don't

18  treat Mrs. Bartlett like she's damaged goods and come in the

19  courtroom and have a lawyer saying, well, you had an ear

20  problem, you had a Caesarean operation, you have scar already.

21      Ladies and gentlemen, here is the difficult part that

22  you have.  This is always a problem.  And I have been doing

23  this for 35 years and I know where juries have problems with

24  corporations.  They don't understand that they're a person.

25  And you have to evaluate this person against that person.  You

1   have to evaluate whether Mr. DuPont is worthy of you giving him

2   a benefit of the doubt, because that's all he was begging for:

3   Benefit of the doubt.  This man does not deserve a benefit of

4   the doubt.  This man, he has made his bed.  And the first time

5   in -- the first time since all this started, you are going to

6   make a decision whether what Mr. DuPont did is acceptable under

7   American democracy standards.

8          The whole world is watching you.  I know you know that.

9   And you have to decide:  Is it okay for a corporation just to

10  go to people who are -- to an area where the most -- all they

11  want, they just want trust.  You see, we want to trust

12  corporations.  We make a contract with them.  The contract is,

13  Mr. Rickard, we want your company to make a lot of money.  We

14  want jobs.  We want you to innovate.  We want you to do all

15  these things.  It's a contract.  But at the end of the day, all

16  we want to say is be honest with us.  Don't lie to us.  Don't

17  hurt our families.  Don't do these things.  It's a contract.

18  And Mr. DuPont here, he violated that contract in such an awful

19  way that's not just negligence, ladies and gentlemen.

20         I'm not going to go through this evidence again.  You

21  have it.  And I wish what you would do is start with those

22  documents I showed you.  And every one of them put on that

23  document line 1301, and you tell me that you're okay with the

24  conduct of Mr. DuPont in the way he's treated these people all

25  along the Ohio River.  Because if it's okay, the system is

1    broken.  The cynic is right.

2          THE COURT:  Thank you, Mr. Papantonio.

3          That completes closing argument.  We're going to take a

4    short break.  Then, when you come back, I will give you the

5    final legal instructions that apply in this case.  We'll be in

6    recess for ten minutes.

7          (Recess taken from 3:27 to 3:40.)

8          THE COURT:  Ladies and gentlemen of the jury:  Now

9    that you have heard the evidence and the arguments in this

10   case, the time has come for me to instruct you as to the law

11   governing in this case.  Although you, as jurors, are the sole

12   judges of the facts in this case, you are, of course, duty

13   bound to follow the law as stated in these instructions and to

14   apply the law so given to the facts as you find them from the

15   evidence before you.

16         You are not to single out any one instruction as stating

17   the law but you will consider these instructions as a whole.

18   And of course you are not to be concerned with the wisdom of

19   any rule of law because, regardless of any opinion you might

20   have as to what the law ought to be, it would be a violation of

21   your sworn duty to base a verdict upon any other view of the

22   law than that given in these instructions.

23         You have been chosen and sworn as jurors to try the

24   issues of fact presented by the allegations of the complaint

25   brought by the plaintiff, Carla Bartlett, whom I will refer to

Vol. 16 - 184

1  as the plaintiff, against DuPont, referred to as the defendant

2  in this case.

3        You are to perform this duty without bias or prejudice

4  as to either party.  The law does not permit jurors to be

5  governed by such things as sympathy, prejudice or public

6  opinion.  The parties and the public expect that you will

7  carefully and impartially consider all the evidence, follow the

8  law in these instructions and reach a just verdict regardless

9  of the consequences.

10        This case should be considered and decided by you as an

11  action between persons of equal standing in the community, or

12  equal worth, and holding the same or similar stations in life.

13  A corporation is entitled to the same fair trial as a private

14  individual.  All persons, including corporations, stand equal

15  before the law and are to be dealt with as equals in a court of

16  justice.

17        A corporation is responsible for the acts of its

18  employees, agents, directors and officers performed within the

19  scope of his or her duties as an employee of the corporation.

20        The attorneys in this case may have referred to some of

21  the governing rules of law in their closing arguments.  If,

22  however, any difference appears to you between the law as

23  stated by the attorneys and those stated in these instructions,

24  you are of course to be guided and governed by these

25  instructions.

1          I want to emphasize to you that nothing I say in these

2     instructions or have said during the course of this trial

3     should be taken by you as any indication that I have any

4     opinion about the facts of this case, what your verdicts should

5     be or what my opinion might be.  It is not my function to

6     determine the facts in the case.  That is your function and

7     yours alone.

8          The evidence in this case consists of the sworn

9     testimony of the witnesses and all of the exhibits which have

10    been received into evidence which you will have with you as you

11    deliberate.  As I mentioned to you earlier and I repeat again,

12    some things are not evidence and you must not consider them as

13    evidence in deciding the facts of this case.  That includes the

14    statements and arguments of the attorneys; questions and

15    objections of the attorneys; any testimony that I instructed

16    you to disregard; and, anything you may have seen or heard when

17    court was not in session even if what you have seen or heard

18    was done or said by one of the parties or witnesses to this

19    case.

20         Again, you are to consider only the evidence in this

21    case.  However, you are not limited to the bald statements from

22    the witnesses.  You are permitted to draw from the facts which

23    you have found proved such reasonable inferences as seem

24    justified in light of your own experience.  That is another way

25    of saying, from the facts that you find are proved, you may

1    draw an inference based upon your reason and your common sense.

2         It is the duty of lawyers to object when the other side

3    offers testimony or materials which a lawyer believes is not

4    properly admissible into evidence.  If, during the course of

5    the trial, I sustained an objection by one lawyer to a question

6    asked by another, you are to, of course, disregard the question

7    and not guess or speculate about what the answer might have

8    been.  If a question was asked and the witness answered it and

9    I later ruled you should not consider the evidence or the

10   answer, then you must disregard both the question and the

11   answer in your deliberations just as if the question and answer

12   had never been spoken.

13        There are some stipulations in this case.  Statements

14   and arguments of the lawyers are usually not evidence in the

15   case unless made as an admission or stipulation.  A stipulation

16   is simply an agreement between both sides that certain facts

17   are true.  When the lawyers on both sides stipulate or agree to

18   the existence of a fact, you must, unless instructed otherwise,

19   accept a stipulation as evidence and regard that fact as

20   proved.

21        I mentioned to you at the beginning of the case there

22   are two types of evidence from which you may properly find the

23   truth as to the facts of this case.  The first is direct

24   evidence, such as the testimony of an eyewitness.  The other is

25   indirect or circumstantial evidence, meaning the proof of a

1    chain of circumstances pointing to the existence or

2    nonexistence of certain facts.

3           As a general rule, the law makes no distinction between

4    direct or circumstantial evidence but simply requires the jury

5    find the facts in accordance with the preponderance of the

6    evidence, which we'll talk about in just a moment.

7           I used the word inference.  Inferences are deductions or

8    conclusions which reason and common sense lead you to draw from

9    the facts established by the evidence in this case.

10          You, as jurors in this case, are the sole judges of the

11   credibility or believability of the witnesses and the weight

12   their testimony deserves.  You may be guided by the appearance

13   and the conduct of the witness or by the manner in which the

14   witness testifies or the character of the testimony given or by

15   the evidence to the contrary of the testimony given.

16          You should carefully scrutinize all the testimony given,

17   the circumstances under which each witness has testified, and

18   every matter in evidence which tends to show whether a witness

19   is or is not worthy of belief.  You may consider each witness'

20   intelligence, motive, state of mind and demeanor or manner

21   while on the stand.  Consider the witness' ability to observe

22   the matters as to which he or she impresses you as having an

23   accurate recollection of those matters.  Consider also any

24   relation each witness may bear to either side of the case, the

25   manner in which each witness might be affected by the verdict

1    and the extent to which, if at all, each witness is either

2    supported or contradicted by other evidence in the case.

3           Inconsistencies or discrepancies in the testimony of a

4    witness, or between the testimony of different witnesses, may

5    or may not cause you to discredit or not believe such

6    testimony.  As I'm sure you can appreciate, two or more persons

7    witnessing an incident or transaction may see or hear it

8    differently; and innocent misrecollection, like failure of

9    recollection, is not an uncommon experience.  In weighing the

10   effect of a discrepancy, always consider whether it pertains to

11   a matter importance or an unimportant detail and whether the

12   discrepancy results from innocent error or intentional

13   falsehood.

14          After making your own judgment, you will give to the

15   testimony of each of the witnesses such weight or credibility,

16   if any, as you believe it deserves.

17          Also, the weight of the evidence is not necessarily

18   determined by the number of witnesses testifying to the

19   existence or nonexistence of any fact.  You may find that the

20   testimony of a smaller number of witnesses as to any fact is

21   more credible than the testimony of a larger number of

22   witnesses to the contrary.

23          You have also heard from witnesses who are experts in

24   particular fields because of special knowledge, education

25   and/or experience.  Such expert testimony is admitted for

1    whatever assistance it may provide to help you to reach a just

2    verdict.

3         As with any other witness, the duty of deciding what

4    weight to give the testimony of an expert witness rests upon

5    you alone.  In deciding what weight to give to an expert's

6    testimony, you may consider the expert's skill, experience,

7    knowledge, veracity and familiarity with the facts of the case.

8    You should also apply the same rules that apply to other

9    witnesses when testing the credibility of each expert witness

10   and deciding what weight to give to his or her testimony.

11        Also, the testimony of certain witnesses was presented

12   by video deposition.  You should give the testimony the same

13   consideration you would give had the witness personally

14   appeared here in court.

15        Unless I instruct you otherwise, the burden of proof in

16   this case is on the plaintiff, Mrs. Bartlett, to prove her

17   claims and any damages by a preponderance of the evidence,

18   which I will define for you.

19        Preponderance of the evidence is the greater weight of

20   the evidence.  That is, evidence that you believe because it

21   outweighs or overbalances in your mind the evidence opposed to

22   it.  A preponderance of the evidence means evidence that is

23   more probable, more persuasive or of greater probative value.

24   It is the quality of the evidence that must be weighed.

25   Quality may or may not be identical with the quantity of

1    evidence.

2          In determining whether an issue has been proved by a

3    preponderance of the evidence, you should consider all of the

4    evidence, regardless of which side produced it.

5          If it turns out the weight of the evidence in your mind

6    is equally balanced or if you are unable to determine which

7    side of an issue has the preponderance, then the party who has

8    the burden of proof has not established the issue by a

9    preponderance of the evidence.

10          When I say throughout these instructions that a party

11    has a burden of proof on any proposition or if I use the

12    expression, quote, if you find or, quote, if you decide, by

13    that I mean, you must be persuaded, considering all the

14    evidence in the case, that the proposition is more probably

15    true than not.

16          We turn now to a general statement of the issues in the

17    case.  As you know, Mrs. Bartlett alleges that DuPont used a

18    chemical known as C-8 in its Washington Works plant near

19    Parkersburg, West Virginia.  She claims from the plant -- C-8

20    from the plant entered her drinking water and caused her to

21    develop kidney cancer.  DuPont denies these allegations, denies

22    it breached a duty to Mrs. Bartlett and denies that C-8 caused

23    her kidney cancer.

24          I instruct you that before this case began, the parties,

25    DuPont and a representative of Mrs. Bartlett, agreed to have a

1    science panel study whether there was a link between C-8 and

2    kidney cancer.  The science panel conducted a study and

3    concluded in 2012 that there is a probable link between C-8 and

4    kidney cancer for persons drinking water for over one year

5    having a C-8 content of .05 parts per billion or over.

6         Following presentment of this case, I instruct you that

7    Mrs. Bartlett has conclusively established that she drank water

8    for more than one year having a C-8 content of more than .05

9    parts per billion.  Therefore, you will treat as proven in this

10   case that Mrs. Bartlett has established that C-8 is capable of

11   causing her kidney cancer.  While this fact is established, you

12   will still decide whether Mrs. Bartlett has proven all the

13   elements of her claim and that, in her case, the kidney cancer

14   was caused by C-8.

15        Mrs. Bartlett brings two claims against DuPont.  The

16   first is for negligence and the second is negligent infliction

17   of serious emotional distress.  These are the two claims you

18   will decide.  The defendant, DuPont, denies both of

19   Mrs. Bartlett's claims and you will decide each of these two

20   claims separately.

21        Now, I will explain the first claim brought by

22   Mrs. Bartlett which is a claim for negligence.  Negligence is a

23   failure to use ordinary care.  Ordinary care is the care a

24   reasonably prudent person or corporation would use in similar

25   circumstances.  Ordinary care is not an absolute term but a

Vol. 16 - 192

1  relative one viewed in the light of all the surrounding

2  circumstances.

3         To prove her claim for negligence, Mrs. Bartlett has the

4  burden of proving three elements by a preponderance of the

5  evidence:  First, that DuPont owed her a duty of care; second,

6  that DuPont breached its duty of care to her; and, third,

7  Mrs. Bartlett suffered an injury as a proximate result of

8  DuPont's breach of the duty of care.

9         I'm going to give you instructions with regard to each

10 of these three elements.

11        First, to prove the existence of a duty, Mrs. Bartlett

12 must show by a preponderance of the evidence that a reasonably

13 prudent person or corporation would have foreseen that injury

14 was likely to result to someone in Mrs. Bartlett's position

15 from DuPont's conduct.  In deciding whether reasonable prudence

16 was used, you will consider whether DuPont should have

17 foreseen, under the circumstances, that the likely result of an

18 act or a failure to act would cause injuries.  The test for

19 foreseeability is not whether DuPont should have foreseen the

20 injuries exactly as it happened to Mrs. Bartlett.  The test is

21 whether, under the circumstances, a reasonably prudent

22 corporation would have anticipated that an act or a failure to

23 act would likely cause injuries.

24        If you find that DuPont owed Mrs. Bartlett a duty, you

25 must then determine whether DuPont breached that duty.  A

1  corporation breaches a duty by failing to use ordinary care.

2  As I've just instructed, ordinary care is the care that a

3  reasonably careful corporation would use under the same

4  circumstances.

5       If you decide that DuPont did not use ordinary care,

6  then DuPont breached its duty of care to Mrs. Bartlett.  If you

7  decide that DuPont did use ordinary care, then DuPont did not

8  breach its duty of care to Mrs. Bartlett.

9       Mrs. Bartlett must prove not only that DuPont was

10 negligent but also that such negligence was a proximate cause

11 of her injuries.  Proximate cause is an act or failure to act

12 that was a substantial factor in bringing about an injury and

13 without which the injury would not have occurred.

14      I will now discuss how to determine whether

15 Mrs. Bartlett's injury was the natural and probable consequence

16 of DuPont's conduct.  To prove proximate cause, Mrs. Bartlett

17 must show that her injuries were a natural and probable

18 consequence of DuPont's conduct.

19      For Mrs. Bartlett's injuries to be considered the

20 natural and probable consequence of an act, Mrs. Bartlett must

21 prove that DuPont should have foreseen and reasonably

22 anticipated that injury would result from the alleged negligent

23 act.  The test for foreseeability is not whether DuPont should

24 have foreseen the exact injury as it happened to Mrs. Bartlett.

25 Instead, the test is whether, under the circumstances, a

1    reasonably careful person or corporation would have anticipated

2    that an act or failure to act would likely result in or cause

3    injuries.

4         You've now heard the relevant law applicable to

5    Mrs. Bartlett's negligence claim.  If you find by a

6    preponderance of the evidence that DuPont negligently and

7    proximately caused injury to Mrs. Bartlett, then your verdict

8    will be for Mrs. Bartlett.  However, if you find that

9    Mrs. Bartlett failed to prove any of the following:  First,

10   that DuPont owed her a duty; second, that DuPont breached the

11   duty; and, third, DuPont's negligence proximately caused her

12   injuries, then your verdict on the negligence claim must be for

13   DuPont.

14        The second claim Mrs. Bartlett brings is for negligent

15   infliction of serious emotional distress.  In order for her to

16   recover on this claim she must prove by the preponderance of

17   the evidence the following four elements.  First, that DuPont

18   was negligent; second, that she suffered serious emotional

19   distress; third, that her serious emotional distress was the

20   proximate result of the negligence of DuPont; and, fourth, that

21   the serious emotional distress of Mrs. Bartlett was reasonably

22   foreseeable by DuPont.

23        I used a term serious emotional distress.  That includes

24   the increased fear of developing cancer if Mrs. Bartlett is

25   aware that she, in fact, possesses an increased statistical

```
 1    likelihood of developing cancer and that from this knowledge

 2    springs a reasonable apprehension which manifests itself as

 3    emotional distress.

 4         In determining whether a serious emotional distress was

 5    reasonably foreseeable by DuPont, you should consider all of

 6    the circumstances of the parties as existing at the time of the

 7    alleged negligence of DuPont.

 8         If you find that Mrs. Bartlett has proved by the greater

 9    weight of the evidence all of the elements I just mentioned of

10    negligent infliction of serious emotional distress, then your

11    verdict on the negligent infliction of serious emotional

12    distress claim must be for Mrs. Bartlett.  However, if you find

13    that she has failed to prove by the greater weight of the

14    evidence any one or more of those elements of negligent

15    infliction of serious emotional distress, then your verdict on

16    this claim must be for DuPont.

17         I'm now going to instruct you on the law of damages as

18    it relates to Mrs. Bartlett's claims.  If you find in favor of

19    Mrs. Bartlett on either of her claims, then you will determine

20    the issue of damages.  As you can guess at this point, I have

21    no way of knowing what your verdict would be.  So the fact that

22    I'm instructing you as to the proper measure of damages should

23    not be considered as indicating any view of mine as to which

24    party is entitled to your verdict.  Instructions as to the

25    measure of damages are given for your guidance only in the
```

1  event you find in favor of Mrs. Bartlett by a preponderance of

2  the evidence in accordance with these instructions.

3      You are instructed that damages are not to be presumed

4  nor may they be based upon speculation or guesswork.  They must

5  be proven to you.  You must also understand that the burden is

6  on Mrs. Bartlett to prove by the greater weight of the evidence

7  each element of damage that she claims.  Unless such item or

8  element claimed is proven by a preponderance of the evidence,

9  then Mrs. Bartlett cannot recover damages on that element of

10  damage.

11      Mrs. Bartlett should neither be undercompensated or

12  overcompensated for her injury.  You must arrive at a

13  reasonable and just award in view of the evidence.  You are in

14  no way bound by, nor should you use, any type of rigid

15  mathematical formula.  The determination of damages is solely

16  your function to determine, not the function of the counsel or

17  of the Court, and must be based on proper evidence.

18      If you find for Mrs. Bartlett, you will decide by the

19  greater weight of the evidence an amount of money that will

20  reasonably compensate her for the actual injury proximately

21  caused by DuPont's negligence and/or negligent infliction of

22  serious emotional distress.  In deciding this amount, you will

23  consider four factors.  First, the nature and the extent of

24  injury; second, the effect upon physical health; third, the

25  pain and suffering experienced; and, fourth, the ability or

1    inability to perform usual activities.

2        From these, you will determine what sum will compensate

3    her for injury to this date. In this case, you may not

4    consider lost wages, salary or other compensation when

5    determining damages because Mrs. Bartlett has not asserted a

6    claim for these types of damages. Nor may you consider the

7    cost of any future medical care that Mrs. Bartlett may require,

8    again, because Mrs. Bartlett has not made a claim for such

9    types of damages.

10       Mrs. Bartlett claims that she will experience pain or

11   disability in the future. As to such claims, no damage may be

12   found except that which is reasonably certain to exist as a

13   proximate result of the injury.

14       Again, you are not to speculate regarding future

15   damages. The law deals in probabilities and not possibilities.

16   So in determining future damages, you may only consider those

17   things that you find from the evidence are reasonably certain

18   to occur in the future. Reasonably certain, as I used that

19   term, means probable, meaning more likely than not to occur.

20       With reference to an amount of an award, if any, you are

21   to follow these instructions as already given. Among other

22   things, as I have instructed you, in determining her future

23   damages, if any, you are not to consider the cost of any

24   medical tests or screening that Mrs. Bartlett may have to

25   undergo in the future but rather, the cost of pain or

1  disability she is reasonably certain to experience as a

2  proximate result of the injury.

3       Finally, you may not consider any federal, state or city

4  income taxes in determining damages.  In no event may you add

5  to or subtract from an award because of a possibility of such

6  taxes.

7       You will be presented also with an interrogatory.

8  That's a question in writing that will ask you whether you

9  found in favor of Mrs. Bartlett on either of her claims.  If

10  you find for Mrs. Bartlett, you will then be asked whether

11  Mrs. Bartlett proved by clear and convincing evidence whether

12  DuPont acted with actual malice and whether Mrs. Bartlett has

13  presented proof of actual damages that resulted from those acts

14  or failure to act on the part of DuPont.

15       I used the term clear and convincing evidence which is

16  different than a preponderance of the evidence.  It applies in

17  only this part of the case.  Clear and convincing means that

18  evidence producing in your minds a firm belief or conviction

19  about the facts to be proved.  It must be more than evidence

20  simply that outweighs or overbalances the evidence opposed to

21  it.

22       The question will also refer you to the term malice.

23  Malice is defined as a conscious disregard for the rights and

24  safety of other persons that has a great probability of causing

25  substantial harm.  Malice may be inferred from conduct and

1    surrounding circumstances.

2        That concludes the part of my instructions explaining

3    the rules you will consider in evaluating the testimony and

4    evidence.  I'm going to finish up by giving some further

5    explanation about your deliberations in the jury room and about

6    your possible verdicts.

7        The first thing you should do as you retire to the jury

8    room to deliberate is to choose someone to be your foreperson.

9    The foreperson will act as the chairperson of the meeting and

10   will be your spokesperson here in court.  He or she must see to

11   it that the charges and the issues are taken up as given to

12   you, that everyone has a chance to speak their minds and that

13   your deliberations proceed in an orderly fashion.

14       Your verdict must be unanimous.  All of you must agree.

15   After you have arrived at a verdict, the foreperson and the

16   jurors will sign the verdict forms on the lines as indicated.

17   I will read them to you in just a moment.  Once you start

18   deliberating, do not talk to anyone else outside of the jury

19   room including the court security officer, the deputy clerk, to

20   me or anyone else but you are free to talk to each other about

21   the case during deliberations.  If you have any questions or

22   messages, please write them down on a piece of paper, signed by

23   any of you, and then give them to the court security officer

24   who will then give the question to me and I will respond to you

25   as soon as I can.  It may be that I will talk to the lawyers

1    about the question you have asked so it may take a few moments

2    to get an answer to you.  Normally, any questions or messages

3    should be sent through your foreperson, although that is not a

4    strict requirement.

5         You've heard a lot of reference to exhibits.  You've

6    seen many of them.  You will have copies of each of them with

7    you in the jury room as you deliberate.

8         If you do send a message, do not write down or tell

9    anyone outside the jury room how you stand on your votes.  For

10   example, do not indicate that you are split a certain way or

11   what your vote happens to be.  That should all stay

12   confidential until you are finished.

13        So now that all of the evidence is in and the arguments

14   have been completed, when you go to the jury deliberation room,

15   you will be free to talk about this case.  In fact, it is your

16   duty to talk with each other about the evidence and to make

17   every reasonable effort you can to reach a unanimous verdict.

18   Talk with each other, listen carefully and respectfully to each

19   other's views and keep an open mind as you listen to what your

20   fellow jurors have to say.  Try your best to work out your

21   differences and do not hesitate to change your mind if you are

22   convinced that other jurors are right and perhaps your original

23   position was wrong.  And I mention again, your verdict must be

24   unanimous.

25        I want to emphasize to you, do not ever change your mind

1    just because other jurors see the case differently or just to

2    be finished with this case.  In the end, your vote must be your

3    vote.  It is important for you to reach unanimous agreement but

4    only if you can do so honestly and in good conscience.

5         So, again, listen carefully to what other jurors have to

6    say and then decide for yourself if the plaintiff has proven

7    her claim by a preponderance of the evidence with regard to

8    each claim.  And remember that if you have taken notes, the

9    notes are for your personal use and should not be shared with

10   other jurors.  The reason for that is, it is important that

11   each of you relies solely upon your recollection of the

12   testimony in this case and not upon another juror's notes.

13        I also emphasize that no one will be allowed to hear

14   your discussions in the jury room and no record will be kept of

15   your discussions.  The whole idea is that you should feel free

16   to openly speak your mind about this case.

17        You will have with you the verdict forms.  And these

18   you've seen a little glimmer of in the closing arguments but I

19   will read them to you.  It has the name of the case on here.

20   The first is the jury verdict form of the negligence claim.  It

21   asks a simple question.  Do you find in favor of Mrs. Bartlett

22   on her negligence claim?  There's a box for yes and there's a

23   box for no.  You will mark but one of the two boxes and then

24   each of you will sign the document.

25        It's also straightforward.  If your answer is yes, if

1   you found for Mrs. Bartlett, then you'll answer the second

2   question which reads, quote, if you found in favor of

3   Mrs. Bartlett, what damages, if any, do you find Mrs. Bartlett

4   is entitled to on her negligence claim?  You will insert an

5   amount.  You'll all agree on that amount as well.  If your

6   answer is no, you of course won't fill that out.

7        The second form is similar.  The second claim reads, the

8   jury verdict form for negligent infliction of serious emotional

9   distress claim.  The question reads, do you find in favor of

10  Mrs. Bartlett on her negligent infliction of emotional distress

11  claim?  Again, there's a yes box and a no box.  You'll mark one

12  of the two.  All of you must agree and all of you will sign.

13       The form also indicates, if you answered yes, keep going

14  to the damage question.  If you answered no, then the form is

15  completed.

16       If you answer yes, the form asks this question.  If you

17  found in favor of Mrs. Bartlett, what damages, if any, do you

18  find Mrs. Bartlett is entitled to on her negligent infliction

19  of emotional distress claim?  You'll insert an amount all of

20  you will have to agree upon.

21       The third verdict form asks you sort of a collective

22  question.  There are two claims and this question reads as

23  follows:  If you found that Mrs. Bartlett was entitled to

24  damages on either of her claims, what is the total sum of the

25  amount of damages you found Mrs. Bartlett is entitled to

1    without duplicating any damages?  You'll insert an amount.

2    Again, you'll only answer this if you found in favor of

3    Mrs. Bartlett on either of the two claims, or both, and then

4    you'll all have to agree and sign the form.

5         The fourth form is captioned jury verdict interrogatory.

6    It reads as follows:  If you found in favor of Mrs. Bartlett on

7    either of her claims, do you find that Mrs. Bartlett has proven

8    by clear and convincing evidence that DuPont acted with actual

9    malice and that Mrs. Bartlett has presented proof of actual

10   damages that resulted from those acts or failures to act of

11   DuPont?  And you will mark yes or no.  You'll check one of the

12   boxes.  Again, all of you must agree.

13        Remember, you have to make your decision based only on

14   the evidence that you've heard here in court together with the

15   exhibits.  Do not try to gather any more information about the

16   case on your own while you're deliberating.

17        For example, do not conduct any experiments inside or

18   outside the jury room.  Do not bring any books such as a

19   dictionary or anything else such as a computer with you to help

20   you with your deliberations.  Again, do not conduct any

21   independent research, writing or investigation about the case

22   and do not visit any places that were mentioned during the

23   trial.

24        During your deliberations, you must not communicate with

25   or provide any information to anyone by any means concerning

1   this case.  You may not use any type of electronic device or

2   medium such as a cell phone, telephone, smart phone,

3   BlackBerry, iPhone, computer, et cetera, and you may not use

4   any sort of social media such as Facebook, LinkedIn, MySpace,

5   YouTube or Twitter to communicate anything about this case

6   until your verdict is accepted.

7        Again, make your decision only on the evidence presented

8   here in court together with the exhibits.

9        Again, I want to conclude by cautioning you that nothing

10  I've said in these instructions or said throughout the trial

11  should be taken by you as any indication of how I think your

12  verdict should be returned.  When you arrive at a verdict, you

13  will notify the court security officer and he will notify me as

14  well.

15       The instructions I have just given to you will be also

16  given to you in writing.  These instructions will be contained

17  in a three-ring binder and will be placed in the charge of your

18  foreperson.  You are invited to use these instructions.

19  There's an index in the beginning and you can use the

20  instructions in any way that will assist you.  You may pass

21  these instructions from juror to juror but I ask that you not

22  remove any single page or pages from the binder because I want

23  you to consider these instructions as a whole and not as one

24  page representing anything that would cause you not to consider

25  the remaining pages.

1          Again, there's a table of contents that you can use.

2          We're ready to go to the jury room to deliberate but

3     there's one more matter I want to bring to your attention to

4     has to do with schedule.

5          I've tried to keep to a 9:00 to 5:00 schedule and that's

6     what we've done up to this point.  Once the case is submitted

7     to all of you, that's going to be up to you.  We can continue

8     on a 9:00 to 5:00 but I will do -- we only have about 40

9     minutes today.  How long you take on this case is entirely up

10    to you.  But what I will do at five o'clock is bring you back

11    in here and ask you if you're ready to recess.  Only if all of

12    you would wish, you can stay later any night that you're here

13    or we can recess at 5:00.  When you come back, if you come back

14    tomorrow, you have to all be here to begin deliberations.

15    We'll keep the door open just so you'll know physically you're

16    not to begin deliberation until you're all present.

17         So with that, you are ready to deliberate and you'll be

18    taken back to the jury room.

19       (Thereupon, the jurors exit the courtroom to begin

20    deliberation at 4:19 p.m.)

21          THE COURT:  Counsel, as we discussed, you don't have

22    to all be here during the deliberations but I do want one

23    attorney from each side who has full authority to speak for

24    each client in the event there's a question or some other

25    matter that develops during the course of deliberations.  As I

1  mentioned to the jurors, I'll bring them back in at 5:00 and

2  see if they would -- my guess is they'll want to go home

3  at 5:00 but we'll see for some reason they want to stay over,

4  I'm inclined to let them.  That may be more of an option as we

5  go further into a day or two of deliberations.

6        Any other matters we need to take up?

7        MR. MACE:  Your Honor, I take it we fully preserved

8  all of our prior objections on the jury instructions and other

9  issues?

10        THE COURT:  And those are noted.  So I make that part

11  of the record.

12        From the plaintiff?

13        MR. PAPANTONIO:  Nothing, Your Honor.

14        THE COURT:  All right.  Scheduling for tomorrow.  I

15  normally invite counsel in for coffee while the jury is out

16  before anybody knows the verdict.  I'm doing a Naturalization

17  at 10:00.  I'm thinking right after that.  So about 10:45, why

18  don't we plan on getting together in my chambers.

19        With that, we'll be in recess.

20     (A recess was taken at 4:21 p.m. until 5:00 p.m.)

21     (Thereupon, the jurors enter the courtroom.)

22        THE COURT:  So, ladies and gentlemen, we're up to five

23  o'clock.  With a show of hands, who would like to go home at

24  this point?  Everybody.  You are unanimous.  Good.

25        So we'll come back tomorrow at 9:00.  If you're all

Vol. 16 - 207

1    here, you can start earlier.  But if not, wait until everybody

2    is here and then you'll be able to begin your deliberations.

3    Add then, again, you'll set the schedule.  I'm going to assume

4    it's 9:00 to 5:00 again, but if you decide differently, just

5    let me know and we'll adhere to that.

6        Remember all at admonitions we've talked about.  I don't

7    need to repeat them.  Keep those in mind and then you'll be

8    back to begin your deliberations at nine o'clock.  Have a nice

9    evening.

10     (Thereupon, the jurors exit the courtroom).

11      THE COURT:  I note the courtroom looks so clean all of

12    a sudden.

13      Are there any other matters we need to take up before we

14    recess for the day?

15      MR. MACE:  Not on behalf of the defense, Your Honor.

16      MR. PAPANTONIO:  Not on behalf of Plaintiffs, Your

17    Honor.

18      THE COURT:  Have a nice evening.  We'll see you

19    tomorrow.

20     (The proceedings were adjourned at 5:02 p.m.)

21                - - -

22

23

24

25

Vol. 16 -  208

1                    C E R T I F I C A T E

2

3          We, Lahana DuFour and Shawna Evans, Official Court

4    Reporters of the United States District Court for the Southern

5    District of Ohio, do hereby certify that the foregoing

6    constitutes a true and complete transcription of our

7    stenographic notes taken of the proceedings held in the

8    afore-captioned matter on the 6th day of October, 2015.

9          In testimony whereof, we hereunto set our hand on the

10   13th day of October, 2015.

11

12

13                         s/Lahana DuFour, RMR, CRR
                           Lahana DuFour, RMR, CRR
14                         Official Court Reporter
                           Southern District of Ohio
15

16

17                         s/Shawna Evans, RMR
                           Shawna Evans, RMR
18                         Official Court Reporter
                           Southern District of Ohio
19

20

21

22

23

24

25