UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

Civil Action 2:13-md-2433
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth Preston Deavers

This document relates to:

*Bartlett v. E. I. du Pont de Nemours and Company*, Case No. 2:13-CV-170

DISPOSITIVE MOTIONS ORDER NO. 12

Defendant's Motion for Judgment as a Matter of Law or, Alternatively, for a New Trial and Remittitur on Plaintiff Carla Bartlett's Claims

This matter is before the Court on the Renewed Motion for Judgment as a Matter of Law or, Alternatively, for a New Trial and Remittitur on Plaintiff Carla Bartlett's Claims ("Post Trial Motion") of Defendant E. I. Du Pont de Nemours and Company ("DuPont"), Mrs. Bartlett's Memorandum in Opposition, and DuPont's Reply.  (ECF Nos. 151, 158, 159 in Case No. 2:13-CV-0170.[1])  For the reasons set forth below, the Court **DENIES** DuPont's Motion.

## I.    BACKGROUND

Mrs. Bartlett's case was the first to go to trial of the over 3500 cases that make up this multidistrict litigation ("MDL").  The Judicial Panel on Multidistrict Litigation describes the cases in its Transfer Order as follows:

All the actions are personal injury or wrongful death actions arising out of plaintiffs' alleged ingestion of drinking water contaminated with a chemical, C-8

---

[1] All documents filed in Mrs. Bartlett's individual case, 2:13-cv-170, will be identified as filed at "Bartlett ECF No."

(also known as perfluorooctanoic acid (PFOA) or ammonium perfluorooctanoate (APFO)), discharged from DuPont's Washington Works Plant near Parkersburg, West Virginia. All of the plaintiffs in this litigation allege that they suffer or suffered from one or more of six diseases identified as potentially linked to C-8 exposure by a study conducted as part of a 2005 settlement ["*Leach* Settlement Agreement"] between DuPont and a class of approximately 80,000 persons residing in six water districts allegedly contaminated by C-8 from the Washington Works Plant. *See Leach v. E. I. Du Pont de Nemours & Co.*, No. 01-C-608 (W. Va. Cir. Ct. [(Wood County Aug. 31, 2001), ("*Leach* Case")].

(Transfer Order at 1, ECF No. 1 in Case No. 2:13-md-2433[2].) DuPont utilized C-8 as a

manufacturing aid in the production of Teflon[TM].

Mrs. Bartlett's trial began on September 14, 2015, and lasted nearly a month. The jury

returned a verdict in favor of Mrs. Bartlett for a total of $1.6 million dollars.

A.    **The *Leach* Case**

As indicated by the Judicial Panel in its Transfer Order, the cases that make up this MDL

are a subset of cases that originated in the *Leach* Case. The *Leach* Case was brought by a group

of individuals who alleged a variety of claims under West Virginia common law tort theories for

equitable, injunctive, and declaratory relief, along with compensatory and punitive damages, as a

result of alleged drinking water contamination.

On April 10, 2002, the West Virginia trial court ("*Leach* Court") granted the plaintiffs'

motion for class certification and certified a class:

[O]n behalf of a class of all persons whose drinking water is or has been contaminated with ammonium perfluorooctanoate (a/k/a/ "C-8") attributable to releases from DuPont's Washington Works plant (hereinafter "the Class") with respect to all issues relating to [DuPont's] underlying liability and Plaintiffs' claims for equitable, injunctive, and declaratory relief, including liability for punitive damages; all damage issues involving any determination of individual harm of the Class members and the amount of any punitive damages are hereby STAYED and RESERVED for later litigation. . . .

_____

[2] All documents filed on the MDL main docket, 2:13-md-2433, will be identified as filed at "MDL ECF No."

2

*Leach v. E. I. Du Pont de Nemours & Co.*, No. 01-C-608, 2002 WL 1270121, at *1 (W. Va. Cir. Ct. April 10, 2002).

After three years of litigation, involving extensive discovery and motion practice, including three issues taken to the West Virginia Supreme Court of Appeals, the parties executed the *Leach* Settlement Agreement to effectuate a class-wide settlement of the *Leach* Case. (*Leach* Settlement Agreement "S.A.," MDL ECF No. 820-8.) On February 28, 2005, following appropriate class-wide notice, objection opportunities, full opt-out opportunities, and a final fairness hearing, the *Leach* Court entered a final order approving the *Leach* Settlement Agreement. (MDL ECF No. 820-9.)

In the *Leach* Settlement Agreement, the parties fashioned a unique procedure to determine whether the nearly 80,000 individual class members would be permitted to file actions against DuPont based on any of the human diseases they believed had been caused by their exposure to C-8. The procedure required DuPont and the plaintiffs to jointly select three completely independent, mutually-agreeable, appropriately credentialed epidemiologists ("Science Panel") to study human disease among the residents exposed to C-8 by the discharges from DuPont's Washington Works plant. (*Leach* Settlement Agreement "S.A." at §§ 12.2.1, 12.2.2; MDL ECF No. 820-8.) The parties selected Tony Fletcher, Ph.D. of the London School of Hygiene and Tropical Medicine, David Savitz, Ph.D., M.S., of Brown University, and Kyle Steenland, Ph.D., Ph.D., M.S. of Emory University as the Science Panel. (http://www.c8sciencepanel.org/members.html.)

The *Leach* Settlement Agreement defines the Science Panel's task as follows:

The Science Panel shall develop and approve, by a vote of at least two members of the Science Panel, a protocol for a study of Human Disease among residents exposed to C-8 in the communities served by the Public Water Districts[3] and

---

[3] (S.A. § 2.1.1; Schedule 2.1.1(A)) (specifying the six Public Water Sources).

Covered Private Sources[4] and shall have the responsibility for conducting such study in accordance with such protocol (the "Community Study").

(S.A. § 12.2.2) (footnotes added).

Pursuant to these instructions, the Science Panel established a protocol and studied numerous human diseases, examining health data and blood samples from approximately 69,000 individuals exposed to C-8 in the communities served by the water districts whose water had been contaminated with C-8 released from DuPont's Washington Works plant. (http://www.c8sciencepanel.org/c8health.html) ("The Science Panel, as part of the Community Study, received the anonymised and non-identifiable health data collected by Brookmar [in the C-8 Health Project] to examine and analyze as part of its work."). DuPont paid the entire cost of the study which was more than $20 million dollars. (S.A. § 9.1.)

The *Leach* Settlement Agreement provided that the conclusions of the Science Panel's study would be issued in either a "Probable Link Finding" or a "No Probable Link Finding" for each human disease the Panel studied. (S.A. § 12.2.3.) "[T]he Probable Link reports [are] presented in detail in scientific articles (follow link [on the C-8 Science Panel website to the] Study Publications)." (http://www.c8sciencepanel.org/study.html.) With regard to its studies, the Science Panel explained:

> In many cases a study requires a team of investigators, but in all studies a member of the Science Panel is overseeing the conduct of each specific study. The studies are listed below, each with the Science Panelist lead in parenthesis:
>
> 1. Cholesterol, Diabetes, Uric Acid, and C8 Levels among Participants in the C8 Health Project (K Steenland)

---

[4] (S.A. § 2.1.1; Schedule 2.1.1(B)) (listing the Covered Private Sources, which are defined in § 2.1.1 of the *Leach* Settlement Agreement as "private water source within the geographic boundaries of the Public Water Districts that is the individual's sole source of drinking water at the location").

4

2. Cross Sectional Study of C8 and Immune Function, Hematopoietic Function, Liver, Kidney, and Endocrine Disorders and Cancer Prevalence - A Prevalence Study among Participants in the C8 Health Project. (T Fletcher)

3. Community Follow-up Study (K Steenland)

4. Worker Follow-up Study (K Steenland)

5. The Study of Birth Outcomes in the Mid-Ohio Valley (D Savitz)

6. The Study of Birth Outcomes among the C8 Health Project Participants (D Savitz)

7. The Geographic Patterns of Cancer Study (T Fletcher)

8. Short Term Follow-up Study of C8 and Immune, Liver, Kidney and Endocrine Function (T Fletcher)

9. Exposure Study (K Steenland)

10. Half-life Study (K Steenland)

11. Study of C8 and Neurobehavioral Development among Children from the C8 Health Project (D Savitz)

(http://www.c8sciencepanel.org/study.html.)

In 2011 and 2012, the Science Panel delivered Probable Link Findings for the following six human diseases ("Linked Diseases"):  kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, diagnosed high cholesterol (hypercholesterolemia), and pregnancy-induced hypertension and preeclampsia.  The *Leach* Settlement Agreement defines "Probable Link Finding" as follows:

> "Probable Link" shall mean that based upon the weight of the available scientific evidence, it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members.

(S.A. § 1.49.)

Also in 2011 and 2012, the Science Panel delivered No Probable Link Findings for the human diseases of rheumatoid arthritis, lupus, type 1 diabetes, Chrohn's disease, multiple

5

sclerosis, Parkinson's disease, liver disease, stroke, osteoarthritis, attention deficit disorders and learning disabilities in children, chronic kidney disease, asthma, chronic obstructive airways disease, common infections such as influenza, thyroid cancer, liver cancer, pancreatic cancer, breast cancer, prostate cancer, melanoma, preterm birth or low birth weight, miscarriage or stillbirth, and birth defects.

Because the Science Panel delivered a Probable Link Finding as to the six Linked Diseases, the *Leach* Settlement Agreement permits the individual class members to pursue the claims "for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims, that . . . relate to exposure to C-8 of Class Members" and *DuPont agreed not to contest general causation in those actions*. (S.A. § 3.3) (emphasis added). DuPont *retained the right to contest specific causation* and to assert any other defenses not barred by the *Leach* Settlement Agreement. Section 3.3 of the *Leach* Settlement Agreement provides in relevant part:

> Upon delivery of any Probable Link Finding to the Administrator, [DuPont] agrees that, in any personal injury or wrongful death action brought by, on behalf of, or otherwise pertaining to a Class Member, [DuPont] will not contest the issue of General Causation between C-8 and any Human Disease(s) as to which a Probable Link Finding has been delivered, but reserves the right to contest Specific Causation and damages as to any individual Class Member or plaintiff and to assert any other defenses not barred by this Agreement. . . .

(S.A. § 3.3.)

> The parties defined general and specific causation as follows:

> "General Causation" shall mean that it is probable that exposure to C-8 is capable of causing a particular Human Disease.

> . . . .

6

"Specific Causation" shall mean that it is probable that exposure to C-8 caused a particular Human Disease in a specific individual.

(S.A. §§ 1.25, 1.60.)

Alternatively, the *Leach* Settlement Agreement provided that if the Science Panel

delivered a No Probable Link Finding (*i.e.*, that it is not more likely than not there is link

between exposure to C-8 and a particular human disease among the *Leach* Class), the individual

class members are forever barred from bringing personal injury or wrongful death claims against

DuPont based on injury or death allegedly resulting from those human diseases. Another portion

of Section 3.3 of the *Leach* Settlement Agreement addresses this issue:

> [T]he Named Plaintiffs on their own behalf and on behalf of the Class Members, *release and forever discharge [DuPont]* from any and all claims, losses, damages, attorneys' fees, costs, and expenses, whether asserted or not, accrued or not, known or unknown, for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims, that: (a) relate to exposure to C-8 of Class Members from any and all pathways including, but not limited to, air, water and soil; (b) are based on the same factual predicate as raised in the Lawsuit; and (c) *relate to any Human Disease for which the Science Panel has delivered a No Association Finding or No Probable Link Finding* to the Administrator as described in Section 12.2.3 (collectively the "Conditionally Released Claims"). This release is intended to include the release of unknown and unsuspected claims, as well as any claim or right obtained by assignment. . . .

(S.A. § 3.3.)

After the Science Panel delivered its Probable Link Findings and No Probable Link

Findings, the individual class members whose claims are based on one or more of the Linked

Diseases began to file cases in West Virginia and Ohio. DuPont moved the United States

Judicial Panel on Multidistrict Litigation for centralization of these individual actions pursuant to

28 U.S.C. § 1407. The Judicial Panel granted DuPont's request and on April 9, 2013, it

transferred the centralized action to this Court. Ultimately, 3,542 cases were filed in or

transferred to this Court as part of this MDL. Through a negotiated process, the parties chose,

and this Court approved, five plaintiffs whose cases would serve as bellwether trials, the first of which was Mrs. Bartlett's.

## B.      Mrs. Bartlett's Case

Mrs. Bartlett suffered from renal cell carcinoma (kidney cancer) that she claims was caused by her ingestion of drinking water contaminated with C-8. Mrs. Bartlett began drinking the water contaminated with C-8 in 1983 and was diagnosed with kidney cancer in 1997. (Expert Report of David L. MacIntosh at 7, MDL ECF No. 2702-2) (opining that Mrs. Bartlett drank water with sufficient C-8 content to be considered a *Leach* Class member). In Dispositive Motions Order ("DMO") 3 the Court determined that Ms. Bartlett's case would be tried under the law of Ohio. (DMO 3, Choice of Law; MDL ECF No. 3551.) DuPont moved for summary judgment on all of the claims brought by Mrs. Bartlett and only her claims for negligence, battery, negligent infliction of serious emotional distress ("NISED"), and punitive damages survived DuPont's motions. (DMO 4, Def.'s Mot. for Partial Summ. J. on "Inapplicable Claims," MDL ECF No. 3973; DMO 5, Def.'s Mot. for Summ. J. Related to Specific Causation, MDL ECF No. 4113; DMO 7, Def.'s Mot. for Summ. J. on Punitive Damages, MDL ECF No. 4185; DMO 9, Def.'s Mot. for Summ. J. on Fraud and Emotional Distress, MDL ECF No. 4211).

Mrs. Bartlett brought those claims to trial before a jury. At the close of Mrs. Bartlett's case-in-chief, DuPont moved for judgment as a matter of law on Mrs. Bartlett's claims and provided the Court with a written motion ("Rule 50 Motion"). (Trial Tr. Vol. 9 at 189–206, Bartlett ECF No. 131-1.) The Court recessed to review DuPont's Rule 50 Motion and had it filed on the docket. (MDL ECF No. 4227.) The Court reconvened and took oral argument on DuPont's Rule 50 Motion. (Trial Tr. Vol. 9 at 190, Bartlett ECF No. 131-1.) From the bench the Court denied DuPont's Rule 50 Motion as it related to Mrs. Bartlett's negligence, NISED,

and battery[5] claims.  *Id.* at 206.  The Court concluded that there had been no change in the evidence offered since it had issued its decisions on summary judgment with regard to those claims.  That is, Mrs. Bartlett presented evidence that raised genuine issues of material fact as to each of the claims at the summary judgment juncture and had done the same at trial.

The Court, however, indicated that it would take under consideration DuPont's Rule 50 Motion and as it related to Mrs. Bartlett's punitive damages claim, permit the parties to fully brief the issue, and issue a written decision.  Once fully briefed, (MDL ECF Nos. 4227, 4229, 4230), the Court issued its decision in which it denied DuPont's Rule 50 Motion as it related to the punitive damages claim.  (DMO 11, Def.'s Rule 50 Mot. on Punitive Damages, MDL ECF No. 4235.)  DuPont does not appeal that decision.

Mrs. Bartlett's claims for negligence and NISED went to the jury on October 7, 2015.  (Bartlett ECF No. 141.)  The jury returned a $1.1 million verdict in favor of Mrs. Bartlett on her negligence claim and a $500,000 verdict in her favor on her NISED claim.  (Jury Verdict Form, Bartlett ECF No. 142.)  The jury marked "no" on the interrogatory that asked if it found "that Mrs. Bartlett has proven by clear and convincing evidence that DuPont acted with actual malice and that Mrs. Bartlett has presented proof of actual damages that resulted from those acts or failures to act of DuPont."  *Id.* at 4.  Thus, the trial did not enter the second phase on punitive damages.

DuPont now, as it must to preserve its arguments for appeal, has filed its Post Trial Motion.  (Bartlett ECF No. 151.)  In its Post Trial Motion, DuPont renews its motion for judgment as a matter of law on Mrs. Bartlett's negligence claims, or alternatively, for a new trial and/or remittitur of the amount awarded to Mrs. Bartlett by the jury.  That motion is ripe for review.  (Bartlett ECF No. 158, 159.)

---

[5] Before the case was submitted to the jury, Mrs. Bartlett withdrew her claim for battery.

## II.    JUDGMENT AS A MATTER OF LAW

DuPont contends that it is entitled to judgment as a matter of law on Mrs. Bartlett's

claims for negligence and NISED because there was no legally sufficient evidentiary basis for

the jury to find in her favor.  Both of those claims were brought under the law of Ohio.

### A.    Standard

"In federal court diversity cases, [the Sixth C]ircuit adheres to the minority rule that state

law governs the standard for granting motions for directed verdicts and judgments

notwithstanding the verdict."  *Mannix v. Cnty. of Monroe*, 348 F.3d 526, 531 (6th Cir. 2003)

(quoting *J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1482 (6th Cir. 1991)).

The Ohio Supreme Court explains:

> When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

*Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St. 3d 677, 679 (1998).

The *Texler* court continued its explanation, stating:

> The law in Ohio regarding directed verdicts is well formulated.  In addition to Civ.R. 50(A), it is well established that the court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion. . . .  Thus, 'if there is substantial competent evidence to support' the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied.

*Id.* (citations omitted)

Finally, the *Texler* court articulated the "reasonable minds" test:

> In *Wagner*, we stated that "'[t]he reasonable minds' test of Civ.R. 50(A)(4) calls upon the court only to determine whether there exists any evidence of substantial probative value in support of [the claims of the party against whom the motion is directed].

10

*Id.* at 679–80.

**B.    Negligence**

This Court set out the applicable law on Mrs. Bartlett's negligence claim in DMO 6:

> To establish a claim for negligence under Ohio . . . law, a plaintiff must allege facts showing: (1) the defendant owed him or her a duty of care; (2) the defendant breached that duty of care; and (3) as a direct and proximate result of the defendant's breach, the plaintiff suffered injury. *Menifee v. Ohio Welding Prods., Inc.*,15 Ohio St.3d 75, 77 (1984); *Strahin v. Cleavenger*, 216 W. Va. 175, 183 (2004), [(citation omitted)]  "In Ohio . . . the existence of a duty derives from the foreseeability of the injury, which usually depends upon the defendant's knowledge. *Menifee*, 15 Ohio St. 3d at 77 [(citations omitted)]. [T]he "test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Menifee*, 15 Ohio St.3d at 77.

(DMO 6 at 6–7, Pl.'s Mot. for Summ. J. on Duty, MDL ECF No. 4184) (alterations added). Based on this law, the Court instructed the parties that "in Mrs. Bartlett's trial the question for the jury on duty is '[w]hether a reasonably prudent person would have anticipated that an injury was likely to result from' DuPont's release of C-8 from the Washington Works plant."  *Id.* at 10 (quoting *Menifee*, 15 Ohio St. 3d at 77)).

DuPont contends that Mrs. Bartlett's negligence claim fails as a matter of law because (1) "instead of working within the limitations of Ohio law, during the course of trial, Mrs. Bartlett instead focused on seeking to prove some form of negligent non-disclosure (a non-viable legal theory under the facts present here) and [(2)] manufactured her own 'duty of care' out of whole cloth that contravened Ohio law and this Court's prior rulings," and as to the applicable duty standard, she "failed to offer sufficient evidence at trial to make th[at] showing."  (DuPont's Post Trial Mot. at 10, Bartlett ECF No. 151; DuPont's Reply at 5, Bartlett ECF No. 159.)

**1.    Negligent Nondisclosure**

As to DuPont's first argument, it states:

11

> At trial, Mrs. Bartlett sought to prove that DuPont should have disclosed to her and similarly situated individual community members in the public the potential toxicity allegedly associated with C-8 exposure and that, by failing to do so, DuPont was negligent. Her expert, Dr. Siegel[6] conceded that DuPont followed the appropriate standard of care with respect to its employees and made appropriate disclosures to government regulatory agencies, [which] are charged with protecting the public. Mrs. Bartlett's theory was that, notwithstanding those disclosures, DuPont breached some duty of care (according to Dr. Siegel) by not disclosing the same information to individual members of the public.

(DuPont's Post Trial Mot. at 11, Bartlett ECF No. 151) (footnote added). DuPont maintains that Mrs. Bartlett's argument is "fatally flawed" because this Court previously granted summary judgment to DuPont on her negligent nondisclosure claim, holding that there were no "*facts upon which the Court could find the necessary special relationship with DuPont sufficient to create a duty to disclose.*" *Id.* at 11–12 (citing DMO 9, MDL ECF No. 4211) (emphasis added by DuPont). DuPont concludes that, "[b]ecause there is no cause of action for negligent failure to disclose under Ohio law, judgment must be entered for DuPont on Mrs. Bartlett's negligence claim, which was founded on a false assumption of the existence of a legal duty to disclose." *Id.* at 11 (internal quotations omitted).

While Mrs. Bartlett disagrees with DuPont's contention that it made appropriate disclosures to government regulatory agencies, Mrs. Bartlett "does not dispute that Ohio law and this Court's rulings foreclose a theory of negligent nondisclosure as a basis for her claims." (Pl.'s Mem. in Opp. at 8, Bartlett ECF No. 158.) Mrs. Bartlett, however, contends that DuPont wrongfully attempts to "recast Mrs. Bartlett's negligence cause of action as 'some form of negligent nondisclosure' cause of action." *Id.* Mrs. Bartlett is correct.

---

[6] Michael B. Siegel, M.D., M.P.H. is an epidemiologist, public health specialist, and medical doctor. (EMO 2 at 23–25, MDL ECF No. 4129.) Mrs. Bartlett offered Dr. Siegel's expert report (Siegel Report," MDL ECF No. 2702-5), his deposition testimony ("Siegel Dep.," MDL ECF No. 2809-10), and his trial testimony.

At the close of Mrs. Bartlett's case-in-chief DuPont moved for judgment as a matter of law on this claim for this same reason. DuPont's counsel argued that instead of focusing on "whether a reasonably prudent person would have anticipated that it was likely that injury was likely to result from DuPont's release of C-8 from the Washington Works plant," Mrs. Bartlett "focused on a nondisclosure theory that's not viable under Ohio law." (Trial Tr. Vol. 9 at 198, Bartlett ECF No. 131-1.) The Court rejected DuPont's argument:

> As [the Court] told the jury in the preliminary jury instructions, the issue is the duty of care and foreseeability, not some fiduciary-type obligation to tell people of something, but the duty to avoid physical injury to someone. That's what we're really talking about. . . . [T]here is a duty to act reasonably so as not to injure another person.

*Id.* at 198–99.

The Court continued, clarifying its prior ruling that Mrs. Bartlett could not maintain a negligent nondisclosure claim did not mean that the jury was precluded from considering the extent of DuPont's warnings and disclosures in the context of evaluating Mrs. Bartlett's negligence-based claims:

> THE COURT: . . . What I'm saying is it's a duty not to physically injure someone.
>
> MR. FAZIO [DuPont's counsel]: Correct.
>
> THE COURT: The measurement here is: Did you meet that standard of care: A reasonable standard of care: I think we agree on that, don't we? . . . It's not a matter of failing to disclose. It's a matter of – The argument they're making, as I understand it, is you have a duty to avoid injuring somebody. Or at least letting them protect themselves from injury.
>
> I mean I know in the summary judgment proceeding, I did hold that there is no independent, freestanding duty to disclose. But there is a duty to act reasonably so as not to injury another person. That's the other side of the coin.
>
> MR. FAZIO: Your Honor, I guess the issue that we're having is that if – That duty then – You shouldn't be able to bootstrap the nondisclosure theory into – that should be a fraud theory into the negligence theory.

13

> THE COURT: . . . I think it goes with the negligence theory in the sense that it
> would be the argument that you could prevent me from being harmed. That's the
> issue. In other words, prevent me from physical harm. Not a freestanding duty of
> disclosure, but a duty not to harm. And one way not to harm is to get somebody
> out of harm's way. . . . [T]here is no stand-alone duty to warn unless I've done
> something in a physical sense that's going to hurt somebody, in which case I do. .
> . . And one way to measure the reasonableness of my conduct is if I had a chance
> to warn and I didn't when I've – when I've done something in a physical sense to
> start with, not just a standing alone, abstract duty to warn. That's my point. I
> have an obligation to blow my horn. That's a warning.

*Id.*

Thus, the Court agrees with Mrs. Bartlett that the evidence she offered was probative of

her negligence claim. The evidence reflected what information DuPont possessed about the

potential danger of C-8, when they obtained that information, and what they chose to do or not to

do with that information (*e.g.*, did that information cause, or should it have caused, DuPont to

believe it should alter its disposal of C-8 into surface waters and unlined landfills). This

evidence was probative of whether Mrs. Bartlett established "that a reasonably prudent

corporation would have foreseen prior to 1997 that release of C-8 from Washington Works

would likely cause harm to community members similarly situated to Mrs. Bartlett." (DuPont's

Reply at 5, Bartlett ECF No. 159.)

As to the appropriate duty inquiry, DuPont argues that Mrs. Bartlett "failed to offer

sufficient evidence at trial to make this showing." *Id.* This Court, however, disagrees.

There was voluminous evidence presented at trial to support the jury's conclusion that

DuPont should have anticipated that an injury was likely to result to someone in Mrs. Bartlett's

position from DuPont's disposal of C-8 into the surface waters and unlined landfills around the

Washington Works plant. Mrs. Bartlett accurately sets out a portion of that evidence in her

response to DuPont's Post Trial Motion:

14

As an initial matter, it is undisputed that DuPont discharged vast quantities of C-8 into the environment around the Washington Works plant resulting in the contamination of area drinking water supplies. (*See* Sept. 23, 2015 Trial Tr. [Bartlett Case ECF No. 129-1] at 8-110:3-4 (Dr. Petty[7] testified that DuPont was dumping tens of thousands of pounds C-8 into the Ohio River); 8-113:2-3 (DuPont was discharging close to 70 percent of its C-8 input back into the environment).) In fact, DuPont discharged C-8 into the Ohio River, despite its own internal 1991 warning specifically stating that C-8 should not be discharged to surface water, (*id.* at 8-111:24 to 8-112:10), and a 1986 warning by the manufacturer of C-8 - the 3M Company - that C-8 should only be disposed through incineration or disposal at a proper landfill, (Sept. 16, 2015 Trial Tr. [Bartlett Case ECF No. 115] at 3-87:6-16; *see also* Sept. 23, 2015 Trial Tr. [Bartlett Case ECF No. 129-1] at 8-110:18-23 (Dr. Petty testified that from an industrial hygiene standpoint and environmental risk assessment standpoint, DuPont should have followed 3M's recommendation).)

Despite the warnings from its own scientists and the warnings from 3M, DuPont, nevertheless, made the very purposeful and conscious decision to release tens of thousands of pounds of C-8 directly into surface waters, unlined landfills, and the air *for years*, in ever-*increasing* amounts, instead of disposing C-8 in either of these recommended and proper manners, (Sept. 16, 2015 Trial Tr. [Bartlett Case ECF No. 115] at 3-102:10-19), even though there was "no reason [these other disposal methods] couldn't have been applied to [the C-8] waste stream [during] that time frame," (Sept. 23, 2015 Trial Tr. [Bartlett Case ECF 129] at 8-47:21-23).

(Pl.'s Mem. in Opp. at 11–12, Bartlett ECF No. 158) (footnote added).

Further, as Mrs. Bartlett points out, Dr. Siegel testified that if DuPont regarded these

warnings, which put DuPont on notice that C-8 was a "really potentially-toxic substance," Mrs.

Bartlett would never have been exposed to C-8:

Q. Did you find any document where [DuPont] listened to the recommendation of the people who actually sold [the C-8] to them initially, who made it, who knew a lot about it, where they say, yeah, we have to incinerate this stuff in a commercial incinerator?

A. [Dr. Siegel]: No. I don't believe that -- I didn't see any evidence that they took that recommendation.

. . . .

---

[7] Stephen E. Petty, P.E., C.I.H., C.S.P. is a chemical engineer with experience in industrial health and safety, forensic engineering, and environmental engineering. Mrs. Bartlett offered his expert report, (Petty Expert Report, MDL ECF No. 2702-1), his deposition testimony (Petty Dep., MDL ECF No. 3066-2), and his trial testimony.

Q. Could you, please, sir, take that and implant it into the facts you've heard in this case when [DuPont]'s being told, this early, you need to burn the stuff up?

A. Well, I think that the -- I think that that information should have put the company on notice that they were dealing with a really serious potential health hazard. I mean, if the chemical is so dangerous, or thought to be so dangerous, that you can't release it to the environment, that you have to incinerate it, I think that puts you on notice that this is a really potentially-toxic substance.

Q. Well, if it's incinerated, it never gets into the water, does it?

A. No.

Q. If it's incinerated, Ms. Bartlett never drinks the stuff, does she?

A. That's true.

(Trial Tr. Vol. 5 at 198–99, Bartlett ECF No. 157-2.)

The evidence further showed that DuPont increased its discharge of C-8 into the environment by up to a factor of three between 1984 and 2000, when Mrs. Bartlett was drinking the contaminated water, even though DuPont could have used a substitute for C-8 as early as 1984. (Trial Tr. Vol. 8 at 44, 50, 52, Bartlett ECF No. 129.) It was not until after the *Leach* Case and another case related to C-8 were filed against DuPont that the corporation began incinerating C-8, which resulted in a significant reduction in C-8 discharges into the environment, beginning around 2001. *Id.* at 52. The total elimination of C-8 that had been recommended by DuPont's own scientists decades earlier did not occur until 2014.

Mrs. Bartlett further highlights the evidence she presented that showed that DuPont was aware as early as 1961 that C-8 was toxic and that DuPont was aware of the biopersistence and bioaccumulation of C-8 in the environment and blood. Mr. Petty testified regarding why DuPont's knowledge of biopersistence should have guided its practices:

Q. Now, with respect to your opinions, in light of the stability -- that is, the persistence -- of C-8 in the environment, can you tell our jury how, from an

16

industrial hygiene standpoint and an engineering standpoint and environmental risk assessment standpoint, how DuPont's knowledge that C-8 was persistent in the environment and, as Dr. Siegel testified earlier, biopersistent, can you tell our jury from a large -- large point of view, not specifically, does that influence in any way good practices with respect to the proper use, processing, and disposal of the chemical known as C-8?

A. [Mr. Petty]: Well, certainly, when you know you have a material that's very difficult to degrade, whether it be degrading through metabolism in the body or degrading in the environment -- and certainly C-8 and organic fluorinated compounds are well known in the chemical engineering profession to be stable compounds -- you want to do everything you can to keep those out of the environment, because you know, if they get there, they're going to persist.

*Id.* at 37. Mr. Petty further explained biopersistence and DuPont's knowledge of C-8's

biopersistence in the following testimony:

Q. And you talked about the eight carbon atoms in the chain and the stability of it, particularly when coupled with fluorine, and how that tells you that it's – Briefly describe for our jury what the importance of that chemical chain was in terms of the issue of persistence.

A. [Mr. Petty]: What happens, the chemical chain is -- it's difficult to break fluorine atoms off of the carbon atoms. And, in the body, there is a process called metabolism. It mainly occurs in the liver. But the body recognizes foreign materials, and it tries to degrade it to -- usually to metabolize it to something that it can then reject. And, in this case, because there is a persistence in the blood, it's clear that the body is having a difficult time metabolizing that material. And the issue really is that, from a basic industrial hygiene standpoint, the longer a material stays in the blood, then the more opportunity it has to cause havoc.

. . . .

Q. All right. And directing your attention to this statement -- that is, C-8 is retained in the blood for a long time -- based upon what you've told our jury about the importance of these eight carbon atoms, coupled with the fluorines, in 1982 -- based upon your opinion as a chemical engineer and a certified industrial hygienist, should it have come as a surprise to DuPont in 1982 that C-8 would be retained in the blood for a long period of time?

A. [Mr. Petty]: No, it should not have. And the reason I say that is that DuPont had Haskell Labs since about 1935. And it was one of the most preeminent industrial hygiene laboratories in the world. So that, coupled with the fact that this was really basic chemical engineering, shouldn't have surprised them at all.

17

*Id.* at 55–57. The evidence further reflected that 3M, the manufacturer of C-8, announced in 2000 its decision to discontinue production of C-8 in 2002, in part because of C-8's biopersistence. *Id.* at 127. Because it no longer had a producer of C-8, DuPont built a plant that would begin to manufacture C-8 two months before 3M's planned discontinuation so that DuPont could continue to utilize C-8 at the Washington Works plant. *Id.*

As to this evidence, and the additional evidence offered at trial in support of Mrs. Bartlett's claim that DuPont owed her a duty, DuPont asserts:

> None of the alleged facts relied on by Plaintiff in her response [to DuPont's Post Trial Motion] can establish that DuPont owed her a duty – *i.e.*, that a reasonable company would have known prior to 1997 that C-8 at community exposure levels was likely to cause harm. For example, Plaintiff asserts that "DuPont was aware as early as 1961 that C-8 was toxic." *See* Opp. at 13. She fails to acknowledge, however, that her own expert witness Dr. Siegel explained that the 1961 study involved health effects in rats who had consumed doses of C-8 that far exceeded those that reached Plaintiff in Tuppers Plains. *See* Sept. 16, 2015 Trial Tr. [*Bartlett* Case ECF No. 155] at 95:19-96:6. Similarly, Plaintiff contends that the [Material Safety Data Sheets ("MSDS")] [that recommended disposal of C-8 through commercial incineration or specially lined chemical landfills] received from 3M should have put DuPont on notice of possible health effects of C-8 to the public, *see* Opp. at 11-12, but she again disregards the contradictory testimony from Dr. Siegel that an MSDS is "not designed to tell you anything about risk of the chemical . . . into the general public." Instead, it is "specifically designed to protect the workers," and a company should "use their own judgment" in determining what parts of an MSDS to rely on. *See* Sept. 16, 2015 Trial Tr. [*Bartlett* Case ECF No. 155] at 85:5-7; 92:7-8.

(DuPont's Reply at 5–6, Bartlett ECF No. 159.)

DuPont's arguments, however, miss the mark. The jury was provided all of the evidence Mrs. Bartlett articulated *supra*, and it was also provided the evidence that DuPont assesses as "contradictory" and/or not complete because Mrs. Bartlett highlights only part of the 1961 study (*i.e.*, the part that labeled C-8 as toxic and not the part that showed the rats were exposed to higher doses of C-8 than was Mrs. Bartlett). The relevant inquiry is whether, after construing the evidence most strongly in favor of Mrs. Bartlett, reasonable minds could only come to one

18

conclusion regarding DuPont's conduct. "[I]f there is substantial competent evidence to support

the party against whom the motion is made, upon which evidence reasonable minds might reach

different conclusions, the motion must be denied." *Texler*, 81 Ohio St.3d at 679. As to that

inquiry, the Court finds that the jury was provided substantial competent evidence to support

Mrs. Bartlett's position that a reasonably prudent corporation would have foreseen prior to 1997

that release of C-8 from Washington Works into surface waters and unlined landfills would

likely cause harm to community members similarly situated to Mrs. Bartlett. It is for the jury to

decide the weight to be given to this evidence and/or the credibility of the witnesses. *See id.* In

discharging that duty, the jury was free to attribute more weight to the "contrary" evidence

offered by DuPont or to attribute more weight to the evidence offered by Mrs. Bartlett.

DuPont next argues that Mrs. Bartlett failed to offer any evidence of foreseeability,

stating:

> Plaintiff spends several pages contending that DuPont owed her a "duty" based on
> the amount of C-8 allegedly discharged from Washington Works and the
> company's alleged knowledge regarding C-8's biopersistence. But neither of these
> factors speaks to whether it was foreseeable that C-8 was likely to cause harm at
> community exposure levels. Plaintiff's considerable efforts to conflate these
> concepts underscores that she failed to offer any evidence at trial proving that a
> reasonable company in DuPont's position would have known that the relatively low
> amount of C-8 reaching community members was likely to cause harm, even
> during peak discharge and considering the chemical's biopersistence. *See* Oct. 1,
> 2015 Trial Tr. [*Bartlett* Case ECF No. 136] at 161:20-25 (Dr. Rickard testifying
> that he "never believed" that "the amounts of C-8 that were reaching the
> community would cause any disease or harm."). The absence of evidence of
> foreseeability is fatal to any "duty," and, accordingly, DuPont is entitled to
> judgment as a matter of law on Plaintiff's negligence claims.

(DuPont's Reply at 6, Bartlett ECF No. 159.)

DuPont's assessment of the evidence of foreseeability is inaccurate. While, in DuPont's

view, evidence of the amount of C-8 discharged from the Washington Works plant and evidence

of DuPont's knowledge regarding C-8's biopersistence taken in isolation does not support a

19

conclusion regarding foreseeability of harm, that evidence was not presented in isolation. The evidence of C-8's biopersistence and DuPont's knowledge of C-8's biopersistence, coupled with the additional evidence presented at trial, supports the jury's conclusion that DuPont owed Mrs. Bartlett a duty. For example, DuPont's classification of C-8 as a carcinogen coupled with the knowledge that it is biopersistent and being released in large quantities into surface waters and unlined landfills speaks to whether it was foreseeable by a reasonably prudent corporation that C-8 was likely to cause harm to the community. (Trial Tr. Vol. 8 at 116, Bartlett ECF No. 129-1.)

Moreover, even taking this evidence in isolation, a reasonable inference can be made that because of the biopersistent nature of C-8, the "low" levels of C-8 in the water supply around the Washington Works plant would certainly accumulate in the blood of an individual to a level that was not being measured. Thus, if the jury were to believe DuPont's evidence that the amount of C-8 in the community water supplies was "low," it could still reasonably infer that based on the biopersistent nature of C-8 any reasonably prudent corporation would have known that those levels did not reflect the levels of C-8 that would accumulate in a person's body.

And finally, as to DuPont's references to the "low" amount of C-8 that it found in the community, Mrs. Bartlett presented evidence showing that the testing DuPont utilized was not designed to provide reliable information as to the actual amount of C-8 in the community water supply. Mr. Petty testified that when designing its testing protocol, DuPont created a level of detection ("action level") for C-8 that was too high, which essentially made the action level meaningless, despite the availability of better detection methods in the early 1980s that would have allowed DuPont to detect levels well below its action level. In other words, by setting the non-detect level so high, the tests could not measure significant levels *below* the non-detect

20

standard. (Trial Tr. Vol. 8 at 63–66, Bartlett ECF No. 129) ("[I]f you have to act on a level that's below the detection limit, you can't act on it, because you don't know when you're there"; "and, more importantly, certainly by '87 or '88, the fact that [DuPont] wanted to detect at a level that was below their detection limit would tell a prudent engineer or industrial hygienist we have to have a better method"; "The technology, gas chromatograph technology, GC; and they used a different detector -- this is all sort of technical -- electron capture detector, ECD, that technology -- both technologies were developed in the late '50s, commercialized into the '60s and '70s. We know from the literature that dioxins, which are also fluorinated chlorinated hydrocarbons, that we could use that same technology to detect down to levels of quadrillions, parts per quadrillion, which is somewhere between a thousand and a million [times] more sensitive . . . . and when you have a really preeminent lab [like DuPont's], my opinion and conclusion is there is nothing that would have stopped them from having a better method in the early '80s in terms of detection limit").

Accordingly, the Court concludes that Mrs. Bartlett worked within the limitations of Ohio law, presenting substantial competent evidence probative of whether DuPont owed her a duty of care. This "[C]ourt must neither consider the weight of the evidence nor the credibility of the witnesses," which is the exclusive province of the jury. *Texler*, 81 Ohio St. 3d at 679. Thus, the Court cannot grant DuPont judgment as a matter of law on Mrs. Bartlett's negligence claim.

### 2. Breach of Duty

As to DuPont's second argument, it states that, "even if Plaintiff had offered enough evidence to demonstrate that DuPont owed her a 'duty' prior to 1997, judgment as a matter of law would still be warranted on her negligence claims because she failed to offer sufficient

evidence to prove that DuPont breached an applicable *legal* standard of care." (DuPont's Reply

at 7, Bartlett ECF No. 159.)[8] This Court disagrees.

The Court instructed the jury on Mrs. Bartlett's burden of proof on the breach element of

her negligence claim as follows:

### Instruction No. 21

### NEGLIGENCE – BREACH

If you find that DuPont owed Mrs. Bartlett a duty, you must next determine whether DuPont breached that duty. A corporation breaches a duty by failing to use ordinary care. As I have just instructed, ordinary care is the care that a reasonably careful corporation would use under the same or similar circumstances.

If you decide that DuPont did not use ordinary care, then DuPont breached its duty of care to Mrs. Bartlett. If you decide that DuPont did use ordinary care, then DuPont did not breach its duty of care to Mrs. Bartlett.

. . . .

### Instruction No. 24

### NEGLIGENCE – CONCLUSION

You have now heard the relevant law applicable to Mrs. Bartlett's negligence claim. If you find, by a preponderance of the evidence, that DuPont's negligence proximately caused injury to Mrs. Bartlett, then your verdict must be for Mrs. Bartlett. However, if you find that Mrs. Bartlett failed to prove any of the following: (1) DuPont owed Mrs. Bartlett a duty; (2) DuPont breached that duty; or (3) DuPont's negligence proximately caused Mrs. Bartlett's injuries, then your verdict on the negligence claim must be for DuPont.

(Final Jury Instructions at 22, 25; Bartlett ECF No. 139.)

The evidence presented at trial and set forth in some detail above, construed most

strongly in favor of Mrs. Bartlett, is sufficient to demonstrate that DuPont failed to use the care

that a reasonably careful corporation would use under the same or similar circumstances. The

---

[8] This Court addresses DuPont's arguments related to Dr. Siegel and Mr. Petty's testimony related to standards of care below in section III.E.

jury unanimously came to this conclusion and there is evidence of "substantial probative value in support of" that conclusion. *Texler*, 81 Ohio St. 3d at 679–80. Therefore, the Court cannot direct a verdict in DuPont's favor on Mrs. Bartlett's negligence claim.

## C.    Negligent Infliction of Serious Emotional Distress

Ohio courts recognize a cause of action for NISED based on cancerphobia. *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1012 (6th Cir. Ohio 1993). "Cancerphobia is a claimed present injury consisting of mental anxiety and distress over contracting cancer in the future, as opposed to risk of cancer, which is a potential physical predisposition of developing cancer in the future." *Id.* (quoting *Lavelle v. Owens–Corning Fiberglas Corp.*, 30 Ohio Misc.2d 14 (1987)). "Increased fear of cancer, to be compensable, means that [a] . . . plaintiff is aware that [s]he in fact possesses an increased statistical likelihood of developing cancer, and that from this knowledge springs a reasonable apprehension which manifests itself in mental distress." *Lavelle*, 30 Ohio Misc. 2d at 15. "Reasonable in this context is not equivalent to probability or certainty, but is for a fact-finder to determine." *Id.* The *Lavelle* court explained:

> Modern tort law now recognizes a separate cause of action for serious emotional distress without a contemporaneous physical injury. *Schultz v. Barberton Glass Co.*, 4 Ohio St.3d 131 (1983); *Paugh v. Hanks*, 6 Ohio St.3d 72 (1983). Examples of serious emotional distress are traumatically induced neurosis, psychosis, chronic depression and phobia. *Paugh v. Hanks*, *supra*, at 78. Cancerphobia falls within this definition.

*Lavelle*, 30 Ohio Misc. 2d at 15.

At Mrs. Bartlett's trial, the Court charged the jury as follows:

### Instruction No. 25

### NEGLIGENT INFLICTION OF SERIOUS EMOTIONAL DISTRESS – GENERAL

In order to recover for negligent infliction of serious emotional distress, Mrs. Bartlett must prove by the greater weight of the evidence the following four elements:

23

(1) DuPont was negligent;

(2) Mrs. Bartlett suffered serious emotional distress;

(3) Mrs. Bartlett's serious emotional distress was the proximate result of the negligence of DuPont; and

(4) The serious emotional distress of Mrs. Bartlett was reasonably foreseeable by DuPont.

### Instruction No. 26

### NEGLIGENT INFLICTION OF SERIOUS EMOTIONAL DISTRESS – SERIOUS EMOTIONAL DISTRESS

"Serious emotional distress" includes the increased fear of developing cancer, if Mrs. Bartlett is aware that she in fact possesses an increased statistical likelihood of developing cancer, and that from this knowledge springs a reasonable apprehension which manifests itself as emotional distress.

### Instruction No. 27

### NEGLIGENT INFLICTION OF SERIOUS EMOTIONAL DISTRESS – FORSEEABLILITY

In determining whether serious emotional distress was reasonably foreseeable by DuPont, you should consider all of the circumstances of the parties existing at the time of the alleged negligence of DuPont.

### Instruction No. 28

### NEGLIGENT INFLICTION OF SERIOUS EMOTIONAL DISTRESS – CONCLUSION

If you find that Mrs. Bartlett has proved by the greater weight of the evidence all the elements of negligent infliction of serious emotional distress, your verdict on the negligent infliction of serious emotional distress claim must be for Mrs. Bartlett.

However, if you find that Mrs. Bartlett has failed to prove by the greater weight of the evidence any one or more of the elements of negligent infliction of serious emotional distress, your verdict on the negligent infliction of serious emotional distress claim must be for DuPont.

(Final Jury Instructions at 26–29; Bartlett ECF No. 139.)

The jury unanimously found that Mrs. Bartlett had met her burden of proving that

DuPont negligently inflicted serious emotional distress upon her in the form of cancerphobia.

24

(Jury Verdict Form at 2; Bartlett ECF No. 142.) DuPont contends that the jury verdict is not reasonable; that reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is that Mrs. Bartlett failed to prove her NISED claim. DuPont asserts two reasons to support its position:

> First, Mrs. Bartlett failed to present sufficient evidence from which a jury could find that DuPont caused her to suffer *severe and debilitating emotional distress.* . . .

> Second, a jury could not conclude on the evidence presented that Mrs. Bartlett faces an "increased statistical likelihood" of redeveloping cancer from her past exposure to C-8, or that she suffers from a "reasonable apprehension" of such risk.

(DuPont's Post Trial Mot. at 4, Bartlett ECF No. 151) (emphasis added). DuPont's arguments are not well taken.

### 1. Emotional Distress

As shown above, this Court instructed the jury that to find in Mrs. Bartlett's favor on her NISED claim she was required to prove, *inter alia*, that she "suffered serious emotional distress." (Final Jury Instructions at 29; Bartlett ECF No. 139.) In its Post Trial Motion, DuPont does not contend that Mrs. Bartlett failed to show that she suffered from serious emotional distress. Instead, DuPont asks this Court to make a legal determination that the law it provided to the jury was incorrect and that if the correct legal standard had been given, (*i.e.*, emotional distress that is both severe and debilitating), Mrs. Bartlett failed to present sufficient evidence from which a jury could find she met *that* standard. (DuPont's Post Trial Mot. at 30, Bartlett ECF No. 151) ("the Court stated the wrong legal standard under Ohio law").

DuPont properly addresses this jury instruction argument in the portion of its Post Trial Motion in which it requests a new trial. *Id.* at 29 ("The Court also incorrectly instructed the jury on the emotional distress required to prove negligent infliction of emotional distress. The jury

25

was instructed only that Mrs. Bartlett must have suffered 'serious emotional distress' rather than 'emotional distress that is both severe and debilitating.'"). Because the Court, in addressing DuPont's argument *infra*, determines that it did not improperly instruct the jury on the law, it is unnecessary to determine whether Mrs. Bartlett presented evidence sufficient to meet the inapplicable standard of "severe and debilitating emotional distress."

### 2. Increased Statistical Likelihood of Developing Cancer and Awareness Leading to Reasonable Apprehension

As to DuPont's second argument, it states:

> Even accepting Plaintiff's incorrect assertion that she is relieved of satisfying the "severe and debilitating" standard, the law requires that her cancerphobia be both reasonable and based on an actual increased statistical likelihood of developing cancer. Under Ohio law, Plaintiff's fear is compensable only if she "is *aware* that [she], *in fact*, possesses an *increased statistical likelihood* of developing cancer, and, from this knowledge, springs a *reasonable* apprehension which manifests itself as emotional distress." *Slane v. MetaMateria Ptnrs, LLC*, 892 N.E.2d 498, 504-505 (Ohio Ct. App. 2008) (emphasis added).

(DuPont's Reply at 4, Bartlett ECF No. 159.) DuPont breaks this inquiry into two considerations.

### a. Increased Statistical Likelihood

As to the issue of whether Mrs. Bartlett presented sufficient evidence at trial from which a jury could reasonably conclude that she faced an increased statistical likelihood that she would develop cancer in the future, DuPont states:

> The undisputed evidence is that C-8 has been filtered from her drinking water since 2006, and the levels of C-8 in her blood as a result of drinking Tuppers-Plains water long ago have now dropped to below the mean of people all across the United States. *See, e.g.*, Oct. 1, 2015 Trial Tr. at 160:25-161:17. [Mrs. Bartlett's treating physician and expert witness] Dr. Bahnson[9] acknowledged that

---

[9] Robert Bahnson, M.D. is a licensed medical doctor, a surgeon, and a Board Certified Urologist, who has been practicing medicine for over thirty years. (MDL ECF No. 2811-3.) He is a Professor in the Department of Urology at The Ohio State University. Dr. Bahnson is the surgeon who, in 1997, performed Mrs. Bartlett's partial nephrectomy after she was diagnosed with kidney cancer. He then treated Mrs. Bartlett in follow-up care for approximately eight years.

he does not know Mrs. Bartlett's current level of C-8, meaning he could not offer any nonspeculative opinion on the risks of recurrence. Sept. 22, 2015 Trial Tr. at 191:17-18. In short, Mrs. Bartlett failed to present any actual statistical evidence to support her claim, and Dr. Bahnson acknowledged, "I can't give you a [statistical] number. . ." *Id.* at 187:1.

(DuPont's Post Trial Mot. at 8–9, Bartlett ECF No. 151); (DuPont's Reply at 4, Bartlett ECF No. 159) ("Plaintiff failed to rebut DuPont's evidence that, based on the half-life of C-8, her current levels of C-8 are likely no greater than anyone else in the population."). DuPont's arguments continue to miss their mark.

The question for the jury to determine was not only whether at the time of the trial how the amount of C-8 in Mrs. Bartlett's blood affected her. Instead, the question for the jury was whether Mrs. Bartlett had an increased statistical likelihood of developing cancer. As to that inquiry, Dr. Bahnson testified unequivocally at trial that because Mrs. Bartlett survived renal cell carcinoma (which the jury determined was caused by DuPont's negligent contamination of her drinking water with C-8), she was at an increased risk of developing or redeveloping cancer. For example, Dr. Bahnson testified:

> So the risk of this kind of a cancer and this kind of an operation is twofold. One is that the cancer comes back and has metastasized to other parts of the body; but, in the situation where you only remove a portion of the kidney and take the cancer out, there is a risk that you could get a recurrence of the cancer in the kidney that you left behind. . . . There is a percentage chance of a recurrence.

(Trial Tr. Vol. 7 at 93–94, Bartlett ECF 128-1.)

Further, the evidence showed that, unlike the general population, Mrs. Bartlett was required to engage in yearly CAT scans and ultrasound testing because of her higher risk of cancer or recurrence of kidney cancer. *Id.* at 99 ("Continuing to take a look at both kidneys, the one that was operated on as well as the opposite one, to check to see if there is any recurrence of cancer or any new cancers.").

27

In addition, even if the appropriate inquiry was whether there is *currently* sufficient C-8 in Mrs. Bartlett's blood to cause her to have an increased statistical likelihood of developing new cancer or redeveloping kidney cancer, the jury verdict is still reasonable. Contrary to DuPont's assessment, when viewing the evidence most strongly in favor of Mrs. Bartlett, Dr. Bahnson offered a non-speculative opinion on the risks of recurrence of cancer based on the current amount of C-8 in her blood. Dr. Bahnson testified that he formed an opinion after being informed about C-8, its biopersistent nature, reading the Science Panel's report, considering the Science Panel Finding that C-8 in the amount found in Mrs. Bartlett's water is capable of causing kidney cancer, and reading the expert reports on the period of time that Mrs. Bartlett drank water containing C-8. Dr. Bahnson's opinion is that because of the current amount of C-8 in Mrs. Bartlett's blood she has a far greater risk for recurrence of cancer than someone who had never been exposed to C-8:

> Q. A follow-up question [to Dr. Bahnson]: Now that you know that [Mrs. Bartlett] has continued for years and years to have -- to have consumed, through 2005, as you saw from Dr. MacIntosh's report, water containing C-8, what is your opinion, sir, to a reasonable degree of medical certainty, as to her prognosis for the future or her chances of a recurrence?
>
> A. [Dr. Bahnson]: I think she has a very favorable prognosis. I believe that her risk of developing a new tumor is far greater than someone who was never exposed to [C-8].

*Id.* at 137.

And, while DuPont suggests that its evidence is stronger and/or its expert more believable as to his testimony that Mrs. Bartlett's "current levels of C-8 are likely no greater than anyone else in the population," that is not the relevant inquiry. This Court "must neither consider the weight of the evidence nor the credibility of the witnesses." *Texler*, 81 Ohio St. 3d at 679. Indeed, even if reasonable minds may differ as to the conclusions to be drawn from the evidence,

28

it is insufficient to provide DuPont the relief it requests. This Court must only "determine whether there exists any evidence of substantial probative value in support of" Mrs. Bartlett's claim that she had an increased statistical likelihood of redeveloping cancer. *Id.* at 679–80.

Finally, DuPont points to no Ohio court that has required statistical analysis reflecting a specific numerical percentage increase in the likelihood of developing cancer that a plaintiff possesses, nor does this Court find any such requirement.

### b.  Awareness Leading to Reasonable Apprehension

DuPont further contends that Mrs. Bartlett failed to present sufficient evidence that she was "aware" of any actual statistical likelihood, or that any such awareness has led to a "reasonable apprehension" manifesting itself as emotional distress. (DuPont's Post Trial Mot. at 9, Bartlett ECF No. 151.)  DuPont continues, stating that "[t]here is no evidence that Mrs. Bartlett was ever told about her C-8 level or an increased risk of recurrence. . . . [nor did she] identify *anyone* who has explained how her blood levels relate to others." *Id.*

DuPont focuses on an immaterial aspect of this inquiry. The inquiry is not whether Mrs. Bartlett understands how the exact amount of C-8 in her blood relates to the amount of C-8 in the blood of other individuals. The issue is whether Mrs. Bartlett was aware that she had an increased statistical likelihood of developing cancer. As to that inquiry, Mrs. Bartlett testified that she was aware that she had a greater chance of developing cancer from the time she had the cancerous portion of her kidney removed than she had prior to her cancer. Mrs. Bartlett testified that after her surgery, she was "very upset and scared" that the cancer "could come back at any time," and that every time she went for follow-up CAT scans or ultrasounds (testing not required or recommended for the general population) she was fearful and apprehensive that the results might reveal that the cancer had returned or a new cancer had appeared. (Trial Tr. Vol. 9 at 99,

109–113; Bartlett ECF Nos. 131, 131-1.) Mrs. Bartlett testified how the fear of cancer coming back was "never out of [her] mind, because [she] worr[ied] constantly about it" and that "the scar reminded [her] of it every day." *Id.* at 113. Thus, not only was Mrs. Bartlett aware she had an increased statistical likelihood of developing cancer when compared to others in the general population, but also when compared to her own pre-cancer self.

Further, as DuPont acknowledges, once Mrs. Bartlett heard Dr. Bahnson testify as to her current increased risk of cancer from her C-8 ingestion, she testified as follows:

> Q. [To Mrs. Bartlett] Now that you've heard Dr. Bahnson state here in this courtroom that you are at an even greater risk because of your continued exposure to C-8 for a recurrence or a new cancer, what are your thoughts and/or concerns for the future?
>
> A. I'm really afraid that the cancer may come back. So I'm going to immediately schedule another CAT scan to be done to make sure everything is okay.
>
> Q. And now that you've heard, in this trial, about the biopersistence and how long [C-8 is] going to stay in your blood, do you have an even greater terror, heightened apprehension, or concern or fear of the return of the cancer in the future?
>
> . . . .
>
> A. Yes, I do. I worry about it more now than I did last year, even.

*Id.* at 136.

All of this evidence is of substantial probative value in determining whether Mrs. Bartlett was aware of her increased statistical likelihood of developing or redeveloping cancer and it provides a reasonable basis for her apprehension. Her apprehension need not be "equivalent to probability or certainty, [that] is for a fact-finder to determine." *Lavelle*, 30 Ohio Misc. 2d at 15. Here, the jury found, based on substantially probative evidence, that Mrs. Bartlett's apprehension was a reasonable one. There is no basis for the Court to take that decision from the jury.

**D.     Conclusion – Rule 50 Judgment as Matter of Law**

The Court concludes that, after construing the evidence most strongly in favor of Mrs.

Bartlett, reasonable minds would not be limited to only a conclusion adverse to her. Indeed, the

Court finds substantial probative evidence supports the jury verdict. Consequently, the Court

**DENIES** DuPont's renewed request for judgment as a matter of law.

### III.     NEW TRIAL

DuPont contends that it is entitled to a new trial because Mrs. Bartlett's "trial contained

numerous fundamental errors that affected the outcome. . . . Considered individually and in their

totality, these errors resulted in a flawed award [that is against the weight of the evidence], and

the appropriate remedy (aside from entering judgment in DuPont's favor) is a new trial . . . ."

(DuPont's Post Trial Mot. at 15, 16 n.3, Bartlett ECF No. 151.) Specifically, DuPont moves for

a new trial under (A) Rule 59 of the Federal Rules of Civil Procedure based upon (B) this

Court's application of the *Leach* Settlement Agreement, (C) admission of "nondisclosure theory"

evidence related to punitive damages, (D) "juror issues," (E) testimony of two of Mrs. Bartlett's

expert witnesses, (F) admission of a 2005 consent decree, (G) questioning of witnesses about

documents they had not seen and related issues, (H) instructions to the jury, and (I) the

cumulative effect of the Court's alleged errors.

**A.     Standard**

A federal court, hearing a case on the basis of diversity jurisdiction, reviews a motion for

a new trial based on a federal standard. *Conte v. Gen. Houseware Corp.*, 215 F.3d 628, 637 (6th

Cir. 2000). Under Rule 59 of the Federal Rules of Civil Procedure, a new trial may be granted in

a jury trial for "any reason for which a new trial has heretofore been granted in an action at law

in federal court." Fed. R. Civ. P. 59(a)(1)(A). The Sixth Circuit has interpreted Rule 59 "to

31

require a new trial only when a jury has reached a seriously erroneous result as evidenced by []

(1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3)

the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced

by prejudice or bias." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 405 (6th Cir.

2006) (citation and internal quotations omitted). Granting a new trial is within the sound

discretion of the trial court and an abuse of discretion occurs only upon "a 'definite and firm

conviction that the trial court committed a clear error of judgment.'" *Id.* (quoting *Engebretsen v.*

*Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994)).

When considering a motion for a new trial, based on the allegation that the verdict is

against the weight of the evidence, federal courts are cautioned that they are "not to set aside the

verdict simply because it believes that another outcome is more justified." *Denhof v. City of*

*Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007). "The court is to accept the jury's verdict 'if it

is one which reasonably could have been reached.'" *Id.* (quoting *Duncan v. Duncan*, 377 F.2d

49, 52 (6th Cir. 1967)). The Sixth Circuit explained:

> Where no undesirable or pernicious element has occurred or been introduced into
> the trial and the trial judge nonetheless grants a new trial on the ground that the
> verdict was against the weight of the evidence, the trial judge in negating the
> jury's verdict has, to some extent at least, substituted his judgment of the facts and
> the credibility of the witnesses for that of the jury. Such an action effects a
> denigration of the jury system and to the extent that new trials are granted the
> judge takes over, if he does not usurp, the prime function of the jury as the trier of
> the facts. It then becomes the duty of the appellate tribunal to exercise a closer
> degree of scrutiny and supervision than is the case where a new trial is granted
> because of some undesirable or pernicious influence obtruding into the trial. Such
> a close scrutiny is required in order to protect the litigants' right to jury trial.

*Id.* (quoting *Duncan*, 377 F.2d at 54) (internal citations omitted).

As to the admission or denial of evidence at trial, it is within a district court's discretion.

*Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 797 (6th Cir. 2007). A trial court abuses

its discretion only if it is determined that there exists a firm conviction that it "made a mistake in admitting challenged evidence." *Id.* (citing *United States v. Wiedyk*, 71 F.3d 602, 608 (6th Cir. 1996)). However, an appellate court will only "reverse a jury's verdict if the error was prejudicial." *Id.* (citing *Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 532 (6th Cir. 1989)). In this context, "prejudice" means "a substantial risk that the jury made a determination of liability on an improper basis—*i.e.*, if the rest of the evidence did not clearly support a finding of liability." *Id.* at 799. If there "has been an evidentiary error, [the Sixth Circuit] will vacate a jury verdict where the error so altered the total mix of information submitted to the jury that it was substantially likely to have affected the verdict." *Id.* at 804.

**B.     The *Leach* Settlement Agreement**

DuPont argues that it was unfairly prejudiced because this "Court's erroneous interpretation of the *Leach* Settlement Agreement constitutes a threshold error that pervasively affected the trial." (DuPont's Post Trial Mot. at 16, Bartlett ECF No. 151.) Specifically, DuPont contends that, "[a]s a result of the Court's rulings on the *Leach* Agreement, Plaintiff was permitted to conflate distinct causation issues, and DuPont was barred from disputing that Plaintiff was exposed to a sufficient dosage of C-8 for her cancer to have been specifically caused by C-8." (DuPont's Reply at 10, Bartlett ECF No. 159); (DuPont's Post Trial Mot. at 22, Bartlett ECF No. 151) ("that each individual plaintiff still had to prove specific causation was read out of the Agreement, denying DuPont the benefit of its bargain").

Application of the *Leach* Settlement Agreement has been extensively briefed by the parties in dispositive motions and evidentiary motions prior to Mrs. Bartlett's trial. (DuPont's Motions/Briefs at MDL ECF Nos. 1031, 1032, 2813, 2816, 3560, 3563); (Pl.'s Motions/Briefs at MDL ECF Nos. 820, 1152, 1519, 2285, 2417, 2822, 2824, 3196, 3201, 3443, 3554, 3555, 4085,

4090, 4091, 4103, 4224). The Court issued several decisions explaining in detail why DuPont's position on causation conflates the parties' unambiguous definitions of general and specific causation that they set forth in the *Leach* Settlement Agreement and effectively rewrites the Agreement's provisions related to the function and application of the Probable Link Findings. Here, the Court will (1) reiterate the relevant portions of those decisions, and (2) will then address DuPont's contentions regarding the impact of the rulings at trial.

### 1. Decisions Regarding Application of the *Leach* Settlement Agreement

On December 17, 2014, this Court issued DMO 1, in which it denied DuPont's Counter-Motion for Partial Summary Judgment Regarding Application of the *Leach* Settlement Agreement ("DuPont's First Motion Regarding Causation") (MDL ECF No. 1032), and granted in part Plaintiffs' Motion for Partial Summary Judgment Under Rule 56 or for Determination of Issues Under Rule 16(C) (MDL ECF No. 820). Those Motions were fully briefed (MDL ECF Nos. 1031, 1152, 1209, 1407) and the Court held oral argument on the Motions on November 13, 2014 ("Motions Hearing"). (MDL ECF No. 1519.) In DMO 1, the Court explained the parties' positions related to application of the *Leach* Settlement Agreement and its covenants and directions related to causation and the Probable Link Findings:

> Relative to the issue of causation, the parties disagree on the function of the Probable Link Findings. The parties agree that they are bound by the Findings. DuPont, however, argues that it that it is permitted to "point[] out the nuances and the limitations of the Science Panel's findings." (Tr. at 27.) DuPont further argues that the Science Panel's Probable Link Findings "include the reasoning and the clarifications on what they did find and, just as importantly, what they did not find." [Motions Hearing Transcript ("Tr."), MDL ECF No. 1519] at 24.) DuPont scrutinizes the epidemiological analysis within the Science Panel's [reports], pointing out:

> > And when you look at the probable linked reports, the way they [the Science Panel] did their analysis was the way epidemiologists do it. They look at groups of people, estimated doses, and they compare the lower exposure to the higher exposure.

34

> But when you look through [the Science Panel reports], they only found associations of increased risk with the highest exposure groups, not with the lowest.

(Tr. at 34).

> DuPont concludes that because of these "limitations" within the Science Panel's Probable Link Findings, it is the individual plaintiffs' burden to show, as part of proving specific causation, "at least two things: What their individual dose was, one; and two, that that dose was sufficient to cause the disease at issue." (Tr. at 37; Tr. at 40) ("that they have to show what their individual dose was; and two, come forward with reliable scientific evidence that says, that particular dosage *was sufficient to cause*."). In other words, DuPont's position is that the Probable Link Findings may not apply to a particular plaintiff, such as those plaintiffs who were in the lowest exposure groups.[10] DuPont posits that dosages of C-8 for individual plaintiffs must be examined and a determination must be made as to whether the Probable Link Finding applies to the individual.

> Plaintiffs counter that the parties agreed contractually in the *Leach* Settlement Agreement that "any issue about the C-8 dosage and whether it's sufficient to have caused this [Linked Disease] is off the table." (Tr. at 37, 44, 45, 51.) Plaintiffs maintain that the dosage level of C-8 that can cause these diseases is a general causation issue, which DuPont clearly agreed to not contest.

(DMO 1, Class Membership and Causation, at 8–9, MDL ECF No. 1679.) This Court agreed

with the plaintiffs and disagreed with DuPont, articulating the following:

> For several reasons, DuPont's analysis is not tenable under the *Leach* Settlement Agreement. First, the unambiguous language of the *Leach* Settlement Agreement unequivocally provides for application of the Probable Link Finding to any class member with the Linked Disease for which the finding was issued, and that for those individuals DuPont waived the right to challenge general causation. Specifically, the Science Panel was tasked with determining whether "it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease *among Class Members*." (S.A. § 1.49) (emphasis added). The way in which the Science Panel was required to make such a finding was for the Panel to establish "a protocol for *a study of Human Disease among residents exposed to C-8 in the communities served* by the Public Water Districts and Covered Private Sources," *i.e.*, to study human disease among the *Leach* class members. (S.A. § 12.2.2) (emphasis added).

---

[10] DuPont suggests that the Findings contain other limitations, including certain objective criteria such as male versus female, main versus prospective analysis, inclusion or exclusion of experience before onset of elevated exposure. (Tr. at 26.)

If the Science Panel found that it was "more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members," the Panel then issued a Probable Link Finding for that specific disease and DuPont *waived its right to challenge whether "it is probable that exposure to C-8 is capable of causing" the Linked Disease, i.e., general causation.* (S.A. § 3.3) ("Upon delivery of any Probable Link Finding . . . [DuPont] agrees that, *in* any personal injury or wrongful death action brought by, on behalf of, or otherwise pertaining to a Class Member, [DuPont] will not contest the issue of General Causation between C-8 and any Human Disease(s) as to which a Probable Link Finding has been delivered . . . .") (emphasis added). DuPont cannot now prevent a class member from the benefit of such a finding by pointing out the "limitations" in the objective criteria and/or protocols the Science Panel utilized to make its conclusions or by extrapolating from the Science Panel's analysis what the Panel "did not find" in its Probable Link Finding.

Indeed, in the introduction to each Science Panel Probable Link Finding and No Probable Link Finding, the Panel states:

> One part of the [*Leach*] Settlement [Agreement] was the creation of a Science Panel, consisting of three epidemiologists, *to conduct research in the community* in order to evaluate whether there is a probable link between [C-8] exposure and any human disease. A "probable link" in this setting is defined in the Settlement Agreement to mean that given the available scientific evidence, it is more likely than not that *among Class Members a connection exists* between [C-8] exposure and a particular human disease.

(http://www.c8sciencepanel.org/prob_link.html) (emphasis **added**).

Second, as Plaintiffs correctly point out, the limitations and non-findings in the Probable Link Findings highlighted by DuPont are taken from "one of the many studies that the science panel looked at. That wasn't their overall conclusion." (Tr. at 47.) They appropriately highlight that the Science Panel "did not limit [its Finding] to only certain exposure groups or only people that were quartile one versus quartile two -- they said the link existed among that entire group." (Tr. at 11.)

The inquiry in which DuPont engages is directed at the objective criteria and protocols the Science Panel utilized in reaching its conclusion that "it is more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members." (S.A. § 1.49.) The *Leach* Settlement Agreement explicitly provides that the Science Panel shall agree on "objective criteria" and "protocols" to evaluate the available evidence for the purpose of making a Probable Link or a No Probable Link Finding. (S.A. §§ 12.2.3(a);

12.2.3(b)). The *Leach* Settlement Agreement prevents DuPont from challenging the protocols utilized by the Science Panel in analyzing the presence or absence of a probable link between a particular human disease and C-8.

Third, DuPont's contention would operate to permit suits by *Leach* class members who suffer or suffered from a condition for which the Science Panel found no probable link to C-8. Instead of being barred from forever bringing a claim for her disease, such a plaintiff could "point out the nuances and the limitations of the Science Panel's findings" to show how her dosage of C-8 prevents the No Probable Link Finding from being applied to her. Obviously, this analysis is prohibited by the unambiguous language of the *Leach* Settlement Agreement. Just as all of the *Leach* class members are foreclosed from challenging the objective criteria and/or protocols utilized by the Science Panel in reaching its No Probable Link Findings, DuPont is foreclosed from challenging the objective criteria and/or protocols utilized by the Science Panel in reaching its Probable Link Findings.

Last, the Court finds unpersuasive DuPont's contention that, in spite of the clear contractual language, toxic tort case law informs what the parties meant by general causation because the parties used the same language in the *Leach* Settlement Agreement that is used in that case law. (Tr. at 28–29) ("[T]he general causation in the settlement agreement is defined the same way consistent with general tort case law, the substance is capable of causing a disease."). In relying on a body of toxic tort federal case law, the Ohio Supreme Court defined general causation as "'whether a substance is capable of causing a particular injury or condition in the general population.'" *Terry v. Caputo*, 115 Ohio St. 3d 351, 355 (2007) (citations omitted). That definition, however, is not the same as the one utilized in the *Leach* Settlement Agreement. The *Leach* Settlement Agreement defines general causation to "mean that it is probable that exposure to C-8 is capable of causing a particular Human Disease." (S.A. § 1.25.) The Agreement does not include the phrase "in the general population." Nor could it have included that phrase and remain consistent with the other provisions of the Agreement. As the Court just outlined, the Settlement Agreement definitively states that the Science Panel was tasked with *studying diseases among the class members* exposed to C-8 and determining whether there is a link between that exposure and a human disease *among those class members* [-- not whether the link exists between C-8 and any human disease in the general population].

*Id.* at 7–12. Based on this analysis, the Court concluded:

Accordingly, the Court concludes that if the individual plaintiffs prove that they are a *Leach* Class member and that they suffer or suffered from a Linked Disease, the Probable Link Finding is applicable to them. This means, for example, that the individual plaintiffs are not required to come forward with evidence proving that their individual dosage of C-8 is sufficient to permit the Probable Link Finding to be applied to them. Under these circumstances, by

agreeing to the *Leach* settlement, DuPont has contractually agreed to a finding of general causation.

*Id.* at 12.

DuPont subsequently moved for clarification of DMO 1, stating:

> In DMO 1, the Court found that, as part of the individual plaintiffs' case in chief, they would not be required to prove that their individual dosage of PFOA is sufficient to permit the relevant Probable Link report to apply to them. During the March 25, 2015 phone conference, the Court clarified that, while no party can deny that there is a link between PFOA and one of the six Probable Link diseases in a case involving a *Leach* class member, DuPont could raise dose as part of the weighing between competing risk factors of the amount of increased risk in an individual plaintiff.

(DuPont's Mot. for Clarification at 1; MDL ECF No. 2814.) At the same time DuPont filed its

Motion for Clarification, it filed a document titled "DuPont's Overview Brief on Causation

Issues" and incorporated it into its Motion for Clarification. (MDL ECF No. 2813.)

On July 6, 2015, the Court issued DMO 1-A addressing DuPont's Motion for

Clarification and its incorporated Overview Brief on Causation Issues, stating, in relevant part:

> There is no dispute that the plaintiffs must prove that C-8 specifically caused their Linked Diseases. In their attempt to do so, the plaintiffs' experts utilize differential diagnoses. (Trial Pls.' Expert Reports; [MDL] ECF No. 3441.) The Court has referred to this type of analysis on several occasions, including the March 25, 2015 discovery dispute telephone conference relied upon by DuPont as reason to bring its Motion for Clarification. It is well-established in the Sixth Circuit that employing a differential diagnosis is an appropriate means to establish causation. *See Best v. Lowe's,* 563 F.3d 171, 178–80 (6th Cir. 2009) (citing *Hardyman v. Norfolk & Ry. Co.,* 243 F.3d 255, 260 (6th Cir. 2001)). "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Hardyman,* 243 F.3d at 260. DuPont contends that as part of *specific causation*, a plaintiff must show that her specific dose of and/or exposure to C-8 was *capable of causing* her Linked Disease *and* that it did in fact cause that disease in her.
>
> As it did in its briefing and arguments before the Court on DuPont's First Motion Regarding Causation, DuPont currently insists that to defend against the plaintiffs' attempt to establish specific causation, it is permitted to dissect the "Probable Link reports" to expose their limitations, teasing out what the Science

Panel found and what it did not find. DuPont engages in this analysis by reevaluating, *inter alia*, (1) the populations the Science Panel studied; (2) the protocols and models used; (3) the mechanisms of action, and (4) the toxicology and epidemiological investigations utilized. According to DuPont, it can then determine "whether increasing exposure to PFOA was associated with increasing risk of human disease." (DuPont's Overview of Causation at 7.)

DuPont contends that this analysis is necessary because the "dose of PFOA varied widely across class members" and some members' exposure and/or dose were in a particular quartile or group where no statistically significant associations were found. DuPont argues that the "Science Panel understood the word 'among' to mean intermingled with, not 'all.'" (DuPont's Reply in Support of Mot. for Clarification at 2.) Thus, when the Science Panel concluded that there is a link between C-8 and a Linked Disease *among* the members of the *Leach* Class, it did not mean that the link was found for every class member. Instead, DuPont continues, the parties must have their experts determine the limitations reflected in the Probable Link evaluations to determine whether the member of the *Leach* Class had sufficient exposure to C-8 for it to be *capable of causing* his or her Linked Disease. DuPont concludes that after such analysis, the Science Panel reports show that there are certain members of the *Leach* Class whose exposure to and/or dose of C-8 was at a level at which the Science Panel found no increased risk of acquiring the Linked Disease with which they suffer, let alone that it is more likely than not that there is a link between their exposure to and/or dose of C-8 and their Linked Disease.

For example, in DuPont's Overview of Causation, it purports to "address[] the proper application of the Science Panel's Probable Link reports to the specific causation determinations for Trial Plaintiff[] Bartlett . . . ." (DuPont's Overview of Causation at 1.) DuPont contends that Mrs. Bartlett cannot show that her exposure to and/or dose of C-8 is *capable of causing* her kidney cancer. DuPont reviews the studies conducted by the Science Panel and determines that, accounting for numerous factors, Mrs. Bartlett fits into what it refers to as a low dose/exposure group of females and that group showed no statistically significant increased risk of developing kidney cancer. In application, as in DuPont's Motion for Summary Judgment on the Individual Claims of Trial Plaintiff Bartlett Based on Specific Causation, DuPont posits:

> There are no toxicology studies that support PFOA increasing the risk of kidney cancer at the exposure levels claimed by Mrs. Bartlett. [Defense Expert Robert W.] Rickard Report at 7. Further, there is no established mechanism of action by which PFOA *could cause kidney cancer at the exposure levels claimed by Mrs. Bartlett. Id.*

(DuPont's Mot. for Summ. J. on Bartlett Specific Causation at 6; ECF No. 2816) (emphasis added).

The plaintiffs dispute whether Mrs. Bartlett falls into a low exposure/dose group, asserting that she has significantly-elevated C-8 [levels]. (Plaintiffs' Mem. in Opp. to DuPont's Mot. for Summ. J. on Bartlett Specific Causation; ECF No. 3196.) Nevertheless, the plaintiffs maintain, it is irrelevant to the issue at hand because DuPont's position is strictly prohibited by the *Leach* Settlement Agreement. This Court agrees.

While DuPont couches its argument in terms of specific causation, it is unquestionably a challenge to what the parties defined in the *Leach* Settlement Agreement as general causation. DuPont's position precludes certain *Leach* Class members from receiving the benefit of the Probable Link Findings based upon an independent analysis of what the Science Panel studies allegedly found and did not find. However, the *Leach* Settlement Agreement unequivocally provides for application of the Probable Link *Finding*, *i.e.*, the *conclusion* reached by the Science Panel, to every plaintiff who can show that he or she is a member of the *Leach* Class and has or had one of the Linked Diseases.

(DMO 1-A at 6–9, DuPont's Motion for Clarification of DMO 1, Class Membership and

Causation, MDL ECF No. 3972.)

The Court additionally explained in DMO 1-A that "[n]othing DuPont brings before the

Court in its Motion for Clarification or Overview of Causation calls into question any of the

Court's analysis in DMO 1." *Id.* at 11. The Court, however, in DMO 1-A provided further

explanation, stating:

The *Leach* Settlement Agreement set forth in detail the project with which the Science Panel was tasked. The Science Panel engaged in its work in two phases:

Phase I. In the first phase of its work, the Science Panel shall be responsible for the Community Study and establishing, by a vote of at least two members of the Science Panel, agreed upon objective criteria for the Science Panel to evaluate the Community Study, Worker Study and any other relevant studies and/or data to determine, based upon a vote of at least two members of the Science Panel, whether there is an Association between C-8 exposure and any Human Disease(s). . . .

Phase II. If one or more Association Findings is delivered by the Science Panel, the Science Panel shall commence a second phase of work ("Phase II"). In Phase II, the Science Panel shall

40

establish, carry out and analyze one or more protocols for further study of any Association Finding from Phase I ("Hypothesis Testing Studies") and, upon completion of all Hypothesis Testing Studies, evaluate the available scientific evidence to determine, based upon a vote of at least two members of the Science Panel, whether such evidence demonstrates a Probable Link between C-8 exposure and any Human Disease. . . .

(S.A. §§ 12.2.3(a) and (b).)

The Science Panel engaged in its work for *seven years* before issuing its Probable Link Findings and No Probable Link Findings. The *Leach* Settlement Agreement unambiguously requires those Findings, not the way in which the Science Panel reached the Findings reported in its reports/evaluations, to apply to the *Leach* Class. (S.A. §§ 1.50, 12.2.3(b)(1) (defining a Probable Link Finding as the Science Panel's "*conclu[sion]* that there is a Probable Link between C-8 exposure and Human Disease(s)") (emphasis added). DuPont's mistake is focusing on the Science Panel's reports/evaluations instead of its Findings.

DuPont, however, does not direct the same focus to the No Probable Link Findings. *DuPont has received the benefit of the No Probable Link Findings –* immunity from lawsuits based on over forty human diseases that tens of thousands of members of the *Leach* Class believe were caused by their ingestion of C-8 that was released into their drinking water by DuPont. *None of those class members may engage in any analysis of the No Probable Link reports/evaluations.* The conclusions reached in the No Probable Link reports, that is, the No Probable Link Findings, universally apply to the *Leach* Class. It is for this reason too that the Court is not persuaded by DuPont's argument that "the Science Panel interpreted 'among' to refer to only part of the whole group -- not the whole group." (DuPont's Overview of Causation at 11). Reading the word in context and with a view to its place in the overall contract leaves the meaning absent of ambiguity.

Moreover, accepting DuPont's position would eviscerate the main benefit flowing to the plaintiffs in the *Leach* Settlement Agreement, *i.e.*, *DuPont's concession of general causation for the Linked Diseases.* Thus, as it is with the No Probable Link reports/evaluations, the only relevant aspect of the Probable Link reports/evaluations is the conclusion, which is defined as the Probable Link Finding. Those Findings are applicable to every member of the *Leach* Class who has or had a Linked Disease. Thus, for example, Mrs. Bartlett is not required to prove that her dose of and/or exposure to C-8 *is capable of causing* her kidney cancer. The Probable Link Finding applies to Mrs. Bartlett and establishes that it is "more likely than not that there is a link between exposure to C-8 and" her kidney cancer, ("a particular Human Disease among Class Members").

41

DuPont takes issue with this conclusion maintaining that "[t]he Science Panel's Probable Link evaluation was not a scientific determination of causation." (DuPont's Reply in Support of Mot. for Clarification at 4.) DuPont posits that "[i]n light of the Science Panel's Probable Link evaluations, DuPont's only concession as it relates to the Bartlett . . . trial[] is that it will not claim that C-8 is incapable of causing . . . kidney cancer at [her] trial[]." (DuPont's Overview of Causation at 3.) It will, however, claim Plaintiff's . . . exposure to and/or dose of *C-8 is incapable of causing* kidney cancer . . . . DuPont's position, stated another way, is that while it will not challenge general causation (as that term is defined in the *Leach* Settlement Agreement), Mrs. Bartlett and Mr. Wolf *must still prove it.*

To further support its position, DuPont relies upon a letter sent to the Science Panel from counsel for the *Leach* Class in which that counsel states he is responding to the Science Panel's request "seeking guidance from the Parties" on the probable link standard. (DuPont's Overview of Causation, Ex. B at 1; ECF No. 2813-2.) The letter refers to the probable link standard as it is established in West Virginia case law related to medical monitoring claims and indicates, among other things, that the "'probable link' test was intended to 'be a relaxation of the traditional requirement that a . . . plaintiff prove general causation, that is, that the substance in question causes the disease. . . . '" *Id.* at 2, 4 ("In short, the Science Panel's sole charge is to determine if, looking at all the available evidence, there is just enough information to tip the scales toward a finding of any link between PFOA exposure and any human disease.").

Leaving aside the issue of whether the Court may even consider this letter to inform the plain language of the *Leach* Settlement Agreement, it is not incongruent with the Agreement. The *Leach* Settlement Agreement does not require a finding of general causation to trigger DuPont's concession of general causation, as that term is defined by the parties. Instead, the *Leach* Settlement Agreement reflects the parties' agreement that a Probable Link Finding triggers concession of general causation, as that term is defined by the parties. The "fact" [as DuPont contends] that the Probable Link Finding is a lower standard than general causation is irrelevant when the parties have made such an agreement, which they are certainly permitted to and did make. And, further, in the context of the *Leach* Settlement Agreement, a distinction between conceding general causation and a prohibition against challenging general causation is, in application, one without a difference.

(DMO 1-A at 11–14, MDL ECF No. 3972) (alterations added). Thus, the Court explained that, even if the letter were considered in isolation as DuPont requests, and the Court accepted that the Probable Link Finding is a lower standard than general causation, it is of no moment in this analysis.

In a later Evidentiary Motions Order ("EMO"), the Court addressed "DuPont's attempt to frame the issue as whether or not the Science Panel made a 'scientific determination'" and found that it "is of no consequence." (EMO 1 at 9, Plaintiffs' and Defendant's Mots. For Expert Opinions Related to Causation, MDL ECF No. 4079.)  The Court explained:

> In the *Leach* Settlement Agreement, the parties directed the Science Panel's work and dictated how the results would be applied to the *Leach* Class members' claims.  It matters not whether, in DuPont's view, the Probable Link Findings and/or No Probable Link Findings are appropriately classified as scientific determinations.   The *Leach* Settlement Agreement unambiguously dictates the effect of the Findings:  If the Science Panel found that it was "more likely than not that there is a link between exposure to C-8 and a particular Human Disease among Class Members," the Panel issued a Probable Link Finding for that specific disease and DuPont waived its right to challenge whether "it is probable that exposure to C-8 is capable of causing" the Linked Disease, *i.e.*, general causation. (S.A. § 3.3)  If, however, the Science Panel issued a No Probable Link Finding for a particular human disease found among members of the *Leach* Class, those members' personal injury and wrongful death claims against DuPont are forever barred.  Thus, it is of no moment whether the Findings are, or are not, properly referred to as what DuPont defines as scientific determinations.

*Id.*

In DMO 1-A, the Court lastly addressed DuPont's position "that it will not claim that C-8 is incapable of causing" kidney cancer at Mrs. Bartlett's trial, concluding that DuPont's position "is based upon its continued reliance on the definition of general causation reflected in toxic tort case law." (DMO 1-A at 14, MDL ECF No. 3972.)  The Court explained that the definition upon which DuPont relies "is different from the one the parties established in the *Leach* Settlement Agreement." *Id.* (citing to DMO 1 at 11–12 and quoted above in the instant decision where the Court explained that the definition utilized in toxic tort law "is not the same as the one utilized in the *Leach* Settlement Agreement").  This Court then expanded on its previous assessment, stating:

> By way of further explanation, the *Leach* Settlement Agreement established a novel procedure for dealing with the approximately 80,000

individuals that make up the *Leach* Class by establishing the Science Panel and directing its work. Unlike the usual situation where epidemiologists start with a chemical exposure and then attempt to define the dose of that chemical which presents a sufficiently increased risk to conclude that such dose is "more likely than not" sufficient to cause a particular disease, the parties directed the Science Panel to follow a very different process.

The Science Panel was focused on an identified group of people (the *Leach* Class) with a defined level of exposure (.05 ppb or greater of C-8 for the period of at least one year) to a particular chemical (C-8) and [directed to] determine, not how much of the chemical it might take to cause various diseases in humans generally, but which diseases were linked to the actual C-8 exposures in that defined group. The Science Panel's Probable Link Findings are, by agreement of the parties and by definition, links that exist and are "probable" in the entire *Leach* Class.

*Id.* at 15.

As stated in the Opinions and Orders referenced above, DuPont's position on causation conflates the parties' unambiguous definitions that they set forth in the *Leach* Settlement Agreement and would eliminate the main benefit flowing to the *Leach* Class from the *Leach* Settlement Agreement, *i.e.*, DuPont's concession of general causation for the Linked Diseases.

**2. Impact of the *Leach* Settlement Agreement on Causation Evidence**

As shown in DMO 1 and DMO 1-A, DuPont and the *Leach* Class plaintiffs explicitly defined specific and general causation in the *Leach* Settlement Agreement and the Court directed admission of evidence at trial and instructed the jury in accordance with the parties' agreements. DuPont maintains that it was prejudiced by "the impact of the Court's ruling during the course of the trial" because the Court (a) "adopted" the "0.05 ppb for at least one year as a standard" and (b) "DuPont was barred from presenting the most fundamental opinion of its specific causation expert" Samuel M. Cohen, M.D., Ph.D. (DuPont's Post Trial Mot. at 17, 21, Bartlett ECF No 151); ("Cohen Report"; MDL ECF No. 2807-1.)

### a.    The 0.05 ppb for at least one year as a standard

DuPont posits that the Court "adopted" the "0.05 ppb for at least one year as a standard" and Mrs. Bartlett's "counsel was improperly allowed to wield the 'standard' to argue that they had conclusively established specific causation with respect to Mrs. Bartlett." (DuPont's Post Trial Mot. at 19, Bartlett ECF No. 151). DuPont argues that the Court permitted Mrs. Bartlett to "present as a scientific 'fact' something that had never been determined by the Science Panel or anyone else" in that

> neither the parties to the *Leach* Settlement nor the Science Panel ever agreed or determined that exposure to C-8 at a level of 0.05 ppb (which was simply the minimum detection limit for C-8 at the time of the *Leach* settlement in 2004) for one year causes kidney cancer or any other disease in any individual. Nonetheless, from the outset of the trial, 0.05 ppb was explicitly pronounced by the Court to be the causation "standard." *See, e.g.*, Sept. 15, 2015 Trial Tr. at 149:19-20 (The Court: "I would call this the .05 standard"). This standard was characterized throughout the trial as one that had been "agreed" to and was "undisputed," despite the fact that there was never any such agreement.

*Id.* at 17 (emphasis removed) (highlighting Mrs. Bartlett's counsel's closing argument in which he stated that the standard was a testament to how quickly cancer could be caused by C-8; and during cross examination of DuPont's expert about DuPont's "getting it wrong" when it set a "safe" standard for C-8 at a much higher ppb; and in opening stating that 0.05 ppb is the "compass" and "beacon in the night because we know that [C-8 causes cancer"). DuPont further notes that the Court denied its request to permit the Science Panel report to be admitted into evidence, even though the jury asked to view it, contending that "the Science Panel Report would have laid bare the fallacy behind Plaintiff's argument because it *never* determined that .05 ppb exposure for a year caused anything." *Id.* at 22. Stated another way in DuPont's Reply:

> More broadly, Plaintiff's response operates under a key fallacy. Plaintiff was exposed to enough C-8 to become a class member, relieving her of the burden of proving general causation, as the Science Panel concluded that *C-8 is capable of causing kidney cancer*. But Plaintiff mistakenly twists this into an

45

> assumed scientific fact (when no such fact exists) that this particular Plaintiff was exposed to enough C-8 to be *capable of causing her kidney cancer*. The Science Panel never determined that the minimum exposure required to be a member of the class was sufficient to cause any disease. The Court's rulings barring DuPont from presenting these issues to the jury pervasively impacted the trial and unfairly prejudiced DuPont.

(DuPont's Reply at 13, Bartlett ECF No. 159) (emphasis added).

DuPont's assessment is inaccurate. There is no mistaken twisting of the Science Panel's determination into the fact that "the minimum exposure required to be a member of the class was sufficient to cause any disease." *Id.* That is exactly what the Science Panel's Probable Link Finding means. Once an individual proved that she drank water that contained at least 0.05 ppb of C-8 for at least one year, she was entitled to have the Probable Link Finding applied to her. The Probable Link Finding means that for that *Leach* Class member it is more likely than not that there is a link between her exposure to C-8 (*i.e.*, drinking water containing at least .05 ppb of C-8 for at least one year) and her Linked Disease.

The Court did not instruct the jury that exposure to C-8 at the level of 0.05 ppb for one year *causes* kidney cancer or that it was a *causation standard*. As the Court just explained in detail above, in the *Leach* Settlement Agreement, the parties agreed that the Science Panel was to evaluate an identified group of people (the *Leach* Class) with a defined level of exposure to C-8 (.05 ppb or greater of C-8 for the period of at least one year) and determine if any diseases were linked to the actual C-8 exposures in that defined group. It is not, therefore, inaccurate to state that the parties agreed that membership in the *Leach* Class is determined by the ".05 ppb for at least one year standard" and that if Mrs. Bartlett met this "standard," DuPont conceded general causation, (*i.e.*, that the C-8 to which Mrs. Bartlett was exposed was capable of causing her kidney cancer).

Further, the mere fact that the jury asked it if it could view the Probable Link Report on kidney cancer in no way reflects that any member of the jury failed to understand any aspect of the specific causation standard. As explained in detail *supra*, the *Leach* Settlement Agreement unquestionably dictated that the Science Panel *Findings* were applicable to each member of the *Leach* Class. The actual reports, setting out the objective protocols and scientific investigations utilized to determine whether it is more likely than not that there is a link between exposure to C-8 and kidney cancer among the *Leach* Class *dealt only with general causation* as that term was defined by the parties in the *Leach* Settlement Agreement. Consequently, contrary to DuPont's unsupported assumptions, reviewing the Science Panel report would have shed no light on the specific causation issue that was presented to the jury.

Moreover, any prejudice that DuPont claims to have suffered from any stray improper statement or insinuation by Mrs. Bartlett's counsel, such as stating in its opening statement that "we know that C-8 causes cancer" instead of "we know that C-8 can cause cancer," was remedied by the Court's careful and repetitive limiting instructions to the jury:

> Prior to this trial, DuPont and representatives of Ms. Bartlett agreed to have a science panel study whether there was a link between C-8 and kidney cancer among people exposed to a certain level of C-8 in their water for at least one year. The science panel conducted a study and determined that there is a probable link between a certain level of C-8 in drinking water and kidney cancer. That level – and you will be hearing testimony on this – is .05 parts per billion. If Ms. Bartlett proves by a preponderance of the evidence that she drank water over a year that had such levels or above of C-8, then both sides in this case have agreed that *C-8 is capable of causing kidney cancer*.
>
> In a case involving exposure to an allegedly hazardous chemical, a plaintiff must typically prove by a preponderance of the evidence two issues. First, that as a general matter of science, the chemical can cause the injuries complained of. This is called general causation, meaning that the chemical is proved to be related to certain medical conditions. Second, a *plaintiff must prove* that she was herself specifically injured by the chemical. That is called *specific causation*.

47

> In this case because of the parties' agreement to be bound by the conclusions of the science panel, there is no dispute that as to general causation, the parties have agreed, and you will be bound by this agreement, that if Ms. Bartlett proves she drank water for over one year that contained .05 parts per billion of C-8, then *she has automatically established general causation, meaning that C-8 is capable of causing kidney cancer*.

> Juries decide disputed facts, and general causation is not disputed if Ms. Bartlett shows she drank water for over a year containing certain amounts of C-8.

> *To be clear, DuPont is contesting what I just described as specific causation. So this issue is a disputed fact which you will decide. Ms. Bartlett has the burden of proving by a preponderance of the evidence that in her actual case, her kidney cancer was caused by C-8 and not some other cause unrelated to C-8.*

(Final Pretrial Conf. Tr. at 4–5, Bartlett ECF No. 124) (emphasis added).

Preserving any previously made objections, the parties agreed to this language. The Court gave the instruction at the beginning of the trial and then, at the request of a party, *eighteen times* during the trial. DuPont maintains that the Court worded this instruction slightly differently when it was given and cites to one occasion when discussing the difference between general and specific causation the Court stated the Science Panel conclusively found, and the jury would therefore not "be deciding that first question of whether or not C-8 in that dosage [.05 ppb] for over a year causes kidney cancer." (Trial Tr. Vol. 7 at 187, Bartlett ECF No. 128-2.) In light of the numerous repetitions of the limiting instruction and the context in which that reference was made, the wording ("causes" instead of "can cause") was not misleading. Further, no party made a contemporaneous objection, which could have permitted a re-wording. And, even if it were less than clear that the Court meant that drinking water with that dosage is capable of causing kidney cancer, it certainly does not rise to anything other than harmless error. Further, at the close of testimony in the trial, DuPont informed the Court that it was not going to put on evidence contesting that Mrs. Bartlett was member of the *Leach* Class. Thus, the Court provided the following instruction at the conclusion of the trial:

48

I instruct you that before this case began, the parties, DuPont and a representative of Mrs. Bartlett, agreed to have a science panel study whether there was a link between C-8 and kidney cancer. The science panel conducted a study and concluded in 2012 that there is a probable link between C-8 and kidney cancer for persons drinking water for over one year having a C-8 content of .05 parts per billion or over.

Following presentment of this case, I instruct you that Mrs. Bartlett has conclusively established that she drank water for more than one year having a C-8 content of more than .05 parts per billion. Therefore, you will treat as proven in this case that Mrs. Bartlett has established that *C-8 is capable of causing* her kidney cancer. While this fact is established, *you will still decide whether Mrs. Bartlett has proven all the elements of her claim and that, in her case, the kidney cancer was caused by C-8*.

(Trial Tr. Vol. 16 at 190–91, *Bartlett* ECF No. 145.)

Based on the foregoing, the Court finds that there is no definite and firm conviction that it committed a clear error of judgment in its assessment of the parties' arguments related to the *Leach* Settlement Agreement.

**b.     Dr. Cohen's Expert Opinion**

Before Dr. Cohen rendered his expert opinion, this Court issued DMO 1, discussing the *Leach* Settlement Agreement as detailed above, in which it concluded, *inter alia*, that "DuPont cannot now prevent a class member from the benefit of [the Probable Link Finding] by pointing out the 'limitations' in the objective criteria and/or protocols the Science Panel utilized to make its conclusions or by extrapolating from the Science Panel's analysis what the Panel 'did not find' in its Probable Link Finding." (DMO 1 at 9–10, MDL ECF No. 1679.) Notwithstanding DuPont's agreement with the *Leach* Class memorialized in the *Leach* Settlement Agreement, and this Court's direction in DMO 1, DuPont failed to provide any instruction to Dr. Cohen regarding DuPont's agreed acceptance of the Probable Link Finding and its agreed prohibition of dissecting the objective criteria and/or protocols utilized by the Science Panel over the seven year period it engaged in its study. Consequently, in his expert report, Dr. Cohen opined:

49

Although several chemicals have been associated with the development of renal cell tumors in animal models . . . none have been shown to be associated with an increase in renal cell carcinomas in humans.

. . . .

The [PFOA] exposure that Mrs. Bartlett claims was not associated [in any study] with an increased risk of kidney cancer.

. . . .

As indicated above, there has been a suggestion of a possible relationship in some studies between PFOA and kidney cancer. However, this only occurs at exposures considerably higher than Mrs. Bartlett's exposure.

No [toxicology] studies support the claim that any cancer tumor could be caused at the low dose of PFOA claimed by Ms. Bartlett. Likewise, in all of the epidemiology studies, including the Science Panel studies, a possible relationship between PFOA and kidney cancer was only observed at much higher exposures than Mrs. Bartlett likely experienced. The exposure that Mrs. Bartlett claims was not associated with an increased risk of kidney cancer.

(Cohen Report at 8, 22, 23, MDL ECF No. 2807-1.) Dr. Cohen also offered testimony related to obesity as a risk and causal factor in kidney cancer and testimony to rebut Mrs. Bartlett's claim that her injury was specifically caused by her exposure to C-8. Dr. Cohen concluded: In sum, it is my opinion . . . that the renal cell carcinoma of Mrs. Bartlett resulted from her history of morbid obesity, and was not caused by or related to her low exposure to PFOA." *Id.* at 22.

In addressing Dr. Cohen's testimony, the Court found that his opinions refer to his "analysis as relating to specific causation, when in actuality the analysis is directed at what the parties defined in the *Leach* Settlement Agreement as general causation." (EMO 1 at 11, MDL ECF No. 4079.) In other words, Dr. Cohen opines that C-8 has _not_ been found to be capable of causing kidney cancer in a member of the *Leach* Class. He simply could not testify to this without scuttling the entire *Leach* Settlement Agreement. In this regard, the Court expounded in EMO 1:

50

Again, as the Court explained in DMO 1 and DMO 1-A, the plaintiffs are not required to prove that their dose of and/or exposure to C-8 is *capable* of causing their Linked Diseases. If the plaintiffs prove that they are a member of the *Leach* Class and that they have or had a Linked Disease, the Probable Link Finding applies to them. Application of the Probable Link Finding establishes that it is more likely than not that there is a link between that class member's exposure to C-8 and his or her Linked Disease, and DuPont is prohibited from challenging whether it is probable that exposure to C-8 is capable of causing that Linked Disease.

What this means in the evidentiary context is that the Probable Link Findings are valid and reliable evidence, admissible to establish that it is more likely than not that there is a link between each member of the *Leach* Class' exposure to and/or dose of C-8 and his or her Linked Disease. Indeed, DuPont confirms that it "is not contesting the 'validity and reliability' of the Science Panel's Probable Link reports." (DuPont's Mem. in Opp. at 3.) Consequently, all of DuPont's experts' opinions that support a challenge to what the parties have defined as general causation are not relevant because there is no "connection between the [opinion] being offered and [any] disputed factual issues" that are before the Court. *Price v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000) (citing *Daubert* [*v. Merrell Dow Pharm., Inc.*], 509 U.S. [579,] 592 [1993]). DuPont has conceded general causation as that term is defined in the *Leach* Settlement Agreement.

(EMO 1 at 9–10, MDL ECF No. 4079.)

In rendering his expert opinion on causation, Dr. Cohen utilized a differential diagnosis, which the Sixth Circuit describes as follows:

This circuit has recognized differential diagnosis as an "appropriate method for making a determination of causation for an individual instance of disease." *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001); *see also Best*, 563 F.3d at 178 (stating that a causation opinion based upon a reliable differential diagnosis may satisfy the requirements of Rule 702). Differential diagnosis is "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Hardyman*, 243 F.3d at 260 (internal quotation marks omitted). As we explained in *Best*, a physician who applies differential diagnosis to determine causation "considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history." 563 F.3d at 178 (internal quotation marks omitted).

*Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 678 (6th Cir. 2011).

> Calling something a 'differential diagnosis' or 'differential etiology' does not by itself answer the reliability question but prompts three more:
>
>> (1) Did the expert make an accurate diagnosis of the nature of the disease? (2) Did the expert reliably rule in the possible causes of it? (3) Did the expert reliably rule out the rejected causes? If the court answers "no" to any of these questions, the court must exclude the ultimate conclusion reached.

*Id.* (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 674 (6th Cir. 2010)).

"'The core of differential diagnosis is a requirement that experts at least consider alternative causes.'" *Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) (quoting *In re Paoli Railroad Yard PCB Lit.*, 35 F.3d 717, 759 (3d Cir. 1994)). Yet, "doctors need not rule out every conceivable cause in order for their differential-diagnosis-based opinions to be admissible." *Id.* at 181. "'The fact that several possible causes might remain uneliminated . . . only goes to the accuracy of the conclusion, not to the soundness of the methodology.'" *Jahn,* 233 F.3d at 390 (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996)).

The Court concluded that Dr. Cohen's specific causation analysis is unreliable because it failed to meet the second prong of *Tamraz*. That is, Dr. Cohen did not reliably *rule in* Mrs. Bartlett's exposure to C-8 as a possible cause of her Linked Disease. (EMO 1 at 17, MDL ECF No. 4079) ("Accordingly, the portions of . . . Dr. Cohen's opinions that fail to rule in C-8 as a possible cause of the [Mrs. Bartlett's] Linked Disease[] are unreliable and excluded under *Daubert* and the Federal Rules of Evidence.").

After issuance of EMO 1, Mrs. Bartlett moved *in limine* for exclusion of Dr. Cohen's expert opinion and testimony specifically related to obesity. (Pl.'s Mot. *in Limine* No. 6; MDL ECF No. 4085.) The Court heard oral argument on that motion, as well as thirty-nine others, on August 24 and 25, 2015, at a Motions *in Limine* Hearing. (MDL ECF Nos. 4209, 4210.) On August 31, 2015, the Court denied Mrs. Bartlett's motion *in limine*. (Motion *in Limine* Order

52

No. 2 ("MIL 2"), Evidence Regarding Obesity as a Causal Factor, MDL ECF No. 4206.)  The

Court concluded that not all of Dr. Cohen's expert opinion was excludable.  At the Final Pretrial

Conference held September 9, 2015, the parties again raised the issue of Dr. Cohen's testimony

and their disagreement as to the direction given in EMO 1 and MIL 2.  The Court ordered a third

round of briefing on the issue, directing the simultaneous exchange of briefs setting out the

parties' positions.  In accordance with that direction, the parties filed their briefs at 8:30 p.m. on

Friday, September 11, 2015.

On Monday, September 14, 2015, before the start of Mrs. Bartlett's trial, the Court held a

conference on the record and rendered the decision orally on Dr. Cohen's testimony and

memorialized and expanded upon it in EMO 1-A.  (EMO 1-A, Def.'s Specific Causation Expert,

MDL ECF No. 4226.)  In that decision, the Court reiterated from EMO 1 that "Dr. Cohen's

statements disregard completely the Science Panel's Finding that it is probable that exposure to

C-8 is capable of causing Mrs. Bartlett's kidney cancer."  *Id.*  The Court then explained further:

> Dr. Cohen in his Report used a different dosage, a different drinking
> history, and a different conclusion than the Science Panel utilized.  To let him
> testify contrary to the Science Panel's Finding would eviscerate the *Leach*
> Settlement Agreement.  Because Dr. Cohen failed to rule in C-8 as a possible
> cause of Mrs. Bartlett's kidney cancer, his Ultimate Causation Opinions are
> unreliable and excluded under *Daubert* and the Federal Rules of Evidence.

*Id.* at 7–8.  To give further direction regarding Dr. Cohen's testimony that would be permitted at

trial, the Court stated:

> It is undisputed that it is Mrs. Bartlett's burden to prove specific causation.
> What that means is, under Federal Rules of Civil Procedure 56 and 50 later in
> trial, DuPont could not merely counter affirmative evidence of specific causation
> with argument to the jury that Mrs. Bartlett's witness should not be believed.  But,
> DuPont can present a witness to create a triable issue by attempting to disprove
> the reliability of testimony on specific causation, which is what may be done here
> with Dr. Cohen.

Dr. Cohen's testimony is admissible to rebut Mrs. Bartlett's claim that her injury was specifically caused by exposure to C-8. For example, the following part of his Report is admissible for impeachment purposes:

> The written reports of the plaintiff's experts are incorrect when they indicate that they can dismiss Mrs. Bartlett's obesity. As explained above, obesity is a very well established risk factor of the development of renal cell kidney cancer.
>
> Although some of the expert opinion reports for the plaintiff list many potential risk factors for kidney cancer, in fact many of the substances on their lists refer to risks associated with kidney pelvis urothelial tumors, not for renal cell carcinomas. For example, phenacetin is listed by them as a cause of renal cell carcinoma. Although it is associated with kidney damage (to the renal papilla), it is only associated with urothelial tumors, most commonly of the kidney pelvis but also of the ureters and urinary bladder (IARC, 2012).
>
> Based on the CV's provided of the plaintiffs' experts, it does not appear that they have experience with investigations concerning animal carcinogenesis or human cancer epidemiology, nor do they appear to have experience on committees or panels related to an evaluation of cancer etiology or extrapolation from animal models to humans. They appear to be relying on published reports without a background to critically analyze them.
>
> . . . .
>
> In the reports of Dr. Stein and Dr. Margulis, they refer to her kidney tumor as stage 2. That is incorrect as the tumor would have had to have been >7 cm. in greatest diameter for such a classification, and Mrs. Bartlett's tumor was up to 3.2 cm. in diameter according to the pathology report and was never measured greater than 5 cm. in diameter in imaging studies.

(Cohen Report at 23); (*see also* MIL 2 at 5) (testimony regarding the role of obesity in kidney cancer generally).

*Id.* at 8–9.

Thus, the gravamen of Dr. Cohen's testimony – that obesity caused Mrs. Bartlett's kidney cancer – was fully heard by the jury. What was excluded was testimony contradicting the Science Panel's Finding, to which the parties had agreed. In DuPont's Post Trial Motion, it

54

contends that it was prejudiced by the rulings the Court made prior to trial regarding Dr. Cohen's testimony and "[t]hat prejudice was compounded when the Court allowed Plaintiff's counsel to question Dr. Cohen about the fact that he did not give an opinion on direct examination with respect to the etiology or causation of Plaintiff's cancer."  (DuPont's Post Trial Mot. at 21, MDL ECF No. 151) (citing Trial Tr. Vol. 12 at 272, MDL ECF No. 133.)  DuPont concludes that, "[t]his improperly gave the jury the false impression that Dr. Cohen did not have an opinion about the cause of Mrs. Bartlett's cancer, when in fact, Dr. Cohen does have an opinion (that her cancer was caused by obesity, and not C-8) but he was specifically prevented from offering that opinion."  (EMO 1-A at 8–9, MDL ECF No. 4226.)  *Id*.  DuPont's arguments are not well taken.

First, as the Court has explained in detail, it has not erroneously interpreted the *Leach* Settlement Agreement -- indeed it has done nothing more than apply the plain and unambiguous language of that Agreement.  DuPont drafted and agreed to the *Leach* Settlement Agreement in 2005.  DuPont had notice that this Court planned to enforce the *Leach* Settlement Agreement as drafted by the parties (DMO 1) before Dr. Cohen's opinion was issued.  Therefore, DuPont had the opportunity to direct its expert within the parameters of the *Leach* Settlement Agreement, but chose not to do so.  Consequently, any prejudice DuPont suffered related to exclusion of a portion of Dr. Cohen's opinion was by its own hand.

Second, the Court disagrees with DuPont's contention that the Court permitted Mrs. Bartlett's counsel to suggest that Dr. Cohen did not have an opinion as to the cause of Mrs. Bartlett's cancer.  During cross examination of Dr. Cohen, the Court sustained an objection made by DuPont in this regard and directed counsel's questioning:

> Q.  [by Mrs. Bartlett's counsel Mr. Douglas to Dr. Cohen]  You did not render an opinion on your direct examination --
>
> MR. MACE: Objection, Your Honor.

55

THE COURT: One- or two-word basis?

MR. MACE:   Can we approach?

THE COURT: I'll see you at side-bar.  You may stand by your seats, ladies and gentlemen.

(Discussion at side-bar as follows:)

MR. MACE:   Your Honor, he's about to ask him, I take it, you didn't render an opinion on direct examination that Mrs. Bartlett's kidney cancer was caused by her obesity.  That clearly is his opinion.

MR. DOUGLAS: That's not quite what I was going to say.

THE COURT:  What were you going to ask?

MR. DOUGLAS: I was going to ask, you're an expert on etiology, but you didn't render an opinion on a cause of this person's cancer.  And let me point out that is exactly what's in the Court's instruction.  So how could that -- how could that possibly be prejudicial or improper?

MR. MACE: Because it implies that he doesn't have an  opinion.  He clearly has a very strong opinion, which we believe he should be allowed to give.  And we think you're opening the door to that if you ask that question.

MR. DOUGLAS: But the fact that his opinion is not admissible is not my doing.  It's his doing.

THE COURT: *It's not that he doesn't have one.  Wait.  He didn't give one.  He has one.  He wasn't allowed to give it.  So, I mean, at a minimum, I would require you to say that.*

MR. DOUGLAS: That's how I'll phrase it: that he did not opine as to the cause on direct examination.

THE COURT: That actually is covered in my instruction, more or less, that they've already heard.

MR. DOUGLAS: I think I'm entitled to make that point through the witness who is on the witness stand who has gone on about how he's an expert.

MR. MACE:  It's not an issue in dispute in the case, Your Honor, much like some of your rulings on causation that you haven't let us get into because it's not a fact in dispute in the case, because you have ruled it out.

56

MR. DOUGLAS: It's a fact as to what occurred on direct examination.

THE COURT: Well, he -- you know, the thing is, he gave a lot of testimony about obesity; but he hasn't given testimony on an opinion because I excluded it.  So you can ask he hasn't given.  Don't imply that he doesn't have one, though.

MS. NIEHAUS: Doesn't the question imply that he doesn't have one, though?

MR. MACE:   It sure does.

THE COURT: No. No. That's what we're going to do.

(Trial Tr. Vol. 12 at 270–72, Bartlett ECF No. 133.)

Third, in denying Mrs. Bartlett's request in its *Daubert* motion and its motion *in limine*, the Court permitted DuPont to elicit extensive testimony related to obesity as a cause of kidney cancer.  Based on this testimony, the jury was left with the very clear understanding that Dr. Cohen believed obesity was the cause of kidney cancer, and that Mrs. Bartlett was obese. *Id.* at 131–202, 258–68 (Dr. Cohen describes literature supporting obesity as a cause of kidney cancer), *id.* at 175 (Dr. Cohen describes Mrs. Bartlett as obese and opines that her obesity increased her risk of contracting her kidney cancer "by 102 percent" or "more than double"), *id.* at 267–68 (Dr. Cohen opines that Mrs. Bartlett is at increased risk for kidney cancer based on her obesity), *id.* at 181–82 (Dr. Cohen states that it is his medical opinion that obesity causes kidney cancer.)  In particular, DuPont presented to the jury the following testimony from Dr. Cohen:

Q: Doctor, do you have an opinion to a reasonable degree of medical certainty as to whether obesity is a causative risk factor for the development of kidney cancer in general?

A: I do.

Q: What is your opinion?

A: I strongly believe that it is a major cause of renal cell carcinoma in the United States.

Q: Do you believe that obesity, as a causative factor for the development of kidney cancer, is well established in the literature?

A: Yes.

. . . .

Q: With regard to [Mrs. Bartlett's expert] Dr. Bahnson's testimony that obesity is not even a risk factor, do you agree or disagree with that?

A: I strongly disagree with that statement.

*Id.* at 181.

DuPont also presented the following testimony from Dr. Cohen related to obesity as a

causal factor in the development of kidney cancer:

Q: . . . Do you have an opinion to a reasonable degree of medical certainty as to whether Dr. Bahnson appropriately considered the level of obesity, the pack years to put it into a different context, the pack years of obesity, or level of obesity in weighing the potential that Mrs. Bartlett's kidney cancer was caused by her obesity?

A: He completely dismissed obesity as a risk factor, so he couldn't put it into perspective of quantitatively since he dismissed it qualitatively.

Q: In terms of the literature, some of which we reviewed, but you said approximately 20 articles out there, several of these cited by Dr. Bahnson, what does the scientific literature in your opinion tell us about the relative risk for getting kidney cancer from obesity if you're morbidly obese, if you have the level of obesity we're talking about here?

A: I think as you saw in the articles we reviewed, all of them talk about a dose response. And nearly all the studies that have looked at obesity and renal cell carcinoma, they've shown a dose response which means the heavier you are, the higher your BMI, the rate of your risk of developing kidney cancer. For the morbidly obese, some of them come up with estimates that are fivefold higher than somebody who is normal weight, or even higher. That would be the high end of the risks. So going back to your cigarette analogy, that would be your three pack a year for 40 years kind of exposure.

Q: Okay. As opposed to a pack a day or a pack –

A: Compared to a cigarette a day.

Q: Okay. So similarly, when applying this pack-year concept to Mrs. Bartlett's exposure to C-8, did you feel that Dr. Bahnson adequately evaluated that?

A: I felt that he did not evaluate quantitatively. He just basically put together all of that, even though he states that dose was an important consideration.

*Id.* at 190–92.

And, the following is another example of Dr. Cohen's trial testimony:

Q: . . . . [O]besity and smoking are commonly linked to several cancers, including renal cell cancer. In this study, morbidly obese individuals, BMI 35 or greater, were at 71 [percent] increased risk for renal cell cancer compared to normal weight individuals. Now, first of all, do you agree with that?

A: Yes.

Q: And was Mrs. Bartlett above, or below, the 35?

A: She was between 40 and 41 at the time of diagnosis.

Q: So, the – according to these statistics, it would be even greater than the 71 percent?

A: Correct.

. . .

Q: . . . Despite counsel's questioning, does it remain your opinion, to a reasonable degree of medical certainty and scientific certainty, that obesity is a cause of renal cell cancer?

A: Yes.

Q: And do you stand by your opinion where you were critical not of Dr. Bahnson's diagnosis and treatment but about his etiology opinions?

A: Yes.

*Id.* at 267–68.

Fourth, and last, DuPont's counsel was permitted, again based on the rulings this Court made prior to trial, to present the following information on obesity as a cause of kidney cancer during his closing argument:

59

> The bottom line, it is undisputed based on the record facts, which is what you need to base your decision on, Mrs. Bartlett is not at any increased risk of kidney cancer from her past C-8 exposure. You heard she's at risk for some other reasons because of her hypertension, her obesity, her genetics, other things.

(Trial Tr. Vol. 16 at 135, Bartlett ECF No. 145.)

> The third thing I told you I would prove is that Mrs. Bartlett's kidney cancer is readily explained by other things and was not caused by any conduct by any DuPont employee. And here, ladies and gentlemen, it's very, very important that you keep in mind the difference between general causation and specific causation.

> General causation is just whether a substance is capable of causing a particular disease. For example, we've used the analogy through the trial about tobacco smoke. Nobody disputes that tobacco smoke is capable of causing lung cancer. That's general causation. Specific causation, the much more important issue, the one you need to decide in this case, is Mrs. Bartlett still has the burden to prove whether the C-8 in fact caused the kidney cancer in this specific instance. You have heard that, unfortunately, kidney cancer occurs every day all across the United States. And you heard that kidney cancer results from many, many, many different things besides exposure to C-8. You heard that the risk factors for kidney cancer includes a very long list, including family history, genetics, smoking, hypertension, age, obesity, spontaneous DNA replication errors, many, many things.

> You saw some other things. You saw that Mrs. Bartlett had the most commonly occurring type of kidney cancer all across the U.S., and she had one of the major risk factors for kidney cancer: obesity.

*Id.* at 137–38.

> And again, you heard it's undisputed that just because C-8 is capable of causing kidney cancer, that does not mean it did cause Mrs. Bartlett's kidney cancer.

*Id.* at 139.

> Now you heard about this very long list of risk factors, and you heard bout what Dr. Bahnson did and, more importantly, what he did not do to check them out.

*Id.* at 141.

> And you heard from Dr. Cohen that Dr. Bahnson did not have the specific expertise on the etiology or causation. He didn't do his homework on the causation here. He didn't adequately investigate these other explanations for Mrs.

Bartlett's kidney cancer. And we talked about weighing of the competing considerations. And he talked about so if we were in a tobacco case, you would be talking about the number of pack years somebody had. . . .

And in terms of weighing the competing risk factors, you heard Dr. Cohen. Because of Mrs. Bartlett's obesity, her morbid obesity, she was off the charts in terms of number of pack years when you look at what that factor be; that it was 90 percent increased risk of kidney cancer. It's higher in women than in men because of her level of obesity.

He analogized this to you're talking about somebody who would be like having three packs a day for many years, smoker, as opposed to the C-8, which you've seen from a number of witnesses, she really was in the background even back at that time.

*Id.* at 146–46.

Based on all of the aforementioned reasons, the Court finds Mrs. Bartlett's trial was not influenced by unfair prejudice or bias against DuPont. The Court merely applied the *Leach* Settlement Agreement as the parties had previously agreed to have done. Further, the Court did not abuse its discretion in excluding Dr. Cohen's conclusion regarding specific causation because he did not rule in C-8 as a potential cause of Mrs. Bartlett's cancer, in direct contravention of the *Leach* Settlement Agreement. Moreover, the Court allowed Dr. Cohen to testify to everything on which he appropriately opined. Accordingly, DuPont is not entitled to a new trial based on its arguments related to application of the *Leach* Settlement Agreement.

C. **Nondisclosure Theory and Punitive Damages**

In section II.B.1 above, the Court addresses DuPont's arguments related to its position that Mrs. Bartlett attempted to prove a claim for negligent nondisclosure that was foreclosed by the law of Ohio and the prior rulings of this Court. The Court explains *supra* that the issue for the jury to determine was not whether DuPont had some free-standing duty to disclose, but instead whether it owed Mrs. Bartlett a duty of care not to physically harm her. In its portion of

the Motion in which DuPont requests a new trial, DuPont again highlights what it refers to as

"non-disclosure theory." Specifically, DuPont argues:

> Even if they do not warrant judgment as a matter of law, Plaintiff's non-disclosure theory and introduction of evidence of alleged malice warrants a new trial. The Court had held before trial that DuPont did not have a duty to disclose. Nevertheless, Plaintiff made this case about non-disclosure in an effort to secure a punitive award, when the punitive question should never have reached the jury in the first place.

> The injection of all of this irrelevant and prejudicial testimony into the trial had improper and unfairly prejudicial spillover consequences for the negligence and emotional distress claims. That is why DuPont sought to bifurcate the trial between punitive damages and liability, but the Court nevertheless allowed Plaintiff to put on virtually all of the evidence [she] wanted about DuPont's conduct in the first phase. Permitting Plaintiff to introduce evidence irrelevant to the compensatory damages claims but claimed to be related to punitive damages unfairly prejudiced DuPont. A new trial should be ordered to preclude Plaintiff from offering evidence of non-disclosure or evidence related to alleged malice during the trial on compensatory liability and damages.

(DuPont's Post Trial Mot. at 28, Bartlett ECF No. 151.) DuPont's arguments are not well taken.

Initially, as this Court recognized in DMO 11, "the evidence related to DuPont's

possession of information that it chose not to disseminate to the public or to disseminate in

limited form while simultaneously depositing C-8 into drinking water sources informs" the jury's

task of assessing punitive damages. (DMO 11 at 6, MDL ECF No. 4235.) However, as the

Court explained above, the evidence DuPont categorizes as nondisclosure theory evidence is

probative of the issue of legal duty, and therefore, is indeed relevant to the issue of compensatory

damages. That is, the knowledge DuPont possessed about the danger associated with C-8, the

time frame in which DuPont obtained that knowledge, and the decisions DuPont made to inform

the public of the dangers or not to inform it, are all relevant and probative of whether a

reasonably prudent corporation would have foreseen prior to 1997 that release of C-8 from the

Washington Works plant would likely cause harm to community members similarly situated to Mrs. Bartlett.

As to DuPont's contentions related to the introduction of evidence of malice (*i.e.,* a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm), it appears to be referring to the post-1997 conduct it believed should have been excluded from trial. In ruling on DuPont's Motion *in Limine* No. 26 (MDL ECF No. 4208), this Court explained that this evidence is relevant to Mrs. Bartlett's negligence claims as well as her punitive damages claim:

> DuPont's position in this litigation is that, "rather than any malice or disregard for safety, the evidence instead shows that DuPont exhibited a *proactive concern* for safety in its use of [C-8] at its Washington Works plant, consistently going beyond the regulatory requirements and the typical conduct of most chemical companies." (DuPont's Mot. for Summ. J. on Punitive Damages at 1–2; ECF No. 2825.) Mrs. Bartlett was diagnosed with kidney cancer in 1997 and underwent surgery to remove a portion of her kidney that same year. DuPont contends that because of this fact, none of its conduct after 1997 is relevant to any issue before this Court. This Court disagrees with this assessment and has so indicated in numerous opinions.
>
> The Court has explained that DuPont's post-1997 actions are relevant not to causally tie its actions to Mrs. Bartlett's 1997 kidney cancer, but to show that DuPont did not exhibit a proactive concern for safety in its use of C-8 at its Washington Works plant, and that it did have knowledge and/or an expectation that there was a likelihood of harm to the community from its release of C-8 into the drinking water. (Dispositive Motions Order ("DMO") No. 7; ECF No. 4185) (denying DuPont's Motion for Summary Judgment on Bartlett's Punitive Damages Claim); (DMO 9; ECF No. 4211) (granting in part and denying in part DuPont's Motion for Partial Summary Judgment on Bartlett's Fraud and Emotional Distress Claims); (DMO 11; ECF No. 4235) (denying DuPont's Rule 50 Motion on Bartlett's Punitive Damages Claim); (Motions *in Limine* Order ("MIL") No. 3; ECF No. 4207) (granting in part and denying in part DuPont's MIL 15, To Exclude Any Statement or Suggestion that Cattle Disease or Cattle Deaths Have Been or Are Caused By C-8); (MIL 4; ECF No. 4212) (granting in part and denying in part DuPont's MIL 7, To Exclude Any References to the Weinberg Group, as Well as its Work Involving Ephedra, Fen-Phen, Tobacco, or Agent Orange).

(MIL No. 6, Calculation of Punitive Damages at 7–8, MDL ECF No. 4239.)

Mrs. Bartlett testified that from the time she was diagnosed with kidney cancer to the time she heard Dr. Bahnson testify at trial that her continued consumption of unfiltered water containing C-8 caused her to be at a higher risk for developing cancer, she suffered from mental distress exhibited as cancerphobia. (Trial Tr. Vol. 9 at 99, 109–113; Bartlett ECF Nos. 131, 131-1.) Thus, DuPont's post-1997 conduct is relevant to Mrs. Bartlett's NISED claim. (Final Jury Instructions at 26; Bartlett ECF No. 139.)

However, even if the evidence was only relevant to malice, the testimony was still admissible. "Federal Rule of Civil Procedure 42(b) allows a district court to 'separate trial of any claim . . . or of any separate issue' to promote convenience and economy or to avoid prejudice." *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 474 (6th Cir. 2004). "A district court's decision to do so is within its sound discretion and 'will be affirmed unless the potential for prejudice to the parties is such as to clearly demonstrate an abuse of discretion.'" *Id.* (quoting *In re Bendectin Litig.*, 857 F.2d 290, 308 (6th Cir. 1988)). This Court addressed the bifurcation issue at the Motions *in Limine* Hearing, explaining how the trial would be bifurcated:

> This is the traditional way I would do it, and everyone else in this building would do it, and that is as far as matters of conduct, original liability on the claims, damages on the claims, and conduct that might give rise to a preliminary finding that would lead us to a punitive damages analysis would all be in the first phase.
>
> And to make a long story short, we have all the regular jury instructions. The jurors would get a definition of key words that go with punitives, damages, malice, all the different words that would follow. And then they will be given a simple interrogatory: Do you find the plaintiff has or has not met the standard? Yes or no.
>
> If the answer is no, the case is over. If the answer is yes, then we would go to phase two. And the only additional evidence would be matters relating to finances basically, ability to pay and non-ability to pay. Now I know the defendants have suggested another way. But it seems to me we have a lot of the same witnesses who would be there on the primary claims and on the issues that might give rise to punitive damages or might not. And if it did, I would call it a trifurcation, rather than a bifurcation. We would be bringing back a lot of the

same witnesses to augment their testimony. It would seem to me that would be very unwieldy and expensive.

(ECF No. 4209 at 228.)

At trial, the Court instructed the jury as follows:

### Instruction No. 33

### INTERROGATORY TO BE GIVEN

You will be presented with an interrogatory that will ask you whether you found in favor of Mrs. Bartlett on either of her claims. If you find for Mrs. Bartlett, you will be asked whether Mrs. Bartlett proved by clear and convincing evidence whether DuPont acted with actual malice and whether Mrs. Bartlett has presented proof of actual damages that resulted from those acts or failures to act of DuPont.

### Instruction No. 34

### CLEAR AND CONVINCING EVIDENCE

"Clear and convincing" means that the evidence must produce in your minds a firm belief or conviction about the facts to be proved. It must be more than evidence that simply outweighs or overbalances the evidence opposed to it.

### Instruction No. 35

### MALICE

"Malice" means a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. Malice may be inferred from conduct and surrounding circumstances.

(Final Jury Instructions at 35–36; Bartlett ECF No. 139.)

The jury returned the interrogatory with its verdict, indicating on it that Mrs. Bartlett did not prove by clear and convincing evidence that DuPont acted with actual malice. The trial, therefore, did not go into the second phase on punitive damages.

Accordingly, the Court concludes that DuPont's conduct, including its choice to disclose or not to disclose its release of C-8 into the *Leach* Class' drinking water, is relevant to Mrs.

Bartlett's negligence claims and to her punitive damages claim. The Court does not find that DuPont suffered any unfair prejudice by the Court's admission of such evidence at the liability stage of the trial.

Finally, and most tellingly, the jury did *not* award punitive damages. DuPont urged a "trifurcation," rather than a bifurcation, as the case was tried. The same jury finding of negligence in the first of three phases would have required the second phase. Those two phases together in a trifurcations scheme would have meant the jury would have heard *the exact same testimony* as adduced in the first phase of a bifurcated trial. Consequently, no error can be claimed.

**D.    Juror Issues**

DuPont contends that "[t]wo juror issues—the exclusion of Juror Number 2 and the granting of numerous 'hardship' exemptions without critical analysis—impacted the fairness of the trial and warrant a new trial." (DuPont's Post Trial Mot. at 35.) This Court, however, disagrees.

**1.    Juror Number 2**

There is no dispute that Juror Number 2 was repeatedly seen sleeping during Mrs. Bartlett's trial and was ultimately dismissed from the jury for so doing. DuPont argues that it was prejudiced by the removal of Juror Number 2 because after his dismissal the jury was left with seven jurors. DuPont further contends that, "the Court had already taken curative action to awaken the juror when he had briefly fallen asleep, and there is no evidence that his nodding off impacted his ability to perform his duties or otherwise prejudiced Plaintiff." (DuPont's Post Trial Mot. at 35.)

Under Rule 48 of the Federal Rules of Civil Procedure, "[a] jury must begin with at least 6 and no more than 12 members . . . ." Fed. R. Civ. P. 48(a). Rule 47 provides that "[d]uring trial or deliberation, the Court may excuse a juror for good cause." Fed. R. Civ. P. 47(c). According to the advisory committee notes to that Rule, "juror misconduct" is an "example[]" of appropriate grounds for excusing a juror." *Id.* advisory committee's note (1991 amendment). Sleeping is a form of juror misconduct because "a juror who sleeps through much of the trial testimony cannot be expected to perform his duties." *United States v. Warner*, 690 F.2d 545, 555 (6th Cir. 1982) (citation omitted).

During Mrs. Bartlett's trial, Juror Number 2 did not, as DuPont contends, briefly fall asleep. Instead, his sleeping was a pervasive problem. The Court on its own accord called at least eight sidebar conferences to address the issue and the Court took note of the juror's sleeping numerous times during out-of-court meetings with counsel during the trial. For example, the following are all directed toward Juror Number 2:

> **During Opening Statements:**
>
> THE COURT: [To DuPont's counsel] Mr. Mace, can I see you and counsel at side-bar for just one moment?
>
> (Discussion at side-bar follows:)
>
> THE COURT: This is always a problem. I have nothing to say to any of you. I wanted the jurors to stand up. We have some people that are sort of having a hard time here. I was going to kid all of you. I've been in front of judges that say, you put them to sleep, you wake them up. But I don't take that view. It's not the quality of this. It's just – *it's Juror #2 is the problem.*

(Trial Tr. Vol. 2 at 123–24, Bartlett ECF No. 154.)

> **Direct Examination of Mrs. Bartlett's treating physician and expert witness Dr. Bahnson related to his qualifications and credibility to render expert opinions on specific causation, which was a contested issue for determination by the jury**.

67

THE COURT: One moment.  Let me see you at side-bar, all of you just a moment.  [To the Jury:]  You may stand, if you wish, ladies and gentlemen.

(Discussion at side-bar follows:)

THE COURT: *There was a juror nodding off*, so I called you over here.  So now we're here.  Let's give them a minute, and then we'll get going again.

(Trial Tr. Vol. 7 at 25, Bartlett ECF No. 128.)

**Direct Examination of Mrs. Bartlett's expert Mr. Petty related to his ultimate opinions about DuPont's conduct.**

THE COURT: Let me interrupt just a moment, Counsel.  I need to see you all at side-bar.  If you wish, ladies and gentlemen, you may stand by your seats.

(Discussion at side-bar follows:)

THE COURT: *I saw a juror nod.*  And I thought I'd just come over and say "hello" and get them on their feet.

(Trial Tr. Vol. 8 at 128, Bartlett ECF No. 129.)

**Video Deposition Examination of epidemiologist and former DuPont employee Dr. William Fayerweather by Mrs. Bartlett's counsel regarding DuPont's decisions not to conduct further studies about the exposure and health effects of C-8.**

THE COURT: I need to stop you right there.  Counsel, I'll see you at side-bar for a moment.  If you wish, ladies and gentlemen, you may stand by your seats.

(Discussion at side-bar follows:)

THE COURT: *You can guess why I called you over here.* . . . .

MR. PAPANTONIO: *The sleeping juror.*

. . . .

THE COURT: *He's up now so I think we're in good shape.*

(Trial Tr. Vol. 9 at 41, Bartlett ECF No. 131.)

**Cross Examination by Mrs. Bartlett's counsel of DuPont Washington Works Plant Manager, Mr. Paul Bossert, regarding DuPont's communications to the public about the health effects of C-8.**

68

THE COURT: Counsel, let me see you at side-bar for a moment. You may stand if you wish, ladies and gentlemen.

(Discussion at sidebar follows:)

THE COURT: I really just wanted to say "hello," but *we have a juror . . . sleeping right now.*

MR. MACE: That's a new record.

THE COURT: That's right. We've only been back for a couple of minutes.

MR. MACE: Seven minutes. You're setting a new record.

 (Trial Tr. Vol. 10 at 138, Bartlett ECF No. 130.)

**Cross Examination by Mrs. Bartlett's counsel of DuPont Washington Works Plant Manager, Mr. Paul Bossert, regarding DuPont's eventual incineration of C-8 waste through the use of a third-party contractor.**

THE COURT: Counsel, let me see you all at side-bar for just a moment. Again, you may stand by your seats, if you wish, ladies and gentlemen.

(Discussion at sidebar follows:)

THE COURT: *Just having the same problem. A guy who is out.* So, hopefully, he is up and about. And we'll be ready to go again.

MR. PAPANTONIO: Can I take my turn back there?

THE COURT: Yeah. Don't worry. I'll note if anybody is sleeping. You'll hear from me.

MR. PAPANTONIO: Okay.

THE COURT: Very good. Thank you.

(Trial Tr. Vol. 10 at 166, Bartlett ECF No. 130.)

**Direct Examination by DuPont of DuPont employee Dr. Anthony Playtis regarding DuPont's testing of its employees' blood for elevated fluorine, and DuPont's discussions with 3M about the discovery of elevated fluorine levels in the blood of workers.**

THE COURT: Counsel, let me see you at side-bar for a moment. You may stand if you wish, ladies and gentlemen.

(Discussion at side-bar follows:)

THE COURT: *Actually we have a juror sleeping again* so I thought I'd bring you over and see if we could shake him up a little bit. So that's the point.

MR. PAPANTONIO: I was bored, too, Judge.

THE COURT: Well, I'm not making any comment. I'm trying to be judicious here. Thank you.

(Trial Tr. Vol. 11 at 49, Bartlett ECF No. 132.)

**Cross Examination of Dr. Anthony Playtis by Mrs. Bartlett's counsel regarding the various pathways of C-8 into the human body.**

THE COURT: Let me see you at side-bar. Ladies and gentlemen, stand at your seats for a few moments.

(Discussion at side-bar follows:)

THE COURT: *One of the jurors is pretty sleepy. . . .*

(Trial Tr. Vol. 11 at 180, Bartlett ECF No. 132.)

**Cross Examination of Dr. Anthony Playtis by Mrs. Bartlett's counsel regarding DuPont's receipt and interpretation of the results of the 1999 Monkey Study and the death of the "low dose" monkey.**

THE COURT: Let me see you at side-bar, Counsel. You may stand if you wish, ladies and gentlemen.

(Discussion at side-bar follows:)

THE COURT: *We have a sleeping problem I want to talk to you about at five o'clock.*

(Trial Tr. Vol. 11 at 227, Bartlett ECF No. 132.)

From these excerpts alone, it is evident that Juror Number 2 missed substantial portions of the evidence presented during the case and this Court properly exercised its discretion to remove him from the jury. The testimony through which Juror Number 2 slept included expert

70

qualifications and opinions, as well as central fact witness testimony. Certainly witness testimony must be viewed in its entirety for a juror to render a fair verdict.

The Court's continuous attempts at curative action were unsuccessful and, at times when offered the chance to stand and attempt to wake himself, Juror Number 2 declined the offer and stayed seated during the side-bar conferences. Moreover, it appeared to the Court that Juror Number 2's sleeping was distracting the other jurors from paying attention. The Court observed other jurors nudging Juror Number 2 to awaken him, or just staring at him sleeping. Under these circumstances, it would have been prejudicial to both parties if the Court had not removed Juror Number 2 from service.

As to DuPont's contention that it was somehow prejudiced because seven jurors remained after Juror Number 2's release, it is not well taken. While it is true that DuPont requested 9 jurors, the Civil Rules unequivocally dictate that a jury must only "begin with at least 6." Fed. R. Civ. P. 48(a). DuPont points to no law, nor does this Court find any, indicating that a defendant is somehow prejudiced by a jury of seven in a civil action.

### 2. Hardship Exemptions

This Court is permitted to grant exemptions to jury service based on undue hardship or extreme inconvenience. 28 U.S.C. § 1869(j) ("undue hardship or extreme inconvenience . . . shall mean great distance, either in miles or traveltime, from the place of holding court, grave illness in the family or any other emergency which outweighs in immediacy and urgency the obligation to serve as a juror when summoned, or any other factor which the court determines to constitute an undue hardship or to create an extreme inconvenience to the juror.").

DuPont argues that it suffered prejudice sufficient to warrant a new trial because of the Court's grant "of numerous 'hardship' exemptions without critical analysis." (DuPont's Post

Trial Mot. at 35.)  DuPont suggests that this Court did not individually consider the potential

jurors' hardship requests, instead automatically granting them.  (DuPont's Post Trial Mot. at 37)

(citing *Cleveland v Cleveland Electric Illuminating Co.*, 538 F. Supp. 1240, 1256-57 (N.D. Ohio

1980) (absent agreement of the parties, a court should consider hardship requests individually

and not merely grant the request of every person who asserts that jury service in a protracted trial

would cause personal hardship)).

DuPont's assessment is not factually accurate.  Indeed, not only did the Court consider

hardship requests individually, it also permitted the parties to review the requests and lodge

objections to any request they felt was improvidently granted.

DuPont *did not object* to any of the initial hardship exclusions.  In fact, DuPont

affirmatively agreed to the procedure used by the Court.  Given the length of the trial and the

publicity regarding the case, the Court had written questionnaires sent to several hundred

potential jurors in the weeks before the trial.  Both parties were able to inspect the responses and

were given a chance to object.  Both parties were satisfied with the process.  Indeed, DuPont

requested that the Court consider granting additional hardship exemptions based on the answers

to the questionnaires.  DuPont stated, in a September 2, 2015 email to the Court, that it was

"generally satisfied that those in the pool who had been pre-excused for hardship should be

excluded, but we saw a few other questionnaires in the 'will summon' pile that we felt would

also warrant excusal in advance of being called in for the trial."  (Pl.'s Mem. in Opp. Ex. A,

Bartlett ECF No. 158-2, 158-3.)

Thus, the record reflects that the Court considered individually each hardship request, and

DuPont reviewed the Court's decisions and agreed with them.  DuPont cannot claim error on a

matter to which it agreed. There is simply no evidence that the Court abused its discretion in granting the hardship exemptions.

E.    **Michael B. Siegel, M.D., M.P.H and Stephen E. Petty, P.E., C.I.H., C.S.P.**

DuPont contends that the testimony of Mrs. Bartlett's expert witnesses Dr. Siegel and Mr. Petty unfairly prejudiced it. DuPont states:

> Mrs. Bartlett's case relied heavily on the "expert" testimony of Dr. Siegel and Mr. Petty. DuPont moved to exclude the testimony of these witnesses prior to trial based on *Daubert* grounds and in motions *in limine*, and it incorporates by reference those arguments, which the Court agreed at trial were fully preserved.
>
> As discussed in [the section on negligence] above and more fully below, DuPont's concerns raised in the *Daubert* and motion *in limine* briefing were validated by what unfolded during trial. This "expert" testimony was highly unfairly prejudicial and repeatedly emphasized extra-legal standards of care that had no bearing on the questions actually before the jury. Such testimony served (and was likely intended to serve) only to confuse and mislead the jury and distract them from the applicable legal duty of care.

(DuPont's Post Trial Mot. at 22–23, Bartlett ECF No. 151.)

The arguments DuPont now incorporates by reference were addressed in EMO 2, wherein the Court considered DuPont's Motion to Exclude Corporate Conduct Experts. (EMO 2, Def.'s Mots. To Exclude Expert Opinions Related to Corp. Conduct, MDL ECF No. 4129.) Because DuPont now argues that the Court improvidently permitted these two experts to testify by denying its *Daubert* motion and motions *in limine* related to them, the Court will reiterate the portions of EMO 2 that address these arguments. The Court will incorporate and consider any additional arguments DuPont makes regarding the effect of this admitted testimony at trial.

1.    **Arguments and Law**

In EMO 2, the Court framed the parties' arguments as follows:

> In its Motion, DuPont first argues that any expert testimony "offering opinions as to corporate intent and motives, and measuring corporate conduct against internal aspirations and inapplicable ethical standards—is not a proper

subject of expert testimony and should be excluded from trial." (DuPont's Mot. at 10.) DuPont moves for complete exclusion of the Trial Plaintiffs' expert witness' testimony, claiming that some of it is directed at this type of evidence.

Next, DuPont contends that the Trial Plaintiffs'[11] expert witnesses are not qualified to provide their proffered testimony, stating that, "while arguably qualified in other areas . . . each of Trial Plaintiffs' proposed experts lacks any requisite experience or qualifications to opine as to DuPont's corporate intent, decision-making, and conduct." *Id*. at 12.

The Trial Plaintiffs respond that the opinions of their experts are not directed at DuPont's intent and motives, and measuring corporate conduct against internal aspirations and inapplicable ethical standards, but instead are directed at the following:

> [E]ach of the Experts focus on addressing the state of knowledge/state of the art on C-8 risks during the time in question and DuPont's compliance with applicable standards of care existing within each of the Experts' respective fields of expertise. Not only are such topics a proper subject of expert testimony (as confirmed by the law discussed below and the topics and opinions addressed by *DuPont's own experts*), but each of Plaintiffs' Experts is more than qualified to provide such opinions.

(Trial Pls.' Mem. in Opp. at 8.)

DuPont does not challenge that its own experts opine on the state of knowledge/state of the art on C-8 risks and DuPont's compliance with the applicable standards of care, but rather argues that "unlike DuPont's designated experts, Trial Plaintiffs' 'Corporate Conduct' Experts seek to opine on issues outside of their areas of expertise and attempt to usurp the roles of both judge and jury." (DuPont's Reply at 3.) DuPont continues that the Trial Plaintiffs' experts' opinions are "unhelpful" because the experts merely "regurgitate" the facts from a simple historic record that any lay "jury is fully capable of reading" and understanding on their own. (DuPont's Mot. at 15–18.) Further, DuPont asserts, "in addition to usurping the role of the jury, testimony by these witnesses that DuPont violated ethical or industry standards (which are not the applicable legal standard) would be unfairly prejudicial and highly likely to mislead and confuse the jury." *Id*. at 26.

(EMO 2 at 5–6, MDL ECF No. 4129) (footnote added).

---

[11] The Court here refers to Mrs. Bartlett and the plaintiff who was selected as the second bellwether trial in this MDL as the "Trial Plaintiffs."

As the Court explained in EMO 2, determining the admissibility of expert testimony

entails a flexible inquiry and any doubts should be resolved in favor of admissibility. *Daubert,*

509 U.S. at 594; Fed. R. Evid. 702 advisory committee's notes ("[A] review of the case law. . .

shows that rejection of the expert testimony is the exception rather than the rule."); *Jahn v.*

*Equine Services, PSC,* 233 F.3d 382, 388 (6th Cir. 2000) (stating that in *Daubert* "[t]he Court

explained that Rule 702 displays a liberal thrust with the general approach of relaxing the

traditional barriers to opinion testimony" (internal quotations omitted)). Rule 702 of the Federal

Rules of Evidence governs the use of expert testimony. As to Rule 702, the Sixth Circuit

explains:

> Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the testimony must be reliable. *Id.* Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data," whether the testimony is the "product of reliable principles and methods," and whether the expert "has applied the principles and methods reliably to the facts of the case." *Id*

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

Additionally, it is well established that experience-based testimony satisfies Rule 702

admissibility requirements. *See Kumho Tire Co., Ltd.,* 526 U.S. at 141; *United States v. Poulsen*,

543 F. Supp. 2d 809, 811–12 (S.D. Ohio 2008). Thus, an expert who intends to provide

experience-based testimony or an experience-based opinion may well assist the trier of fact in

understanding the evidence and/or in determining a fact in issue.

With regard to DuPont's particular arguments related to testimony about a corporation's

state of mind and non-legal standards of care, the Court articulated the law as follows:

Courts have typically barred expert opinions or testimony concerning a corporation's state of mind, subjective motivation, or intent. *See, e.g., In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D. N.Y. 2004). In general, courts have found that this type of "testimony is improper . . . because it describes 'lay matters which a jury is capable of underststanding and deciding without the expert's help'" *Id.* at 546 (citation omitted); *see also Sanchez v. Boston Sci. Corp.*, No. 2:12-cv-05762, 2014 U.S. Dist. LEXIS 137189, at *9-10, 25, 48, 79, 81-83 (S.D. W. Va. Sept. 29, 2014)[12] (considering it "to usurp the jury's fact-finding function by allowing an expert to testify as to a party's state of mind"); *Mahaney v. Novartis Pharms. Corp.*, 2011 U.S. Dist. LEXIS 156848, at *21–23, 47–49 (W.D. Ky. Sept. 9, 2011) ("testimony of this ilk will be excluded"). Although witnesses may discuss certain subjects about which they possess specialized knowledge, this does not mean they are allowed to speculate regarding corporate intent, state of mind, and/or motivations. *See In re Rezulin*, 309 F. Supp. 2d at 546 ("[T]he opinions of these witnesses on the intent, motives or states of mind of corporations . . . have no basis in any relevant body of knowledge or expertise.").

Contrarily, courts have generally permitted expert testimony regarding standards of care in situations where the testimony is "distinctively related to a profession beyond the understanding of the average layman." *Betz v. Highlands Fuel Delivery,LLC*, No. 5:10-cv-102, 2013 U.S. Dist. LEXIS 13290, at *17–18 (D. Vt. Jan. 31, 2013) (discussing the standard of care for refurbishment and recertification of propane tanks as "not something within the knowledge of the average layperson"); *Cook v. Rockwell Intern. Corp.*, 580 F. Supp. 2d. 1071, 1149 (D. Colo. 2006) (rejecting defendant's argument that expert's "testimony is no more than a summary of documentary evidence" and finding that "[s]afety and operating practices at a nuclear production facility are . . . highly specialized matters not within the province of an ordinary juror"); *Nat'l. Tel. Coop. Assoc. v. Exxon*, 38 F. Supp. 2d 1, 10 (D.C. 1998) (allowing standard of care expert in environmental contamination case where the issues are "so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.").

Additionally, in similar cases defendants have filed summary judgment motions where a plaintiff does not proffer an expert opinion that establishes the applicable [industry] duty of care to provide a basis for a jury to conclude whether or not a legal duty was breached. *Betz*, 2013 U.S. Dist. LEXIS 13290, at *3 (seeking summary judgment because "Plaintiffs do not have an expert opinion on the applicable standard of care"); *In re: Yasmin & Yaz (Drospirenone) Marketing, Sales Practices & Prods. Liab. Litig.*, 3:09-md-02100, MDL No. 2100, 2011 U.S. Dist. LEXIS 145593, at *36–37 (S.D. Ill. Dec. 16, 2011) (finding that expert

---

[12] This case is "one of seven MDLs assigned to [United States District Judge Joseph R. Goodwin] by the Judicial Panel on Multidistrict Litigation concerning the use of transvaginal surgical mesh to treat pelvic organ prolapse and stress urinary incontinence. In the seven MDLs, there are over 60,000 cases currently pending, over 13,000 of which are in the Boston Scientific Corporation MDL." *Sanchez*, 2014 U.S. Dist. LEXIS 137189, at *3.

testimony on the standard of care in the pharmaceutical industry is appropriate "because of the complex nature of the process and procedures and the jury needs assistance understanding it"); *O'Neal v. Dep't of Army*, 852 F. Supp. 327, 335 (M.D. Pa. 1994) (finding for defendant because the plaintiff failed to offer testimony regarding the appropriate standard of care to which the defendant should have been held, while the government offered uncontradicted testimony that all toxic chemical handling was in accordance with then-existing industry standards in groundwater contamination case).

(EMO 2 at 7–8, MDL ECF No. 4129.)

### 2. The Court's Limitations on Dr. Siegel's and Mr. Petty's Testimony

Based on the law just articulated, in EMO 2 the Court granted DuPont's request to

exclude portions of Dr. Siegel's and Mr. Petty's opinions. The Court explained:

> First, in Dr. Siegel's testimony and his report he speculates as to DuPont's motives, which is not permitted. By way of example, Dr. Siegel testified that DuPont's "actions speak to a . . . concerted effort to try to cover something up . . . . And I think it would be hard to explain that kind of behavior unless they actually were seriously concerned that this was causing harm." (Siegel Dep at 131.) In essence, Dr. Siegel has drawn inferences. While a witness may testify as to facts and an expert as to opinions, only a jury may draw inferences.

*Id.* at 26. The Court also excluded all portions of Dr. Siegel's opinion related to "negligence."

For although Dr. Siegel clarified that he does not refer to negligence "in the legal sense," it is

unlikely that a jury would appreciate the legal versus non-legal distinction. The Court further

explained:

> Dr. Siegel's testimony in this regard creates a danger of unfair prejudice, confusing the issues, and misleading the jury, and therefore, warrants exclusion under Federal Rule of Evidence 403. Dr. Siegel's testimony related to purported negligence and fraudulent activity also "usurp[s] . . . the role of the trial judge in instructing the jury as to the applicable law [and] the role of the jury in applying that law to the facts before it." *See In re Rezulin*, 309 F. Supp. 2d at 547 (internal quotations and citations omitted); *cf.* United States v. Sheffey, 57 F.3d 1419, 1426 (6th Cir. 1995) ("The best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate.").

*Id.* at 27.

The Court then specified the portions of Dr. Siegel's opinion that were appropriate to

utilize during Mrs. Bartlett's trial, stating:

> The Court finds that Dr. Siegel is qualified to opine on DuPont's conduct as it
> relates to the relevant applicable scientific standards such as the "generally
> accepted principles in evaluations of human carcinogenicity based on evidence of
> animal carcinogenicity." (Siegel Report at 18.)

*Id.* at 28.

The Court made clear that Dr. Siegel could not testify as to "DuPont's motives and/or

state of mind," explaining:

> While Dr. Siegel can properly state that it is his opinion that DuPont manipulated
> its stated health standards, he cannot add his opinion as to DuPont's motive for
> doing so, *i.e.*, to avoid liability. It is for a jury to infer, or not to infer, whether
> DuPont took certain actions to avoid liability. And, while Dr. Siegel can state that
> it is his opinion that DuPont deviated from the prevailing scientific principles, he
> cannot add his judgment that DuPont did so to protect itself. Again, DuPont's
> motive for its action is for a jury to determine. Thus, when the offending portions
> are removed, the opinion is one based on Dr. Siegel's comparison of DuPont's
> actions to the relevant scientific standards, which his report has sufficient
> scientific data and analysis to support:
>
> > DuPont violated established scientific standards in interpreting the
> > results of C-8 health studies, manipulating its health standards and
> > deviating from scientific principles.

*Id.*

The Court similarly limited Mr. Petty's testimony to exclude any speculation concerning

DuPont's state of mind, motives, and intent. As an example, Mr. Petty's statement that "[b]ased

on timing, it would appear that DuPont was attempting to discredit the laboratory studies," was

excluded. *Id.* at 30 (citing Petty Report at 7.) The Court held that "Mr. Petty is prohibited from

offering an opinion on the motive behind DuPont's actions for the same reasons the Court

explained above regarding Dr. Siegel." *Id.*

### 3. Rule 702 of the Federal Rules of Evidence

DuPont renews its arguments that Dr. Siegel and Mr. Petty and their expert reports fail to meet the requirements set forth in Evidence Rule 702. In EMO 2, the Court addressed Rule 702's requirements (a) that Dr. Siegel and Mr. Petty are qualified, (b) that their testimony was relevant, and (c) that it was reliable.

### a. Qualifications

In EMO 2, the Court explained its disagreement with DuPont's contention that Mrs. Bartlett's experts sought to opine outside of their areas of expertise. The Court set forth in detail Dr. Siegel's qualifications. In short, Dr. Siegel is an epidemiologist, public health specialist, and medical doctor who was educated at Brown University, Yale University, and University of California at Berkeley. (EMO 2 at 20–21, MDL ECF No. 4129) (citing Siegel Report, MDL ECF No. 2702-5; Siegel Dep., MDL ECF No. 2809-10). Dr. Siegel has written several books, 119 peer reviewed and published scholarly articles, 44 published articles, columns, book chapters and letters, all in the fields of public health, preventive medicine and epidemiology, focusing his research on the ability of corporate advertising and marketing to impact human health.

Dr. Siegel's expert report and his testimony at Mrs. Bartlett's trial were related to the state of knowledge and standards of care applicable to corporate conduct arising from commonly-accepted principles and standards of basic epidemiologic analysis, carcinogen analysis in humans based on evidence of animal carcinogenicity, environmental risk analysis, and health hazard assessment.

The Court did the same for Mr. Petty, who is a chemical engineer with over thirty years of experience in industrial health and safety, forensic engineering, and environmental

79

engineering.  (EMO 2 at 26–27, MDL ECF No. 4129) (citing Petty Expert Report at 177–95, MDL ECF No. 2702-1; Petty Dep., MDL ECF No. 3066-2).  Mr. Petty has published in peer review journals and has published numerous reports over the years for the United States Department of Energy and the United States Environmental Protection Agency ("EPA"), including reports regarding the physical and chemical properties of hazardous waste, identification of hazardous waste disposal sites and the management of those sites, and reports examining different modalities for treating hazardous wastewater.  Numerous federal courts have found Mr. Petty qualified to provide expert opinion on the standards of care in cases involving exposures to organic chemicals, inorganic chemicals, mold, and bacteria.  Mr. Petty has consulted with chemical manufacturers, including 3M, developing and designing a large chemical manufacturing process.

Mr. Petty evaluated DuPont's historic conduct with regard to standards of care that he identified as arising from chemical "industry standards and best practices," DuPont's "own internal standards and policies," and "governmental codes and standards."  (Petty Dep. at 28, 26, MDL ECF No. 3066-2; Petty Report at 82, MDL ECF No. 2702-1.)

DuPont has offered nothing new to its arguments regarding these experts' qualifications.  Thus, for the reasons stated in EMO 2 and set forth in much detail above, the Court reaffirms its conclusion that Dr. Siegel and Mr. Petty are qualified in the areas in which they testified.

### b.      Relevance

The Court addressed DuPont's contention that Dr. Siegel's and Mr. Petty's testimony was "unhelpful" because the experts merely "regurgitate" the facts from a simple historic record that any lay "jury is fully capable of reading and understanding on its own," stating:

> The historical documents to which DuPont refers include the factual record that contains evidence of DuPont's conduct that began over fifty years ago

80

and involves well over a decade of complex litigation, millions of documents, hundreds of witnesses operating in dozens of different regulatory, scientific, and technical fields, including, among others, toxicology, epidemiology, risk assessment, medicine, occupational health, regulatory compliance, public health, and chemical industry practices and policies.

Indeed, this is the very same factual record that DuPont utilizes with its own expert witnesses so that they may identify and summarize the key facts and to help the jury understand DuPont's contention that it not only complied with all applicable industrial and scientific standards of care, but that it was proactive in that regard and demonstrated exemplary conduct throughout its entire history. As the Trial Plaintiffs highlight,

> DuPont itself has *expressly acknowledged* in the context of prior C-8 drinking water contamination litigation that "[t]here is little doubt that . . . whether DuPont's stewardship of PFOA was consistent with the industry's best practices, falls outside the 'everyday knowledge and experience of a lay juror'" and that expert "testimony on the reasonableness of [DuPont's] conduct may be helpful to a jury in understanding otherwise complex issues." (Plaintiffs' Standard of Care Aff. Ex. L at 13.)

(Trial Pls.' Mem. in Opp. at 35.)

> DuPont further noted [in prior litigation]:
>
> [T]estimony on the reasonableness of a sophisticated manufacturer in its use and stewardship of an unregulated polyfluoromer chemical [C-8] within the framework of existing state and federal regulatory and remediation programs and the then-governing industry standards and best practices" derived from an expert's "specialized and technical knowledge, will assist the trier of fact in determining a highly complex and nuanced aspect of this case, and is the type of opinion testimony contemplated for submission to the jury under Rule 702 and *Daubert*." (*Id.* Ex. L at 14-15 (emphasis added).)

*Id.* (emphasis removed).

(EMO 2 at 9–10, MDL ECF No. 4129); (EMO 3, Def.'s Mot. to Exclude Expert Opinions Related to Narrative Testimony, MDL ECF No. 4178) (reviewing the varied and complex nature of the historical record).

The Court then viewed DuPont's conclusions formed from its own experts, stating:

Based on its experts' testimony and opinions, DuPont argues that the available evidence "shows that DuPont exhibited a proactive concern for safety in its use of PFOA at its Washington Works plant, consistently going beyond the regulatory requirements and the typical conduct of most chemical companies." (DuPont's Mot. for Partial Summ. J. on Punitive Damages in the Bartlett and Wolf Cases at 1; ECF No. 2825.)  According to DuPont, its proffered evidence is "undisputed" and shows:

> DuPont had *no* knowledge or expectation based upon any of the animal studies, 3M's extensive research, and/or DuPont's own monitoring of its workers that there was *any* likelihood of *any* harm at the relatively low levels [of C-8] found outside the plant," and that "Trial Plaintiffs have no evidence of any state-of-the-art knowledge of *any* increased risk of *any* harm from low community levels of exposure."

*Id.* at 30.

*Id.* at 12.

In EMO 2, this Court concluded, and it reaffirms that conclusion here, that:

> The Trial Plaintiffs, however, have offered their corporate conduct expert witness testimony to dispute what DuPont contends is undisputed.  The expert witnesses from both parties offer opinion testimony of the type contemplated for submission to the jury under Rule 702 and *Daubert*.  Specifically, the parties' experts opine on DuPont's stewardship of C-8 within the framework of the then-governing industry standards, best practices, and the state and federal regulatory programs; deriving their opinions from their specialized and technical knowledge, which will assist the trier of fact.  This is so even though DuPont's experts and the Trial Plaintiffs' experts come to differing conclusions based on review of the same available historical evidence and their assessment of the state of knowledge/state of the art on C-8 risks during the time in question.  "[C]hallenges to the accuracy or import" of the evidence relied upon by an expert "bear on 'the weight of the evidence rather than on its admissibility.'"  *Little Hocking Water Ass'n, Inc. v. E.I. du Pont de Nemours & Co.*, No. 2:09-CV-1081, 2015 WL 1055305, at *8 (S.D. Ohio Mar. 10, 2015) (quoting *In re Scrap Metal*, 537 F.3d at 529–31).

*Id.*

In DuPont's Post Trial Motion, it points out testimony where Dr. Siegel and Mr. Petty refer to "a public health duty of care" and the "industry standard of care," in the context of speaking about the then-governing industry standards and best practices, and at times shortened

the statement to "duty of care."  (DuPont's Post Trial Mot. at 23–27, Bartlett ECF No. 151.)

DuPont asserts that its "alleged compliance or non-compliance with any subjective standard of

ethics, morality, or social responsibility is not relevant to DuPont's legal liability in this case."

*Id*. at 12–13 (citing to testimony of the "aspirational ethical principles, such as those contained in

the Helskinki Declaration . . . the Belmont Project . . . and the so-called precautionary

principle").  DuPont contends that these experts made legal conclusions, which misled and

confused the jury regarding the appropriate legal standard, suggesting that DuPont was legally

negligent by virtue of having breached these standards of care.  *Id*. at 23.  This Court disagrees.

Dr. Siegel and Mr. Petty stayed within the parameters set forth in EMO 2 regarding their

testimony.  DuPont does not cite to a single instance where these experts used the terms

"negligent" or "breach" in the context of the industry duties of care nor where they testified to

DuPont's state of mind, motives or intent.  Instead, the experts testified that DuPont fell short or

similarly deviated from the standards of care related to DuPont's stewardship over C-8.

Whenever one of these experts referred only to "duty of care" it was within the context of

discussing the then-governing industry standards.  Indeed, Dr. Siegel made clear that the public

health duty of care is not the same as the applicable *legal* duty of care that Plaintiff was required

to prove to establish her negligence claim, testifying:

> Q. [To Dr. Siegel] You realize that the standards of the public health field, which
> is informed by a whole host of things, can be different than the standards in a
> court of law?
>
> A. Yes.
>
> Q. And the public health field is focused on minimizing risks?
>
> A. [E]liminating – well, sometimes its elimination, but sometimes its
> minimization.

Q. And that's different than determining whether a substance actually caused a disease in a specific individual or whether something was likely to happen?

A. Correct.

(Trial. Tr. Vol. 4 at 217, Bartlett ECF No. 156-2.)

This exchange is also an example of the numerous issues that go to the weight of an expert's testimony that vigorous cross examination is meant to, and in Mrs. Bartlett's trial, did address. DuPont's counsel engaged in vigorous cross examination throughout these experts' testimony, dealing with such concerns that DuPont raises in its Post Trial Motion such as what information the experts relied upon in reaching their conclusions. (DuPont's Post Trial Mot. at 24) (whether the expert "compare[d] DuPont's conduct to anyone else's in the industry" or whether he "identif[ied] any violations of EPA regulations").

Moreover, reviewing Dr. Siegel's entire testimony, he was asked to explain the Belmont Project and the Helsinki Declaration, as they informed public health science. He explained that the principle of autonomy was important in that "people should not be exposed to hazards without their knowledge . . . ." Dr. Siegel's testimony did not reflect "subjective standards of ethics, morality or social responsibility." Instead, his testimony gave context to the then-existing industry standards for chemical companies and was helpful for a lay jury to determine whether DuPont should have anticipated that an injury was likely to result from its release of C-8 into the surface waters and unlined landfills in the surrounding communities.

Finally, any concern DuPont may have regarding the difference between the duties embedded in the then-governing industry standards and the legal duty of care is alleviated by the Court's clear instructions to the jury. At the beginning of the trial, the Court gave the jury "a summarized version of the law that applies [to Mrs. Bartlett's case]. . . . to help [the jury] follow the evidence as it [was] submitted":

In her first claim for negligence, Mrs. Bartlett must prove to you by a preponderance of the evidence three elements, or parts: First, that DuPont owed her a duty of care; second, that DuPont breached or failed to follow its duty of care; and, third, as a result of this breach, . . . Mrs. Bartlett was injured.

When I say that Mrs. Bartlett must prove that DuPont owed her a duty of care, that means essentially that she must show that DuPont did not act reasonably, that a reasonable company or person would have anticipated that injury to a person was foreseeable from their conduct.

(Trial Tr. Vol. 2 at 31, Bartlett ECF No. 154.)

Then again at the end of trial, the Court instructed the jury in instructions that were sent

to deliberations:

### Instruction No. 19

### NEGLIGENCE – GENERALLY, ORDINARY CARE

Now, I will explain the first claim brought by Mrs. Bartlett, which is a claim for negligence. "Negligence" is a failure to use ordinary care. "Ordinary care" is the care a reasonably prudent corporation would use in similar circumstances. "Ordinary care" is not an absolute term, but a relative one, viewed in the light of all the surrounding circumstances.

To prove her claim for negligence, Mrs. Bartlett has the burden of proving three elements by a preponderance of the evidence:

(1) DuPont owed Mrs. Bartlett a duty of care;
(2) DuPont breached its duty of care to Mrs. Bartlett; and
(3) Mrs. Bartlett suffered an injury as a proximate result of DuPont's breach of the duty of care.

I will now instruct you on each of these three elements.

### Instruction No. 20

### NEGLIGENCE – DUTY

To prove the existence of a duty, Mrs. Bartlett must show by a preponderance of the evidence that a reasonably prudent person would have foreseen that injury was likely to result to someone in Mrs. Bartlett's position from DuPont's conduct. In deciding whether reasonable prudence was used, you will consider whether DuPont should have foreseen, under the circumstances, that the likely result of an act or failure to act would cause injuries. The test for

foreseeability is not whether DuPont should have foreseen the injuries exactly as it happened to Mrs. Bartlett. The test is whether under the circumstances a reasonably prudent corporation would have anticipated that an act or failure to act would likely cause injuries.

(Final Jury Instructions at 20–21, Bartlett ECF No. 139.)

### c. Reliability

In EMO 2 the Court also considered DuPont's assertion that the testimony and reports of Dr. Siegel and Mr. Petty should be excluded because they are unreliable. DuPont argued:

Trial Plaintiffs' proposed experts have all employed a virtually identical and equally unreliable "methodology." Namely, each bases his conclusions entirely on a select group of DuPont documents hand-picked and provided by plaintiffs' counsel to construct a self-serving chronology that forms the sole basis of [their] knowledge and opinions regarding DuPont's use and handling of PFOA.

(EMO 2 at 13, MDL ECF No. 4129) (quoting DuPont's Mot. at 2) ("reading uncomplicated historical documents (cherry picked by them/Plaintiffs' counsel)"). DuPont continued, asserting that "[a] simple review of self- or counsel-selected internal company documents, followed by narrative summaries of those documents, is not valid 'expert' testimony. Such 'opinions' go to the heart of the jury's task, and a jury is fully capable of reading the documents and drawing its own conclusions." *Id*. (citing DuPont's Mot. at 18 citing as an example *In re Prempro*, 554 F. Supp. 2d 871, 886 (E.D. Ark. 2008) ("If an expert does nothing more than read exhibits, is there really any point in her testifying as an expert?")).

Mrs. Bartlett responded that the suggestion that her experts "relied solely on the historical records received from counsel and did no independent investigation nor relied on any other materials is simply not true." *Id*. at 14 (quoting Trial Pls.' Mem. in Opp. at 45). Additionally, Mrs. Bartlett continued, in cases that have extensive factual records it is not surprising that experts rely upon counsel to provide the historic record relevant to their areas of inquiry. Last,

Mrs. Bartlett contended that a majority of DuPont's arguments go to the weight of the evidence

not its admissibility.  The Court found these arguments well taken and concluded as follows:

> First, a review of the Trial Plaintiffs' experts' reports and deposition testimony reflects that each conducted his own extensive investigation and review of relevant scientific, technical, and other literature relevant to his analysis, some involving extensive review of completely separate, independent databases and historic archives.  The Trial Plaintiffs' experts do more than "read exhibits" cherry-picked by counsel.

> As to the review of the historical record in this action, as discussed above, it spans decades and encompasses millions of documents.  It is not uncommon in such situations that experts rely on counsel to provide the historic record relevant to their areas of inquiry.  In any event, "critiques of an expert's evidence gathering techniques . . . generally go to the weight of the evidence, not its admissibility."  *Little Hocking*, 2015 WL 1055305, at *14 (S.D. Ohio Mar. 10, 2015) (citing *United States v. Stafford*, 721 F.3d 380, 395 (6th Cir. 2013)).  As this Court noted in *Little Hocking*, DuPont's "charges of cherry-picking data" do not "undermine the reliability of [the expert's] methodology." *Id.* at 9.  Similar to the experts the plaintiff utilized in *Little Hocking*, the experts Trial Plaintiffs rely upon in this case offer opinions that "rest[] on a complex web of interrelated and corroborating evidence in the record, and the data on which [they] rel[y] does not rest on only one data point at one point in time." *Id.*

> Finally, DuPont challenges the Trial Plaintiffs' experts' interpretation of certain toxicology studies, their failure to review the CATT report, and any other government C-8 risk assessments, public statements by agencies, and related documents.  These matters are appropriately addressed on cross examination. The fact that an expert focuses on one piece of information or fact over another within that data set does not mean that the opinions are automatically unreliable products of "cherry picking" data.  Criticism of which facts were selected or relied upon "go[es] to the weight of [the] testimony, not its admissibility." *Id.* (stating that "when such differences in interpretation rest on rationale grounds—[it] is an issue more appropriately addressed on cross-examination").  This Court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury: 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking'" evidence a party finds lacking. *Wellman v. Norfolk & Western Ry.*, 98 F. Supp. 2d 919, 924 (S.D. Ohio 2000) (quoting *Daubert*, 509 U.S. at 596).

> The Court concludes that the Trial Plaintiffs have met their burden of showing that their expert witnesses utilized a reliable methodology.

(EMO 2 at 14–15, MDL ECF No. 4129.)  The Court reaffirms its conclusion here.

### 4.  Conclusion – Dr. Siegel and Mr. Petty

Based on the foregoing, the Court finds that Dr. Siegel and Mr. Petty are qualified to opine on the subjects on which they testified at trial, and that each rendered relevant and reliable expert testimony.  The Court limited these two experts' testimony to exclude any speculation concerning DuPont's state of mind, motives, or intent and also to prohibit their use of any legal terminology or legal conclusions.  As the Court's instructions to the jury related to legal duty make clear, these two experts testified not to legal duty or legal conclusions, but instead to DuPont's stewardship of C-8 within the framework of the then-governing industry standards, best practices, and the state and federal regulatory programs, deriving their opinions from their specialized and technical knowledge.  Nothing in these expert witnesses' testimony was confusing or misleading such that it "so altered the total mix of information submitted to the jury that it was substantially likely to have affected the verdict."  *Stockman*, 480 F.3d at 804.

### F.  2005 Consent Decree

DuPont contends that it is entitled to a new trial based on the Court's admission of the 2005 Consent Decree reflecting the agreement between DuPont and the EPA.  Specifically, DuPont states,

> The Court's allowing the admission of the 2005 Consent Agreement and concomitant testimony ran afoul of Rules 401, 402, 403, 408, 801 and 802.  The Consent Agreement involves allegations that were hotly contested and never actually proven, and allowing the jury to consider a voluntarily-reached settlement vitiates the policy behind shielding settlement negotiations.  *See, e.g., Korn, Womack, Stern & Assocs. v. Fireman's Fund Ins. Co.*, 1994 U.S. App. Lexis 15022, at *15–16 (6th Cir. June 15, 1994) ("[E]vidence of a settlement may have little relevance to the validity of the claim and may subvert the truth-finding goal of a trial.").

(DuPont's Post Trial Mot. at 33, Bartlett ECF No. 151.)

Mrs. Bartlett responds that, "[c]ontrary to the contentions in DuPont's Motion, the Consent Decree is highly relevant and probative under Fed. R. Evid. 401 and 402, and is not unfairly prejudicial under Fed. R. Evid. 403, inadmissible under Fed. R. Evid. 408, or inadmissible hearsay under Fed. R. Evid. 801 and 802." (Pl.'s Mem. in Opp. at 48, Bartlett ECF No. 158.) This Court agrees.

### 1. Relevance, Rules 401 and 402 and Unfair Prejudice, Rule 403

With respect to the relevance of the Consent Decree, as the Court has explained throughout this Opinion and Order, what DuPont knew or should have known, and when DuPont knew or should have known, about C-8's potential to cause harm were triable issues of fact. As the Court explained at the Motions *in Limine* Hearing, the Consent Decree is directly relevant to DuPont's notice and knowledge of C-8's potential to cause harm to human health.

> THE COURT: All right. Then we get to the consent decree. So I view this as a little tougher question than usual. Normally, I would say this is not coming in because it's a settlement. It's also a – it's got no admission of liability right in the document itself.
>
> But one of the things that is triable here is: What did DuPont know?

(Mot. *in Limine* Hearing Tr. at 58, MDL ECF No. 4209.) The Consent Decree is relevant to that inquiry. The Court then went on to address the potential unfair prejudice, stating:

> THE COURT: So what I tell you as a trial judge, what I try to do is see a way to get what's probative into matters to be considered by the jury and try to skin back as much as what's unfairly prejudicial.

*Id.* Therefore, to avoid any potential unfair prejudice under Rule 403, the Court crafted a limiting instruction that identified for the jury the purpose for which the Consent Decree could be considered:

> So in this case you will hear evidence that the United States Environmental Protection Agency, EPA, initiated an administrative proceeding against DuPont in 2004 claiming that DuPont failed to comply with certain

89

reporting requirements relating to C-8 under two statutes, the Federal Toxic Substance Control Act, TSCA, and also the Resource Conservation and Recovery Act, called RCRA. Specifically, the EPA claimed that DuPont failed to submit certain data that it had acquired in 1981 from sampling the blood of female DuPont Washington Works employees indicating that C-8 crossed the placenta from pregnant mothers to their children in utero.

Second, EPA claimed that DuPont failed to submit data concerning C-8 in the drinking water samples obtained from the Little Hocking, Ohio, and Lubeck, West Virginia, water districts between 1989 and 1991, including levels above 1 part per billion.

Third, EPA claimed that DuPont failed to report data concerning C-8 in blood samples taken in 2004 from twelve community residents living in water districts around the Washington Works plant.

And, fourth, EPA claimed that the data at issue reasonably supported the conclusion there was a substantial risk of injury to human health or the environment of which the EPA was not already aware and that EPA's efforts to investigate C-8 might have been more expeditious if the data had been received sooner.

Now DuPont denied all of these EPA claims and denied that it withheld any reportable information from the EPA.

Before there was any determination made as to the validity of EPA claims, DuPont and the EPA agreed to settle the claims by entering what's called a consent decree. It's basically a Court order that the parties have agreed to. That agreement fully resolved the EPA's claims, acknowledged that DuPont denied liability, and expressly stated that nothing in the agreement should be taken as an admission of liability by DuPont.

So this evidence is admissible for a limited purpose. You may consider this evidence only to the extent that you believe it bears on what notice or knowledge DuPont received as a result of this 2004 administrative claim giving the weight, if any, you believe it deserves as you would with any other evidence in this case.

You are also instructed you may not infer liability nor draw any conclusions about DuPont's potential liability in this case based upon the fact that it settled the 2004 EPA administrative claims against it.

(Trial Tr. Vol. 4 at 46–47, Bartlett ECF No. 156.) That limiting instruction was read, in its

entirety, to the jury, at the request of DuPont's counsel three times during the course of the trial

and a shortened version was read a fourth time.  (Trial Tr. Vol. 4 at 46–47, Bartlett ECF No.

156); (Trial Tr. Vol. 6 at 171–72, Bartlett ECF No. 127-1); (Trial Tr. Vol. 13 at 190–91, 193–95,

Bartlett ECF No. 136.)

The Court finds that, because of the clear limiting instruction stating that neither

inferences of liability nor conclusions could be drawn from the fact that DuPont settled with the

EPA, there is no danger and/or concern of unfair prejudice and/or jury confusion.  With this

limiting instruction, the Court addressed this concern and eliminated any potential for unfair

prejudice during trial.

Similarly, the Consent Decree, which was Plaintiff's trial exhibit number P1.558, was

extensively redacted in order to further ensure the elimination of any potential unfair prejudice.

Specifically, with the Court's guidance, all references to the amount of the $16.5 million

settlement were redacted, as were all references to the *Leach* class action, in addition to

numerous other paragraphs. (http://www.epa.gov/enforcement/ei-dupont-de-nemours-and-

company-settlement) (stating that the settlement included "the largest civil administrative penalty

EPA has ever obtained under any federal environmental statute" requiring "DuPont to pay

$10.25 million in civil penalties and perform Supplemental Environmental Projects worth $6.25

million").

### 2.      Compromise Offers, Rule 408 and Hearsay, Rules 801 and 802

DuPont argues that the Court admitted the Consent Decree in violation of Federal Rule of

Evidence 408.  Mrs. Bartlett points out, however, that while Rule 408 provides that offers of

compromise are not admissible to prove liability for or invalidity of a claim, it also makes clear

that an offer for compromise may be admissible if it is offered for a purpose other than to prove

liability or disprove a claim.  Fed. R. Evid. 408(a) and (b).  "The decision to admit evidence of a

compromise offer 'for another purpose' under Rule 408 'is within the discretion of the trial

court; the court's decision will not be reversed in the absence of an abuse of discretion

amounting to 'manifest error.'" *Evans v. Troutman*, No. 85-3583, 1987 U.S. App. LEXIS 5581,

at \*7 (6th Cir. 1987) (citation omitted). *See also*, *Korn, Womack, Stern & Assocsiates*, 1994 U.S.

App. LEXIS 15022, at \*18 (upholding the trial court's decision to admit evidence of a prior

similar settlement on the ground that the prior settlement "was not admitted to show the truth of

the allegations" contained within the underlying lawsuit). Mrs. Bartlett argues that the Consent

Decree was offered as evidence of DuPont's knowledge and/or notice of C-8's potential for

harm, not as evidence that DuPont acted negligently.

DuPont, however, takes issue with Mrs. Bartlett's assertion that the Consent Decree was

not offered for the truth of the matters asserted in it because of "a glaring deficiency in the logic

underlying" her premise. (DuPont's Reply at 22, Bartlett ECF No. 159.) DuPont continues:

> The core of Plaintiff's argument is that she did not offer the Consent Agreement
> as evidence of the truth of the EPA's allegations. "Rather, the Consent Decree
> was offered as evidence of DuPont's notice and knowledge of C-8's potential for
> harm . . . ." Opp. at 51. But for the Consent Agreement to serve as evidence of
> DuPont's "knowledge of C-8's potential for harm," the jury would have to
> assume the truth of the allegation that the data supported the conclusion that C-8
> posed a substantial risk of injury to human health. Logically, Plaintiff could not
> use the Agreement in this way without improperly implying the truth of the
> allegation.

*Id.* at 22–23. This Court disagrees.

The Consent Decree was offered as evidence that DuPont had knowledge that the EPA

*believed* DuPont's handling of C-8 was deficient – not that its handling of C-8 was actually

deficient. For this same reason, the Consent Decree is not inadmissible hearsay, *i.e.*, it is not

being offered for the truth of the matters asserted in it. Indeed, the jury was expressly instructed

that it was not to consider the Consent Decree as evidence of DuPont's liability, and as such, it

was properly admitted into evidence for the limited purpose permitted by the Court. Accordingly, the Court finds that the admission of the Consent Decree did not violate any Federal Rule of Evidence and does not give rise to a firm conviction that its admission was a mistake. *Stockman*, 480 F.3d at 797.

## G. Witnesses and Personal Knowledge of Documents

DuPont contends that "a new trial is warranted due to improper questioning and introduction of documents through witnesses with no personal knowledge." (DuPont's Post Trial Mot. at 23.) DuPont finds impropriety in the (1) authentication and introduction of documents, (2) exhibits, and (3) in the alleged hearsay within the admitted documents. DuPont's arguments are not well taken.

### 1. Authentication and Introduction of Documents and Related Testimony

First, DuPont's asserts:

> The Court permitted this approach on the grounds that the officials being questioned were high-ranking, and therefore should have seen the documents. But "should have" is not enough: Introducing a document through a witness with no personal knowledge of the document or its contents "clearly violates Fed. R. Evid. 602's mandate that 'a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.'" *Akins v. Zeneca, Inc.*, 1995 U.S. App. LEXIS 21536, *22 (6th Cir. July 27, 1995); Fed. R. Evid. 602. As numerous courts have recognized, the practice of reading unfamiliar documents into the record and asking a witness either to simply confirm what was read or to offer up unwitting interpretations and/or reactions is not a proper way to introduce documents or to elicit admissible witness testimony under Rule 602. Instead, it is a vehicle to improperly enable Plaintiff's counsel to testify and argue the case.

(DuPont's Post Trial Mot. at 30–31.)

DuPont mischaracterizes the Court's rulings. As Mrs. Bartlett correctly points out, this Court did not permit the documents to be authenticated in this manner nor to be introduced in this manner. The Court explained at the September 12, 2015 pre-trial hearing:

> As a general rule, a witness without knowledge can't be questioned about a document he or she says they have never seen. There are exceptions. In this case one of the issues is what was known or should have been known to DuPont. And another matter that is of some moment to the Court, at least the exhibits I have looked at so far that the witnesses could not identify, *all are exhibits that are coming into evidence through other witnesses.* Now if I am wrong on that, this is an exception to my ruling *so hear me carefully.* My assumption is that, that these are exhibits that *are otherwise coming into evidence* and the jury will see. If that's not the case, we will treat these separately.

(Sept. 12, 2015 Hr'g Tr. at 4, Bartlett ECF No. 153) (emphasis added). Thus, the documents at issue were authenticated and/or admitted through witnesses who had personal knowledge as contemplated by Rule 602. And, the fact that a witness had not seen a particular document in itself is relevant. For example, it is relevant to the assessment of DuPont's conduct to know that the high-ranking official in charge of communicating with the community about the safety of their drinking water never saw a document in the possession of DuPont that indicated C-8 was a potential carcinogen. In other words, its relevance was found in the fact that DuPont possessed the information in the document and the high-ranking official had *not* seen it.

Second, the Court did not permit the witnesses to be questioned because their position was such that they "should have seen the documents." Instead, the Court made clear that the purpose of the questioning was to inform the jury what DuPont knew or should have known about C-8. The Court explained at the September 12 hearing:

> So the – In all corporations there are people at high levels and low levels in corporations of any size. I am looking at both of these witnesses. One [John Little] is the plant manager in some critical years of our case in charge of over 2,500 people and, in his own words, was the public face of DuPont with regard to the plant which is where all of the C-8 came from in this case.
>
> The other person [Kathleen Forte] left was the vice president in charge of all corporate communications at the main corporate headquarters and was familiar with the Washington Works plant and C-8 and had been involved in many statements involving the plant. Those are factors that I also considered. *These are not just simply witnesses who are strangers to the documents but, instead, have been involved in the issues involving C-8.*

So with all of those matters as foundation here, my ruling is going to be that the witness – these two witnesses only I'm talking about – may be questioned about documents that were produced before or during their role at the Washington plant or to do with C-8 in their role, *and the document is otherwise admissible through other witnesses or stipulations or admissions*. All objections on this basis are overruled.

I will offer the opportunity to DuPont for a limiting instruction given what I have just held would be the purpose for the questioning of documents here. If there are other objections not related to what I have just ruled on, then DuPont will let me know while the testimony is being presented, and I will rule as we go through the testimony in trial.

*Id*. at 4–5 (emphasis added).

As Mrs. Bartlett correctly contends, the Court's ruling here was carried over in the trial where documents that were otherwise admissible were utilized to question high-ranking DuPont officials as to what DuPont knew or should have known about C-8. In those instances, the Court gave a limiting instruction to the jury that the witness has indicated that he or she had not seen the document before so the document was not being offered for the truth of its contents, but rather, just to indicate what DuPont could or should have known at that time. (*See e.g.,* Trial Tr. Vol. 10 at 98, Bartlett ECF No. 130) ("The witness has indicated that he hasn't seen it before. It's not being offered through this witness for you to believe the report, but just to, in cross-examination, indicate what DuPont could or should have known at the time.").

The Sixth Circuit has held that "[t]he threshold for admitting testimony under Rule 602 is 'low.'" *United States v. Franklin*, 415 F.3d 537, 549 (6th Cir. 2005) (citation omitted). Indeed, "'[t]estimony should not be excluded for lack of personal knowledge unless no reasonable juror could believe that the witness had the ability and opportunity to perceive the event that he testifies about.'" *Id*. (citation omitted). Here, there is no doubt that the witnesses had the ability

95

and opportunity to perceive the event about which they testified. As Mrs. Bartlett explains in her

opposition to DuPont's Motion *in Limine* No. 20, these witnesses are the

> highest-ranking DuPont corporate executives ever deposed on C-8-related issues
> over the last decade, including its in-house corporate counsel handling the C-8
> litigation (John Bowman), its in-house corporate counsel handling C-8
> environmental compliance issues (Bernard Reilly), those handling its corporate-
> level public/media statements on C-8 (Kathleen Forte and George Ainsley), its
> Washington Works Plant Manager and "face of DuPont in the community" (John
> Little), its lead corporate toxicologist on C-8 (Gerald Kennedy), [and] its
> corporate Medical Director (Bruce Karrh).

(MDL ECF No. 4163 at 3.) It is this ability and opportunity coupled with the fact that, as the

Court stated at the September 12 hearing, the witnesses are not "strangers to the documents but,

instead, have been involved in the issues involving C-8," that gives rise to their personal

knowledge. (Sept. 12, 2015 Hr'g Tr. at 4–5, Bartlett ECF No. 153).

Moreover, because of these witnesses ability to perceive the events about which they

testified, questioning them was not a vehicle to permit Mrs. Bartlett's counsel to testify. The

Court disagrees with DuPont's contention that Mrs. Bartlett's counsel's "testimony" was not but

could have been remedied by the Court providing a proposed limiting instruction during trial,

"which would have made clear to the jury that the lawyers' questions [] are not evidence."

(DuPont's Post Trial Mot. at 32.) This Court did specifically instruct the jury on this very issue,

which is why it declined to reiterate that instruction with the one proposed by DuPont. In the

Court's preliminary instructions to the jury on the first day of testimony in Mrs. Bartlett's trial,

the Court explained to the jury that the lawyers' questions are by no means to be considered

evidence in the case:

> First of all, opening statements made by the lawyers, closing arguments made by
> the lawyers, and *questions of the lawyers are not evidence. I want to explain that.*
> Certainly not diminishing the roles of the lawyers in this case, they have a big job.
> But if any of them were actually witnesses to the facts in this case, they couldn't
> be lawyers in this case. So, while what they do is very important, it is the answers

given to the questions and the evidence received through the witnesses that will form the basis for your decision.

(Trial Tr. Vol. 2 at 28, Bartlett ECF No. 154) (emphasis added).)  The Court repeated a similar instruction at the close of trial in the Final Jury Instructions, which were sent with the jury to its deliberations:

### Instruction No. 6

### EVIDENCE

The evidence in this case consists of the sworn testimony of the witnesses and all the exhibits which have been received into evidence.  The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case: (1) statements and arguments of the attorneys; (2) questions and objections of the attorneys; (3) testimony that I instruct you to disregard; and (4) anything you may see or hear when court is not in session even if what you see or hear is done or said by one of the parties or by one of the witnesses.

You are to consider only the evidence in the case.  However, you are not limited to the bald statements of the witnesses, but you are permitted to draw from the facts which you have found have been proved, such reasonable inferences as seem justified in the light of your own experience.  This is to say, from the facts which have been proved, you may draw an inference based upon reason and common sense.

(Final Jury Instructions at 6, Bartlett ECF No. 139.)  Because the Court clearly and concisely addressed the issue with the jury prior to the start of trial and in the Final Jury Instruction, any limiting instruction on the same topic was unnecessary.

### 2. Exhibits

DuPont argues in a footnote that "[i]n addition to failing to properly authenticate documents, Plaintiff's counsel introduced and used numerous exhibits at trial that were not included on Plaintiff's final pre-trial list of over 6,000 exhibits, and which were never disclosed at any time before they were introduced at trial." (DuPont's Post Trial Mot. at 30–31.)

*Id.* at 31, n. 7 (citing as examples P1.945, P1.965, P1.977, P1.1024, P1.1042, P1.1044, PP1.1045, P1.1046). To the extent that DuPont relies on this argument as a basis for a new trial, it is not well taken.

Mrs. Bartlett correctly points out that the exhibits to which DuPont refers were used by her at trial without objection from DuPont. But, most importantly, the exhibits were only used for purposes of impeachment during cross-examination of defense witnesses Robert Rickard and Anthony Playtis. Pursuant to Rule 26 of the Federal Rules of Civil Procedure, it is not necessary to disclose evidence before being introduced at trial when the evidence will be used solely for impeachment purposes. Fed. R. Civ. P. 26(a)(3)(A) ("a party must provide to the other parties and promptly file the following information about the evidence that it may present at trial other than solely for impeachment").

Likewise, the Court's Final Pretrial Order, signed by both parties, provides the same exception for exhibits used solely for impeachment: "Except for good cause shown, the Court will not permit the introduction of any exhibits unless they have been listed in the pretrial order, with the exception of exhibits to be used solely for the purpose of impeachment." (Case Management Order No. 10-A at 18, MDL ECF No. 4248.) Consequently, under the Federal and Local Rules and an Order of this Court, these exhibits were not required to be disclosed.

### 3. Hearsay and Other Evidence

Last, DuPont contends that the evidentiary errors this Court made were "further compounded" by the use of testimony by witnesses without personal knowledge "to [(1)] introduce large amounts of hearsay and [(2)] other inadmissible evidence." (DuPont's Post Trial Mot. at 32); *see* Fed. R. Evid. 801(c)(2) (defining hearsay as an out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement"); Fed. R. Evid.

802 (providing that hearsay is not admissible absent a valid and applicable exception).  DuPont

raises two objections in this regard.  First, DuPont states:

> [T]he Court allowed testimony regarding the personal emails of DuPont's in-house counsel, Bernard J. Reilly, despite the fact that these personal (*i.e.*, not in official capacity) emails are hearsay (and in some cases even hearsay-within-hearsay), are irrelevant to Plaintiff's claims, and would mislead and confuse the jury and unfairly prejudice DuPont.   *See* MIL 23, ECF No. 4111, at 1.  Plaintiff's counsel and witnesses made inflammatory references to Mr. Reilly's emails at nearly every turn in the trial.  Fed. R. Evid. 403 and the hearsay rules were specifically designed to prevent such "evidence," which is unfairly prejudicial to DuPont and has low probative value.

*Id*.  DuPont, however, ignores this Court's pretrial rulings on this evidence in which it

determined that these emails clearly fell within the purview of the hearsay rule exclusions, and

that, after redaction, were not unfairly prejudicial.

The issue of excluding the personal emails of Mr. Reilly that were sent on his work

computer and provided during discovery was the basis of a Motion *in Limine* No. 23, which was

filed by DuPont and opposed by Mrs. Bartlett.  (DuPont's Motion *in Limine* No. 23, MDL ECF

No. 4111; Pl.'s Mem. in Opp., MDL ECF No. 4171.)  Mr. Reilly is an in-house attorney at

DuPont who was involved in issues related to C-8 at the Washington Works plant.  A sampling

of the relevant sections of the emails is provided here:

> Sent: 10/5/1998
>
> . . .  trip to Parkersburg, WV . . . .  Meeting covered an exotic surfactant we use at that plant, where we make Teflon, it seems to get everywhere, to include drinking water, and then want to stay in human blood.  Toxicity not pretty but not bad either.  We hope that the liver effects it shows at higher concentrations in rats cannot happen in primates.  We are conducting a study on monkeys right now in cooperation with 3M, who makes it.  We have some promising options for a different compound.  Each has 8 carbons and mostly fluorine along the chain, but the ends are different.  Important to have the molecule charged on the ends to keep the particles at bay it is trying to keep from lumping.
>
> Sent: 8/22/1999

99

Fly to Parkersburg, WV, tomorrow, another long meeting . . . .  We really should not let situations arise like this, we should have used a commercial landfill and let them deal with these issues, instead, the plant tries to save some money . . . .

Sent: 5/7/2001

. . . .

Got a call about 2130 when in bed last night from one of our engineers worrying about our technique for measuring surfactant at Parkersburg.  We learned recently that our analytical technique has very poor recovery, often 25%, so any results we get should be multiplied by a factor of 4 or even 5.  However, that has not been the practice, so we have been telling the agencies results that surely are low.  Not a pretty situation, especially since we have been telling the drinking water folks not to worry, results have been under the level we deem "safe" of 1 ppb.  We now fear we will get data from a better technique that will exceed the number we have touted as safe.  Ugh

Sent: 3/9/2002

. . . Mostly more bad news with the Parkersburg surfactant in drinking water, the crap is everywhere and local press seems to need the headlines.  We hired a PR firm, it recommended a web page for information, something I had recommended long ago.  Should be up this week.

(Complete Emails, MDL ECF No. 4111-1.)

The Court addressed this issue at the Motions *in Limine* Hearing, stating:

> When we left off yesterday, we were dealing with some e-mails from – in-house counsel, and let's take this in steps. There is the first issue of whether there's an admission under Rule 801, and then we'll address whether there's unfair prejudice under 403.

> I have looked at the case law, and just to give you a brief explanation, the way I look at this, if we had a sole proprietorship and the owner walked into a bar and made statements such as in the e-mails, we would all agree they were admissions.

> Here it's somebody at a high level in the corporation making a similar kind of statements. The issue is not whether you're doing it in the course of your employment.  It's whether it's in the scope, something within your knowledge. And I find that is.  So the first threshold question has been addressed.

. . . .

I'm finding under 801 that this is exempt from the hearsay rule.

(Mot. *in Limine* Hearing at 277, 282; MDL ECF No. 4210);  Fed. R. Evid. 801 ("Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule.").  DuPont provides no reason, nor does this Court find any reason, to revisit its previous decision that the internal emails at issue do not constitute inadmissible hearsay.

After ruling that the emails did not constitute inadmissible hearsay under Federal Rule of Evidence 801, the Court analyzed whether the emails would be unfairly prejudicial to DuPont, pursuant to Evidence Rule 403.  *Id.* at 277 ("Let's talk about the second issue, that being whether there has been any amount of undue or unfair prejudice I should consider under 403.").)  DuPont argued that, under Rule 403, "it's extremely unfairly prejudicial because of some of the coarse language that he obviously wouldn't be using in talking in a business context and really has no relevance to the case."  *Id.* at 279.  During the hearing, the Court addressed the emails one-by-one identifying any statements that should be redacted to avoid any Rule 403 concerns before DuPont suggested that the parties could work together on the remaining redactions.  *Id.* at 278–82.  As a result, all of the internal emails were redacted to remove any "course language" or other reference that DuPont found irrelevant and unfairly prejudicial, which alleviated any potential Evidence Rule 403 concerns.  For example, DuPont argued that reference to its corporate plane in the following sentence from an email Mr. Reilly sent October 28, 2001 was prejudicial:

> I fly to Charleston, WV Tuesday late, at least the company plane, we meet with the WV folks to plan for the public meeting for Parkersburg that will be Nov. 29, we are assuming that shouting will occur from those drinking the impacted water.

(MDL ECF No. 4111-1 at 4.) The trial exhibit reflected the sentence with the words "at least the

company plane" redacted as per DuPont's request. (Pl.'s Trial Ex. P1.89.)

As to the course language, the Court had it all redacted from the emails. For example, the

following is a paragraph from an email that was sent by Mr. Reilly on August 13, 2000:

> The shit is about to hit the fan in WV, the lawyer for the farmer finally
> realizes the surfactant issue, he is threatening to go to the press to embarrass us to
> pressure us to settle for big bucks. Fuck him. Finally the plant recognizes it must
> get public first, something I have been urging for over a year, better late than
> never, we are hoping plaintiff does not get there the next couple days, we need
> about a week. We boned ourselves again, such in life in big and I suspect little
> companies.

(MDL ECF No. 4111-1 at 1.) After redaction the paragraph read:

> ████████████████████████, the lawyer for the farmer finally
> realizes the surfactant issue, he is threatening to go to the press to embarrass us to
> pressure us ██████ for big bucks. ████████ Finally the plant recognizes it must
> get public first, something I have been urging for over a year, better late than
> never, we are hoping plaintiff does not get there the next couple days, we need
> about a week. ████████████████, such in life in big and I suspect little
> companies.

(Pl.'s Trial Ex. P1.2.)

In light of these redactions, as well as the use of other redacted documents throughout the

trial, the Court provided the jury with the following instruction on two occasions during trial:

> There will be some documents in this case that will have evidence that
> may be admissible and also some evidence in the document that would not be
> admissible. In that case there will be redactions or blackening out of those parts
> of the document that are not proper under the rules of evidence and does not
> constitute evidence that you should consider. So, I instruct you to simply ignore
> what has been blacked out. Don't guess or speculate as to what's been blacked
> out. But then just treat what's left in the document as proper evidence for your
> consideration.

> . . . .

> I will give you an instruction that I gave earlier in this case. You have
> just seen some documents with redactions, blacked out parts. These have been
> eliminated because they don't fit the rules that apply in court as to what

> evidence should be considered.  So I ask you don't speculate or guess about what those redactions are about.  Focus on what is permissible for you to consider.

(Trial Tr. at 2-28–2-29, Bartlett ECF No. 154; Trial Tr. at 4-36, ECF No. 156.)  Consequently, the emails were in no way unfairly prejudicial to DuPont because the purportedly objectionable portions were redacted.

As to DuPont's second argument, it contends:

> [T]he Court permitted Plaintiffs to cross-examine Dr. Cohen with testimony by Dr. Weed.  This was highly improper, as Dr. Weed's testimony did not form the basis of Dr. Cohen's opinion, nor was Dr. Cohen familiar with it.  *See, e.g., In re Richardson-Merrell "Bendectin" Prods. Liab. Litig.*, 624 F. Supp. 1212, 1227 (S.D. Ohio 1985) ("Where a defendants expert did not rely upon that study, any effort to introduce its flaws or defects would be irrelevant and could only have been prejudicial to the defendant.  Under those circumstances cross-examination was prohibited.").

(DuPont's Post Trial Mot. at 33); (DuPont's Reply) ("Dr. Weed was not called as a witness at trial, his testimony did not form the basis of Dr. Cohen's opinion, and indeed, Dr. Cohen was not even familiar with it.").

DuPont, however, is mistaken.  Dr. Cohen was not unfamiliar with Dr. Weed's opinion, testifying as follows:

> Q. Did you read the part of Dr. Weed's testimony where he said it wasn't within the scope of his assignment to analyze the relationship between obesity and kidney cancer?
>
> A. Yes.

(Trial Tr. Vol. 12 at 260, Bartlett ECF No. 133.)

Further, the Court specifically ruled that Dr. Cohen could *only* be questioned about his testimony within the context of the obesity issue in light of Dr. Weed's opinion that he does not believe there is anything in the literature establishing a connection between obesity and renal cell

carcinoma. *Id.* at 223–24 ("If he is relying on somebody else's opinion, then he can be crossed on it.").

### 4.    Conclusion – Improper Questioning of Witnesses

Accordingly, the Court finds that the documents about which DuPont complains were not improperly authenticated or admitted and that the questioning it permitted of the high-level DuPont officials about the documents did not yield speculative testimony that was inadmissible under Rule 602.  Nor were the questions related to the documents misleading or unduly prejudicial to DuPont requiring exclusion under Rule 403.  Additionally, the exhibits about which DuPont complains were not included on Mrs. Bartlett's final pretrial list were used only for impeachment and, under the Federal and Local Rules, were therefore not required to be disclosed.  And, it was not improper to permit Mrs. Bartlett to cross examine Dr. Cohen regarding a portion of Dr. Weed's opinion about which he was familiar.  Finally, the emails with which DuPont takes issue are appropriately considered admissions and are therefore excepted from the hearsay rule and were not unfairly prejudicial or inflammatory after redaction.

### H.    Jury Instructions

DuPont contends that it is entitled to a new trial because the "Court issued improper instructions on causation and negligent infliction of emotional distress [NISED]."  (DuPont's Post Trial Mot. at 28.)  "In the Sixth Circuit, it is well established that jury instructions are reviewed as a whole and that an issue as to instructions is a question of law that is reviewed *de novo*."  *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.,* 400 F.3d 360, 365 (6th Cir. 2005) (citing *Fisher v. Ford Motor Co.,* 224 F.3d 570, 576 (6th Cir. 2000)).  When reviewing a district court's jury instructions, the appellate court will "not to read the instructions word for word to find an erroneous word or phrase, but rather [it will] review the instructions as a whole in order

to determine whether they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision." *Id.* at 365 (internal quotations and citations omitted).  Moreover, even if the district court misstates the law, it will not necessitate a new trial if the error was harmless.  *See e.g., O–So Detroit, Inc. v. Home Ins. Co.*, 973 F.2d 498, 502 (6th Cir.1992) ("The misstatement of Michigan law contained therein was neither confusing, misleading nor prejudicial and thus does not require a new trial.").

### 1.  Proximate Causation Jury Instructions

Before finalizing the proximate causation jury instructions, the Court reviewed each parties' proposed instructions and took oral argument on their respective positions.  (Joint Proposed Jury Instructions at 32–34, MDL ECF No. 4238-2; Charging Conf. Tr. at 49–62, Bartlett ECF No. 138.)  The Court ultimately fashioned two instructions that rejected some parts and accepted other portions of each parties' proposed instructions:

### Instruction No. 22

### NEGLIGENCE – PROXIMATE CAUSE

Mrs. Bartlett must prove not only that DuPont was negligent, but also that such negligence was a proximate cause of her injuries.  Proximate cause is an act or failure to act that was a substantial factor in bringing about an injury and without which the injury would not have occurred.

(Final Jury Instructions at 23, Bartlett ECF No. 139.)

DuPont argues that Ohio law is better reflected in the following definition of proximate cause:  "an act or failure to act that in the natural and continuous sequence directly produced the injury and without which it would not have occurred."  (DuPont's Post Trial Mot. at 29.)  This Court utilized this language in the following additional instructions on proximate cause:

Instruction No. 23

NEGLIGENCE – PROXIMATE CAUSE – FORSEEABLE INJURY

I will now discuss how to determine whether Mrs. Bartlett's injury was the natural and probable consequence of DuPont's conduct.  To prove proximate cause, Mrs. Bartlett must show that her injuries were a natural and probable consequence of DuPont's conduct.

For Mrs. Bartlett's injuries to be considered the natural and probable consequence of an act, Mrs. Bartlett must prove that DuPont should have foreseen or reasonably anticipated that injury would result from the alleged negligent act.  The test for foreseeability is not whether DuPont should have foreseen the injury exactly as it happened to Mrs. Bartlett.  Instead, the test is whether under the circumstances a reasonably careful person would have anticipated that an act or failure to act would likely result in or cause injuries.

*Id*. at 24.

DuPont maintains that the Court's use of the "substantial factor" language "weaken[ed] the causal connection required under Ohio law, [and therefore] failed to properly inform the jury of the law on negligence." *Id*.  This Court, however, disagrees.

When exercising diversity jurisdiction, federal courts are bound to apply state law "in accordance with the then controlling decisions of the state's highest court." *Ziegler v. IBP Hog Mkt., Inc.,* 249 F.3d 509, 517 (6th Cir. 2001). The Ohio Supreme Court has discussed proximate causation in the context of allegations of *combined causes* to an injury.  *City of Piqua v. Morris,* 98 Ohio St. 42 (1918) ("The 'proximate cause' of a result is that which in a natural and continued sequence contributes to produce the result, without which it would not have happened. The fact that *some other cause concurred* with the negligence of a defendant in producing an injury does not relieve him from liability, unless it is shown such other cause would have produced the injury independently of defendant's negligence.") (emphasis added).  The parties agree that the Ohio Supreme Court has not issued any decision that is directly on point with the facts and circumstances of Mrs. Bartlett's case where there are allegations of *competing causes*

106

of injury. Thus, a review of the decisions of Ohio's appellate courts is appropriate. *Ventura v. The Cincinnati Enquirer,* 396 F.3d 784, 792 (6th Cir. 2005). Decisions from intermediate state appellate courts are viewed as persuasive unless it can be demonstrated that the Ohio Supreme Court would decide the matter differently. *In re Dow Corning Corp.,* 419 F.3d 543, 549 (6th Cir. 2005).

The "substantial factor" language utilized by the Court in the instant action has been acknowledged in numerous Ohio appellate court decisions that are analogous to the case *sub judice. See, e.g., Person v. Gum,* 7 Ohio App. 3d 307, 310 (8th Dist. Ohio Ct. App. 1983) (teacher's conduct in letting student leave school was not a "substantial factor" bringing about the injury (quoting Restatement (Second) of Torts § 431)); *State v. Dunham*, No. 13CA26, 2014 Ohio App. LEXIS 961, at *18 (5th Dist. Ohio Ct. App. Mar. 14, 2014) ("The plaintiff need only prove 'some reasonable connection' between the act or omission and the damage suffered or prove that the conduct is a substantial factor in bringing about the injury in order to satisfy the requirement of proximate cause."); *State v. Knapp*, No. 2011-A-0064, 2012 WL 1925406, at *10 (11th Dist. Ohio Ct. App. May 29, 2012) ("This court has held that '[i]t is well established that the definition of 'cause' in criminal cases is identical to the definition of 'proximate' cause in civil cases. The general rule is that a defendant's conduct is the proximate cause of injury or death to another if the defendant's conduct (1) is a 'substantial factor' in bringing about the harm and (2) there is no other rule of law relieving the defendant of liability."); *Innovative Techs. Corp. v. Advanced Mgmt. Tech.*, No. 23819, 2011 WL 5137204, at *10 (2d Dist. Ohio Ct. App. Oct. 28, 2011) ("The general rule is that a defendant's conduct is the proximate cause of injury or death to another *if the defendant's conduct (1) is a 'substantial factor' in bringing about the harm* and (2) there is no other rule of law relieving the defendant of liability."); *Popham v.*

107

*Golden Corral Corp.*, No. CA2006-04-087, 2007 Ohio App. LEXIS 1265, at *P24 (12th Dist. Ohio Ct. App. 2007) ("Proximate cause requires a finding that the defendant's negligent act was a substantial factor in causing the plaintiff's claimed injury, in the absence of a public policy rule prohibiting the imposition of liability."); *Lanese v. CBK Corp.*, No. 71792, 1997 Ohio App. LEXIS 4133, at *7 (8th Dist. Ohio Ct. App. 1997) ("Whether [defendant's] conduct was a substantial factor, however, goes to the issue of proximate cause."); *Skinner v. North Mkt. Dev. Auth.*, 1997 Ohio App. LEXIS 3015, at *7 (10th Dist. Ohio Ct. App. 1997) ("Thus, a plaintiff must prove that the [negligent] conduct is a substantial factor in bringing about the injury in order to satisfy the requirement of proximate cause." (internal quotation and emphasis omitted)). Indeed, the Court finds only one outlying appellate case that did not reject the language on its merits, but merely stated that it was not accepted Ohio Law at the time of the decision in 1992. *See Williams v. O'Brien*, No. 12344, 1992 Ohio App. LEXIS 6001, *24–25 (2d Dist. Ohio Ct. App. 1992).

The substantial factor language is also utilized in the Restatement Second of Torts, Anderson's Ohio Personal Injury Litigation Manual, and Federal Jury Practice & Instructions. Restatement (Second) of Torts, § 431 (1965) (a defendant's conduct is negligent, if "(a) [it] is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the defendant from liability . . . ."); 1-4 Anderson's Ohio Pers. Injury Litig. Manual § 4.21 (2015) ("In ordinary negligence actions, plaintiff's counsel must show that defendant's conduct was a substantial factor in bringing about the injury or, put another way, that defendant's conduct was a substantial causative factor in the sequence of events that led to plaintiff's injury."); 3 Fed. Jury Prac. & Instr. § 120:60 (6th ed.) ("An injury or damage is proximately caused by an act or a failure to act whenever it appears from the evidence that the act or failure to act played a

substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission.").

Further, federal courts applying Ohio law have defined proximate cause in the same way as did this Court. *See, e.g., Lennox v. Goodrich*, No. 1:12 CV 1017, 2013 U.S. Dist. LEXIS 155604, at *10 (N.D. Ohio Oct. 30, 2013) (relying on Ohio law that held that the definition of "cause" in criminal cases is identical to the definition of "proximate cause" in civil cases that the defendant's conduct is a "substantial factor" in bringing about the harm); *Christian v. Justice (in Re Justice)*, Nos. 01-50091, 01-02156, 2002 Bankr. LEXIS 1569, at *12–13 (U.S. Bankr. S.D. Ohio Dec. 26, 2002) ("To establish proximate cause, it must be demonstrated that the conduct was a substantial factor in the loss, or the loss may be reasonably expected to follow."). Indeed, the Sixth Circuit has recognized that "proximate cause" as used in Ohio's Product Liability Act (Ohio Rev. Code § 2307.73(A)(2), which requires that a defendant's product proximately caused the plaintiff's injury and is the same general standard used in non-product negligence cases,

> is in essence, the "substantial factor" test of legal cause stated in the Restatement (Second) of Torts, Sections 431, 433 (1965), and comment a, which focuses on the defendant's conduct in relation to the plaintiff." *See Horton v. Harwick Chem. Corp.*, 653 N.E.2d 1196 (Ohio 1995) (adopted); *Pang v. Minch*, 559 N.E.2d 1313 (Ohio 1990) (discussed with approval); *see also Jeffers v. Olexo*, 539 N.E.2d 614, 616-17 (Ohio 1989) (rule of proximate cause "requires that the injury sustained shall be the natural and probable consequence of the negligence alleged").

*Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1432 (6th Cir. 1997) (internal citations altered).

And, while DuPont is correct that the Ohio Jury Instructions ("OJI") do not utilize the "substantial factor" language, those instructions merely provide guidance and are "not considered binding." Ohio Jury Instructions § Guide.01 (2015) (the instructions are "a collection of non-binding model instructions"); *cf. United States v. Jones*, No. 93-1423, 1994 U.S. App. LEXIS 6907 (6th Cir. March 30, 1994) ("This circuit's pattern criminal jury instructions provide

guidance, but they do not represent the only instructions which can be used in this circuit.  The district court is vested with broad discretion in formulating its charge.").  The Court must always determine whether the model instructions fit the factual circumstances of the case before it.  In engaging in that determination, the Court utilized the portion of the OJI instruction that required a "but-for" causation test to be met, *i.e.*, "Proximate cause is an act or failure to act that was a substantial factor in bringing about an injury ***and*** *without which the injury would not have occurred*."  (Final Jury Instructions at 23, Bartlett ECF No. 139) (emphasis added).  Because a "but-for" test presents a higher standard than does a substantial factor analysis, any concern DuPont has regarding the Court's alleged lowering or weakening the proximate cause standard is alleviated.  *Cf. Burrage v. United States*, 134 S. Ct. 881, 887–88 (2014) (without which the injury would not have occurred reflects a "but for" test, which is a more stringent one than the substantial factor standard).

Consequently, the Court concludes that its instructions to the jury on proximate cause "adequately inform[ed] the jury of the relevant considerations and provide[d] a basis in law for aiding the jury in reaching its decision."  *Williams ex rel. Hart*, 400 F.3d at 365–66.  Therefore, DuPont is not entitled to a new trial based on the Court's proximate cause jury instruction.

### 2.        Negligent Infliction of Serious Emotional Distress Jury Instruction

Similar to the proximate cause instructions, the Court reviewed each parties' proposed NISED instruction and held oral argument on the issue.  (Joint Proposed Jury Instructions at 42–46, MDL ECF No. 4238-2; Charging Conf. Tr. at 27–28, Bartlett ECF No. 138.)  Ultimately, the Court drafted the instructions related to NISED that are set forth in their entirety above in the Rule 50 portion of this Opinion and Order.  As to the current issue related to Mrs. Bartlett's NISED claim, DuPont objects to the portion of the Court's instructions that provides the

110

definition of "serious emotional distress," arguing that it is "the wrong legal standard under Ohio law." (DuPont's Post Trial Mot. at 30.)  The Court instructed the jury as follows:  "'Serious emotional distress' includes the increased fear of developing cancer, if Mrs. Bartlett is aware that she in fact possesses an increased statistical likelihood of developing cancer, and that from this knowledge springs a reasonable apprehension which manifests itself as emotional distress." (Final Jury Instructions at 27; Bartlett ECF No. 139.)

DuPont relies upon *Paugh v. Hanks*, 6 Ohio St. 3d 72, 78 (1983) for the proposition that "a plaintiff must prove 'serious emotional distress,' which requires evidence of 'emotional injury which is both *severe and debilitating*.'" (DuPont' Post Trial Mot. at 4) (emphasis added by DuPont).  DuPont points out that *Paugh* was an NISED case and the standards announced in it apply here.  DuPont continues, asserting that "[f]ears related to cancer are no different, as Mrs. Bartlett must still satisfy the 'severe and debilitating' requirement."  *Id*. (citing as an example *Coffman v. Dep't of Rehab. & Corr.*, No. 12AP-816, 2013 Ohio App. LEXIS 3995, at *5 (10th Dist. Ohio Ct. App. Sept. 5, 2013)).

DuPont's argument, however, fails to recognize that Ohio courts have distinguished between NISED claims in which there is a physical impact or injury and those in which there is none.  A review of the evolution of this nuanced area of law is helpful here.

To start, both cases upon which DuPont relies, *Paugh* and *Coffman*, involve plaintiffs who alleged mental distress without any accompanying physical injury.  Those two cases follow *Schultz v. Barberton Glass Company*, 4 Ohio St. 3d 131 (1983), the case in which the Ohio Supreme Court first recognized a claim for NISED without an accompanying serious physical injury.  Overruling two prior cases[13] and their progeny, the *Schultz* court held that "[a] cause of

---

[13] *Miller v. Baltimore & O. S. W. R. Co.*, 78 Ohio St. 309 (1908) and *Davis v. Cleveland Ry. Co.*, 135 Ohio St. 401 (1939).

action may be stated for the negligent infliction of serious emotional distress without a contemporaneous physical injury." *Id.*, syllabus.

The Ohio Supreme Court later set a higher evidentiary bar for claims of emotional distress unaccompanied by physical injury, holding that "[w]here a bystander to an accident states a cause of action for negligent infliction of serious emotional distress, the emotional injuries sustained must be found to be both serious and reasonably foreseeable, in order to allow a recovery. Serious emotional distress describes emotional injury which is both severe and debilitating." *Paugh*, 6 Ohio St. 3d 72, paragraph 3, 3(a) of syllabus. The *Paugh* court began its discussion as follows:

> Based on our recent pronouncement in *Schultz v. Barberton Glass Co.* (1983), 4 Ohio St.3d 131, 447 N.E.2d 109, we hold that summary judgments in the instant cause were improper and that, therefore, the cause must be reversed and remanded to the court of common pleas, since the plaintiffs here have stated a cause of action for the negligent infliction of serious emotional distress. Upon remand, we wish to guide the trial court, as well as the bench and bar, as to the limitations and scope of Ohio's recognition of the tort of negligent infliction of serious emotional distress.
>
> . . . .
>
> We view our decision today as a bold and promising step in ensuring an individual's right to emotional tranquility which is redressable in an action against a blameworthy defendant for the negligent infliction of serious emotional distress.

*Paugh*, 6 Ohio St. 3d at 74.

A few years after issuance of *Paugh*, the Ohio Supreme Court further refined the legal standards applicable to the tort of NISED, holding that if a plaintiff suffers contemporaneous physical injury, she does not need to prove that her resulting psychological injuries are severe and debilitating. *Binns v. Fredendall*, 32 Ohio St. 3d 244 (1987). The *Binns* court noted that the "plaintiff's physical injuries take her outside the class of *Schultz* and *Paugh* plaintiffs who suffer purely emotional or psychiatric injury." *Id.* at 246. "As such, the emotional or psychiatric

injuries which have arisen as a proximate result of the defendant's tortious act are compensable under the traditional rule for recovery." *Id.* ("Accordingly, when the trial court erroneously recited language from *Paugh* requiring that emotional distress be both severe and debilitating to be compensable, it committed reversible error.").

Nonetheless, DuPont argues that *Binns* is not applicable to Mrs. Bartlett's claims for two reasons, the first of which is that *Binns* involved claims by a bystander plaintiff and, "[h]ere, there is no such claim by a bystander to an auto accident." (DuPont's Post Trial Mot. at 6–7.) However, courts, including this one, have applied *Binns* in situations outside of those involving a bystander plaintiff. *See e.g., Day v. NLO*, 851 F. Supp. 869, 878 (S.D. Ohio 1994). In *Day*, the plaintiff was exposed to radiation that he claimed caused him serious emotional distress in the form of cancerphobia. This Court explained that, when "Plaintiffs can prove that they were exposed to a sufficiently high dose of radiation, this in itself will constitute a physical injury, sufficient to bring their action for emotional distress based on their exposure." *Id.* (collecting cases). This Court further clarified:

> As stated in a prior Order, the Plaintiffs' emotional distress need not be severe and debilitating in order to recover. The severe and debilitating requirement does not apply to emotional distress cases which are accompanied by physical injury. *Binns v. Fredendall*, 32 Ohio St.3d 244 (1987).

*Id.* at 878.

As to DuPont's second argument, it contends that *Binns* does not apply to Mrs. Bartlett because her physical injuries were not suffered contemporaneous with her emotional distress. (DuPont's Post Trial Mot. at 7.) Mrs. Bartlett responds that "DuPont ignores well-recognized case law holding that 'the growth and metastasis of cancer are contemporaneous physical injuries that may support a claim for negligent infliction of emotional distress that is not severe and debilitating.'" (Pl.'s Mem. in Opp. at 4) (citing *Loudin v. Radiology & Imaging Servs., Inc.*, 185

113

Ohio App. 3d 438, 450 (2009) *aff'd,* 128 Ohio St. 3d 555 (2011)[14]; *Binns,* 32 Ohio St.3d at 245)).

In reply, DuPont claims that unlike the plaintiff in *Loudin,* Mrs. Bartlett's "claimed cancerphobia

regarding future cancer is a more recently-arising fear that was not contemporaneous with the

diagnosis and removal of her kidney cancer, and therefore she must meet the severe and

debilitating emotional distress standard." (DuPont's Reply at 1.) In this regard, DuPont states:

> DuPont does not dispute that "the growth and metastasis of cancer" could
> constitute a physical injury accompanied by contemporaneous emotional distress.
> *See* Opp. at 4. The emotional distress claim here, however, is one of
> cancer*phobia*, which came about after Plaintiff's *remission.* Plaintiff seeks
> damages for her fear of *recurrence* or a new cancer, a fear which arose long after
> her initial diagnosis, not "contemporaneously" with her prior manifestation of
> cancer.

(DuPont's Reply at 2.) DuPont, however, is mistaken.

Nothing in the record supports DuPont's assessment that Mrs. Bartlett's NISED claim is

based on a fear that came about "long after her initial diagnosis." As discussed above in more

detail in the Rule 50 portion of this decision, Mrs. Bartlett testified at trial that from the time she

was diagnosed with kidney cancer until the day she testified at her trial, she suffered from

serious emotional distress over the possibility that her cancer would return. (Trial Tr. Vol. 9 at

99, 109–113, 136; Bartlett ECF Nos. 131, 131-1.) All of the follow up medical testing was

performed on Mrs. Bartlett specifically to provide an early diagnosis of a recurrence or a new

cancer, which she was at a statistically increased likelihood to get. (Trial Tr. Vol. 7 at 93–94, 99,

---

[14] In *Loudin*, the court of appeals reversed a grant of summary judgment to defendants in a medical malpractice action. The Ohio Supreme Court affirmed the court of appeals' judgment reviving the suit, but concluded that the plaintiffs failed to plead a claim for negligent infliction of emotional distress. DuPont contends, therefore, that the Ohio Supreme Court effectively vacated the lower court's reasoning. (DuPont's Reply at 2.) The Ohio Supreme Court, however, did not indicate that a NISED claim was unavailable under the facts of that case, only that the complaint did not state one. *Loudin v. Radiology & Imaging Servs., Inc.*, 128 Ohio St. 3d 555, 562 (2011) ("We hold that the inclusion of damages for emotional distress in a complaint alleging negligence does not automatically transform the claim into one alleging the negligent infliction of emotional distress, nor does it automatically create a cause of action separate and distinct from the negligence claim."). Thus, the appellate court's in-depth discussion of NISED claims based on cancerphobia certainly still appropriately informs the law in Ohio.

114

137, Bartlett ECF 128-1) (Dr. Bahnson testifying about the risk of recurrence and/or metastasis to other parts of the body based on prior cancer and/or continued ingestion of C-8). This evidence, if believed by the jury, showed that Mrs. Bartlett's mental distress over contracting cancer in the future existed during the same period that she suffered from kidney cancer.

The Court notes that its conclusion that *Binns* is applicable to the instant situation follows the public policy rationale expressed by the Ohio Supreme Court in *Schultz, Paugh*, and *Binns*, and was articulated in *Day* as follows:

> This Court's conclusion that a severe and debilitating requirement does not apply to the Plaintiffs' emotional distress claim follows the public policy rationale behind the law regarding emotional distress. Historically, courts were reluctant to allow compensation for mental injuries. *See generally, Prosser and Keeton on Torts* § 54 (5th ed. 1984). Courts feared a deluge of emotional distress claims, particularly fraudulent ones. *Id.* As courts began to recognize the deleterious effects of mental injuries, they began to allow compensation for emotional distress if the emotional distress was accompanied by a physical injury. *Id.* at 363 (explaining that a physical injury makes it more likely that the plaintiff's emotional distress is genuine).
>
> Subsequently, Ohio courts allowed recovery for purely emotional distress if the emotional distress was severe and debilitating. *Paugh v. Hanks,* 6 Ohio St.3d 72, 451 N.E.2d 759 (1983). *Just like a physical injury, the severe and debilitating requirement ensures that liability probably will not be affixed for emotional distress claims which are speculative or even fraudulent.* *See* Robert A. Bohrer, *Fear and Trembling in the Twentieth Century: Technology, Risk, Uncertainty and Emotional Distress,* Wis.L.Rev. 83, 94 (1984). Similarly, in the case before the Court, assuming that the Plaintiffs have been exposed to excessive dosages of radiation, then we can reasonably conclude that no liability will be imposed for emotional distress claims which are fraudulent or speculative. *See* Terry Morehead Dworkin, *Fear of Disease and Delayed Manifestation Injuries: A Solution or a Pandora's Box?,* 53 Fordham L.Rev. 527, 542–58 (Dec.1984) (recovery allowed for emotional distress, when the emotional distress can be sufficiently verified); *see also Plummer,* 580 F.2d at 76 (exposure to disease constitutes a physical impact because the exposure guards against feigned emotional distress claims).

*Day*, at 878–79 (emphasis added). Stated another way, it is reasonable to conclude that emotional distress claims are unlikely to be speculative or fraudulent when the plaintiff can show

that she has either an accompanying physical injury or that her emotional distress is severe and debilitating. There is no reason for a plaintiff to be required to show both.

Thus, the Court finds that Mrs. Bartlett's allegation that her cancer and her contemporaneous mental anxiety and distress over contracting cancer in the future "take[s] her outside the class of *Schultz* and *Paugh* plaintiffs who suffer purely emotional or psychiatric injury." *Binns*, 32 Ohio St. 3d at 246. Mrs. Bartlett was therefore not required to show that her emotional distress was severe and debilitating. Accordingly, the Court concludes that the NISED instructions it provided to the jury adequately informed it of the relevant considerations and provided it with a basis in law for aiding it in reaching its decision. *See Williams ex rel. Hart*, 400 F.3d at 365–66.

## I.  Cumulative Effect

The final argument made by DuPont relates to the "cumulative effect" of this Court's rulings during and before Mrs. Bartlett's trial. Explicitly, DuPont states:

> DuPont respectfully submits that each of the above errors was individually significant enough to prevent the trial from being "fair to the party moving." *Montgomery Ward*, 311 U.S. at 251. At minimum, however, their cumulative effect warrants a new trial. "Since a jury reaches its verdict in light of the evidence as a whole, it makes no sense to try to analyze errors in artificial isolation, when deciding whether they were harmless." *Beck v. Haik*, 377 F.3d 624, 645 (6th Cir. 2004), overruled on other grounds by *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009); *see also Penn, LLC v. Prosper Bus. Dev. Corp.*, 600 Fed. Appx. 393, 402 (6th Cir. 2015) ("the cumulative effect of several erroneous rulings may constitute reversible error [even] where no single one would undermine our 'fair assurance' in the verdict") (citing *Beck*, 377 F.3d at 645).

(DuPont's Post Trial Mot. at 34, Bartlett ECF No. 151.)

Mrs. Bartlett responds that, "DuPont has identified no error in Mrs. Bartlett's trial which would warrant a new trial. Accordingly, there is no 'cumulative effect,' of error and DuPont's

Motion for a new trial based upon a purported cumulative effect of errors should be denied."
(Pl.'s Mem. in Opp. at 52, Bartlett ECF No. 158.)  Mrs. Bartlett's arguments are well taken.

As Mrs. Bartlett highlights, to warrant reversal based on a cumulative effect of errors
argument, DuPont "must show that the combined effect of individually harmless errors was so
prejudicial as to render [the] trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593,
614 (6th Cir. 2004) (even where an error had been found, argument rejected where appellant
"failed to identify any other error committed by the district court which could be combined with
this harmless error in order to support a finding of cumulative error and which would rise to the
level of fundamental unfairness") (citing *United States v. Rivera*, 900 F.2d 1462, 1471 (10th Cir.
1990) (holding that "a cumulative-error analysis should evaluate only the effect of matters
determined to be error, not the cumulative effect of non-errors").

As discussed *supra,* the Court has found no errors and the cumulative effect analysis,
therefore, does not provide an avenue to a new trial.

**J.     Conclusion – Rule 59 Request for a New Trial**

Based on the foregoing, the Court concludes that the jury verdict is not against the weight
of the evidence, *i.e.*, it "is one which reasonably could have been reached." *Denhof*, 494 F.3d at
543.  Further, the trial was in no way "influenced by prejudice or bias" so that it was "unfair [to
DuPont] in some fashion." *Mike's Train House, Inc.*, 472 F.3d at 405.  Accordingly, the Court
**DENIES** DuPont's request for a new trial.

## IV.     REMITITUR

DuPont contends that if it is not granted judgment as a matter of law or a new trial, this
Court should require a remittitur of Mrs. Bartlett's jury award because is it excessive.  In the
Sixth Circuit "as a general rule, a jury verdict should not be remitted by the court 'unless it is

117

beyond the maximum damages that the jury reasonably could find to be compensatory for a

party's loss.'" *Jackson v. City of Cookeville*, 31 F.3d 1354, 1359 (6th Cir. 1994) (quoting *Farber*

*v. Massillon Bd. of Educ.*, 917 F.2d 1391, 1395 (6th Cir.1990)).

> A trial court is within its discretion in remitting a verdict only when, after
> reviewing all evidence in the light most favorable to the awardee, it is convinced
> that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is
> so excessive or inadequate as to shock the judicial conscience of the court.

*Id.* (quoting *Farber,* 917 F.2d at 1395). *See also In re Lewis,* 845 F.2d 624, 635 (6th Cir.1988)

("[A] motion for remittitur should only be granted if the award *clearly* exceeds the amount

which, under the evidence in the case, was the maximum that a jury reasonably could find to be

compensatory for the plaintiff's loss.") (quotation omitted).

DuPont maintains that Mrs. Bartlett's jury award is clearly excessive not because of the

amount of the award, but because it fails to "comport[] with the Ohio Tort Reform Act."

(DuPont's Post Trial Mot. at 37); (DuPont's Reply at 25) ("DuPont premised its remittitur

argument on the fact that the Ohio Tort Reform Act caps the amount of noneconomic damages

recoverable by Mrs. Bartlett."). DuPont asserts:

> Based on Ohio's Tort Reform Act, this Court should order that the
> damages be reduced. Mrs. Bartlett's damages should have been limited to no
> more than $250,000. A remittitur, or reduction in damages, is an alternative to
> granting a new trial when excessive damages are awarded. *See Malandris v.*
> *Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1983)
> ("Where the court concludes there was error [] in an excessive damage award . . .
> the appellate court may order a remittitur and alternatively direct a new trial if the
> plaintiff refuses to accept the remittitur, a widely recognized remedy.").
>
> It is the role of the Court "to determine whether the jury's verdict is *within*
> *the confines set by state law*, and to determine, by reference to federal standards
> developed under Rule 59, whether a new trial or remittitur should be order."
> *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 435 (1996) (quoting
> *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal Inc.*, 492 U.S. 257, 279
> (1989)) (emphasis added). Here, the jury's verdict is excessive on its face. The
> jury awarded Mrs. Bartlett $1.1 million on her negligence claim and $500,000 on
> her claim for negligent infliction of emotional distress, for a total of $1.6 million.

> DuPont respectfully submits that this award is not "within the confines set by state law." *Gasperini*, 518 U.S. at 435.

(DuPont's Post Trial Mot. at 37–38, Bartlett ECF No. 151.)

Thus, to grant DuPont's request, the Court must find that the jury verdict is not within the confines of Ohio law because it is outside of the Tort Reform Act's limitations. This Court, however, determined in DMO 10 that Ohio's Tort Reform Act does not apply to Mrs. Bartlett's claims. (DMO 10, Ohio Tort Reform Application, MDL ECF No. 4215.) DuPont offers no new argument related to this issue, and instead suggests that "[t]his Court should reconsider its prior ruling on the applicability of the Ohio Tort Reform Act and, to the extent possible, minimize further harm from its threshold error." (DuPont's Reply at 25, Bartlett ECF No. 159.) The Court accepted DuPont's invitation to reconsider DMO 10, and in doing so found that its prior analysis of the issue is correct. Thus, the Court reiterates the relevant portions here.

## A.     The Ohio Tort Reform Act of 2004

Under the Ohio Tort Reform Act of 2004, effective April 7, 2005, the Ohio Revised Code was amended to, *inter alia*, cap the amount of noneconomic damages recoverable in tort actions and to cap the amount of punitive damages. Ohio Rev. Code §§ 2315.1–21. Ohio's tort reform statute does not apply retroactively. Ohio Rev. Code § 1.48 ("A statute is presumed to be prospective in its operation unless expressly made retrospective."); *Heffelfinger v. Connolly*, No. 3:06-CV-2823, 2009 WL 112792, at *2 (N.D. Ohio Jan. 15, 2009) (finding no retroactive application of the Ohio Tort Reform Act);  *see also Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 105 (1988) (setting out principles for evaluating retroactivity of statutes); *Mastellone v. Lightning Rod Mut. Ins. Co.*, 175 Ohio App. 3d 23, 31 (2008) (no retroactive

application of provisions of the Ohio Tort Reform Act of 2004). Thus, application of the damages limitations in the Ohio Tort Reform Act hinges on the accrual date of an Ohio Plaintiff's injury.

**B.      Application of the Ohio Tort Reform Act to Mrs. Bartlett's Case**

In DMO 10, the Court framed the parties' positions as follows:

> DuPont contends that the Tort Reform Act and its damages caps apply to Mrs. Bartlett's claims because her claims accrued after April 7, 2005, the statute's effective date. DuPont premises its argument on Ohio's statute of limitations for bodily injury claims based upon toxic chemical exposure, which incorporates a discovery rule:
>
> > [A] cause of action for bodily injury . . . that is caused by exposure to hazardous or toxic chemicals . . . accrues upon the date on which the plaintiff is informed by competent medical authority that the plaintiff has an injury that is related to the exposure, or upon the date on which by the exercise of reasonable diligence the plaintiff should have known that the plaintiff has an injury that is related to the exposure, whichever date occurs first.
>
> Ohio Rev. Code § 2305.10(B)(1).
>
> DuPont maintains that Mrs. Bartlett was not informed by competent medical authority that her kidney cancer is related to her exposure to C-8 until the Science Panel issued its Probable Link Finding relating to kidney cancer in 2012. Mrs. Bartlett responds that the analysis of when the statute of limitations began to run on her claim is a separate and distinct one from the analysis of when a claim arose for the purpose of application of the Ohio Tort Reform Act. As to the latter inquiry, Mrs. Bartlett maintains that her claim arose well before the effective date of the Tort Reform Act. This Court agrees.

(DMO 10 at 5–6.)

In its Opinion and Order, the Court then indicated why Mrs. Bartlett's arguments were well taken, explaining the law in this area:

> "Courts have routinely held that the relevant date for determining whether the [Tort Reform Act] applies is the date the conduct giving rise to the plaintiff's cause of action occurred." *Heffelfinger,* 2009 WL 112792 at *3; *see also Blair v. McDonagh,* , 177 Ohio App.3d 262, 282 (Ohio Ct. App. 2008) ("[A] court cannot

120

apply [the Tort Reform Act] to causes of action that arose before the statute's effective date even if some of the conduct giving rise to the cause of action occurred after the [statute's] effective date."). Indeed, three cases from this Court have made clear that determining when a claim arises or accrues for purposes of determining application of the Ohio Tort Reform Act depends on "whether the initial injury took place before . . . April 7, 2005," regardless of when the plaintiff may have actually discovered or "should have" discovered the injury. *Liming v. Stryker Corp.*, No. 1:11-CV-00788, 2012 WL 1957287, at *3 (S.D. Ohio May 31, 2012) (accrual of claim occurred before effective date of the Act when injuries occurred in 2001, even though plaintiff did not become aware of his cause of action until 2009); *Troyer v. I-Flow Corp.*, No. 1:11-CV-00045, 2011 WL 2517031, at *4 (S.D. Ohio June 23, 2011) (same); *Edwards v. Warner-Lambert*, No. 2:05-cv-657, 2011 WL 5914008, at *4–5 (S.D. Ohio Nov. 28, 2011) (evidence existed supporting plaintiff's argument that his cause of action accrued within meaning of the Act in 2004, because his injuries occurred between 2002 and 2004, even though he did not become aware of his causes of action until after April 7, 2005)).

DuPont points out, however, that there is a split of authority in this District on this issue. DuPont relies upon *Musgrave v. Breg*, Inc., No. 2:09-cv-01029, 2011 WL 5299489 (S.D. Ohio Nov. 4, 2011), which held that the date for determining when the statute of limitations begins to run is the same date that a claim arose for purposes of application of the Tort Reform Act. The *Breg* court explained:

> [U]nder Ohio law, there is no meaningful distinction between a claim "arising" or "accruing." Indeed, those concepts are synonymous, as the Ohio Supreme Court unequivocally stated:

>> Pursuant to R.C. 2305.10, the two-year period of limitations begins to run when a cause of action for bodily injury "arose," while the R.C. 2305.11(B)(1) statute of limitations for "medical claims" begins to run when a cause of action "accrued." However, we believe that the terms "arose" and "accrued" are synonymous and that the rule of discovery long recognized in Ohio as applicable to the "accrual" of causes of action should be applied to the R.C. 2305.10 statute of limitations for claims of hospital negligence in credentialing a physician.

> *Browning v. Burt,* 66 Ohio St.3d 544 (Ohio 1993). Because the Ohio Supreme Court has so held, Plaintiffs' claim in this case that a cause of action "arises" at one time (when an injury is

discovered, according to Plaintiffs) but "accrues" at a later time (when a competent medical professional informs the plaintiff of the relation between his or her injury and a medical device), is incorrect as a matter of law.

*Musgrave v. Breg, Inc.*, No. 2:09-CV-01029, 2011 WL 5299489, at \*4 (S.D. Ohio Nov. 4, 2011).[15]

The Ohio Supreme Court case relied upon in *Breg* is distinguishable from the issue before this Court in an important way. That is, the *Browning* court interpreted as synonymous the terms "arise" and "accrue" utilized in *two statute of limitations provisions*: Ohio Revised Code § 2305.10 provides the limitations period for bodily injury begins when a claim accrues, and § 2305.11 provides the limitations period for medical claims is triggered when a claim arose. In that context, this Court agrees that "the rule of discovery long recognized in Ohio" as extending a statute of limitations to a date that the cause of action was or reasonably should have been discovered is appropriately applied to either statute of limitations. There is certainly no meaningful distinction between negligently caused bodily injury claims and negligently caused medical claims for statute of limitations purposes. Thus, it is not surprising that Ohio does not make such a distinction in its case law.

As the *Troyer* court correctly explained, however, the analysis DuPont asks this Court to adopt conflates the test for when a claim accrues or arose for purposes of application of the Ohio Tort Reform Act with the test for determining when a claim accrues for purposes of statute of limitations analyses. As Judge Spiegel explained in *Troyer*:

> Defendant is conflating the statute of limitations and the effective date of [the Ohio Tort Reform Act]'s abrogation of common law claims. Ultimately the issue is whether the initial injury took place before the amendment to the [Ohio Tort Reform Act] on April 7, 2005, and it did. The fact that Plaintiff did not discover his injury until 2010 brings his Complaint within the statute of limitations.

2011 WL 2517031, \*4. Or, framed another way, DuPont asks this Court to impose a discovery rule into the determination of whether the Ohio Tort Reform Act applies to a cause of action.

As to the determination of the triggering date for application of the Tort Reform Act, many courts have appropriately considered it a distinct concept from the date triggering a statute of limitations, particularly one that incorporates a

---

[15] The most recent decision from this District disagrees with that reasoning. *Liming*, 2012 WL 1957287, at \*3 ("Respectfully, the Court simply disagrees with the *Breg* court and reaffirms the position the Court has taken in its previous pain pump cases: 'the issue is whether the initial injury took place before the amendment to the [Ohio Tort Reform Act] on April 7, 2005, and it did. The fact that Plaintiff did not discover his injury until [2009], brings his Complaint within the statute of limitations.'").

122

discovery rule.  For example, a sister district court explained that "[t]he point at which a cause of action 'arises' can be different from the point at which it 'accrues.' A cause of action 'accrues,' or 'come[s] into existence as an enforceable claim,' when the injured party becomes aware, or reasonably should become aware, of the injury and the cause. . . . a cause of action 'arises' when the act or omission complained of occurs." *Abramson v. P.J. Currier Lumber Co.,* No. 00-315-M, 2001 WL 274772, *1, 2001 U.S. Dist. LEXIS 1039, at *2–3 (D.N.H. Jan. 17, 2001).  Other courts agree with this reasoning and recognize a distinction.  *See, e.g., Kaplan v. Shure Bros.,* 153 F.3d 413, 422 (7th Cir. 1998) ("[A] cause of action can 'arise' before it 'accrues.'"); *Van Den Hul v. Baltic Farmers Elevator Co.,* 716 F.2d 504, 510 n.4 (8th Cir. 1983) (noting that "in certain contexts, the words 'accrue' and 'arise' have significantly different meanings"); *Vine v. Republic of Iraq,* 459 F. Supp.2d 10, 21 (D. D.C. 2006) *reversed in nonrelevant part at* 529 F.3d 1187 (D.C. Cir. 2008) (a claim "arises" on the date that the action in question occurred, yet does not "accrue" until a prior disability to suit is removed); *Heinrich v. Sweet,* 118 F.Supp.2d 73, 79-80 (D. Mass. 2000) (explaining the "subtle, yet important, difference between the two words"); *Adobe Lumber, Inc. v. Hellman,* CIV 05-1510-WBS-PAN, 2008 WL 4615285, *4 (E.D. Cal., Oct. 17, 2008) ("The discovery rule allows claims based on distinct types of wrongdoing to accrue at different times, even though the claims arise out the same injury to a plaintiff.").  Consequently, the Court finds that the discovery rule does not apply to the determination of when a claim arose for purposes of determining whether the Tort Reform Act applies to a cause of action.

*Id.* at 9.

The Court then applied that law to Mrs. Bartlett's situation:

The Court must, therefore, determine when Mrs. Bartlett's injury arose – not when she discovered it was connected to her ingestion of C-8.  DuPont began releasing C-8 into the environment in which Ms. Bartlett lived in the 1950s; she began drinking the water in Tuppers Plains in 1983; and she was diagnosed with kidney cancer in 1997.  Thus, the Court finds that Mrs. Bartlett's injury arose at the very latest in 1997 when she was diagnosed with kidney cancer.  Accordingly, the damages caps encompassed in the Ohio Tort Reform Act do not apply to Mrs. Bartlett's claims.

However, even if DuPont were correct and the test for determining whether the Tort Reform Act applied to Mrs. Bartlett's claims incorporated a discovery rule, her claims still accrued prior to the enactment of the Act.  As discussed in detail above, the Ohio statute of limitations does not define the accrual date only as the date upon which competent medical authority informed a plaintiff that she has an injury related to some toxic chemical exposure, but also incorporates a discovery rule.  The statute provides that "the date on which by the exercise of reasonable diligence the plaintiff should have known that the plaintiff

123

has an injury that is related to the exposure" may also be determinative. Ohio Rev. Code § 2310 (either medical authority information or discovery, "whichever date comes first").

In 2001 Mrs. Bartlett was named as part of a purported class of individuals who drank water contaminated with C-8, which the complaint alleged was a carcinogen. In 2002, it was first revealed in newspaper articles that Tuppers Plains was one of the local water supplies contaminated with C-8. In December 2004 a direct-mailed written notice was sent to all members of the *Leach* Class that explained the *Leach* Settlement Agreement and alerted the members that if they drank water from any impacted local water supply (including Tuppers Plains) for more than one year prior to December 4, 2004, they would be entitled to DuPont's prompt removal of C-8 from such water supplies. The Class Notice also specifically advised Class Members that they may have personal injury and wrongful death claims against DuPont relating to their C-8 exposure. At that same time, there were repeated publications of notice in a dozen local newspapers serving the class area and in two nation-wide publications. There is no genuine issue of material fact on this question.

The Court finds that through the exercise of reasonable diligence any resident of Tupper Plains who was a *Leach* Class Member and who had been diagnosed with kidney cancer in 1997 would have known before April 7, 2005 that her injury was related to her exposure to C-8. Thus, even if this Court were incorrect in its assessment of the date a claim arose for purposes of application of the Tort Reform Act, that Act still would not apply to Mrs. Bartlett's claims.

*Id.* at 10–11.

For the same reasons set forth in DMO 10, the Court finds that the damages caps encompassed in the Ohio Tort Reform Act do not apply to Mrs. Bartlett's claims. Thus, the jury award is not clearly excessive based on application of the Tort Reform Act's damages limitations. Accordingly, the Court **DENIES** DuPont's request for a remittitur.

124

## V.    CONCLUSION

Based on the foregoing, the Court **DENIES** DuPont's Post Trial Motion.  (Bartlett ECF No. 151.)

**IT IS SO ORDERED.**

_2-17-2016_
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**